# EXHIBIT C

AO 106 (SDNY Rev. 01/17)  Application for a Search Warrant



# UNITED STATES DISTRICT COURT
## for the
### Southern District of New York

 

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. |
| See Attached Affidavit and its Attachment A | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attached Affidavit and its Attachment A

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section(s)* | *Offense Description(s)* |
| --- | --- |
| 18 U.S.C. § 1343 | Wire fraud |
| 18 U.S.C. § 1956(a)(1)(B)(i) | Money laundering |
| 18 U.S.C. § 1957 | Engaging in monetary transactions in property derived from specified unlawful activity |

The application is based on these facts:

See Attached Affidavit and its Attachment A

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Nicholas DiMarino
*Applicant's signature*

Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/2/25

City and state: New York, NY

_____
*Judge's signature*

Hon. Barbara Moses, U.S.M.J.
*Printed name and title*

USAO_RINSCH_00043458

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

 

In the Matter of the Application of the United
States Of America for a Search Warrant for the
following electronic devices, which were seized
on or about March 18, 2025, from ▮▮▮▮
▮▮▮▮▮▮ West Hollywood, CA 90046:

    (1) Black Apple iPhone
    (2) Silver Apple iPhone
    (3) Silver MacBook Pro
    (4) Black MacBook
    (5) SanDisk SSD
    (6) LACIE hard drive
    (7) U3 Smart Thumb-Drive

USAO Reference No. 2023R01207

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

    NICHOLAS DiMARINO, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

    1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and am currently assigned to a squad investigating complex financial crimes. I have been a Special Agent since approximately September 2021. During my time with the FBI, I have participated in investigations into criminal offenses involving wire fraud and money laundering and am familiar with the means and methods used to commit such offenses. During the course of those investigations, I have participated in the execution of warrants involving information stored on electronics like cellphones, laptops, and hard drives, and I know how such information can be used to investigate and prosecute fraud and money laundering offenses.

    2.    I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic devices specified below (the

03.13.2025

USAO_RINSCH_00043459

"Subject Devices") for the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B. The Subject Devices

3.      The Subject Devices were all seized by law enforcement officers on or about March 18, 2025, from ████████████████████ West Hollywood, CA 90046 (the "Apartment"), and are particularly described as follows:

a.      A black-colored Apple iPhone (the "Black iPhone"). The Black iPhone was seized from the person of CARL RINSCH. Below are photographs of the Black iPhone.

 

b.      A silver-colored Apple iPhone (the "Silver iPhone"). The Silver iPhone was seized from a counter in the kitchen area of the Apartment. Below are photographs of the Silver iPhone.

03.13.2025

USAO_RINSCH_00043460

 

    c.     A silver-colored MacBook Pro laptop (the "Silver MacBook") with serial number ███████████ The Silver MacBook was seized from a couch in the living-room area of the Apartment. Below is a photograph of the Silver MacBook.



    d.     A MacBook laptop in a black-colored case (the "Black MacBook"). The Black MacBook was seized from a couch in the living-room area of the Apartment. Below is a photograph of the Black MacBook.



03.13.2025

USAO_RINSCH_00043461

e.    A silver-colored SanDisk SSD hard drive, with approximately 4 terabytes of storage space ("Hard Drive-1"). Hard Drive-1 was seized from a table in the kitchen area of the Apartment. Below is a photograph of Hard Drive-1; in the photograph, Hard Drive-1 is partially covered by what appears to be a user manual for the drive.



f.    A LACIE hard drive with an orange-colored rubber bumper guard ("Hard Drive-2"). Hard Drive-2 was seized from a table in the kitchen area of the Apartment. Below is a photograph of Hard Drive-2.



g.    A U3 Smart Thumb-Drive, with approximately 2 gigabytes of storage space ("Hard Drive-3"). Hard Drive-3 was seized from a black backpack that was found in the kitchen area of the Apartment. Below is a photograph of Hard Drive-3.

03.13.2025

USAO_RINSCH_00043462



4.    Based on my training, experience, and research, I know that the Subject Devices have the following capabilities, among others:

a.    The Black iPhone and the Silver iPhone have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs.

b.    The Silver MacBook and the Black MacBook are laptop computers, which have the capability to send and receive emails and text and instant messages, browse the internet, edit video and audio files, and draft text files.

c.    Hard Drive-1, Hard Drive-2, and Hard Drive-3 are hard drives that have the capability to store electronic information and records, including PDFs, video files, word documents, and email files.

5.    The Subject Devices are presently located in the Southern District of New York in FBI custody.

### C. The Subject Offenses

6.    For the reasons detailed below, I submit that there is probable cause to believe that the Subject Devices contains evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud), 1956(a)(1)(B)(i) (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity) (collectively, the "Subject Offenses").

03.13.2025

USAO_RINSCH_00043463

## II. Probable Cause

7.    On or about March 4, 2025, a grand jury sitting in this district returned an indictment charging CARL RINSCH with the Subject Offenses. Then, on or about March 14, 2025, the Hon. Brianna Fuller Mircheff, United States Magistrate Judge, Central District of California, authorized warrants permitting law enforcement officers to search the Apartment and the person of CARL RINSCH for evidence of the Subject Offenses (the "March 14 Warrants"). The March 14 Warrants, and the accompany agent affidavits, are attached as Exhibits A and B, and are incorporated herein.

8.    Each of the Subject Devices was seized pursuant to the March 14 Warrants. Specifically, although the March 14 Warrants did not authorize law enforcement to search through electronically stored information, they expressly permitted law enforcement to seize any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses.

### A. Probable Cause Regarding the Subject Offenses

9.    CARL RINSCH is a film and television writer and director. In or about 2018, the streaming company Netflix agreed to purchase a television show that RINSCH was developing called "White Horse." In or about early 2020, in response to requests from RINSCH for additional funding to help complete the show, Netflix agreed to send RINSCH $11 million, on the condition that this money be spent producing White Horse. Shortly after receiving that money, RINSCH routed Netflix's funds, through a series of transfers, into his personal brokerage account. RINSCH then lost millions speculating on stock options and other securities. Over the following years, RINSCH invested what remained of Netflix's money in cryptocurrency, and spent his returns from those investments on things like high-end furniture and mattresses, luxury vehicles, and legal fees.

