and Subject Person that contain evidence of the Subject Offenses, there is also probable cause to believe that these electronic devices constitute instrumentalities of the Subject Offenses because they were used to make misrepresentations to Netflix regarding RINSCH's intentions and progress regarding the completion of White Horse.

36. Based on the foregoing, I respectfully submit there is probable cause to believe that RINSCH engaged in the commission of the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises and on the Subject Person, and on computers, cellphones, and electronic media found in those locations.

37. Specifically, based on the foregoing, there is probable cause to believe that the following evidence, described below and in Attachment B, will be found in the Subject Premises or on the Subject Person:

    a. Evidence concerning RINSCH's communications, representations, and omissions with respect to his contractual relationship with Netflix regarding White Horse, including communications on digital devices;

    b. Evidence concerning the negotiation and execution of RINSCH's agreements with Netflix, including but not limited to the November 2018 term sheet and the March 2020 email amendment;

    c. Evidence of any work or lack of work performed on White Horse, including but not limited to audio or video footage; photography; sketches or drawings; costumes; props;

15

USAO_RINSCH_00043511

storyboarding; or records of payments to actors, artists, and crewmembers;

     d.   Evidence concerning RINSCH's misuse of funds received from Netflix, including but not limited to information regarding RINSCH's registration for and use of online brokerage and cryptocurrency platforms during and around the time of the Subject Offenses;

     e.   Evidence concerning fraudulent purchases RINSCH made with the money received from Netflix, including but not limited to invoices, receipts, records, and correspondence with various vendors;

     f.   Luxury items that were purchased with the money received from Netflix, including Frette luxury bedding and a Vacheron Constantin wristwatch, S/N 30110/0009-B108;

     g.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies;

     h.   Evidence related to other accounts, devices, or physical premises where evidence of the commission of the Subject Offenses may be found;

     i.   The location of other evidence relating to the commission of the Subject Offenses, including information about other devices or online accounts containing evidence of the scheme;

     j.   Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses; and

USAO_RINSCH_00043512

k.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

38.    Time Limitation. To the extent materials are dated, the proposed warrants are limited to materials created, modified, sent, or received between January 1, 2016, that is, the approximate time at which RINSCH began work on White Horse, until the present.

## V.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

39.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

USAO_RINSCH_00043513

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.     The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.     Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

USAO_RINSCH_00043514

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

USAO_RINSCH_00043515

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RINSCH's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of RINSCH's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

USAO_RINSCH_00043516

42.   Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrants.

43.   In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and

USAO_RINSCH_00043517

location of data potentially related to the subject
matter of the investigation; and

- reviewing metadata, system information, configuration
  files, registry data, and any other information
  reflecting how, when, and by whom the computer was used.\

20. Law enforcement personnel will make reasonable efforts
to restrict their search to data falling within the categories
of evidence specified in the warrants. Depending on the
circumstances, however, law enforcement personnel may need to
conduct a complete review of all the ESI from seized devices or
storage media to evaluate its contents and to locate all data
responsive to the warrants.

21. If the Government determines that the electronic
devices are no longer necessary to retrieve and preserve the
data, and the devices themselves are not subject to seizure
pursuant to Federal Rule of Criminal Procedure 41(c), the
Government will return these items, upon request. Computer data
that is encrypted or unreadable will not be returned unless law
enforcement personnel have determined that the data is not (i)
an instrumentality of the offense, (ii) a fruit of the criminal
activity, (iii) contraband, (iv) otherwise unlawfully possessed,
or (v) evidence of the Subject Offenses.

22. Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means

USAO_RINSCH_00043518

## VI. CONCLUSION

23.   For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in the Subject Premises, and on the Subject Person, as described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 14th day of
March, 2025.

