UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 25-cr-85 (JSR) |
| Plaintiff, | |
| -v- | OPINION |
| CARL ERIK RINSCH, | |
| Defendant. | |

JED S. RAKOFF, U.S.D.J.:

On August 18, 2025, defendant Carl Erik Rinsch filed four pretrial motions. See ECF Nos. 22, 24, 26, 28. He moved to (1) suppress evidence obtained pursuant to two warrants he contends violated the Fourth Amendment, (2) dismiss Counts Three through Seven of the indictment on the ground that 18 U.S.C. § 1957 is unconstitutional, (3) require the Government to furnish a bill of particulars as to Count One of the indictment, which charges wire fraud, and (4) dismiss or transfer the case for improper venue. The Government filed a consolidated opposition brief on September 16, 2025. See ECF No. 34. The Court heard oral argument on September 30, 2025, and published a "bottom-line order" on October 1, 2025, see ECF No. 38 ("October 1 Order").

The October 1 Order denied all of Rinsch's pretrial motions except for the third motion, i.e., the request for a bill of particulars on Count One. See October 1 Order. The Government was directed to provide the defendant, by no later than close of

1

business on November 24, 2025, with a "specification of each of the materially false statements that it will contend at trial were made by the defendant or his agents to the victim of the defendant's allegedly fraudulent scheme for the purpose of executing that scheme." Id. at 1–2.

This Opinion sets forth the reasons for the October 1 Order.

I.    Background

According to the allegations set forth in the Indictment, Carl Rinsch is a film and television writer and director. See ECF No. 3 (the "Indictment") ¶ 1. In or about 2018, Rinsch, through his production company, entered into an agreement with Netflix granting Netflix the rights to a science-fiction show he was filming called *White Horse*. Indictment ¶¶ 1, 6–7. The show was only partially shot at that point, and the parties' contract required Rinsch to complete the show's production. Id. In exchange, Netflix agreed to pay Rinsch approximately $44 million dollars. Id. ¶ 8.

Around the end of 2019, Rinsch asked Netflix for additional money to finish producing the show. Id. ¶ 9. That request led to weeks of negotiations between the parties. Id. During those discussions, Netflix explained that any additional funds would have to be used for certain enumerated production-related tasks. Id. Rinsch agreed, and on March 6, 2020, Netflix wired $11 million to a bank account in the name of Rinsch's production company. Id.

2

¶¶ 9, 10.

The indictment further alleges that after Netflix wired the funds, Rinsch routed the payment through a series of different bank accounts until he eventually collected the money in a personal brokerage account. Id. ¶ 10. Rinsch then spent and lost most of that money on speculative securities investments. Id. ¶¶ 11, 22, 24, 26. Over the next few months, Rinsch gave positive updates regarding the production of the show to executives at Netflix, including by claiming that everything was "awesome and moving forward really well." Id. ¶ 12. During that time, he invested his remaining proceeds in cryptocurrencies, which proved profitable. Id. ¶ 13. But he spent that money -- nearly $10 million -- on personal expenses and luxury items. Id. ¶ 14. Rinsch never finished *White Horse* and never returned the payment to Netflix. Id. ¶ 15.

In or about March 2025, a grand jury indicted Rinsch for his scheme to defraud Netflix and his laundering of the fraud proceeds. Specifically, the Indictment charges Rinsch with one count of wire fraud tied to false statements he allegedly made to Netflix in order to obtain and retain the $11 million payment, one count of money laundering related to the steps Rinsch took to move and conceal his personal exploitation of the proceeds of his fraud, and five counts of engaging in unlawful monetary transactions with those proceeds.

II.  Discussion

a. <u>Warrants</u>

Rinsch challenges two search warrants in his pretrial motions. The first is an email search warrant, issued by a magistrate judge, that permitted officers to search emails and related account information on Rinsch's Gmail account from August 22, 2017 to July 26, 2022 ("Gmail Warrant"). The second warrant, also issued by a magistrate, permitted officers to search Rinsch's electronic devices, including through files on Rinsch's iPhones, MacBook laptops, and three hard drives ("Electronic Devices Warrant").

