PC2JRIN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

     v.                      25 Cr. 85 (JSR)

CARL ERIK RINSCH,

                             Trial
         Defendant.

------------------------------x

                           New York, N.Y.
                           December 2, 2025
                           9:30 a.m.

Before:

                   HON. JED S. RAKOFF,

                           District Judge
                           -and Jury-

                     APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
DAVID MARKEWITZ
TIMOTHY CAPOZZI
ADAM SOWLATI
    Assistant United States Attorneys

LAW OFFICES OF DANIEL A. McGUINNESS
    Attorneys for Defendant
BY:  DANIEL A. McGUINNESS
    -and-
ZEMAN & WOMBLE, LLP
BY:  BENJAMIN C. ZEMAN

Also Present:
Nicholas DiMarino, FBI
Maria Larracuente, Paralegal
William Coleman, Paralegal
Laurie Tang, Paralegal

(Case called; jury not present)

MR. MARKEWITZ: Good morning, your Honor.

David Markewitz appearing for the government. Joining me at counsel table are my colleagues, Assistant United States Attorneys Tim Capozzi and Adam Sowlati. In addition, down the row here we have Paralegal Specialists Maria Larracuente and William Coleman, and at the end of the table is FBI Special Agent Nicholas DiMarino.

THE COURT: Good morning. So it's clear there's no one left over at 26 Federal Plaza. So please be seated.

MR. MCGUINNESS: Good morning, your Honor.

For the defense, Daniel McGuinness and joined at counsel table by Ben Zeman. Mr. Rinsch is to his right, and at the far right is Laurie Tang, our paralegal.

THE COURT: Good morning. All right. I think we covered virtually everything we needed to at the hearing last week. I've decided it's not necessary to give a separate preliminary instruction to the jury, but thank you for your submissions on that.

I really think when I describe the case in the voir dire I'll be telling them everything they need to know. It's a simple case in terms of the legal issues, so we don't need to have a separate instruction. But thank you for sharing your views on that.

The government at some point yesterday indicated they

PC2JRIN1

might have another motion *in limine*.  Did you want to discuss that now or --

MR. SOWLATI:  No, your Honor.  Right now we are still deciding if we're going to put forward that motion *in limine*.

I do have just one preliminary note, and this is something that we could take up now or we could take up as the witness testifies.  We sent over to defense counsel yesterday the exhibits that we're going to be using for our first few witnesses.  They didn't have any objections to any of them except one, and the one is an email they would like the top portion of the email redacted.

We disagree.  We could wait until the witness testifies or we could discuss it with your Honor now, show you the exhibit.

THE COURT:  Well, I just learned that the jury panel is already ready earlier than I thought, so I think let's go ahead and pick the jury and we'll find an opportunity after that.

MR. SOWLATI:  Certainly your, Honor.  Thank you.

MR. MARKEWITZ:  Your Honor, very briefly, the parties have agreed on a number of stipulation.  The government was planning just to admit them without reading them and then we would read them as relevant and it came up rather than sitting there and reading ten pages in a row.  I think the defense is fine with that as long as your Honor is okay.

THE COURT: That's fine with me. I'm sure the jury will be excited to learn that the very first thing you're going to do is introduce some stipulations. They will be so thrilled. But --

MR. MARKEWITZ: Welcome to federal court, your Honor.

THE COURT: Anyway. Now, in terms of scheduling, I want to alert you, I'll tell the jury this after we've picked the jury. Tomorrow we will only go to 3:00 because of other matters I have. And as a result of that, we'll also take the lunch break early, probably around 12:00. So it will be a little bit different from our normal schedule tomorrow.

Today we'll go to 4:00, not till 4:30. But we'll never go past 4:30. But depending on other matters I have, sometimes it will be a little earlier. I'm going to tell the jury that I think the case will be over in two weeks, though no absolute guarantees, but that seems to be very likely.

Trying to think if there's anything else. I don't think so. I'm not sure this is relevant, but just for my curiosity in showing my general ignorance of all modern culture, is Netflix itself a corporation?

MR. MARKEWITZ: Yes, your Honor.

THE COURT: And a public corporation?

MR. MARKEWITZ: Yes, your Honor.

THE COURT: And where is it incorporated?

MR. MARKEWITZ: I'm not certain, your Honor.

THE COURT: Probably Delaware, but --

MR. MARKEWITZ: I assume Delaware, but not positive. The reason I ask is I'll want to ask the jurors if anyone not only is employed or has any special connection to Netflix, but also whether they own any shares in Netflix.

MR. CAPOZZI: Your Honor, counsel for Netflix is here. We could ask them.

THE COURT: Well, it's not really that relevant, but I'm delighted to have -- who is counsel from Netflix? So why aren't you home watching movies?

FEMALE SPEAKER: I watched my movies, your Honor. It's Delaware.

THE COURT: The main attraction of Delaware — this goes back to the 19th century, so only I was around to witness it, but the reason all the corporations are -- a great majority of big corporations are incorporated in Delaware, although Nevada is trying to lure them away, is two things. One is low taxes. Delaware basically was the first state to eliminate taxes on corporations. But also, no jury. God forbid we should have a corporation have its matters decided by a jury. So anyway, that's why it's the court of chancery, as you may know.

I have one more thing I should have mentioned earlier, but I'm sure is already known to counsel. No witnesses should be in the courtroom until they're called to testify. They

should remain in the witness room at all times. Who are your witnesses today? Because --

MR. MARKEWITZ: Your Honor, we're starting with Peter Friedlander. If we get through Mr. Friedlander, we'll move to Adam Checchi. I highly doubt we'll get through Mr. Checchi today, but if we do, we'll be calling Ronald See.

THE COURT: I'm not quite sure why it's taking so long, but I'm going to ask the few people that are sitting there to sit in the back while we pick the jury so the jurors can sit in those seats. Then you can move back forward afterwards.

One other thing, which again I'm sure you're already aware, but just to remind everyone, there must be no contact of any kind with the jurors. So if you're on an elevator and there's a juror there and they smile, don't say hello. Don't say anything. Don't smile back. Have no contact with them whatsoever. And that goes for the witnesses as well.

MR. MARKEWITZ: Yes, your Honor.

(A jury of twelve and three alternates was impaneled and sworn)

(Continued on next page)

(Jury present)

THE COURT:  So, ladies and gentlemen, we're about to hear opening statements of counsel.  I want to caution you that nothing that counsel says is evidence.

The evidence will come from just three things: testimony of witnesses, exhibits that come into evidence, and there may be occasionally a stipulation where the parties agree on some fact.

And why do we even have opening statements?

THE DEPUTY CLERK:  There's a juror in the bathroom.

THE COURT:  Oh, I'm sorry.  We're still missing a juror.  I didn't realize that.

(Pause)

THE COURT:  Okay.  So, ladies and gentlemen, as I said, we're about to hear the opening statements of counsel.  And nothing that counsel says is evidence.  The evidence will come from the testimony and the exhibits and any stipulations.

So, why do we have opening statements?  It's because the evidence will come in a little bit at a time and therefore, it may be useful for you to have an overview of what each side believes that the evidence will show or fail to show, as the case may be, so it's kind of a road map so help you follow what's happened.

Now, the government bears the burden of proof beyond a reasonable doubt, so we will begin with the government.

OPENING STATEMENT

MR. CAPOZZI:  This is a case about greed and lies, lies that this man, the defendant, Karl Rinsch told to get $11 million and lies he told to keep that money.

How was the defendant in a position to steal $11 million of other people's money?  He was a movie and television director working at the heights of Hollywood.  He promised to use that money to create an exciting new television show, but that was a lie.

He took that money and laundered it, moving it through bank accounts to hide what he was doing, and then he gambled it in the stock market and on cryptocurrencies.  He then used the money he stole to fund his own luxury lifestyle, to buy a Ferrari and a fancy watch.  That's why we are here today.  We are here because the defendant lied to get $11 million and lies over and over again to keep that money.

For that, the defendant was charged with wire fraud and money laundering, and the evidence you will see and hear at this trial will prove that he is guilty.

During this opening statement, I'll first tell you what the evidence will show, and then I'll describe the types of evidence you can expect to see and hear at this trial.

So, what will the evidence show?  The defendant was a director who was working on a new science-fiction show he created called White House.  White Horse was set in the future

and was a story about human-like robots that were created to help people with disasters.

By 2018, the defendant had completed several episodes of the show and was pitching the project.  He pitched the show to Netflix, a company that makes movies and television programs available to its subscribers over the internet.  The defendant met with Netflix executives.  He showed them a trailer for White Horse and he let them read the script.  They were impressed.  They liked what they saw and they pursued a deal with the defendant.

Eventually, Netflix paid the defendant tens of millions of dollars to finish building the show.  After securing the deal with Netflix, the defendant began filming. But he quickly went over budget.  How did the defendant deal with this?  The evidence will show that defendant came up with an idea.  You see, in late 2019 and early 2022, just as the defendant was struggling to deliver on White Horse, the world began to confront a once-in-a-lifetime development, the COVID-19 pandemic.  Where others saw crisis, the defendant saw an opportunity.

The defendant believed he knew how the pandemic would affect the stock market, which stocks would go up and which stocks would go down.  He thought he could make a killing if he just had the money.

Where could the defendant get the millions of dollars

he wanted?  Netflix.  But things weren't so simple.  The defendant knew Netflix wasn't going to give him millions of dollars to make bets on the stock market.  They would only give him money to do work for their business, making a TV show.

So the defendant lied.  To convince Netflix to send him $11 million, the defendant sent Netflix a list of tasks that he promised he would use the money for, tasks like paying an editor to edit the film and paying for art and costume designer.  Netflix continued to believe in the project and they trusted the defendant, and so Netflix agreed to pay him $11 million.

But Netflix didn't know the truth, that the defendant had other plans for that money.  The defendant took that money and within days, laundered it through bank accounts that he controlled.  Instead of using that money on White Horse, like he promised, he quickly used it on a series of risky stock bets, risky gambles that did not pay off.

In just over a month, the defendant lost about half of that $11 million.  And while he was losing that money, the defendant was continuing to lie to Netflix, lying that White Horse was moving forward really well and was game-changing good, lies that continued for month, after month, after month, to keep up his ruse and to prevent Netflix from knowing what he was up to.

Even after the defendant lost half of Netflix's

money, he continued to make risky bets. The defendant took what was left of the money and he invested it in cryptocurrency. Unlike his earlier bets, these investments actually paid off.

So what did he do now? Did the defendant finally spend the money on White Horse doing what he promised he would do? No. The defendant had no intention of doing that. He wanted to keep the money from his fraud for himself. And so after winning back the money he lost, the defendant went on a spending spree, buying expensive cars and a watch and other items, items he thought he could explain away as being props for White Horse but, in fact, had nothing to do with the show, items that were often just luxuries for himself, like a $740,000 Ferrari and a $380,000 watch.

What did Netflix get for that money? It got nothing. That's what the evidence will show. It will show that the defendant lied to get Netflix's money and lied to keep that money.

Now, how will we prove it to you? Let me take a moment and tell you about some of the evidence you will see and hear at this trial that will prove that the defendant is guilty. First, you'll hear from witnesses. You're going to hear from several witnesses from Netflix, people the defendant deceived into paying him $11 million to use on White Horse. You will see the trailer for White Horse that they saw, and you

will hear from them how impressed they were.  They will explain how they wanted the project to succeed so they could show White Horse to their subscribers around the world.

The Netflix witnesses will explain that they trusted defendant and believed his promise that he would use the money on White Horse and that they would have never paid him that money if they knew he would use it on anything other than the production.  They believed the defendant when he repeatedly lied that he was working on the show during the pandemic.  They will explain what they got for their $11 million.  Nothing.

You will also hear from witnesses who worked for the defendant on White Horse.  You'll hear from the defendant's personal assistant, from a bookkeeper, and from an editor.  These witnesses will explain how White Horse went over budget and how much work still needed to be done when the defendant safed the $11 million from Netflix.  They will explain that much of this work could have been done, even during the pandemic.  They wanted to do the work.  The defendant had other plans.

You will hear from the defendant's financial advisors.  You will learn that within days of receiving the money from Netflix, the defendant transferred it to a brand new bank account he, alone, controlled and then quickly wired the money into his investment accounts.  He then began making big bets on the stock market, big bets on a company that had a promising

treatment for the virus.  The defendant's financial advisor will tell you that he became so concerned about the defendant's risky bets that he put limits on the defendant's trades.

How did the defendant respond?  He transferred his money to a different financial advisor.  You'll hear from that other financial advisor as well.  He will explain that defendant didn't explain anything about how the money was from Netflix.  Instead, the defendant lied and said that money was his own money, that he was comfortable losing it on risky investments.

And that is exactly what the defendant did.  The defendant used the money to make bets on stock and lost about half of the $11 million in just over a month.

You'll also hear witnesses who saw firsthand what the defendant did with the rest of the money once his bets on cryptocurrency paid off.

You will hear from a witness that helped the defendant buy luxury items that had nothing to do with White Horse. You'll even hear from a witness who sold the defendant four luxury mattresses for $600,000.  Those are just some of the witnesses who saw the defendant's actions firsthand and who will testify before you at this trial.

Second, you're going to be able to follow the money. You will see documents showing how the defendant predicted how the pandemic would affect the market before getting the $11

million and how, after getting that money, he quickly routed it through a new bank account before transferring it to his investment accounts.

You will see records reflecting the defendant's risky stock bets and his later successful trades on cryptocurrency. You will see the money flow back into his personal account. And you'll see how the defendant used that money -- Netflix's money -- to buy luxury items for himself.

Third, you'll see the defendant's own words. You will see the many lies he told in emails in text messages, lies about how he would use the $11 million from Netflix on specific tasks for White Horse like editing film and costume design.

And you'll see messages the defendant sent to Netflix after he got their money so that he could keep it and dodge suspicion, messages in which he lied that he was working away and had not slowed down and that White Horse was awesome and moving forward really well.

You'll see that defendant was also lying to his financial advisor. You'll read messages from where the defendant falsely said that the money from Netflix was his own personal money. You'll see a message where the defendant lied to a producer on the project, claiming he had put the $11 million in a separate account so that it would be kept safe and preserved for the production of White Horse. In reality, the defendant had laundered that money and put it in his investment

accounts.

And you'll see the defendant's lies about the luxury items that he bought with his fraud money. You'll see how he tried to claim that cars and jewelry and mattresses that he bought were owned by Netflix, even though the items were never used on White Horse and were entirely unnecessary for the production.

You'll see that in private messages, the defendant said what was really going on. That $380,000 watch, that was a big purchase for himself. The red Ferrari, that was a birthday gift for himself.

Ladies and gentlemen, during this trial, you will hear from many witnesses and see many documents, but at bottom, this is a simple case. It's a case about how the defendant lied to get $11 million and lied to keep that money for himself. It's a case about greed and lies.

Now, I'm about to sit down, but before I do, I'd ask that you do three things during this trial. First, pay close attention to the evidence. Second, follow the judge's instructions on the law, and third, use your common sense, the same common sense that guides you in your everyday lives. If you do that, at the end of this trial, you will reach the only verdict that is consistent with the evidence and with the law: The defendant is guilty.

THE COURT: Thank you very much.

PC2Frin2                    Opening - Zeman

We'll hear now from defense counsel.

OPENING STATEMENT

MR. ZEMAN:  Karl Rinsch is a genius.  Karl Rinsch is a luminary.  Karl Rinsch is a Challenge.  Karl Rinsch is a hack. As a writer and as a director, Karl Rinsch is a visionary, a virtuoso, a man who is able to breathe life into a world that had never existed, a storyteller who dreamed into being a brand new universe without history.

As a producer, Karl Rinsch was a challenge, a man who had shown a pattern of exceeding financial targets, mismanaging, being difficult with collaborators, and repeatedly going over budget, a producer who was unable to properly predict what it would take to realize his dream.

You are going to hear both of these narratives throughout the course of this trial, over and over again. You're going to hear about both of these Karl Rinsch, the two Karl Rinsches, the genius and the hack.

What you will not hear, what you will not see, is that Karl Rinsch is a fraud.  The evidence the government will put forth throughout this trial will not support their theory that Karl Rinsch is a fraud.  An artist, a provocator, a savant, sure; a fraud, no way.  That's what the evidence will show.

This is the story of a creative genius, an artist who has proven that he can develop original, franchisable intellectual property, struggling against the content-hungry

Hollywood during the streaming wars of the last decade and into the global pandemic that was COVID-19.

When Netflix made a bet on Karl Rinsch, for a number of reasons that you will learn about during the course of this trial, the bet did not pay off. The bet didn't pay off, not because Karl Rinsch had devised some scheme where he intended to defraud Netflix but rather, to a combination of bottom-line focused executive groupthink playing fast and loose to expectations, promises, and contract amendments while repeatedly moving the goalposts as to what was to be delivered in an effort to indulge their need for original franchisable IP. Then COVID hit. Things went further off the rails. That's what the evidence will show.

Karl Rinsch is not the person the government has alleged him to be. That is what the evidence will show.

To convict Karl Rinsch of wire fraud and all of the other charges that stem from that allegation, you will need to believe, beyond a reasonable doubt, that between October 2019 and March 2022, Karl Rinsch set out to commit fraud rather than endeavor to realize his artistic vision.

But you won't be able to convict Karl Rinsch Of these crimes, because Karl Rinsch did not commit those crimes. That is what the evidence will show.

You will hear about profligate spending, risky investments, and excessive purchases, but that is not what this

case is about.  This case is about whether Karl Rinsch committed fraud.  The evidence will show that he did not.

What the evidence will show is that Karl Rinsch spent years conceiving, developing, imagining, crafting, writing, and shooting an original concept and franchise that he was able to sell to Netflix.  This concept, at times Conquest and at other times, White Horse, was his baby.  It was a concept that he, alone, had created.  It was an original idea that he dreamed of turning into a franchise.  This was going to be his Star Wars, his John Wick, his Westworld, or his Matrix: multiple seasons, spinoffs, video games lunchboxes, you name it.  That was his dream.  That is what Karl Rinsch endeavored to build.

