PC3FRIN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v.                                    25 Cr. 85 (JSR)

CARL ERIK RINSCH,

                                      Trial
            Defendant.

------------------------------x

                                      New York, N.Y.
                                      December 3, 2025
                                      9:30 a.m.

Before:

                  HON. JED S. RAKOFF,

                                      District Judge
                                      -and Jury-

                        APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
DAVID MARKEWITZ
TIMOTHY CAPOZZI
ADAM SOWLATI
     Assistant United States Attorneys

LAW OFFICES OF DANIEL A. McGUINNESS
     Attorneys for Defendant
BY:  DANIEL A. McGUINNESS
     -and-
ZEMAN & WOMBLE, LLP
BY:  BENJAMIN C. ZEMAN

Also Present:
Nicholas DiMarino, FBI
Maria Larracuente, Paralegal
William Coleman, Paralegal
Laurie Tang, Paralegal

(Trial resumed; jury not present)

THE COURT:  Please be seated.

Where is the defendant?

MR. McGUINNESS:  Your Honor, he informs me that he is on his way.  He may be running a couple minutes late.

I'm awaiting his explanation, but he tells me that he may have had some bad juice.

THE COURT:  Some what?

MR. McGUINNESS:  I added the word "some."

THE COURT:  Bad juice?

MR. McGUINNESS:  That's what I'm told, your Honor.

THE COURT:  And what does that mean?

MR. McGUINNESS:  I'm awaiting clarification.

THE COURT:  All right.

So, there's some matters that the government wanted to take up.  Do you waive his appearance for purposes of that discussion?

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  All right.  Let me hear from the government.

MR. SOWLATI:  Good morning, your Honor.

The first issue that we wanted to raise is, we became informed about that the defendant had contacted witnesses on two occasions yesterday.  The first occasion is an email that he sent to a number of Netflix witnesses and as well as his

PC3FRIN1

ex-wife that appears to discuss trial strategy. I have a copy for your Honor. One of the witnesses is the witness on the stand. I should note that it was sent to his Netflix email, and he no longer works at Netflix, as your Honor is aware.

THE COURT: Let me see the email.

MR. SOWLATI: Sure.

THE DEPUTY CLERK: There are attachments in here, too.

THE COURT: I'm not sure what to make of all this, so maybe you can explain.

MR. SOWLATI: Your Honor, we aren't either. We just wanted to notify the Court about that, because there's somewhat of a pattern as well. Yesterday, the defendant approached one of our witnesses who is going to testify today, his former investment advisor. He just saw him in the cafeteria and said "hey," so we would ask that the Court remind the defendant that he should have no contact with witnesses.

THE COURT: I'm happy to do that.

I assume there's no objection to that.

MR. McGUINNESS: There's no objection, your Honor.

I just wanted to add a bit of context. The financial advisor is also someone who he went to high school with and has a longstanding relationship. I understand he said "hey" when he saw him. There was nothing further.

And as to these emails, I just note, for the record, that this was inadvertently sent. I think the reason that it

happened -- I can only speculate, but -- it appears he was going through old emails and inadvertently replied all to one of the old. Emails it does say, for Dan and Ben -- which is Mr. Zeman and myself -- and then he follows up with another email after counsel for Netflix writes: Mr. Rinsch, I believe you inadvertently sent this to us. Sure enough, he states: Reply all was not the intended command.

THE COURT: Yeah. I must say, I don't see anything here that looks like an attempt to influence the witnesses, although some of it is of uncertain meaning. But what can you do when you've had bad juice. Anyway.

But, I will certainly admonish the defendant when he arrives.

Now, there are some other things the government wanted to raise.

MR. MARKEWITZ: Yes, your Honor.

There was a statement made during the defense's opening statement that we're not asking for any relief from the Court but we do want to put on the record, that we disagree with their description of the law and our theory of the case, and we want to make sure that the government is not seemed to have waived any views on the law or its theory of the prosecution. And in particular, it's a statement at page 17, lines 15 to 20. I have a copy if your Honor would like.

(The Court conferred with the Deputy Clerk)

THE COURT: Go ahead.

MR. MARKEWITZ: The specific statement is: To convict Carl Rinsch of wire fraud and all of the other charges that stem from that allegation, you will need to believe beyond a reasonable doubt that between October 2019 and March 2022 -- and I believe it was either intended to be or was just a typo, March 2020, Carl Rinsch set out to commit fraud rather than endeavor to realize his artistic vision.

THE COURT: I am sure that was -- if counsel said 2022, I'm sure that was inadvertent. The point he was making, which is a fair point, is that the jury will have to find that, "Carl Rinsch set out to commit fraud rather than to endeavor to realize his artistic vision," which is a fair argument.

So, I don't think anything's -- as you agree, I don't think anything's required now, but of course, counsel should be clear that on summation, they need to make sure that they have the dates as alleged by the government.

MR. MARKEWITZ: Well, beyond just the dates, your Honor, we just wanted to make very clear that, consistent with case law, the government's theory is that the fraud can be accomplished either through obtaining fraudulently or retaining proceeds fraudulently through fraudulent wires. And that's supported by Second Circuit case law, both *United States v. Gole* and *Porcelli v. United States* as well as has been included

in several jury charges.

I don't think we need to debate the merits of that. Again, we wanted to make sure that --

THE COURT: I think the point counsel is making, which is mail and wire fraud 101, is that the government has to prove false representations were made for the purpose of obtaining or retaining money and property with that specific intent, not it's a mail fraud wire fraud or specific intent crimes.

So, it's not enough for the government to simply show that something that the defendant said was false or even that it was knowingly false. They have to show that it was intended to obtain or retain money or property, and so to the extent -- you know, all of that will be set forth in my instructions of law, but that's really, I think, the point they were making. I don't view is differently.

MR. MARKEWITZ: Thank you, your Honor.

And we just wanted to make sure that the retain aspect was not --

THE COURT: Actually, I think -- we don't want to get into it because it's not necessary because I have to follow Second Circuit law. I think that's an interesting question under the statute about retaining as opposed to obtaining, because the statute speaks of obtaining. That's the language in the statute.

Now, there is alternative scheme to defraud. but

scheme to defraud has, since, for some years now -- been defined more narrowly rather than more broadly than the obtaining clause. But anyway, way I'm clearly governed by Second Circuit law.

MR. MARKEWITZ: Okay. Two brief --

THE COURT: All history to the contrary.

MR. MARKEWITZ: Two, then, brief issues on exhibits, you Honor.

The first was, we just wanted to alert your Honor, there are several exhibits in which we have -- that are the subject of stipulations that are the defendant's statements during prior deposition and arbitration hearings. And the government was planning to actually introduce those in between witnesses without a witness on the stand, just to read them to the jury. We wanted to alert your Honor in case.

THE COURT: Now, we have the following problem. The jury is all here, and we have a short day, so I'm anxious to get moving. The defendant is not here.

MR. McGUINNESS: Your Honor, I did -- as we were speaking -- receive a text message that he was at security downstairs.

THE COURT: Okay. All right. So, we'll wait a few more minutes.

MR. McGUINNESS: And that was five minutes ago.

MR. SOWLATI: Your Honor --

THE COURT: Linda, why don't you tell the jury that counsel and I are discussing a legal matter so we'll be few minutes delayed.

MR. SOWLATI: And your Honor, one more issue to raise.

So, I had flagged it yesterday. Government Exhibit 6057, which we're happy to put on the screen, defense counsel is fine with the exhibit, except the top portion of the email they would like redacted. We disagree, and I can explain why, but I'll give your Honor a moment to read it.

THE COURT: It's not on the screen.

MR. SOWLATI: Okay. Just give us one second.

But for context, your Honor this is an email exchange between the defendant and his former investment advisor. It's in late --

THE COURT: Blow up the first part, the part that's objected to.

Go ahead, counsel.

MR. SOWLATI: So, your Honor, this is an email exchange between the defendant and his financial advisor. This is an email from the defendant, and he's talking about his plans for the money that Netflix sent him. This was money that was sent to his Charles Schwab account. And one of his theories, one of his investment thesis was to short the Brazilian economy. He thought that that would be advantageous for COVID.

Your Honor, we believe this both goes to his intent and his motive, and so we would ask that it be kept unredacted.

THE COURT: All right. Let me hear from the defense counsel.

MR. McGUINNESS: Yes, your Honor.

I'm concerned with the exact thing that Mr. Rinsch spells out in the third paragraph here. This may appear predatory. I'm concerned that this is going to be overly prejudicial and not really probative to any significant degree.

THE COURT: What is it that you want redacted?

MR. McGUINNESS: The entire paragraph beginning: To consider I will want, which is the second paragraph, and at least the first clause of the following paragraph: This may appear predatory. However, it may be more appropriate to take out the entire sentence.

And I just want to note, your Honor, this is a much longer document that discusses his investment strategy as to investments he actually did make. I am not seeking to have those taken out. Those are to short the SPDR index fund and to but stock options on Gilead Science. Those are the investments where he actually did invest and did lose the money.

And the defense concedes that that's relevant and can go to the jury, but these discussions of shorting the nation of Brazil are, potentially, very prejudicial and not probative of anything helpful to this case.

MR. SOWLATI: And your Honor --

THE COURT: I don't see the particular prejudice of saying what his views are with respect to the shorting of the Brazilian economy. That's a prediction, in effect, as to what's going to happen in Brazil, and it reflects part of his strategy.

I do think --

THE DEPUTY CLERK: May I bring in the jury?

THE COURT: Hold on one second.

THE DEPUTY CLERK: Okay.

THE COURT: I think the language: This may appear predatory, is prejudicial and adds nothing to the relevance that the government has otherwise correctly noted.

So, I will strike the paragraph beginning: This may appear predatory, but the rest will remain.

MR. SOWLATI: Your Honor, I just wanted to note on this paragraph, at the end, he says: The money invested represents a small portion of overall wealth, and I am comfortable forfeiting it in the event that these investments are not fruitful. So that's talking about his overall investment strategy.

THE COURT: Okay. That's a good point so just -- we'll leave that sentence, but the rest of the paragraph --

MR. SOWLATI: Or your Honor, we could --

THE COURT: No.

I'm not going to keep the jury while we have endless discussion about an incredibly small matter.

Now, Mr. Rinsch, why were you late?

THE DEFENDANT: Sorry, Sir. I was not feeling well.

THE DEPUTY CLERK: Just put a microphone directly in front of you.

THE DEFENDANT: I apologize to the Court for being late, your Honor.

THE COURT: I understand that you may have inadvertently sent some emails. Just be careful, because we don't want you to have any contact with any witness.

THE DEFENDANT: Absolutely.

THE COURT: I know you understand that, so I'm not upset about it, but I'm --

THE DEFENDANT: I'm upset with myself.

THE COURT: Well, all right.

I'll leave it to you to impose the appropriate punishment on yourself.

So okay. Very good. Let's bring in the jury. Let's get the witness back on the stand.

(Continued on next page)

(Jury present)

THE COURT:  Please be seated.

Good morning, ladies and gentlemen.

First and most importantly, thank you for your promptness.  It's critical that we keep things moving, and you were terrific.  And I'm sorry.  A matter that came up unexpectedly that I had to talk about with counsel about.  That's why we're running a few minutes late.

My thought was, since we're going -- as you may recall -- to have an early lunch today at 12 because of another matter I have from 12 to 1, why don't we go -- if it's okay with you -- without a break from now until a quarter to 12 and then we'll give you an hour and a quarter for lunch, and that way, we'll likely make up for the lost time.  Okay.  Real good.

Counsel, go ahead.

MR. McGUINNESS:  Thank you, your Honor.

PETER FRIEDLANDER, resumed.

CROSS-EXAMINATION

BY MR. ZEMAN:

Q.  Good morning, Mr. Friedlander.

A.  Good morning.

Q.  I just wanted to circle back on something that may have been a little confusing yesterday.  You first learned of the show in January of 2018; correct?

A.  I think it was at the end of 2017.

Q. Okay. When you first learned of the show, it was your understanding that there was still 40 percent left to shoot of principal photography for the first season; is that correct?

A. There were -- I don't remember a percentage.

You know, there was all of the photography that was left, like, the rest of the story, and then there was a lot of photography left from the beginning that we would have done in the early episodes, too.

MR. McGUINNESS: Ms. Tang, if you could please bring up, for the witness and the parties, what's been previously marked as Government Exhibit 6329.

Q. And Mr. Friedlander, I'm just going to have you read this document and see if it refreshes your recollection.

Ms. Tang, could you zoom in on the top portion. It's very small. I'm sorry.

A. I see it.

Q. Does that refresh your recollection, Mr. Friedlander?

A. I have a question mark next to it, so I don't know that I actually knew what they had left to shoot, but I think that was probably -- I don't know what I was quoting here.

Q. Okay.

THE COURT: In any event -- because I don't want to spend a lot of time on this, but -- did I understand, from your testimony yesterday, that there were supposed to be 13 episodes of which either, as best you can recall, five or six had been

completed; is that right?

THE WITNESS:  There were five or six that were completed, but the intent was that when we were going to build out the 13 episodes, that there would be changes inside of those first five and six as well.  So --

THE COURT:  Not that the arithmetic matters, I don't think, but it would -- there was at least more than a half to go by that calculation, not 40 percent.

THE WITNESS:  I would say, yes, more than a half.

THE COURT:  Okay.  Good.

MR. McGUINNESS:  I'll move on.  Thank you, your Honor.

BY MR. ZEMAN:

Q.  Mr. Friedlander, you also testified yesterday that Netflix told Mr. Rinsch that they were going to be hands off during the production going forward.  Is that your testimony?

A.  I don't know if we actually said we would be hands off, but I think the spirit around the whole thing was that this was a group that, again, had done this first batch and so this was a team that was going to be consistent in, kind of, how they were going to build the rest of it.

And so it was really kind of learning how to support them as opposed to being, you know, heavy-handed in any way.  It was like, how can we be there, so you're going to start light and figure out how you can support along the way.

Q.  Understood. and Mr. Rinsch was also given a final cut by

Netflix in this show; correct?

A.   I believe that's true.

Q.   Meaning that meant he would ultimately be the one who decided what would go up on the screen; correct?

A.   Well, final cut -- I haven't worked with final cut a lot, but I will say that final cut implies that you get to an end of an edit, meaning, like, you finish the show, you finish the edit and the final, final cut is what it's about.

Q.   At the end of the day, he gets to decide what goes on the screen; right?  That's what final cut means?

A.   I think that's -- with due respect, that's reductive.  I mean, it's really about how we -- you're kind of agreeing to the project all the way until the end.  And then there's, there may be certain things that that you don't agree about.

Q.   And he would have the final say; right?

A.   It's a tiebreaker.  It's a tiebreaker.  So, you know, once -- the way I understand it is, you get -- if there's certain things that you get to the very end of the edit, meaning you finish the show and you get to the very edit, that's where that final cut comes in.

Q.   And as you said, it's a tiebreaker, and he wins the tiebreaker; right?  The director with the final cut gets the tie?

A.   At the end of the cut, yeah.

Q.   Okay.  And Mr. Rinsch was the writer of the show, right?

A.   He was the writer.

Q.   And the director?

A.   Of the whole thing.

Q.   And the producer?

A.   He was one of them.

Q.   So, these are all three big jobs; correct?

A.   Correct.

Q.   And it's not common that on a production of this type, one person would have all these three of these jobs, right?

A.   It's not common, no.

Q.   Especially on a job like this where there's no line producer as we discussed yesterday, right?

A.   My understanding is there wasn't one, no.

Q.   But it would be even more rare for a writer, director, and producer not to have a line producer in this type of production; correct?

A.   It's very rare.

Q.   Moving back to the spring of 2019, Mr. Rinsch kept working on the script.  Do you remember that?

A.   Yes.

Q.   And you and your team were also working with him during that period, Spring 2019, right?

A.   Trying to, yeah.

Q.   Okay.  And you were giving him notes, right?

A.   In the Spring of '19, I think we were -- at that point, we

were really trying to work through -- that's when we were in the budget schedule issue to try to figure out the rest of the shoot is that hasn't finished.

Q.   There were some issues are with the pacing of the script, right?

A.   Again, in 2019, we were already shooting the script that -- we were already in the process of that, so at that point, we were just trying to figure out what was left to shoot.

He wasn't --

Q.   Well, weren't you concerned, Mr. Friedlander, that the first half of the story jumps around a bit, right, as far as time?

A.   In terms of the story you're talking about, in the actual storytelling?

Q.   Yes.

A.   Was I concerned about that in March of 2019?

Q.   Yes.  In comparison to the latter half of the story, which was more streamlined or linear.

MR. MARKEWITZ:  Objection, foundation.

Q.   If you can remember.

THE COURT:  Well, let me -- for some reason, it's not appearing on my screen.  Let me have the reporter read the last question.

(Readback)

THE COURT:  I'll allow it.

THE WITNESS:  I guess there's two -- it would be helpful to know the question, because I was doing -- most of the creative notes that I would provide would have been pre-would have been -- I'm sorry.  You're saying 2019.

Q.  I'm talking about March of 2019.

A.  March of 2019.  I'm sorry.  I have the dates wrong.

March of 2019, was I concerned about the -- there were creative notes that I would have given.  That's probably true, but I don't remember them exactly.

Q.  Well, you were concerned with -- that the story maintained a consistent rhythm, right?

A.  Truly I don't remember.  That might have been something.

Q.  Based on the notes you gave to Mr. Rinsch, he provided a new script to you in April of 2019.

Do you remember that?

A.  April or May, that might have been around the time, yeah.

Q.  April 2019, he provided you a 203-page script.

Do you remember that?

A.  I don't remember exactly but, roughly, that may be right.

Q.  Mr. Rinsch was, at this time, preparing to go out and shoot what was left to be shot, remember?

A.  Yes.

Q.  And this was a story, now, that he had provided you with, an extended script, do you remember that?

A.  This would have been the -- I would have just called it the

script.

Q. We'll, I'm just talking about the original script you read at Mr. Reaves' house, that was the 160 page script. Do you remember that?

A. I remember reading the script. I don't remember the page count, but yeah.

Q. Moving forward to early August of 2019, that's when principal photography resumed.

A. Yes.

Q. And that was in Brazil; correct?

A. Correct.

Q. And almost immediately, you heard from Mr. Rinsch, right?

A. Somewhere in that first month, yeah.

Q. August 10, 2019, you got an email from Mr. Rinsch.

Do you remember that?

A. I don't know which email you're referring to.

Q. It was an email: subject, 911.

MR. ZEMAN: Ms. Tang, if you could pull up for the witness and the parties what's been previously marked Government Exhibit 6340.

Sorry. Can you zoom in on just the top half of this email?

Q. And Mr. Friedlander, I'd just ask you to look at the subject line.

Does that refresh your recollection, sir?

PC3Frin1                    Friedlander - Cross

A.  It does.

Q.  And this was at the very beginning of the shoot in Brazil; correct, Mr. Friedlander?

A.  August 11, yes.

Q.  And Mr. Rinsch expressed concern to you that they were starting to shoot down there; correct?

A.  Yes, they were close to shooting.

Q.  And he informed you that he didn't have a cast; correct?

A.  I think there were certain cast members he had yet to cast on.

Q.  And this was on -- when they began shooting; correct?

THE COURT:  Sorry.  Do you have on objection?

You seem to be going up and down.

MR. MARKEWITZ:  Yes, your Honor.

The non-admitted exhibit is still on the screen.

THE COURT:  Sustained.

Q.  Well, Mr. Friedlander, do you recognize this email?

A.  I do.

Q.  How do you recognize it?

A.  It's an email from me to people at Netflix.

Q.  And is it a true and accurate copy of the email between you and those people from Netflix from August 11, 2019?

A.  Yes.

MR. McGUINNESS:  Your Honor, defense offers what was previously marked as Government Exhibit 6340.