USAO_RINSCH_00043464

The Indictment charges RINSCH with having committed the Subject Offenses in connection with his request for and misuse of the $11 million.

10.    The evidence in this case and relied upon below is based upon, among other things, (i) records provided by Netflix detailing the negotiations and terms between RINSCH and Netflix as regards White Horse, including a November 2018 term sheet, as well as other communications and emails between the parties; (ii) financial records for various bank and investment accounts held in the names of RINSCH, Home VFX (RINSCH's production company), or other related entities, which show how RINSCH spent the funds Netflix sent him for the production of White Horse; and (iii) transcripts of testimony provided by various Netflix executives and RINSCH himself during an arbitration between Netflix and RINSCH related to White Horse.

11.    Based on my review of those records and testimony, I have learned, in substance and in part, the following:

a.    In or about 2016 and 2017, RINSCH, began filming White Horse.  White Horse was a science fiction television show about a scientist who created a group of superintelligent clones.  Those clones were banished to a walled area in a Brazilian city, where they began developing advanced technology and came into conflict with humans and each other. "White Horse" is a reference to one of four horsemen of the apocalypse, who rides a white horse.

b.    The production and filming of White Horse was initially funded by two media companies.  While working with those media companies, RINSCH, largely completed approximately six short-form episodes of White Horse, which were each between approximately four and ten minutes.

c.    In or about 2018, RINSCH began negotiating with numerous film and television streaming platforms about purchasing White Horse.  RINSCH hoped to reach an

USAO_RINSCH_00043465

agreement with a streaming platform in which it would pay RINSCH for the existing episodes of White Horse and also fund completion of the remaining footage that, along with the already completed episodes, would comprise the first season of White Horse.

        d.      In or about 2018, RINSCH reached such a deal with Netflix. RINSCH entered into the deal through his production company, Home VFX, which handled the filming of White Horse.

        e.      Between in or about June 2018 and October 2019, Netflix paid approximately $44 million for White Horse. The majority of those funds were transferred to Home VFX, while some of the funds were paid to other parties that had been involved in the production of the existing episodes of White Horse.

        f.      Between in or about late 2019 and in or about early 2020, RINSCH requested additional money from Netflix to complete the filming of White Horse. Between on or about March 4, 2020 and March 5, 2020, RINSCH and Netflix engaged in substantial negotiations over email about how exactly RINSCH would use the funds to work on White Horse. On or about March 5, 2020, Netflix agreed to send RINSCH an additional $11 million, the entirety of which was to be spent on completing White Horse. In particular, the parties agreed that the additional $11 million paid by Netflix was to be used for various and pre-and post-production projects, such as storyboarding; art, makeup, and costume design; paying actors, artists, and crew members; and editing footage that had already been shot.

        g.      On or about March 6, 2020, Netflix transferred approximately $11 million to a bank account in the name of Home VFX. But rather than use those funds to complete White Horse, RINSCH quickly transferred those funds through numerous different bank accounts held in the name of either Home VFX, the "Carl Erik Rinsch Trust," or RINSCH himself, before

03.13.2025

USAO_RINSCH_00043466

consolidating approximately $10.5 million of the funds in a personal brokerage account managed

by Charles Schwab & Co., Inc. on or about March 30, 2020. Specifically, based on a review of

records for various financial accounts, I have learned that RINSCH engaged in the following series

of transactions in quick succession:

- On or about March 6, 2020, Netflix wired approximately $11 million to a bank account in Home VFX's name ("Home VFX Account-1").

- Around three days later, on or about March 9, 2020, RINSCH opened another bank account in Home VFX's name ("Home VFX Account-2") and wired approximately $10.5 million into that account from Home VFX Account-1.

- Around a week later, on or about March 16, 2020, RINSCH wired approximately $8 million from Home VFX Account-2 into an account with Wells Fargo Advisors in the name of the "Carl Erik Rinsch Trust" (the "Trust Account").

- Later that month, on or about March 30, 2020, RINSCH wired approximately $2 million from Home VFX Account-2 and another approximately $8.5 million from the Trust Account into a newly opened brokerage account with Charles Schwab.

Based on my training and experience investigating money laundering and other fraud offenses, I

have learned that one effect of quickly routing money through a series of different financial

accounts is that it can make it more difficult to trace the location of money or to determine the

origin of certain funds.

        h.    Almost immediately after these transfers, on or about March 31, 2020,

RINSCH made a number of extremely risky purchases of securities from his Charles Schwab

brokerage account, including call options on a biopharmaceutical company, and put options on an

exchange traded fund that tracks the S&P 500 index. In emails that RINSCH sent to his investment

advisor just days before making those investments, RINSCH referred to these trades as

"aggressive" and "highly speculative," and he acknowledged that he was "enter[ing] [the

investments] fully accepting to lose it all." Examples of trades RINSCH made out of his brokerage

account with Charles Schwab include the following, all of which were made on or about March 31,

03.13.2025

USAO_RINSCH_00043467

2020: (i) an approximately $341,000 transaction to purchase put options connected to the SPDR S&P 500 ETF trust; (ii) an approximately $168,000 transaction to purchase put options connected to the SPDR S&P 500 ETF; and (iii) an approximately $26,000 transaction to purchase call options connected to shares of Gilead Sciences, Inc. RINSCH's trades were not successful, and in less than two months after receiving $11 million from Netflix, RINSCH had lost more than half of those funds.

    i.  While RINSCH was in the process of losing most of the $11 million intended to complete White Horse, he falsely informed Netflix that White Horse was progressing well. For example, the following are excerpts of select text messages that RINSCH sent to Netflix executive Cindy Holland—one of the senior-most Netflix executives overseeing the White Horse project—over the weeks following the payment of the $11 million and RINSCH's misuse of that money:

- **March 8, 2020:** "On our end, we are prepared and have planned for what I have described as a 'tunnel.' So there is no need to worry. We are moving forward with preproduction and at 100% effectivity. We will be on track to shoot end of July and present in 5 weeks."

- **March 10, 2020:** "As it pertains to our business, we continue moving forward diligently."

- **April 20, 2020:** "By the way, don't worry about the show. It's awesome and moving forward really well."