_____
HON. BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE

USAO_RINSCH_00043519

# EXHIBIT B

USAO_RINSCH_00043520

AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means        □ Original     □ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*The person of Carl Rinsch* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. **2:25-MJ-01482**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.  ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return</u> <u>through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for____days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     **March 14, 2025 at 5:47 p.m.**              *Bmirff*

_____
*Judge's signature*

City and state:     Los Angeles, CA          Hon. Brianna F. Mircheff, U.S. Magistrate Judge
                                             *Printed name and title*

AUSA:     William Larsen (x0298)

USAO_RINSCH_00043521

AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

USAO_RINSCH_00043522

**ATTACHMENT A-2**

<u>PERSON TO BE SEARCHED</u>

The person known as CARL ERIK RINSCH, date of birth ███ ██ 1977, and who is depicted in the photograph below:



The search of RINSCH shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within RINSCH's immediate vicinity and control at the location where the search warrant is executed.

The items to be seized from the Subject Person also include any luxury items believed to have been purchased with fraudulent proceeds, including a Vacheron Constantin wristwatch, S/N 30110/0009-B108, and any computer devices, cellphones and storage media that may contain any electronically stored information falling within the categories set forth in

iii

USAO_RINSCH_00043523

Attachment B, including, but not limited to laptop computers, cellphones, thumb drives, portable hard drives, discs, and personal digital assistants. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

iv

USAO_RINSCH_00043524

**ATTACHMENT B**

I. **ITEMS TO BE SEIZED**

1. The items to be seized are evidence, fruits, or instrumentalities of violations of the crimes of wire fraud, in violation of 18 U.S.C. § 1343, money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957, in connection with RINSCH's theft of $11 million from Netflix, which was awarded to him based on his false representations that the money would be used to fund completion of a television show (the "Subject Offenses"), from January 1, 2016 to the present, namely:

a. Evidence concerning RINSCH's communications, representations, and omissions with respect to his contractual relationship with Netflix regarding White Horse, including communications on digital devices;

b. Evidence concerning the negotiation and execution of RINSCH's agreements with Netflix, including but not limited to the November 2018 term sheet and the March 2020 email amendment;

c. Evidence of any work or lack of work performed on White Horse, including but not limited to audio or video footage; photography; sketches or drawings; costumes; props; storyboarding; or records of payments to actors, artists, and crewmembers;

d. Evidence concerning RINSCH's misuse of funds received from Netflix, including but not limited to information

USAO_RINSCH_00043525

regarding RINSCH's registration for and use of online brokerage and cryptocurrency platforms during and around the time of the Subject Offenses;

       e.   Evidence concerning fraudulent purchases RINSCH made with the money received from Netflix, including but not limited to invoices, receipts, records, and correspondence with various vendors;

       f.   Luxury items that were purchased with the money received from Netflix, including Frette luxury bedding and a Vacheron Constantin wristwatch, S/N 30110/0009-B108;

       g.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies;

       h.   Evidence related to other accounts, devices, or physical premises where evidence of the commission of the Subject Offenses may be found;

       i.   The location of other evidence relating to the commission of the Subject Offenses, including information about other devices or online accounts containing evidence of the scheme;

       j.   Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses;

       k.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies; and

USAO_RINSCH_00043526

1.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2.    As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.    During the execution of this search warrant, law enforcement is permitted to: (1) depress RINSCH's thumb- and/or fingers onto the fingerprint sensor of the digital device (only

USAO_RINSCH_00043527

when the device has such a sensor), and direct which specific
finger(s) and/or thumb(s) shall be depressed; and (2) hold the
device in front of RINSCH's face with his eyes open to activate
the facial-, iris-, or retina-recognition feature, in order to
gain access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

    5.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

USAO_RINSCH_00043528

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of ) | **FILED**<br>CLERK, U.S. DISTRICT COURT |
| *The person of Carl Rinsch* ) | **Mar. 14, 2025** |
| ) Case No. **2:25-MJ-01482** | CENTRAL DISTRICT OF CALIFORNIA<br>BY: ch DEPUTY |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1956, and 1957 | Wire fraud, money laundering, and engaging in unlawful monetary transactions |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

*/s/ Nicholas DiMarino, FBI SA*
_____
*Applicant's signature*

Nicholas DiMarino, FBI SA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: **March 14, 2025**
_____

*Judge's signature*

City and state: Los Angeles, CA
_____

Hon. Brianna Fuller Mircheff, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: William Larsen (x0298)

USAO_RINSCH_00043529

<u>ATTACHMENT A-2</u>

<u>PERSON TO BE SEARCHED</u>

The person known as CARL ERIK RINSCH, date of birth ███ ███ 1977, and who is depicted in the photograph below:



The search of RINSCH shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within RINSCH's immediate vicinity and control at the location where the search warrant is executed.