In his motion, Rinsch argues that the (1) search warrant applications did not establish probable cause to believe Rinsch's Gmail account and electronic devices would contain evidence of a crime and (2) the search warrants were defective because they were overbroad and lacked particularity. See ECF No. 23. He requests the Court order suppression because suppression would satisfy the purposes of the exclusionary rule and argues that the good-faith exception cannot rescue the warrants. The Court denies this motion because probable cause exists and because, even assuming, arguendo, that the warrants were insufficiently particular or overbroad, the good-faith exception saves the warrants.

i. Probable Cause

A search warrant must be supported by probable cause. But "[p]robable cause is not a high bar," District of Columbia v.

4

Wesby, 583 U.S. 48, 57 (2018).[1] To obtain a warrant, the Government must only establish a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).

Rinsch argues that the affidavits supporting the search warrants did not establish probable cause for several reasons. First, Agent DiMarino -- who requested both warrants -- conceded that Rinsch's primary email account was hosted on an alternative email platform, Runbox, rather than Gmail. ECF No. 23 at 8; see ECF No. 23-1 at 23. Further, Rinsch contends that the agent did not provide evidence that Rinsch ever directly emailed Netflix from his Gmail account, conducted business on his Gmail account, or used the Gmail account as anything other than an alternative account that was copied on a few emails.

Rinsch also argues that DiMarino's application for the Electronic Devices Warrant similarly did not establish probable cause. ECF No. 23 at 8-9. He argues that DiMarino concedes that Rinsch was not using the same cell phone at the time of the warrant application that Rinsch owned at the time of the suspected offenses. Additionally, although DiMarino relies on his training and experience to conclude that it was possible that Rinsch backed

---

[1] Unless otherwise indicated, all case and record citations omit internal alterations, brackets, citations, ellipses, quotations, and quotation marks.

up data from his old iPhone either to his new phone or laptops, id., training and experience can only support a probable cause determination when combined with other specific, factual allegations that link the alleged criminal conduct to the place to be searched, see United States v. Silva, 2025 WL 2078339, at *4 (2d Cir. 2025). Rinsch contends that no factual allegations in the Electronic Devices Warrant application linked the alleged wire fraud to Rinsch's current phones or laptops other than common knowledge that some people sometimes back up their devices and send messages from them.

Rinsch also contends that the hard drives seized from Rinsch's home were only suggested to contain video files of the show that Rinsch promised to make for Netflix but allegedly never delivered. ECF No. 23 at 10. Because the wire fraud theory is based on Rinsch not continuing to work on the show, however, Rinsch argues that this undelivered footage would not constitute evidence of a crime. Id. Moreover, DiMarino's affidavit contained no case-specific allegations supporting the inference that Rinsch possessed undelivered film footage. Id.

The Government responds that both affidavits established a fair probability that evidence of the defendant's commission of the subject offenses would be found in the locations described by the affidavits. The Government also argues that sufficient probable cause supported searching the hard drives and thumb drives

seized from the apartment.

The Court is convinced that the sworn affidavits established probable cause to search the Gmail account and electronic devices. As to the Gmail account, the affidavit indicated that Rinsch's Gmail account was copied on emails with Netflix discussing *White Horse*. See ECF No. 23-1 at 24. There were several emails sent to Rinsch's Gmail account discussing *White Horse*. Id. at 24-25. And Rinsch himself asked Netflix executives to communicate with him on the Gmail account. Id. Together, this information created probable cause to believe Rinsch's Gmail account "contain[ed] relevant evidence of the criminal conduct." United States v. Silva, 146 F.4th 183, 189 (2d Cir. 2025).

The Electronic Devices Warrant, similarly, was supported by probable cause. The affidavit stated (1) that Rinsch was believed to have been using Apple devices both during the period of the search and when the subject offenses were occurring, ECF No. 23-3 at 16; (2) that Apple devices can be backed up and synced to iCloud, meaning that data from old devices could be on the new one, id.; and (3) that it was not unlikely that Rinsch was logged onto online accounts from his devices, because Rinsch's Runbox account was associated with his Apple and Google accounts, id. Thus, there was sufficient probable cause to suggest that information relevant to the offenses would be present on Rinsch's electronic devices.