And you will see that Karl Rinsch did a ton of work on this show, boatloads of work.  He had a huge budget that allowed him to realize an enormous vision, colossal sets throughout the world.  They went to Brazil, to Sao Paolo, where they closed down the busiest street in the city.

(Continued on next page)

MR. ZEMAN:  They were shooting on locations as big as airport hangars.  You will see that they shot on massive sets with hundreds of extras.  You will get a glimpse into Carl Rinsch's imagination — so original, so franchisable that multiple streamers were jockeying to get in on the action.  The creativity that he was ultimately able to sell to Netflix was amazing stuff.  That is what the evidence will show.

You will see that after Brazil they went to Uruguay.  Same thing — monumental vision, massive budget, huge set, elaborate costumes and setups, hundreds of extras.  And again you will hear that things went over budget, but they kept shooting.  And Carl, the brilliant innovator that he is, kept writing, kept expanding his vision.  He was out to build a new world.

Then you will hear after Uruguay they went to Europe, to Budapest, Hungary.  Then you will see again sweeping concepts, boundless creativity, enormous sets.  They were shooting castles, hundreds of extras, green screens as big as the size of sporting arenas, big, beautiful, bold, all up to the quality that Netflix demands.  But again, it cost too much, unexpected overages.  And as always, when the artist cares more about the thing than the cost of the thing, emotions begin to interfere with the contractual relationship he had with Netflix.

For an artist with an expansive vision like Carl

Rinsch, the cost was incidental.  The thing itself was essential.  For Carl Rinsch, the worth lay in the thing itself, not what it cost.  The artist in Carl valued the essence of the work more than the producer in carl valued what it would cost.  And this, you will see created real tension with the artist's benefactor.

This case is a contractual dispute, not a federal criminal fraud.  Carl Rinsch did not set out to defraud Netflix.  He set out to realize his original, franchisable story.  That is what the evidence will show.

And let's not forget the time period during which this dispute began and took place.  We are going to ask you throughout the course of this trial to look back a decade to understand the context of the time in which Carl Rinsch envisioned his wholly original story.

That period of time when Carl developed *Conquest* and *White Horse* was a time when the streamers — Netflix, Amazon, Disney+ and the rest — were in an arms race that battled for the eyeballs and screen time of their customers.  All of these steamers were vying for original, franchisable intellectual property.  If you were a director like Carl Rinsch, you couldn't get a meeting in Hollywood unless you could produce original, franchisable intellectual property, and that's what he did because that's who he is, an artist with a vision.

That is the world in which this story began.  All

steamers were desperate for that original IP.  That is what the evidence will show.  Carl Rinsch showed them that he could conceive and cultivate a world that is of a quality that could be streamed on a platform like Netflix, the biggest streamer in the universe, up to the highest of standards.  They wanted to turn this idea into a brand new world that they could build upon.  That's what the evidence will show.

Carl is a genius who pitched a brilliant concept, and Netflix bought the show.  They bought the concept that Carl Rinsch had conceived and they bought into Carl Rinsch.  They paid him for his idea.  They paid him for his intellectual property, paid him to write more, to shoot and direct more. They paid him to executive produce the show.

And you will see that he was wearing all of these hats at the same time.  He was the one spinning the plates while trying to deliver them the pyramids.  But will you see that as talented as he was as an artist, he was equally deficient as a producer.  That is what the evidence will show.

But Netflix believed in Carl Rinsch.  They wanted the story that he had conceived, so they paid.  You will see that they began paying Carl and his production team even before they had signed, finalized the deal.  They wanted the original franchisable IP.  They were paying for this world that Carl Rinsch had created.

And then even before the deal was signed, Carl got

back to work.  He worked as a writer, as a producer, as a director all over the world.  This case is not a case about a fraud or someone who had intended to defraud a huge multinational company, but rather this is a case about a contract dispute, all flowing from unanticipated overages due to an expansion of the story and an expansion of Netflix's expectations.

This is not a case about fraud or an illegal taking of money.  This is a case about a contract dispute.  The federal fraud statute is not a general enforcement mechanism for punishing disappointment in contractual relationships.  So you're going to be asking yourself throughout the course of this trial how can the government possibly establish prior intent?  How can the government possibly establish that Carl Rinsch set out to commit fraud?  Keep asking yourself that question throughout the course of this trial because the answer you will see is that they cannot.

This project was Carl's baby.  He is an artist.  He is an eccentric.  You will see frustration took hold over him.  His frustration with Netflix and the behavior he exhibited towards them during the COVID lockdowns will explain his volatility.  He was Vincent van Gogh with a Netflix deal, struggling with his benefactor during a once-in-a-century global pandemic.  That is what the evidence will show.

So what was promised?  That's another question you are

going to have to answer.  You will see Carl's relationship with Netflix grew, so too did the show, so too did the scope and the concept.  What began as a script that was 160 pages and contemplating a run time between 110 and 120 minutes ballooned into a script that was 203 pages, then 229 pages.  New characters were added.  It kept expanding as Carl's vision kept expanding.  Carl Rinsch believed in the story and the grand scale of the story because it was a world that he alone had created.

You're going to hear a ton of numbers during the course of this trial, enormous sums of money.  That's what it takes to make prestige TV these days.  But what is at issue is the last $11 million that Netflix paid to Carl Rinsch.  We contend, as Carl did, that that money was his, due to him upon completion of principal photography.  That's what Carl told Netflix at the beginning of February 2020 when he informed that he had completed principal photography for the first season. That's what the evidence will show.

All Carl knew was that Netflix kept asking for more while he kept writing and he kept shooting and he kept trying to deliver more, trying to deliver the original franchisable intellectual property that they wanted.  Carl Rinsch is an artist, a creator who kept creating.  The expansion of the script expanded the project.  While he was working to deliver the first season, Carl was also working toward the second and

other subsequent seasons, working on that expanded universe that he had created.

The government is going to try to argue that the $11 million was for Carl to do certain specific enumerated things over the course of five weeks following early March 2020, things like story boards and shot diagrams and securing locations and fabrication of art and costume design. $11 million in five weeks, that's what they're going to say.

Netflix or the government is going to argue that that $11 million, the 11 at issue here, was for Carl to make budgets and production design, all in five weeks beginning in early March 2020, the start of the biggest global pandemic in a century.  And you will see that when the global pandemic hit and the world went into lockdown, Carl put his head down and went to work.

You will see that his mind did not stop working despite being locked down.  Carl kept working on the show.  He kept expanding the story.  He kept working on *White Horse*.  He was paying a special effects master, paying for his insurance, paying the people who were working for him on the production. You will see that he was still creating, drawing story boards, working through new concepts, and expanding the universe.

What you will learn and the evidence will show is that Carl was certain that $11 million was money due to him pursuant to the contract.  And you will see the correspondence.  You

will hear from these Netflix executives, and you will see that they were not able to prove that Carl took that money with the intent to defraud Netflix. The evidence will simply not support that allegation.

Carl Rinsch believed that money was money due to him because the script kept growing. And while the size of the deliverable, 110 to 120 minutes, had not changed, the expanded script required the story to be told in a different way.

He had final cut and had more than enough footage to deliver that 110 to 120 minutes. So at that point, with respect to the term sheet that you will see that required him to deliver 110 to 120 minutes, he had finished principal photography, thus triggering an $11.218 million payment. That is what Carl told Netflix, and that is what his lawyer told Netflix. That is what the evidence will show.

So how can anyone other than the artist who imagined and created the concept of the show that was pitched and who had been given final cut say when principal photography is complete? If Carl Rinsch had final cut, which he did, then as the script kept expanding, he made decisions that he felt were in the best interest of the story that he had conceived and he was trying to deliver. That's not fraud. That's art. That's what the evidence will show.

You will hear from one of the main negotiators from Netflix, former vice president of original series, Bryan Noon.

He will tell you that this was a special deal. You will also hear later today from Peter Friedlander, another Netflix executive. He will tell you this was a special, unique deal. So will Cindy Holland, another former Netflix executive. They will all tell you this was a unique deal, unlike anything Netflix normally undertook, a bespoke deal. Carl had final cut and little oversight.

You will learn that there was a lack of accounting. Money was flying around. This deal, this term sheet and subsequent negotiations were unique and loose. But it all started with the original pitch. Carl went to them with original franchisable intellectual property, and they bought that concept. He pitched them a show where the episodes were to be between four and fourteen minutes each. Again, this is something totally new. Netflix wanted what the genius Carl Rinsch had shown he could do. They gave him final cut and full license.

Now, this case may be a breach of Netflix's expectations, but it was not a fraudulent taking of property. That's what the evidence will show. Not every contract dispute or subjectively unmet expectation amounts to federal fraud. The federal fraud statute is not a general enforcement mechanism for punishing disappointment in contractual relationships.

Netflix paid for the project, and in exchange for this

money, it would obtain a science fiction series. If there was a misrepresentation, which we do not concede, it was about process, not product. Because you will see the products. And whether you like science fiction or not, you will see that it is breathtaking.

An artist trying to realize his vision while focus groups and Netflix executives tell him they needed more, studio notes telling him to expand the story, studio's expanded demands, the hiccups and unforeseen budget complications, all of that came when COVID arrived. That's what this case is about.

Netflix's complaint is essentially that they didn't get what they deemed was the completed series because, according to them, Mr. Rinsch misused some of the budget. But he had finished principal photography, he told them that. It was his money. That's what the evidence will show.

The government is going to argue that the amendment which triggered the $11 million payment imposed a new obligation that every dollar be used in a specific way. That is simply not true and can't be supported by the evidence. Carl worked on those new obligations. He worked on them to the best of his ability given the limits of the situation during the early lockdown days of COVID. He kept working. He was showing his work.

But now, Netflix argues, the work he was doing was not

enough, but their arguments will not be supported by the evidence. A criminal wire fraud charge cannot be predicated on duties or constraints that did not legitimately exist. There was no scheme or artifice to defraud, none was devised and none ever existed. That is what the evidence will show. Carl made no false pretenses. He made no lies.

So let's look at the timeline. What will the evidence show? And I will offer only the highlights. So Carl Rinsch began conceiving of this world around 2010 or 2011. He began writing and shooting footage that he funded personally and then with some support from investors. By 2018, seven or eight years later, both Amazon and Netflix showed real interest in buying and supporting this project. By the summer of 2018, before Netflix and Carl's production company had entered into a formal written contract, Netflix has already advanced Carl and his company more than $2 million to keep working on the show.

On November 12, 2018, the parties entered into a formal contract called a term sheet. That contemplated approximately 13 episodes ranging from approximately four to fourteen minutes, totaling 110 to 120 minutes based on Carl's original 160-page script.

By April 2019, Carl had shared a newer, expanded version of the script that was now 203 pages long. Netflix loved it. You will see that they told Carl, great work on the new pass of the script. The story, world, and characters

continue to be engaging and riveting.  So Carl kept working, telling Netflix that he anticipated beginning shooting in Brazil in early August, and then he expected to wrap principal photography by Christmas.

You will see that they shot in Brazil through the month of August, and you will see that what they shot was extraordinary — huge sets, giant concepts, lavish costumes, and impressive visual effects and production design.  You will also see that there were unexpected overages in Brazil.  Things just kept costing more than anticipated and money became an issue.  The adequate producer was not up to realizing the vision of the brilliant artist.

But Carl kept Netflix in the loop.  He told them within a week of the commencement of shooting that they needed more money to capture all that he envisioned.  They made it through Brazil, having been able to get everything they hoped, but the financial surprises left the production in a precarious situation.  Carl already recognized that the expanded version of the project would require additional resources.  He told Netflix repeatedly, he told them that the project needed more money.  And they responded, thanking him for the calls.

Through September and into October 2019, Carl continued to shoot going from Brazil to Uruguay, all while keeping Netflix in the loop about the budgetary issues.  Carl would send emails and messages and have phone calls with

Netflix where he would explain to them they needed more to finish the expanded script. When Bryan Noon suggested that he cut some scenes, you will see that Carl wrote him that he was not interested in that kind of relationship that Netflix was proposing.

He is an artist who was trying to realize his vision despite the strictures of what he saw the corporate bean counters were putting on him. He was trying to build pyramids. They were busy counting goats. That's what the evidence will show.

You will see that in October 2019, two Netflix executives flew to Hungary where Carl and the crew were shooting on a huge green screen stage. You will hear that the conversation between Carl and Netflix became heated and antagonistic. The artist was trying to realize his vision. The producer was in over his head. That's what the evidence will show.

You will see that in late October 2019, Netflix proposed an amendment to the term sheet that spelled out what needed to be included in the first season. Carl, having final cut and not wanting to be limited artistically, did not sign or agree to this proposed amendment. Instead, he told them he was at the limit of his resources required to pull the next level of commitment off. He was not giving up his final cut. The production needed more money.

Carl also said it was necessary to table renegotiations of an existing contract during overseas physical production explaining that he would not make a commitment beyond the short-term challenges posed by the situation in Hungary. Carl's attorney, Richard Kendall, also told Netflix Carl was not prepared to sign a new agreement that would commit him to a fixed budget. He had final cut. Netflix sent more money. The work in Hungary continued.

You will see that they shot for the rest of November in Hungary a ton of footage with hundreds of extras with grand sets and costumes, and ultimately wrapped shooting December 5, 2019. They then returned to Los Angeles, and Carl Rinsch kept working.

On January 26, 2020, he delivered a new, further expanded 229-page version of the script for which Mr. Rinsch again informed Netflix he would need more money to complete. When Netflix pushed back on additional funding, on February 4, 2020, Carl emailed Netflix informing them that "principal photography is to be considered completed and prepared for immediate post production on 110 to 120 minutes of material."

He then asked for the 11.218 million which would have been due to him upon the completion of principal photography. Having more than enough footage to deliver that 110 to 120 minutes meant that Carl had finished principal photography. That was the amount due under the original term sheet. And you

will see Carl acknowledge that any further production was a choice, not an obligation of Netflix.

Through February 2020, you will see the negotiations continued regarding finishing production and exploration of the expanded script. On March 4, 2020, will you see that Netflix offered to pay Carl $11 million. You will also see that Netflix asked that Carl and VFX, his production company, complete a series of tasks over the next five weeks which includes story boarding, shot diagram, location contracts, and a number of other things.

You will see that on March 6, Netflix paid the 11 million to Rinsch's production company. That same day you will see that Carl separated the money by transferring ten and a half to a personal trust account. Within days the world had been locked down due to COVID, but Carl kept working on the show.

You will see that over the next few months while the world was locked down, he spent more than the 500,000 that he had segregated from the principal photography amount on things related to the show that were part of those extra contractual tasks that Netflix had asked him to do. He drew up story boards, paid insurance, paid special effects designers, and kept working. He kept working.

You will see that things grew increasingly tense between Carl and Netflix --

THE COURT:  Counsel, you have gone well beyond the time you asked for when we had the pretrial conference on Friday.  I'll give you five more minutes and not a minute more.

MR. ZEMAN:  Thank you, your Honor.

All to say the evidence in this case will show that this was a contract dispute, not an illegal taking of property, and most definitely not a fraud.  You will hear from several executives that Carl Rinsch had a unique approach to production.  He would be difficult to work with.  And despite Netflix being well aware of his unique approach and his well-worn history of going over budget, Netflix made an affirmative decision to be hands off with Carl.

You will hear that normally there's a script, and usually that script stays the same, but that wasn't the case here.  The script kept growing, 40 percent bigger, then 80 percent bigger, kept changing, kept expanding, kept breathing.  Carl was creating a new universe.  Carl was the writer, producer, and director.

You will learn that this sort of arrangement is extremely rare, quite unique.  Usually these are three different jobs.  But despite it becoming clear to Netflix that Carl Rinsch was struggling with production and scheduling, they kept letting him cook.  They were hungry for the meal that the genius had shown he could engineer.

This is the story of a creative genius, an iconoclast,

a virtuosic writer and director that was able to give pulse to a world that had previously never existed.  He was a storyteller that dreamed into being a whole new universe.

As a producer, Carl Rinsch was a man what couldn't quite deliver, but that doesn't make him a fraud — a visionary innovator, yes, but not a fraud.  That is what the evidence will show.  The government decided to bring this case.  You, ladies and gentlemen of the jury, get to decide whether they should have.

We are confident that at the close of this case, once you've heard all of the witnesses and seen all the messages and exchanges, you will agree that this was not a fraud.  This was a contract dispute.  The evidence will show that Carl Rinsch did not devise or intend to devise a scheme or artifice to defraud Netflix.  Carl Rinsch set out to make a show.  He set out to create a new universe, not to defraud Netflix.  That's what the evidence will show.

We are confident that if you really consider what they're asking you to believe, you will find Carl Rinsch not guilty, not guilty of the wire fraud and not guilty of all of the allegations that stem from this dispute.  Not guilty. Thank you.

THE COURT:  Thank you very much.  The government will call its first witness.

MR. MARKEWITZ:  Your Honor, the government calls Peter

Friedlander to the stand.  And if I might approach, your Honor, I just have two items to place on the witness stand before he does that.

PETER FRIEDLANDER,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

          MR. MARKEWITZ:  Before we get started, I would just like to offer into evidence a series of stipulations that the parties have agreed upon.  Those are marked for identification purposes as Government's Exhibit S1, as in Sam, through S10.

          THE COURT:  Received.

          (Government's Exhibit S1 through S10 received in evidence)

DIRECT EXAMINATION

BY MR. MARKEWITZ:

Q   Good morning, Mr. Friedlander.

A   Good morning.

Q   Are you familiar with something called *White Horse*?

A   I am.

Q   What is *White Horse*?

A   *White Horse* is the title of a TV series.

Q   What connection, if any, did you have to *White Horse*?

A   When I worked at Netflix, I acquired *White Horse*.

Q   And what was your role in the project specifically?

A   I was what would be called a -- the lead creative

executive.

Q   Did you have any interactions with the creator of the show?

A   I did.

Q   Who was the creator of *White Horse*?

A   Carl Rinsch.

Q   Do you see Mr. Rinsch in the courtroom here today?

A   I do.

Q   Can you please identify him by describing where he is and an article of clothing he's wearing.

A   He's in the second row of desks in a tie and glasses.