PC3Frin1                    Friedlander - Cross

MR. MARKEWITZ:  No objection.

THE COURT:  Received.

(Government's Exhibit 6340 received in evidence)

MR. ZEMAN:  Ms. Tang, if you could publish that for the jury, please.

BY MR. ZEMAN:

Q.  So, Mr. Friedlander, could you just read the bottom portion of the email from the: to all?

A.  Yes.

To all:  This is a 911 situation that I need to handle immediately.  Show is set to collapse without cast.  Need immediate support.  Without actor, there will be no product.  I am available at all times of day and night and open to any suggestions.  Not looking to post blame.  I now simply have no show.  Need English-speaking actor to play the role of Daisy, Paz, Frank.  No subsequents.  All dates are as discussed and published.

Q.  Thank you.

And this is not usually how this is done; right, Mr. Friedlander?

A.  Normally the cast -- typically, you have -- yes, your cast before you start shooting.  There could be ones that happen at the last minute for sure.

Q.  Well, you specifically blamed these problems on Mr. Rinsch; is that right?

A.   Are you referring to the email above?

Q.   Your reaction to this email and what you learned.

A.   Where I say: his own delays?

Q.   Yes.

A.   I see this, but I honestly don't remember the --

Q.   Well --

A.   -- why I am saying that at the time.  There was a lot going on.  But I remember we did -- he did ask for names, and I was contributing names and calling in some -- calling some frequents, directly, that were actors to potentially be in the show, and we were definitely trying to help.

Q.   But specifically the third line of your response or your forwarding of this message state that you -- you say that these delays, his own delays in decisions have caused this; right?

A.   I see that I wrote that, yeah.

Q.   And this would be the type of thing that a line producer would typically have made sure didn't happen; right?

A.   A line producer can be helpful, but ultimately, like, the director is the one that makes the decisions.  So, the line producer can be helpful in terms of, like, you need to make a decision by this date, but it doesn't mean that they can enforce it.

Q.   But in a production of this size, this is the type of things thing that could cause delays that could cause other delays down the line; right?

PC3Frin1                     Friedlander - Cross

A.   For sure, yeah.  Everything's important to be buttoned up.

Q.   Something you really need to get ahead of; correct?

A.   It's helpful to get ahead of a lot of this.

          MR. MARKEWITZ:  Objection, form.

Q.   So, they ended up shooting in Brazil?

A.   Yeah.

Q.   And they ended up getting some incredible footage; right?

A.   I saw some of it.  It looks really amazing.

Q.   Much of that is reflected in the coffee table book we saw yesterday; right?

A.   Yes.  It's here.

Q.   And --

          THE COURT:  Counsel, approach the sidebar.

          (Continued on next page)

(At sidebar)

THE COURT:  So, I continue to be concerned about the lack of adherence to the Rules of Evidence.

First, I do not understand what is meant by: a question to which there was no objection, that, quote, this is incredible footage.  I don't know what that means.  The jury doesn't know what that means.  The response was that, yes, it was amazing.  What the heck does that mean?

I also don't -- completely lost on the relevance of any of this, but there's been no objection.

And then we also get into the interesting hearsay question that no one raised of, because there was no objection to the admission of the exhibit as to how a prior statement of a witness that is not inconsistent can be introduced for its truth when it seems to be precluded by the hearsay rule.

So, I think it's important -- and I tried to get this across to both sides last night -- to keep questions more precise.  Cross, of course, you can lead, so that enables you to be precise, but what is the relevance of any of this?

MR. ZEMAN:  I think it's spelled out in the arguments that I laid out in my opening, your Honor, which is that, you know, the fact that this project wasn't successful isn't so much a function of Mr. Rinsch setting up to commit fraud but rather, his inability to actually execute his vision.  And --

THE COURT:  So, I'm not sure -- the government may

PC3Frin1                    Friedlander - Cross

have opened the door to that; I'll consider that --

but assuming the door was not opened, I don't see what the relevance of that is.

The question that the jury has to decide is whether Mr. Rinsch made statements that were made, that were intentionally false, that were made for the purpose of obtaining or retaining money.

And a huge amount of the testimony elicited from both sides has to do what was in the mind of Mr. Friedlander, which, it seems to me, to be of no relevance whatsoever. But since no objection has been made and the door has clearly been opened by the government -- to my amazement, to use the term of art -- I'm going to let you continue at least with this witness, but you have to make your questions more precise.

MR. ZEMAN: I will do. Thank you, your Honor.

(Continued on next page)

PC3Frin1                    Friedlander - Cross

(In open court; jurors present)

Q. Thank you. Mr. Friedlander they wrapped shooting in the end of August 2019, in Brazil; correct, or early September?

A. Yeah. In September they finished that part of the shoot, yeah.

Q. And they had gotten about 300 hours of footage; is that correct?

A. I don't know how much was shot.

Q. You were concerned with the overages that the production had taken on in Brazil; correct?

A. Well, Carl and the producers were concerned about it and they flagged it to us.

Q. And Mr. Rinsch told you that it might have serious implications for the future of the show; correct?

A. Yes.

Q. You knew the show needed help at this point?

A. I did.

MR. MARKEWITZ: Objection, vague.

THE COURT: Sustained.

Q. In September of 2019, they moved the production down to Uruguay?

A. Yes.

Q. And they were able to shoot a significant amount of footage in Uruguay as well; correct?

A. They shot there, yes.

PC3Frin1                         Friedlander - Cross

Q.  And after shooting in Uruguay, you

decided, Mr. Friedlander, that the shoot in Mexico was

unnecessary; correct?

A.  I may have suggested that we not necessarily shoot

there, but I don't remember the sequence of events.

Q.  At this point, you were trying to trim budget in any way

you could; correct?

A.  Well, we were trying to help out with the budget and figure

it out, so, yes, that was the stage we were in.

Q.  Okay.  So after Uruguay, the production moved on to

Budapest; correct?

A.  Yes.

Q.  And more production issues arose; correct?

A.  There were -- I don't remember exactly what happened in

Budapest, but there are always challenges on shows.

            THE COURT:  I'm going to instruct the witness to just

answer the question.

            THE WITNESS:  Okay.

            THE COURT:  The question was:  And more production

issues arose.

            Strangely enough, there was no objection to that vague

question.

            The answer was, I don't remember exactly.

            That's the answer.

            THE WITNESS:  Okay.

PC3Frin1                    Friedlander - Cross

Q.   You flew to Budapest to check in on the production;
correct?

A.   I did.

Q.   And you went there with Mike Posey; correct?

A.   I did.

Q.   And he was somebody you had been working on the project
with as well; correct?

A.   Yes.

Q.   And you and Mr. Posey got to see what was actually
happening on set; correct?

A.   Yes.

Q.   And you got to see some of the footage that Mr. Rinsch
shot; correct?

A.   Yes.

Q.   And you were excited about this footage; correct?

A.   Yes.

Q.   And you met with Mr. Rinsch on several occasions in
Budapest; correct?

A.   On two occasions.

Q.   And you saw the sets that they had there; correct?

A.   Yes.

Q.   And they were shooting in a large football stadium;
correct?

A.   Yes.

Q.   Hundreds of extras?

PC3Frin1                    Friedlander - Cross

A.   There were a lot of extras there, yeah.

Q.   After Budapest, you and Mr. Posey flew back to Los Angeles; correct?

A.   Yes.

Q.   And you and Mr. Posey came up with some suggestions of cuts to the script; correct?

A.   Likely, that was -- that's what we would do.

Q.   You sent some suggestions of cuts to the script to Mr. Rinsch.  Do you remember that?

A.   Was that the email we looked at yesterday?

Q.   Yes.

A.   Yes.

Q.   And Mr. Rinsch did not respond well to your suggestions of cuts; correct?

          MR. MARKEWITZ:  Objection, form.

          THE COURT:  Also disguised hearsay.

          Sustained.

Q.   Mr. Rinsch was clear to you about what he wanted to shoot; correct?

          MR. MARKEWITZ:  Objection, form.

          THE COURT:  Sustained.

Q.   Moving forward to February 3, 2020, Mr. Friedlander, Mr. Rinsch shared with you a 229-page script.

          Do you remember that?

A.   Yes.

PC3Frin1          Friedlander - Cross

MR. ZEMAN: And Ms. Tang, if we could pull up what's already been admitted as Government Exhibit 6351.

If you could go down a page or two.

Q. This is the 229-page script; correct?

A. I'm sorry. Can you zoom in?

Q. Here we go. Sorry. Right there.

MR. ZEMAN: The page before this, Ms. Tang, please.

Q. So this is -- could you just read the title of this page?

A. Yes.

White Horse, or how I stopped worrying and learned to love the singularity.

MR. ZEMAN: Ms. Tang, can you go down so we see what page number that is?

THE COURT: I'm sorry. What exhibit number is this?

MR. ZEMAN: It's government 6351, your Honor.

THE COURT: And it's in evidence?

MR. McGUINNESS: Yes.

Thank you, Ms. Tang. You can take this down.

BY MR. ZEMAN:

Q. Mr. Friedlander, you didn't voice any concern to Mr. Rinsch that the script had grown too large; right?

MR. MARKEWITZ: Objection, relevance.

THE COURT: I think it's marginally relevant.

Overruled.

A. Can you repeat the question?

Q.   You never expressed any concern to Mr. Rinsch that the script had grown too long; correct?

A.   I was never talking to Mr. Rinsch about the length of the script being too long, that is, we were always looking at the story.

Q.   So, Mr. Rinsch, you testified yesterday, was given the $11 million that are at issue in this trial in the beginning of March 2020; correct?

A.   Correct.

Q.   And after that, you were in touch with Mr. Rinsch, you testified yesterday; correct?

A.   After March of 2020, yes.

Q.   Yes.  And at this point, you were not concerned with him performing his obligations?

        MR. MARKEWITZ:  Objection, 403.

        THE COURT:  I sustained the objection, and I think it's probably also 401 and 402, but, sustained.

Q.   You testified yesterday, Mr. Friedlander, about a meeting you had with Mr. Rinsch at the Four Seasons in 2020; correct?

A.   Correct, yes.

Q.   And that was the first time you had seen Mr. Rinsch after COVID hit; correct?

A.   Yes.

Q.   And this was a meeting that Mr. Rinsch had called for with you and Ms. Holland; correct?

PC3Frin1                    Friedlander - Cross

A.   Yes.

Q.   And he had been begging for an in-person meeting with you and Ms. Holland; correct?

MR. MARKEWITZ:  Objection, form.

THE COURT:  Sustained.

Q.   He asked for this meeting to take place; correct?

A.   Correct.

Q.   And the three of you met; correct?

A.   Yes.

Q.   And this was where he showed you and Ms. Holland the book; correct?

A.   Yes.

Q.   And you didn't ask Mr. Rinsch about the particular bullet point items that you discussed yesterday during that meeting; correct?

A.   I don't remember going through that list.

Q.   And on July 10 of 2020, Mr. Rinsch sent you a Dropbox link with work he'd been doing on the show.  Do you remember that?

A.   On July 20 of 2020?

Q.   July 10 of 2020.

A.   I don't.

Q.   And you never followed up with Mr. Rinsch about his progress on his action items; correct?

MR. MARKEWITZ:  Objection, 401.

THE COURT:  So, the reason I said the similar question

was marginally relevant -- and I will allow this question -- is, it goes to the issue of materiality, but not to anything else.

But the objection is overruled.

Q.  Can you repeat the question, please?

MR. McGUINNESS:  Sure, can you read it back.

MR. ZEMAN:  Can you read it back, please.

THE COURT:  And you never followed up with Mr. Rinsch about his progress on his action items; correct?

THE WITNESS:  No, I reached out through the summer, not only to Carl and to Gabby.  I was checking in, and we were in touch.

Q.  You testified yesterday, Mr. Friedlander, that in September of 2020, you made the decision to write down the show; isn't that correct?

MR. MARKEWITZ:  Objection, misstates testimony.

THE COURT:  Well, if -- I think that's right, but we'll put it to the witness.

Did you make the decision to write down the show?

THE WITNESS:  Others made the decision, but I supported it.

THE COURT:  All right.

Q.  And I think you testified yesterday that this writing down is an accounting term; is that correct?

A.  That's my understanding.

PC3Frin1                    Friedlander - Cross

THE COURT:  Well, what do you understand it to mean?

THE WITNESS:  That, as I was saying yesterday -- I'm not an expert, but -- the way that it --

THE COURT:  Let me put it to you this way.  I'll ask. I'll try to help you out.  Is it your understanding that that means that the value attributed to this particular item has been substantially reduced?

THE WITNESS:  Yes.  This is -- correct, this is an asset that doesn't have the same value or future value to the business.

THE COURT:  Okay.

MR. ZEMAN:  Just one moment, your Honor.

(Counsel conferred)

Q.  Mr. Friedlander, thank you.

MR. ZEMAN:  I have no further questions.

THE COURT:  Redirect.

MR. MARKEWITZ:  Thank you, your Honor.

No redirect from the government.

THE COURT:  Thank you very much.

You may step down.

(Witness excused)

THE COURT:  Please call the next witness.

MR. MARKEWITZ:  Before we call Mr. Checchi to the stand, the government would like to introduce and read into the record certain exhibits.

PC3Frin1                    Friedlander - Cross

THE COURT:  Okay.

MR. MARKEWITZ:  Mr. Coleman, can you please pull up what's already in evidence as Government Exhibit S-3.

And Mr. Coleman, it looks like there's some red markings.

THE COURT:  Yeah, I see that.  It's on my screen, too.

MR. MARKEWITZ:  Thank you, Mr. Coleman.

THE COURT:  Okay.

MR. MARKEWITZ:  Stipulation S3, titled arbitration records.  And it begins:  It is hereby stipulated and agreed between the parties that Government Exhibits 1001 through 1014 and Government Exhibits 5089 through 5093 consist of true and accurate copies of records created, issued, produced, or filed in an arbitration between Carl Eric Rinsch and Netflix Entertainment LLC, with caption ADR, Case No. 22-6311-RJM, the arbitration.

Mr. Coleman could you go to page 2, please.

Subparagraph E reads:  Government Exhibits 1005 through 1006 are true and accurate excerpts of transcripts of deposition testimony provided by Carl Erik Rinsch during the arbitration.

And at the bottom of the page, it reads:  When this stipulation refers to a Government Exhibit by a number, it includes any Government Exhibit identified by that number followed by a letter.

PC3Frin1                    Friedlander - Cross

Your Honor, at this time, the government would offer Government Exhibits 1006-A and 1006-C.

THE COURT:  Received.

(Government's Exhibits 1006-A and 1006-C received in evidence)

MR. MARKEWITZ:  Mr. Coleman, could you please pull up on one side of the screen government exhibit 6358 and on the other side of the screen, if you could pull up Government Exhibit 1006-C.

THE COURT:  Ladies and gentlemen, all of the exhibits will be given to you during your deliberations together with an index so you can find anything that you want to look at again, so to speak.

MR. MARKEWITZ:  It's 1006-C on the right, please, Mr. Coleman.  And on the document on the left, Government Exhibit 6358, could you please go to page 5 for me and zoom in from where it says Dick and Carl down through the bulleted list.

And if you could just put that to the left so we can see that at the same time as Government Exhibit 1000-C.  Just a little bit smaller.  It's infringing on the page.

Thank you, Mr. Coleman.

On the first page of Government 1006-C, in the middle, it reads: video tape deposition of Carl Rinsch, person most knowledgeable on behalf of VFX and in his personal capacity,

PC3Frin1                    Friedlander - Cross

Los Angeles, California; Wednesday, September 20, 2023.

Mr. Coleman, can you please go to page 2 of exhibit 1006-C.

Mr. Hammer:

"Q.  Now, Mr. Rinsch, you can see this is a March 4 and 5 email chain.

"A.  Uh-huh.

"Q.  And I want to direct your attention to the first email in the chain.  It's from Bryan Noon to you and Richard Kendall.

Do you see that?  It starts at the bottom of the first page and carries over.

"A.  Sorry, Dick and Carl, that one?

"Q.  Yeah, that one.

"A.  Yeah, okay.

MR. MARKEWITZ:  Skipping down to line 22:

"Q.  Do you recall receiving this email?

"A.  Very much so.

"Q.  And if you read it, it says:  Based on Cindy's and Carl's --

MR. MARKEWITZ:  Mr. Coleman, can you go to the next page, please.

"Q.  -- discussions, we are prepared to approve the following as the next phrase towards completing the production and delivery of the project based on the most recent script.

Do you see that?

PC3Frin1                    Friedlander - Cross

"A.   Yes.

          MR. MARKEWITZ:  Mr. Coleman, next page please.

          And it goes on and it says:

"Q.   Netflix shall fund 11 million.  Such funding shall not

represent an acknowledgment of any of the contractual

milestones.  Do you see that?

"A.   Yep.

          MR. MARKEWITZ:  And then it says:

"Q.   Home VFX shall perform and shall use $11 million to fund

the following over a five-week period.  And then there's

certain bulleted items there.  Do you see that?

          MR. MARKEWITZ:  Next page, please, Mr. Coleman.

"A.   Yes, I --

"Q.   Is that a yes?

          And, you know, I'll show you, in a moment, the March 5

email agreement?

"A.   Yes, thank you.

"Q.   Netflix ended up paying the 11 million; correct?

"A.   That's correct.

"Q.   And was HVFX agreeing to use the 11 million for the

purposes listed here?

"A.   To answer your question, yes.  Yeah.  Home VFX shall

perform and shall use the 11 million to fund this.

          MR. MARKEWITZ:  Thank you, Mr. Coleman.

          You can take that down.

PC3Frin1                    Friedlander - Cross

MR. SOWLATI:  Mr. Coleman, could you please put Government Exhibit S-8 on the screen?

All right.  I will now read a portion of Government Exhibit S-8, a stipulation that has been entered into by the government and the defendant, and admitted into evidence.

Bank of America. N.A. is a financial institution that provides financial services, including banking services. Deposits at Bank of America have been continuously insured by the Federal Deposit Insurance Corporation since at least January 1934.

Government Exhibits 3001 through 3026, Government Exhibit 3053 and Government Exhibit 3055 consist of true and accurate copies of records maintained by Bank of America in the regular course of its business.

The records were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records were kept in the course of regularly-conducted activity of Bank of America as a regular practice of that activity.

Charles Schwab Co. is a financial institution that provides consumer financial services, including brokerage services.  Since at least March 2020, Charles Schwab has been a broker-dealer registered with the Securities and Exchange Commission under the Securities and Exchange Act of 1934.

Government Exhibits 3027 through 3031, Government

PC3Frin1                    Friedlander - Cross

Exhibit 3054, and Government Exhibit 3056 consist of true and accurate copies of records maintained by Charles Schwab in the regular course of its business.

The records were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records were kept in the course of regularly-conducted activity of Charles Schwab as a regular practice of that activity.

Government Exhibit 3031 is a true and accurate copy of options trading operations transactions conducted using the Charles Schwab brokerage accounts owned by Charles Rinsch.

Citibank, N.A. is a financial institution that provides consumer financial services, including banking services.  Deposits at Citibank have been continuously insured by the FDIC since at least January 1934.

Government Exhibit 3032 consists of excerpts of true and accurate copies of records maintained by Citibank in the regular course of its business.  The records were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records were kept in the regular course of regularly-conducted activity of Citibank as a regular practice of that activity.

Finally, Wells Fargo Advisors is a financial institution that provides financial services, including

PC3Frin1                    Friedlander - Cross

brokerage and financial advisory services.

Government Exhibits 3033 through 3052 consist of true and accurate copies of records maintained by Wells Fargo in the regular course of its business.  The records were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records were kept in the course of regularly-conducted activity of Wells Fargo as a regular practice of that activity.

The government now offers the following exhibits referenced in Government Exhibit S-8: Government Exhibits 3001 through 3026, and the Government Exhibits 3053 and Government Exhibit 3055, which were Bank of America exhibits.