- **April 20, 2020:** "It's other level."

- **April 20, 2020:** "Don't worry. Game changing good. And hasn't stopped (or even slowed down) while I've been handling 'other stuff.'"

I submit that there is probable cause to conclude that those messages were sent with the intent to reassure Netflix that RINSCH was using the funds to complete White Horse, and to conceal his fraud.

USAO_RINSCH_00043468

j.     Even after losing most of the $11 million, RINSCH still did not spend the remaining funds he had stolen on White Horse. Instead, between in or about February 2021 and in or about May 2021, RINSCH transferred nearly all the remaining Netflix funds to a cryptocurrency exchange account that was also in his own name. RINSCH then used those funds to speculate on cryptocurrency—which eventually proved profitable.

k.     Between in or about June 2021 and in or about November 2022, RINSCH transferred Netflix's funds from the cryptocurrency exchange to yet another personal bank account held at Bank of America. RINSCH then spent millions on personal expenses and luxury items, including but not limited to (i) approximately $1,787,000 on credit card bills; (ii) approximately $1,073,000 on lawyers; (iii) approximately $395,000 to stay at the Four Seasons hotel and at various luxury rental properties; (iv) approximately $3,787,000 on furniture and antiques; (v) approximately $2,417,000 to purchase high-end cars; and (vi) approximately $652,000 on watches and clothing.

l.     RINSCH never completed White Horse and never returned the fraudulently obtained funds to Netflix.

## B. Probable Cause Justifying Search of the Subject Devices

12.     Based on my training and experience, I know that individuals who engage in the Subject Offenses will often have records relating to their illegal activity stored on devices like cellphones and laptops. Such records can include, for example, (i) communications with their victims, including false representations made to the victims; (ii) communications with others about the proceeds of their crime, including how they intend to hide or spend that money; and (iii) records of illegal financial transactions using stolen funds. In addition, I know that devices like hard drives and thumb drives can be used to store numerous types of records. For instance, I know that those sorts of devices can be used to store video footage.

USAO_RINSCH_00043469

13.    There is probable cause to believe that evidence and fruits of the Subject Offenses, including the sorts of evidence described above, will be found on the Subject Devices.

14.    To start, there is probable cause to conclude that the Subject Devices belong to or are used by CARL RINSCH.

a.    The Subject Devices were all seized from the Apartment, pursuant to the March 14 Warrants, on or about March 18, 2025.

b.    There is also reason to believe that RINSCH was living at the Apartment at that time. In addition to location information associated with his cellphone and food delivery records, *see, e.g.,* Ex. A ¶¶ 23–28, RINSCH was found at the Apartment at approximately 6 AM that morning, when I would expect that many people would be at their residence. Based on a discussion with a law enforcement officer who participated in that search, I also know that there were no indications of someone other than RINSCH living at the Apartment, that RINSCH was the only person present that morning, and that, according to the manager for the Apartment's building, RINSCH is the only person on the lease for his unit.[1]

c.    Given that the Subject Devices were found at RINSCH's residence, and given that there was no indication that others lived at the residence with RINSCH, I submit that there is probable cause to conclude that the Subject Devices belong to or are used by RINSCH.

15.    There is also reason to believe that CARL RINSCH used electronic devices to further the Subject Offenses. For example, as described above, RINSCH repeatedly sent emails

---

[1] The Apartment has two bedrooms, but, based on my conversations with a law enforcement officer who participated in the search, I understand that it did not appear as though a second person was living in that other bedroom.

03.13.2025

and text messages to Netflix employees to request additional funding for White Horse, *see* Paragraph 10(f), and to offer reassurances that the show's production was moving forward as planned after he had already stolen Netflix's money, *see* Paragraph 10(i). RINSCH also corresponded with his financial advisors over email to discuss the investments he would ultimately make with the money that he stole from Netflix. *See* Paragraph 10(h).

16.    To be sure, the Subject Offenses occurred several years ago, and records produced by Apple Inc. and AT&T Corporation indicate that CARL RINSCH has changed cellphones since that time.[2] Nevertheless, there is still reason to conclude that evidence of the Subject Offenses will be found on the Subject Devices:

a.    Based on my training and experience, I know that many people back up files from their cellphone or laptop and can upload those files to a new device. For example, data on smartphones like an Apple iPhone—including messages, emails, photographs, etc.—can be backed up to an online account, like an Apple-offered iCloud account or a Google account, and then synced to a second cellphone or device. So even when someone replaces one cellphone with another cellphone, it is possible for that second cellphone to retain information or data that was on the first cellphone. Moreover, I know, based on experience, that it is common for people to sync data in this fashion, as it makes changing devices less disruptive.

---

[2] Records produced by Apple and AT&T for accounts registered in CARL RINSCH's name (and associated with the same phone number RINSCH used to contact Netflix executives) show that he has owned multiple Apple iPhones over the years. Moreover, AT&T toll records indicate that the International Mobile Equipment Identity ("IMEI") number associated with the cellphone RINSCH is using has changed since in or about 2020. As an IMEI number is associated with a particular mobile device, this suggests that RINSCH is now using a different cellphone than he used in 2020.

USAO_RINSCH_00043471

b.      AT&T records reflect that the phone number RINSCH used to contact Netflix executives has consistent been connected to IMEI numbers associated with Apple iPhones. Accordingly, RINSCH is believed to have been using Apple devices both now and during the period when the Subject Offenses were occurring. Among the Subject Devices are two Apple iPhones and two Apple-manufactured MacBook laptops. As noted above, information stored on an Apple device—like an Apple iPhone or Apple MacBook— can be backed up or synced using online accounts like iCloud. Given that fact, there is reason to believe that the Subject Devices may contain data from the device that RINSCH was using during the commission of the Subject Offenses.

c.      Moreover, even without backing up data from an old device itself, it is possible that one or more of the Subject Devices are logged into online accounts that RINSCH was using while committed the Subject Offenses. For instance, when emailing Netflix or his financial advisors, RINSCH typically used the email address ███████████████ Based on records produced by Apple Inc. and Google LLC pursuant to grand jury subpoenas, I know that RINSCH's Runbox email address continues to be associated with his Apple and Google accounts.[3] I also know, based on my training and experience, that many people use their cellphones and laptops to send and receive emails, and will do so with email accounts connected to online services like those managed by Apple and Google. Accordingly, there is reason to believe that certain of the Subject Devices will be connected to RINSCH's Runbox email account. If such a connection exists, there is reason to believe that messages sent and received by that account will be accessible

---

[3] With respect to RINSCH's Google account in particular, the Runbox email account is listed as a recovery email address, rather than the account's primary email address.