The items to be seized from the Subject Person also include any luxury items believed to have been purchased with fraudulent proceeds, including a Vacheron Constantin wristwatch, S/N 30110/0009-B108, and any computer devices, cellphones and storage media that may contain any electronically stored information falling within the categories set forth in

iii

USAO_RINSCH_00043530

Attachment B, including, but not limited to laptop computers, cellphones, thumb drives, portable hard drives, discs, and personal digital assistants. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

iv

USAO_RINSCH_00043531

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, fruits, or
instrumentalities of violations of the crimes of wire fraud, in
violation of 18 U.S.C. § 1343, money laundering, in violation of
18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary
transactions in property derived from specified unlawful
activity, in violation of 18 U.S.C. § 1957, in connection with
RINSCH's theft of $11 million from Netflix, which was awarded to
him based on his false representations that the money would be
used to fund completion of a television show (the "Subject
Offenses"), from January 1, 2016 to the present, namely:

a.   Evidence concerning RINSCH's communications,
representations, and omissions with respect to his contractual
relationship with Netflix regarding White Horse, including
communications on digital devices;

b.   Evidence concerning the negotiation and execution
of RINSCH's agreements with Netflix, including but not limited
to the November 2018 term sheet and the March 2020 email
amendment;

c.   Evidence of any work or lack of work performed on
White Horse, including but not limited to audio or video
footage; photography; sketches or drawings; costumes; props;
storyboarding; or records of payments to actors, artists, and
crewmembers;

d.   Evidence concerning RINSCH's misuse of funds
received from Netflix, including but not limited to information

v

USAO_RINSCH_00043532

regarding RINSCH's registration for and use of online brokerage
and cryptocurrency platforms during and around the time of the
Subject Offenses;

       e.   Evidence concerning fraudulent purchases RINSCH
made with the money received from Netflix, including but not
limited to invoices, receipts, records, and correspondence with
various vendors;

       f.   Luxury items that were purchased with the money
received from Netflix, including Frette luxury bedding and a
Vacheron Constantin wristwatch, S/N 30110/0009-B108;

       g.   Evidence of efforts to conceal the commission of
the Subject Offenses and evade detection by law enforcement
and/or regulatory agencies;

       h.   Evidence related to other accounts, devices, or
physical premises where evidence of the commission of the
Subject Offenses may be found;

       i.   The location of other evidence relating to the
commission of the Subject Offenses, including information about
other devices or online accounts containing evidence of the
scheme;

       j.   Evidence of the receipt, transfer, disposition,
or location of funds raised through the commission of the
Subject Offenses;

       k.   Evidence of efforts to conceal the commission of
the Subject Offenses and evade detection by law enforcement
and/or regulatory agencies; and

USAO_RINSCH_00043533

1.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2.   As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.   During the execution of this search warrant, law enforcement is permitted to: (1) depress RINSCH's thumb- and/or fingers onto the fingerprint sensor of the digital device (only

USAO_RINSCH_00043534

when the device has such a sensor), and direct which specific
finger(s) and/or thumb(s) shall be depressed; and (2) hold the
device in front of RINSCH's face with his eyes open to activate
the facial-, iris-, or retina-recognition feature, in order to
gain access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