Finally, the hard drives and thumb drives seized from the apartment were likely to contain relevant information for the offenses. The premise of the charged offenses is that Rinsch never completed *White Horse*, and undelivered footage is relevant to that analysis. For instance, as the Government explains, "[t]he existence of undelivered footage -- and the state, level of development, and nature of that footage -- would go directly to whether the defendant had been using the March Payment to develop *White Horse*." ECF No. 34 at 44-45.

In short, there was probable cause to believe that evidence of the alleged crimes would be uncovered in the Gmail account, electronic devices, and electronic storage units.

### ii. Good-Faith Exception

In addition to asserting that the warrants were insufficiently supported by probable cause, Rinsch also argues that the warrants themselves were insufficiently particular and were overbroad. But even if the Court were to assume, arguendo, that Rinsch was correct in any or all of these assertions, the "good-faith exception" would nevertheless save the searches.

The good-faith exception applies where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922 (1984). The pivotal question is "whether a reasonably well trained officer would have known that the search was illegal despite the

magistrate's authorization." Id. n.23. A court should exclude evidence from a warrant only where law enforcement "'exhibit[s] deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" United States v. Raymonda, 780 F.3d 105, 117–18 (2d Cir. 2015) (quoting United States v. Stokes, 733 F.3d 438, 443 (2d Cir. 2013)).

The good-faith exception is only inapplicable where (1) the issuing magistrate has been knowingly misled; (2) the issuing magistrate wholly abandoned his or her judicial role; (3) the application for a warrant was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (4) the warrant is so facially deficient that reliance upon it is unreasonable. United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992).

Rinsch argues that the good-faith exception does not save the warrants here because the warrant affidavits contains no indicia for probable cause and the warrants are facially defective in failing to particularize the places to be searched or the things to be seized.

The Court disagrees with Rinsch. The warrant affidavits included sufficient indicia of probable cause and were not so facially deficient that reliance on them would have been unreasonable. As to the claim that the affidavits lacked any indicia of probable cause, Rinsch argues that the officer's

affidavits provided virtually no basis for finding probable cause. That is incorrect. As discussed above, see supra pp. 5–8, the affidavits identified several reasons suggesting that evidence of Rinsch's wrongdoing would likely be found at the specified locations. This case therefore bears little resemblance to United States v. Clark, on which Rinsch relies for the proposition that the good-faith exception does not apply where an officer submits a "barebones affidavit almost calculated to mislead." 638 F.3d 89, 103–04 (2d Cir. 2011). While Rinsch may dispute the affidavits' conclusions, it is unreasonable to suggest they contained "practically no" indicia of probable cause.

Second, the warrants were not so facially deficient that reliance on them would have been unreasonable. The Gmail and Electronic Devices Warrants were issued by two independent magistrate judges. District courts defer to warrants issued by neutral magistrate judges, with "doubts . . . resolved in favor of upholding the warrant." United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993). Moreover, a magistrate judge's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983). And here, the warrants identified the specific crimes for which evidence was sought and defined categories of evidence to be seized that limited the warrants' scope.

Rinsch nevertheless argues that the warrants were so

overbroad and lacking in particularity that the good-faith exception cannot apply. On breadth, the Gmail warrant permitted searches of material from August 22, 2017, to July 26, 2022, a period beginning three months before *White Horse* was first pitched to Netflix and ending when Rinsch initiated an arbitration to recover funds Netflix had improperly withheld. And the Electronic Devices Warrant permitted some searches without temporal limitations. Rinsch argues the affidavits provide no support for the wide-ranging time frames, because the alleged fraudulent representations did not take place until March 5, 2020. Rinsch also argues that the warrants were overbroad because they permitted searches of locations where relevant evidence could not possibly be found. For example, Rinsch contends that the Gmail warrant permitted law enforcement to read every single email in Mr. Rinsch's account in the time frame listed, based purely on DiMarino's assertion that keyword searches might not work.