          MR. MARKEWITZ:  Your Honor, the government respectfully requests the record reflect that the witness identified the defendant.

          THE COURT:  Yes.

Q   So Mr. Friedlander, before we get into the details of *White Horse*, I want to hear just a little bit about your background. So where are you from originally?

A   I was born in Phoenix, Arizona.

Q   Do you still live there today?

A   I do not.

Q   Where do you live now?

A   Los Angeles, California.

Q   Did you go to college?

A   I did.

Q   Where?

A    I did my undergrad at Duke University.

Q    And what did you study there?

A    I studied public policy.

Q    Did you earn a degree from Duke?

A    I did.

Q    And did you go to any graduate programs thereafter?

A    I did.

Q    Where?

A    I attended UCLA, the school of urban planning.

Q    So how do you go from pursuing an urban planning degree to working in the entertainment industry?

A    Well, firstly, I was in Los Angeles.  But while I was studying urban planning, I was looking to augment that with a business degree, so I got accepted into the business school. But in order to finish both degrees, I had to take a year off. And in that year off in Los Angeles, I needed to make a living, and so I took a job as a driver.  I drove actors, and I was a production assistant on a movie.  And then I went from there.

Q    What is the first company in the entertainment industry you worked for?

A    The first actual company I worked for was called Playtone.

Q    What is Playtone?

A    Playtone is a film and television production company that's run by Tom Hanks and Gary Goetzman.

Q    You said it's a production company.  What does a production

company do in general?

A    Production companies are producers.  They find great stories that are films or documentaries, podcasts, TV shows, and then they sell them to distributors and then they make them.

Q    So you said that you eventually came to work at Netflix; is that right?

A    I did, yeah.

Q    Around when did you start at Netflix?

A    I started at Netflix in the fall of 2011.

Q    At a high level, what is Netflix?

A    Netflix is an entertainment company.  It distributes entertainment subscription video.

Q    And do you still work at Netflix today?

A    I do not.

Q    Around when did you leave the company?

A    I left Netflix in September of this year, 2025.

Q    Let's go back to when you started there in 2011.  At that time, what was your title?

A    My first title at Netflix was director of original series.

Q    And I just want to be clear because we're talking about entertainment.  When you say "director," were you actually directing shows or was that just a corporate title?

A    I wasn't directing shows.  That's the corporate title.

Q    So as a director at Netflix, around how many different

shows would you work on in a given year?

A    It really varied, at the beginning when I started at Netflix to the outer years.  But you know, at the beginning when we were building it, probably eight to ten, and then it would grow year over year.

Q    And can you give us just three or four examples of shows you worked on during your time at Netflix?

A    Sure.  In the first year, I worked on shows like *House of Cards*, a series called *Orange Is the New Black*, *Narcos*.

Q    And can you just give us a sense of what your day-to-day responsibilities were on these shows that you're working on?

A    Also varied day by day.  But as a creative executive usually part of my day was buying shows, so listening to people's pitches about stories they wanted to tell.  And then once we were in a business relationship with them, I would oversee all creative aspects of a show, which included the writing of the scripts, notes on scripts, actors, who should we cast for different roles.  And then when we were in production, various other things.  So it was just all the creative elements.

Q    How long did you hold the title of director of original series?

A    I was -- I held that title till around 2015, I think, or 2015, 2016.

Q    So what title did you take on at that point?

A    I was promoted to vice president.

Q    Vice president.  Was there any other --

A    Original series.

Q    Vice president of original series?

A    Correct.

Q    How, if at all, did your responsibilities and duties evolve over time at Netflix?

A    When I became vice president, I still held the same creative oversights that I had as a director.  But the promotion then included me in more corporate responsibilities and other decisions that the company would be making.

Q    And in this new role, around how many different shows would you be overseeing or working on in a given year?

A    At that point, again the numbers were still growing, so it could have -- at that point maybe, you know, 15 to 20.

Q    And then what about over the next few years?

A    We continued to grow.  You know, it depends.  Shows would be in different stages at different times, but let's just say generally between 20 and 30.

Q    Roughly speaking, around how many people worked under you in your department?

A    In this -- when I was vice president of original series, I probably managed around 12 to 15 executives.

Q    Did Netflix have project-specific budgets for TV shows that you were overseeing as a vice president?

A    Yes, shows had budgets.

Q    During your time as vice president of original series, who if anyone, did you report to?

A    As -- in this role, I had three different managers at -- yeah.

Q    Who were those?

A    Cindy Holland was my first one, and then Channing Dungey for a period, and then Bela Bajaria.

Q    How long were you in the role of vice president of original series?

A    I was promoted again in May of 2021.

Q    And what new role or title did you take on that the point?

A    At that point I became the head of scripted series for the U.S. and Canada.

Q    Was that your title until you left Netflix earlier this year?

A    That's correct.

Q    And where do you work today?

A    Now I work at Amazon MGM Studios.

Q    Are you familiar with the terms "studio" and "network" as they relate to the entertainment industry?

A    I am.

Q    What's a studio?

A    A studio is a business that owns shows or films, and they sell those to distributors or networks, but they're accountable

for producing the shows, financing the shows.  But they technically own the shows -- the studio technically owns the show.

Q   You said the studio sells the show to the network.  What does the network then do?

A   The network's role is the distribution.  So they're the ones that present the show to the customers.

Q   Is Netflix a studio or a network?

A   It's both.

Q   Can you explain what you mean by that.

A   So when Netflix is the network only, other studios can sell to Netflix and Netflix can distribute them.  So that's when it's the network.  Netflix is also a studio network when they own the show, so came up with the ideas, you know, developed them, and then distributed them as well.  So they were both the owner and the distributor.

Q   I think you said that when you were vice president, one of the things that you did was look to acquire projects for Netflix; is that right?

A   Correct.

Q   So what were the things that you would look for when you were looking to acquire projects?

A   Yeah.  It changes over time.  As Netflix grew, we grew more members, and so we were always looking to figure out what would entertain the members.  And so you'd hear pitches, you'd read

scripts. But I would always be looking for a voice behind the show, a vision behind the show, someone with a creative voice and vision, characters you want to spend a lot of time with because it's television shows. You want to spend a lot of time with them and emotionally connect to them. And you were just looking for the best-in-class stories that if it was a thriller, you wanted it to be thrilling. If it was a comedy, you wanted it to be hilarious. So that's what my job would be.

Q   I want to now focus on those shows in which Netflix is the studio creating the project. Are there different stages in a show's production life cycle?

A   Yes.

Q   Can you just walk us through those.

A   Sure. Once you've bought a project or you're in a deal with a creative team, then you move into this development period, which is where you're cultivating the creative, really working on the scripts. It's where there's sometimes a writers room, but there is where it's just all about what's on the page, and it's called development.

       And then the next stage would -- it can be called preproduction or prep. But this is the stage where we've decided to green light the show, so it's going to get made. And in that period of time, that's when we spend our time building schedules, budgets, hiring the crews that make the shows like cinematographers, picking locations, building the

sets, casting the show, so looking at actors and tapes. So that's that period.

And then we move into what is called production, which is when the cameras are actually rolling and you know that's the most, like, time consuming part of this. And then the final stages are post production when the -- all of the footage that's been shot is cut together, edited, and visual effects are added in and music is added in and it's all finished.

Q   So I want to just pause on that third stage, I believe you said it was production, when the cameras are actually rolling. Are there any other words or terms or phrases that are used to describe that phase?

A   Shooting, principal photography.

Q   So with that background, I want to shift our focus back to the *White Horse* project in particular. Do you know the show *White Horse* by any other names?

A   I do.

Q   What other name or names?

A   Just one other name, *Conquest*.

Q   So why is that show named both *White Horse* and *Conquest*?

A   *Conquest* was the code name.

Q   What do you mean by "code name"?

A   It's common for a lot of films or TV series to have code names just to -- for the confidentiality of the show, to protect spoilers and keep things secret.

Q   So *White Horse* and *Conquest*, that's the same show?

A   The same exact show.

Q   And just remind us what specific role did you play for Netflix as it relates to *White Horse*?

A   So again, I picked it for Netflix and then I was the lead creative executive on it, so the point person.

Q   Around how much time were you spending working on the show when it was at Netflix?

A   It varies depending on what stage of the production it is. But couple times a week, whether they're internal meetings or external meetings on average.  It could be more.

Q   Around when did you first learn about *White Horse*?

A   The -- I think the -- around fall of 2017, I guess.

Q   How did you find out about it?

A   I heard about *White Horse* from an agent who is -- who represented the creative team, and I think he called me to say hey, there's this project I want you to hear about.

Q   And did you have a sense of why he wanted you to hear about the project?

A   He was excited about it and thought it would be a good match for Netflix and what we were doing.

Q   Was he pitching it or he selling it?

A   He was pitching it.  He was a sales -- exactly.

Q   You mentioned an agent.  Very briefly at a high level, what did agents do for shows like *White Horse*?

A    Agents are representatives.  They're the ones that -- who introduce I guess a project to a seller and, you know, also negotiate the deals around it sometimes.  So they're the representative.

Q    Now, as part of this sales process, did you attend any meetings with members of the *White Horse* team?

A    I did.

Q    Was that one meeting or multiple meetings?

A    I remember two meetings.

Q    So who from the *White Horse* production did you meet with during this sales process?

A    I met with Carl, Gabby Roses, Pete Micelli, he's the agent. Keanu Reeves, Ram Bergman and Rian Johnson.

Q    So you said Carl.  Is that Carl Rinsch?

A    Yes, Carl Rinsch.

Q    So what was his role in the project?

A    Carl was the creator, producer, director, writer.

Q    And you mentioned a Gabby Roses.  What was her role on the project?

A    Gabby's role was also a producer, and later she was also the costume designer.

Q    So you said that both Mr. Rinsch and Ms. Roses were producers.  Generally speaking, what does a producer do on a show like *White Horse*?

A    There are a lot of definitions for producers.  But

producers are really the folks on the ground in charge, right.
They are the ones who are accountable for both the business
side, the schedule, the budgets, but also the creative
execution, so really accountable for delivering the show.

Q    And beyond working on the show together, were you aware of
any other relationship between Mr. Rinsch and Ms. Roses?

A    They were married.

Q    They were married?

A    Yes.

Q    You mentioned Keanu Reeves.  Is that the actor Keanu
Reeves?

A    It is.

Q    What connection, if any, did he have to the show?

A    Keanu was a producer on the show as well.

Q    And then lastly you mentioned a Rian Johnson and a Ram
Bergman.  What connection did they have?

A    They were also producers on the show.

Q    So you mentioned a number of different folks that you met
with who all had the title producer.  Based on those meetings,
were there any producers who you understood to be the ones who
were primarily running the project?

A    Yeah.  Carl and Gabby were the main producers.

Q    Now, based on your meetings with Mr. Rinsch and other
members of the project, what was your understanding of the
status of the show's production at that time?

A    So this one's unique in that at the time they brought it in, there were already six short episodes that had been produced and shot and edited, and then there was other footage that had been shot but unedited, and so it was partially finished.

Q    So you say "partially finished."  Was there more that was going to be shot?

A    Yeah, the whole point of it was to turn this into a season of television, which was -- at the time we talked about it being around 13 episodes or chapters.  And so five or six of them had been shot and there were going to be several others to be shot, and that would be the business we would be in together.

Q    And so just to confirm, is it 13 episodes total with five or six having already been completed or five or six already completed and then another 13 on top of that?

A    No, five and six of the 13 were completed even though we were still going to go in and shoot more and change those as well.

Q    What, if any, footage from *White Horse* were you shown during this time?

A    The first thing I saw was the trailer, and I also saw -- I can't remember when, but those short episodes.

Q    To your right there should be a CD with a sticker on it marking it for identification purposes only as Government

Exhibit 6328. Do you recall that CD?

A    I do.

Q    How do you recognize the CD itself?

A    I signed it.

Q    So you saw it and signed it?

A    I saw it and I signed it.

Q    Have you seen what's on the CD?

A    I did.

Q    What's on the CD?

A    What's on the CD is the trailer for *White Horse*.

Q    And how do you recognize the trailer?

A    I watched the trailer on the DVD, and then I -- I also had seen it so many times before.

Q    And is what's on that CD a true and accurate copy of the trailer that you saw for *White Horse* during your time at Netflix?

A    It is.

        MR. MARKEWITZ:  Your Honor, the government would offer exhibit 6328.

        MR. ZEMAN:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 6328 received in evidence)

        MR. MARKEWITZ:  Mr. Coleman, could we please pull up Government Exhibit 6328 and now play it for the parties and the jury.

(Video played)

MR. MARKEWITZ: Thank you very much, Mr. Coleman. You can pull that down please.

Q   Mr. Friedlander, around the time that Netflix was in negotiations to acquire *White Horse*, was there a script?

A   There was.

Q   At some point were you shown that script?

A   I was.

Q   Where?

A   I read it at the home of Keanu Reeves.

Q   And based on that script and the footage that you saw, what was your understanding of the plot of the show?

A   Sure. The story was a futuristic sci-fi show that there's this brilliant biologist scientist who has discovered a way to create organic intelligence, sort of like artificial intelligence, but they look like human beings and they're able to be grown rather than built.

And the hopes would be that these OI, organic intelligence, would be then used for good around the world and deployed to do humanitarian aid and things like that, but they were always meant to be identified as humans. And when it's discovered that they aren't human beings, actual humans react horribly and kill them. And it's a disaster for the OI.

And then so the OI -- there's a community or a safe haven that's created for the OI called Neo Sao Paulo. And

inside of this community these OI would live. And what happens in this part of the story is they start to develop and evolve and create technologies, build a society. There's a hierarchy that is also established. And it goes on from there, but that's the general shape of the story.

Q   So during the sales process, what was your reaction to the *White Horse* project?

A   I was truly blown away. Visuals were something I had never seen before. Thought it was visionary, relevant, exciting, innovative, and felt like something that would be a success at Netflix.

Q   Was a deal eventually reached for Netflix to acquire the show?

A   It was.

MR. MARKEWITZ: Mr. Coleman, could you please publish what's already been admitted into evidence as Government Exhibit S9, please, and I'll read just portions of this. This is titled "stipulation business record" and it begins, It is hereby stipulated and agreed by and between the parties that -- and Mr. Coleman, could you go to page 3, please.

Directing your attention down to paragraph 9, I'll continue. The exhibits set forth in attachment A-3 consist of true and accurate copies of records including emails and their attachments, maintained by Netflix in the regular course of its business. The records were made by or from information

transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records -- and then Mr. Coleman, could you please go to the next page -- were kept in the ordinary course of regularly conducted activity of Netflix as a regular practice of that activity.  To the extent a record is an email, the from, to, CC, and BCC fields accurately display the email addresses that sent or received the emails.  The sent field accurately displays the date and times on which the emails are sent, and the subject line refers to the subject line of the email.

Jumping down to paragraph 12, when this stipulation refers to a Government Exhibit by a number, it includes any Government Exhibit identified by that number followed by a letter.  This stipulation may be received in evidence as a Government Exhibit at trial.  The parties agree that the Government Exhibits identified herein are business records pursuant to Federal Rule of Evidence 803(6) and that neither party will raise authenticity objections to the admission of the Government Exhibits identified herein.  The parties reserve objections based on other evidentiary grounds.

And then Mr. Coleman, could you briefly jump to page 9.  And then if you wouldn't mind just paging through. Thank you.  We can pull this down, Mr. Coleman.

Can we now please show just the witness --

THE COURT:  That was downright visionary.

MR. MARKEWITZ:  Thank you, your Honor.

Could we now please show just the witness and the parties what's been marked for identification purposes as Government Exhibit 6332.

Q   Mr. Friedlander, do you recognize this document?

A   I do.

Q   What is it?

A   This is an email from me to my assistant.

Q   And are there other emails in the chain?

A   There are.

Q   Other emails with Mr. Rinsch?

A   Yes, there are.

MR. MARKEWITZ:  Your Honor, the government would offer Government Exhibit 6332.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6332 received in evidence)

BY MR. MARKEWITZ:

Q   Mr. Coleman, could you please now publish this so that the jury may see it.  Then go side by side on pages 1 and 2.  And then if you wouldn't mind please zooming in on the email at the bottom of the first page and the continuation onto the second page.

So Mr. Friedlander, this is dated March 2, 2018 email and it's sent by a pfriedlander@netflix.com.  Whose email is

that?

A    That was my email address.

Q    Who are you sending this email to?

A    I'm send it to Carl.

Q    Is that Carl Rinsch?

A    Carl Rinsch.

Q    Now looking at the second paragraph of your email, you write, we are so damn excited to be joining you on this project.  Do you see that?

A    I do.

Q    Looking down to the next paragraph, in the second to last line of it you reference grabbing a celebratory dinner or drinks.  Do you see that?

A    I do.

Q    What, if anything, happened around March of 2018 between Netflix and the *White Horse* project?

A    Well, the deal had closed and -- so this was an opportunity to kick off the next stage of that.  And we often like to celebrate the beginning of the relationship, so that's what I was offering up.

             (Continued on next page)

BY MR. MARKEWITZ:

Q. (continued) Whose decision at Netflix, ultimately, was it to acquire White Horse?

A. That was a Cindy Holland and myself.

Q. Were you personally involved in the actual negotiations of that deal?

A. I was not.

Q. Who were the primary negotiators of that deal?

A. The folks involved with the deal were Cindy Holland, Bryan Noon, and Tehmina Jaffer.

MR. MARKEWITZ: Mr. Coleman, you can pull that down now, please.

Q. Mr. Friedlander, you described for us earlier that there were different stages in a production's life cycle.

When Netflix acquires White Horse in 2018, what stage was it in?

A. Sort of in all of them at the same time.

It was in a writing stage, because now it's going to be re-crafted as a series and so it's extensive writing, but it was also -- it could start prepping and planning for the shoot, because some of the locations they had already been to because they had shot in them, so that part of the business -- I'm sorry, that part of the process could continue.

And because it was still unedited footage, that could continue, so it was sort of everything at once.