THE COURT:  Received.

(Government's Exhibits 3001 through 3026, 3053 and 3055 received in evidence)

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MR. SOWLATI:  The government also offers Government Exhibits 3027 through 3031 and Government Exhibit 3054 and Government Exhibit 3056, which were records from Charles Schwab.

THE COURT:  Received.

(Government's Exhibit 3027 through 3031, 3054, 3056 received in evidence)

MR. SOWLATI:  The government offers Government Exhibit 3032, which is a record produced by Citibank.

THE COURT:  Received.

(Government's Exhibit 3032 received in evidence)

MR. SOWLATI:  The government offers Government Exhibits 3033 through 3047, which are records provided by Wells Fargo.

THE COURT:  Receives.

(Government's Exhibit 3033 through 3047 received in evidence)

MR. SOWLATI:  The government calls Adam Checchi.

ADAM CHECCHI,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE COURT:  Counsel.

DIRECT EXAMINATION

BY MR. SOWLATI:

Q   Good morning, Mr. Checchi.

A    Good morning.

Q    What's your occupation?

A    I'm a financial advisor.

Q    What's your educational background?

A    I graduated from Harvard College, and from Harvard Business School.

Q    Can you quickly run through your employment history.

A    Sure.  After Harvard College I worked for the Walt Disney Company as a financial analyst and in venture capital.  After Harvard Business School I worked for Goldman Sachs as an investment banker for approximately three years.  And then I started the firm that I run today.

Q    What is the name of that firm that you run today?

A    Checchi Capital Advisors.

Q    What's your title?

A    I'm the managing partner.

Q    When did you found Checchi Capital?

A    2007.

Q    Can you describe what Checchi Capital does.

A    Checchi Capital is a registered financial advisor, we provide financial advice, money management, and financial services to high net worth clients.

Q    How much money does Checchi Capital manage?

A    Presently approximately $2.6 billion.

Q    Now that have that introduction, I'd like to switch topics.

Are you familiar with someone named Carl Rinsch?

A    Yes.

Q    How do you know Mr. Rinsch?

A    Originally Mr. Rinsch and I went to junior high and high school together.

Q    At some point did Checchi Capital do business with Rinsch?

A    Yes.

Q    When did you do business with Rinsch?

A    Approximately May -- late May, early April of 2020.

Q    Now, how did this business come about?

A    I hadn't spoken to Mr. Rinsch probably since high school, but a mutual friend of ours who is also my business partner, a gentleman names Sam Pfister, had run into him and gotten reacquainted.  Carl was interested in placing some options trades, and this was a specialty of our firm.  And so he reconnected with me to engage in that business activity.

Q    What are options at a high level?

A    Options are what are called a derivative security, and they're derivative of an underlying security like a stock.  So if you had a stock like Google, you could transact in options on Google that would allow you to bet on the price of Google rising or falling in a specified amount of time and in a specified level, and you'd get a larger payout if that occurred.

Q    Are there different types of options?

PC3JRIN2                    Checchi - Direct

A    There are.  The most significant are call and put options.

Q    What are call options and what are put options?

A    A call option is an option that's a bet that the stock will go up, so it's a call on the stock that you're expecting it to go up a certain direction over a certain amount over a certain time.  And a put option is a bet against a stock.  You're betting that it's going to go down or shorting it.

Q    Can you give an example of a call option to make it more concrete.

A    Sure.  I'll stick with Google.  So let's say that Google is trading at $200 per share.  You could purchase a call option on Google at $220 that expired in six months.  And what you would be betting on is that the price of Google stock would go over $220 sometime in the next six months.  And if it did so, you would profit on the difference between the 220 and whatever the price of Google was.  If it didn't do that, the option would become worthless.

Q    Now, you mentioned that Rinsch reached out to your partner. Did you end up having direct communications with Rinsch about the investment he wanted to make?

          MR. McGUINNESS:  Objection.  Compound.

          THE COURT:  Overruled.  You may answer.

A    Yes, I did have direct communications with Mr. Rinsch.

Q    How did you communicate with him?

A    Predominantly via email and phone conversations.

Q   Can you be more specific about what type of investments he was looking to make.

A   Mr. Rinsch was focused on making some investments that he thought would profit during the turmoil of COVID.  This was 2020.  And he was focused on placing a bet that Gilead Pharmaceutical would increase dramatically in price based on his perspective of their drug -- potential drugs for treating COVID.  As I recall, he also wanted to place a bet against the broader U.S. market like the S&P 500.  He was interested in betting on other markets, basically betting against the Brazilian market, and then, if it I recall correctly, a trade in gold.

Q   Two followup questions.  First, is there another term used for betting against the market?

A   Sure.  Shorting the market.

Q   And second --

THE COURT:  How do you do that?  So you explained, for example, with respect to calls and puts, you're essentially purchasing the right to obtain the stock at a future time at a certain price.  And if the price has in the meantime gone above that price, you make money.  Do I have that right?

THE WITNESS:  Yes, in the case of a call, you do, your Honor.

THE COURT:  That's a call, yes.  And put is the reverse, in effect?

THE WITNESS:  Yes, sir.

THE COURT:  So how do you bet against an entire economy?

THE WITNESS:  There are a few ways to do it.  A very efficient way is to bet against a security that tracks broadly, say, the U.S. market.  So in this case, there's what's called an ETF or exchange traded fund, which is a security that trades like a stock, like a Google, but it represents all of the S&P 500, which is the 500 largest companies in the United States, so as a basket.  So in this case, you would buy a put option on the S&P 500, and effectively if the broad U.S. stock market declined as represented by those 500 largest companies, you would benefit.

THE COURT:  Go ahead, counsel.

BY MR. SOWLATI:

Q   And you mentioned Gilead Pharmaceutical.  What is Gilead Pharmaceutical?

A   To my knowledge, Gilead Pharmaceutical is a large pharmaceutical company that develops a number of different drug therapies and happened to have some oriented towards treating COVID.

Q   Did you discuss with Rinsch the source of the funds for the investment he was looking to make?

A   Yes.

Q   What did he say?

A    He represented that these were personal funds of his and that they represented a small portion of his overall net worth.

Q    Why did you discuss with Rinsch whether the funds for the investment were personal?

A    We discussed it because we always want to understand the purpose of the money that's being invested as we help clients make some of these decisions.  And in this case, because this were -- these were self-directed trades oriented towards very specific speculative bets, it was important to us to understand that this didn't represent, say, all of his money or something else.  We wanted to make sure that this was money he could afford to lose.

Q    You said that Rinsch told you that the funds he wanted to invest were personal funds.  Did Rinsch ever tell you that the money came from Netflix?

        MR. McGUINNESS:  Objection.  Relevance.

        THE COURT:  Well, it depends on the answer.  So just answer that question yes or no, and then I'll rule.

A    No.

        THE COURT:  Then I think that's irrelevant.  The objection is sustained.  The jury will disregard the last answer.

Q    Did you have any reason to think that the money was for a business, as opposed to Rinsch's personal funds?

        MR. McGUINNESS:  Objection.

PC3JRIN2                    Checchi - Direct

THE COURT:  I'll allow that.  You may answer.

A   No.

Q   Why not?

A   Mr. Rinsch, both in conversations and in email correspondence, represented consistently that it was personal funds.

MR. SOWLATI:  I'd like to turn to some documents. Unless there's any objection, the government offers Government Exhibit 6057.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6057 received in evidence)

BY MR. SOWLATI:

Q   Are you familiar with this document?

A   Yes.

Q   And what is it?

A   This is an email from Mr. Rinsch to me.

Q   Mr. Coleman, can you please go to page 6 of this exhibit.

On the very bottom of the page, there is an email from cerinsch@runbox.com to Sam Pfister dated March 26, 2020 at 8:15 p.m.  Would it be possible to call that out as well as the email below.  Who is this email from and who is it to?

A   This is from Mr. Rinsch to my business partner, Sam Pfister, and myself.

Q   Now, before we look at the bottom email, did you discuss

the contents with Mr. Rinsch?

A    Yes.

Q    Okay.  Let's start with the first paragraph starting with "don't know."  I'll give the jury a moment to read it.

Did Rinsch discuss with you what he meant when he said he wasn't a broad diversify kind of guy?

A    Yes.

Q    What did he say?

A    My understanding was that he didn't invest his money sort of broadly, that he kept significant reserves but then made highly concentrated bets with a small portion of his money.

Q    And Rinsch wrote that he does more another aggressive options trading.  Did he tell you what he meant by that?

A    Yes.  These would be more speculative trades and options. Options tend to allow you to scale a bet both in terms of how far out of the money — meaning how far away from the current stock price you are — and in terms of how much time it has to pay off.  If you're further out of the money, the stock has to go up a lot more for something to be profitable or down a lot more depending on where you are.  And the shorter the contract, the less time you have for that to happen, so tending towards options transactions that were on the riskier end of trading.

Q    In your experience, is investing in options an aggressive or risk averse strategy?

A    It's an aggressive strategy.

PC3JRIN2                    Checchi - Direct

Q    And why is that?

A    It's an aggressive strategy because you're setting constraints around how correct you can be. And if you're wrong, the value of the option expires worthlessly.

Q    Let's focus on the second paragraph of this email which is on the second page. And if we could call out the whole email, and I'll give everyone a moment to read it.

Who did you understand Adam to be referring to?

A    I understood it to be referring to me.

Q    And Rinsch wrote, for the time being, you guys might be interested in this fun bit of my overall portfolio. Did you discuss with Rinsch what he meant by this?

A    My understanding was he meant --

MR. McGUINNESS:  Objection.

THE COURT:  Well, did you discuss it with him?

THE WITNESS:  Yes.

THE COURT:  Okay. And in substance what did he say?

THE WITNESS:  That this was the portion of his portfolio that he was taking — I'll call them more complicated and aggressive bets, and that it would be in our wheelhouse as a firm to help him with.

THE COURT:  Just so I'm clear and the jury is clear, did you understand by that that he meant that he was investing in high-risk investments, but according to him it was only a small portion of his net worth? Is that what he was saying?

THE WITNESS:  Yes, your Honor.

BY MR. SOWLATI:

Q   Now let's focus on the second paragraph on this page starting with, I could send over 3mm personal to get started. What did you understand 3mm to mean?

MR. McGUINNESS:  Objection.

THE COURT:  Overruled.

A    I understood that to mean $3 million of his personal funds.

Q   Now, before we move on, Mr. Coleman, can you please highlight where Rinsch wrote, and please keep this communication under your hat as I try to live a low profile and am immensely private.  All right.  We can take this exhibit down.

Mr. Checchi, after this email did you end up helping Rinsch invest his money?

A    Yes.

Q   Approximately how much did Rinsch ultimately invest through Checchi Capital?

A    I believe approximately $6 million.  He transferred about 10 million to the account.

Q   And what did he end up investing in?

A    He ended up investing in call options on Gilead stock and put options on the S&P 500 and put options of an ETF -- as I described, in put options on a ETF that tracked the Brazilian stock market.  And he took a long position, a direct position

in an ETF that tracked the price of gold.

THE COURT:  All right so first of all, what do you mean by "long position"?  You have to remember that not all of the jurors are as familiar with the terminology as you may be. What do you mean by "long"?

THE WITNESS:  Yes, sir.  Sorry.  "Long position" means he bought the security just like if you wanted to own Google stock, you would be long in Google stock, and this particular security tracked the price of gold.  It was backed by gold bullion.  So as gold prices would move up, just like buying a stock, he would benefit from the increased price in gold.

THE COURT:  And you told us before, you gave us an example of a call.  Give us an example of a put.

THE WITNESS:  In a put option, you're doing the opposite of a call.  So a call means you're -- you own a call, you're expecting the stock to go up.  In a put option you're expecting the stock to go down.  So if Google were at $200 and you bought a put option on Google at $200, if Google went down during the time that you held that put option, you would make the difference between $200 and whatever Google's stock price was at.

BY MR. SOWLATI:

Q   Now, whose ideas was it to take this approach?

A   Mr. Rinsch drove the trade decisions.

Q   Did you give him any feedback on the investment?

A   We did.  Our firm did it in two ways.  One was just how to structure some of these in terms of actually trade them and the actual contracts that reflected his wishes effectively and the bets he wanted to make.  And the other is we give him feedback fairly consistently that these were high risk, and just to be aware that there's a very good potential to lose all of your principle.

Q   How did he react to this feedback?

MR. McGUINNESS:  Objection.

THE COURT:  Sustained.  You can ask him what he said.

MR. SOWLATI:  Yes, your Honor.

Q   Did he respond?

A   Yes.

Q   How did he respond?

MR. McGUINNESS:  Objection.

THE COURT:  I'll allow it.  What did he say, as best you recall in words or substance?

A   As best I recall, the substance — and it's reflected, I believe, in our email correspondence — is that he was well aware of the risks.  He had a good understanding of how these options trades worked and sort of where the levers for making them higher risk/higher return existed, and that he fully appreciated the fact that, you know, this money could be lost if the bets didn't pan out.

Q   Before Checchi Capital made the investment on Rinsch's

behalf, were there any logistical steps Rinsch needed to take?

A    Yes.  As with any client, Mr. Rinsch needed to open an account at a custodian that we could then make the trades on his behalf for, and he needed to sign up as a client of ours.

Q    Why did you need an open an account for Rinsch?

A    We don't run a broker dealer.  We manage assets on a third-party platform.  In this case it's Schwab.

Q    Mr. Coleman, can you please put on the screen what's been admitted into evidence as Government Exhibit 3028.  Are you familiar with this document?

A    Yes.

Q    And what is it?

A    This is a fairly standard letter from Schwab, the custodian, informing the client of the fact that they have an account open with their organization.

Q    And which client is it for?

A    It's indicated at the top left.  It's for Mr. Rinsch.

Q    What's the date of this document?

A    April 7, 2020.

Q    Did you make investments for Rinsch before or after April 7, 2020?

A    We made investments before.

Q    Why does the document say April 7, 2020 then?

A    The document often comes, you know, several days or up to a couple weeks after accounts are opened.

Q    And on the top right it says, your investment advisor Checchi Capital Advisors.  Why does it say that?

A    That's indicating that we have power of attorney over the account to make transactions.

Q    Now, let's turn to the second page.  The top header says your account profile.  Who is that preferring to?

A    That's referring to Mr. Rinsch.

Q    And the information on this page, do you know where it would have come from?

A    It would have come from account opening documents --

MR. McGUINNESS:  Objection.  Foundation.

THE COURT:  Is this a kind of document that you're familiar with from your experience?

THE WITNESS:  Yes, your Honor.

THE COURT:  You've seen this kind of document many times?

THE WITNESS:  Yes, sir.

THE COURT:  Overruled.

Q    And the information on this page, do you know where it would have come from?

A    It would have come from the account application that Mr. Rinsch filled out.

Q    And let's focus on the bottom.  What did Rinsch represent was his total net worth?

A    That's indicated in the lower right.  Total net worth,

$40 million.

Q    And how about his annual income?

A    Just above it, $1 million.

Q    Now, towards the top of the page, there's a section, account features and information, and there's a line for investment objective.  If we could blow up the top portion, and it says income/speculation.  Are you familiar with what this is?

A    Yes.

Q    And what is it?

A    When you open an account with a custodian like Schwab or a Fidelity, they have to indicate or they have you indicate the purposes of the account.  And you can choose multiple -- you can have multiple choices.  You don't have to pick one.  So income would be the expectation that you were going to earn income off of income producing securities.  And speculation would indicate that you expected to take higher risk return bets or investments in the account.

Q    And again, who would have filled this out?

A    Mr. Rinsch.

Q    Now, there's also a reference to options strategy account approved.  What is that?

A    So Schwab will not allow a client to just open an account and immediately trade options or allow us to trade options on a client's behalf.  That client has to indicate some level of

experience with transacting in options in order to have that feature turned on to their account.

Q   And how would someone obtain that approval?

A   They would fill out separate paperwork with Schwab indicating their specific experience.

Q   Did Rinsch fill out those forms to get approval?

A   Yes.

MR. McGUINNESS:  Objection.

THE COURT:  Sustained.

In the ordinary course, would Mr. Rinsch have had to fill that out in order to get the approval, in your experience?

THE WITNESS:  Yes, your Honor.

Q   And what is spread trading?

A   Spread trading is an indication of the level of and type of options activity that you engage in in the account.  In this case it would be allowing you to both buy and sell options, which would be the highest level that you could achieve.

Q   Is this type of strategy, the type of strategy you would propose to someone looking for asset preservation?

MR. McGUINNESS:  Objection.

THE COURT:  Sustained.

Q   In your conversations with Rinsch, did he appear to know how options worked?

A   Yes.

Q   Can you explain.

PC3JRIN2                        Checchi - Direct

A    In conversations and in correspondence, Mr. Rinsch indicated that he had traded options before and that, you know, he used the appropriate or had an appropriate understanding of the various things that drive options values and how to increase the risk and return of the types of trades that he wanted to make.  And those fell along the lines that I described before of things like where the strike price was relative to the current price of the security and how much term i.e., time the option allowed you for the bet to pay off.

Q    Let's turn to --

THE COURT:  I need to caution you again to remember that you're not talking to a bunch of your fellow investment experts.  What do you mean by "strike price"?

THE WITNESS:  Yes, your Honor.  So I'll keep going with Google.  So the strike price in an option — let's say it was a call option on Google — would be the price at which Google would have to exceed for you to make money.  So if Google was trading at $200 and you bought a call option on Google for $220, Google would have to go above 220 before you started to make money on the option.

BY MR. SOWLATI:

Q    Let's turn to the third page, which has the header, your trading and investment profile.

Again, where would this information have come from?

MR. McGUINNESS:  Objection.  Asked and answered.

PC3JRIN2                          Checchi - Direct

THE COURT:  No, I'll allow that.

A    This would have been filled out as part of the options paperwork by Mr. Rinsch.

Q    The listed knowledge level of stocks and options is extensive.  Based on your discussions with Rinsch, how would you have compared Rinsch's level of sophistication with respect to finance compared to your typical clients?

A    I thought Mr. Rinsch had a very good understanding of the options markets relative to most of our clients.

Q    Mr. Coleman, can you please put on the screen what's been admitted into evidence as Government Exhibit 6057.  This was the email thread we previously looked at, but I want to focus on a later email on the thread.  I'll like to focus on the email dated March 27, 2020 at 10:46 p.m., which is at the start of the bottom of page 1.  And who is this from and who is it to?

A    This is from Mr. Rinsch to me.

Q    Let's go to the next page to see the rest of the email. And the first paragraph, let's highlight the sentence, I'm able to wire funds from my Wells Fargo account as soon as possible. If we could just highlight that sentence, I'm able to wire funds from my Wells Fargo account as soon as possible.

Based on your discussions with Rinsch, do you know what funds he was referring to?

A    I believe he was referring to personal funds from a

personal bank account.

Q   Now, let's focus on the section that starts "strategy." And let's call that out, that word out plus the four paragraphs underneath it.  And I'll give everyone a moment to read it.

Based on your discussions with Rinsch, do you know what strategy he was referring to?

A   Yes.  He was referring to the strategy where he wanted to buy call options on Gilead stock.

Q   And there's the reference in here to remdesivir.  It's on the third paragraph.  Do you know what that is?

A   My understanding was that was a drug produced by Gilead.

Q   And in the first paragraph Rinsch wrote, I would look for Gilead calls out of the money with a maturation date of April 3 and April 9.  I presently have out of the money calls on the April 17th, but as this has developed I think there is an opportunity to make more focused and targeted calls.

Based on your discussions with Rinsch, what did you understand he was referring to?

MR. McGUINNESS:  Objection.

THE COURT:  Overruled.