03.13.2025

USAO_RINSCH_00043472

on the connected Subject Devices, even messages sent from another device (such as an old cellphone).

17.    Lastly, with respect to Hard Drive-1, Hard Drive-2, and Hard Drive-3, I know that these are the sorts of devices on which people will often store large files, such as video files, including video files that are in the process of being edited. Here, that could include footage that RINSCH shot of White Horse but never delivered to Netflix. That sort of footage would be relevant to the Government's investigation of the Subject Offenses for numerous reasons, including because it may be relevant to showing what work, if any, RINSCH did on White Horse after receiving the $11 million from Netflix.

18.    Computer files or remnants of such files can be recovered months or even years after they have been created or saved on an electronic device such as the Subject Devices. Even when such files have been deleted, they can often be recovered, depending on how the hard drive has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve from information from the Subject Devices depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits.

19.    Based on the foregoing, I respectfully submit there is probable cause to believe that CARL RINSCH engaged in the Subject Offenses, and that there is probable cause to believe that evidence of this criminal activity will be found on the Subject Devices.

### III.  Procedures for Searching ESI

#### A.  Review of ESI

20.    Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government

USAO_RINSCH_00043473

control) will review the ESI contained on the Subject Device for information responsive to the warrant.

21.    In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- scanning storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[4];

- using document review programs, including machine learning enabled software; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the electronic device, or a file, was used.

22.    Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Device to locate all data responsive to the warrant.

---

[4] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

03.13.2025

USAO_RINSCH_00043474

## B.  Return of the Subject Device

23.    If the Government determines that the Subject Device is no longer necessary to retrieve and preserve the data on the device, and that the Subject Device is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Device, upon request.  Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

*[Remainder of the page intentionally left blank]*

03.13.2025

USAO_RINSCH_00043475

## IV.  Conclusion and Ancillary Provisions

24.    Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

25.    In light of the confidential nature of the scope of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

NICHOLAS DIMARINO
Special Agent
Federal Bureau of Investigation

Sworn to before me this ___2d___ day of April, 2025

HON. BARBARA MOSES
United States Magistrate Judge
Southern District of New York

18

03.13.2025

## Attachment A

### I.  Devices Subject to Search

The devices that are the subject of this search warrant (the "Subject Devices") were all seized by law enforcement officers on or about March 18, 2025, from ████████ ██ West Hollywood, CA 90046, and are described as follows:

a.    A black-colored Apple iPhone (the "Black iPhone"). The Black iPhone was seized from the person of CARL RINSCH. Below are photographs of the Black iPhone.

 

b.    A silver-colored Apple iPhone (the "Silver iPhone"). The Silver iPhone was seized from a counter in the kitchen area of the Apartment. Below are photographs of the Silver iPhone.

 

c.    A silver-colored MacBook Pro laptop (the "Silver MacBook") with serial number ████████ The Silver MacBook was seized from a couch in the living-room area of the Apartment. Below is a photograph of the Silver MacBook.



03.13.2025

     d.    A MacBook laptop in a black-colored case (the "Black MacBook"). The Black MacBook was seized from a couch in the living-room area of the Apartment. Below is a photograph of the Black MacBook.



     e.    A silver-colored SanDisk SSD hard drive, with approximately 4 terabytes of storage space ("Hard Drive-1"). Hard Drive-1 was seized from a table in the kitchen area of the Apartment. Below is a photograph of Hard Drive-1; in the photograph, Hard Drive-1 is partially covered by what appears to be a user manual for the drive.



     f.    A LACIE hard drive with an orange-colored rubber bumper guard ("Hard Drive-2"). Hard Drive-2 was seized from a table in the kitchen area of the Apartment. Below is a photograph of Hard Drive-2.



2

USAO_RINSCH_00043478

g.    A U3 Smart Thumb-Drive, with approximately 2 gigabytes of storage space ("Hard Drive-3"). Hard Drive-3 was seized from a black backpack that was found in the kitchen area of the Apartment. Below is a photograph of Hard Drive-3.



## II.  Review of ESI on the Subject Devices

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, outside technical experts under government control, and software tools) are authorized to review the electronically stored information ("ESI") contained on the Subject Devices for information identified in Section III, below.  In conducting this review, law enforcement personnel may use various techniques to locate data responsive to the warrant, including, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation

- using document review programs, including machine learning enabled software; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Section III of this Attachment.  However, law enforcement personnel are authorized to conduct a complete

03.13.2025

USAO_RINSCH_00043479

review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant; and law enforcement personnel may make copies of the Subject Device, and data stored within, to effectuate their review.

## III.  Data to Be Seized

The data to be seized from the Subject Devices consist of the following evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering), and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity) (the "Subject Offenses"), described as follows:

1.    Evidence concerning Carl Rinsch's communications, representations, and omissions with respect to his contractual relationship with Netflix regarding White Horse, including communications sent over text message and email;

2.    Evidence concerning the negotiation and execution of Carl Rinsch's agreements with Netflix, including but not limited to the November 2018 term sheet and the March 2020 amendment;

3.    Evidence of any work or lack of work performed on White Horse, including but not limited to audio or video footage; photography; sketches or drawings; costumes; props; storyboarding; or records of payments to actors, artists, and crew members;

4.    Evidence concerning Carl Rinsch's misuse of funds received from Netflix in or about March 2020, including but not limited to information regarding Rinsch's registration for and use of online brokerage and cryptocurrency platforms during and around the time of the Subject Offenses;

5.    Evidence concerning fraudulent purchases Carl Rinsch made with the money received from Netflix in or about March 2020, including but not limited to invoices, receipts, records, and correspondence with various vendors;

6.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies following in or about March 2020;

7.    Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses;

8.    The location of other evidence relating to the commission of the Subject Offenses, including information about other devices or online accounts containing evidence of the scheme; and

9.    Any files or records needed to access the data stored on the Subject Devices not limited to any login credentials, passwords, private encryption keys, or similar information.