    5.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

USAO_RINSCH_00043535

### AFFIDAVIT

I, NICHOLAS DIMARINO, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for warrants to search a residence located at ████████ ████████ West Hollywood, CA 90046, and all closed and locked containers located therein (the "Subject Premises"), as described more fully in Attachment A-1, and the person of CARL ERIK RINSCH, date of birth, ████████ 1977 (hereinafter, the "Subject Person" or "RINSCH"), including any personal effects, baggage, cellphones and electronic devices within the possession, custody, and control of RINSCH at the time of the execution of the requested warrant, as described more fully in Attachment A-2.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of the crimes of wire fraud, in violation of 18 U.S.C. § 1343, money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957, in connection with RINSCH's theft of $11 million from Netflix, which was awarded to him based on his false representations that the money would be used to fund completion of a television show (collectively, the "Subject Offenses"), as described more fully

USAO_RINSCH_00043536

in Attachment B.[1]  Attachments A-1, A-2, and B are incorporated
herein by reference.

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant,
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and am currently assigned to a squad
investigating complex financial crimes in the Southern District
of New York.  I have been a Special Agent since approximately
September 2021.  During my time with the FBI, I have
participated in investigations into criminal offenses involving
wire fraud and money laundering and am familiar with the means
and methods used to commit such offenses.  During the course of
these investigations, I have participated in the execution of
numerous search warrants involving premises and digital devices.

---

[1] With respect to digital devices, the requested warrant
seeks authorization only to seize such devices as outlined in
Exhibit B.  To the extent necessary, the Government will obtain
a separate warrant authorizing the search of any seized digital
devices and establishing a search procedure.

2

USAO_RINSCH_00043537

### III. SUMMARY OF PROBABLE CAUSE

5.    CARL RINSCH is a film and television writer and director.  In or about 2018, the streaming company Netflix agreed to purchase a television show that RINSCH was developing called "White Horse."  In or about early 2020, in response to requests from RINSCH for additional funding to help complete the show, Netflix agreed to send RINSCH $11 million, on the condition that this money be spent producing White Horse. Shortly after receiving that money, RINSCH routed Netflix's funds, through a series of transfers, into his personal brokerage account.  RINSCH then lost millions speculating on stock options and other securities. Over the following years, RINSCH invested what remained of Netflix's money in cryptocurrency, and spent his returns from those investments on things like high-end furniture and mattresses, luxury vehicles, and legal fees.

6.    On or about March 4, 2025, a grand jury sitting in the Southern District of New York returned an indictment charging RINSCH with the Subject Offenses in Case No. 25 Cr. 85 (the "Indictment").  That same day, a warrant was issued for RINSCH's arrest, which is still outstanding.  The Indictment is attached hereto as Exhibit A and incorporated by reference herein.  The Indictment charges RINSCH with having committed the Subject Offenses in connection with his fraudulent request for and misuse of the $11 million.

7.    RINSCH currently resides at the Subject Premises.  The government previously obtained a search warrant for RINSCH's

USAO_RINSCH_00043538

historical and prospective cellphone location data, which has consistently placed RINSCH at the Subject Premises. RINSCH's phone was pinging at the Subject Premises as recently as March 14, 2025, among additional evidence described below placing RINSCH at the Subject Premises. RINSCH used several digital devices to carry out the Subject Offenses, which, based on my training and experience, I expect to be located either at the Subject Premises or on RINSCH's person.

## IV. STATEMENT OF PROBABLE CAUSE

8.    Based on my review of (i) records provided by Netflix detailing the negotiations and terms between RINSCH and Netflix regarding White Horse, including a November 2018 term sheet, as well as other communications and emails between the parties; (ii) financial records for various bank and investment accounts held in the names of RINSCH, Home VFX, or other related entities, which show how RINSCH spent the funds Netflix sent him for the production of White Horse; and (iii) transcripts of testimony provided by various Netflix executives and RINSCH himself during an arbitration between Netflix and RINSCH related to White Horse, as well as my conversations with other law enforcement agents regarding the same, I have learned, in substance and in part, the following.