But for the purposes of the good-faith exception, the warrants were not so overbroad as to make reliance upon them unreasonable. For example, the Gmail affidavit amply supports the warrant's timespan. Though the fraudulent representations did not occur until March 2020, there are valid reasons to suspect that the entire period of the relationship between Rinsch and Netflix would provide relevant evidence for the charged counts; specifically, the entire period might include information about when Rinsch began

seeking to defraud Netflix. On the Electronic Devices Warrant, the timing, too, is not an issue. Though it is true that some categories of evidence in the warrant did not have express temporal limitations, each of those categories were tied to specific events that would necessarily limit the Government's review. For example, Items One and Two of the Electronic Devices Warrant focused on the contractual relationship between Rinsch and Netflix, meaning that the Government's search would have been limited to the period in which the defendant began negotiating with Netflix -- i.e. around early 2018. ECF No. 23-3 at 37. Similarly, Items Four, Five, and Seven, were focused on the Rinsch's use of the March payment, meaning the Government's review would be focused on what happened after March 2020. Id. at 38.

Finally, the lack of a key word search does not render the good-faith exception inapplicable. Rinsch cites no case law to support his proposition, and in the context of stored electronic data, courts have affirmed similar requests. See United States v. Ray, 541 F. Supp. 3d 355, 393 (S.D.N.Y. 2021) (defendant's argument for key word search finds no support in this circuit). As the Second Circuit has stated, "it will often be impossible to identify in advance the words or phrases that will separate relevant files or documents before the search takes place, because officers cannot readily anticipate how a suspect will store information related to the charged crimes. Files and documents can easily be given

12

misleading or coded names, and words that might be expected to occur in pertinent documents can be encrypted; even very simple codes can defeat a pre-planned word search." United States v. Ulbricht, 858 F.3d 71, 102 (2d Cir. 2017), overturned on other grounds.

As to particularity, the warrants were not so insufficiently particular that reliance upon them would be unreasonable. To satisfy the Fourth Amendment's particularity requirement, a warrant must (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to designated crimes." United States v. Purcell, 967 F.3d 159, 178 (2d Cir. 2020). A warrant is also insufficiently particular if it fails to place some "limitation on the kind of evidence sought" and instead "leaves it entirely to the discretion of the officials conducting the search what items are to be seized." Id. A warrant "is defective if it is broader than can be justified by the probable cause upon which the warrant is based." United States v. Galpin, 720 F.3d 436, 446 (2d Cir. 2013).

Here, the warrants identify the specific offenses for which probable cause had been established, which Rinsch does not dispute. ECF No. 34 at 47. Second, the warrants described the places to be searched -- electronic data associated with the Google Account and each of the Electronic Devices. Id. Finally, the warrants listed

specific categories that were related to the subject offenses. The
Google Warrant called for the seizure of:

- "Communications regarding the television series known as
  'White Horse,' or 'Conquest,'";

- "Communications regarding the disposition of funds
  provided by Netflix";

- And "[l]ocation of other evidence (e.g., emails reflecting
  registration of other online accounts potentially
  containing relevant evidence)."

ECF No. 23-2 at 19. The Electronic Devices Warrant permitted the
seizure of, <u>inter alia</u>:

- "Evidence concerning Carl Rinsch's communications,
  representations, and omissions with respect to his
  contractual relationship with Netflix regarding White
  Horse . . .";

- "Evidence concerning the negotiation and execution of Carl
  Rinsch's agreements with Netflix, including but not limited
  to the November 2018 term sheet and the March 2020
  amendment";

- And "[e]vidence of any work or lack of work performed on
  White Horse, including but not limited to audio or video
  footage; photography; sketches or drawings . . .";

ECF No. 23-3 at 24.

Here, each of the categories of items to be seized relates to
the charged offenses. For the purposes of the good-faith exception,
governing case law does not require the greater specificity Rinsch
demands. Indeed, Rinsch's own case cites are clearly inapposite.
<u>United States v. Kow</u>, for example, involved a warrant allowing for
the seizure of "essentially all the documents on the premises," a
situation far broader than the one here. 58 F.3d 423, 428 (9th