Q.   It sounds like there was a plan to shoot more footage; is that right?

A.   Yeah, that was the whole point of this.

Q.   And, in fact, did photography on the show resume at some point?

A.   It did.

Q.   The email we just looked at was March of 2018.

Roughly how long after that email was sent was it before photography resumed?

A.   Photography picked up around August of 2019.

Q.   So, March 2018 to August 2019, about a year and a half or so?

A.   Yeah.

Q.   At a high level, what sorts of work was going on with the project during that time?

A.   As I listed before, it was -- there was -- Karl was writing, costumes were being built.  There was a -- Karl had a really unique way of working with these pre-visualizations where he could design the look of every camera angle and shot, and he would mock that up and so he -- when he went into the actual shoot, he would know exactly what he wanted to capture, and so there was a lot of work on that.

There was, like, furniture manufacturing, because it's set in the future.  And Karl had a real vision for the look and feel and aesthetics of it.  They started to manufacture

chairing and carpets and things like that.

Q. And when you say manufacture, you mean the production is actually creating the furniture that it wants to the shoots?

A. That's my recollection.

Q. Over that period, how frequently, if at all, were you speaking to Mr. Rinsch about the show?

A. Frequently.

You know, we'd talk on the phone, or I'd visit his office and see what he was creating. And it was really exciting to see, you know, all those visuals and what was in the works.

Q. What was Netflix's actual role in the day-to-day of creating this TV show?

A. It was much more of a place of support.

So they were already -- Karl was writing, and they were the producers, but they were the real -- you know, I guess I was more in the background. And there is a creative partner and business partner to them.

Q. Was that a typical role for Netflix in a relationship like this?

A. Not usually.

Netflix is usually more involved with the projects, but because this one had already started and had been shot, part of it had been edited, there was a lot of expertise there that we were leaning on, that they had the expertise.

Q.  Based on your discussions with Mr. Rinsch and what you observed about the project during this period, how involved in the details of making the show did you understand him to be?

A.  Karl was involved in every detail.  I don't think there was anything that Karl didn't touch or review or select.

Q.  And what was your impression of how focused he was on the specific look and feel of what would be appearing on the show?

A.  The design of the show was -- is -- was very important to Karl.  And he had a real, again, vision for it.  And it was exclusive to him, so he had a real acute attention to detail. I believe that you testified that you read a script for the show at Keanu Reeves' house around the time that Netflix purchase purchased is that right?

A.  That is correct.

Q.  Did you see any changes get made to the script after Netflix acquired the project?

A.  Yes.  Yeah.

Q.  Can you explain?

A.  Yeah.  In that period of time before we were shooting, Karl was going to work on the script and, you know, evolve the characters, build up some characters, create new characters, pull things back and really adjust the story across this new 13-episode approach and so -- and that's what he did.

           MR. MARKEWITZ:  Mr. Coleman, can we show just the parties and the witness what's been marked as Government

PC2Frin4                    Friedlander - Direct

Exhibit 6339. If we could just zoom in on the top half of the page to make it a little easier to see, Mr. Coleman. We can include the bottom as well. Can you just include basically all the text on the page, thank you.

Q. So, Mr. Friedlander, I'm showing what's been marked for identification purposes only as Government Exhibit 6339.

Do you recognize this document?

A. I do.

Q. What is it?

A. This is an email from me to Fidan Manashirova.

Q. Your Honor, the government would offer Government Exhibit 6339.

MR. ZEMAN: No objection.

THE COURT: Received.

(Government's Exhibit 6339 received in evidence)

THE COURT: Counsel, find an appropriate spot to stop, because we're going to give the jury their lynch break.

MR. MARKEWITZ: Perhaps we can stop before I get into the document, your Honor.

THE COURT: Very good.

Ladies and gentlemen, we're going to take our lunch break now. Be back at 2 o'clock. Today we're only going to 4, so we won't take a break between 2 and 4.

Have a good lunch, and we'll see you at 2 o'clock.

(Continued on next page)

(Jury not present)

THE COURT:  Mr. Friedlander, you can step down.

Okay.  We'll see you all at two o'clock.

(Lunch recess)

(Continued on next page)

PC2Frin4                      Friedlander - Direct

2:00 p.m.

(Trial resumed; jury present)

THE DEPUTY CLERK:  I've got an alternate in the loo, I think.

Here we go.

THE COURT:  Please be seated.

Counsel.

MR. MARKEWITZ:  May I proceed, your Honor?

THE COURT:  Yes.

MR. MARKEWITZ:  Thank you.

BY MR. MARKEWITZ:

Q.  Welcome back, Mr. Friedlander.

A.  Thanks.

MR. MARKEWITZ:  Mr. Coleman, can we please pull back up the document we were looking at before we left, for everybody, which is Government Exhibit 6339.

If you could zoom in on just the top email, that would be much appreciated.  And the text of it, too, please.

BY MR. MARKEWITZ:

Q.  Mr. Friedlander, can you just remind us what this is?

A.  Yeah.  This is an email from me to Fidan Manashirova.

Q.  Who is Ms. Manashirova?

A.  She was my assistant at the time.

Q.  And the email is dated as June 3, 2019.  At that point, had

PC2Frin4                    Friedlander - Direct

photography on the remaining episodes of White Horse resumed?

A.  No.

Q.  Sorry, I didn't hear that.

A.  No.

Q.  About five lines down from the top is a row that's titled:
attachments.

        Do you see that?

A.  I do.

Q.  And after that it reads Conquest one-liner 5.28.19.pdf.

        Do you see that?

A.  I do.

Q.  What is a one-liner?

A.  A one-liner is a shooting schedule.

Q.  And who creates a one-liner for a project like White Horse?

A.  The producers would create this.

Q.  And remind us, who are the producers?

A.  This would be with Karl Rinsch and Gabby Roses and probably
the first AD, the first assistant director.

Q.  What's a first assistant producer?

A.  First assistant director is a person who helps build the
schedule and is a director's right hand, really.

        MR. MARKEWITZ:  Mr. Coleman, can we please go to
page 2 of this document.

Q.  Mr. Friedlander, what are we looking at on the screen here?

A.  This is a one page of a one-liner schedule.

MR. MARKEWITZ: Mr. Coleman, could you please zoom in from the top row that reads 5.28.19 and go through the gray row. Again, it's end of shooting Day 1. Thank you.

Q. So, Mr. Friedlander what do you understand the 5/28/19 to mean at the very top of this document?

A. That's the date that the one-liner schedule is issued and shared.

Q. Now the next row says, Sao Paolo. What is that?

A. That is the actual location where the shooting takes place.

Q. Sao Paolo, Brazil?

A. Sao Paolo, Brazil. The city.

Q. Below that are two rows, the first reading: national memorial IOIR and then the next reading Parliament building.

What are those saying?

A. The national memorial IOIR is -- I believe that's the frictional location that's in the story. So, you see the OI, the organic intelligence. That's the fictional location.

And then the Parliament building is the actual building in Sao Paolo where the shooting will take place.

Q. Now, below that, there are five colorful rows and then at the bottom is a gray bar that starts: end of shooting Day 1.

Do you see that?

A. Yes.

Q. Let's start with that gray bar at the bottom.

What's that saying?

A.   The gray bar says: end of shooting Day 1 Wednesday,

August 7, 2019.  All the rows above that are scenes that will

be shot inside of shooting Day 1.  And shooting Day 1 will take

place on Wednesday the 7th, 2019.

The three and one-eighth pages in the gray bar

indicates that on Day 1, they will shoot three and one-eighth

pages of the script.  And usually, time estimate is like how

much time would we spend shooting, but it's not filled in

there.

Q.   Okay.  And you said that the rows above it, those are the

scenes that would be shot that day?

A.   Exactly.

Q.   Before we look at one of those, can you just explain to us

what you understand the different colors to mean on those rows?

A.   Oftentimes, the different colors represent different times

of day.  And the reason that's important is for lighting

purposes.

So if you're lighting for morning or lighting for day

or lighting for night, it's a different type of lighting style,

and so those colors represent that.

Q.   So, let's just start at the first scene that's being shot

that day.  Can you walk us through each of the cells in this

one-liner and explain what they mean?

A.   Yes.

So starting with the upper left pink cell, yeah, sheet

PC2Frin4                           Friedlander - Direct

No. 228 -- this is less common, but my recollection is that this sheet number is tied to Carl's pre-visualization of the scene, as I described before, where he had already looked at the differential camera angles, so I believe that is what that is referencing.

Underneath, that says seven-eighths of a page, so that's the length of the scene that will be shot inside of the script, so seven-eighths of a script page.

The next cell over, that is the actual scene number inside the script. So, every scene has a number associated with it, and that is the scene number inside the Conquest script.

And then the next cell says interior morning, so that means we will be shooting inside instead of as opposed to exterior, which would be outside, and again, it's in the morning, set in the morning, so we need morning light.

And then the next cell is the fictional location. That's the IOIR bunker. And then in the story that takes place, Daisy and Paz at the mainframe, they launch Samson, that's a description of what happens in the scene. Daisy and Paz are two of the characters in the show, and what's -- that's just a shorthand of what the scene is about.

And then the last cell, so, every cast member is also associated to a number, and so Daisy and Paz are likely 10 and 20 on a different document, which would be the cast list or the

character list.

Q. Okay, so with that introduction, what date was shooting planned to resume on White Horse, according to this one-liner?

A. According to this one-liner, Wednesday, August 7, 2019, would be Day 1 of photography.

Q. And in what country would they be shooting?

A. In Brazil.

Q. At this time when -- the planning to resume shooting, was the entirety of principal shooting to take place in Brazil?

A. No. This was a global shoot, so it would start in Brazil but it was intended to shoot in South America, Europe, Africa.

MR. MARKEWITZ: Mr. Coleman, can you just flip page by page until we get to page 9, please.

Thank you.

Q. Mr. Friedlander, we're at page 9 of the document. About a fourth of the way down this page, it says company travel to Uruguay.

Do you see that?

A. I do.

Q. What connection did Uruguay have to the White Horse production?

A. Uruguay is the second country after Brazil where the company or the crew would travel to to shoot the next portion of White Horse.

Q. According to this one-liner, when was the crew expected to

start shooting on the ground in Uruguay?

A.   If you follow down to the gray bar, the end of shooting Day 21 -- it says Wednesday, September 11, 02019, that would have been the first day of shooting in Uruguay, Montevideo.

          MR. MARKEWITZ:  Mr. Coleman, could you, please, flip now until you get to page 11.

Q.   Mr. Friedlander, what was the next planned shooting location?

A.   After Uruguay, the company would then move to Budapest, Hungary.

Q.   And when was photography in Budapest planned to begin?

A.   Well, according to this, if you look at the gray bar, ending of shooting Day 27, which would have been Monday, October 27, 2019.

Q.   Were there additional locations planned for the shoot after Budapest at this time?

A.   Yes.  We were planning to do Berlin, potentially somewhere in Prague, Kenya, Mexico was on the docket, so there were several other places left.

          MR. MARKEWITZ:  Mr. Coleman, can we please jump straight to page 20.

Q.   And is Kenya there?  Is that a reference to the shoot occurring in Kenya?

A.   Correct, in that black bar there, yeah.

Q.   So the schedule at this time was planned to be Brazil, then

Uruguay, then Budapest, then other locations?

A.   Correct.

MR. MARKEWITZ:  Mr. Coleman, we can pull down this document.  Thank you.

Q.   Mr. Friedlander, generally speaking, what goes into setting up an international shoot like this?

A.   Well, they are not common because they're -- they're, it takes a lot of organization.  Every -- inside of every country, you basically have to kind of start all over by building a whole new crew, getting new equipment, new hotels, obviously, so it's -- each country involves quite a bit of planning.

And what typically happens is that a production like White Horse would make a deal with what's called a production services company.  And a production services company, they're experts inside of the city or country where you hire them, and they are the ones that have the pre-existing relationships with lighting vendors or stages or local actors or casting directors, and so you form those partnerships inside of each country that you head into.

And so for a show like this, it's complicated because there's a lot of jumps to different countries, and there's also the same crew that you take with you to all of these shoots as well and the actors that you bring with you, so it takes a lot of coordination and planning.

Q.   Based on what you could see in your conversations with Mr. Rinsch around this time, how would you view that planning process to be going?

A.   It wasn't -- it wasn't entirely clear, but -- you know, I was, at the time, trying to help them find a different kind of a producer called a line producer, because that's really the person who's going to help them organize all of these locations and pull that off.

     And so we -- you know, it was a struggle to find a line producer.

Q.   So at that time, did they have a line producer?

A.   To my knowledge, they never hired one.

Q.   And how, if at all, did that affect your views of the project at that point?

A.   It was troubling, because I knew how hard it could be to do one of these international shoots, and so it was a concern.

Q.   I think you said that shooting did, in fact, begin at some point; is that right?

A.   It did.

Q.   Around when?

A.   It was around August of 2019.

Q.   And what was the first location they actually started filming at?

A.   It was Sao Paolo, Brazil.

          MR. MARKEWITZ:  Mr. Coleman, can you show the witness

and the parties what's been marked as Government Exhibit 6341.

Q.  Mr. Friedlander, is that large enough for you to see it? Yes?

MR. MARKEWITZ:  Mr. Coleman, why don't we zoom in on the top half of the page.  Thank you so much.

Q.  Mr. Friedlander I'm showing you what's been marked for identification purposes only as Government Exhibit 6341.

Do you recognize this document?

A.  I do.

Q.  What is it?

A.  This is an email from me to Kris Henigman.

Q.  And are there other emails in that thread?

A.  Yes.

Q.  Is one of those from Karl Rinsch?

A.  One's from Karl to me.

Q.  Your Honor, the government would offer Government Exhibit 6341.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6341 received in evidence)

MR. MARKEWITZ:  Mr. Coleman, can you now publish this so that the jury may see it as well?  And can we zoom in on Mr. Rinsch's email from the header down to paragraph 8.

BY MR. MARKEWITZ:

Q.  Mr. Friedlander, this email is dated September 10, 2019.

Just remind us who is this from?

A.  This email is from Karl Rinsch to me.

Q.  And who is copied on the email?

A.  Gabby Roses.

Q.  Is that one of the producers of the show you mentioned earlier?

A.  Yes.

Q.  Mr. Friedlander, can you read aloud, for us, the third and fourth paragraphs.  This is the one starting:  The problem in this case?

A.  The problem in this case is a simple one of money, which is a reality I have to face and manage.  Despite our best efforts and meticulous planning of schedule, budget, pre-pro, once we have landed abroad, the budgets have exploded on us with no leverage and total exposure.

We are constantly taking damage.  Having gone through what we have gone through in the last month, there is no reason to believe that this pattern will change moving forward or that we will be able to hold the line financially.

Q.  When you received this email, what was your understanding of the state of production?

A.  My understanding was -- up until this email -- was that we were going to, you know, continue shooting.

But this was a concerning note to receive.

Q.  So, two photograph paragraphs below that, Mr. Rinsch

writes:  As far as I can tell and excepting that my point of view is limited to deep inside the eye of the storm, there are two options.  And then he sets out two options below that.

Do you see that?

A.  I do.

Q.  Can you describe for us what you understood the impact would be of going with option one?

A.  Yeah.  So, option one Karl described as protect and survive.  And in this option, Karl is suggesting that they only shoot the first 110 pages of the screenplay, so like half of the story.  And it wouldn't go over budget, but they would deliver half the show.

Q.  You said they would deliver half of the show or half of the story.

What did you understand the story to be?

A.  Well, the story was much like the one I described to you and much like the one that was in the trailer, where it goes all the way through to the Neo Sao Paolo Palace story, and this was suggesting to tell half that.

Q.  Okay.  Below that, what did you understand Mr. Rinsch to be proposing as option two?

A.  Option two he is saying, well, we can continue shooting as planned, but the budgets are just going to keep going up and we don't know what they're going to be.  It's unpredictable. and we'll just need more money.

Q.   Did you talk to Mr. Rinsch about these two options he proposed?

A.   I did.

Q.   What did you tell Mr. Rinsch about option one?

A.   Well, option one wasn't an option, because we were going to tell the whole story that we agreed to tell.  And option two, you know, we could figure out how to talk through how the budget would grow, but we needed to be included in all of those conversations.  So, that wasn't also an option unless we really got under the hood and talked about what that would look like.

Q.   And could you just remind us what is the date of this email?

A.   This is Tuesday, September 10, 2019.

         MR. MARKEWITZ:  Mr. Coleman, can we please pull this down and replace it -- for just the witness and parties -- what's been marked as Government Exhibit 6342.

         And if you wouldn't mind zooming in on the text so it's a little bit easier to read.  Thank you.

BY MR. MARKEWITZ:

Q.   Mr. Friedlander do you recognize what's been marked, for identification purposes only, as Government Exhibit 6342?

A.   I do.

Q.   What is it?

A.   This is an email from me to Karl Rinsch and Gabby Roses.

         MR. MARKEWITZ:  The government would offer Government

Exhibit 6342.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6342 received in evidence)

MR. MARKEWITZ:  Mr. Coleman, can we now publish so that the jury may see it now as well.

This is an email that you sent to Mr. Rinsch on September 12, 2019; is that right?

A.  That's correct.

Q.  Is that two days after the last email that we looked at?

A.  Yes.

Q.  At a high level, what were you seeking to get from Mr. Rinsch in this email?

A.  So, this was the information that we were looking to to get from Karl to understand what has been shot and what would future needs be for the show, and so these are the -- I guess -- documents that -- and information that we would need to order to have a real conversation about the needs moving forward.

Q.  I just want to make sure that we all understand what each of these bullets are, so I just want to talk about a few of them.  Bullet number 2 refers to full cost reports.

What's a cost report?

A.  A cost report includes where the money had been spent in Brazil, sort of day by day, so you get an understanding of:

Okay, well if the budgets went over, where did they go over and then what categories did they go over.

Q. Now, bullet 4 has two sub-bullets below it.

Do you see that?

A. I do.

Q. So the first sub-bullet refers to assembly of storyboards.

What's that?

A. So, the storyboards is another way to describe what Karl did with those pre-visualizations. I would call those interchangeable. They're just ways to see drawings or sketches of what the scenes would look like so you could see them even if they're not the actual footage.