A   My understanding was that Mr. Rinsch was referring to placing another bet on Gilead purchasing options with our assistance that would be for options that matured even sooner than options he already had on Gilead stock.

Q   What does it mean for a call to be out of the money?

A   For a call to be out of the money is sort of what I referenced before in the Google example where Google is trading at $200 and the strike price is at 220.  Out of the money means the strike is above the current trading price of the security, so it's out of the money, meaning you're not making any money until the stock — in this case Google — were to go above 220.

Q   What's the maturation date?

A   The maturation date or expiration date -- the maturation date refers to the expiration date of the option.  That's when -- the time period you have on the contract.  And so once that date is reached, if in my Google example Google stock does not exceed $220, the contract is voided and worthless.

THE COURT:  So if I understand what you're saying, if you're making a bet and if your bet doesn't meet your expectations, you lose all the money that you put in that option.  Do I have that right?

THE WITNESS:  Correct, your Honor.

Q   Would obtaining calls for April 3 and April 9 be a more or less risky bet than April 17 calls?

A   Calls for a shorter dated period like April 3 or April 9 would be more risky because would you have less time for the bet to wok out in your favor.

Q   Did Checchi Capital place the earlier calls on Gilead, the April 17 ones?

A   No, we did not place the April 17 calls.

Q   Now, let's scroll down a bit more in this email and go to the next page.  And if we could call out the paragraph that starts, bottom line hedge the out of the money calls for the third and the ninth for the most aggressive investment posture.

Did you discuss with Rinsch what he meant by this?

A   Yes.

Q   And what did he say?

A   He recognized -- the gist of it was he recognized that this was a more aggressive bet than the one that he had placed with the April 17 and a very aggressive posture to try to profit from a near-term event he expected to happen.

Q   Scroll down to the paragraph beginning, bottom line as this is considered to be a hundred percent total exposure and I am comfortable with a total loss.  And let's call out that paragraph along with the paragraph immediately below it starting with "obviously."

Did you discuss with Rinsch what he meant when he said, as this is considered to be 100 percent total exposure and I am comfortable with a total loss?

A   Yes.

Q   And what did he say?

A   He just indicated that he understood the risk of the strategy, which was that these were very short-dated options that were out of the money and therefore had a low probability of paying out.  But if they paid out, it's referred to in

the second paragraph, they would have a very high payout.

Q   And how about this, did you discuss this with Mr. Rinsch, this investment is to be made as highly aggressive and speculative call?

          MR. McGUINNESS:  Objection.  Cumulative.

          THE COURT:  Sustained.

Q   Now, focusing on the next paragraph, he wrote in the second sentence, if possible looking for 10X return profile if the stock to reach 100 by April 3 maturation date.  What do you understand "10X return" to mean?

          MR. McGUINNESS:  Objection.

          THE COURT:  Overruled.

A   I understood that to mean making ten times his original investment.

Q   Now, if we could scroll down further in Rinsch's email to the next page, the paragraph starting, bottom line hedges to short the overall market aggressively.  And if we could call that out and I'll give everyone a moment to read it.

          Did you discuss this with Mr. Rinsch?

A   Yes.

Q   And what did he say?

A   He said he wanted to place a trade as described, in this line, that would pay out if the U.S. market fell significantly.

Q   Now, let's focus on two final paragraphs in this email which are in the top of page 5, and if we could call them out.

The one starting with as highly -- exactly.  I'll give everyone a moment to read them.

And if we could just highlight the sentence, there is fundamentally a total exposure that I willingly accept when purchasing such aggressive calls.  If nothing is to come of any of it, then so be it.  Okay.  If we could look at the email at the top of this exhibit, at the top of the thread and call it out.  At the very top, so first page.  Thank you, Mr. Coleman. If we could call out the whole top email.

THE COURT:  Ladies and gentlemen, every once in a while, in the exhibits you'll see lines blacked out.  They've been blacked out because they contained information that was irrelevant to any of your consideration.  So don't infer anything.  That's just a way of making sure that you're not presented with anything that's irrelevant.

Q   Mr. Checchi, what's the date of the email?

A   Sunday, March 29, 2020.

Q   And who is it from and who is it to?

A   It's from Mr. Rinsch to me.

Q   Now, I want to focus on the final paragraph.  Mr. Coleman, if you could highlight the final two sentences.

And Mr. Checchi, can you please read these into the record.

MR. McGUINNESS:  Objection.  Cumulative.

THE COURT:  No, I'll allow it.

A    This process should be considered highly speculative and aggressive to yield extreme returns.  The money invested represents a small portion of overall worth, and I am comfortable forfeiting it in the instance these investments are not as fruitful as I may want them to be.

Q    Did you discuss with Mr. Rinsch what he meant by forfeiting it?

A    Yes.

Q    What did he say?

A    The gist of the conversations were always that this was capital that could go to zero.  It was risk capital.

Q    Mr. Coleman --

THE COURT:  So did you have an understanding, given your obligations, as to why these discussions would be occurring regarding the portion of his net worth that was being put at risk?  Maybe my question is unclear.

Are you familiar with something called the know your customer rule?

THE WITNESS:  Yes, sir.

THE COURT:  What is that?

THE WITNESS:  Basically that you need to understand who your customer is to make sure you're servicing them appropriately for the risk they're taking and also for any money laundering purposes.

THE COURT:  And that's a legal obligation?

THE WITNESS:  Yes.

THE COURT:  Very good.

BY MR. SOWLATI:

Q   Mr. Coleman, we can take this down.

After these discussions, did you end up executing Rinsch's investment thesis for him?

A   Yes.

MR. SOWLATI:  Unless there are any objections, the government would offer Government Exhibit 6058.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6058 received in evidence)

BY MR. SOWLATI:

Q   Mr. Coleman, please publish this.

Mr. Checchi, are you familiar with this document?

A   Yes, I am.

Q   And what is it?

A   This is an email from me to Mr. Rinsch copying our head of trading, Gabi Gasafy, on proposed allocations and then specific trades that we would make on Mr. Rinsch's behalf.

Q   What's the date of this email?

A   Monday, March 20, 2020.

Q   Why were you sending this email?

A   We wanted to confirm the specifics of the trades that we wanted to engage in with Mr. Rinsch.  And so he had indicated,

you know, the specific bets that he wanted to make and his perspectives, and we wanted to summarize that in a document that had both the total amount of money that was being invested in these various approaches and then the specific trades that we would endeavor to make.

Q   In the first sentence you wrote, here are the proposed allocations and trades.  What did you mean by that?

A   That these were based on the conversations we had what we understood his wishes to be for engaging and transacting in these securities.

Q   And there's a table below that.  What is that?

A   This table summarizes the aggregate amounts, approximate amounts that we would be investing in each of these components of his strategy.

Q   Can you walk us through it.

A   Sure.  So I know it's a little hard to read, but the first line is long GILD.  That's Gilead Pharmaceutical.  That's the symbol for the stock.  And the allocation to that long strategy, i.e., betting that the stock would go up, is a million and a half dollars.

The next is short SPY.  SPY is the symbol for the ETF that tracks the S&P 500, the 500 largest companies in the United States.  Short indicates that we would be betting against those on his behalf.  And the allocation to that bet is a million and a half dollars.

The next is short EWZ. EWZ is the symbol for the security that tracks the Brazilian stock market, so a basket of stocks that are representative of the Brazilian stock market. Again, short, this would be a bet against the Brazilian stock market for approximately $500,000.

So the next, just the total of those trades, which is three and a half million. And then below that is long, meaning we would go long. We're betting on the position going up gold. And it says GLD ETF, which is the security that tracks gold, the symbol is GLD. And that was for $2 million.

Q   Did you discuss with Rinsch why he wanted to buy gold?

A   Yes.

Q   And what did he say?

A   That it was another bet that -- you know, there was the potential for further chaos from COVID that would likely drive the price of the S&P 500 down and would likely also result in people sort of running to gold, which traditionally has been a safe haven in times of stress in markets.

Q   So just to be clear, the numbers that we see here, the allocations, who made the final decision on the type of security and the amount to invest?

A   So this is a proposal based on Mr. Rinsch's desires to place various bets in these positions.

Q   Looking at these trades, how risky were they compared to your typical client's bets?

MR. McGUINNESS:  Objection.

THE COURT:  Sustained.

Q   Were these bets that you advised against?

A    In this case these were self-directed trades by Mr. Rinsch that we were helping facilitate.  So the advice that we proffered to him was to indicate that they were extremely risky, to offer alternatives for less risky but lower return ways of doing this, and to ultimately settle on what he wanted to do.

Q   Did Checchi Capital end up executing this exact trade?

THE COURT:  So just so I'm clear, and hopefully this is helpful to the jury, the reason it's risky is because you can lose everything.  Whereas if you buy Google and it goes from 200 to 190, you've only lost a portion of your investment. And if you bought a call betting it will go to 220 and it actually does increase but only to 210, you lose everything, correct?

THE WITNESS:  Lose everything, yes, your Honor.

THE COURT:  Very good.

Q   Did Checchi Capital end up executing this exact trade?

A    We ended up executing trades that were similar to this.

Q   Mr. Coleman, can you please publish what's been admitted into evidence as Government Exhibit 3027.

Are you familiar with this document?

A    Yes.

Q   How are you familiar with it?

A   This is a standard monthly statement distributed by the custodian, in this case Schwab, to the client.

Q   And for who is it?  For which client?  Sorry.

A   For Mr. Rinsch.

Q   And what period is it for?

A   That's in the upper right, for March 30 to March 31, 2020.

Q   And if we could focus on the top where it says the independent investment imaginer is Checchi Capital Advisors, do you know why it says that?

A   Yes, because we had power of attorney over the account to hope with the transactions.

Q   Mr. Coleman, can we please turn to page 4.

        It says the starting value was zero and then there are credits of 10.5 million.  What do you understand that to mean?

A   That indicates that ten and a half million dollars was transferred into the account.

        MR. SOWLATI:  Mr. Coleman, can you please keep Government Exhibit 3027 on the screen on the left and put on the right of the screen what's been admitted into evidence as Government Exhibit 6121.

        Now I'm going to read a portion of Government Exhibit S7, paragraph 7, which is a stipulation entered into by the government and the defendant and admitted into evidence. Government Exhibit 6121 is a true and accurate copy of a record

maintained by the Federal Reserve Bank of New York regarding an $8.5 million Fedwire transaction on March 30, 2020 from a Wells Fargo account on behalf of Carl Rinsch Trust and received by the Citi Master Account on behalf of Charles Schwab and Co.

Mr. Coleman, can you call out where it says in the middle of the page, originator information, name, Carl Erik Rinsch Trust and name, Wells Fargo Clearing Services LLC. And then if you could please call out the beneficiary information on the bottom.

Q   Mr. Checchi, can you please read what is listed in the name as the beneficiary.

A   Yes, Charles Schwab and Co.

Q   And if you could also read address line 1.

A   399 Park Avenue, New York, New York.

Q   Mr. Coleman, you can take Government Exhibit 6121 down and keep on the screen Government Exhibit 3027. And if we could turn to page 7.

There's a section here, trades pending settlement. What does this section generally show?

A   This section indicates which trades were executed during the period of this report but had not settled by the time this report -- the ending date of this report.

Q   And what is the period of the report?

A   March 30 to March 31.

Q   Can you walk us through each column and explain the type of

information the column would generally show.

A    Sure.  So the first column that doesn't have a heading indicates the security, in this case a call on Gilead Sciences Inc., GILD.  And below that indicates the expiration date we talked about, April 30, 2020, and the strike price of $81 and --

Q    If I could stop you.  For the record, I think you said April 30.

A    I'm sorry.  April 3, 2020.  Excuse me.

And the C indicates that it's a call option.  The transaction column indicates whether it was purchased or sold. In this case it was bought, it was purchased.  The quantity column indicates how many options contracts were purchased, in this case, 23.

Q    Let me just stop you right there.  What does 23 represent?

A    23 represents 23 options contracts.  An options contract consists of 100 units of options in a given security.  So in this case, it would be 2300 options, so 2300 shares of Gilead.

Q    And earlier you mentioned two terms, "executed" and "settled."  Can you explain what those terms mean.

A    Yes.  So there's -- when you trade a stock there's the date you put your trade in, whether you're doing it through a third-party group like us or you're doing it on your Robin Hood app or whatever it is.  When you hit trade, the trade goes. And for your purposes and the purpose of the person who let's

say sold you the stock, that's the price that you get.

However, most -- sorry, in the modern trading system there's also what's called a settlement date, and they usually allow a couple days before that security actually moves from that person's account that sold it to you to your account. And the reason for that is to allow to -- time to correct errors and things like that that might occur so that it doesn't happen instantaneously. You for all intents and purposes own that piece of paper, just there's a couple days between when the transaction occurred and when it's actually settled to your account.

Q   Mr. Checchi, if you could keep going through the columns on here.

A   Sure. The next column is the unit price column. That's just the price per option. So for each of the 2300 options, each one is 45 cents, and then the purchase debit means the total amount of that trade. So 2300 times 45 cents is approximately $1,050.31.

Q   Mr. Coleman, if we could scroll down page by page quickly to page 54.

Mr. Checchi, on the previous pages what did we see?

A   The previous pages were a list of all of the Gilead Sciences call transactions that occurred in the account.

Q   And now what are we seeing on this page?

A   Now we're seeing the same information, but for the put

options on the S&P 500.

Q   And now let's go page by page and scroll down to page 60.
On the previous pages what did we see?

A   We saw all of the transactions for the put options on the
S&P 500.

Q   And what do we see on this page?

A   Now we see the transactions for purchasing the gold ETF.

Q   Now, let's turn to page 61, the next page.  At the bottom,
it says total trades pending settlement.  And there's a number
there, 6,255,866.23.  What did that number represent?

A   That number represents the total value of all of the
transactions.  So the client purchased $6,255,000 worth of
securities.

Q   Mr. Coleman, you can bring that down.

          Mr. Checchi, how did Rinsch's investment, the
6.2 million, perform over the next month?

A   It performed poorly.

Q   What do you mean by that?

A   Most of the -- or all of the options expired worthlessly.

Q   Mr. Coleman, can you put on the screen what's been admitted
into evidence as Government Exhibit 3030.

          Are you familiar with this document?

A   Yes.

Q   And what is it?

A   This is the subsequent monthly statement for Mr. Rinsch's

account.

Q   When you say "subsequent," what period are you referring to?

A   The April 1 to April 30.

Q   Of what year?

A   2020.

Q   Now, I'd like to turn to page 7.  At a high level, what does this page show?

A   This page shows all of the realized gains or losses in the account.

Q   Now, I'd like to go through each line.  Can you go through each line item and focus on what is shown in the column sold/closed and realized gain or loss columns.

A   Yes.  So the first column is for the Gilead Sciences call that he purchased.  As you can see, it has an expiration of April 3, 2020.  When you look at the sold/closed column on April 3, 2020, that option expired.  The total proceeds column indicates that it expired worthlessly, worth zero.  He had spent $466,000 on those options, and so that was a realized loss of $466,000.

Q   Okay.  And if you could keep going through each line but just focus on the sold/closed column as well as the realized gain or loss.

A   Sure.  The next line item also sold/closed, it was an expired option.  And the loss was $422,000.

PC3JRIN2                    Checchi - Direct

Q    What was the date of that?

A    On April 3, 2020.

Q    And if you don't mind, keep --

A    April 9, 2020, same Gilead options loss of $741,000.

April 9, 2020, Gilead options, loss of $737,000.

April 9, 2020 was the expiration of the S&P 500 put options, loss of $249,000.

April 15, 2020 was the expiration of the next set of S&P 500 put options, loss of $501,000.

April 17,2020 were the Gilead options, loss of $1.255 million.

April 17, 2020, S&P 500 options expire, loss of $199,000.

April 17, 2020, was the expiration date of the S&P 500 options, loss of $294,000.

April 24, 2020 was the expiration date of those S&P 500 options, loss of $247,000.

April 24, 2020 was the expiration of the S&P 500 options, loss of $751,000.

Q    So from April 3, 2020 through April 24, 2020, what were Rinsch's total losses on his investments with Checchi Capital?

A    The total losses are indicated below, $5,866,569.87.

Q    Mr. Coleman, please publish what's been admitted into evidence as Government Exhibit 3029.

Are you familiar with this document?

A    Yes.

Q    What is it?

A    This is a form 1099.  It's provided to a client to summarize the previous year's activity in their brokerage account for tax purposes.

Q    And for what year would that be for, this document?

A    This document is referring to the tax year 2020.

Q    Who is this 1099 for?

A    Mr. Rinsch.

Q    And this document, did it relate in any way to the investments we talked about earlier?

A    Yes.

Q    In what way?

A    It summarizes all of the transactions that were completed in that given year.

Q    Now, let's turn to page 8 and let's focus on two lines that start with, total short term on the bottom.

         Can you walk us through what these show.

A    Yes.  These indicate the total purchases that were made that year, 5,866,569.87.  And of those purchases, how much resulted in losses, which was the same number.

Q    So just to be clear, with respect to Rinsch's investment portfolio with Checchi Capital, the 6.2 million you discussed earlier, how much of that had he lost by the end of April 2020?

A    The $5,866,000.

Q    Did you discuss the losses with Rinsch?

A    Yes.

Q    What did he say?

MR. McGUINNESS:  Objection.  Relevance.

THE COURT:  Overruled.

A    Mr. Rinsch both verbally in correspondence said that he appreciated the work that we did, basically that he fully understood the risk that he was taking and that, you know, the bet didn't work out, but he didn't blame us for that.

Q    Mr. Coleman, can you bring this down.

We had seen 10.5 million in Rinsch's account initially.  You testified he invested 6.2 million of that and saw 5.9 million of losses.  What did Rinsch do with the remainder of the money, the 4 million or so that he hadn't invested and lost with Checchi Capital?

A    The remainder of the money was eventually transferred out of the account.

Q    Approximately when did that happen?

A    I believe within about a year.

Q    Okay.  Did you have any discussions with Rinsch about what he was going to do with the money?

A    Yes.

Q    And what did he say?

A    Mr. Rinsch asked us if we could trade cryptocurrencies on his behalf.  We said that we didn't have that capability, and

PC3JRIN2                        Checchi - Cross

he said that he was very interested in those markets and wanted to transact in them, and so he would be transferring the remainder of his money out to do that activity.  That's what he indicated to us.

MR. SOWLATI:  No further questions.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. McGUINNESS:

Q   Good morning, Mr. Checchi.

A   Good morning.

Q   Approximately how many clients did Checchi Capital have in March of 2020?

A   Probably 100.

Q   And did you represent other creative people who worked in the entertainment industry?

A   Yes.

Q   Have you referred to them as Hollywood types?

A   I don't know if I've used that exact phrase.

MR. SOWLATI:  Objection.

Q   These people in the entertainment industry, many of them were concerned during COVID about what would happen with their investments, is that a fair statement?

MR. SOWLATI:  Objection.  Hearsay.

THE COURT:  Sustained.

Q   Mr. Rinsch in his communications with you that we just saw

had a narrative about what would happen during COVID. Is that a fair characterization?

A    Yes.

Q    And was that consistent with other people in the entertainment industry that you work with?

MR. SOWLATI:  Objection.

THE COURT:  Sustained.

Q    The communications we saw, this was in March and April of 2020, right?

A    Yes, sir.

Q    This was in the beginning of the COVID pandemic lockdowns, right?

A    Yes, I believe so.

Q    Fair to say that this was a very financially uncertain time?

MR. SOWLATI:  Objection.

THE COURT:  Ground?

MR. SOWLATI:  Relevance, your Honor.

THE COURT:  Well, I'm doubtful that it has much relevance, but I will allow it to go for a question or two to see if it has any greater relevance than I now perceive, so overruled for now.

A    Sorry.  Could you repeat the question.

MR. McGUINNESS:  Could I have it read back, please.