10.    Any files or records that may facilitate a forensic examination of the Subject Devices, including any hardware or software manuals or other information concerning the configuration of the Subject Devices or files and folders stored within the Subject Devices.

4

03.13.2025

USAO_RINSCH_00043480

# EXHIBIT A

USAO_RINSCH_00043481

AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

In the Matter of the Search of )
)
████████████ )
*West Hollywood, CA 90046,* )          Case No. **2:25-MJ-01479**
*as described more fully in Attachment A-1.* )
)
)
)
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return
through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*

☐ for_____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      **March 14, 2024 at 5:47 p.m.**          *Bminry*
_____          _____
                                                    *Judge's signature*

City and state:      Los Angeles, CA          Hon. Brianna F. Mircheff, U.S. Magistrate Judge
                                               *Printed name and title*

AUSA:      William Larsen (x0298)

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

USAO_RINSCH_00043483

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

A residence located at ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ West
Hollywood, CA 90046, and all closed and locked containers
located therein (the "Subject Premises"). The Subject Premises
is a two-bedroom, two-bathroom private apartment located on the
first floor within a private luxury apartment complex. The
exterior of the Subject Premises is a white building with black-
framed windows. In front of the exterior of the Subject
Premises is an address sign that reads ▆▆▆▆▆ Below is a
photograph of the Subject Premises:



The items to be seized from the Subject Premises also
include any computer devices, cellphones and storage media that
may contain any electronically stored information falling within
the categories set forth in Attachment B, including, but not

i

limited to, desktop and laptop computers, cellphones, thumb drives, portable hard drives, discs, and personal digital assistants.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

USAO_RINSCH_00043485

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, fruits, or
instrumentalities of violations of the crimes of wire fraud, in
violation of 18 U.S.C. § 1343, money laundering, in violation of
18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary
transactions in property derived from specified unlawful
activity, in violation of 18 U.S.C. § 1957, in connection with
RINSCH's theft of $11 million from Netflix, which was awarded to
him based on his false representations that the money would be
used to fund completion of a television show (the "Subject
Offenses"), from January 1, 2016 to the present, namely:

a.   Evidence concerning RINSCH's communications,
representations, and omissions with respect to his contractual
relationship with Netflix regarding White Horse, including
communications on digital devices;

b.   Evidence concerning the negotiation and execution
of RINSCH's agreements with Netflix, including but not limited
to the November 2018 term sheet and the March 2020 email
amendment;

c.   Evidence of any work or lack of work performed on
White Horse, including but not limited to audio or video
footage; photography; sketches or drawings; costumes; props;
storyboarding; or records of payments to actors, artists, and
crewmembers;

d.   Evidence concerning RINSCH's misuse of funds
received from Netflix, including but not limited to information

v

USAO_RINSCH_00043486

regarding RINSCH's registration for and use of online brokerage and cryptocurrency platforms during and around the time of the Subject Offenses;

   e.    Evidence concerning fraudulent purchases RINSCH made with the money received from Netflix, including but not limited to invoices, receipts, records, and correspondence with various vendors;

   f.    Luxury items that were purchased with the money received from Netflix, including Frette luxury bedding and a Vacheron Constantin wristwatch, S/N 30110/0009-B108;

   g.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies;

   h.    Evidence related to other accounts, devices, or physical premises where evidence of the commission of the Subject Offenses may be found;

   i.    The location of other evidence relating to the commission of the Subject Offenses, including information about other devices or online accounts containing evidence of the scheme;

   j.    Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses;

   k.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies; and

USAO_RINSCH_00043487

1.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.    During the execution of this search warrant, law enforcement is permitted to: (1) depress RINSCH's thumb- and/or fingers onto the fingerprint sensor of the digital device (only

USAO_RINSCH_00043488

when the device has such a sensor), and direct which specific
finger(s) and/or thumb(s) shall be depressed; and (2) hold the
device in front of RINSCH's face with his eyes open to activate
the facial-, iris-, or retina-recognition feature, in order to
gain access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

    5.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

USAO_RINSCH_00043489

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | **FILED**<br>CLERK, U.S. DISTRICT COURT<br>Mar. 14, 2025<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ch DEPUTY |
| West Hollywood, CA 90046, as described more<br>fully in Attachment A-1. | ) | Case No. **2:25-MJ-01479** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1343, 1956, and 1957 | Wire fraud, money laundering, and engaging in unlawful monetary transactions |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

*/s/ Nicholas DiMarino, FBI SA*
_____
*Applicant's signature*

Nicholas DiMarino, FBI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___March 14, 2025___

City and state: Los Angeles, CA

_____
*Judge's signature*
Hon. Brianna Fuller Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: William Larsen (x0298)

USAO_RINSCH_00043490

## ATTACHMENT A-1

<u>PREMISES TO BE SEARCHED</u>

A residence located at ███████████████████████ West Hollywood, CA 90046, and all closed and locked containers located therein (the "Subject Premises"). The Subject Premises is a two-bedroom, two-bathroom private apartment located on the first floor within a private luxury apartment complex. The exterior of the Subject Premises is a white building with black-framed windows. In front of the exterior of the Subject Premises is an address sign that reads ████████ Below is a photograph of the Subject Premises:



The items to be seized from the Subject Premises also include any computer devices, cellphones and storage media that may contain any electronically stored information falling within the categories set forth in Attachment B, including, but not

i

USAO_RINSCH_00043491

limited to, desktop and laptop computers, cellphones, thumb
drives, portable hard drives, discs, and personal digital
assistants.  In lieu of seizing any such computer devices or
storage media, this warrant also authorizes the copying of such
devices or media for later review.