**A.    RINSCH Enters Into a Contract with Netflix to Produce a Television Show Called White Horse**

9.    In or about 2016, RINSCH began filming White Horse. White Horse was a science fiction television show about a scientist who created a group of superintelligent clones. Those

4

USAO_RINSCH_00043539

clones were banished to a walled area in a Brazilian city, where they began developing advanced technology and came into conflict with humans and each other. "White Horse" is a reference to one of four horsemen of the apocalypse, who rides a white horse.

10. The production and filming of White Horse was initially funded by two media companies. While working with those media companies, RINSCH largely completed approximately six short-form episodes of White Horse, which were each between approximately four and ten minutes each.

11. In or about 2018, RINSCH began negotiating with numerous film and television streaming platforms about purchasing White Horse. RINSCH sought to reach an agreement with a streaming platform in which it would pay RINSCH for the existing episodes of White Horse and also fund completion of the remaining footage that, along with the already completed episodes, would comprise the first season of White Horse.

12. In or about 2018, RINSCH reached such a deal with Netflix. RINSCH entered into the deal through his production company, Home VFX, which handled the filming of White Horse.

13. Between in or about June 2018 and October 2019, Netflix paid approximately $44 million for White Horse. The majority of those funds were transferred to Home VFX, while some of the funds were paid to other parties that had been involved in the production of the existing episodes of White Horse.

14. Between in or about late 2019 and in or about early 2020, RINSCH requested additional money from Netflix to complete the filming of White Horse. Between on or about March 4, 2020,

5

USAO_RINSCH_00043540

and March 5, 2020, RINSCH and Netflix engaged in substantial negotiations over email about how exactly RINSCH would use the funds to work on White Horse.  On or about March 5, 2020, Netflix agreed to send RINSCH an additional $11 million, the entirety of which was to be spent on completing White Horse.  In particular, the parties agreed that the additional $11 million paid by Netflix was to be used for various and pre-and post-production projects, such as storyboarding; art, makeup, and costume design; paying actors, artists, and crew members; and editing footage that had already been shot.

**B.    Instead of Using the Funds from Netflix to Make White Horse, RINSCH Made Speculative and Unsuccessful Investments**

15.   On or about March 6, 2020, Netflix transferred approximately $11 million to a bank account in the name of Home VFX.  But rather than use those funds to complete White Horse, RINSCH quickly transferred those funds through numerous different bank accounts held in the name of either Home VFX, the "Carl Erik Rinsch Trust," or RINSCH himself, before consolidating approximately $10.5 million of the funds in a personal brokerage account managed by Charles Schwab & Co., Inc. on or about March 30, 2020. Specifically, based on a review of records for various financial accounts, I have learned that RINSCH engaged in the following series of transactions in quick succession:

- On or about March 6, 2020, Netflix wired approximately $11 million to a bank account in Home VFX's name ("Home VFX Account-1").

6

- Approximately three days later, on or about March 9, 2020, RINSCH opened another bank account in Home VFX's name ("Home VFX Account-2") and wired approximately $10.5 million into that account from Home VFX Account-1.

- Around a week later, on or about March 16, 2020, RINSCH wired approximately $8 million from Home VFX Account-2 into an account with Wells Fargo Advisors in the name of the "Carl Erik Rinsch Trust" (the "Trust Account").

- Later that month, on or about March 30, 2020, RINSCH wired approximately $2 million from Home VFX Account-2 and another approximately $8.5 million from the Trust Account into a newly opened brokerage account with Charles Schwab.

16. Based on my training and experience investigating money laundering and other fraud offenses, I have learned that one effect of quickly routing money through a series of different financial accounts is that it can make it more difficult to trace the location of money or to determine the origin of certain funds.