Cir. 1995). United States v. Buck actually approved application of the good-faith exception, explaining that although "catch-all description[s] in a search warrant" were not permitted, that the officers could reasonably have relied on the warrants. 813 F.2d 588, 593 (2d Cir. 1987). United States v. George restricted the good-faith exception from applying to warrants permitting searches for evidence of crimes defined only by references to broad criminal statutes, which is not the case here. 975 F.2d 72, 77 (2d Cir. 1992). And United States v. Zemlyansky is inapplicable because that case involved a warrant that failed to specify the crimes for which the search was being undertaken, had catch-all categories of evidence to be seized, and "in addition to other deficiencies, fail[ed] to specify a temporal limitation." 945 F. Supp. 2d 438, 472 (S.D.N.Y. 2013). That is far from the present situation. Accordingly, even if the Court assumes that the warrants were overbroad or insufficiently particular, the good-faith exception saves them.

### b. 18 U.S.C. § 1957's Constitutionality

Rinsch argues that 18 U.S.C. § 1957, which criminalizes engaging in monetary transactions with property derived from unlawful property, is unconstitutionally vague and violates both the Fifth and Eighth Amendments. Because of that unconstitutionality, he argues, Counts Three through Seven (which charge violations of Section 1957) of the indictment should be

dismissed.

18 U.S.C. § 1957 makes it a crime for a person to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." A monetary transaction under the statute means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument." 18 U.S.C. § 1957(f)(1). Criminally derived property means "any property constituting, or derived from, proceeds obtained from a criminal offense." Id. § 1957(f)(2). "Specified unlawful activity" includes wire fraud. Id. §§ 1956(c)(7)(A), 1957(f)(3), and 1961(1)(B).

Rinsch contends that Section 1957 fails both to give adequate notice to individuals and to provide sufficient guidance and constraints to protect against arbitrary enforcement. The statute criminalizes "knowingly" engaging "in a monetary transaction in criminally derived property of a value greater than $10,000," which was "derived from specified unlawful activity." 18 U.S.C. § 1957(a); see United States v. Ness, 565 F.3d 73, 78 (2d Cir. 2009) (stating offense elements). Rinsch argues that the statute has "staggering breadth," sweeping in any transaction of more than $10,000 involving the direct or indirect proceeds of numerous and varied criminal offenses. ECF No. 25 at 2. A person can be liable under Section 1957, Rinsch contends, even if he was not involved

in the criminal activity that generated the "derived" proceeds, and even if he personally engaged in only lawful, legitimate activities with the proceeds. Id. at 2-3.

Rinsch also points to Section 1957's broad phrasing, which he argues fails to provide constitutionally adequate notice. ECF No. 25 at 3. He contends that the statute criminalizes "a host of apparently innocent activities," including those far removed from the original criminal conduct from which money or property was derived. Id. And he further suggests that the text of Section 1957 gives "virtually unfettered discretion" to law enforcement and prosecutors, with no governing standards or constraints on use. Id. at 4.

Finally, Rinsch argues that the Second Circuit's interpretation of Section 1957 exacerbates its constitutional infirmity in two ways. ECF No. 25 at 5. First, the Second Circuit, unlike the Fifth and Ninth Circuits, does not require the Government to prove a violation of Section 1957 by tracing criminally derived proceeds if they have been commingled with other, legitimate funds. See United States v. Silver, 864 F.3d 102, 114-15 (2d Cir. 2017). Rinsch argues this makes the constitutional notice problem more acute because a defendant engaging in a legitimate transaction with no criminal intent can still violate the statute. And second, this interpretation of Section 1957 means the Government can seize and freeze an uncapped

portion of a defendant's assets, regardless of whether those assets themselves were involved in or derived from criminal activity. Rinsch avers that this is an unconstitutional seizure under the Fifth Amendment and an unconstitutionally excessive fine under the Eighth Amendment.

Ultimately, Rinsch argues that Section 1957 is unconstitutional both facially and as applied to him. Assuming, arguendo, that the Government could prove Rinsch committed the wire fraud charged in Count One, Rinsch argues that he "could not and would not have been on notice that openly transferring money among his own accounts" would constitute an additional, separate crime. ECF No. 25 at 5. And by permitting the Government to seize and freeze Rinsch's money that has been comingled with the alleged fraud proceeds, Rinsch argues that Section 1957 infringes his right to dispose of and direct his own lawful assets without adequate notice or process.