Q. And then the next bullet refers to dailies.

What are dailies?

A. That's a different term for footage. Dailies are what you -- at the end of every shooting day, all of that raw footage is aggregated in a set of dailies. And so, typically, on any show I worked on, I would get dailies, but I hadn't at this point.

Q. For White Horse?

A. For White Horse.

Q. Now, the next bullet refers to call sheets, wrap reports, and production reports. What are those?

A. Call sheets, wrap reports, and production reports are what the assistant director team and -- would pull together.

Call sheets are what you get the night before you're

shooting, so it's the most details the most detailed document of what you're going to shoot that day or the next day. And those are critical for every crew member, and it lists every scene -- similar to the one-liner, but then there's way more detail in terms of like the props that are required, stunts that are required, safety issues. It also includes what's shooting the next day so people can prepare for the next day.

And then on the back of a call sheet, every crew member that will be in attendance on that day is listed there with an "in" time and "out" time, so that's for "in" time.

Wrap reports are what you make at the end of the day that is an update to what you achieved based on what you were intending to do on the call sheet.

So, there's the call sheet that sets up the day. The wrap report is the actual results. And I believe production reports are similar but they might be more aggregations of reports over days.

Q. And then, lastly, the next bullet has starts with PSC.

What does PSC stand for?

A. Production service companies are those companies that I described earlier that are the local production companies or experts for that city or region. And for future territories, those were the countries we hasn't been shooting it yet.

Q. And can you just explain to us, why did you view this information as relevant to Mr. Rinsch's request for more money?

A.   Well, up until this point, we didn't have this information, and now the show is at a crisis point.

And in order to have a real conversation about how we could be helpful and assess the situation, we needed to have all the information that Karl and Gabby had.  And this was the information that should have been readily available to share.

Q.   Around this time, from your perspective, how easy was it to get information out of Mr. Rinsch about the status of the show?

A.   It was very difficult, if not, impossible.

Q.   Why do you say that?

A.   Because up until this point, I had the script and I had the one-liner, but very little else that would be -- if not anything else.

Q.   After this exchange in early to mid- September of 2019, were there ongoing conversations with Mr. Rinsch about the productions budget?

A.   Could you repeat that?

Q.   This exchange occurs in September of 2019; right?

After that, were there ongoing conversations with Mr. Rinsch at all about the budget?

A.   Yes.

MR. MARKEWITZ:   Mr. Coleman, would you please pull this down and replace -- just for the witness and the parties -- what's marked as Government Exhibit 6344?

And Mr. Coleman, can you please zoom in on the piece

PC2Frin4                        Friedlander - Direct

of this page with text?  That should be sufficient.  Thank you.

BY MR. MARKEWITZ:

Q.  Mr. Friedlander, I'm showing you what's marked for

identification purposes only as Government Exhibit 6344.

Do you recognize this document?

A.  I do.

Q.  What is it?

A.  This was -- this is an email from Bryan Noon to Karl

Rinsch.

Q.  And are you on this email?

A.  I'm copied.

Q.  Your Honor, the government would offer Government Exhibit

6344.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6344 received in evidence)

MR. MARKEWITZ:  Mr. Coleman, can you please publish

this so that the jury may see it.

And can we jump to page 3, and if you couldn't mind

zooming in on the two emails in the middle of the page, ending

under where it says:  Best, CER.

BY MR. MARKEWITZ:

Q.  Mr. Friedlander, starting at the bottom of this chain, who

are these two emails between?

A.  Between Bryan Noon and Karl Rinsch.

Q.   And generally speaking, what issue were they talking about here?

A.   They're talking about the budget and the overages.  And Bryan Noon is inquiring what actually is -- is asking what is actually driving up the budget, what is causing the $7 million in overages.

         MR. MARKEWITZ:  Mr. Coleman, can we go to page 2. and can you zoom in on Mr. Rinsch's email at the bottom of the page.

Q.   Mr. Friedlander, this is Mr. Rinsch's response.

         Can you read the first three paragraphs of the email aloud for us?

A.   There is an unexpected cost associated with the "Netflix tax factor."  But you're right, not everything is that.  The short answer, the length; it's just more.

Q.   What did you understand Mr. Rinsch to mean by the "Netflix tax factor"?

A.   You know, he -- what I think he's saying is that because this show is now affiliated with Netflix that there are charges.  People are charging him more.  Vendors are charging them more because people think that Netflix can pay more.

Q.   And then he refers to length.

         What did you understand him to be saying about how length was impacting the budget overages?

A.   He's just saying the length of the script is just costing

more.

Q. Now, in the next three paragraphs, Mr. Rinsch writes: If it's something that has exceeded expectations and given a great ROI, creatively and financially, then this is a chance to get more product at a critical point of fabrication at a lower cost per minute than even initially negotiated.

If it's not, then everybody is best off stopping here and cutting, fixing the original length. I believe you win either way.

What did you understand Mr. Rinsch to be saying in the first two paragraphs?

A. He's suggesting that if what he's making is better than we had hoped and we're getting more for our money, based on the execution, then we should continue to invest more in the show because it's already a lower cost-per-minute show, so put more money into it.

Q. And in the second paragraph?

A. If you don't want to do that, then we can just stop and go back to the -- I guess, the first script.

Q. And he says: I believe you win either way.

Did you agree with that?

A. No.

Q. Why not?

A. Because we were investing in this to tell the entire story with a beginning, a middle, and an ending. And to just end it

before the end would be to create an unsatisfying and terrible

customer experience Mr.

MR. MARKEWITZ:  Mr. Coleman, can you please go to page

1, and can you zoom in from the top of the email and just above

the bullet reading: merge Day 19 and 20.

Q.  Mr. Friedlander, what is Mr. Bryan Noon -- actually, let me

first ask, Bryan Noon, you mentioned that name before.

Can you just remind us who he is?

A.  Yeah.  Bryan Noon is a Netflix employee who ran business

affairs.

Q.  And then copied, I see Ms. Roses and you.

There's a Mike Posey.  Who is Mr. Posey?

A.  Mike Posey is an executive who is in charge of physical

production or actual shooting.

Q.  And then Cindy Holland.  Who is that?

A.  Cindy Holland ran the team, was my manager.

Q.  So with that background, what is Mr. Noon proposing in this

email, at a high level?

A.  So, what this email is offering up is some ideas to Karl

that we understand that the costs are going up.  Here's some

ideas where we think maybe we could make some creative trims to

the show where the whole story holds up still, but there's some

areas that we can save some money.

And this was our way of making creative suggestions

that we thought could be helpful, you know, for Karl to

deliberate on and see if he agreed that these would make sense.

Q. And what role, if any, did you have in coming up with this list of suggested cuts?

A. I was a part of it, and -- yeah.

Q. Below the first bullet where it says Budapest, Mr. Noon writes to not reshoot the tunnel chase sequence?

Do you see that?

A. I do.

Q. What did you understand the tunnel chase sequence to be a reference to?

A. There is a tunnel chase sequence. You can actually can see. Part of it was in the trailer where there are these robots and there's a car chase and -- it had already been shot.

MR. MARKEWITZ: Mr. Coleman, could we publish for the jury, all of us, Government Exhibit 3028 again.

And if you wouldn't mind, could you play from two minutes 53 seconds to three minutes, five seconds?

(Video played)

BY MR. MARKEWITZ:

Q. Mr. Friedlander, is that the chase sequence you were describing?

A. Yes. Those were -- the chase sequence was intercut with other scenes, but yes. All that with the car flipping and going through the tunnel.

Q. Why was Netflix suggesting not to reshoot that scene?

PC2Frin4                    Friedlander - Direct

A.   On the one-liner schedule that we had, it listed, like, shooting five days of the tunnel sequence again.

We thought well maybe this is an opportunity to not reshoot this because the first one looked so amazing and looked excellent, so why would we need to reshoot it.  And that felt like a good place to save some budget and time.

MR. MARKEWITZ:  Mr. Coleman, can we please briefly pull back up Government Exhibit 6344, and if you wouldn't mind zooming in on the header and the two paragraphs below it.

Q.   Mr. Friedlander, in the last sentence of the first paragraph, Mr. Noon references the immediate plan to shoot in Hungary.

Do you see that?

A.   Yes.

Q.   Did the White Horse shoot move to Budapest at some point after this email was sent?

A.   Yes, it did.

Q.   Okay.

MR. MARKEWITZ:  Thank you, Mr. Coleman.

You can pull that down.

Q.   Who from Netflix, if anyone, visited that shoot?

A.   I went to Budapest, and Mike Posey, who I mentioned earlier, went with me.

Q.   And why did you and Mr. Posey visit the production in Budapest?

PC2Frin4                          Friedlander - Direct

A.   We thought this would be a good opportunity to have continued budget conversations with Karl and the team, and doing it in person is often easier when -- you know, directors are busy shooting. It can be hard to get their time and attention, so we thought it would be best to just show up and be there in the same time zone.

          MR. MARKEWITZ:  Mr. Coleman, can you show just the witness and the parties Government Exhibit 6345. And if you wouldn't mind, please just zoom in on the parts with text.

Q.   Mr. Friedlander, I'm showing you what's been marked for identification purposes only as Government Exhibit 6345.

          Do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is an email from me to Ethan Weiner.

Q.   Who is Mr. Weiner?

A.   Ethan Weiner was Karl's assistant.

Q.   And what role, if any, did Mr. Weiner have with respect to the White Horse production?

A.   He was involved all the way through it and did a lot of coordinating of meetings and distributions, *et cetera*.

          MR. MARKEWITZ:  Your Honor, the government offers 6345.

          MR. ZEMAN:  No objection.

          THE COURT:  Received.

PC2Frin4                    Friedlander - Direct

(Government's Exhibit 6345 received in evidence)

MR. MARKEWITZ:  Mr. Coleman, can we please publish this so that the jury can see it now.  Thank you.

Q.  So, a little bit down the page is an email, October 11, 2019, at 11:16 a.m. from Ethan Weiner.

Do you see that?

A.  I do.

Q.  And was that email sent around the same time as your trip to Budapest?

A.  I believe so.

Q.  And how long was that trip?

A.  I think I was there for two nights.

Q.  So the email references an itinerary for the day.

Do you see that?

A.  Yes.

Q.  When you went to Budapest, can you describe to us, at a high level, what you decided to do there?

A.  Yeah.  We started the day going to Origo Studio.  That's where White Horse was shooting, so we got to see -- for the first time, actually -- White Horse being shot and some of the way they were approaching the creative work on the ground.

And then we also saw some footage from Brazil and in Uruguay, and then we went to -- I think some time letter that night we went to have dinner, dinner meeting.

Q.  Was Mr. Rinsch a part of that meeting?

A.   Yes.

Q.   So during that meeting, what, if anything, was discussed about the status of the production?

A.   The meeting was intended to be an opportunity to have a conversation around some of the same topics that were listed in a prior email that we talked about where it was:  What has been shot, what needs to be shot, and how are we going to tackle it.

     And so that was the purpose of the meeting is to just, you know, be thought partners and understand better how we can help solve some of the budget challenges and the shooting challenges, because there were many in front of us.

     MR. MARKEWITZ:  Mr. Coleman, we can actually pull this down.  Thank you.

Q.   Mr. Friedlander, you described the purpose of the meeting.

     How did the meeting actually go?

A.   It wasn't productive.

Q.   Why do you say that?

A.   Well, for one, I didn't get a lot of information out of the meeting, and then Karl left the meeting.

Q.   When he left, did he appear to be agitated or upset?

A.   Yes.  He left, and the meeting was not over.

Q.   Did you speak with Mr. Rinsch again before leaving Budapest?

A.   We did.

Q.   And how did that second conversation go?

PC2Frin4                        Friedlander - Direct

A.   It was the next day, and again, the same spirit of trying to, you know, understand what the challenges are so we could help.  And it resulted in the same experience where Karl left the meeting.

Q.   Okay.  And this is taking place in October 2019?

A.   The month?  Yes.

Q.   So focusing for a moment just on the remainder of 2019, did Netflix send Mr. Rinsch money for the show?

A.   In that year?  My recollection is, we may have advanced him some money against a delivery but --

Q.   When you say "advance," what do you mean by that?

A.   So, the way a deal can be structured is where you get paid part of your money at the end, once you've finished the show and you've delivered it.  And an advance on that would be, we'll pay you some of that money even though you haven't delivered yet.

Q.   Were you personally involved in the negotiations around that advance?

A.   Not at all.

Q.   Around when did shooting in Budapest end, to your knowledge?

A.   I think it was before Thanksgiving, but I know it was within that year.

Q.   Late 2019 or around then?

A.   Yes.

Q.  Now, earlier today, you testified that there were some locations after Budapest that had planned to be shoot; is that right?

A.  Yes.

Q.  Can you just remind us what a few of those were?

A.  Berlin.  There was some palace, castle-palace work that could have been done in, I think, in Prague or outside of Prague.  And then Kenya, still, was outstanding.  There was some work in Mexico.

Q.  When the shooting ended in Budapest, did the production go to those locations?

A.  It did not.

Q.  Why not?

A.  Partly because it was the holidays, and that's typically a time where people, you know, take a break and then also because there was no plan.  There was no schedule or plan in place.

Q.  When you say there was no plan, what do you mean?

A.  Schedule, budget, approach.

     We didn't know what the next stage of this was going to be, so it was felt wise to take a pause.

Q.  To your knowledge, was principal photography done with the story that you had purchased by this point?

A.  No.

Q.  And why do you say that?

A.  Because we hadn't completed it, and we had much of the

story left to tell. There was shooting that still needed to take place even in the earliest episodes, so there was shooting all the way through the story that hasn't been completed.

MR. MARKEWITZ: Mr. Coleman, can you please show just the witness and the parties what's been marked at Government Exhibit 6348.

Q. Mr. Friedlander, I'm showing you what's been marked, for identification purposes only, as Government Exhibit 6348.

Do you recognize this document?

A. Yes.

Q. What is it?

A. This is an email from Mike Posey to Karl Rinsch.

Q. And are you copied on this email?

A. I am.

Q. Your Honor, the government offers Government Exhibit 6348.

MR. ZEMAN: No objection.

THE COURT: Received.

(Government's Exhibit 6348 received in evidence)

MR. MARKEWITZ: Mr. Coleman, can we please publish this for the jury. And if you wouldn't mind, Mr. Coleman, can you go to page two and zoom in on the first email in the chain?

Thank you.

Q. So, this is a December 16, 2019 email from Mike Posey and addressed to Karl Rinsch.

Do you see that?

A.   I do.

Q.   And can you just remind us, who is Mike Posey?

A.   Mike is the person that oversees physical production and worked very closely with me.

Q.   So, he begins by thanking Mr. Rinsch for coming in in the week prior.

     Can you read aloud the second paragraph of Mr. Posey's email?

A.   With that in mind, we just wanted to check in on the revised schedule and see if you have something you're ready to share.  And we should also pick back up the conversation of budget and how this all fits together.  Should we jump on the phone in the next few bay days before the break?

     MR. MARKEWITZ:  Mr. Coleman, can you now go to page 1 and please zoom in on Mr. Rinsch's response at the bottom.

     Thank you.

Q.   Mr. Friedlander, can you read aloud the first two paragraphs of Mr. Rinsch's response?

A.   Absolutely.

     I've been taking this time to do some writing.  The goal is to have scripts, breakdowns, and schedules by the new year to be laser specific.

     But the general overview is consistent with the plan of setting up shop in Eastern Europe and finishing out all of the OI storyline as first priority.  The key will be to lock in

PC2Frin4                          Friedlander - Direct

the service provider ASAP to help put together budgets.

I can make basic assumptions, but when it comes to something material we can all reference, we should have firm budgets from the providers in place and be comfortable with them before we step in the pool.

Q.  So he references finishing out a storyline.  What storyline did you understand him to be referring to there?

A.  My recollection is, he wanted to finish the -- this is the OI story line -- so the organic intelligence, those characters -- and where they move into their own society and they're inside the palace.  My recollection is that's that part of the story to shoot out in Eastern Europe, because that's where all the old palaces were.

Q.  And was that piece of the story part of the trailer that you saw?

A.  Yeah.  That was the whole last section of the trailer where you see the elements that look like a palace and fantasy.

Q.  And you referenced a complete story that you understood when Netflix acquired the show.  What was part of the story you understood you were buying?

A.  Yeah.  That was a big part of the story.

And what was exciting was how this story really evolved into this whole unexpected community and all the drama that took place between the OI.  That was critical.

Q.  Mr. Rinsch references doing some writing and working on the

script.

Do you see that?

A.  Yes.

Q.  How did you understand that to relate to the budget issues that Mr. Rinsch had been facing in 2019?

A.  That would have been the only script work to do at this time is to just figure out what trims he could make and adjust to contain some of the overages and then schedule and budget it.

Q.  So, trimming the script?

A.  Trimming.

MR. MARKEWITZ:  You could take this down, Mr. Coleman. Thank you.

Q.  Did there come a time over the next few months after that email when Mr. Rinsch send you a revised script for White Horse?

A.  Yes.

Q.  How was that script different from the prior script you had seen?

A.  Hard to remember in detail, but it was -- it was more different than I expected it to be.

Q.  What do you mean by that?

A.  It wasn't just trims.  It was kind of rethinking the way of telling the story.  And we'd already shot part of it.  We still didn't know what had been shot, so then, to then come up with a

PC2Frin4                    Friedlander - Direct

whole new approach was incongruous with, you know, with the middle of what we were doing.

MR. MARKEWITZ:  Mr. Coleman, can you please show the witness and the parties what's marked as Government Exhibit 6351.  And if you could zoom in on the piece with text, please.

Q.  So, Mr. Friedlander, I'm showing you what's marked for identification purposes only as Government Exhibit 6351.

Do you recognize this document?

A.  I do.

Q.  And what is it?

A.  This is an email from Karl Rinsch to Bryan Noon.

Q.  And were you copied on this email?

A.  I am copied.

MR. MARKEWITZ:  Your Honor, the government offers Government Exhibit 6351.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6351 received in evidence)

MR. MARKEWITZ:  Mr. Coleman, can you publish this exhibit so the jury can see it as well.  Thank you.