THE COURT:  Question was "Fair to say that this was a

very financially uncertain time?"

A    Yes.

Q    Now, we looked at some Schwab account statements and we saw some gold ETF purchases.  Do you recall that?

A    Yes.

Q    Those were not options, right?

A    Correct.

Q    And what is an ETF?

A    Sure.  An ETF, the acronym stands for exchange traded fund. And it is effectively a security that trades like a stock, meaning it trades every second of every, you know, part of the trading day just like Google stock trades every second.  But it represents -- it's effectively a holding vehicle for some type of security that's not a stock.  In this case -- or commodity. In this case it's backed by physical gold, but you're not physically exchanging gold every second of every day.  You instead trade it in this entity.

        (Continued on next page)

PC3Frin3                    Checchi - Cross

BY MR. McGUINNESS:

Q. (Continued) And did you advise Mr. Rinsch against that investment?

A. No, in the sense that it was part of his broader thesis.

Q. Did you consider it to be a risky investment?

A. I would say that gold is a pretty volatile investment. I don't recall giving him specific advice as to the riskiness of it.

Q. If we could pull up what's in evidence as GX 3029 at page 77, and if we could just call out the fees section.

Do you see Mr. Checchi, where it says: description, advisor fees, $22,000 -- $22,098, do you see that?

A. Yes.

Q. And who was that money paid to?

A. That was paid to our firm.

Q. And was that the money you earned for advising Mr. Rinsch in 2020?

A. That is the money we earned for helping him structure the trades, yes.

MR. McGUINNESS: No further questions.

THE COURT: Anything else?

MR. SOWLATI: No redirect, your Honor.

THE COURT: Thank you very much. You may step down.

(Witness excused)

THE COURT: Call your next witness.

PC3Frin3                     See - Direct

MR. SOWLATI:  The government calls Ronald See.

THE COURT:  Counsel, keep in mind that I promised the jury that we'd stop at a quarter to 12.  We can start with this witness.

MR. SOWLATI:  Yes, your Honor.

RONALD SEE,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOWLATI:

Q.  Good morning, Mr. See.

Where do you work?

A.  Wells Fargo Advisors.

Q.  What is Wells Fargo Advisors?

A.  It's a brokerage arm of Wells Fargo Bank.

Q.  What does Wells Fargo Advisors do?

A.  We advise people on how to invest their money.

Q.  How long have you worked for Wells Fargo Advisors?

A.  About 42 years.

Q.  What's your title there?

A.  First Vice President Investment officer.

Q.  At a high level, what do you do as a first vice president investment officer?

A.  I counsel people on how to invest their money and meet their goals.

PC3Frin3                    See - Direct

Q.   With that introduction, I'd like to shift gears.

Do you know someone named Carl Rinsch.

A.   I do.

Q.   How do you know Carl Rinsch?

A.   A client of mine.

Q.   What type of work have you done for Rinsch?

A.   I've entered stock and option orders for him.

Q.   How would you communicate with Rinsch?

A.   Mostly by telephone, but once in a while by email.

Q.   Did you ever meet with him in person?

A.   No, I never have.

Q.   And how would you compare Mr. Rinsch's knowledge of
investing compared to your typical clients?

A.   More than average.

Q.   I want to focus you on the March 2020 time period.

Did you help Rinsch make any investments during this
period?

A.   Yes.

Q.   What sort of investments?

A.   Stocks and some options.

Q.   And at a high level, what are options?

A.   Options are a contract to buy a particular stock at a
certain price by a certain time.

Q.   And I'll ask you a few more questions about options in a
moment, but for what company did Rinsch buy options for?

PC3Frin3                    See - Direct

A.   I believe it was Gilead Sciences.

Q.   Did Rinsch tell you why he was interested in Gilead?

A.   It was five years ago, but I kind of recall that it was because he was thinking they were going to come up with a solution for COVID.

Q.   And I'd like to show you some documents.

MR. SOWLATI:  Ms. Larracuente, can you put on the screen what's been admitted into evidence as Government Exhibit 3046.

Q.   Do you recognize this document?

A.   I do.

Q.   And what is it?

A.   It's an email from my assistant Annette to Karl Rinsch, giving him instructions to wire money into his account at Wells Fargo Advisors.

Q.   And what's the date of the email?

A.   Monday, March 9th of 2020.

Q.   And can you read the subject line?

A.   Received securely-wired instructions.

Q.   Do you know why Ms. Conradi was sending this email to Rinsch at that time?

A.   Yes.  Because he asked for it.

Q.   What were the last for digits of the account number he wanted to transfer money to?

A.   4450.

PC3Frin3                    See - Direct

MR. SOWLATI:  Ms. Larracuente, can you put on the screen what's been admitted into evidence as Government Exhibit 3036.

Q.  Are you familiar with this document?

A.  Yes, I am.

Q.  And what is it?

A.  It's a Wells Fargo Advisors monthly statement for January of 2020 for the Karl Rinsch Trust.

Q.  And what are the last four digits of this account number?

A.  4450.

MR. SOWLATI:  Now I'd like to turn to page 23.

Q.  What does this page generally show?

A.  It's the details of the activity in an account.

Q.  Okay.  And for what period?

A.  March of 2020.

Q.  Now I'll focus on a few line items.  On March 1, 2020, how much was in the account?

A.  Looks like the total balance $1,688,365.06.

Q.  Now let's call out the line items from March 9, March 11, and March 13.

What happened on those days?

A.  We sold 1540 shares of Netflix and then subsequently bought 2,000 shares and 4700 shares and another 4,000 shares at Gilead Sciences.

Q.  What was the total dollar amount of the Netflix shares that

he sold?

A.   300 -- I'm sorry, $528,656.11.

Q.   And approximately how much of Gilead did he purchase?

A.   700,000.

Q.   Now can we call out the line item for March 16?

What happened on March 16?

A.   Funds were wired into the account for Bank of America.

Q.   How much funds?

A.   $8 million.

Q.   And from what bank account?

A.   I imagine it's Home VFX.

Q.   If we could now call out March 24, there are a number of items there.

And what happened on March 24?

A.   He bought Carnival Cruise Lines, bought Gilead, and then he bought -- you want the share amounts?

Q.   Yes, thank you.

A.   Okay.  72,000 shares of Carnival and then 30,000 shares of Carnival.  Then he purchased 6,750 shares at Gilead.  And then he bought 430 Gilead, April 17, 75 calls.

Q.   Okay.  What was the total amount of calls he purchased?

A.   430.  The dollar amount was $230,200.57.

Q.   And what are calls?

A.   Each -- okay there's 430 contracts.  Each contract gives him the right to buy 100 shares at Gilead Sciences at $75.  And

PC3Frin3                    See - Direct

that expires on the 17th of April, 2020.

Q.   In your experience, are calls typically risky investments?

A.   They're riskier because of that -- the expiration.  Your time is limited when you can make money.

Q.   Okay.  What does that mean, in practice?

A.   Well, stock, you can own forever.  You buy an option, it expires on a certain date, like this one expires on April 17.

Q.   And what happens to your money if it expires?

A.   If the stock is under $75, then it becomes worthless.  The options become worthless.

MR. SOWLATI:  Your Honor, this may be a good time.

THE COURT:  Yeah.  Okay.

So, ladies and gentlemen, we'll give you your lunch break now.  It will be for an hour and a quarter today because of my schedule, and we will resume at 1 o'clock and continue at that point without a break from 1 to 3 and then end for the day.  So it's a little unusual, but there it is.

Have a good lunch.

(Jury not present)

(Continued on next page)

PC3Frin3a

(Jury not present)

THE COURT: Please be seated.

THE COURT: Juror No. 10 reads as follows: This is a note he just passed to my courtroom deputy.

If I continue serving as a juror in this trial, I would not be able to remain impartial. I am a substitute teacher, and I get paid about $200 a day. Because there are 17 days of school in the month of December and due to this ten-day trial, I would only be able to work seven of those days. Because of his $11 million fraud, I would not be able to afford my rent for the next month.

If it's possible, I'd like to be excused from the jury. I can complete the jury duty at a later date, like in June when school is out, if needed. If that's not possible, we can discuss how much a fine would be for not complying. That may be my only option. I apologize for the inconvenience. Dante Ramos.

So, interesting. I'm going to have my courtroom deputy give both sides a copy of that note.

I'm going to go take the other matter, which is by a Zoom call. It starts at noon, so I have to be in my chambers for that. But why don't you all come back. You'll still have a full hour for lunch. Come back at a quarter of, and we'll talk about what we should do with this.

(Lunch recess)

PC3Frin3a

AFTERNOON SESSION

12:45 p.m.

(Trial resumed)

THE COURT:  My suggestion is, initially, we bring the juror to the robing room with the reporter and at least one counsel from each side -- it could be all counsel, if you want -- and then I'll question the juror.

Assuming we wind up excusing the juror, I would also want to question the juror to make sure that he's not had any communications with other jurors about his apparent views.  And then I think if we do excuse him, of course, I'll replace him with Alternate No. 1.

Any other views anyone wants to raise?

MR. CAPOZZI:  We agree with your Honor's approach, and we would just say, the trial is moving forward, we believe, efficiently.  We fully expect that the trial will be done before next week, and so to the extent --

THE COURT:  We may not have to excuse him at all.

To tell you the truth -- and I may be overly cynical here -- I think some of the words in his note were designed to assure that he would be likely to be excused.  This is not an unintelligent gentlemen.  He's a substitute teacher and so forth, but we have to question him and see what he has to say.

MR. CAPOZZI:  Thank you, your Honor.

THE COURT:  Let's get the jurors here.  Let's bring

PC3Frin3a

them in, and come into the robing room along with the court reporter.

THE DEPUTY CLERK:  This is Juror No. 10.

THE COURT:  Hello.

(Pages 245 through 251 SEALED by order of the Court)

PC3Frin3b

(In open court; jurors not present)

THE COURT: Linda, as soon as the juror has left, please bring in the jury, and let's make sure that Alternate Juror No. 1 is now seated in seat 10.

THE DEPUTY CLERK: Juror No. 4 is missing. I'm going to call her cell phone.

THE COURT: It's only a few minutes after I asked them to return, so.

(The Court conferred with the Deputy Clerk)

THE DEPUTY CLERK: I'm going to stand by the courtroom door.

THE COURT: Well, while we're waiting, just out of curiosity -- not part of the evidence in this case -- Mr. Witness, where are you from originally?

THE WITNESS: Originally?

THE COURT: Yeah.

THE WITNESS: New York.

THE COURT: Where did you go to school?

THE WITNESS: I graduated from Palm Springs High School in California.

THE COURT: I'm sorry. A little louder.

THE WITNESS: I graduated from Palm Springs High School in California.

THE COURT: So you had moved out to California?

THE WITNESS: Yes, when I was younger.

PC3Frin3b

THE DEPUTY CLERK:  Okay.  May I bring in the jury?

THE COURT:  Yes.

(Continued on next page)

PC3Frin3b

(Jury present)

THE DEPUTY CLERK: Alternate Juror No. 1 is Ms. Weems. Please take seat No. 10. Mr. Davis, please back up.

Thank you.

THE COURT: Yes. That's exactly right.

Okay. Please be seated.

Ladies and gentlemen, we had to excuse the prior juror, Juror No. 10 and you should not speculate. It's what happens. That's why we have alternates.

Congratulations.

JUROR: Still single, ready to mingle.

THE COURT: Don't let it go to your head.

Let's continue, counsel.

BY MR. SOWLATI:

Q. Good afternoon.

MR. SOWLATI: Ms. Larracuente, could we put Government Exhibit 3046 back on the screen. Okay.

Q. Now, Mr. See, when we left off, we were walking through this account statement for the Carl Erik Rinsch Trust with the period March 1, 2020 through March 31, 2020. We had just gone through this page.

MR. SOWLATI: I'd ask Ms. Larracuente to turn to the next page, which is page 6 on this document.

Now, if we could call out the rest of March 24, the rest of the line items.

PC3Frin3b

Q.   Mr. See, what else happened on March 24?

A.   We purchased 126 of the Gilead.  April 17, 75 calls, and then another 117, then 80, then another 80, then 72.

Q.   Mr. See, if you could speak up a little bit, I'm having a little trouble hearing you.

THE DEPUTY CLERK:  And move closer to the mic, please.

THE WITNESS:  Is that better?

Q.   That's fine.

And what were the expiration date of those calls?

A.   They were all April 17 of 2020.

Q.   Now, if we can call out the row from March 30, 2020, what happened then?

A.   There was a wire transfer out of the account to Citibank for $8.5 million.

Q.   All right.

MR. SOWLATI:  Ms. Larracuente, if you could put on the screen, just for the witness, the following documents marked for identification: Government Exhibit 3049, 3050, 3051, and 3052, if you could just cycle through those for him.

Q.   Did you have a chance to look at those documents?

A.   Yeah, a little bit, yes.

MR. SOWLATI:  Why don't we cycle through them all.  Why don't we start with 3049 and then go through 3052.

Q.   Mr. See, do you recognize these documents that you were just shown.

PC3Frin3b

A. Yes, they are -- yes, I do.

Q. And what are they?

A. They're client notes that I entered on the household for this account.

Q. What sort of information do you memorialize in these notes?

A. Conversations with the client, activity that we might have purchased or sold securities.

Q. Do you update your notes at or near the time you speak to your client?

A. I try to as soon as the conversation is over.

Q. Is it your regular practice to memorialize your calls with clients?

A. Yes.

Q. Are these notes kept in the ordinary course of your work at Wells Fargo Advisors?

A. Yes.

MR. SOWLATI: Your Honor, the government offers Government Exhibits 3049, 3050, 3051, 3052.

MR. McGUINNESS: Objection.

THE COURT: Come to the sidebar.

(Continued on next page)

(At sidebar)

THE COURT: So, while the Second Circuit has taken a fairly relaxed view as to what qualifies as an ordinary business record, I'm not so clear that this would qualify.

I'm a little surprised that the government didn't go what would have been the ordinary route, which would be to say: Do you remember a conversation you had; no. I show you exhibit X for, does that refresh your recollection. That might well have refreshed his recollection as to this conversation he had.

And I suppose one could also, perhaps, lay a foundation here as a past recollection recorded, but the government's chosen to go the route of an ordinary business record.

The business record and its origins began for what were, essentially, ministerial recordings. You know, someone back in the old days would call up and say: I want to buy, a widget. I want to buy ten widgets for $20, and some functionary would then record it on a ledger and send, you know, he purchased 20 widgets for whatever and so forth. And this is more than that.

But let me ask the government, what's your authority for saying this is an ordinary business record?

MR. SOWLATI: Your Honor, I think it's the Second Circuit's opinion in *United States v. Kaiser.* That's 609 F.3d

556, where the Court held that the witness's handwritten notes or telephone conversations were business records because they were maintained in a consistent way or focused on a certain range of issues that were relevant to the witness's business -- here, transactions -- and even though the notes here indicated that he wrote down highlight the matters he thought were important.

THE COURT: Yeah, I must say that it's consistent with my own recollection of where I think the Second Circuit has moved towards a more expansive view of this particular heresy exception, but let me hear from defense counsel.

MR. McGUINNESS: Judge, I don't have the case law at my fingertips. It was in the motion *in limine* opposition, but I would just point to trustworthiness of this as well. These are sell-serving documents to guard against any future liability.

And I want to further say, your Honor, any modest relevance that this has that these were risky investments has been beaten into the jury thoroughly, and it is also cumulative at this point to go through each of these records. And there's additional hearsay.

THE COURT: Let me push that a little further.

Are you disputing that he made high-risk investments during this period?

MR. McGUINNESS: No, Judge.

PC3Frin3b

That's not part of our case at all.

THE COURT: That's what I thought.

So I wonder whether the government can't simply ask him about what does he recall. And I take it defense counsel would have no problem with the question that, during this period, did you discuss with him his strategy, and -- you know, so it doesn't have to be a more pinpoint question just to move this along.

Would that be agreeable to the defense?

MR. McGUINNESS: Yes, Judge.

THE COURT: And then you can show him these and see what happens.

(Continued on next page)

(In open court; jurors present)

BY MR. SOWLATI:

Q. Mr. See, before our lunch break, you testified about how on March 16, 2020, Rinsch wired $8.5 million to his Wells Fargo account.

Did Rinsch give you notice that he was going to be wiring additional money to his account?

A. Yes.

Q. Did he tell you where the money was coming from?

A. No.

Q. Did he tell you whether it was personal or for business?

A. No.

Q. Mr. See, did you have any discussions with Rinsch about the risk of purchasing large amounts of Gilead securities?

A. I did.

Q. Did you talk to him once or multiple times?

A. Several times.

Q. Did he tell you what his view was on the risk of purchasing --

THE COURT: What did he say to you, and what did you say to him, in substance.

THE WITNESS: When he started buying larger amounts, I had to discuss with him that he was buying an awful lot of one particular security.

And he said he was comfortable with it. Don't worry

about it. I can afford to lose the money.

And then he got a little out of hand -- not out of hand; that's not a nice way to put it. Then we put parameters on his account.

MR. McGUINNESS: Objection.

THE COURT: Yeah. The question is just about discussions you had with him, but maybe I can move this along.

Did you express to him, in words or substance, that these were high-risk investments?

THE WITNESS: Well, in their self, they're not. It was the amount that was high risk.

THE COURT: And why was that?

THE WITNESS: Because he was putting, as they say, all his eggs in one basket.

THE COURT: So, he could lose everything.

THE WITNESS: Correct.

THE COURT: And that was because of the nature of what he was investing in.

THE WITNESS: Well, in any stock, you don't put all your money in one stock.

THE COURT: And was there any -- okay.

I'll leave it alone for now.

Go ahead, counsel.

BY MR. SOWLATI:

Q. Now, over the course of March, what, if anything, did you

do about your concerns?

MR. McGUINNESS: Objection.

THE COURT: Did the nature of your conversations over the course of March, do you recollect how they developed?

THE WITNESS: Yes.

We -- you know, he was buying some stocks. He bought seven different stocks, and then he bought the options. Then he called me one day and said he wanted to buy a lot more Gilead and a lot more options.

I went to my branch manager. We discussed it.

MR. McGUINNESS: Objection.

THE COURT: Overruled. Go ahead.

THE WITNESS: And we agreed that he could not put more than 25 percent in any one security or invest more than $250,000 in options.

THE COURT: And that was because why?

THE WITNESS: Because of the amount of risk he was taking, and we weren't comfortable taking it on.

THE COURT: Okay.

Now did you communicate that to him?

THE WITNESS: I communicated with it Carl; yes, I did.

THE COURT: And what did he say in response?

THE WITNESS: I'll be wiring out the funds to -- I believe it was Charles Schwab -- he goes, and they won't put restrictions on me there.

PC3Frin3b

THE COURT: Okay.

Go ahead, counsel.

MR. SOWLATI: Thank you.

BY MR. SOWLATI:

Q. I'm going to show you one more document.

MR. SOWLATI: Ms. Larracuente, can you put on the screen what's been admitted into evidence as Government Exhibit 3047.

Q. Do you recognize this document?

A. Yes, I do.

Q. And what is it?

A. It's a letter from Karl Rinsch asking us to wire $8.5 million to Citibank, which is the bank for Charles Schwab.

Q. And what's the date that you received this letter?

A. March 30th of 2020.

Q. Can you read the last four digits of the account number for the record?

A. 3719.

Q. And can you read into the record the last line of Rinsch's letter?

A. Thanks again for helping me make this happen today and in a critically time-sensitive moment for my business.

MR. SOWLATI: No further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. McGUINNESS:

Q.  Mr. See, that account that you were looking at, that was opened a number of years prior.

A.  Correct.

MR. McGUINNESS:  No further questions.

THE COURT:  Thank you very much.  You may step down.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Please call your next witness.