USAO_RINSCH_00043492

<u>ATTACHMENT B</u>

## I.    <u>ITEMS TO BE SEIZED</u>

1.    The items to be seized are evidence, fruits, or instrumentalities of violations of the crimes of wire fraud, in violation of 18 U.S.C. § 1343, money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957, in connection with RINSCH's theft of $11 million from Netflix, which was awarded to him based on his false representations that the money would be used to fund completion of a television show (the "Subject Offenses"), from January 1, 2016 to the present, namely:

a.    Evidence concerning RINSCH's communications, representations, and omissions with respect to his contractual relationship with Netflix regarding White Horse, including communications on digital devices;

b.    Evidence concerning the negotiation and execution of RINSCH's agreements with Netflix, including but not limited to the November 2018 term sheet and the March 2020 email amendment;

c.    Evidence of any work or lack of work performed on White Horse, including but not limited to audio or video footage; photography; sketches or drawings; costumes; props; storyboarding; or records of payments to actors, artists, and crewmembers;

d.    Evidence concerning RINSCH's misuse of funds received from Netflix, including but not limited to information

v

USAO_RINSCH_00043493

regarding RINSCH's registration for and use of online brokerage and cryptocurrency platforms during and around the time of the Subject Offenses;

e.    Evidence concerning fraudulent purchases RINSCH made with the money received from Netflix, including but not limited to invoices, receipts, records, and correspondence with various vendors;

f.    Luxury items that were purchased with the money received from Netflix, including Frette luxury bedding and a Vacheron Constantin wristwatch, S/N 30110/0009-B108;

g.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies;

h.    Evidence related to other accounts, devices, or physical premises where evidence of the commission of the Subject Offenses may be found;

i.    The location of other evidence relating to the commission of the Subject Offenses, including information about other devices or online accounts containing evidence of the scheme;

j.    Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses;

k.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies; and

USAO_RINSCH_00043494

1.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.    During the execution of this search warrant, law enforcement is permitted to: (1) depress RINSCH's thumb- and/or fingers onto the fingerprint sensor of the digital device (only

vii

when the device has such a sensor), and direct which specific
finger(s) and/or thumb(s) shall be depressed; and (2) hold the
device in front of RINSCH's face with his eyes open to activate
the facial-, iris-, or retina-recognition feature, in order to
gain access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

     5.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

USAO_RINSCH_00043496

## AFFIDAVIT

I, NICHOLAS DIMARINO, being duly sworn, declare and state as
follows:

### I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of an application
for warrants to search a residence located at ██████████
██████████ West Hollywood, CA 90046, and all closed and
locked containers located therein (the "Subject Premises"), as
described more fully in Attachment A-1, and the person of CARL
ERIK RINSCH, date of birth, █████████ 1977 (hereinafter, the
"Subject Person" or "RINSCH"), including any personal effects,
baggage, cellphones and electronic devices within the
possession, custody, and control of RINSCH at the time of the
execution of the requested warrant, as described more fully in
Attachment A-2.

2.  The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of the crimes of
wire fraud, in violation of 18 U.S.C. § 1343, money laundering,
in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in
monetary transactions in property derived from specified
unlawful activity, in violation of 18 U.S.C. § 1957, in
connection with RINSCH's theft of $11 million from Netflix,
which was awarded to him based on his false representations that
the money would be used to fund completion of a television show
(collectively, the "Subject Offenses"), as described more fully

in Attachment B.[1]  Attachments A-1, A-2, and B are incorporated
herein by reference.

    3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant,
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

    4.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and am currently assigned to a squad
investigating complex financial crimes in the Southern District
of New York.  I have been a Special Agent since approximately
September 2021.  During my time with the FBI, I have
participated in investigations into criminal offenses involving
wire fraud and money laundering and am familiar with the means
and methods used to commit such offenses.  During the course of
these investigations, I have participated in the execution of
numerous search warrants involving premises and digital devices.

---

[1] With respect to digital devices, the requested warrant
seeks authorization only to seize such devices as outlined in
Exhibit B.  To the extent necessary, the Government will obtain
a separate warrant authorizing the search of any seized digital
devices and establishing a search procedure.

2

USAO_RINSCH_00043498

### III. SUMMARY OF PROBABLE CAUSE

5.    CARL RINSCH is a film and television writer and director.  In or about 2018, the streaming company Netflix agreed to purchase a television show that RINSCH was developing called "White Horse."  In or about early 2020, in response to requests from RINSCH for additional funding to help complete the show, Netflix agreed to send RINSCH $11 million, on the condition that this money be spent producing White Horse. Shortly after receiving that money, RINSCH routed Netflix's funds, through a series of transfers, into his personal brokerage account.  RINSCH then lost millions speculating on stock options and other securities. Over the following years, RINSCH invested what remained of Netflix's money in cryptocurrency, and spent his returns from those investments on things like high-end furniture and mattresses, luxury vehicles, and legal fees.

6.    On or about March 4, 2025, a grand jury sitting in the Southern District of New York returned an indictment charging RINSCH with the Subject Offenses in Case No. 25 Cr. 85 (the "Indictment").  That same day, a warrant was issued for RINSCH's arrest, which is still outstanding.  The Indictment is attached hereto as Exhibit A and incorporated by reference herein.  The Indictment charges RINSCH with having committed the Subject Offenses in connection with his fraudulent request for and misuse of the $11 million.

7.    RINSCH currently resides at the Subject Premises.  The government previously obtained a search warrant for RINSCH's

3

USAO_RINSCH_00043499

historical and prospective cellphone location data, which has
consistently placed RINSCH at the Subject Premises. RINSCH's
phone was pinging at the Subject Premises as recently as March
14, 2025, among additional evidence described below placing
RINSCH at the Subject Premises. RINSCH used several digital
devices to carry out the Subject Offenses, which, based on my
training and experience, I expect to be located either at the
Subject Premises or on RINSCH's person.

### IV. STATEMENT OF PROBABLE CAUSE

8.   Based on my review of (i) records provided by Netflix
detailing the negotiations and terms between RINSCH and Netflix
regarding White Horse, including a November 2018 term sheet, as
well as other communications and emails between the parties;
(ii) financial records for various bank and investment accounts
held in the names of RINSCH, Home VFX, or other related
entities, which show how RINSCH spent the funds Netflix sent him
for the production of White Horse; and (iii) transcripts of
testimony provided by various Netflix executives and RINSCH
himself during an arbitration between Netflix and RINSCH related
to White Horse, as well as my conversations with other law
enforcement agents regarding the same, I have learned, in
substance and in part, the following.