17. Almost immediately after these transfers, on or about March 31, 2020, RINSCH made a number of extremely risky purchases of securities from his Charles Schwab brokerage account, including call options on a biopharmaceutical company, and put options on an exchange traded fund that tracks the S&P 500 index. In emails that RINSCH sent to his investment advisor just days before making those investments, RINSCH referred to these trades as "aggressive" and "highly speculative," and he

7

acknowledged that he was "enter[ing] [the investments] fully
accepting to lose it all."  Examples of trades RINSCH made out
of his brokerage account with Charles Schwab include the
following, all of which were made on or about March 31, 2020:
(i) an approximately $341,000 transaction to purchase put
options connected to the SPDR S&P 500 ETF trust; (ii) an
approximately $168,000 transaction to purchase put options
connected to the SPDR S&P 500 ETF; and (iii) an approximately
$26,000 transaction to purchase call options connected to shares
of Gilead Sciences, Inc. RINSCH's trades were not successful,
and in less than two months after receiving $11 million from
Netflix, RINSCH had lost more than half of those funds.

     **C.   RINSCH Lied to Netflix about the Funds**

     18.  While RINSCH was in the process of losing most of the
$11 million intended to complete White Horse, he falsely
informed Netflix that White Horse was progressing well.  For
example, the following are excerpts of select text messages that
RINSCH sent to Netflix executive Cindy Holland—one of the
senior-most Netflix executives overseeing the White Horse
project—over the weeks following the payment of the $11 million
and RINSCH's misuse of that money:

- March 8, 2020: "On our end, we are prepared and have
  planned for what I have described as a 'tunnel.' So there
  is no need to worry. We are moving forward with
  preproduction and at 100% effectivity. We will be on
  track to shoot end of July and present in 5 weeks."

8

- March 10, 2020: "As it pertains to our business, we continue moving forward diligently."
- April 20, 2020: "By the way, don't worry about the show. It's awesome and moving forward really well."
- April 20, 2020: "It's other level."
- April 20, 2020: "Don't worry. Game changing good. And hasn't stopped (or even slowed down) while I've been handling 'other stuff.'"

19.   RINSCH did not mention that he had, by late April, transferred almost all of the money Netflix gave him to a personal brokerage account, where he began to lose most of it on risky investments.  I therefore submit that there is probable cause to conclude that those messages were sent with the intent to falsely reassure Netflix that RINSCH was using the funds to complete White Horse, and to conceal his fraud.

   **D.    RINSCH Continued to Make Risky Investments and Enrich Himself**

20.   Even after losing most of the $11 million, RINSCH still did not spend the remaining funds he had stolen on White Horse.  Instead, between in or about February 2021 and in or about May 2021, RINSCH transferred nearly all the remaining Netflix funds to a cryptocurrency exchange account that was also in his own name.  RINSCH then used those funds to speculate on cryptocurrency -- which eventually proved profitable.

21.   Between in or about June 2021 and in or about November 2022, RINSCH transferred Netflix's funds from the cryptocurrency exchange to yet another personal bank account held at Bank of

USAO_RINSCH_00043544

America. RINSCH then spent millions on personal expenses and luxury items, including but not limited to (i) approximately $1,787,000 on credit card bills; (ii) approximately $1,073,000 on lawyers; (iii) approximately $395,000 to stay at the Four Seasons hotel and at various luxury rental properties; approximately (iv) at least approximately $47,000 in luxury bedding from Frette; (v) approximately $3,787,000 on furniture and antiques; (vi) approximately $2,417,000 to purchase high-end cars; and (vii) approximately $652,000 on watches and clothing, including a Vacheron Constantin wristwatch.

22. RINSCH never completed White Horse and never returned the fraudulently obtained funds to Netflix.

> **E.  Investigation in the Southern District of New York into RINSCH's Fraud and Identification of the Subject Premises in the Central District of California**

23. Based on conversations with the individual who manages the apartment complex in which the Subject Premises is located, I know that RINSCH has lived in the Subject Premises since approximately March 10, 2025, and that before March 10, RINSCH resided in a different apartment in the same apartment complex.

24. On or about March 6, 2025, the Honorable Robyn F. Tarnofsky, United States Magistrate Judge for the Southern District of New York, authorized a warrant for historical and prospective cellphone location information for a certain cellphone number ending in ████ that I know, based on my review of records from AT&T, to be subscribed to by RINSCH (the "Rinsch Cellphone").