Nonetheless, Rinsch's various challenges to Section 1957's constitutionality fail, for several reasons. First, parties cannot bring vagueness challenges to a statute if their own conduct is clearly proscribed by the statute. See United States v. Scott, 979 F.3d 986, 993 (2d Cir. 2020). Rinsch's conduct is clearly proscribed by the statute, so his vagueness challenge must fail. Count One of the Indictment alleges that Rinsch committed wire fraud by falsely representing that he would use Netflix's funds to

produce a show when he actually intended to use, and did use, the money for his own personal benefit. He then transferred these funds to different accounts before ultimately placing them in his personal brokerage account. And then he used the proceeds of his fraud to trade securities and cryptocurrency, the profits from which he then used to purchase luxury items. Counts Three through Seven of the indictment are related to these transactions and allege knowing transfers to or from bank accounts and brokerage accounts of the proceeds of the wire fraud charged in Count One.

Each of the counts expressly alleges that Rinsch "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Rinsch has never disputed that Section 1957 covers wire fraud as an "unlawful activity." The values from the various transactions are each plainly over $10,000 -- Count Three involves an $8.5 million transfer from one bank into another, Counts Four through Six involve tens and hundreds of thousands of dollars transferred from a brokerage account to purchase securities, and Count Seven involves approximately $150,000 used to buy high-end furniture. Each of these transactions is also a "monetary transaction" under Section 1957 because they are "deposit[s], withdrawal[s], transfer[s], or exchange[s] . . . by, through, or to a financial institution." Id. (f)(1).

Finally, the charged counts meet Section 1957's knowledge requirement. According to the indictment, Rinsch knew that the amounts he received were "criminally derived property." United States v. Blarek, 1998 WL 907429, at *3 (2d Cir. Dec. 23, 1998) (unpublished). The funds Rinsch allegedly transferred were "derived directly" from his alleged fraud. ECF No. 34 at 22. This forecloses his lack of knowledge claim.

Still, Rinsch claims that he "could not and would not have been on notice that openly transferring" money among his accounts would constitute a separate crime. That is plainly incorrect: the statute obviously proscribes such actions, and Second Circuit precedent makes clear that those transactions create liability, even when fraud proceeds are intermingled with other amounts. See United States v. Silver, 864 F.3d 102, 115 (2d Cir. 2017). The point, of course, is to prevent felons and their compatriots from realizing the financial benefits of their misconduct by hiding the proceeds of their crime through repeated transfers and comingling. Rinsch's further argument that the statute is unconstitutional because the Government could seize and freeze his money also fails because the Government has not actually seized or frozen any of Rinsch's assets.

Rinsch's facial challenge cannot stand on its own because the Second Circuit evaluates vagueness challenges to statutes not threatening the First Amendment on an as-applied basis. United

States v. Requena, 980 F.3d 30, 40 (2d Cir. 2020). For the reasons stated above, the as-applied challenge fails. And, in any event, Rinsch cites no cases holding that Section 1957 is unconstitutionally vague, either as applied or facially, and several circuits have held the very opposite. See, e.g., United States v. Blarek, 1998 WL 907429, at *3 (2d Cir. Dec. 23, 1998) (unpublished); see also United States v. Gabriele, 63 F.3d 61, 65 (1st Cir. 1995); United States v. Bazazpour, 690 F.3d 796, 801 (6th Cir. 2012); United States v. Baker, 19 F.3d 605, 614 (11th Cir. 1994). In short, Rinsch's motion to dismiss Counts Three through Seven on the ground that Section 1957 is unconstitutional entirely fails.

### c. Bill of Particulars

Rinsch also requests that the Court order the Government to provide a bill of particulars identifying which misrepresentations it believes support the wire fraud underlying Count One of the indictment. Rinsch argues that, without this information, he cannot adequately prepare his defense as to the wire fraud charge.