Q.  Mr. Friedlander, you had said that this was an email from Karl Rinsch to Bryan Noon, copying yourself and others.

What date was this email sent?

A.  This is on February 3, 2022.

Q.  Now, starting in the third paragraph, Mr. Rinsch writes:

In an effort to move forward in a smooth, productive, and efficient fashion, I would like to present the current state of affairs and propose a structured business plan that might provide a simple roadmap to a complex endeavor.

To be clear, our objective is to complete and deliver the product and to bring it to market.  I hope this proposal may provide a reasonable, feasible order of operations directed towards this goal.

Do you see that?

A.   Yes.

Q.   So, at the time that you received this email in February 2020, had Netflix received any episodes of White Horse beyond those that already existed at the time Netflix bought the project?

A.   No.

MR. MARKEWITZ:  Mr. Coleman, can we please jump to page 3.

Q.   Mr. Friedlander, at the top of this page, it's titled: State of the Union.

Do you see that?

A.   I do.

Q.   Without going line by line, what did you understand, at a high level, Mr. Rinsch to be saying on this page?

A.   What this page is is a list of items that, I guess, Karl has in his possession and documents that he has in his

possession and legal documents and accounting documents and he has in possession. And he talks about that he has them.

Q. How, if at all, did this relate to the sorts of information Netflix had been seeking from him over the past few months?

A. This would be the type of information we were needing to see in order to understand how we could help address the problems.

Q. And when you say this would be the type of information, is this the actual information itself you were asking for?

A. No. This is the list that says what the information is, but this is not the information.

MR. MARKEWITZ: Mr. Coleman, can you please go to page 4, and can you zoom if in on the section titled: A Personal Request.

Q. Mr. Friedlander, can you please read this aloud for us.

A. The whole thing?

Q. Yes, please.

A. A personal request: First and foremost and independent of cost operational considerations, I kindly ask the script to be reviewed creatively on its own terms. As this script attempts to deal delicately with important and sensitive issues such as trauma, I would like to honor that without financial bias.

If, later in the process, this project does not make financial sense, then I will deal with the consequences accordingly. But for now I would ask to take this moment to

gauge its artistic merit or lack thereof.

Please respect that this is a personal request and non-negotiable. I am confident that this script represents my best creative emotional efforts for the project, but I'm open to any, all artistic critique, feedback, and interested in collaborating.

This script will be the most accurate representation of the final product and will be considered an unmoving target for all production.

Q. Mr. Friedlander, was Netflix making any decisions about the White Horse project without considering cost issues?

A. At this point, we're in the middle of a shoot. We weren't trying to solve creative issues, we were trying to resolve budget and scheduling issues, so that was the only thing we were considering at this time.

MR. MARKEWITZ: Mr. Coleman, can now please go to page 7 and zoom in on the proposed two-step deal at the bottom.

Q. Mr. Friedlander, can you explain to us what you understood Mr. Rinsch to be proposing under that header there?

A. So, this is a proposal for -- what he's proposing is a ten-week preproduction period. And that would cost $5 million. And in that period, it would finance all of these things that are listed here.

Q. It was your understanding that that was money he was simply saying he was going to spend, or was it money he needed from

PC2Frin4                        Friedlander - Direct

Netflix?

A.   That was the money he needed from Netflix in order to finance these line items.

Q.   Did discussions about White Horse funding continue after this email?

A.   Yes.

MR. MARKEWITZ:   Mr. Coleman, we can pull this down.

And can you please show just the witness and the parties what's been marked as Government Exhibit 6358?

Q.   Mr. Friedlander, I'm showing you what's been marked at identification purposes only as Government Exhibit 6358.

Do you recognize this document?

A.   I do.

Q.   What is it?

A.   This is an email from Bryan Noon to Richard Kendall.

Q.   And who is Richard Kendall?

A.   Richard Kendall was Karl's lawyer, Karl Rinsch's lawyer.

Q.   And were you copied on this email?

A.   Yes.

Q.   Your Honor, the government offers Government Exhibit 6358.

MR. ZEMAN:   No objection.

THE COURT:   Received.

(Government's Exhibit 6358 received in evidence)

MR. MARKEWITZ:   Thank you.

Mr. Coleman can we go to page -- down to the bottom of

the thread and go to page 5.  And if you could zoom in on Mr. Noon's email, from the header down to the third paragraph, ending just above the bulleted list there.

If we could include just one more line in the zoom-in. Thank you.

Q.  So, Mr. Friedlander, this email was sent from Bryan Noon to Karl Rinsch and Richard Kendall on March 4, 2020.

Richard Kendall, that's Karl's lawyer?

A.  Correct.

Q.  Now in the first sentence of his email, Mr. Noon writes: Based on Cindy's Karl's discussions, we are prepared to approve the following as the next phase towards completing the production of delivery based on the most recent script.

What Cindy did you understand that to be referring to there?

A.  That's Cindy Holland.

Q.  And the next lines, Mr. Noon writes:  Netflix shall fund 11 million.  Such funding shall not represent an acknowledgement of any of the contractual milestones.

Home VFX shall perform and shall use the $11 million to fund the following over a five-week period.

Do you see that?

A.  I do.

Q.  What did you understand Home VFX to be?

A.  That was the name of the Karl's production company.

Q.  And was that company involved in creating White Horse?

A.  Yes.

MR. MARKEWITZ:  Mr. Coleman, can we now keep the zoom in on that, the last line we're just one, the: Home VFX shall perform, and include the bulleted list below it.

Q.  Mr. Friedlander, now we can see the list.  I'm going to just read the intro again.  Home VFX and shall perform and shall use the $11 million to fund the following over a five-week period.

Can you just walk us through each of the bullets here and explain what they are?

A.  Sure.

The first one is storyboards and shot diagrams for every shot.  Again, this is what I've mentioned a few times.  These are these very detailed camera angles and pre-visualizations of every shot and that would be remaining to be shot.

Secured location contracts, location contracts are -- so, you select a location where you're going to shoot, like a palace for a palace scene, and you find out that it's available and you start to -- or they'll let you shoot there, and then you start to make a contract with that location.

Production designs, art designs, costume designs, hair and makeup designs, those all of the textiles like the fabrics and the couches, and the costume designs are what they sound

PC2Frin4                    Friedlander - Direct

like.  And of course, if there's any extra design work that has to be done for prosthetics, for makeup and hair.

The fabrication for art and costume means the actual building, making of costumes and art elements.

Block calendar, this is the calendar -- I don't know what MM breakdown is; I don't remember, but shooting schedule, these are the schedules and calendars for the rest of the shoot.

The next one is pay or play on key crew actors, artists.  These are different things.  There's a -- pay or play is a way to describe certain deals where you're obligated to pay certain actors even if you don't shoot because you've booked their time, so that's a pay or play.

And then just key crew deals, that we know that were making deals with crews, so when we go to these locations, we know we have the best.

Budgets, as we've stalked about, those are budgets.

And then PSA, those are the production service contracts with the local experts.

Editor and support team for editorial on existing material, so, that's editing.  This is what I talked about as that later phase of editing and working with what we have so we could see what actually cuts together and what we might need more of or even what we might need less of.

And lastly, production insurance, legal

overhead, accounting overhead, office space, these are just operational needs, so to make sure that that everything's running legally and properly in every location.

(Continued on next page)

Q   What, if any, connection did you understand there to be between Netflix's offer to pay Mr. Rinsch money and the tasks listed here?

A   Well, as it says, this is the money to fund these deliveries.

Q   At this time as the creative head overseeing the project for Netflix did you support giving Mr. Rinsch additional money if it was not going to be spent making *White Horse*?

A   No.   The only money to be spent was to be to finish *White Horse*.

Q   Mr. Coleman can we show pages 5 and 6 side by side, and if you can zoom in on the last paragraph that starts on page 6 and then spills over onto the next page.

Mr. Friedlander, at this time in March of 2020 how important to you, if at all, was it that Mr. Rinsch be updating Netflix about his progress on the show moving forward?

A   Well, it was very important because we needed to get this show back up and running again.   In order to do that we needed to get this information quickly.   And because we hadn't received this information yet, we needed to stay in touch on it in order to make sure it was going to happen and so then we can get back on our feet.

Q   Now this is an email from Bryan Noon with this offer.   And I think this is page 5 of the email thread.   So there's a number of additional pages.   Were you involved in the back and

forth of the actual negotiation itself at this time?

A    No, I was never involved with any of the negotiations.

Q    To your knowledge, was the $11 million referenced in Mr. Noon's email actually paid to Mr. Rinsch?

A    Yes.

MR. MARKEWITZ:  Mr. Coleman, if we could please pull this down and if you could please publish in its place what is already in evidence as Government Exhibit S7.  And this begins that it's stipulated and agreed between the parties as follows: The Federal Reserve Bank of New York, the FRB-NY, and other Federal Reserve banks operate the Fedwire Funds Service, which is a real time gross settlement system that enables participants to initiate immediate funds transfers.

Financial institutions that hold an account with a Federal Reserve bank, which are called master accounts, are eligible to participate in Fedwire.  Fedwire is a credit transfer service through which the entity originating a Fedwire transaction instructs the Federal Reserve bank to debit funds from its own master account and credit funds to the recipient's master account.

Since at least April 2009, the processing of all Fedwire transactions has involved a multistep process and two data centers located in New Jersey and Texas, respectively. Every Fedwire transaction requires the exchange of electronic communications between those two facilities before it can be

completed.  Since at least March 2020, the FRB-NY has been headquartered at 33 Liberty Street, New York, New York.  Any master account that a final institution has with the FRB-NY is located at the FRB-NY's headquarters.

Since at least March 2020, Citibank N.A. has held a master account with the FRB-NY, the Citi Master Account.  Government Exhibit 6119 is a true and accurate copy of a record maintained by the FRB-NY regarding an $11 million Fedwire transaction on March 6, 2020.  The March 6 transaction was originated by a Wells Fargo bank account on behalf of Netflix Studios LLC and was received by a Bank of America account on behalf of Home VFX.

Government Exhibit 6120 is a true and accurate copy of a record maintained by the FRB-NY regarding an $8 million Fedwire transaction on March 16, 2020.  The March 16 transaction was originated by a Bank of America account on behalf of Home VFX and was received by a Wells Fargo account on behalf of the Carl Rinsch Trust.

Government Exhibit 6121 is a true and accurate copy of a record maintained by the FRB-NY regarding an $8.5 million Fedwire transaction on March 30, 2020.  The March 30 transaction was originated by a Wells Fargo account on behalf of the Carl Rinsch Trust and was received by the Citi Master Account on behalf of Charles Schwab & Co.  The Citi Master Account located at the FRB-NY was the beneficiary of the

March 30, transaction and was credited 8.5 million as a result.

Government Exhibits 6119 through 6121 were maintained by the FRB-NY in the regular course of its business.  The records were made by or from information transmitted by a person with knowledge of the matter set forth in the records at or near the time of their creation.  The records were kept in the ordinary court of regularly conducted activity of the FRB-NY as a regular practice of that activity.

Your Honor, at this time the government would move to admit Government Exhibits 6119, 6120, and 6121.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6119, 6120, 6121 received in evidence)

Q   Mr. Coleman, if you wouldn't mind pulling up next to this Government Exhibit 6119, and if you could zoom in on the page where there's text.

Mr. Friedlander, looking at the document on the right-hand side of the page, you see at the top where it says Fedwire funds message?

A   Yes.

Q   A little bit down below the page there's a header that says basic information, and below that there's a row titled amount. What number is after amount?

A   11 million.

Q    Down the page a bit there's a header that reads originator

information, and under that there's a name.  What name?

A    Netflix Studios LLC.

Q    And then below that is another header that's titled

beneficiary information.  What is the name below that?

A    Home VFX.

Q    Can you remind us what was the name of Carl Rinsch's

production company?

A    Home VFX.

Q    Okay.  Mr. Coleman, we can put down both of these.  Thank

you so much.

         Now, Mr. Friedlander, did lockdowns due to the

COVID-19 pandemic start in March of 2020?

A    Yes.

Q    How did COVID impact the Netflix shows that were in

production or going into production at that time?

A    They impacted all of them and we had to shut down the shows

that were shooting and really stop.

Q    Mr. Coleman, can you please pull back up Government

Exhibit 6358.  And if you wouldn't mind going to page 5 and

zooming in on the bulleted list in the sentence just above it.

         Mr. Friedlander, around how many different projects

were you overseeing in March of 2020?

A    You know, they're all in various stages of production

again, so --

Q    Overall.

A    Roughly, you could say probably between 20 and 25.

Q    Were some of those projects in either preproduction or post production at that time?

A    Yeah.  Yes.

Q    Which, if any, of the tasks listed here continued on projects you were overseeing after the start of COVID?

                MR. ZEMAN:  Objection.

                THE COURT:  Ground?

                MR. ZEMAN:  Foundation, your Honor.

                THE COURT:  All right.  Lay a foundation.

Q    Mr. Friedlander you said that you were overseeing a number of projects during COVID; is that right?

A    Yes.

Q    Were you receiving updates about the status of those projects?

A    Yes.

Q    Were you kept advised of the work that was being done on those projects?

A    Yes, there was a lot of communication.

Q    Did that include after the pandemic started?

A    Yes.

Q    Which, if any, of these tasks listed here continued on projects you were overseeing after the start of the COVID lockdowns?

A   You know, every -- again, every show is in a different state, so I can't say all were doing this.  But shows were being edited, which was one of the bullet points.  Shows were working on budgets and schedules and designs knowing that one day this pandemic would end and we needed to be prepared.  So folks were working on those on different shows.  You know, several of these -- almost all of them could have been done on shows during that period.

Q   And focusing on editing in particular, how was it that edits could continue during the lockdown?

A   Editing was the one -- is usually -- editing is one editor who can work on a computer.  So that was a -- more of a solitary work experience that you could do safely from the comfort of your -- and safety of your home if you're an editor.

Q   Now turning our focus to *White Horse* specifically, did you ever receive work product from Mr. Rinsch or anyone else on the *White Horse* team showing that these tasks listed here were being worked on after March 4, 2020?

A   No.

Q   If we could please pull this down, Mr. Coleman, and if we could show just the witness and the parties what's marked as Government Exhibit 6330.  And if you could zoom in on just the text, please.  I apologize, 6360.  Excuse me.  I misspoke.

     Mr. Friedlander, do you recognize what's marked for identification purposes only as Government Exhibit 6360?

A    I do.

Q    What is it?

A    This is an email from me to Kris Henigman and Mike Posey.

Q    Further down in the chain are there emails between you and Mr. Rinsch?

A    Yes.

        MR. MARKEWITZ:  Your Honor, the government would offer Government Exhibit 6360.

        MR. ZEMAN:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 6360 received in evidence)

BY MR. MARKEWITZ:

Q    Mr. Coleman, can we now publish this so that the jury may see it.

        At the bottom of this thread, Mr. Friedlander, you write an email to Mr. Rinsch on March 8, 2020.  Why did you send him that email?

A    I recall sending that email because we had agreed about doing this next preproduction phase so we could start figuring out and planning the rest of the shoot.

Q    Mr. Rinsch responds, sounds great we're around and quietly moving forward while the craziness swirls overhead.  What craziness swirling overhead to you understand him to be referring to in mid-March 2020?

A    My guess, this was about four days before I know we shut

our offices down, so I believe that's the COVID craziness.

Q   What then did you understand from his message that he was moving forward with COVID swirling overhead?

A   That he was working on the items that we agreed upon.

Q   Okay.  And then you forward this email to others at Netflix and you include what looks like a smiley face in your email. Do you see that?

A   I do.

Q   Why did you include that smiley face?

A   Because I was happy to have progress in that we were on the path to finishing.  It was good news.

Q   And your understanding of that progress, where did that come from?

A   From the -- what Carl says that we're quietly moving forward.

Q   Mr. Coleman, can we please pull this down and replace it for just the witness and the parties what's marked as Government Exhibit 6363.  We can zoom in on just a little bit of text on top there.

Mr. Friedlander, do you recognize what's marked for identification purposes only as Government Exhibit 6363?

A   I do.

Q   What is it?

A   This is an email from me to Carl.

MR. MARKEWITZ:  Your Honor, at this time the

government would offer Government Exhibit 6363.

          MR. ZEMAN:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 6363 received in evidence)

BY MR. MARKEWITZ:

Q    Mr. Coleman, can you please publish this for the jury --

          THE COURT:  Counsel, come to sidebar.

          (Continued on next page)

(At sidebar)

THE COURT: Since there doesn't seem to be any objection to any of these emails, I'm wondering why we're going through the waste of time of first showing it to the witness, etc. Does defense counsel know -- you've seen the list of exhibits?

MR. ZEMAN: Yes.

THE COURT: And for these emails authored either by your client or by Mr. Friedlander, is there any objection?

MR. ZEMAN: I don't think so, no.

THE COURT: All right. So I think the thing to do is just introduce them. If when you hear the number there's some objection, then alert government counsel and he can go through the process. But otherwise I think we need to move this along. I'm a little concerned that the jury is bogging down a little bit.

(Continued on next page)

(In open court; jury present)

Q   So getting back to it, Mr. Friedlander, we're looking at a March 31, 2020 email that you sent to Mr. Rinsch with the subject line touch base.  Do you see that?

A   I do.

Q   At this time why did you want to set up a touch base with Mr. Rinsch?

A   Well, March 31, it's been a couple weeks since the start of the shutdown, and it made sense that I had one check-in on his well-being like I did with all of our partners, but also get a sense of how he was approaching working on the things that we talked about.

Q   If we can pull this down, Mr. Coleman, thank you.

So after the start of the pandemic, did there come a time when you met with Mr. Rinsch in person again?

A   Yes.

Q   Around when was that meeting?

A   It was in May of 2020.

Q   Where was that in-person meeting held?

A   That was in Los Angeles at the Four Seasons Hotel.

Q   And who set up the meeting at the Four Seasons Hotel?

A   Carl set this meeting up.

Q   Who attended the meeting in person?

A   The meeting was with me and Cindy Holland and Carl.

Q   What, if anything, did Mr. Rinsch give to you and

Ms. Holland during that meeting?