MR. MARKEWITZ:  Your Honor, the government calls Bryan Noon to the stand.  And if I might approach, your honor, I have a binder of exhibits the witness would just like to have a copy of.

THE COURT:  Sure.

MR. MARKEWITZ:  Thank you, your Honor.

BRYAN NOON,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. MARKEWITZ:

Q.  Good afternoon, Mr. Noon.

There's a binder to the right of you.  There's a few documents I'll be referring to during your testimony here today, and a number of those will be found in that binder.  Okay?

A.   Okay.

Q.   First things first, Mr. Noon, where did you grow up?

A.   In California.

Q.   Do you still live there today?

A.   Yes.

Q.   Did you go to college?

A.   Yes.

Q.   Where?

A.   I went to undergrad at UC Berkeley and I went to graduate school at UCLA.

Q.   Did you get a degree from your graduate school?

A.   Yes, an MBA.

Q.   An MBA?

     Did there come a time when you went to work at Netflix?

A.   Yes.

Q.   Around when did you begin working at Netflix?

A.   Late 2012.

Q.   Do you still work there today?

A.   No.

Q.   Around when did you leave?

A.   Late 2020.

Q.   When you first started at Netflix, what was your title?

A.   Director of Original Series.

Q.   What were your responsibilities as Director of Original

Series?

A.   When I first started, we were licensing content from third-party studios for our original series initiative. and I was the lead negotiator at that time.

Q.   What does it mean to license content?

A.   So, a studio like Warner Brothers or Universal would have a series that they wanted to produce, and they would pitch it around town to different outlets.  And Netflix, as a distributor, would license that so that we could exhibit it on our service.

Q.   And what were your day-to-day responsibilities as a negotiator for those types of deals?

A.   Working with my counterparts at those studios to make deals to license the content.

Q.   Can you give us two or three examples of Netflix projects on which you worked?

A.   Orange is the New Black, Narcos, Stranger Things.

Q.   About how long did you hold the title of Director or Original Series?

A.   Probably a little over two years.

Q.   What title did you get at that point?

A.   Vice President of Original Series.

Q.   And how, if at all, did your duties and responsibilities evolve as you moved into that position?

A.   Not necessarily tied to the title, but as the original

series initiative evolved, it got bigger.  I had more direct reports, and eventually, we decided to move into creating content and producing content ourselves.

Q.  When you were vice president, around how many people worked under in you in your department?

A.  Anywhere from five to 50 over the course of my time there.

Q.  During your time as vice president, who, if anyone, did you report to.

A.  I reported to Cindy Holland.

Q.  Can you move the microphone just a touch closer?

A.  I'll move my chair.

Is that better?

Q.  Yes.

How long were you in that vice president role?

A.  Until I left in 2020.

Q.  And where did you go to work after leaving Netflix?

A.  I was off.  I took about a year off, and then I ended up taking a job at Disney after that.

Q.  Are you familiar with something called White Horse?

A.  Yes.

Q.  What is White Horse?

A.  It was a project that Netflix was interested in acquiring, and we did a deal with Carl and his company to acquire the rights to exhibit it.

Q.  You said Carl.  Who is Carl?

A.   Carl Rinsch.

Q.   And you mentioned Mr. Rinsch's company.

What company is that?

A.   I believe it was called Home VFX.

Q.   What connection, if any, did you have to this project?

A.   It varied over time.

Early on, I was deeply involved in the negotiations to acquire the project.  But then at some point, someone on my team would be sort of the day-to-day person overseeing the business side.  But then I would get pulled in at various times when issues would come up.

Q.   You mentioned that someone else would be overseeing the business side.

What is the role of the business side on a project like White Horse?

A.   Primarily, deal with issues that come up through the course of a production that are not creative, so things around when production issues happen and then we need to amend a deal or resolve some issues, then the business team would come in and try to resolve that with whoever was representing either the talent or the third-party studio.

Q.   Unless there's objection, the government would offer Government Exhibit 6330.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6330 received in evidence)

MR. MARKEWITZ:  Ms. Larracuente, can you please publish Government Exhibit 6330 to the screen, and if you could zoom into where there's text on the page.

BY MR. MARKEWITZ:

Q.  Mr. Noon, do you recognize this document?

A.  Yeah.  It looks familiar.

Q.  What is it?

A.  It's an email from myself to an agent at Creative Artist Agency around the time that we were looking to acquire the project.

Q.  What project?

A.  White Horse.

Q.  And the agent, who is that?

A.  Peter Micelli was an agent at CAA at the time.

Q.  Okay, so, the date of this email is January 27, 2018, and it looks like you've copied a Tehmina Jaffer.

Who is that?

A.  Yeah, Tehmina reported to me, so she would be more of the day-to-day person on the project.

Q.  The subject line of your email is: White Horse.  And you write:  Hey, Pete.  This is what Tehmina and I have been calling about.  What do you need to know?  Email or let's talk Monday.

Why were you reaching out to Mr. Micelli at this

point?

A.  At this point, I think our creative team would have heard the pitch and met with Carl and seen some materials and were interested in acquiring the show.

What happens at that point is, the business team, myself and Tehmina, would reach out to someone like Pete who was representing the project at CAA to start the deal-making process.

Q.  And I know you had said that your role on White Horse changed a bit over time, so at this point, around January 2018, what was your role?

A.  I would say, between Tehmina and myself, we were the primary negotiators, but I was pretty involved in the initial stage of the deal negotiations.

MR. MARKEWITZ:  Ms. Larracuente, we can pull this down.  Thank you.

Q.  You mentioned that you were involved at the initial stage. Did I hear that right?

A.  Yes.

Q.  In general, are there stages to a negotiation that will purchase a TV show?

A.  Yeah.

Q.  Can you just explain to us what those stages are, generally?

A.  At first, you will try to figure out the general framework

pc3frin3                    Noon - Direct

of a deal, some kind of -- what are the major deal points going to be.  And then you'll get into the specifics of money and how long you're going to be licensing or owning a project if you're going to own the project, budget, things like that.

And then once you agree to those sort of basic deal terms, you'll move on to a more formal agreement, sometimes called a short form, and eventually, you'll get to some sort of long form agreement that has a lot more legal terms in it.

(Continued on next page)

BY MR. MARKEWITZ:

Q   Can you explain to us at a high level how the negotiations for Netflix to acquire *White Horse* progressed.

A   So from this email forward it was mostly myself and Tehmina and I think one of our production lawyers working with the team that was representing the project.  So that would be Pete Micelli, and I believe they also had a law firm involved at that time.  So just going back and forth on the high-level deal structure and the deal points.

Q   Did you reach agreement on a high-level deal structure?

A   Yeah.

Q   And was that agreement memorialized in any fashion?

A   Yeah, I believe I think it was some sort of term sheet at some point.

Q   At a very high level, what is a term sheet?

A   A term sheet will capture the majority of those deal points that we discussed but also include some language around other provisions beyond just the financial and the deal structure, just how the project is being acquired, how will it have the rights, just a lot more detail than the high-level deal points.

           MR. MARKEWITZ:  Unless there's objection, the government would offer Government Exhibit 6336.

           MR. McGUINNESS:  No objection.

           THE COURT:  Received.

           (Government's Exhibit 6336 received in evidence)

MR. MARKEWITZ:  Ms. Larracuente, can we please publish that for the jury.

Q   Mr. Noon, do you recognize this document, Government Exhibit 6336?

A   Yes, I do.

Q   What is it?

A   This seems to be the term sheet that the parties agreed to on *White Horse*.

Q   Is this something that you saw while you were at Netflix?

A   Yes.

Q   What is the date of this term sheet?

A   November 12, 2018.

Q   Ms. Larracuente, can we please go to page 16 and then can you call out the signature.

Mr. Noon who were the parties to this term sheet?

A   Ice Cream Fridge, LLC, which was the Netflix entity for this project, and then Home VFX, which was Carl Rinsch's production entity.

Q   Can you explain to us a little bit the relationship between Ice Cream Fridge and Netflix.

A   I don't recall specifically, but generally for each project Netflix will create a subsidiary to actually engage whoever the party is that's going to be producing that project or licensing that project to us.

Q   Ms. Larracuente, can we please go back to page 1 and can

you call out sections one through three for us, please.

Mr. Noon, at the bottom of the page do you see how it says, company: Ice Cream Fridge, LLC?

A   Yes.

Q   Can you read aloud for us the description in section one.

A   The project currently referred to as *Conquest* (a/k/a *White Horse* inclusive of the first season) as defined below (the project or series).

Q   In section two, how many episodes are mentioned?

A   Approximately 13.

Q   Ms. Larracuente, can we please go to page 3 and can you call out section seven.

Mr. Noon, can you read aloud the first sentence of section seven stopping where it says "defined below"?

A   Yes.  The initial commitment shall be $61.224 million comprised of the initial purchase price, supplemental purchase price, first season fees and production costs, and the buyout as defined below.

Q   How much money did you understand Netflix to be agreeing to pay in total for *White Horse*?

A   61.224 million.

Q   To your knowledge, was that amount going to be paid out all at once?

A   No.

Q   What do you mean by that?

PC3JRIN4                    Noon - Direct

A    That upon certain milestones that part of the money would get paid on those milestones being met.

Q    Ms. Larracuente, can we put this down for a moment and show just the witness and parties what's marked for identification as Government Exhibit 2008.

Mr. Noon, I'm showing you what's been marked for identification only as Government Exhibit 2008. Do you recognize this document?

A    Yeah, it looks familiar.

Q    What is it?

A    Is seems to be a chart that breaks down the buckets of when payments would be made based on certain milestones under the agreement.

Q    And you said "under the agreement." Which agreement?

A    That term sheet.

Q    Did you create this document?

A    No.

Q    Have you reviewed it?

A    Yes.

Q    Did you give feedback on drafts of this document?

A    Yes.

Q    Does this chart fairly and accurately summarize your understanding of the milestone payments in the term sheet?

A    Yes, it seems to.

MR. MARKEWITZ:  Your Honor, the government would offer

Government Exhibit 2008.

MR. McGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 2008 received in evidence)

MR. MARKEWITZ: Ms. Larracuente, can we please publish this so the jury can see it.

Q So Mr. Noon, now that we all see the first page of this document, can you describe to us what we're looking at.

A Yeah, it's a chart that shows the full amount that Netflix would be paying of 61.224 million broken down in those what I would call buckets of amounts that get paid at certain milestones.

Q So what are each of the colorful blocks?

A The lowest one, the pinkish-red one, that's the initial purchase price which would be first thing that would get paid. Then a supplemental purchase price in the purple, followed by the first season fees and production costs in green, and then the final payment, which is the buyout fee in blue.

Q What's the meaning of the colorful numbers next to each of the blocks?

A I'm sorry. What's that?

Q What's the meaning of the colorful numbers next to each of the blocks? So for instance, next to the red block it's 22M in red.

A Those correspond to the amount that the term sheet would

say would get paid at that point.

Q   Ms. Larracuente, can we please go to page 2 of this exhibit and zoom in on the red payment block.  And can we also pull up side by side the term sheet at Government Exhibit 6336, and there can we go to page 3 and call out section 7A.

Mr. Noon, you see below where it starts section A is titled "initial purchase price"?

A   Yes.

Q   How much did you understand Netflix to be agreeing to pay as an initial purchase price for *White Horse*?

A   $22 million.

Q   Can you read aloud the last three lines of section 7A starting with payable on full.

A   Payable on full execution of this term sheet and the short form assignment attached hereto as Exhibit A and incorporated herein by reference.

Q   Ms. Larracuente, can we now go to page 3 of Government Exhibit 2008 and zoom in on the payment block.  And then as to Government Exhibit 6336, can we zoom in on section 7B.

Mr. Noon, how much did you understand Netflix to be agreeing to pay in total as a supplemental purchase price for *White Horse*?

A   $11 million.

Q   And can you read aloud the portion of section 7B from company shall pay HVFX and stopping after January 1, 2019.

A    Company shall pay HVFX a supplemental purchase price in the amount of $11 million (the supplemental purchase price) as follows:  5 million within ten business days following January 1, 2019.

Q    Ms. Larracuente, can we please go to page 4 of Government Exhibit 2008 and zoom in on the payment block.  And can we otherwise stay on section 7B of Exhibit 6336.

      Mr. Noon, can you now finish reading aloud the rest of the supplemental purchase price paragraph in the term sheet starting with 6 million.

A    And 6 million upon commencement of principal photography of the remaining episodes of the first season.

Q    As a general matter were you familiar with what principal photography is in television production?

A    Generally, yes.

Q    How are you familiar with that term?

A    It generally means the --

      MR. McGUINNESS:  Objection.

Q    Mr. Noon, the question would be how are you familiar with the term?

A    It's a term that gets used during -- just to signify -- I guess what do you mean by "how"?

      THE COURT:  What he's getting at is is this a term that you heard frequently in your business work?

      THE WITNESS:  Yeah, it's a term that's used in film

and television production fairly regularly.

THE COURT:  Okay.  And you were familiar with what it meant because of that prior experience, hearing it frequently in the movie business?

THE WITNESS:  Correct.

THE COURT:  Okay.  Go ahead, counsel.

MR. MARKEWITZ:  Thank you, your Honor.

Q   So as a general matter, what do you understand that term to mean?

A   Principal photography is the shooting of a script where you have cameras and actors present.  It would exclude things like shooting a background of a mountain where you didn't have actors or anything like that, but it's the majority of the scripted material that would comprise a film or television show.

Q   Ms. Larracuente, can we please go to section 7C which starts on this page of GX-6336.  Let everyone read the start of this as it spills onto the next page.  Ms. Larracuente, can we now move to the continuation of section 7C on the next page.

Mr. Noon, how much in total did you understand Netflix to be agreeing to pay for the first season fees and production costs of *White Horse*?

A   Sorry.  Can you repeat that?

Q   How much did you understand Netflix to be agreeing to pay in total for first season fees and production costs?

A    23.224 million.

Q    Can you read aloud the sentence after romanette one.

A    $6 million on commencement of principal photography of the remaining episodes of the first season less the 2,023,066.23 that was cash flowed to HVFX through September 14, 2018.

Q    What was the date of this term sheet?

A    November 12, 2018, I believe.

Q    What does it mean to cash flow?

A    That means we had advanced some money to Home VFX prior to the term sheet being signed.

Q    Why would Netflix advance money to the production before the term sheet was signed?

A    Generally a term sheet takes awhile for the parties to agree to, and while that's going on there's some level of comfort that you've pretty much agreed to most of the terms, and you don't want to hold up probably in this case preproduction from happening so that we'd be pushing back the start of the production waiting for the paperwork to get signed.  So we would advance some money so that preproduction or other things could start happening while the term sheet was being negotiated.

          MR. MARKEWITZ:  Ms. Larracuente, can we please go to page 5 of Government Exhibit 2008, and we can otherwise stay on section 7C of the term sheet.

Q    Mr. Noon, can you read aloud the sentence after romanette

two.

A   $11.218 million on completion of principal photography of the first season.

Q   So similar to my question I asked before, are you familiar with completing principal photography, what that means?

A   Yes.

Q   And how are you familiar with what that means?

A   Same way as before, it's just a common term used in film and television production.

Q   What does it mean in your experience for a television show to complete principal photography?

A   Where you've shot the scripted material, that involves actors, but certain things that -- like, if there's a visual effect shot that doesn't involve actors or cameras, that could be done after the end of principal photography being done.

Q   Ms. Larracuente, can we now please go to page 6 of Government Exhibit 2008 and stay up on section 7C.

        Mr. Noon, can you read aloud the sentence after romanette three.

A   $6.006 million on the later of delivery of all episodes of the first season or signature of a rights assignment/long form agreement and a production services agreement for HVFX's production services in connection with the remaining episodes of the first season.

Q   Ms. Larracuente, let's stay on page 6 of Government 2008,

PC3JRIN4                    Noon - Direct

but can you now move Government Exhibit 6336 down to section 7F.

Mr. Noon, do you see that 7F is titled "buyout fee"?

A    Yes.

Q    How much did you understand Netflix was agreeing to pay in total for the buyout fee?

A    $5 million.

Q    The first sentence of the buyout fee section refers to Ice Cream Fridge receiving signed agreements for subsequent productions.  Do you see that?

A    Yes.

Q    In general, are you familiar with the term "subsequent productions," not as defined in the contract, but just generally?

A    Yeah.

Q    And how are you familiar with that term?

A    Especially in television series, you produce one season first and then additional seasons would be considered subsequent productions.

Q    If you look down the paragraph, do you see the line 8 rows from the bottom that starts payable as follows?

A    Sorry, just a second.  Yes.

Q    Can you read aloud the first half of the sentence after the colon about episode delivery, stopping when you get to the "and."

A    50 percent following delivery of all the episodes of the first season and --

Q    And Ms. Larracuente, can we now go to page 7 of Government Exhibit 2008 keeping up section 7F of the term sheet.

Mr. Noon, can you please read aloud the remainder of that sentence in the buyout fee paragraph.

A    50 percent following initial commercial exhibition of the last episode of the first season.

Q    Thank you, Ms. Larracuente.  We can pull this down.  What involvement did you have in the *White Horse* project in the months after the term sheet was executed in November of 2018?

A    For quite a time not a lot.  I wasn't the day-to-day business person on the project.  That was Tehmina.  But as things would come up, I'd get pulled into meetings or calls or discussions.

Q    And what sorts of things would come up that would require you to get involved?

A    Like on any project we worked on, I'd hear about how things were progressing in a sort of general update on a regular basis from my team or from the production or creative teams.  But also if things were coming up in the shoot or they were having any differences I might get called in to hear about them.

Q    Ms. Larracuente, can we please publish what's already been admitted as Government Exhibit 6341.  And Ms. Larracuente, if you could please zoom in on the first forwarded message and

then about half of the way down, the message below that as well.

Mr. Noon, do you recognize this document?

A    Yeah, it looks familiar.

Q    What is it?

A    Well, what you're showing me now or the whole -- you cut off the top part of it.

Q    Let's start at the bottom.  What's at the bottom?

A    It's an email from Carl to Peter Friedlander talking about scenarios for the project moving forward.

Q    And then the email above that, what's that?

A    Peter forwarding it to the internal team at Netflix.

Q    Did you receive that forward?

A    Yes.

Q    Can you just tell us who the other people who received it are and what their roles in the project were.

A    Cindy Holland, she oversaw the entire original series initiative.  David Goldman worked on my team.  He replaced Tehmina Jaffer as the day-to-day person as I think she left the company at this time.  Erik Liang was production legal in-house at Netflix.  Mike Posey was a production executive.  Rahul I believe was an assistant on the creative team.  And Shelly Stevens was another production executive.

Q    And Ms. Larracuente, if we could just zoom in, please, on Mr. Rinsch's email from the header down through the option two

paragraph.

Mr. Noon, in the fourth paragraph, Mr. Rinsch writes despite our best efforts and meticulous planning of schedule/budget prepro, once we have landed abroad, the budgets have exploded on us. Do you see that?

A    Yes.

Q    Then down below, Mr. Rinsch puts forward an option two. Can you explain what you understood him to be proposing there.

MR. McGUINNESS:  Objection.

THE COURT:  Overruled.  You may answer.

A    Just a second.  That if he's going to continue shooting as was planned, he'll need some financial support from Netflix.

Q    Did you understand how much financial support he needed?

A    I don't recall specifically at this point.

MR. MARKEWITZ:  Ms. Larracuente, we can pull this down.

And the government would offer, unless there's objection, Government Exhibit 6343.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6343 received in evidence)

MR. MARKEWITZ:  Can we please publish that.  Thank you.  Can we please zoom in, Ms. Larracuente, on just the bottom email on this page.

Q    Mr. Noon, do you recognize this?

A    Yeah, this looks familiar.

Q    What is it?

A    It looks to be an email from Dick Kendall, who was Carl's attorney at the time, to myself regarding the project.

Q    At a high level, what did this email concern?