### A.   RINSCH Enters Into a Contract with Netflix to Produce a Television Show Called White Horse

9.   In or about 2016, RINSCH began filming White Horse.
White Horse was a science fiction television show about a
scientist who created a group of superintelligent clones. Those

USAO_RINSCH_00043500

clones were banished to a walled area in a Brazilian city, where they began developing advanced technology and came into conflict with humans and each other. "White Horse" is a reference to one of four horsemen of the apocalypse, who rides a white horse.

10. The production and filming of White Horse was initially funded by two media companies. While working with those media companies, RINSCH largely completed approximately six short-form episodes of White Horse, which were each between approximately four and ten minutes each.

11. In or about 2018, RINSCH began negotiating with numerous film and television streaming platforms about purchasing White Horse. RINSCH sought to reach an agreement with a streaming platform in which it would pay RINSCH for the existing episodes of White Horse and also fund completion of the remaining footage that, along with the already completed episodes, would comprise the first season of White Horse.

12. In or about 2018, RINSCH reached such a deal with Netflix. RINSCH entered into the deal through his production company, Home VFX, which handled the filming of White Horse.

13. Between in or about June 2018 and October 2019, Netflix paid approximately $44 million for White Horse. The majority of those funds were transferred to Home VFX, while some of the funds were paid to other parties that had been involved in the production of the existing episodes of White Horse.

14. Between in or about late 2019 and in or about early 2020, RINSCH requested additional money from Netflix to complete the filming of White Horse. Between on or about March 4, 2020,

USAO_RINSCH_00043501

and March 5, 2020, RINSCH and Netflix engaged in substantial negotiations over email about how exactly RINSCH would use the funds to work on White Horse.  On or about March 5, 2020, Netflix agreed to send RINSCH an additional $11 million, the entirety of which was to be spent on completing White Horse.  In particular, the parties agreed that the additional $11 million paid by Netflix was to be used for various and pre-and post-production projects, such as storyboarding; art, makeup, and costume design; paying actors, artists, and crew members; and editing footage that had already been shot.

> **B.    Instead of Using the Funds from Netflix to Make White Horse, RINSCH Made Speculative and Unsuccessful Investments**

15.  On or about March 6, 2020, Netflix transferred approximately $11 million to a bank account in the name of Home VFX.  But rather than use those funds to complete White Horse, RINSCH quickly transferred those funds through numerous different bank accounts held in the name of either Home VFX, the "Carl Erik Rinsch Trust," or RINSCH himself, before consolidating approximately $10.5 million of the funds in a personal brokerage account managed by Charles Schwab & Co., Inc. on or about March 30, 2020. Specifically, based on a review of records for various financial accounts, I have learned that RINSCH engaged in the following series of transactions in quick succession:

- On or about March 6, 2020, Netflix wired approximately $11 million to a bank account in Home VFX's name ("Home VFX Account-1").

USAO_RINSCH_00043502

- Approximately three days later, on or about March 9, 2020, RINSCH opened another bank account in Home VFX's name ("Home VFX Account-2") and wired approximately $10.5 million into that account from Home VFX Account-1.

- Around a week later, on or about March 16, 2020, RINSCH wired approximately $8 million from Home VFX Account-2 into an account with Wells Fargo Advisors in the name of the "Carl Erik Rinsch Trust" (the "Trust Account").

- Later that month, on or about March 30, 2020, RINSCH wired approximately $2 million from Home VFX Account-2 and another approximately $8.5 million from the Trust Account into a newly opened brokerage account with Charles Schwab.

16.  Based on my training and experience investigating money laundering and other fraud offenses, I have learned that one effect of quickly routing money through a series of different financial accounts is that it can make it more difficult to trace the location of money or to determine the origin of certain funds.

17.  Almost immediately after these transfers, on or about March 31, 2020, RINSCH made a number of extremely risky purchases of securities from his Charles Schwab brokerage account, including call options on a biopharmaceutical company, and put options on an exchange traded fund that tracks the S&P 500 index.  In emails that RINSCH sent to his investment advisor just days before making those investments, RINSCH referred to these trades as "aggressive" and "highly speculative," and he

7

USAO_RINSCH_00043503

acknowledged that he was "enter[ing] [the investments] fully accepting to lose it all." Examples of trades RINSCH made out of his brokerage account with Charles Schwab include the following, all of which were made on or about March 31, 2020: (i) an approximately $341,000 transaction to purchase put options connected to the SPDR S&P 500 ETF trust; (ii) an approximately $168,000 transaction to purchase put options connected to the SPDR S&P 500 ETF; and (iii) an approximately $26,000 transaction to purchase call options connected to shares of Gilead Sciences, Inc. RINSCH's trades were not successful, and in less than two months after receiving $11 million from Netflix, RINSCH had lost more than half of those funds.

**C.    RINSCH Lied to Netflix about the Funds**

18.    While RINSCH was in the process of losing most of the $11 million intended to complete White Horse, he falsely informed Netflix that White Horse was progressing well. For example, the following are excerpts of select text messages that RINSCH sent to Netflix executive Cindy Holland—one of the senior-most Netflix executives overseeing the White Horse project—over the weeks following the payment of the $11 million and RINSCH's misuse of that money:

- March 8, 2020: "On our end, we are prepared and have planned for what I have described as a 'tunnel.' So there is no need to worry. We are moving forward with preproduction and at 100% effectivity. We will be on track to shoot end of July and present in 5 weeks."

USAO_RINSCH_00043504

- March 10, 2020: "As it pertains to our business, we
  continue moving forward diligently."

- April 20, 2020: "By the way, don't worry about the show.
  It's awesome and moving forward really well."

- April 20, 2020: "It's other level."

- April 20, 2020: "Don't worry. Game changing good. And
  hasn't stopped (or even slowed down) while I've been
  handling 'other stuff.'"

19.  RINSCH did not mention that he had, by late April,
transferred almost all of the money Netflix gave him to a
personal brokerage account, where he began to lose most of it on
risky investments.  I therefore submit that there is probable
cause to conclude that those messages were sent with the intent
to falsely reassure Netflix that RINSCH was using the funds to
complete White Horse, and to conceal his fraud.