10

USAO_RINSCH_00043545

25. Based on my review of prospective cellphone location information obtained pursuant to the warrant, I know since March 8, 2025, the Rinsch Cellphone has consistently been located in the vicinity of the Subject Premises.

26. Specifically, between 12 and 4 AM on March 14, 2025, the Rinsch Cellphone was pinging in the following locations, seen in the leftmost image below. For context, the rightmost image depicts the Subject Premises:



27. Based on my review of historical cellphone location information obtained pursuant to the warrant, I know that the RINSCH Cellphone has also consistently been located in the vicinity of the Subject Premises since approximately January 15,

USAO_RINSCH_00043546

2025, including between the hours of 3 and 4 AM, when RINSCH was likely to be sleeping.

28.  Based on my review of records provided to me by Uber in response to a court order obtained pursuant to 18 U.S.C. § 2703(d), I know that between approximately January 15 and March 7, 2025, an Uber Eats account registered to the Rinsch Cellphone made approximately at least 150 food deliveries to the prior unit with the same apartment complex that RINSCH occupied.

29.  As explained above, RINSCH used the money he received from Netflix to purchase hundreds of thousands of dollars in luxury items, such as antiques, other high-end furniture, luxury beds and linens, and cars.  Based on my investigation, I know that RINSCH has since returned some, but not all of those items. I therefore believe it is possible that some of those items, which constitute fruits of the scheme, are located within the Subject Premises.  In addition to the items themselves, I believe it is possible the Subject Premises contains evidence of the fraudulent purchase of those items, including any invoices, receipts, or correspondence with various vendors.

30.  As explained above, RINSCH also used digital devices, particularly a cellphone and computer, to communicate with Netflix executives throughout the scheme and to transfer the proceeds of the scheme to various personal bank and brokerage accounts.  In addition to what I have learned based on my participation in this investigation, based on my training and experience, I know that when digital devices are used to commit unlawful conduct, those digital devices often contain records of

12

that activity, including call logs, voicemail messages, text
messages, email correspondence, payment records, documents and
multimedia (such as videos and photographs of documents or other
evidence of criminality), contact information of co-conspirators
and/or witnesses, notes about calls and meetings, internet
search history relating to unlawful conduct, and logs of
communication with co-conspirators and/or witnesses over
messaging applications.  As a result, they often store data on
their computers related to their illegal activity, which can
include email correspondence; contact information of co-
conspirators, including telephone numbers, email addresses, and
identifiers for instant messaging and social media accounts; and
records of illegal transactions or the disposition of criminal
proceeds.  In additions, individuals engaged in fraud frequently
use digital devices to communicate regarding their illegal
activity.

        31.  Moreover, based on my training and experience, I know
that even when a user updates or replaces a cellphone or
computer, it is often the case that the full contents of the old
phone or computer are transferred to the new phone, including
any historical message, call detail and browsing history.  Thus,
the ability to retrieve relevant information from cellphones and
computers depend less on when the information was first created
or saved than on a particular user's device configuration,
storage capacity, and storage habits.

        32.  Based on my training and experience, I also know that
when individuals use digital devices to send messages, such as

                                13

texts and emails, in furtherance of fraudulent activity, such messages are often sent from and stored on the user's personal cellphone, desktop computer, or other portable electronic device, such as a laptop, and that people often save data across multiple devices, either because the devices share information automatically or because the user intentionally sends data from one device to another for safekeeping.

33. Similarly, I also believe that RINSCH likely keeps several digital devices in his home. Based on my training and experience, as well as my review of U.S. census data and survey data from the Pew Research center, I know that the majority of adults own multiple digital devices (smartphones, desktop or laptop computers, or tablets). See "Computer and Internet Use in the United States: 2018" available at https://www.census.gov/content/dam/Census/library/publications/2021/acs/acs-49.pdf; see also Mobile Fact Sheet available at https://www.pewresearch.org/internet/fact-sheet/mobile/. This is particularly true of higher-income individuals, like RINSCH.