The Government responds that Rinsch has extensive information about the upcoming case. They note that he possesses (1) a detailed indictment, (2) extensive Rule 16 material, (3) records from an arbitration, (4) a chart tracing many of the financial transactions at issue, (5) an email identifying several documents of importance, (6) early production of some material, and (7) a detailed letter

from the Government listing communications or statements from both before and after the $11 million payment that reflect misstatements made by Rinsch or his agents in furtherance of his fraudulent scheme. ECF No. 34 at 29. The Government explains that Rinsch is essentially arguing there is too much material to parse, but that a defendant cannot "use the vastness or complexity of the alleged [crime] and its attendant documentary evidence as a sword against the Government, when the Indictment, discovery, and other information provided by the Government adequately notify [d]efendant[] of the charges against [him]." United States v. Rigas, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003).

Federal Rule of Criminal Procedure 7(f) permits a defendant to seek a bill of particulars "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988). A defendant is entitled to a bill of particulars "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). In considering whether to order a bill of particulars, courts consider "whether the information sought has been provided elsewhere, such as in other items provided by

discovery, responses made to requests for particulars, prior proceedings, and the indictment itself." United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995). The decision to grant or deny a bill of particulars is within the "sound discretion" of the district court. Davidoff, 845 F.2d at 1154.

While the extensive discovery already provided by the Government goes a way to preventing unfair surprise at the upcoming trial of this case, the Court is convinced that a modest bill of particulars is appropriate to identify with the necessary particularity the wire fraud charge in Count One and to assist the defendant in preparing for trial of that charge. "In cases involving fraud, courts have required the Government to specify through a bill of particulars which documents or transactions it intends to prove are fraudulent if this information is not ascertainable; otherwise, in effect, the burden of proof impermissibly may shift to the defendant to prove the documents or transactions are not fraudulent." United States v. Vaid, 2017 WL 3891695, at *11 (S.D.N.Y. May 24, 2017). This is a case involving fraud: the Government alleges that Rinsch, "[f]rom at least in or about October 2019 through at least in or about November 2020 . . . devised and intend[ed] to devise a scheme and artifice to defraud." Indictment ¶ 16. And the information that the Government has provided Rinsch, though helpful, is neither "exhaustive" nor "exclusive." ECF No. 27-1 at 2.

Thus, the Court reiterates its direction to the Government to provide the defense, by no later than close of business on November 24, 2025, a written specification of each of the materially false statements that it will contend at trial were made by the defendant or his agents to the victim of the defendant's allegedly fraudulent scheme for the purpose of executing that scheme.

d. Venue

Finally, Rinsch argues that the charges should either be dismissed or transferred for lack of venue. During the period alleged in the indictment, Rinsch neither lived nor worked in New York. His production company was based in Los Angeles. And his counterparts at Netflix were also based in Los Angeles. Additionally, Rinsch argues that no acts relevant to the alleged fraud or money laundering were committed here. Rinsch argues that because he is now indigent and lives in California, he cannot meaningfully participate in his defense from thousands of miles away, and thus requests the Court either dismiss the indictment for lack of venue or transfer venue to the Central District of California.

The Court denies both requests. First, as to dismissal, "[t]o survive a motion to dismiss for lack of venue, the prosecution need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information." United States v. Chocron, 2021 WL 3005086, at *1

(S.D.N.Y. July 14, 2021). In practice, that means "the mere allegation that an offense occurred 'in the Southern District and elsewhere' is sufficient to overcome a pretrial motion to dismiss." United States v. Paduch, 2024 WL 778938, at *1 (S.D.N.Y. Feb 26, 2024). And here the indictment goes further.

For example, with respect to the wire fraud charge, the indictment alleges that Rinsch caused "others to send and receive emails and other electronic communications to and from the Southern District of New York." Indictment ¶ 16. For wire fraud, venue "lies [in any district] where a wire in furtherance of [the] scheme begins its course, continues[,] or ends." United States v. Rutigliano, 790 F.3d 389, 397 (2d Cir. 2015). Thus, the wire fraud charge is appropriately in the Southern District.