A    He gave us a book.

Q    Mr. Friedlander, sitting next to you is an item that is marked for identification purposes as Government Exhibit 6372. Do you recognize it?

A    I do.

Q    What is it?

A    This is a copy of the book.

Q    The book that Mr. Rinsch provided?

A    Correct.

Q    You say it's a copy.  Is it the actual book he gave to you personally?

A    No.  I think I still have that.  This is somebody else's.

Q    So how do you recognize it as the book that was provided?

A    Oh, it was shown to me before, and I flipped through it and it was the same.

Q    And have you ever seen another book that looks like this about *White Horse*?

A    Besides the one that I have?

Q    Correct.

A    There are other copies of it, but they're all --

Q    The same book though?

A    The same book.  Yes, the same.

Q    Is this a true and accurate copy of the book that you believe Mr. Rinsch gave you at that Four Seasons meeting?

A    It is.

MR. MARKEWITZ:  Your Honor, at this time the government would move to admit Government Exhibit 6372.

MR. ZEMAN:  No objection.

THE COURT:  Received, but let me see it.

(Government's Exhibit 6372 received in evidence)

THE COURT:  I see.  So it's a book within a cover of some sort?

MR. MARKEWITZ:  I was actually going to ask the witness to remove the cover, your Honor.

THE COURT:  Very good.  Because from where I was sitting it did not appear to be a book even in the sci-fi view of books.

Q   Mr. Friedlander, if you turn it down and put it on the desk and shake it, I think that will get it out.  Can you just lift it up and show the jury the front cover and just remind us, *Conquest*, that's the other name for the *White Horse* show?

A    Yeah, that was the code name.

Q   And could you show them the side just so they can get a sense of how many pages it is.  Thank you.  You can put that down, Mr. Friedlander.

Was that coffee table book something that you would ask Mr. Rinsch to put together?

A    No, it was not.

Q   Based on that meeting you had with him, what was your

impression as to why he gave it to you?

A    I don't know exactly.  I think because we hadn't seen anything, this was one thing to show that he could share with us.  And it -- and I think it was hopefully I think in his head it was to impress us.

Q    At a high level what's actually in the book?

A    These are photographs that are behind the scenes or -- that's called unit photography that are taken during the shoot. So there's a camera -- there's a photographer that's on set as well and documenting the shoots, so these are very, like, high-gloss images.

Q    Is this from the 2019 shoot?

A    This was from the 2019 shoot, yes.

Q    During this meeting at the Four Seasons, did Mr. Rinsch say anything about what he had been doing with the money Netflix gave him in March?

A    We didn't talk about that.

Q    Was that your last in-person meeting with Mr. Rinsch that year?

A    Yes.

Q    So following the start of the pandemic, I think you had said that you were in touch with the various projects that you were overseeing; is that right?

A    Yes.

Q    And getting updates on their status?

A    Yes.

Q    Did projects you were overseeing go back into production?

A    Yeah, they did.

Q    Around when?

A    I think some were in the fall, some started in the new year.

Q    To your knowledge, did production resume on *White Horse* around that time?

A    No.

Q    Are you personally aware of production ever resuming on *White Horse* during your time at Netflix?

A    No.

Q    Are you familiar with the term "write-down"?

A    I am.

Q    What does it mean to write-down a show?

A    Well, I'm not -- I'm not an account -- it's kind of an accounting term.  But the way that I understand it is if something is intended to be an asset for a business and then it's no longer perceived to be an asset, you write it down.

Q    Did there come a time when Netflix wrote-down *White Horse*?

A    Yes.

Q    Around when?

A    It was in that -- in 2020, maybe in the -- that fourth quarter.

Q    Fourth quarter of 2020?

A    Yeah.

Q    What role, if any, did you play in the decision to write-down the show?

A    I was part of that decision.

Q    And at a high level why was the decision made?

A    The decision to write-down the show was based on the fact that there hadn't been any progress in preparing the next stage of shooting and it seemed unlikely to happen.

Q    Once a show is written down, does that mean it can no longer be worked on?

A    No, it could still be worked on.  It's an accounting term, so it could continue.

Q    After *White Horse* was written down, were you still interested in receiving a finished copy of the show if it could be completed?

A    I'm -- yeah.  I mean, I spent years working on this.  I always wanted to see what it would finish, what it would feel like when it was finished.

Q    In your view what would have been a better outcome for Netflix's business, writing down *White Horse* or receiving a finished show?

A    Receiving a finished show.

Q    Why is that?

A    Well, because we're -- we run entertainment business and our business is about bringing entertainment to people.  So

bringing something like this and working years on it to bring it to our members was -- is the goal of our business.

Q   After March of 2020, other than that book that you have in front of you there, do you recall receiving any *White Horse* related work product from Mr. Rinsch or his team?

A   No.

Q   At any point after March of 2020, did Mr. Rinsch or anyone else on the *White Horse* production provide you with any of the items in that bulleted list from the March email we saw?

A   No.

Q   Over the course of 2020, did Mr. Rinsch ever tell you how, if at all, he spent Netflix's 11 million?

A   No.

Q   At any point following March 6 of 2020, did Mr. Rinsch ever say anything to you about investing Netflix's money in the stock market?

A   No.

Q   At any point following March 6 of 2020, did Mr. Rinsch ever say anything to you about losing money on investing in stock options?

A   No.

Q   Other than *White Horse*, did Netflix have any additional projects with Mr. Rinsch while you were at Netflix?

A   No.

Q   During your early period around when Netflix purchased

*White Horse*, do you recall hearing the term "Amarna" when you went to Mr. Rinsch's office?

A   Only in that it was like the -- I think it was the password he gave when you came in to walk in to enter the office.

Q   Other than that, to your knowledge did the term Amarna have anything to do with *White Horse*?

A   I don't think so.

Q   At any point before you left Netflix this year, did the company receive additional work product from Mr. Rinsch on *White Horse* that you're aware of?

A   No.

Q   To your knowledge was *White Horse* ever completed?

A   No.

Q   At any point before you left Netflix this year, did the company ever receive any episodes of *White Horse* other than those that already existed at the time Netflix bought the show in 2018?

A   No.

Q   Did any of those episodes of *White Horse* ever stream on Netflix?

A   No.

          MR. MARKEWITZ:  Just one moment, your Honor.

          No further questions at this time.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. ZEMAN:

Q   Good afternoon, Mr. Friedlander.

A   Good afternoon.

Q   So you've been in the television business for quite some time, right?

A   Yes.

Q   I think you said you started at -- was it Tom Hanks' production company?

A   Yes, Playtone.

Q   And you moved over to Netflix 2011, correct?

A   That's correct.

Q   And you were -- I think you said you were the first executive to start an original series initiative at Netflix; is that correct?

A   I was.

Q   And your job was to oversee the creative side of show development, right?

A   Yes.

Q   Not the business side, just the creative, right?

A   Just the creative, yeah.

Q   And at the beginning of opening a show, you would assess the submissions, right?

A   Yes.

Q   And then if you liked something, you'd try to help develop that content, right?

A    Yes.

Q    And this was scripts, right?

A    It could be scripts.  It could be pitches, books, articles, yeah.

Q    But some creative person, a writer or a director, would come in, whether it's a script or an idea or a story or some sort of pitch, and pitch it to you, right?

A    Yeah.  They'd have a "take," it's called.

Q    And you were then responsible -- your job was to help them to kind of execute the development of those ideas, right?

A    Yeah.  It's -- we're there to help and support it creatively and, you know, make suggestions and give them ideas and --

Q    And it's not just creative suggestions, but it's also helping them to assess how much an idea might cost, right?

A    Yeah.  And that's more with the partnership of the physical production executives, yes.

Q    So in combination with those folks, you would try to help figure out how much it would cost to realize the vision of a story, right?

A    Yeah.  Yes.

Q    Okay.  And part of that would be helping with the scheduling, right, for the production itself?

A    Yes.

Q    Okay.  And not just with the scheduling of the production,

but also with the post production, correct?

A    Yes.

Q    Okay.  And that would include visual effects, right?

A    Typically, but not always, yeah.

Q    Well, in a show that would require visual effects, right?

A    Yes.

Q    Okay.  As well as even the music, right?

A    Yeah.  Yes.  You know, each show has a different need, but yes.

Q    And Netflix, they're responsible for the financing of these shows typically, right?

A    No, it's different.  Like, there's some that are studio financed and there are different approaches.

Q    Well, the ones that were studio financed, they would come in, Netflix would buy more of the finished product, right?

A    It's definitely not my area of expertise in terms of how those deals are structured.

Q    Okay.  I'll move on.  But you've been in this business --

A    Yeah.

Q    -- for a long time, right?

        And it's fair to say you've been involved in the production of hundreds of shows; is that fair to say?

A    Seasons, yes.

Q    Hundreds of seasons?

A    Probably, yeah.

Q   And as many as a new show a week, right, you've been involved with?

A   I don't know if that's accurate, but it's been a lot of shows.

Q   Let's direct your attention back to 2018 or so, right?

A   Okay.

Q   That was a pretty robust time in Netflix's development of new content, correct?

A   Yeah.  It was a busy time, yeah.

Q   2018, 2019, those were probably the busiest times for Netflix, would you say, as far as producing new content?

A   I don't know that I would say that, but it was busy.

Q   So that was a time where Netflix was really ascendant; would you say that's fair?

A   When you're in there working on it, you're just making the shows.  It was definitely a busy time, but I -- yes.

Q   Okay.  And this was also -- it was a pretty competitive environment, right, with respect to the other streamers?

A   It was definitely heating up in terms of -- there were a lot of entrants into the streaming world.  I think it was a little later than that.

Q   2018, 2019 is the time I'm specifically referring to.

A   Okay.

Q   And that's when HBO was making a lot of new content, new shows, right?

A    I don't remember if they ha -- Max had launched yet, but I remember those businesses were forming.

Q    Well, I guess what I'm getting at is it was a cutthroat time at that point to secure new shows for Netflix; would you say that's fair to say?

A    I don't know that it would be any different.  It's always pretty competitive.

Q    Well, you were looking for shows that could be hits, right?

A    Always.

Q    Always?

A    Always.

Q    Original concepts?

A    Really it was just the best stories.  So they could be original or they could be adaptations.

Q    And you weren't limited in the type of show that you would oversee, right?

A    You mean in terms of genre.

Q    Exactly.

A    Well, at that time I didn't oversee certain lanes.  Like, I didn't oversee comedy, for instance.  I was overseeing more of the sci-fi, fantasy, thriller genres.

Q    Okay.  And just talking about sci-fi and fantasy and thriller, the best types of shows were the ones that would run for more than a season; would you say that's fair to say?

A    Well, I think that's -- it's hard -- I mean, you want the

shows that are intended to go many seasons to be many seasons. Because there can be great shows that are meant to be one season, and that could be a sci-fi show too.

Q   Wouldn't you agree that you want to get an audience hooked on the show, right?

A   You definitely want the audience to watch a show for sure.

Q   Okay.  And oftentimes you were looking for what's called original IP, right?

A   Again, I always said -- and I say this to my teams, I'm always looking for the best story, but it can be original. It's certainly fun and exciting when it's original.

Q   Well, original shows are the ones that are typically franchised, right?

A   I don't know that that's accurate.  Any show can become a franchise.

Q   Can you give me an example of a show that's based on a true story that's been franchised?

A   I mean, you could argue that *Narcos* and *Narcos Mexico* are part of a franchise, and that's a true story.

Q   So I want to direct your attention back to *White Horse*, okay, and specifically the early part of 2018.  Do you remember the first time you heard about *White Horse*?

A   I remember seeing the trailer for the first time, yeah.

Q   And the trailer came in as a submission or did an agent or a fellow producer bring it in?  Do you remember?

A    I remember that the agent Pete Micelli introduced me to it.
I can't remember if he sent me the trailer or we watched it
together, but I remember seeing the trailer.

Q    And I think you said on direct examination that you were
blown away by the trailer.

A    Yeah, I was.

Q    I think we all were.  It was impressive stuff, right?

A    Very.

Q    And I think you shared your excitement with your team.  You
said it was a very competitive project, right?

A    I shared my excitement.  I don't know if I knew it was
competitive at the time.  I saw the trailer, but I remember
being super excited about it.

Q    Did you come to learn that there were other bids for the
show at that time?

A    I do remember it became competitive or it was competitive.
I learned that later.

Q    And would you agree that it was already -- what you had
seen was of the quality that Netflix would stream?

A    It was very high quality execution.

Q    Really impressive visuals, right?

A    Yes, impressive.

Q    And original ideas?

A    Really inspiring ideas.

Q    Lush production design?

A    Yeah, scopic, cinematic.

Q    A rich palette?

A    Yes.

Q    And you were very excited about the show, right?

A    Very.

Q    Okay.  And I think you said you thought the visual effects were mind-blowing, right?

A    Yes.

Q    Among the highest quality visuals of any TV show you'd seen up to that point, fair to say?

A    Pretty special in terms of visual effects.  You know, there hadn't been a lot of television shows, like, that were starting -- you know, to start to be that spectacle-driven, and this one felt like it was going to be something special.

Q    And part of your excitement was that you thought it could reach that kind of core sci-fi audience that you were after, right?

A    Typically when you buy something, you really do want it to -- you want to target what you think would be the core audience.  And then when that core audience loves it, they start talking about it, and then a lot more people will hopefully fall in love with it too.

Q    And in your experience, the sci-fi audience is one of the more loyal audiences, right, to a program that they enjoy?

A    I mean, there's a passionate fan base for sci-fi shows for

sure.

Q   Okay.  Well, it's an important, loyal audience?

A   For sure.  I think that fans of certain sci-fi shows get really immersed in it, the mythologies, and they're excited to kind of delve into because really sky is the limit when it comes to science fiction story telling.

Q   So you were excited try to stream that show on Netflix, right?

A   Very.

Q   But you had a lot of questions for Mr. Rinsch, right?

A   Questions when?

Q   Just when you first saw the trailer and saw what you saw -- had you ever worked with Mr. Rinsch before that?

A   No, I had not.

Q   Did you know of him?

A   I knew of his movie that he made, *47 Ronin*, but we didn't know each other.

Q   Okay.  But safe to say that you wanted to get to know him after you saw what he'd made?

A   Yeah.  I was excited to, you know, be a part of it.

Q   And when you say "be a part of it," that means to kind of flesh out the concept of the show, right?

A   Yeah, to help -- what you would do with any creator and help them execute their show.

Q   And where they were going to go with the plot?

A    Typically, yeah.

Q    And the characters, things of that nature?

A    Yes.

Q    And I know you testified on direct that there came a time when you actually met him.  Was that the first time you met him at the reading at Keanu's house?

A    No, I had met him in -- if not both of the initial, like, pitch meetings, those -- that was the first time.  Those were the first times roughly.

Q    And did he explain to you about the OI characters and his creation of those?

A    Yeah, because I saw them in the trailer.  And I don't know if we talked about the actual -- like, how he created them visually, but yeah, that's the thrust -- that's what the show is about, so we talked about it.

Q    And after you saw it and after you met with Mr. Rinsch, you immediately shared your excitement with your boss at the time, Cindy Holland, right?

A    I did.  I can't remember.  She might have been in one of the meetings, but I definitely was enthusiastic --

Q    She wasn't at the first meeting where you saw it, right?

A    Maybe not.

Q    But you told her what you'd seen and --

A    Yes.

Q    Yes.

And thought it could be streamed on Netflix, right?

A   Yes.

Q   If you guys could close the deal, right?

A   Yes.

Q   Okay.  And I think you believed at the time or you testified that at that point there was approximately 40 percent of the show left that needed to be shot; is that correct?

A   I don't remember what the percentage was.  Again, it was -- we had five or six episodes of the 13.

Q   And that was for the two hours -- the 110 to 120 minutes of the show that was anticipated, right?

A   We always talked about like -- like, one of the things that was really cool and innovative about the show was it was going to have a lot of different running times, and we thought that was really cool.  There wasn't going to be a lot of -- like, this one's going to be this length or that one's going to be that length, but we were going to find it along the way.  But you know, some could be 20, it really was kind of a -- that was going to be the journey that we were going on to find out what it was, so --

Q   So let's talk about that for a minute.  This was a unique pitch in that way, right?

A   Yeah, it was very unique.

Q   Insofar as just with respect to the run times, right?

A   That was part of it, yeah.

Q   And this was during the time of Quibi?  Am I pronouncing it correct?

A   I remember Quibi, but I don't remember when it started and stopped.  But yeah, Quibi was the short form.

Q   Right.  It was a platform that was trying to share content in a shorter form, right?

A   Quick bites, Quibi.

Q   Right.  And this was during that time, right?

A   I remember -- it probably overlapped, yes.

Q   Because anticipated run times of each episode were just four to fourteen minutes approximately?

A   For *White Horse*?

Q   Yes.

A   I think those were the lengths of the initial ones that we saw.

Q   Okay.  And the whole season, the whole first season was set to be around two hours, right?

A   I don't honestly remember, like, what it would actually amount to.  You know, I've just -- we were going to be flexible.  Like, some could be shorter, some could be longer, but we -- you know, it wasn't -- you know, I don't remember thinking about it in those terms.

Q   Okay.  Well, the first bit that you saw, the first episodes and the trailer that we all saw earlier today, that wasn't the whole story that had been pitched, right?

A    In the episodes, the trailer -- I'm sorry.  In the trailer, that was not the -- there was pieces of a lot of the story across what the first season would potentially be, but this was before new scripts, etc.  So it was not the complete story.

Q    But you knew that Mr. Rinsch had written more at that point already, right?

A    At that point I hadn't read the script, so I knew the script existed --

Q    I'm getting there.  You did get to read the script then?

A    I did, yes.

Q    And you testified on direct examination that that was -- the script reading occurred at Keanu Reeves's, right?

A    The first one, yes.

Q    And did you read the script or was there, like, a table reading or how did that go?

A    I -- Cindy and I sat there and we both read them quietly by ourselves.

Q    And this gave you an opportunity to see kind of the larger story that was in Mr. Rinsch's head and he put onto paper, right?