A    A plan and a request for funds to complete the script at the time, which I think is the 203-page script he refers to here.

Q    Again, can you make sure that the mic is near you.  Every once in a while it's tricky to hear.

And just to confirm, make sure were speaking about the same thing, what project does this relate to?

A    *Conquest*, which was another name for *White Horse*.

Q    Can you read aloud the second paragraph of this email.

A    None of this additional funding would go to any of Carl, Gabriela, or Keanu.  All of this additional funding would go directly into the product 100 percent on the screen.  Carl is happy to share budgets with Netflix.

Q    Who did you understand to be the Carl, Gabriela, and Keanu referenced here?

A    Carl would be Carl, who is here right now.  Gabriela was a producer on the show as well, and I believe at the time Carl's wife.  And Keanu is Keanu Reeves, who was involved with the project from the beginning.

Q    So what did you understand Mr. Kendall to be saying here?

A    That the talent producers on the show wouldn't be profiting from this additional funding, that it would all go towards producing and putting things on the screen for the show.

Q    How important, if at all, was that to you?

A    Very.

Q    Why is that?

A    Because they were asking Netflix to put more money into the project.

THE COURT:  Sorry.  One of the jurors needs a break. Is that all right?  So finish your answer and then --

THE WITNESS:  Can you repeat --

THE COURT:  Just let him finish his answer.

THE WITNESS:  Can you repeat the question.

Q    I believe you said it was very important to you; is that right?

A    Yes.

Q    And why is that?

A    That if there was going to be additional funding above what was contracted for, that it should all go on the screen and shouldn't be going to reward or profit -- provide profit to any of the talent at this point.

THE COURT:  Okay.  Ladies and gentlemen, since Alternate No. 2 needs a break, why don't we give all of you a quick five-minute break at this time.

(Jury not present)

THE COURT:  Okay.  We'll see you all in five minutes.

(Recess)

(In open court; jury present)

THE COURT:  Please be seated.  Counsel, go ahead.

BY MR. MARKEWITZ:

Q   Ms. Larracuente, if we could please pull back up the document we were looking at, Government Exhibit 6343.  Thank you so much.  Can we move to page 2 of this document, please.  Can we zoom in on the top half of the page so it's a little bit easier to see.

Mr. Noon there at the top it says "best, Dick."  Who do you understand Dick to be?

A   Richard Kendall.

Q   Underneath "best, Dick" there's three asterisks and then it says "from Carl" and then there's more text below that.  I guess, Ms. Larracuente, if we could just put down the call out.  Thank you.

Who did you understand to be the author of the portion of this email below "from Carl"?

A   Carl Rinsch.

Q   Ms. Larracuente, can you pull up on this page side by side with the next one, and then on each can you zoom in on the bolded country names and the paragraphs below them.

At a high level, what did you understand Mr. Rinsch to be saying about the production for each of these countries?

A   He was making an assessment of what some of the overages to date were on Brazil.  And I don't remember whether Uruguay was shot at this point or not, but also the future locations, sort of what the financial needs would be for those locations.

Q   And Ms. Larracuente, if we can do pages 3 and 4 of the exhibit side by side.  And for 3, can you zoom in from where it says "I'm happy to share" and then down.  And then on the next page zoom in from the top through one line where below where it says "approximately."

What did you understand Mr. Rinsch to be asking for?

A   It appears to be he's asking for $9 million, which would be made up of 8 million of the overages from the various locations and a contingency of $1 million.

MR. MARKEWITZ:  The government would offer, unless there's objection, Government Exhibit 6346.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6346 received in evidence)

BY MR. MARKEWITZ:

Q   Ms. Larracuente, can we please publish that for the jury and zoom in, please, on the text at the top.

Mr. Noon, do you recognize this?

A   Yeah, it looks familiar.

Q   What is it?

A   An email from Carl to myself, an assessment of the

situation in Hungary, which was the shooting location they were about to start, I believe, on this date.

Q    And what is the date of this email?

A    October 30, 2019.

Q    And what did you understand Mr. Rinsch to be telling you in this email?

A    One second, please. That he seemed to need a decision on additional funds being provided. And it was imminent, otherwise the Hungary shoot might not happen.

Q    Did Netflix provide funding to Mr. Rinsch following this email?

A    Yes, I believe so.

Q    Were you involved in that?

A    Yes.

Q    In what capacity?

A    Working with Carl and/or Richard Kendall to come up with what that number would be and how it would be funded.

Q    And can you just describe for us what was discussed with them and if there was an agreement reached.

A    Yeah. I believe what we resolved was that Netflix, rather than providing more money than was in the contract, would advance one of the future payments or part of the -- one of the future payments around this date, as opposed to waiting for the milestone for that whole payment to be reached. But it would offset whatever amount was due on that next installment.

I believe Carl had funded some money himself, and we agreed that Carl would leave some of that money from the production. And then there were some -- this was shooting in Hungary. And in Europe you have value added tax, VAT, which for productions you pay it upfront but then you're allowed to get a refund of it some point down the road. And I believe we agreed that Netflix would have that VAT money refunded back to them since we're advancing the -- I think it was $5.3 million for the Hungary shoot.

Q   I believe in your answer there you referred to the contract. What contract were you referring to?

A   That was the contract that was the term sheet that we looked at earlier.

Q   The one we looked at earlier?

A   Yes.

MR. MARKEWITZ:  Your Honor, the government would offer, unless there's objection, Government Exhibit 6347.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6347 received in evidence)

BY MR. MARKEWITZ:

Q   Publish Government Exhibit 6347, and if we could zoom in on the top email.

Mr. Noon, do you recognize this?

A   Yeah, this looks familiar.

Q    What is it?

A    It's an email from myself to Dick Kendall outlining the agreement around the advance that I just mentioned.

Q    Is this a fair and accurate description of the agreement that you believe you reached at that time?

A    Yes.

Q    Did either Mr. Rinsch or his lawyer respond to your email and disagree with your description?

A    Not that I recall.

Q    Did Netflix in fact pay the money that you're describing here, this 5.3 million?

A    Yes, I believe so.

Q    So you see on the second line where you write accelerate 5.3 million of our next installment to cover the remaining Hungary cash flow?  What did you mean by Hungary cash flow?

A    That would be the cost to produce the scenes that were being shot in Hungary.

Q    Are you familiar with the phrase "cash flow problem"?

A    Yes.

Q    And how are you familiar with that phrase?

A    A cash flow problem would be we are sending money out the door faster than money is coming in the door.

Q    And at this time to your knowledge, what were the financial issues, if any, facing the production?

A    Well, there were two separate issues.  One was a cash flow

issue, which this was seeming to resolve, which was there's money having to go out the door but not enough -- we haven't gotten enough money from the agreement to fund that. The other is overages, which would cause the total cost of the show to exceed in total what was contracted for in the term sheet.

Q   So which, if either, of those problems was this acceleration of 5.3 million intended to address?

A   The former, the cash flow issue.

Q   And then you reference a Pioneer in that same line. What's Pioneer?

A   They are the production services company in Hungary. So they're on the ground executing the production plan.

Q   Ms. Larracuente, can we show just the witness and parties what's marked as Government Exhibit 2009A.

        Mr. Noon, I'm showing you what's been marked for identification purposes only as Government Exhibit 2009A. Do you recognize this document?

A   Yes, it looks familiar.

Q   What is it?

A   It's a revision of that prior document we looked at that breaks out some of the future funding amounts.

Q   And you said "a revision." How, if at all, is it a revision?

A   It just outlines -- it points out the remaining amounts that were due under the agreement, as to the specific amount

that they are.

Q   Did you create this document?

A   No.

Q   Did you review it before today?

A   Yes.

Q   Did you offer feedback on the document?

A   Yes.

Q   Does this chart fairly and accurately summarize your understanding of the amounts remaining under the agreement?

A   Yes, around that time.

Q   And what time is that?

A   Of that prior email.

Q   The October email we were looking at?

A   Well, prior to that email.

MR. MARKEWITZ:  Your Honor, the government would offer Government Exhibit 2009A.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 2009A received in evidence)

BY MR. MARKEWITZ:

Q   Ms. Larracuente, can we please publish this for the jury.

Mr. Noon, if you could just explain to us what we're looking at in the first page here.

A   Sorry.  It's the same document that you were asking me.  It hasn't changed.

Q   2009A?

A   Okay.

Q   Could you explain to us what we're looking at in the first page.

A   I only see one page.

Q   On this page, sorry.

A   Okay.  I think it's showing prior to that agreement on the advance what moneys had already been paid under the term sheet, which would be the 22, the 11, and the 6, and then what amounts remains, a total of 22.24 remaining, 11.218 million of which would be paid at the end of principal photography being completed.

Q   Ms. Larracuente, can we please go to slide two.

        What are we looking at here, Mr. Noon?

A   This one appears to break out what was agreed to in that prior email where of that 11.218, 5.3 million of it would be advanced around October 31.

Q   And what impact, if any, did that have on the amount remaining under the contract?

A   It would reduce it by $5.3 million.

Q   If we can pull this down, Ms. Larracuente.

        After this advance, did the parties have further discussions about the budget for *White Horse*?

A   Yes.

Q   Were you involved in those discussions?

A    In some, yes.

Q    Who was the lead negotiator for Netflix during those discussions?

A    There were times where I was.  Depends on what month or what time specifically.

Q    Let's focus on the period from January 2020 to March 2020.

A    Yeah, that would be me.

Q    It would be you?

     Ms. Larracuente, can we please publish what's already been admitted as Government Exhibit 6351.  And can you please zoom in on the portion of the page that has text.

     You recognize this document?

A    Yeah, that looks familiar.

Q    What is it?

A    It's an email from Carl to mostly the Netflix team on the show.  I'm not sure who John -- I'm not sure who one of the people is though.  Yeah.

Q    What sorts of discussions were you having with Mr. Rinsch around this time, February 3, 2020?

A    I think this is where we were again talking about not as much the cash flow issues, but more of the issues around the total cost of the project.

Q    And we'll go through this email there a moment, but can you just summarize for us what was being discussed at that time about the overage issues?

A    A plan where Netflix would provide additional financing, and in return we'd have more insight and transparency around the project and the status of things.

Q    And you said "transparency."  What did you mean by that?

A    That there would be additional information provided to Netflix beyond what was required in the term sheet.  So we were looking for additional transparency around the progress of the production.

Q    What sorts of information?  Can you give us some examples?

A    Budgets, schedules, breakdowns of what's been shot and not shot, location plans, etc.

Q    Why were you interested in receiving that information?

A    I think at some point if we were going to provide additional financing, we wanted to have greater visibility on a day-to-day, week-to-week basis as to how the money was being spent and the progress of the production at that point.

Q    Why the connection between those two things?

A    Because we were being asking to provide more money, which was on overage, and to have some reassurances that things were happening that we expected to have happen.

Q    Ms. Larracuente, can you please go to page 7 of this document and zoom in on the section at the bottom titled proposed two-step deal.

         What did you understand Mr. Rinsch to be proposing in the two bulleted lines here and then the sub-bullets?

A    Requesting that there be a commitment of $5 million that would go to fund the following list of things that would be done on the project.

MR. MARKEWITZ:  Your Honor, unless there's objection, the government would offer Government Exhibit 6352.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6352 received in evidence)

BY MR. MARKEWITZ:

Q    If we could just zoom in at the top there, Ms. Larracuente. Thank you.

Mr. Noon, do you recognize this document?

A    It looks familiar.

Q    What is it?

A    An email from Carl to myself with some sort of attachment as a response.

Q    And what's the date of this document?

A    February 4, 2020.

Q    Ms. Larracuente, can we please go to the attached letter on page 2.  And can you zoom in on the top half of the page through the second dashed line.  Pause for a moment to allow everyone to read this.

What did you understand Mr. Rinsch to be saying in the last paragraph?

A    He seemed to be saying that the milestone for the payment

PC3JRIN4                    Noon - Direct

of the $11.218 million had been met.

Q   And if that had been met, what did you understand that would mean?

A   Sorry?

Q   If that payment had been met, what did you understand that would mean financially?

A   I'm sorry.  What did I understand it to mean or what did I understand Carl to be saying in this email about it?

THE COURT:  The latter.

Q   The latter.

A   Can you repeat the question just to be clear.

Q   What did you understand it would mean financially if that milestone was met?

A   That he was expecting to get paid $11.218 million or claimed to expect.

Q   Ms. Larracuente, can we now please pull up page 3 side by side with this page, and if you could zoom in on the last two paragraphs of page 2 and then the top of page 3 above the bolded heading bottom line.  Give everyone a moment to read this.

A   Okay.

Q   Mr. Noon, you see where it starts 5MM cash flow in the proposal submitted yesterday?

A   Yes.

Q   What did you understand that to be a reference to?

A    I think from the exhibit you showed me two exhibits ago where he was asking for $5 million for those bulleted items.

Q    And so what did you understand him to be saying that about?

A    That in fact it didn't need to be $5 million, it only needed to be $3.75 million because there was already 1.25 accounted for.

Q    Okay.  And then Ms. Larracuente, can you please replace these zoom-ins with a single one from page 3 of the section titled "bottom line" until you get to the dashed line.

So how much money did you understand Mr. Rinsch to be requesting in this letter?

A    Seems to be requesting roughly 15 million, 11.218 which is required, and then a discretionary amount of 3.75 million.

Q    And what did you understand it to mean that one is labeled "required" and one is labeled "discretionary"?

A    Well, that was Carl's point of view that it was required.

MR. MARKEWITZ:  Unless there's objection, the government would offer Government Exhibit 6353.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6353 received in evidence)

BY MR. MARKEWITZ:

Q    Mr. Noon, do you recognize Government Exhibit 6353?

A    Yeah, that looks familiar.

Q    What is it?

A    This appears to be an email from myself to Carl, copies some of the folks at Netflix, in response to I believe his -- the email you showed me --

Q    Sorry.  Can you say that last part again.

A    In response to the email you showed me or his correspondence two exhibits ago.

Q    Ms. Larracuente, can you please zoom in on the second paragraph of this email, the first -- sort of basically the first big paragraph.

Now, in the second sentence of this paragraph, Mr. Noon, you refer to Mr. Rinsch's request for payment of 11.218 million.  Do you see that?

A    Yes.

Q    And then a little bit further down, you write Netflix has already accelerated 5.3 million.  Do you see that?

A    Yes.

Q    And then about four rows from the bottom, you write accordingly the correct balance for this particular installment when due will be 5.918 million.  Do you see that?

A    Yes.

Q    What were you saying to Mr. Rinsch in this paragraph?

A    Well, two things.  One, the 11.218 -- well, hold on a second.  Let me read the whole thing.

That of the 11.218 million we had already advanced 5.3.  So even when that 11.218 million is due, it should be

reduced by the 5.3 that was already advanced.

Q   And Ms. Larracuente, can you please pull up the second page of this email side by side and then zoom in on the third paragraph which flows across the two.

The first sentence, you write with regard to the current situation, it is irresponsible to, as you propose, spend our funding working on two different versions of the show.  What did you mean by two different versions of the show?

A   I think that's in reference to Carl saying there's a longer version of the show which probably matched a lot more closely with the 203-page script we had at the time and then there's some other version, shorter version of the show he was proposing.

Q   And you say that it would be irresponsible.  What did you mean by that?

A   We already were talking about overages.  So to spend money on two different versions would mean you're not going to end up with two different versions of the show.  So one of those is going to be wasting money on a version that's not going to be the final version, so better to just decide which version to work on and go forward.

Q   A little further down this paragraph, you reference advancing an amount from the next contractual payment.  Do you see that?

A   Hold on.  Where is it?

Q    The sentence beginning "to that end."

A    Yeah.  Yes, I do.

Q    What were you proposing there?

A    Where we would provide an advance of other moneys that were due under the contract to provide Home VFX the time to prepare budgets and schedules for completing the script that we had at that point.

          MR. MARKEWITZ:  Ms. Larracuente, we can pull this down.

          The government would offer if there's no objection Government Exhibit 6355.

          MR. McGUINNESS:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 6355 received in evidence)

BY MR. MARKEWITZ:

Q    Mr. Noon, do you recognize Government Exhibit 6355?

A    Yeah, this looks familiar.

Q    What is it?

A    It looks to be an email from myself to Dick Kendall on February 29, 2020.

Q    Ms. Larracuente, can we do a side by side of pages 1 and two and then zoom in on the email at the bottom of page 1 spilling into page 2.

          Mr. Noon, can you read aloud the second sentence of your email through the bulleted list.

A    Yes.  We would want a short agreement as to what would happen over that period and the intended uses of such funding, which would include the following activities:  Pay or play or other hold moneys on key crew/actors/artists, block calendar, MM breakdown shooting schedule, budgets, PSA contracts, editor and support team for editorial on existing material, accounting and office overhead commensurate with the level of activities during this period.

Q    So what date was this email sent and who are you sending it to?

A    It's February 27, 2020, and I was send it to Dick Kendall.

Q    That's Carl's lawyer?

A    Yes.

Q    Why were you sending Mr. Rinsch's lawyer -- or excuse me. Why were you telling Mr. Rinsch's lawyer that, among other things, you wanted a short agreement about intended uses of funding?

A    Similar to the prior advance where those moneys were going towards the Hungary shoot, we wanted to formalize -- have a formal agreement around what the moneys we were going to advance this time were going towards.

Q    How important was getting an agreement like that to you?

A    I mean, if we were advancing more moneys, it was important to have an understanding of where that money was going.

Q    Ms. Larracuente, can you put down these two zoom-ins and

then from page 1, can you please zoom in on Mr. Kendall's response.

What did you understand Mr. Kendall to respond to your email?

A   Can you give me one second?  That he's saying that Carl is expecting the full $11.2 million payment, and that would be needed to budget and produce the -- what he's calling an expanded version of the script, which was about 220 pages it looks like.  Otherwise Carl would do something -- he wouldn't proceed with that prep for that script.

Q   Ms. Larracuente, can we now please zoom in on Mr. Noon's response.

Mr. Noon, in your first sentence, you write as the 11.218 is not the correct amount of the next installment, nor is the next installment currently due, Netflix is not, as you can understand, in a position to remit such a requested amount.  Do you see that?

A   Yes.

Q   Why did you say that the next installment is not currently due?

A   Well, one, it's -- part of it was advanced, so 5.3 million should reduce that 11.218, and that the milestone for that payment hadn't been met.

Q   What was the milestone for that payment?

A   I believe that one was completion of principal photography.

MR. MARKEWITZ:  Your Honor, the government would offer, if there's no objection, Government Exhibit 6357.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6357 received in evidence)

BY MR. MARKEWITZ:

Q   And then we would actually publish Government Exhibit 6358. Ms. Larracuente, can we please pull up page 5 and zoom in on the header information in the first two paragraphs, Mr. Noon's March 4 email.

In your first paragraph you reference discussions between Cindy and Carl.  Do you see that?

A   Yes.

Q   Did you personally participate in those discussions?

A   I don't believe so.

Q   In the second paragraph, you write Netflix shall fund 11M. What does 11M mean?

A   $11 million.

Q   You continue on by saying such funding should not represent an acknowledgment of any of the contractual milestones.  What did you mean by this second sentence?

A   That based on what Carl and Dick had emailed us previously, they seemed to be taking a position that certain milestones had been met and we were in this instance, even though we were willing to send $11 million, we were not in agreement that

certain milestones had been met.

Q   And why did you put that in this email?

A   Because it seemed to be a difference of opinion between the parties.

Q   Ms. Larracuente, can you now zoom in from the third paragraph down to the bottom of the page.  In the next paragraph you write Home VFX shall perform and shall use the 11 million to fund the following over a five-week period, and then there's a bulleted list.  Do you see that?

A   Yes.

Q   What were you proposing there?

A   That there would be a five-week period where the moneys that we were funding were going to be used for the following items.