   **D.  RINSCH Continued to Make Risky Investments and Enrich
        Himself**

20.  Even after losing most of the $11 million, RINSCH
still did not spend the remaining funds he had stolen on White
Horse.  Instead, between in or about February 2021 and in or
about May 2021, RINSCH transferred nearly all the remaining
Netflix funds to a cryptocurrency exchange account that was also
in his own name.  RINSCH then used those funds to speculate on
cryptocurrency -- which eventually proved profitable.

21.  Between in or about June 2021 and in or about November
2022, RINSCH transferred Netflix's funds from the cryptocurrency
exchange to yet another personal bank account held at Bank of

USAO_RINSCH_00043505

America.  RINSCH then spent millions on personal expenses and
luxury items, including but not limited to (i) approximately
$1,787,000 on credit card bills; (ii) approximately $1,073,000
on lawyers; (iii) approximately $395,000 to stay at the Four
Seasons hotel and at various luxury rental properties;
approximately (iv) at least approximately $47,000 in luxury
bedding from Frette; (v) approximately $3,787,000 on furniture
and antiques; (vi) approximately $2,417,000 to purchase high-end
cars; and (vii) approximately $652,000 on watches and clothing,
including a Vacheron Constantin wristwatch.

22.  RINSCH never completed White Horse and never returned
the fraudulently obtained funds to Netflix.

**E.    Investigation in the Southern District of New York
into RINSCH's Fraud and Identification of the Subject
Premises in the Central District of California**

23.  Based on conversations with the individual who manages
the apartment complex in which the Subject Premises is located,
I know that RINSCH has lived in the Subject Premises since
approximately March 10, 2025, and that before March 10, RINSCH
resided in a different apartment in the same apartment complex.

24.  On or about March 6, 2025, the Honorable Robyn F.
Tarnofsky, United States Magistrate Judge for the Southern
District of New York, authorized a warrant for historical and
prospective cellphone location information for a certain
cellphone number ending in ████ that I know, based on my review
of records from AT&T, to be subscribed to by RINSCH (the "Rinsch
Cellphone").

10

USAO_RINSCH_00043506

25.  Based on my review of prospective cellphone location information obtained pursuant to the warrant, I know since March 8, 2025, the Rinsch Cellphone has consistently been located in the vicinity of the Subject Premises.

26.  Specifically, between 12 and 4 AM on March 14, 2025, the Rinsch Cellphone was pinging in the following locations, seen in the leftmost image below.  For context, the rightmost image depicts the Subject Premises:



27.  Based on my review of historical cellphone location information obtained pursuant to the warrant, I know that the RINSCH Cellphone has also consistently been located in the vicinity of the Subject Premises since approximately January 15,

11

2025, including between the hours of 3 and 4 AM, when RINSCH was likely to be sleeping.

28. Based on my review of records provided to me by Uber in response to a court order obtained pursuant to 18 U.S.C. § 2703(d), I know that between approximately January 15 and March 7, 2025, an Uber Eats account registered to the Rinsch Cellphone made approximately at least 150 food deliveries to the prior unit with the same apartment complex that RINSCH occupied.

29. As explained above, RINSCH used the money he received from Netflix to purchase hundreds of thousands of dollars in luxury items, such as antiques, other high-end furniture, luxury beds and linens, and cars. Based on my investigation, I know that RINSCH has since returned some, but not all of those items. I therefore believe it is possible that some of those items, which constitute fruits of the scheme, are located within the Subject Premises. In addition to the items themselves, I believe it is possible the Subject Premises contains evidence of the fraudulent purchase of those items, including any invoices, receipts, or correspondence with various vendors.

30. As explained above, RINSCH also used digital devices, particularly a cellphone and computer, to communicate with Netflix executives throughout the scheme and to transfer the proceeds of the scheme to various personal bank and brokerage accounts. In addition to what I have learned based on my participation in this investigation, based on my training and experience, I know that when digital devices are used to commit unlawful conduct, those digital devices often contain records of

USAO_RINSCH_00043508

that activity, including call logs, voicemail messages, text messages, email correspondence, payment records, documents and multimedia (such as videos and photographs of documents or other evidence of criminality), contact information of co-conspirators and/or witnesses, notes about calls and meetings, internet search history relating to unlawful conduct, and logs of communication with co-conspirators and/or witnesses over messaging applications. As a result, they often store data on their computers related to their illegal activity, which can include email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social media accounts; and records of illegal transactions or the disposition of criminal proceeds. In additions, individuals engaged in fraud frequently use digital devices to communicate regarding their illegal activity.

31.  Moreover, based on my training and experience, I know that even when a user updates or replaces a cellphone or computer, it is often the case that the full contents of the old phone or computer are transferred to the new phone, including any historical message, call detail and browsing history. Thus, the ability to retrieve relevant information from cellphones and computers depend less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and storage habits.

32.  Based on my training and experience, I also know that when individuals use digital devices to send messages, such as

13

USAO_RINSCH_00043509

texts and emails, in furtherance of fraudulent activity, such messages are often sent from and stored on the user's personal cellphone, desktop computer, or other portable electronic device, such as a laptop, and that people often save data across multiple devices, either because the devices share information automatically or because the user intentionally sends data from one device to another for safekeeping.

33. Similarly, I also believe that RINSCH likely keeps several digital devices in his home. Based on my training and experience, as well as my review of U.S. census data and survey data from the Pew Research center, I know that the majority of adults own multiple digital devices (smartphones, desktop or laptop computers, or tablets). See "Computer and Internet Use in the United States: 2018" available at https://www.census.gov/content/dam/Census/library/publications/2021/acs/acs-49.pdf; see also Mobile Fact Sheet available at https://www.pewresearch.org/internet/fact-sheet/mobile/. This is particularly true of higher-income individuals, like RINSCH.

34. Based on my training and experience, I know that it is also likely that RINSCH keeps at least a personal cellphone on his person, as most individuals who use a cellphone keep the phone on their person most of the time. For this reason, the proposed warrants also seek authorization to search RINSCH's person for any digital devices or other evidence of the Subject Offenses.

35. In addition to there being probable cause to believe that electronic devices will be found on the Subject Premises

14

USAO_RINSCH_00043510