34. Based on my training and experience, I know that it is also likely that RINSCH keeps at least a personal cellphone on his person, as most individuals who use a cellphone keep the phone on their person most of the time. For this reason, the proposed warrants also seek authorization to search RINSCH's person for any digital devices or other evidence of the Subject Offenses.

35. In addition to there being probable cause to believe that electronic devices will be found on the Subject Premises

14

and Subject Person that contain evidence of the Subject Offenses, there is also probable cause to believe that these electronic devices constitute instrumentalities of the Subject Offenses because they were used to make misrepresentations to Netflix regarding RINSCH's intentions and progress regarding the completion of White Horse.

36. Based on the foregoing, I respectfully submit there is probable cause to believe that RINSCH engaged in the commission of the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises and on the Subject Person, and on computers, cellphones, and electronic media found in those locations.

37. Specifically, based on the foregoing, there is probable cause to believe that the following evidence, described below and in Attachment B, will be found in the Subject Premises or on the Subject Person:

a. Evidence concerning RINSCH's communications, representations, and omissions with respect to his contractual relationship with Netflix regarding White Horse, including communications on digital devices;

b. Evidence concerning the negotiation and execution of RINSCH's agreements with Netflix, including but not limited to the November 2018 term sheet and the March 2020 email amendment;

c. Evidence of any work or lack of work performed on White Horse, including but not limited to audio or video footage; photography; sketches or drawings; costumes; props;

15

USAO_RINSCH_00043550

storyboarding; or records of payments to actors, artists, and crewmembers;

d.    Evidence concerning RINSCH's misuse of funds received from Netflix, including but not limited to information regarding RINSCH's registration for and use of online brokerage and cryptocurrency platforms during and around the time of the Subject Offenses;

e.    Evidence concerning fraudulent purchases RINSCH made with the money received from Netflix, including but not limited to invoices, receipts, records, and correspondence with various vendors;

f.    Luxury items that were purchased with the money received from Netflix, including Frette luxury bedding and a Vacheron Constantin wristwatch, S/N 30110/0009—B108;

g.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies;

h.    Evidence related to other accounts, devices, or physical premises where evidence of the commission of the Subject Offenses may be found;

i.    The location of other evidence relating to the commission of the Subject Offenses, including information about other devices or online accounts containing evidence of the scheme;

j.    Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses; and

USAO_RINSCH_00043551

k.    Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

38.    Time Limitation. To the extent materials are dated, the proposed warrants are limited to materials created, modified, sent, or received between January 1, 2016, that is, the approximate time at which RINSCH began work on White Horse, until the present.

## V.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

39.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

USAO_RINSCH_00043552

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

18

USAO_RINSCH_00043553

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

40. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

41. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

USAO_RINSCH_00043554

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RINSCH's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of RINSCH's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

20

42. Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrants.

43. In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and

USAO_RINSCH_00043556

location of data potentially related to the subject
matter of the investigation; and

- reviewing metadata, system information, configuration
files, registry data, and any other information
reflecting how, when, and by whom the computer was used.\

20.  Law enforcement personnel will make reasonable efforts
to restrict their search to data falling within the categories
of evidence specified in the warrants.  Depending on the
circumstances, however, law enforcement personnel may need to
conduct a complete review of all the ESI from seized devices or
storage media to evaluate its contents and to locate all data
responsive to the warrants.

21.  If the Government determines that the electronic
devices are no longer necessary to retrieve and preserve the
data, and the devices themselves are not subject to seizure
pursuant to Federal Rule of Criminal Procedure 41(c), the
Government will return these items, upon request.  Computer data
that is encrypted or unreadable will not be returned unless law
enforcement personnel have determined that the data is not (i)
an instrumentality of the offense, (ii) a fruit of the criminal
activity, (iii) contraband, (iv) otherwise unlawfully possessed,
or (v) evidence of the Subject Offenses.

22.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means

USAO_RINSCH_00043557

## VI. CONCLUSION

23.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in the Subject Premises, and on the Subject Person, as described in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 14th day of
March, 2025.

_____
HON. BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE

23

USAO_RINSCH_00043558

USAO_RINSCH_00043559