The other charged counts are also properly in this venue. A money laundering offense can be tried in any district where the charged monetary transaction was conducted or where the underlying criminal activity took place "if the defendant participated in the transfer of the proceeds . . . from that district to the district where" the monetary transaction took place. 18 U.S.C. § 1956(i). For Count Two, money laundering, the government alleged that the defendant, "in the Southern District of New York and elsewhere," met the elements of money laundering. Indictment ¶ 18. That is also true for Count Three, id. ¶ 20, Count Four, id. ¶ 22, Count Five, id. ¶ 24, Count Six, id. ¶ 26, and Count Seven, id. ¶ 28.

In the alternative, Rinsch argues that the Court should transfer venue to the Central District of California. The burden is on the moving party to justify transferring venue, United States v. Larsen, 2014 WL 177411, at *2 (S.D.N.Y. Jan. 16, 2014). "[N]ot often" can defendants meet this substantial burden. Id.

Pursuant to the Federal Rules of Criminal Procedure, a court may transfer the proceeding upon a defendant's motion to another district "for the convenience of the parties, any victim, and witnesses, and in the interest of justice." Fed. R. Crim. Pro. 21(b). The Court has broad discretion to transfer venue. In exercising this discretion, the Court considers (1) the location of the defendant; (2) the location of possible witnesses; (3) the location of events likely to be in issue; (4) the location of documents and records to be involved; (5) the disruption of a defendant's business unless the case is transferred; (6) the expense to the parties if transfer is denied; (7) location of counsel; (8) the relative accessibility of place of trial; (9) the docket condition of each district involved; and (10) any other special elements that might affect the transfer. Platt v. Minn. Mining & Mfg. Co., 376 U.S. 240, 243–44 (1964).

The Platt factors weigh towards not transferring venue. Though Rinsch lives in California, the defendant's residence "has no independent significance in determining whether transfer to [a different] district would be in the interest of justice." United

States v. Christian, 2012 WL 1134035, at *1 (S.D.N.Y. Apr. 2, 2012). Rinsch's residence only has significance to the extent he complains it affects his ability to meet with counsel and attend trial. But thanks to modern technology and the defendant's release on bail, he can have effective contact with his attorney on a regular basis. And the Court has already arranged to provide Rinsch with transportation to, and lodging near, the S.D.N.Y. courthouse at no cost to him, pursuant to 18 U.S.C. § 4285 and 18 U.S.C. § 3006A.

Regarding the location of the witnesses, a defendant must "specifically describe how particular witnesses would be entirely prevented from testifying at trial in the Southern District of New York." United States v. Blakstad, 2020 WL 5992347, at *4 (S.D.N.Y. Oct. 9, 2020) (emphasis added). In other words, the mere inconvenience to witnesses is not dispositive; witnesses must fully be unable to testify in this District. Jones, 2021 WL 3500806, at *3. That is an especially demanding standard to meet, particularly since witness preparation can now occur by videoconference or telephone. Id. Yet Rinsch has not identified any witness who would be wholly unable to testify in this district.

The location of events relating to the charged counts and the location of documents and records both favor the Government or, at minimum, are neutral. While some of the events happened in California, others, including many of the monetary transfers,

happened in New York. Additionally, many of the documents and evidence have already been brought to the Southern District of New York, ECF No. 34 at 16, and in any case, the "conveniences of modern transportation and communication" make the location of these documents a minor concern. United States v. Kolfage, 2020 WL 7342796, at *4 (S.D.N.Y. Dec. 14, 2020). Rinsch is not employed, so there is no disruption to his business. The Southern District's docket can easily bear the weight of this case. And finally, with regard to the expense to parties, a transfer would unfairly burden the Government, who would need to shoulder the lion's share of costs in appointing new counsel for Rinsch and relocating U.S. Attorneys, law enforcement officers, and paralegals. See ECF No. 34 at 17.

Beyond all this, the Court, consistent with the Speedy Trial Act, has moved this case efficiently and it is now firmly scheduled for trial here beginning December 2, 2025. Any transfer of venue at this stage would be entirely disruptive to all concerned, including the parties. In sum, Rinsch has not met his substantial burden in justifying a transfer. This case will remain within the Southern District of New York.

## III. Conclusion

For the foregoing reasons, the Court reconfirms its October 1 Order denying all of Rinsch's pretrial motions except for his request for a bill of particulars.

New York, NY
October 22, 2025

JED S. RAKOFF, U.S.D.J.