A    Yeah.  I could match them, some of the pieces of the trailer into some of the show, but yes, that was -- that was, you know, the exciting part of reading the script.

Q    And again, you were even more excited than after you'd seen the original footage, right?

A    Yeah, it was promising.

Q    You had a few small criticisms, though, at this point on the first read of the script, right?

A    I'm sure I do -- I did.  I often do.  That's my job.

Q    Not to criticize you.  Of course that's your job.  I mean one of the criticisms that you offered was you wanted more of the story, right?  You wanted the story to breathe a little bit more, to expand a little bit more?

A    Well, I think that's -- you know, when you work on the television show you're always looking to invest more in characters.  And so it's about, you know, deepening characters or building them out, and that was -- that would have probably been my -- I don't remember exactly, but just knowing that's something I'm always looking for in a television show.

Q    Because a big part of your job is to try to make the best product you can so people want to watch it, right?

A    Yes.

Q    And you want to help the creators do what's best for what your experience tells you is best for the show, right?

A    You know, I can offer suggestions of what I think might be helpful, but --

Q    Well, your suggestions often come from you imagining what the audience wants, right?  Your experience knowing what audiences like and --

A    Yeah, I think that's something that a platform can offer up

is audience information or audience insights.  But a lot of it is also just personal gut and instinct.

Q   Taste?

A   Taste.

Q   But at the end of the day you want to get the audience hooked on the story, right?  Hooked on the show?

A   We just want to tell a great story that we hope an audience would love.

Q   Well, you want them to want more, right?

A   I want them to -- you know, I would like an audience to be so entertained that they want to finish the story.

Q   So early March 2018, Mr. Rinsch sent you a script, right? Sent you the script.  This was after your initial reading?

A   I believe that's true.

Q   And I believe March 3 actually he emailed you that script, the first script, the 160-page script?

A   That sounds about right because that was near the time when I read it.

Q   And that script included the origin story of the OI that we talked about, right?

A   I believe so.

Q   And how they came into existence?

A   Yes.  That's a part of the story.

Q   And what ended up happening to them when they were put to work around the world, right?

A    Yes.

Q    And then what happened when they were exposed for not being human?

A    Yes.

Q    Big stuff, multiple cities, right?

A    Yeah, big scope.

Q    Four continents, right?

A    I think so.

Q    Just what you'd seen and what was in the script -- in the trailer that we saw, we saw the scope of the story, right?

A    Yeah, that's a good representation of it.

Q    And there was that stuff inside of Neo Sao Paulo?

A    Yes.

Q    And this stuff shot on huge green screens, right?

A    I would assume that some of that was made with big green screens, but obviously you can't see that in the trailer.

Q    You -- well, you -- when you went -- well, we'll get there later.  Sorry.

        THE COURT:  Keep in mind, counsel, that we only have about eight minutes left.

        MR. ZEMAN:  Thank you.

Q    So you discussed the full script with Mr. Rinsch then again, right?

A    Likely.

Q    But you gave him some more notes.  You said you wanted him

to take another crack at the script, right?

A    After March 3?

Q    Yes.

A    I would assume because that's still really early in the process.

Q    Well, in the next month, April 2019, he had fleshed out some new characters in the script.  You remember that?

A    I thought we were talking about 2018.  I'm sorry.  Are we in --

Q    2019.

A    Okay, 2019.

Q    Yeah.

A    So a year after I'd read the first script?

Q    Sorry.  April 2019 is where I am now.

A    Okay.

Q    He had fleshed out some new characters in the script for you, right?

A    I don't remember the exact timing, but there were definitely characters that he was fleshing out that were new somewhere in the development process.

Q    Daisy and Thomas.  Remember those?

A    I do.

Q    And I think you told him that these characters were total standouts, right?

A    I liked them.

Q   Well, ultimately you guys signed a deal with Mr. Rinsch and his production company, right?

A   Before that, yeah.  Yeah.

Q   And as you said on direct a couple times I think, this was not a typical show, right?

A   Not in any way.

Q   And it also wasn't a typical deal, right?

A   I don't think so.  But again, I wasn't part of building that deal.

Q   Well, just for the show, a whole season of a show isn't typically two hours, right?

A   No.

Q   So Mr. Rinsch was pitching something new, fair to say?

A   Yeah.  It was an innovative way to tell a story.

Q   Breaking new ground?

A   That was the hope.

Q   And the deal that Netflix ultimately signed with Mr. Rinsch and his production company was unlike most deals that Netflix makes with talent, right?

A   I don't know that I know of another deal that was like this that I worked on.

Q   Partly because of the length of the episodes, right?

A   I think that that was part of the innovation for sure. That was unique.

Q   And also part was that about 60 percent had already been

shot, right?

A    Again, I don't know how much had been shot, but the fact that there was shooting done and that there was editing done that was very unique.

Q    So this was a bit of a hybrid deal then with Mr. Rinsch, right?

A    I don't know what that means exactly.

Q    What I mean is you were buying what he had already done, right, and you were paying for what he was yet to do; is that fair to say?

A    I mean, that -- I don't know that I would call it that.  It was mostly like we were buying a season of television.

Q    Okay.  So Netflix and you as kind of the creative guy from Netflix agreed with Mr. Rinsch that you would be pretty hands off on the production of this show; is that correct?

A    We were hands off, yeah.

Q    You said you'd have a light touch?

A    A light touch.

Q    Right?

A    That's what it was.

Q    Okay.  One of the ways you were hands off was you weren't auditing the spending when he was on production, right?

A    I don't think so, no.

Q    Netflix didn't provide him with any accountant, right?

A    Again, not my area of expertise, but I don't think so.

Q    And to your knowledge there wasn't a line producer working on the show, right?

A    I don't believe they hired a line producer.

Q    And this was concerning to you early on in the preproduction, right?

A    It was.

Q    In fact, you tried to help Mr. Rinsch get a line producer, right?

A    I remember making some introductions to some really talented line producers.

Q    One of those was a gentleman named Mr. Malerba, right?

A    Mr. Malerba -- oh, Roberto Malerba?

Q    Yes, Roberto Malerba.

A    Yes.

Q    And he was a guy who was quite experienced in this type of production, right?

A    I had worked on a project that he was a part of that was similar and that was global in scale.

Q    And you knew from your experience doing all the shows that you've done that a type of show like this that's working at this scale that this show had ambitions to work at needed somebody experienced to make sure the trains ran on time, right?

A    Yes.

Q    So that's why you reached out to Mr. Malerba, right?

A    I might have been the one that reached out, yes.

Q    You had a lot of respect for him, right?

A    He's got a good track record.

Q    Well, he'd worked on similar shows that shot in multiple locations around the world, right?

A    I know of the one that I worked with him on, yes.

Q    Okay.  So you brought him onto the show initially, right, in the summer of 2019?

A    I wouldn't say I brought him on, but I guess they maybe worked together for a little bit.

Q    Well, he did work on the show, right, for about a week?

A    That's probably right, yeah.

Q    Okay.  But then he left, right?

A    I do remember that he left the show or it wasn't a match.

Q    Well, he told you that Mr. Rinsch's style of working just wasn't compatible with his own style.  Do you remember that?

A    I remember that it wasn't a match, yeah.

Q    Was this a surprise to you?

A    Was it a surprise?  No.

Q    Were you concerned?

A    I was concerned because, you know, I wanted Carl and his team to have somebody that was a strong line producer.  But you know, they're very selective about -- Carl and Gabby, who they wanted to work with, so it wasn't always going to be a match.

Q    Well, wasn't it Mr. Malerba who decided he couldn't work

with Mr. Rinsch?

A    I don't remember exactly.

Q    You remember he said it was because there was no accountant on the project, that's why he left the show?

MR. MARKEWITZ:  Objection, hearsay.

THE COURT:  Sustained.

I think that's a good place to break.  Ladies and gentlemen, so tomorrow our schedule, as you may possibly recall, is a little bit different.  We still will start at 9:30, but we will take lunch at 12:00 because of a matter I have between 12:00 and 1:00, and then we will only go to 3:00 tomorrow because of a matter I have at 3:00.  So it's my fault, so to speak, but the advantage for you is you get a shorter day.

Now, I know based on the testimony that you were planning to fly tonight to Brazil, to Sao Paulo, or possibly to Budapest, but instead just go home.  Have a very good evening and we will see you -- and by the way, we can't start until all 15 of you are here, so be sure to all be in the jury room by 9:30 tomorrow and have a good evening.  See you tomorrow.

Mr. Friedlander, you can step down, we'll see you at 9:30.

(Witness temporarily excused)

(Continued on next page)

(In open court; jury not present)

THE COURT: Please be seated. So I have a vague recollection that trials are supposed to be in accordance with the federal rules of evidence. What I've heard instead without objection, and therefore I haven't interrupted, are questions that are either leading or misleading, remarkable number of questions calling for speculation, questions that are filled with idiomatic phrases that are very imprecise, questions that are conclusory, questions that are — I hesitate to use the word "compound" because usually it's a multiple of compound, questions that assume facts not in evidence.

In my naivete I was hoping to hear at some point a question like, what did he say to you and what did you say to him? But I never heard any such question from either side. There will come a point where the Court will have to intervene. And the reason is not simply because both sides seem to feel that the rules of evidence don't apply, but also because so much of the testimony has been imprecise.

So we have terms like "cutthroat." We have terms like "the sky is the limit." We have all sorts of idioms, which is of very little value to a jury that has to determine such questions as whether we're talking about just a contractual breach or intent to defraud, etc., as the parties framed in their opening statements.

So I am not at that point yet, and I've -- since there

was only one objection, you must -- government's counsel must have been getting very tired because they finally broke down and made an objection. Oh my gosh, I was so amazed. But of course maybe the argument should be made that the government had no right to make objections since defense counsel made no objections to the numerous misleading or numerous imprecise and often highly leading questions, but on direct testimony by the government.

So gentlemen, stop it, unless you want me to start intervening and embarrass both sides in front of the jury by informing them that you don't know the rules of evidence. The rules of the evidence exist for a very good reason because over 500 years they've been found to aid the jury in finding the facts.

I have one much more trivial question, but just out of curiosity, and maybe I missed it, but where is defense counsel getting this 60 percent was done when I thought the testimony of the witness was that he was confronted with either five or six of 13 episodes? And unless my arithmetic is very deficient, that's less than half.

MR. ZEMAN: Your Honor, there's a Government Exhibit where that witness specifically uses that 40 percent number of the show left to shoot.

THE COURT: That's at a later point, right?

MR. ZEMAN: No.

THE COURT: No? Okay. Then I stand corrected. Thank you for bringing that to my attention. But there again, it might have been useful to have some clarification because the witness repeatedly in response to questions from both sides talked about five to six, that what he was confronted with at the outset was he couldn't remember whether it was five or six episodes out of 13, which is considerably less than 60 percent.

So if I were a juror, I would have that question, where is that coming from? But I'm glad to know where it was coming from. But I think that's the kind of thing that some clarification might be helpful to the jury because part of this case is how much more had to be done and how much more and so forth.

Let me ask a similar question. Again, this is independent of the bigger point I was making a few minutes ago about the Federal Rules of Evidence, just really for my curiosity. Where are you getting the two hours?

MR. ZEMAN: The original term sheet spelled out between 110 and 120 minutes.

THE COURT: Okay. Because again -- and this is why I think the jury might have been confused, certainly I was, the witness said that each episode was roughly 14 minutes, and 14 minutes times 13 is a lot more than two hours.

MR. ZEMAN: Pardon me, your Honor, four to fourteen minutes.

THE COURT: Oh, four to fourteen minutes. You may want to check the transcript because I'm not sure -- I have Live Notes, and it was 14 on my screen, but maybe I missed something else. Okay. Well, that clarifies. Thank you very much for clarifying that for me. How much more do you have roughly? This is not binding, but just a ballpark on cross.

MR. ZEMAN: I would guess 45 minutes.

THE COURT: Okay. And who is the government's next witness?

MR. MARKEWITZ: Your Honor, Adam Checchi. It's one of Mr. Rinsch's financial advisors.

THE COURT: Okay. And again, it's funny, I called you to the sidebar too late because all the emails had already come in. But I would encourage counsel to work together. If there's no objection to a particular exhibit, why go through the whole business of first showing it to the witness and the parties outside the jury?

A much more expeditious way would be to say something like unless there's any objection, Mr. Paralegal, would you put number 7054 on the screen. And then if there is an objection, you'll state it right away and won't put it on the screen to the jury. But otherwise that takes two seconds as opposed to three or four minutes. Okay.

Anything else we need to take up tonight?

MR. MARKEWITZ: Not from the government. Thank you,

your Honor.

MR. MCGUINNESS: Very briefly, your Honor, this is just something I wanted to raise, which is my client was served over the weekend and accepted service of an if-as-when subpoena for my client requiring productions of different collections of documents.

THE COURT: Yes, that's standard.

MR. MCGUINNESS: The difference here is there was also a corporate subpoena filed and served to my client this morning. I am appointed to represent my client in his personal capacity, your Honor. He's left without representation. I'm also told this corporate subpoena is not an if-as-when subpoena, but they expect a response.

Your Honor I'm raising this to the Court. I can't represent him in that capacity. However, if I was to, I would note that it seeks production of documents as a trial subpoena that are to be produced before the time he was served, your Honor, which is today at 9:30. He received it I believe slightly after that.

THE COURT: Well, that's consistent with the sci-fi theme. But anyway, so let me ask the government what about this?

MR. MARKEWITZ: We're happy to discuss with counsel an appropriate time. It just had the start date of trial which we typically do for trial subpoenas. But we're happy to discuss

with counsel --

THE COURT: No, his second objection or question was who did you -- the corporate subpoena was for what corporation?

MR. MARKEWITZ: Home VFX, the production company that Mr. Rinsch owns.

THE COURT: And who was it served on?

MR. MARKEWITZ: Mr. Rinsch himself.

THE COURT: And so counsel is saying that the corporation may need to have counsel or something along those lines, given that counsel only represents Mr. Rinsch personally. Let me ask a question, though. Maybe we can pierce through this. So far as either counsel is aware, is Mr. Rinsch the sole shareholder and owner of the corporation?

MR. MARKEWITZ: Yes.

THE COURT: So he is clearly the alter ego. And so let me find out what, if anything, defense counsel is saying. Are you saying that some lawyer needs to address the subpoena and it can't be you?

MR. MCGUINNESS: Well, your Honor, I'm not representing there's a conflict. I don't know if I can be appointed pursuant to the CJA for the corporation.

THE COURT: Well, I'll appoint you right now for the limited purpose of reviewing the subpoena.

MR. MCGUINNESS: All right. Well, in that point, your Honor, I would state that this is an untimely subpoena. It's

requiring my client to do work as he's sitting on trial and assisting in his own defense. And additionally, he asserts a production privilege over this. It requires a characterization of documents -- they have all of these documents, but they want him to spend his time assembling them into groups and produce them as he's sitting trial.

MR. MARKEWITZ: To the extent they're documents we have, they don't need to produce that. But what we're trying to gather is are there other documents he's going to say are out there?

THE DEFENDANT: No.

THE COURT: So --

MR. MARKEWITZ: I would just -- one other thing to note, your Honor, we provided these subpoenas over the weekend. We were told over the weekend that they could not accept service for the company, and that's why it was then served directly today. But the subpoena itself was communicated prior to today. I understand it's not served, but the subpoena itself --

THE COURT: Well, this is only relevant if he takes the stand.

MR. MCGUINNESS: Your Honor, that was my --

THE COURT: Well, I'm asking the government.

MR. MARKEWITZ: The corporation, I think if they're going to assert active production privilege and there's a basis

for that, then that would be an if-as -- it would only sort of kick in once he took the stand. But to the extent there is not an active production privilege over the other documents, I think those would be recovered and would be produced regardless of whether Mr. Rinsch took the stand.

THE COURT: Well, if they're documents that are not contingent on his taking the stand, why didn't you seek those documents -- could have been subpoenaed weeks ago.

MR. MARKEWITZ: Understand, your Honor.

THE COURT: So why isn't it untimely to that extent, to the extent that it doesn't relate to what would be producible if he took the stand?

MR. MARKEWITZ: One moment, your Honor.

Your Honor, I think the government's prepared to say we'll only require or seek to force the subpoena if Mr. Rinsch takes the stand. And I think the thinking behind it is to make sure that Mr. Rinsch cannot say that, oh, I did not produce this document because it's not in my possession. It's the possession of my company, and it's sort of intended to get a complete holistic production of the records that are requested therein.

THE COURT: Okay. So given that representation, I don't need to take up other objections until and unless he takes the stand. So --

MR. MCGUINNESS: Thank you, your Honor.

THE COURT:  Very good.  We'll see you tomorrow.

By the way, you can leave all your stuff here, but if I have other matters you need to clear out fairly quickly.  But you can leave stuff on your table or the side or whatever. That's all fine.

(Adjourned to December 3, 2025, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

PETER FRIEDLANDER

Direct By Mr. Markewitz . . . . . . . . . . . .35

Cross By Mr. Zeman . . . . . . . . . . . . . . . 121

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

S1 through S10    . . . . . . . . . . . . . . . .35

6328      . . . . . . . . . . . . . . . . . . . . .49

6332      . . . . . . . . . . . . . . . . . . . . .53

6339      . . . . . . . . . . . . . . . . . . . . .59

6341      . . . . . . . . . . . . . . . . . . . . .70

6342      . . . . . . . . . . . . . . . . . . . . .74

6344      . . . . . . . . . . . . . . . . . . . . .78

6345      . . . . . . . . . . . . . . . . . . . . .85

6348      . . . . . . . . . . . . . . . . . . . . .89

6351      . . . . . . . . . . . . . . . . . . . . .93

6358      . . . . . . . . . . . . . . . . . . . . .97

6119, 6120, 6121    . . . . . . . . . . . . . . 105

6360      . . . . . . . . . . . . . . . . . . . . 109

6363      . . . . . . . . . . . . . . . . . . . . 111

6372      . . . . . . . . . . . . . . . . . . . . 115

       OPENING STATEMENT BY MR. CAROZZI          8

       OPENING STATEMENT BY MR. ZEMAN          16

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300