Q   Why did you include this specific list of bullets in your email?

A   I believe this was a list that was actually sent to us by Carl.  So I was basically agreeing to the things that he was proposing were going to get done over that five-week period.

Q   Ms. Larracuente, can we please pull up side by side Government Exhibit 6351 at page 1.  If we could zoom in on the header information just to orient ourselves, Ms. Larracuente.  Thank you.

        Mr. Noon, we looked at this document earlier.  Can you just remind us who sent Government Exhibit 6351 and on what

date.

A     It was from Carl Rinsch on February 3, 2020.

Q     Ms. Larracuente, can we now please go to page 7 of Government Exhibit 6351, and if you could zoom in on the bulleted list at the bottom of the page.  If you could situate it next to it so we can compare the two.  Thank you.

          Mr. Noon, how do the bulleted tasks in your email of March 4 compare to the bullets in Mr. Rinsch's February 3 document?

A     They seem to be, if not exact copy, a copy of what he had provided.  I don't see any differences.

          (Continued on next page)

BY MR. MARKEWITZ:

Q.   And why were you including Mr. Rinsch -- the bullets in Mr. Rinsch's email were similar bullets in your email?

A.   Because they seemed to be what Carl was proposing be done over that five week -- well, was ten weeks, now, five weeks -- over that period of time.

MR. MARKEWITZ:  Ms. Larracuente, can you please pull down Government Exhibit 6351, and then for Government Exhibit 6358, can you please zoom in on Mr. Kendall's response.

Q.   Mr. Noon this is a response to your email from Mr. Kendall. Can you describe your understanding of how he was responding to your proposal?

A.   My understanding is, he was agreeing to what was in my proposal but he had two things to clarify.

Q.   What did you understand the first clarification to be?

A.   That this doesn't change any of the production company's obligations under the term sheet, nor does it -- but -- and Carl gets to keep his final cut right.

Q.   And what about the second?

A.   That they wanted to call the $11 million, quote on quote, first season production costs and refer to it as that.

Q.   And that phrase, first season production costs, are you familiar with it?

A.   I don't know where it would have come from, but I believe in subsequent emails, he explains it's for tax reasons for HVFX

for Carl.

MR. MARKEWITZ:  Ms. Larracuente, can we pull side by side up Government Exhibit 6336, and can we go to page 3, please.  If we could zoom in on section 7.

Q.  Mr. Noon, do you see at the bottom there, in paragraph 7C, it's titled: first season fees and production costs?

A.  Yes.

Q.  And then just remind us, what's the document on the right-hand side of the screen?

A.  The term sheet from November of 2018.

MR. MARKEWITZ:  Thank you, Ms. Larracuente.  We can pull that down and we can replace the other document as the full document on the screen.  And if you could please zoom back into Mr. Kendall's email.

Q.  What, if anything, did you understand these clarifications to be saying about how the $11 million would be used?

A.  They don't seem to change how it would be used other than the name that we referred to it as.

Q.  So what was your understanding of what Mr. Kendall was saying about that piece of your proposal?

A.  Well, he said my language was acceptable, so it seems that he agreed with what was in my email, provided we agreed to something along the lines of what he mentions here.

MR. MARKEWITZ:  Ms. Larracuente, can we now go up the page to Mr. Rinsch's response?

Pc3Frin5                          Noon - Direct

Q.  Mr. Noon, was Mr. Rinsch on the email thread when Mr. Kendall sent that email?

A.  I'm not sure because it was a forward, and sometimes forwards don't include some CCs, so I'm not --

Q.  Is this forward, is it below or above.

A.  I believe it's above.

Q.  So then, looking down below the forward, was Mr. Rinsch on the email?

A.  On this one you're showing me?

Q.  On the thread I mean, at that sort of --

A.  Do you want to show me the whole page?

MR. MARKEWITZ:  Yeah.  Ms. Larracuente, how about we put up the two pages side by side after the forward line and the page we were just looking at.

Ms. Larracuente, the document on right should be just the next page of this same document.  Ms. Larracuente, excuse me.  The -- let's go to page 3 on the right.  Page 3.

Thank you.

Q.  Mr. Noon, just looking at it on the left is page 4 of the email.  On the right is page 3.  The forward line is at the top.

Was Mr. Rinsch on the email thread for the piece below that forward line?

A.  I'm sorry.  On which side of the screen?

Q.  On the left-hand side.

A.   On the Thursday, March 5 at 19:40, that one?

Q.   Yes.

A.   He does not appear to be, but at the same time, I don't know that -- some email programs don't put all the CCs on them when they say something like: Richard Kendall wrote, so I'm not sure.

Q.   Well, does it list anybody who actually received that March 15, 2020 email at 19:40?

A.   No.

Q.   And who is replying to that email?

A.   At the top of the page?

Q.   Yes.

A.   Carl.

Q.   Okay.

          MR. MARKEWITZ:  Can we zoom in on Mr. Rinsch's email please, Ms. Larracuente?

          Your Honor, I think one of the juror's screens is --

          THE COURT:  I'm sorry.

          JUROR:  My screen doesn't work.

          THE COURT:  Oh.

          The screens are off?

          JUROR:  No, just his.

          THE COURT:  Someone --

          (The Court conferred with the law clerk)

          MR. McGUINNESS:  I think we have an extra one in the

back, your Honor.

MR. MARKEWITZ:  There's a screen in the back, your Honor.

THE DEPUTY CLERK:  Whose screen?  Hand?  Thank you.

THE COURT:  Linda, since we only have a few minutes left --

THE DEPUTY CLERK:  Only if I stand here and hold the button.

THE COURT:  You can move to the screen in the back row.

THE DEPUTY CLERK:  Well, anyway, is it all right if he sits up there, just in case this thing goes out again.

THE COURT:  This is our juror who is already a giant, and now he's king of the mountain.

Go ahead, counsel.

MR. MARKEWITZ:  Thank you, your Honor.

BY MR. MARKEWITZ:

Q.  Mr. Noon, what did you understand Mr. Rinsch to be saying in this email?

A.  The March 5 email?

Q.  Correct; the one that's blown up on your screen.

A.  Yeah, clarifying that the $11 million would be considered for season production costs for White Horse and then just talking about the time pressure and deadlines.

Q.  Did you understand him to be saying anything about how the

money would be used?

A.  It doesn't appear to.

Q.  So, we spoke about this.  At the top, it says forwarded message.  Do you see that?

A.  Yes.

MR. MARKEWITZ:  Ms. Larracuente, can we please pull up the page immediately before this one in the exhibit, and if we could zoom in on Mr. Noon's email at the bottom of it, at 4:17 p.m.

Q.  So, you're now sending this email.

Is Mr. Rinsch on the thread anymore after the forward?

A.  He does not appear to be.

Q.  Why?

A.  Frequently, when there's sort of language tweaking, the business and legal folks will do that but not forward every single version of that to the principal.

So, Cindy and Carl not being on there is not surprising because this is more tweaking the language between the business and legal folks.

Q.  Okay.  So you say, slight tweak to make sure we are on the same page about all funding to date.  Do you see that?

A.  Yes.

MR. MARKEWITZ:  Ms. Larracuente, can you leave this, zoom up, but can you also zoom in on the second numbered paragraph of Mr. Kendall's email from page 4?

Q.   Is what you are saying here different than what you understood Mr. Kendall to be saying?

A.   Well, they sort of involve two different concepts.

Q.   Can you explain?

A.   I mean, what Dick Kendall was proposing here was sort of a backstop version of the show if we hadn't come to an agreement after the five weeks, and what I was proposing was mostly just about how the $11 million would get treated vis-a-vis the existing term sheet.

          MR. MARKEWITZ:  And I apologize.  Ms. Larracuente, the document on the right that we should be calling out, it's at the bottom, Bates No. ending 367.  And I'd like paragraph 2 from that one, please.  Thank you.

Q.   Okay.  I apologize.

          Mr. Noon looking at this one, this paragraph now, from Mr. Kendall's prior email, is what you're saying in your email different than what you understood him to be saying?

A.   Yes, it appears to be.

Q.   How so?

A.   That he was saying $11 million is considered additional production costs.  But what I was saying was that only 6 million of the $11 million would be considered extra contractual amount over and above what was due in the term sheet.

Q.   And so what would that mean -- in your proposal what would

it mean in terms of how much money was going to Mr. Rinsch under the parties' agreement, in total?

A. My understanding, based on my email, would be that the 61-point-something million would now be 67-point-something million in total.

MR. MARKEWITZ: Ms. Larracuente, can you please pull down these bubbles and then do a side by side of pages two and three of the exhibit. And once those are up, can you zoom in on Mr. Kendall's response that starts on the bottom of page 2.

Q. This is Mr. Kendall's response to you. What did you understand him to be proposing in response?

A. That we pay $11 million now. That there's some sort of backstop version that Carl would deliver if no agreement was reached after the five weeks.

And he does seem to be agreeing that the $6 million amount I proposed would be treated as an overage and not the full 11 and that Carl retains his final cut.

Q. Why did you say that he seemed to be agreeing that $6 million would be extra contractual, just 6 million would be extra contractual?

A. He's thrown in this idea that there's a shorter version of the show that Carl could deliver and that if he's going to agree that the $6 million is extra contractual, as I proposed, that that's still the amount, even if Carl delivers that version, I think, is what he's getting at.

Pc3Frin5                    Noon - Direct

Q. Did you understand anything in his email to address how the 11 million would be spent?

A. No.

MR. MARKEWITZ: Ms. Larracuente, can you pull up, side by side, pages one and two. And then can you zoom in on the last line of page 1, and then on page 2, zoom in on the top from Mr. Noon's email at 5:16:51 p.m.

Q. Mr. Noon, the email at the bottom is your response, and then the thread goes on. If you wouldn't mind reading your response, I'll read Mr. Kendall's, and then we can go to the top. So, starting at the bottom, can you read what he wrote?

A. My email to Dick Kendall?

Q. Correct.

A. Discussing, is there an amount Carl needs ASAP in the event an $11 million wire may take longer than a smaller amount?

Q. No. He wants the whole amount in one payment.

And if you could read your response.

A. Okay, though it may take longer to process, as I mentioned.

Q. He knows.

Did Mr. Kendall or Mr. Rinsch ever explain to you why Mr. Rinsch wanted the full amount of money paid at once if it might take longer?

A. I don't recall anything beyond this email.

MR. MARKEWITZ: Ms. Larracuente, can you please pull down these bubbles, and then page 1, can you zoom on Mr. Noon's

5:40 p.m. email.

Q.  You write:  Hey, Dick.  I think we are conceptually aligned but need to reword your proposal.  Let us know if this is acceptable.

And then you have four paragraphs.  Do you see that?

A.  Yes.

Q.  Do any of these paragraphs in your email expressly say anything about how the $11 million would be spent?

A.  It doesn't say how it will be spent.  It talks about how it would get treated under the agreement, but not how.

Q.  Why is that not included there?

A.  Because there was -- Dick had agreed to it previously.

Q.  What do you mean by that?

A.  He said, your language is acceptable in a prior email.

Q.  Okay.  And then, so then why were the parties continuing to discuss?

A.  Because Dick had raised two new issues, and so we were resolving those two issues in this email chain.

Q.  Okay.  So, these four paragraphs here, what did they relate to?

A.  A resolution of the things that Dick had proposed, which were in addition to what was already agreed.

MR. MARKEWITZ:  Ms. Larracuente, can you please zoom in now on the two emails at the top of page 1?

Mr. Kendall writes, Bryan, the language you propose in

the below 5:40 p.m. email is acceptable.

And then you respond and say: Okay, great. Let me send to both of you, and if Carl can respond and confirm that we are in agreement, that would be great.

Why did you say that you wanted Carl to respond and confirm?

A. Because Carl's the principal for the production company, and Dick and I had been doing a back and forth around the language that Cindy and Carl were not on, so just circling back.

Q. And by this point in the email thread, was Mr. Rinsch on the email?

A. No.

MR. MARKEWITZ: At this point, the government would offer Government Exhibit 6359.

MR. McGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 6359 received in evidence)

MR. MARKEWITZ: Ms. Larracuente, can you please publish that and zoom in on the email at the bottom and Mr. Rinsch's reply just above it.

BY MR. MARKEWITZ:

Q. Mr. Noon what, do you recognize this document?

A. Yeah, it looks familiar.

Q. What is it?

A. You took the header off, so I'm not sure.

Q. Oh.

MR. MARKEWITZ: Ms. Larracuente, can we include the top header.

A. Yeah, it's an email from Cindy Holland to Carl, myself, Dick and Eric, our lawyer, just thanking everybody.

Q. And if we go down to the bottom of this thread, it's listed as an email that you're sending.

Why are you sending that email?

A. Just as a follow-up to what I asked Dick, if I could send the email to Carl so he could confirm that he agreed with it.

Q. Did Netflix, in fact, send $11 million to Mr. Rinsch or his company after that email was sent?

A. I believe so.

MR. MARKEWITZ: Please pull this down, Ms. Larracuente.

Q. Mr. Noon, what visibility, if any, did you have into how the 11 million was spent after it was provided?

A. Not much.

Q. At any point after March 6, 2020, did Mr. Rinsch tell you how the money was being spent?

A. No, but we also we had -- COVID became an issue, so a lot of things were not happening shortly thereafter.

Q. At any point following March 6, did Mr. Rinsch ever talk to you about investing in the stock market?

Pc3Frin5                    Noon - Direct

MR. McGUINNESS:  Objection.

A.  Not that I recall -- sorry.

THE COURT:  No.  I think that given the nature of the charge, that that is a permissible question.

Overruled.

A.  Not that I recall.

Q.  Unless there's objection, the government would offer Government Exhibit 6369.

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6369 received in evidence)

Q.  Mr. Noon, there's going to be various messages between you and Mr. Rinsch with dates and time stamps.  Do you see that?

A.  Yes.

MR. MARKEWITZ:  Ms. Larracuente, can you please go to page 2 and zoom in on the messages sent between 2:40:03 and 3:59:22?

So, at the top, Mr. Rinsch refers to a Ted and a Reed. Who did you understand those people would be?

A.  Ted Sarandos who was, at the time, the head of content and Reed Hastings, who was the CEO at that time.

Q.  He also references an updated book.  Do you see that?

A.  Yes.

Q.  What book did you understand him to be referring to?

A.  I believe he's referring to -- it was like a coffee table

book of stills from the production.

Q. Did you receive that book?

A. Yes.

MR. MARKEWITZ: One moment, your Honor.

May I approach?

THE COURT: Yeah.

Remember, Counsel, we have to stop in five minutes.

MR. MARKEWITZ: Okay. Thank you, your Honor.

Q. Mr. Noon, I've handed you what's already been admitted into evidence as Government Exhibit 6372. Do you recognize it?

A. It looks familiar.

Q. What is it?

A. It seems to be the book that's mentioned here. I don't know if it's my copy or someone else's copy.

Q. But you have a copy of the book?

A. I did, yes.

Q. Why, to your knowledge, did Mr. Rinsch send it to you?

A. I'm not totally certain.

Q. Did you ask him to send you the book?

A. No.

MR. MARKEWITZ: Ms. Larracuente, can we please go to page 4 of the exhibit on the screen? And can you please zoom in on the last three messages on the page? I'll let everyone read that for a moment.

You can pull that down. Thank you, Ms. Larracuente.

pc3frin5

BY MR. MARKEWITZ:

Q.  Mr. Noon, can you just remind us, when did you leave Netflix?

A.  Fall of 2020.

Q.  At the time that you left Netflix, what was your understanding of the status of the White Horse show?

A.  I knew, with all of the issues with COVID, that it was at some stage of potentially moving forward, but I don't recall specifically.

Q.  Just one moment, your Honor.

(Counsel conferred)

MR. MARKEWITZ:  Nothing further, your Honor.

THE COURT:  All right.  We'll end for today and hold off cross-examination for tomorrow.

So, ladies and gentlemen, tomorrow we will have a full day, starting at 9:30 and going to 4:30 with breaks both in the morning and for lunch.

I want to remind you of my housekeeping rules, though you've heard them before.  First, do not discuss the merits of the case with anyone outside.  Second, don't even discuss them among yourselves until the start of deliberations. Third, don't do any research.  Don't try to Google something. In the unlikely event that you see any reference to this case in the media or the web, turn away; disregard it completely. And finally, remember that the lawyers and the parties, the

pc3frin5

witnesses, when they run into you -- as they may on the elevator -- are to have no contact with you. So, they're not being rude if they don't say hello or whatever.

So, have a very good evening. Get ready for a full day tomorrow, and we'll see you tomorrow.

JUROR: Thank you.

(Jury excused)

(Continued on next page)

pc3frin5

(Jury not present)

THE COURT: Okay. I have one quick question.

Please be seated.

Earlier at the very start, the government was referring to the fact that its charge was not only for fraud in the obtaining of money but also the retaining of money.

What is the case you're relying on in that latter regard?

MR. MARKEWITZ: Yes, your Honor.

(Counsel conferred)

MR. MARKEWITZ: Sorry. One moment, your Honor I'm just pulling it up from our requested charge.

So, the two cases that we are referring to are *Porcelli v. United States*, 404 F.3d 157. That's a Second Circuit case from 2005.

And we're also citing *United States v. Gol*e. That is at 158 F.3d 166, and that's a Second Circuit case from 1998.

And then we've also included two jury charges. The first provided by the Honorable Vernon Broderick in *United States v. Cal-* --

THE COURT: I don't to see it. I just want to go back and look at those cases, so thank you very much.

MR. MARKEWITZ: Yes, your Honor.

THE COURT: I'll take a look at them tonight.

Very good.

pc3frin5

Since this morning we had a few extra things come up, why don't you come in at, say, 9:20 just in case there is something, and I'll ask our reporter to be here at 9:20 as well.

MR. MARKEWITZ: We'll see you then, your Honor.

THE COURT: Good. Thank you very much.

(Adjourned to December 4, 2025, at 9:20 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

PETER FRIEDLANDER

Cross By Mr. Zeman . . . . . . . . . . . . . . . 164

ADAM CHECCHI

Direct By Mr. Sowlati . . . . . . . . . . . . 194

Cross By Mr. McGuinness . . . . . . . . . . . 232

RONALD SEE

Direct By Mr. Sowlati . . . . . . . . . . . . 236

Cross By Mr. McGuinness . . . . . . . . . . . 264

BRYAN NOON

Direct By Mr. Markewitz . . . . . . . . . . . 264

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

6340     . . . . . . . . . . . . . . . . . . . 173

1006-A and 1006-C   . . . . . . . . . . . . . 188

1006-A and 1006-C   . . . . . . . . . . . . . 188

3001 through 3026, 3053 and 3055 . . . . . . 193

3001 through 3026, 3053 and 3055   . . . . . 193

3027 through 3031, 3054, 3056   . . . . . . . 194

3032     . . . . . . . . . . . . . . . . . . . 194

3033 through 3047   . . . . . . . . . . . . . 194

6057     . . . . . . . . . . . . . . . . . . . 201

6058     . . . . . . . . . . . . . . . . . . . 219

6330     . . . . . . . . . . . . . . . . . . . 269

6336 . . . . . . . . . . . . . . . . . . . 272

2008 . . . . . . . . . . . . . . . . . . . 276

6343 . . . . . . . . . . . . . . . . . . . 285

6346 . . . . . . . . . . . . . . . . . . . 289

6347 . . . . . . . . . . . . . . . . . . . 291

2009A . . . . . . . . . . . . . . . . . . 294

6352 . . . . . . . . . . . . . . . . . . . 298

6353 . . . . . . . . . . . . . . . . . . 300

6355 . . . . . . . . . . . . . . . . . . 303

6357 . . . . . . . . . . . . . . . . . . 306

6359 . . . . . . . . . . . . . . . . . . 319

6369 . . . . . . . . . . . . . . . . . . 321