PC4JRIN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                       25 Cr. 85 (JSR)

CARL ERIK RINSCH,

                                 Trial
          Defendant.

------------------------------x

                                New York, N.Y.
                                December 4, 2025
                                9:30 a.m.

Before:

                    HON. JED S. RAKOFF,

                                District Judge
                                -and Jury-

                        APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
DAVID MARKEWITZ
TIMOTHY CAPOZZI
ADAM SOWLATI
     Assistant United States Attorneys

LAW OFFICES OF DANIEL A. McGUINNESS
     Attorneys for Defendant
BY:  DANIEL A. McGUINNESS
     -and-
ZEMAN & WOMBLE, LLP
BY:  BENJAMIN C. ZEMAN

Also Present:
Nicholas DiMarino, FBI
Maria Larracuente, Paralegal
William Coleman, Paralegal
Laurie Tang, Paralegal

(Trial resumed; jury not present)

THE COURT:  Apparently we're missing a juror or two, so let's see what the story is.

(In open court; jury present)

THE COURT:  Please be seated.  So good morning, ladies and gentlemen, welcome back to the salt mine.  And we are ready to continue.  Counsel.

MR. McGUINNESS:  May I proceed, your Honor?

THE COURT:  Yes.

BRYAN NOON, resumed.

CROSS-EXAMINATION

BY MR. McGUINNESS:

Q   Good morning, Mr. Noon.

A   Good morning.

Q   You were involved in negotiating the term sheet for *White Horse*, right?

A   Yes.

Q   If we could bring up Government Exhibit 6336, please.

And you're familiar with what's in the term sheet, right?

A   Yes.

Q   All right.  And if we could call out number two, please.

The term sheet was an agreement for Netflix to purchase the first season, correct?

A   Correct.  With the right to do additional seasons.

Q   We'll get to that in a minute.  And it described the first season as approximately 13 episodes, right?

A   Yeah, that's what it says here.

Q   And approximately four to fourteen minutes, right?

A   Yes.

Q   And totaling 110 to 120 minutes, right?

A   Yes.

Q   So there's three definitions here of the first season, two of which have the modifier "approximately," right?

A   Yes.

Q   One of them does not, right?

A   Correct.

Q   And the one that does not is the one that says the total length, which is described as 110 to 120 minutes, right?

A   Yeah.

Q   So we can take that down, thank you.

        Getting back to subsequent seasons, there were discussions about casting for the second season as early as August 2019, right?

A   I mean, I don't recall specific dates.

Q   If we could show the witness what's been marked as Defendant's Exhibit 16.

        Okay.  Do you recognize this document?

A   Not specifically.  But it looks like an email that I was on.

MR. McGUINNESS:  All right.  If we could bring up a defense stipulation marked DX-S1.  And if I could just read this or portions of this -- well, I move to admit this stipulation, your Honor.

THE COURT:  Received.

(Defendant's Exhibit S1 received in evidence)

MR. McGUINNESS:  And I would like to read portions of this, just the second paragraph, if I could have that called out.  Sorry, number two.

Defense Exhibits 1 through 65 are true and accurate excerpts of email conversations between Carl Erik Rinsch and other individuals which were produced in the arbitration. Moreover, the "from," "to," "CC," and "BCC" field accurately display the email addresses that sent or received the emails. The sent field accurately displays the dates and times on which the emails were sent, and the subject line refers to the subject line of the email.

If we could go back to DX-16 for the witness only, please.

Q   This an email between yourself and Peter Friedlander, right?

A   It seems to be, yes.

Q   And it was sent on August 5, 2019, right?

A   Yeah, it appears to be.

MR. McGUINNESS:  Defense moves to admit DX-16.

MR. MARKEWITZ:  Objection.  Hearsay.

THE COURT:  Sustained.

Q   Mr. Noon, you discussed with Mr. Friedlander which characters would become "series regulars" in season two, correct?

MR. MARKEWITZ:  Objection.  Hearsay.

THE COURT:  Overruled.

A   Can you repeat.

Q   You discussed on August 5, 2019 --

THE COURT:  No, no, no.  The question was you discussed with Mr. Friedlander which characters would become "series regular" in season two, correct?  That was the question.  You didn't put a date on it, and that was significant in my ruling.

MR. McGUINNESS:  Yes, your Honor.

A   So can you repeat that one more time.  Sorry.

THE COURT:  I'll put the question.  Did you discuss -- and it's a yes or no question.  Did you ever discuss with Mr. Friedlander which characters would become "series regulars" in season two?

THE WITNESS:  Can I ask a question?

THE COURT:  Go ahead.

THE WITNESS:  You said characters plural.  This email is only discussing --

THE COURT:  No, no.  The email is not in evidence.

I'm asking an independent question from your memory.

THE WITNESS:  I don't recall specifically.

THE COURT:  Okay.  That's the answer.

Q   Well, did you discuss whether the character Thomas would be a series regular in season two?

A   Based on my recollection or based on this email?

THE COURT:  Based on your recollection.

A   Not off the top of my head.

THE COURT:  You can look at this email.  It's not in evidence, but you can look at it to see if it actually jogs your memory.  If it jogs an actual memory, as opposed to just seeing what's there, then you did give your refreshed memory.  If it doesn't jog your actual memory, then the answer is I don't remember.  You understand?

THE WITNESS:  Yes.

THE COURT:  All right.  Does it jog your memory?

THE WITNESS:  I mean, it looks like something I would have been discussing with Peter, but I don't remember this specifically.

THE COURT:  No, that's not responsive.

Q   Well, would a discussion of who would be in season two inform contract negotiations?

A   Between whom?

Q   Between Netflix and the potential actor.

A   Netflix wasn't engaging the actors directly.

Q   Well, at any time were you asked for assistance in engaging actors into contracts?

A   I recall having discussions about actors and who would be series regulars.

Q   And would it inform your advice to Mr. Rinsch or Home VFX how to proceed in contract negotiations if someone was going to be a series regular in future seasons?

A   Yes.

MR. McGUINNESS:  Your Honor, based on those answers I move to admit DX-16 for effect on listener.

THE COURT:  For what?

MR. McGUINNESS:  The effect on the listener, not truth of the matter, your Honor.

THE COURT:  Okay.  I understand your point, but the objection is still sustained.

Q   There was a point at which you discussed which individuals would become series regulars and a star in season two, correct?

A   I don't recall specifically, but generally there was suggestions about which roles would be series regulars in the show.

Q   And in subsequent seasons as well, right?

A   Correct.  Yeah, that's part of being a series regular is having options for additional seasons.

Q   So you were discussing additional seasons as early as August 2019, right?

A    Can I refer to this email?

THE COURT:  No.  If the answer is I don't recall, then say I don't recall.

A    I don't recall specifically the timeframes.

MR. MARKEWITZ:  Your Honor, can we take the email down if there's going to be additional questions around it if it's not in.

Q    On September 20, 2019, Dick Kendall, Mr. Rinsch's attorney, emailed a proposal from Carl, correct?

A    I don't recall what was that -- what was presented on that specific date.

MR. McGUINNESS:  If we could show the witness what's in evidence I believe as 6343.

Q    Okay.  We looked at this email before.  Do you recognize this email?

A    Yeah, looks familiar.

Q    And this is the email where Carl is asking for additional money to continue the production, right?

A    Can you go through the other pages just to refresh my memory?  Yes, that appears to be the case.

Q    And he's presenting you with two options, right, a plan A and a plan B?

A    Do you want to point me to the language in the email.

Q    Can we go to the second page, please, third page.  So if we could call out timing, please, that paragraph.

So he's presenting two options, a plan A and a plan B, right?

A    That's what it says here, but I'm not sure what the plan A or plan B are.

Q    Well, do you recall discussions occurring in the fall of 2019 where Carl was proposing either a shorter 120-minute version or a longer expanded version of *White Horse*?

A    I remember discussions about those two versions, but I don't recall specifically the timing.

Q    I'm sorry.  You don't recall specifically what?

A    Specifically the timing of those conversations.

Q    Well, do you recall that they happened in the fall of 2019?

A    I don't recall it was the fall of 2019 or the beginning of 2020.

Q    Well, do you recall that Netflix funded the *White Horse* production $5.3 million?

A    Are you -- if you're referring to the money we advanced for the Hungarian shoot, I do recall that.

Q    And when did that happen?

A    I believe that was the end of October of 2019.

Q    And surrounding the October 2019 transfer of money, there was significant discussion about these two options, correct?

A    Yeah, I think that was part of the discussion was additional money Carl would need to complete the show.

Q    What's a negative pickup?  You can bring that down, please.

A    Generally, it's where a distributor will pay a certain amount to, you know, acquire a project that's completed.

Q    It's when a project is funded by the producer or a studio and then the purchasing company pays them back for the work they've performed, right?

A    Something along those lines.

Q    And this project was a negative pickup, right?

A    Not necessarily.

Q    You referred to it as a negative pickup, right?

A    It's a kind of a hybrid.

Q    You referred to it as a negative pickup, right?

A    I don't recall.

Q    If we could show the witness, only the witness, what's been marked as DX-30.  If we could call out that bottom paragraph, please.

         You called this project a negative pickup, right?

A    Yeah, I don't recall this email specifically.

Q    You called it a negative pickup, right?

A    I seem to be referring to it.  Yeah.  I don't even know who this email is to though.

Q    You called it a negative pickup, right?

         MR. MARKEWITZ:  Your Honor, asked and answered.

         THE COURT:  Hold on a minute.  So this email is in evidence, yes?

         MR. McGUINNESS:  No, your Honor.

MR. MARKEWITZ:  No, your Honor.

THE COURT:  No?  Sorry.  So are you offering this email?

MR. McGUINNESS:  I was just going to ask a question on it, your Honor.  I was just going to ask a question of what he stated previously.  I was not offering it yet.

THE COURT:  Well, if you're not offering it, the objection is sustained.

Q   Did you ever describe this project, *White Horse*, as a negative pickup?

MR. MARKEWITZ:  Objection.  Hearsay.

THE COURT:  It's both hearsay and in effect asked and answered.  Sustained.

Counsel, do you want to offer this or not?

MR. McGUINNESS:  Yes, your Honor.  I'll offer this as an exhibit.

MR. MARKEWITZ:  Objection.  Hearsay.

THE COURT:  Come to the sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  So a problem we've had throughout this is when these emails go on the screen, they are in such small print that even though I'm told by my ophthalmologist that my vision with my glasses is 20/20, I find them unreadable.  Do you happen to have — you will forgive a historic reference — a hard copy of this email?

MR. McGUINNESS:  I don't, but perhaps I could isolate the language even further.

THE COURT:  So this is an email -- I can't even see who it's to and from.

MR. SOWLATI:  Your Honor, we have an iPad that we can zoom in.

THE COURT:  Okay.  Great.  Thank you very much.

So this is from Mr. Posey at Netflix to the witness, Mr. Noon, Re: Pioneer.  And Mr. Noon says, hey Steve, our show *Conquest* is moving to Hungary shortly, and we'll be using Pioneer.  Carl Rinsch, our producer, is saying that he needs to sign a contract with Pioneer immediately.  This one is a negative pickup, so we are not super involved.  So that's a reference apparently to Pioneer, yes?

MR. McGUINNESS:  This one is referencing *White Horse*.

THE COURT:  That's not clear to me.  Why do you say that?

MR. McGUINNESS:  Pioneer is a production services

company, so they couldn't be a negative pickup because *White Horse* is being serviced by Pioneer. The negative pickup can only refer to the relationship between Netflix and the project, not between the project --

THE COURT: What's the relevance of any of this?

MR. McGUINNESS: Judge, this is critically relevant. We're arguing that $11.218 million was a payback pursuant to the contract, that this was a negative pickup agreement. Mr. Noon stated previously that this wasn't a negative pickup, but as you can see in contemporaneous emails, he stated affirmatively that it was a negative pickup.

THE COURT: So let me ask the government. You agree that the reference to "this one is a negative pickup" is a reference to *White Horse*?

MR. MARKEWITZ: Yes.

THE COURT: Okay. So why isn't this admissible as a prior inconsistent statement?

MR. MARKEWITZ: I believe Mr. Noon said it did not quite appear a negative pickup.

THE COURT: I'm sorry.

MR. MARKEWITZ: I believe Mr. Noon said it was partly -- essentially partially a negative pickup, but did not a pure negative pickup deal. He said that it was sort of slightly more complicated than that. And then when he was asked if he referred to it as a negative pickup before, he did

not say no.  He said I simply cannot recall.

THE COURT:  I know he can't recall.  That's why this would otherwise be inadmissible as hearsay, even though it's his statement because of the out-of-court statement.  But it's being offered here as a prior inconsistent statement.

MR. MARKEWITZ:  Well, I think even if it's offered then, your Honor, then it would need to be just that line.  The remainder of it would all be hearsay.

THE COURT:  Well, that's okay.  But do you care about the remainder?

MR. MARKEWITZ:  I'd have to look at it again, your Honor.

THE COURT:  Yes.

MR. MARKEWITZ:  The top two messages, your Honor.

MR. McGUINNESS:  You want those redacted out?

MR. MARKEWITZ:  Yes.

MR. McGUINNESS:  Okay.

THE COURT:  Hopefully he's coming to his senses --

MR. MARKEWITZ:  And the one right below that.

THE COURT:  Who is that a reference to?

MR. McGUINNESS:  My client, Judge.

THE COURT:  I see.  Okay.  So do you have any objection to deleting those two?

MR. McGUINNESS:  No objection, your Honor.

THE COURT:  So we'll delete those two.

(In open court; jury present)

THE COURT:  So ladies and gentlemen, why do we have these sidebars?  It's not just so we can have some exercise. It's so that I can hear testimony that has not yet been offered, to see whether it's admissible or not.  We don't do this for every little item.  But if there's an item that the parties feel is sufficiently important, they need to give me a sort of forecast of what the further testimony will be, obviously, you can't hear that testimony until I've ruled whether it's admissible or not.  So we do all that at the sidebar.  So forgive that interruption.  We'll try to keep those to a minimum.

As redacted, the exhibit is received.

(Defendant's Exhibit 30 received in evidence)

BY MR. McGUINNESS:

Q   We're going to come back to this later.

We were just discussing a minute ago the discussions around the two different versions Carl was offering.  And as a response to that, Netflix offered some proposed script edits. Do you recall that?

A   I don't -- there were more than -- there were multiple versions that were discussed, so I don't know which ones you're specifically referring to.

Q   If we could pull up GX-6344, please.  That's in evidence. We can publish it.

Do you recall this email that you looked at yesterday?

A   I don't recall looking at this email yesterday, but it looks familiar.

Q   Okay.  Can we go to the next page, please.  I'm sorry.  Can we go back to the first page.

This is an email from you, right?

A   Yeah, it appears to be.

Q   And you're sending it to Carl?

A   Yes, and copying several other people.

Q   And it's October 9, 2019?

A   Yes.

Q   Okay.  If we can go to the second page and if we can call out where it says Mexico.

Okay.  You see where it says Mexico, cut entire Mexico shoot and use existing footage to open show?

A   I see that.

Q   What does that mean?

A   Can you go back to the prior page just so I understand the context?

Q   Sure.  If you'd like anything enlarged, please just let me know.

A   I think at this point Carl was requesting funds to shoot the script that existed at that time, which was about 203 pages, and we were suggesting things that we'd be okay with not having in that 203-page script.

Q    I'm sorry.  I missed the last part of that.

A    We were suggesting potential scenes that Netflix didn't necessarily think had to be in the 203-page script, if Carl wanted to remove them.

Q    Thank you.  Could we go to the second page again, please, Ms. Tang, and call out that Mexico portion.  Okay.

So could you explain what this Mexico, cut the entire Mexico shoot and use existing footage to open show, what did that mean?

A    I don't recall specifically.  But there was a shoot that was planned to happen in Mexico, and this seems to refer to that footage not necessarily being needed, and then you don't have to shoot in Mexico.

Q    The Mexico shoots were added from the original script to the revised script, right?

A    I don't know.

Q    Well, do you remember the first episode of the show originally took place in an auction house?

MR. MARKEWITZ:  Objection.  Foundation.

THE COURT:  Do you remember where the first episode of the show took place?

THE WITNESS:  I recall the scene he's referring to.  I don't recall where it was in the show.

THE COURT:  Okay.

Q    Do you recall how the show opened?

A    I recall that scene and feel like it may have been the first scene that was presented to us, but I don't know where it was in the scripts that we were given subsequent to that.

Q    The expanded script added an entire location of Mexico into the first episode, correct?

A    I don't know.

Q    Did you read the expanded script?

         MR. MARKEWITZ:  Objection.  Form.

         MR. McGUINNESS:  I can rephrase, your Honor.

Q    Did you read the 203-page script?

A    I may have read parts.  I don't recall if I read the entire thing or even parts of it.

Q    Were these changes that you're recommending in this email coming from yourself or others?

A    From others.

Q    And why were you the one emailing it to Carl?

A    Can you open the email, the rest?  I think because it was part of the discussions around the schedule and the budget that we were trying to solve with Carl.

Q    And were you the lead negotiator at this point for additional funds?

A    Yeah, I would say so.  Probably.

Q    And this email generally is suggesting a number of cuts to various locations, right?

A    It appears to be, yeah.

Q   And is it fair to say that despite these many cuts, it would maintain the same story?

A   I mean that's not for me to ascertain.  I'm the distance guy, not the creative person.

Q   Okay.  We can take that down.

So this negotiation continued into October when you were discussing the longer and the shorter version of the show, right?

A   That appears to be the case.

Q   Well, you were the lead negotiator.  Was that the case?

A   Again, that email reminds me of the timeframe, so that sounds right.  But I don't specifically myself remember the dates.

Q   Well, you recall sending the $5.3 million at the end of October, you said, right?

A   Yeah.  But that didn't have anything to do with the larger or shorter version of the script.

Q   Well, all leading up to that -- well, withdrawn.

That prior email we just saw was discussing how to do the 203-page script versus the 160-page script, right?

A   Do you want to bring it back up?

Q   Sure.  Can we show 6344 again, please.  Okay.  If we can call out that second paragraph, please.  Sorry, the one below that.

A   Do you want to repeat the question?

Q   These conversations you were having about script edits, that was in relation to the 203-page script versus the 160-page script, right?

A   Yeah.  That appears to be the case.

Q   And there were many conversations you were having or -- withdrawn.

There were many emails exchanged with Carl about his plan A option to do a shorter version and his plan B option to do the full 203-page script, right?

A   There were emails about that as well, but I don't know that those two things equate to 203 pages and 160 pages.

Q   Well, there was a longer version which was based on the 203-page script and a shorter version, correct?

A   Again, Carl proposed a shorter version.  I don't know how that shorter version relates to the 160-page script.

Q   Okay.  And eventually you did transmit $5.3 million to continue funding the project, right?

A   Yeah, at the end of October.

Q   We can bring that email down, please.

And eventually Mr. Rinsch sent you a proposal on October 26, 2019 through his attorney, right?

A   I don't recall the specific date if you want to show it to me.

Q   If we can bring up DX-39, please, just for the witness.  If we can call out that middle portion, please.

A    Was there a question?  Sorry.

Q    My question is you received an offer from Dick Kendall on behalf of Carl Rinsch on October 25, 2019, correct?

A    That appears to be the case in this email.

Q    Defense offers DX-39 into evidence?

MR. MARKEWITZ:  Your Honor, the government would just object to language in the last paragraph under Rule 401 and 403, but we're otherwise fine with the exhibit.

THE COURT:  Any problem with redacting this, defense counsel?

MR. McGUINNESS:  No problem, your Honor.

THE COURT:  All right.  So received as redacted.

(Defendant's Exhibit 39 received in evidence)

MR. McGUINNESS:  Ms. Tang, could you call out that section without that final paragraph being visible, please.  If you're able to do that, we can publish to the jury.  Thank you.

Q    So this email we're looking at is the email from Richard Kendall to yourself negotiating additional money for the project in October 25, 2019, right?

A    That appears to be the case.

Q    And beginning with that paragraph, alternatively, Mr. Kendall is also discussing a longer and a shorter version of the project, correct?

A    Give me a second.  Yeah.  There seems to be a 203-page script and then a discussion around Carl being able to remove

25 pages from something.

Q   And in order to give the longer script, he needs $12.2 million, right?

A   Just a second.  That seems to be what he's asking for here.

Q   And he's specific that this would be over and above the term sheet budget, right?

A   Yeah.  That seems to be what he's asking for.

Q   Okay.  We can take that down.

Now, you testified that you wrote an email to Mr. Kendall that you would accelerate 5.3 million of our next installment.  Do you recall that?

A   Yeah.  From yesterday, yes.

Q   And you said there was no disagreement with that, right?

A   What's that?

Q   You said there was no disagreement with the email you sent stating you would accelerate 5.3 million of our next installment?

A   I believe what I said was I don't recall there being a disagreement from Carl or Dick.

Q   And in fact, there was no agreement to that, correct?

A   I'm sorry.  I don't know what you mean.

Q   Well, Mr. Kendall never responded yes, agreed, or anything of that nature, right?

A   I don't recall.

Q   And Mr. Rinsch never responded yes, agreed, or anything

like that, correct?

A    I don't recall.

Q    In fact, no one ever agreed to those terms that $5.3 million was going to be an advance on the installment after that email, right?

A    I don't recall.

Q    You sent that email and just assumed that they were going to go along with it, right?

A    I don't recall.

Q    If we could bring up what's in evidence as 6347.  So this is the email I was just talking about.  And if we can go to the following page.  And this is in evidence.

Who wrote this on the second page?

A    I believe this is something from Carl.

Q    This was Carl's proposal, right?

A    I believe so.

Q    And nowhere in here does Carl discuss an advancement on an installment, right?

A    I don't know if this is the entirety of what he sent.

Q    We can go through every page and give you time to read it, if you'd like.

A    Do you want me to do that?

Q    If you don't recall.

A    I don't recall.

Q    I'd be happy if you did.  Thank you.

A    Well, can you go back to the first page.  Sorry.  The first page of Carl's -- yeah, it doesn't really refer to what the money is, whether it's an extra-contractual amount for an advance.

Q    Okay.  We can take that down.  And right about the time you advanced the $5.3 million in your words, you also sought --withdrawn.

On October 31, 2019, you discussed writing down *White Horse*, right?

A    I don't recall.

Q    Well, do you recall asking anyone at Netflix whether Netflix could absorb writing down *White Horse* in that quarter?

A    Sorry.  What was the date?

Q    In October of 2019.

A    I don't recall.

Q    If we could show the witness DX-40, just the witness, please.

A    Is there a question?

Q    Yes.  Do you recall asking someone at Netflix whether Netflix could absorb writing down *White Horse* at that time?

A    Yeah, this looks familiar.

Q    That wasn't my question.  My question was do you recall asking anyone at Netflix whether Netflix could absorb a write-down of *White Horse* in that quarter?

A    I don't recall.  But I've now seen this email, which looks

familiar.

Q   Let's take the email down for a second.  Did you ask someone at Netflix whether they could absorb writing down *White Horse* in that quarter?

A   Based on that email, it seems that I did.

        MR. MARKEWITZ:  Your Honor, objection.

        THE COURT:  Well, I think that objection was effectively waived given the previous questions and answers.  Overruled.

Q   What is a write-down?

A   It's when a company feels that the money they've invested and they're carrying on their balance sheet may not be fully realized in either revenue or some other way.

Q   It what are the tax implications of a write-down.

A   I don't know.

Q   Do you know generally?

A   No.

        THE COURT:  Sustained.  It's a legal question.  It's only for the Court.

Q   If we could bring up GX-6351.

        Do you recall reviewing this document yesterday?

A   Could you zoom in.

Q   Which part?

A   Just the top part.  It's a little small on my screen.  Yeah, this lookings familiar.

Q   Okay.  And this was the email where Carl was giving a proposal on financing to move forward, right?

MR. MARKEWITZ:  Objection.  Form.

THE COURT:  Is that your understanding?

THE WITNESS:  Sorry.  Can you repeat the question.

THE COURT:  The question he put was and this was an email where Carl was giving a proposal on financing to move forward, right?  And there was an objection.  And I'm saying I'm modifying the question to say was that your understanding of what Carl was proposing?

THE WITNESS:  Yeah, Carl seemed to be proposing a go-forward plan for the project.

Q   Now, following that email, Carl informed you via email that principal photography was done and that he was owed $11.218 million, right?

A   Apologies.  Where -- when is this and what are you referring to?

Q   Following that email, there was a different email sent where Carl said principal photography is completed and $11.218 million is owed, right?

A    I don't recall the sequencing vis-à-vis that email.

Q   If we can bring up 6352 just for the witness.  And go to the next page, please.  Okay.

Does that refresh your recollection that Carl sent you a message on February 4, 2020 stating that --

THE COURT: No, if it's for refreshing recollection, you cannot quote it. You know that, counsel.

Q Does that refresh your recollection as to when Carl -- does that refresh your recollection?

A Can you go back to the prior page of the email. Yes.

Q And Carl emailed you on February 4, 2020 and told you that principal photography was completed, correct?

A I didn't see that in the email, what you just showed me.

Q When Carl told you principal photography was completed, he stated that $11.218 million was due, right?

A Again, I don't know what -- I can't see that email any more to see if that was part of that email.

THE COURT: The answer is you don't recall, if I understand your answer.

THE WITNESS: I don't recall the specific timing of that request.

Q Well, do you recall any time in February of 2020 when Carl stated that he was owed $11.218 million because principal photography was completed?

THE COURT: Sustained. Compound.

Q Carl requested $11.218 million in February 2020, correct?

THE COURT: Sustained. Compound.

Counsel, maybe we should have a sidebar.

MR. McGUINNESS: It's okay, Judge. I'll rephrase.

Q Carl requested $11.218 million, right?

THE COURT: At some point, any point.

A    At some point I recall him requesting that.

Q    And he did that in February 2020, right?

A    I don't recall the specific timing.

Q    And he asked for the $11.218 million because he said he was completed with principal photography, right?

A    That sounds familiar.

Q    And you had discussions with his attorney Dick Kendall as well, right?

A    I had many discussions with Dick Kendall. Is there something specific you're referring to?

Q    In February 2020 you had discussions with Dick Kendall?

A    Yeah, I recall discussions around that timeframe.

Q    And the discussions were about the same topic, whether Carl had completed principal photography, right?

A    There were discussions around that. I don't remember the specific timing of those specific discussions.

Q    Well, do you recall having discussions with Mr. Kendall in which Mr. Kendall said my client has completed principal photography?

A    I don't recall specifically if that came from Dick or from Carl.

Q    If we can bring up DX-50, please.

THE COURT: This is in evidence?

MR. McGUINNESS: This is not in evidence. This is

357
PC4JRIN1                    Noon - Cross

just for the witness. And the defense would move to admit.

MR. MARKEWITZ: Just one moment, your Honor. Your Honor, we're fine admitting it purely as a statement and negotiations, not for the truth.

THE COURT: That's what you're offering it for?

MR. McGUINNESS: Yes, your Honor. Exactly.

THE COURT: All right. With that reservation, it's received.

(Defendant's Exhibit 50 received in evidence)

MR. McGUINNESS: If we could clear the dots off of the screen. I'm not entirely sure how to do that. Apologize.

THE COURT: I think it has to be done up here, but why don't you proceed and we'll handle it at the break.

MR. McGUINNESS: Okay. Thank you.

Q   All right. So we looked at a version of this email yesterday. Right. Let me rephrase. Sorry.

We looked at this email chain excluding this top part, this most recent message, yesterday, right?

A   I don't recall specifically.

Q   Well, let's go down to the first message in this chain, all the way to the back, please. Okay.

So on February 27, 2020, you're making a proposal to Carl's attorney, Dick Kendall, right?

A   Yeah, that appears to be the case.

Q   Okay. Go back to the full page for a second. Okay. And

if we could see the previous page side by side with this and call it out so that it is readable as one message. All right.

So this is Richard Kendall's response, right?

A   Yeah, it appears to be.

Q   And his position is that Netflix owes Carl $11.218 million, right?

A   Something changed.

THE COURT:  Let's get it back.  That was not -- we haven't gotten back the paragraph that we were looking at. There we go.

THE WITNESS:  Can you repeat.

THE COURT:  He's asking what did you understand from this was Mr. Rinsch's position.

THE WITNESS:  Well, this specific email doesn't really state what his position is.

THE COURT:  Okay.  That's the answer.

Q   When Mr. Kendall states, if Netflix pays the $11.218 million installment, what did you understand that to refer to?

A   Well, I think the 11.218 installment -- I think Dick is referring to the installment in the agreement for that amount.

Q   And please remind us that amount, that installment was due when?

A   If I recall, it was based on completion of principal photography.

Q   And Mr. Rinsch had communicated to Netflix that he had completed principal photography, correct?

A   I don't think it says it here, but I recall he claimed to have -- that it was due.  I don't recall the exact wording.

Q   And he states that he does not think Carl will change his mind on this.  What did you understand that to mean, if anything?

A   Just what it says on the page.

Q   And final question on this, he states I think I have already -- sorry.  I'll back up a bit.  I will be happy to discuss his reasoning with you, but I think I have already shared it with you several times.  Now, what was he referring to -- if you know, what was your understanding of what he was referring to when he said he had spoken to you about this several times?

A   Yeah, I don't recall.

Q   Well, do you recall speaking with him several times about this?

            THE COURT:  What is "this"?

Q   About Carl's reasoning on this.

A   I don't recall.

Q   Okay.  If we can take down the call outs.

            Okay.  And then the response message you send, would you agree with me, if we call that out just briefly, this is your disputing that $11.218 million is due, correct?

A    That appears to be the case here.

Q    Okay.  If we could take that down and just call out the final message in this.

And here, Mr. Kendall, he responds to your response and he's requesting an explanation of the basis for your statement below that the next installment is not yet due.  What did you understand him to be asking for there?

A    Just what it says on the page.

Q    He states principal photography has been completed and Netflix has been duly notified.  When you read this, were you confused?

A    Confused about what?

Q    Well, was this the first time you were learning that Mr. Rinsch had stated that principal photography had been completed?

A    I don't recall the sequencing of being notified of that.

Q    But at this point did you understand that he was asking for $11.218 million because he is stating he completed principal photography and that is what he's owed under the contract?

MR. MARKEWITZ:  Objection.  Compound.

THE COURT:  Yes.  Sustained.

Excuse me.  Just so the jury is clear, this exhibit was admitted to show what the state of negotiations were, not for its truth.  This is not, for example, proof of whether or not Mr. Rinsch had in fact completed the photography.  That's a

separate question. This is just to explain the negotiations that were going on. Go ahead, counsel.

Q Did you understand from this response now why Mr. Rinsch believed he was entitled to $11.21 million?

THE COURT: Sustained.

MR. MARKEWITZ: Objection. Form.

THE COURT: Calls for the operations of someone else's mind.

Q Okay. We can take that down. If we could bring up GX-6358. And if we could go to page 5, please.

THE COURT: Counsel, just so the jury and the record is clear, when you introduce exhibits, state whether or not it's already in evidence.

MR. McGUINNESS: Yes. I apologize, your Honor. This is in evidence.

Q Okay. If we could just call out that final message up until the bullet points. You write here based on Cindy and Carl's discussions. What discussions were those?

A I don't recall specifically.

Q And your proposal is to give Carl $11 million here, right?

A I wouldn't use the word "give", but we'd fund $11 million for the production.

Q And you state that he shall use the 11 million to fund the following over a five-week period, right?

A That's what it says.

Q   You stated yesterday that this language, such funding shall not represent an acknowledgment of any of the contractual milestones, was inserted because the parties had different opinions, right?

A   Yeah.  I think we had a -- we did not necessarily agree on which contractual milestones had or had not been met at this point.

Q   Well, specifically the completion of principal photography was a disagreement between the parties, right?

A   Yeah, I think we had a different point of view.  Sorry.  I would rephrase that.  I think -- I don't know what Carl and Dick believed, but they were taking a position that I don't think we agreed with.

Q   Okay.  If we can call out the message above this.  So this is Mr. Kendall's response to the proposal you've just put in, and he states that nothing in this will alter HVFX's obligations under the November 12, 2018 term sheet.  Did you have an understanding of what he meant by that?

A   Generally it's what it says there.  I don't know specifically what he was referring to, but it's a general statement.

Q   Okay.  It wouldn't change the obligations of any of the parties under the term sheet, right?

A   I don't know what he intended by that language.

Q   Okay.  Let's look at the response above.  This is the

message where Carl is stating that there's some sort of tax significance associated with calling the $11 million first "season production costs."  Did you have any understanding of what that meant?

A   Beyond what's in the email, not necessarily.

Q   Did you do any followup with Carl or Cindy to find out what in the world he meant by that?

A   I don't recall.

Q   If we could go to the next message above.

Okay.  This is where you say slight tweak to make sure we're on the same page about all funding to date.  What did you mean about by "funding to date"?

A   Basically how the funding was being treated vis-à-vis the term sheet.

Q   So did you mean funding to date, the funding that had occurred up until that point?

A   I don't recall specifically.

Q   You don't remember if "funding to date" meant funding up until now?

A   Well, that's generally what the term means.

Q   Okay.  And you had funded in October of 2019 5.3 million to *White Horse*, right?

A   Yes, per the prior emails.

Q   And Carl had previously characterized that amount as 6 million, right?

A    I don't recall.

Q    If we could bring up GX-49 just for the witness.  This is not in evidence.  If we could call out that two-paragraph message.  Directing your attention to the second paragraph.

A    Is there a question?

Q    Yes.  Does that refresh your recollection that the amount of money that had already been sent to *White Horse* had been characterized as $6 million?

        MR. MARKEWITZ:  Objection.  Hearsay.

        THE COURT:  Sustained.

Q    If we could take down the call out.

        This document is an exchange between yourself and Cindy Holland, right?

A    Yeah, with CC'd to other participants at Netflix.

        MR. McGUINNESS:  Defense offers DX-49.

        MR. MARKEWITZ:  Objection.  Hearsay.

        THE COURT:  Sustained.

        MR. McGUINNESS:  Judge, could we have a brief sidebar?

        THE COURT:  Sure.

        (Continued on next page)

(At sidebar)

THE COURT:  Before we get to the issue at hand, I want to remind defense counsel that when you put a question and the witness says he doesn't recall, you can show him any document you want to try to refresh his recollection.  But the only proper question then is "does this refresh your recollection?"  To say instead, does this refresh your recollection that you said to so-and-so such-and-such is plainly just reading from the document not in evidence — and you have done that in one way or another repeatedly — if you do it again, we will have to consider some more severe remedy.  Understood?

MR. McGUINNESS:  Understood, Judge.

THE COURT:  All right.  Now, you wanted to make a argument why this is admissible?

MR. McGUINNESS:  Yes, Judge.  The critical part of this document is that it discussed $6 million of funding to date.  This is in the final agreement language.  I believe it goes to state of mind.  It goes to the state of mind of Mr. Rinsch, and it goes to state of mind of Mr. Noon as well.  And --

THE COURT:  What is their state of mind relevant to?

MR. McGUINNESS:  Their state of mind is relevant to my client's intent because he's responding to what they're stating --

THE COURT:  No, this is something that has been I

think a problem for some days now.  The state of mind of other people such as various Netflix people is not an element of this case, so the objection is sustained.

MR. McGUINNESS:  May I just note it's also being offered not for the truth of the matter.  In fact, $6 million was not given, that there is no --

THE COURT:  I have allowed with some limitations, I have allowed some things to be offered for its truth.  But there were things that went to Mr. Rinsch's state of mind such as the last exhibit that came in under that rubric involving the negotiations by his lawyer with Netflix.  That arguably goes to Mr. Rinsch's state of mind, although I think it gets carried away.  But the state of mind of Netflix is neither here nor there.  Sustained.

(Continued on next page)

(In open court; jury present)

THE COURT:  Thank you very much.  Probably this is a good time to take our midmorning break anyway, so why don't we take a 15-minute break at this time.

(Jury and witness not present)

THE COURT:  Please be seated.  I just want to flag — we don't need to discuss it now, but I just want to flag I don't think the cases that the government counsel quoted on their request to charge that mail fraud can be or wire fraud in this case can be a scheme for obtaining or retaining property is supported by those cases.  But I think what I need is further elucidation by what the government means by "retaining."

Do you mean if someone received money for a legitimate purpose and then converted it to his personal purpose, that might be obtaining money rather than retaining in any sense relevant to the construction of the statute?  But I'm not quite sure what the significance of any of this is.  I thought that the government's position was that when the defendant sought the 11 million-or-so extra dollars, he at that very moment wanted it for his personal purposes, not for the purposes represented.  That would be classic obtaining money by means of false and fraudulent pretenses, representations, or promises.

If instead the government is saying that even if the jury doesn't accept that, they can still convict him if at some

point, having obtained the money legitimately with true representations, he makes further false representations in order that he can continue to pocket the money. That's an interesting question. I think there is some case law going both ways on that question. But I don't think the cases you cited really address that. So if that's your theory, we need to look at other cases.

MR. MARKEWITZ: Your Honor, just to be clear for the record, the government's theory is that he had the fraudulent intent when he gets the money. But we are also saying that even if he did not and after the fact he then converts the money to personal use and then is making false statements to lull the victim and to hide what he's doing in order to keep them from learning the truth and enforcing their rights --

THE COURT: Lulling is always -- you know, the government can always introduce additional false statements to show lulling. That's been true for 50 years at least. But that's different from saying that the obtaining of the money was obtained by false statements. So the distinction I thought you were making — but if it's not an issue, I don't have to research it. If the government's position is he used false statements, intentionally false statements, to obtain the $11 million from the outset, the fact that he made further false statements later on to lull the victims into believing he was really doing what he said he would do but he never intended

to do, that would be classic lulling. That would be permissible.

But that's because it just a further execution of the scheme, but it has to be still predicated on he obtained the money initially through false representations. If instead the government's position is that even if the jury were not to find that we had shown -- that the government had shown that he initially obtained the money through false representations, they could still convict because he made further false statements that allowed him to convert the money that he had otherwise obtained legitimately to his own pocket, that would be the issue that would raise this "retaining" matter, but now I'm not hearing you saying that --

MR. MARKEWITZ: To clarify, your Honor, the government is saying that either would be sufficient to convict Mr. Rinsch if the jury finds either that he had the fraudulent intent at the time he received the money, sort of the traditional obtaining and there was a line order to obtain the money in the first instance, we are certainly proceeding on that theory.

The government is saying though that our theory is broader and encompasses the alternative situation where even if the jury does not conclude he had fraudulent intent on March 6 when the money is paid, if he then pockets it, misuses it, embezzles it, then makes false statements to the victim in order to lie about what he is doing to hide the fact that he

has pocketed the money and misused it under the terms of their contract and thereby prevents them from exercising their contractual rights in order to get the money back, that that would also be wire fraud. And I think it is -- I understand that your Honor --

THE COURT: That's different. that's the issue then that I think we need to look more into the case law, but that's not lulling.

MR. MARKEWITZ: Understood. It sort of -- I guess what I'm describing, your Honor, is the nature of the fraudulent statement in that situation would look similar to lulling. But I absolutely take your Honor's point. It is not lulling with a defined term, capital L. We would appreciate, your Honor, the opportunity to brief this further if you're not convinced by these cases. I do think the cases support this, but we would like to brief the issue further if your Honor's not convinced at this moment.

(Continued on next page)

PC4Frin2

THE COURT: (Continued) Then that would be very appreciated.

And I don't say you're wrong. I think what you're saying has a certain common sense appeal. It's not technically, I think, embezzlement, but it's akin to embezzlement. It's not embezzlement because embezzlement involves money skimmed to you in our company capacity and then you convert it to your personal use.

MR. MARKEWITZ: Correct.

THE COURT: But it is a similar kind of concept.

My recollection is that this kind of issue sometimes comes up in the context of, one enters into a contract and with no fraudulent intent -- or, at least, no proven fraudulent intent or misstatements -- and then changes into a fraudulent situation.

And the question, then, is, there was a common law doctrine -- that I'm only vaguely remembering -- that says that under the common law, which the mail fraud and wire fraud statutes, in effect, adopt by reference, you couldn't bring a separate fraud claim in that situation.

I think the common law is wrong in that regard, but I think I have a vague recollection that there's a Second Circuit decision in -- I think it's written by Judge Wesley, and it involves the situation where, in connection with the mortgage-backed securities, Citibank was providing Fannie Mae

PC4Frin2

with mortgages and interest in mortgage pools that were originally backed by legitimate mortgages, AAA mortgages, and eventually consisted with the way that whole mortgage-backed security crisis developed. They started giving them junk. they were still mortgages but they were really, as the phrase went, liar's loans.

And if I remember correctly, the person at Citibank who was responsible -- I have this only as a vague memory, but someone was indicted and the Second Circuit held either -- that shows how weak my memory is -- either that under the common law, a breach of contract that gets transformed into an alleged fraud cannot support a mail fraud/wire fraud statute, because of the common law doctrine that prohibited fraud except for when it was at the outset or maybe just said that the instructions of the Court did not present the more nuanced issue.

So I'm not sure whether that case is helpful or harmful, but I know it has been addressed is my point, and so let's look into that.

MR. MARKEWITZ: Understand, your Honor.

And I think, sort of, the government's position is that in Porcelli it makes clear -- and there was obviously other cases; this is just one example -- that the idea of tax evasion can be prosecuted under the wire fraud statute even though the money that was not being paid could be obtained

lawfully; it's merely retaining the money and not giving it to somebody who has the property right and interest in it, in this case, the IRS.

THE COURT: I read Porcelli. The real focus on Porcelli -- even though I understand how you're interpreting it and it's not an impossible interpretation -- but the issue that was being directly addressed was whether the Hobbs Act analogy and language that applied should be also applicable to the mail fraud statute.

So, I don't think the Court was focusing -- the facts may support -- let me -- I don't want to take everyone's break time. Why don't we just hold off on this until later this afternoon.

MR. MARKEWITZ: Okay. Yes, your Honor.

THE COURT: We'll take a short break.

(Recess)

MR. ZEMAN: Ms. Tang, if you could bring back up 6358, which is in evidence. If we could go back to where we were, next page. Following page, please.

BY MR. ZEMAN:

Q. So, for the callout, that message again, beginning: slight tweak.

You're discussing the funding to date, and you referenced $6 million. Where did that $6 million come from, that number?

A.   I don't recall.

MR. ZEMAN:  You could take that callout down.  And then if we could have the previous page and this page to put together Mr. Kendalls response on one screen.

Mr. Kendall writes:  Now you have confused me.  This won't work.  The bottom line after this exchange has to be, Netflix pays 11 million now; no agreement is reached on phase due in five weeks; Carl will deliver the contractually required 100 to 120-page deliverable; Netflix will owe the final instatement amount of 218,000; Carl will have -- -sorry -- Netflix will have no argument that it has overpaid for that deliverable and will have no recourse against Carl to recover the 6 million; and Carl retains the final cut.

When Mr. Kendall wrote:  Netflix will owe the final installment payment amount of $218,000, what did you understand that to mean?

A.   I don't recall, other than what's in this email.

Q.   Mr. Kendall and Mr. Rinsch had previously stated to you in these negotiations that Mr. Rinsch was owed $11.218 million; correct?

A.   I believe they said that somewhere.  I don't know, in relation to this email, if it was before or after.

Q.   Okay.  The date of this email is March 5, 2020.  Before this time period, in the conversations that took place in February 2020, Mr. Kendall and Mr. Rinsch stated that

Mr. Rinsch was owed $11.218 million; right?

A.  I don't recall the timing off the top of my head, but if you want to bring up those emails.

MR. ZEMAN:  If we could bring up the document that's in evidence as 6352, please.  If we could go to -- well, before we do that, could we call out the date of this.

Who is this email from?

A.  From Carl to me.

Q.  And what's the date?

A.  February 4.

MR. ZEMAN:  Go to the next page, please.  Okay.  If we could call out that fourth paragraph, please.

A.  I see that.

Q.  Do you see where it says:  Principal photography is to be considered complete?

A.  I see that.

Q.  Do you see the request that says:  Please process the contracted installment of $11.218 million?

A.  Yes, I see that.

Q.  Okay.  If we could go back to the email chain we were on, GX 6358, which is in evidence.  In this proposal from Mr. Kendall on March 5, 2020, he is asking for $11 million now; right?

A.  I see that, yes.

Q.  And he says the next -- and the final installment payment

will be 218,000?

A.   I see that.

Q.   And prior to this, Mr. Kendall and Mr. Rinsch had stated that $11.218 million was owed to him because he completed principal photography; right?

A.   In that prior email, yes.

Q.   And in fact, that was the subject of many discussions you had in February 2020 with Mr. Rinsch and with Mr. Kendall; right?

A.   Again, I don't -- off the top of my head, I don't recall the sequencing and dates of specific discussions.

Q.   And your testimony is, you don't recall what that $218,000 refers to?

A.   No, that's not my testimony.  You were asking me about a timeline.

Q.   Do you recall what that $218,000 refers to?

A.   Well, it's a little confusing because he says, Netflix will owe the final installment payment.  But I don't think that was the final installment payment under the contract.  Maybe it's just a word choice that was wrong.

         And I guess he's saying that $218,000 remaining on that 11.218 was due, so I don't know if he's now saying the principal photography is not done because they're not asking for 11.218 or if he's planning to finish between then and when the 218 is due.

Q.   Well, he's asking for $11 million; right?

A.   Yes.

Q.   And he's asking for .218 as the final installment, right?

A.   That's what this says.

          MR. ZEMAN:  Can we get the next message, please?

          Actually, and if we could go to the first page, I believe.  Okay.

Q.   This is the final proposal you make back that is agreed to; right?

A.   I don't know if that's the final, but it's a response.

Q.   Okay.  Could we take out the callout and look above it. And could we call out the message right below that again, please.

A.   I'm sorry, was there something you wanted me to read on that prior one?

Q.   Yes.  Yes.

          In fact, I'm showing you the entire message, because my question is that this message you sent at 5:40 p.m., that was the final proposal you made; right?

A.   Again, final in terms of final forever, I don't know.  But in this email chain, there appears to be an additional email that follows it.

Q.   Okay.

          MR. ZEMAN:  So please, Ms. Tang, if we could show him the email that follows it.

Q.   Have you had a chance to read that?

A.   Yes.

Q.   So, the 5:40 p.m. email you make is the proposal you make that is accepted; right?

A.   Again, now you're asking me a new question.

Can you go back to the top of the email?

Q.   Okay.  Let's show him the top of the email again, please, Ms. Tang.

A.   Yeah, Dick seems to agree to that.

Q.   Okay.  So if we can go back to the proposal on the bottom, this is the last proposal in this negotiation that you made; right?

A.   Again, you're using words like "last" and "final," and I don't know if you're talking about the entirety of the project or if you're just being specific to this particular email chain.

Q.   This is the last proposal you made related to the transfer of $11 million to Carl Rinsch in March of 2020; correct?

A.   This appears to be the last proposal I made on this email chain.

Q.   Well, do you know if there's another email chain?

A.   I don't know off the top of my head.

Q.   You think there might have been a different agreement other than this one?

A.   I don't know off the top of my head if it ever was revised.

PC4Frin2                          Noon - Cross

Q.  You don't know if you had an entirely separate email chain, other than this one, in which different agreements were made by the parties?

A.  Well, now you're stipulating it being via on email chain.

Q.  No.  I'm asking you, was there a separate email chain where other agreements were made between the parties?

A.  I don't recall one.

Q.  Was there a phone conversation there are separate agreements made by the parties?

A.  I don't recall.

Q.  Did you consider this proposal and the acceptance of it by Mr. Kendall to be binding on the parties?

            MR. MARKEWITZ:  Objection, calls for a legal conclusion.

            THE COURT:  Sustained.

Q.  Did you authorize a transfer of the $11 million to Mr. Rinsch?

A.  I don't know.  I didn't work in finance, so I don't know that I would authorize it.

Q.  Did you have any contact with someone telling them that they should go forward with an $11 million transfer to Mr. Rinsch?

A.  I don't recall specifically, but I believe there were conversations about being able to do a transfer.

Q.  And in authorizing that transfer, did you rely on this

email chain?

A.   Again, I'm not in finance, so I wouldn't use the word "authorize."

Q.   So, in this email, you write back to Mr. Kendall.  You state that you were going to have Netflix pay 11 million now; right?

A.   I see that.

Q.   And you state that Netflix will owe the outstanding $218,000 for the applicable installment.  What does that mean?

A.   I think it just means, the rest of the balance for whatever the next, the applicable installment would have been.

Q.   Okay.  And what would that have been?

A.   I think it would have been the remainder of the 11.218.  That seems to be what it refers to, but I'm not totally certain.

Q.   This is an email you sent; right?

A.   Yes.

Q.   So, again, going back to February 4, 2020, Mr. Rinsch and his attorney, Mr. Kendall, have been asking for $11.218 million for completing principal photography; right?

A.   I think that's what that last --

Q.   And now your proposal is to give the $11 million with 2.8 coming later; right?

A.   That seems to be the case.

Q.   And below that, you state that Netflix agrees that the

PC4Frin2                         Noon - Cross

$6 million of Netflix's funding to date is an approved overage

over and above the contractually-required amount.

What does an approved overage over and above the

contractually-required amount mean?

A.   Meaning that we expected that the contractual amounts were

$61 million and at the end of the production, it would be more

like $67 million.

Q.   And then finally, it's agreed that Carl retains his final

cut, right?

A.   I see that, yes.

Q.   If we could go back to --

A.   Well, I would clarify that this particular payment will not

be divesting him of that.

Q.   Thank you.

MR. ZEMAN:  If we could go back to defense exhibit

30, please.  This is now in evidence and you can publish to the

jury, please.  And if we can call out the paragraph that

starts:  Hey, Steve.

Q.   Who is this email from?

A.   It will seems to be from me.

Q.   And this is from September 21, 2019; right?

A.   Yes, that appears to be the date.

Q.   And this is discussing White Horse; right?

A.   I believe so, yeah.  I called it Conquest, but it's the

same project.

Q.  And could you read that sentence beginning:  This one, in the second line?

A.  This one is a negative pickup, so we're not super involved.

MR. ZEMAN:  You can take down that exhibit.

If I could just have one second?

(Counsel conferred)

MR. ZEMAN:  Nothing further.  Thank you.

THE COURT:  Redirect.

MR. MARKEWITZ:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MR. MARKEWITZ:

MR. MARKEWITZ:  Ms. Larracuente, can you please pull up, on one side of the screen, Government Exhibit 6358, and can you go to page 5 for me, please.

It's already in evidence.  I apologize.

And if you could zoom in on the third paragraph and the bulleted list just below it.

Actually, you know what.  No.  I apologies.  Can you zoom in where it says: Dick and Carl, down at the bottom of the bulleted list.

At this time, I'd like to read something from a stipulation that's already in evidence as Government Exhibit S3.  It's titled: Arbitration Records, and it's hereby stipulated and agreed between the parties as follows: Paragraph 1F, Government Exhibits 1007 through 1011 are true and accurate excerpts of

transcripts of hearing testimony provided by Carl Eric Rinsch during the arbitration.

Your Honor the government would offer Government Exhibit 1009A and Government Exhibit 1009B.

MR. ZEMAN: No objection.

THE COURT: Received.

(Government's Exhibits 1009A and 1009B received in evidence)

MR. MARKEWITZ: Ms. Larracuente, can we pull up Government Exhibit 1009B on the right-hand side of the screen, please. If we could go to page 3, please.

I'd like to read Mr. Rinsch -- the question answer to Mr. Rinsch. Question, starting at the bottom left: And if you do the bottom part of the chain, there was an email from Bryan Noon to Mr. Kendall and to you on March 4.

And he writes, Dick and Carl, based on Cindy's and Carl's discussions, you were prepared to approve the -- continuing at the top right -- following as the next phrase towards completing the production and deliver of the project based on the most recent script.

And then he writes: Netflix shall fund 11 million. That's great. Such funding shall not represent an acknowledgment of any of the contractual milestones.

And then he writes, HVFX shall perform and shall use the 11 million to fund the following over a five-week period.

Pc4Frin2                    Noon - Redirect

And then, there's bullet points: storyboards and shot diagrams for every shot, secured location contracts, production design, art designs, costume design, hair and makeup designs, fabrication for art costume, block calendar, MM breakdown.

And I'm going to jump down to the next page at line 2. Do you see that? Yeah. And those were the bullet points from your February 2, proposal, right?

I'd have to look at them side by side, but I think they call upon each other for sure.

Can we go to the next page, please, Ms. Larracuente.

And you agreed to use the 11 million that you received from Netflix on those bullet-pointed items.

I hadn't agreed. I think these are proposals back and forth, so I would be remiss if I said I agreed to something in the context os a legal dispute such as this.

Okay. Can we show a portion of Mr. Rinsch's depo transcript? And I'm going to jump now to the bottom right.

Question, and it goes on and says: As read, Netflix shall fund 11 million. Such funding shall not represent an acknowledgment of any of the contractual milestones. Do you see that?

Yep.

And then it says: As read home VFX shall perform and use 11 million to fund the following over a five-week period. And then there are certain bulleted items there. Do you see

Pc4Frin2                    Noon - Redirect

that?

Jumping down to line 23: Yes, thank you.

Was HVFX and -- strike that.

Netflix ended up paying the 11 million.

Can you go to the next page please, Ms. Larracuente.

Correct?

That's correct.

And was HVFX agreeing to use the 11 million for the purposes listed here?

To answer your question, yes, yeah. Home VFX shall perform and shall use the 11 million to fund this. Do you see that?

One hundred percent.

And Home VFX was agreeing that the 11 million would be used on the bulleted items in that email right there, the March 4 email that we looked at.

Yes. I don't know if some gotcha, if I forgot a comma or something, but yeah.

MR. MARKEWITZ: Nothing further, your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: I'll note, for the record, that that portion of redirect, which technically was not redirect at all but could have been offered independently and therefore will be

allowed -- and there was no objection, was read in a way that, although the jury on the screen could see what were the questions and the answers, the transcript will be hopelessly confusing because counsel made no effort to indicate which were the questions and which were the answers.

The jury was not confused, but I will note that the transcript, as a result of counsel's approach, was and will be a muddle.

Call your next witness.

MR. CAPOZZI:  Your Honor, the government calls Michael Naccarelli.

MICHAEL NACCARELLI,

called as a witness by the Government,

having been duly sworn, testified as follows:

MR. CAPOZZI:  May I inquire, your Honor?

THE COURT:  Please.

DIRECT EXAMINATION

BY MR. CAPOZZI:

Q.  Mr. Naccarelli, how far did you go in school?

A.  Masters.

Q.  Where did you get your master's?

A.  Saint John's University.

Q.  What was your master's in?

A.  Accounting.

Q.  When did you graduate?

A.   2018.

Q.   Do you have an undergraduate degree?

A.   Yes.

Q.   From where?

A.   Also Saint John's university.

Q.   What was your undergraduate degree in?

A.   Accounting.

Q.   When did you get your undergraduate degree?

A.   2017.

Q.   Where did you work after graduating?

A.   I worked at Price Waterhouse Coopers.

Q.   What was your position at Price Waterhouse Coopers?

A.   I was an associate for three years and a senior associate for two years.

Q.   And what were your responsibilities as an associate and then a senior associate at Price Waterhouse Coopers?

A.   My role was to audit the financial statements of asset wealth management companies.

Q.   For how long did you work there?

A.   Approximately five years.

Q.   Where did you work after Price Waterhouse Coopers?

A.   I worked at National Grid for approximately nine months.

Q.   What was your position at National Grid?

A.   I had a governance role.

Q.   And what were your responsibilities in that role?

A.   My role was to maintain the relationship between internal

and external project managers.

          THE COURT:  Come to the sidebar.

          (Continued on next page)

PC4Frin2                    Naccarelli - Direct

(At sidebar)

THE COURT:  So, it is a shame that there are so few trials these days so that counsel are not familiar with what needs to be done to make the jury cognizant of what is being stated.

For example, there was a reference that he worked for Price Waterhouse.  One might have put the question:  What is Price Waterhouse because, believe it or not, a lot of our jurors probably don't know.  But that question was not put.

Now, we have the question National Grid, and I confess, I don't know what the heck National Gris is, but I'll bet it could be elicited with one question.

So, please, keep the jury in mind.

Now, while we're at the sidebar, I just want to make clear that if any further testimony from a prior proceeding, whether a deposition or an arbitration or the like is read, you need to say:  question, blah blah; answer, blah blah.

MR. CAPOZZI:  Understood, your Honor.

THE COURT:  And so it was not proper redirect.  You didn't put a single question to the witness.  What you should have done is excused witness and then offer the stipulation and then read the testimony.  It was definitely relevant to his testimony, but it wasn't redirect because it didn't involve any question to him.

PC4Frin2                    Naccarelli - Direct

MR. MARKEWITZ:  Understood, your Honor.

THE COURT:  So anyway, my purpose of this is not to be picky, although, of course, that's an independently sufficient reason.  But in all seriousness, we've got to make clear to the jury.  This is not a case where everything is obvious and clarity is very important.

So, proceed.

MR. CAPOZZI:  Thank you, your Honor.

(Continued on next page)

(In open court; jurors present)

BY MR. CAPOZZI:

Q. Mr. Naccarelli, you testified that you worked at Price Waterhouse Coopers. What is Price Waterhouse Coopers?

A. Price Waterhouse Coopers is a Big Four accounting firm.

Q. And what types of services does it provide?

A. Assurance, tax, consulting, and advisory.

Q. And then --

THE COURT: When you say Big Four, you mean it's one of the four largest accounting firms in the United States; correct?

THE WITNESS: Yes.

BY MR. MARKEWITZ:

Q. You also testified that after Price Waterhouse Coopers, you worked at National Grid; is that correct?

A. Yes.

Q. What is National Grid?

A. That is a utilities company. They provide gas and electric.

Q. Where do you currently work?

A. I currently work at the Federal Bureau of Investigation.

Q. Is that also known as the FBI?

A. Yes.

THE COURT: That probably was an unnecessary question, counsel.

PC4Frin2                    Naccarelli - Direct

Q.   What is your title at the FBI?

A.   I'm a forensic accountant.

Q.   And how long have you been a forensic accountant at the FBI?

A.   About a year and three months.

Q.   What are your responsibilities as a forensic accountant at the FBI?

A.   My role is to review financial records and to summarize or analyze those records.

Q.   As part of your work for the FBI, have you been involved in this case?

A.   Yes.

Q.   At a high level, in what way have you been involved?

A.   I reviewed various financial records such as bank statements, wire detail checks, signature cards, and created various charts and tables and graphs.

Q.   Were those accounts that you reviewed held by individuals or something else?

A.   Individuals and/or business entities.

Q.   Who was the holder of the individual accounts that you reviewed?

A.   Carl Rinsch.

Q.   And what entity or entities held the other accounts you reviewed.

A.   Home VFX.

PC4Frin2                    Naccarelli - Direct

Q.   In the charts you'll be testifying about today, are the
numbers always exact number, or were they sometimes rounded?

A.   Sometimes rounded.

Q.   Mr. Naccarelli, as part of your work, were you asked to
review the holdings in particular financial accounts on
particular dates?

A.   Yes.

          THE COURT:   Your Honor, unless there is an
objection, the government offers Government Exhibit 2011.

          MR. ZEMAN:   No objection.

          THE COURT:   Received.

          (Government's Exhibit 2011 received in evidence)

          MR. CAPOZZI:   Ms. Larracuente, please publish
Government Exhibit 2011.

Q.   Mr. Naccarelli, do you recognize this exhibit?

A.   Yes.

Q.   How do you recognize it?

A.   I created it.

          MR. CAPOZZI:   If we could go to the sources tab at the
end.

Q.   What's depicted on the sources tab?

A.   These are the Government Exhibits that I used to create the
Government Exhibit that we're looking at.

          MR. CAPOZZI:   And if we could go back to the accounts
reviewed tab.

PC4Frin2                     Naccarelli - Direct

Q.   Mr. Naccarelli, at a high level, what is this exhibit?

A.   This is various bank accounts' ending balance on various dates.

Q.   Focusing first on this accounts reviewed tab, what is listed here?

A.   These are the various bank accounts and the relevant information associated with those accounts.

Q.   And are these, on this tab, all of the accounts that you reviewed for this case?

A.   No.

Q.   Why not?

A.   Some of the accounts didn't exist on the dates that I was asked to look at.

Q.   Could you just walk the jury through what information is reflected in each column of this table?

A.   Yes.

     Column B is the bank or the financial institution where the account is held.  Column C is the account name that appears on the bank accounts.  Column D is the last four digits of the account number.  Column E is the type of account, whether it's a checking savings, *et cetera*.  Column F is the signer or signers on the account.  Column G is the date the account was opened.  And column H is whether it is a Home VFX account or a personal account.

Q.   When you were discussing Column F, you said signer.

PC4Frin2                    Naccarelli - Direct

A.   Yes.

Q.   Is signatory another term for signer?

A.   Yes.

Q.   Are you familiar with something called a signature card?

A.   Yes.

Q.   What is a signature card?

A.   A signature card is an application or a form of identification when opening or updating a bank account.

Q.   What does it mean to be a signer or a signatory on a bank account?

A.   It means that you have capacity to deposit money, withdraw money, write checks and similar types of transactions.

Q.   Focusing, for the moment, on row 3 and the account ending in 6485 held by Home VFX, who are the signatories on that account?

A.   On August 11, 2012, it was solely Carl Rinsch.  And then on June 29, 2015, Gabriela Roses was added as a signer.

Q.   To be clear, did Carl Rinsch remain a signatory after Gabriela Roses was added as a signatory on June 29, 2015?

A.   Yes.

         MR. CAPOZZI:  Ms. Larracuente, if we could go to the tab in this exhibit labeled BOAX 6485.

Q.   Mr. Naccarelli, what is BOAX 6485 a reference to?

A.   That is a reference to the financial institution and the last four digits of the account number.

PC4Frin2                    Naccarelli - Direct

Q.   What financial institution is BOA?

A.   That is Bank of America.

Q.   In the upper left of this tab, there's a table.  What information is contained in each column of that table?

A.   There is the account number, the last four digits, the account name associated with the account, the statement date in which where the date that I was asked to review appears in. Column D is the specific date that I reviewed, and column E is the ending balance on that date.

Q.   There appear to be about 11 rows of data in the table.

     Why is that?

A.   Those were the only dates that I was asked to review.

Q.   In the upper right of this tab, there's a chart.  What information is contained in the chart?

A.   That is a bar graph of the information in the top left, so it is, essentially, the same information, just in a bar graph form.

Q.   If we go back to the left side in the table and the upper left, using row 13 as an example, could you just walk us through what is reflected in row 13 for March 7, 2020?

A.   Yes.  So, the ending balance on March 7, 2020 in this particular account was $11,415,203.30.

Q.   Now, moving to the chart, where, if at all, is that reflected?

A.   On the far right bar where the date is 3/7/2020.

PC4Frin2                    Naccarelli - Direct

And you see the $11,415,203.30 at the top of that bar.

Q. Mr. Naccarelli, did you create similar tabs for the other accounts that you reviewed for this exhibit?

A. Yes.

Q. For example, if we look at the tab labeled: BOAX 6964, what's reflected on that tab?

A. It is the same information, but for a different bank account.

Q. It's the same dates that you looked at; is that correct?

A. Yes.

Q. In the chart that we looked at for BOA account ending in 6485, the rectangular blocks in the chart were orange. On this tab the blocks are blue. Why is that?

A. The tabs that have blue bars are indicative of a personal account, whereas orange is indicative of a Home VFX account.

Q. If we could turn to the tab labeled Home VFX total, there's a table on the left. What's reflected in that table?

A. That table is all of the Home VFX accounts combined on those particular dates.

Q. So am I correct in understanding there were multiple accounts held by Home VFX; is that right?

A. Yes.

Q. And what's reflected in the chart on the right?

A. It is essentially the same as the chart on the left, but in bar graph form.

PC4Frin2                    Naccarelli - Direct

Q.   Now if we could move to the total balance tab.

Could you explain what information is contained in each column of this table?

A.   Yes.

Column B is the particular date.  Column C is all of the Home VFX balances.  Column D is all of the personal accounts balances.  Column E is the total of all of the accounts.  Column F is the percentage of the total that relates to the Home VFX accounts, and column G is the percentage that relates to the personal accounts.

Q.   For example, if we look at row 13, what's reflected in this table for March 7, 2020?

A.   The total ending balance on March 7, 2020 was 13,914,474.82, with 84 percent of that coming from the Home VFX ending balances and 16 percent coming from the personal account balances.

Q.   And what's reflected for March 5, 2020, two days prior?

A.   The total ending balance on March 5, 2020 was $2,953,825.77,with 22 percent of that comes from the Home VFX accounts and 78 percent coming from the personal accounts.

MR. CAPOZZI:  Ms. Larracuente, if we could turn back to the tab labeled BOA 6485.

Q.   Now, on the bottom left of this tab, there's a table.  What is depicted in that table?

A.   Those are dates and amounts that relate to deposits from

PC4Frin2                    Naccarelli - Direct

Netflix Studios.

Q.  Do similar tables like this appear on the tabs for the other bank accounts in this exhibit?

A.  No.

Q.  Why is that?

A.  The other bank accounts didn't have any deposits from Netflix Studios.

Q.  Focusing on March 6, 2020, what's reflected for that date in this chart?

A.  $11 million.

Q.  Going back to the total balance tab, what, if anything, were you asked to do with the data reflected in this table?

A.  I was asked to create a bar graph.

        MR. CAPOZZI:  Your Honor, unless there is an objection, the government offers Government Exhibit 2011A.

        MR. ZEMAN:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 2011A received in evidence)

        MR. CAPOZZI:  Ms. Larracuente, if you could please public what's now in evidence as Government Exhibit 2011 A.

Q.  Mr. Naccarelli, do you recognize this exhibit?

A.  Yes.

Q.  How do you recognize it?

A.  I created it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

PC4Frin2                    Naccarelli - Direct

Q.   And turning to slide 2 for a moment, what's depicted on slide 2?

A.   Those are the Government Exhibits that I used to create the bar graph.

Q.   Moving to slide 1, at a high level, what does this chart depict?

A.   This is depicting the total balance across all those various accounts on the particular date, broken out by Home VFX accounts and personal accounts.

Q.   For several of the dates listed on this chart, there is a red arrow with words in red font.  What do those represent?

A.   Those represent deposits from Netflix Studios on the day of or the day prior.

Q.   Are all of the deposits from Netflix we just saw when we were -- strike that.

          Are those all of the deposits from Netflix that you saw when you were reviewing the financial records?

A.   No.

Q.   Which deposits from Netflix did you depict on this chart?

A.   The ones depicted occurred on the particular date or one day previous to that date.

Q.   Focusing on March 5, 2020, what was the total ending balance on that date for the accounts you reviewed?

A.   The total balance was $2,953,825.77.

Q.   And then if we look at March 7, 2020, what was the total

ending balance in the accounts you reviewed?

A.  13,914,475.82.

Q.  And what happened between those two days with respect to the accounts you reviewed?

A.  Netflix deposited $11 million into one of the Home VFX accounts.

Q.  Were you asked to review the financial records to see what happened to that $11 million from Netflix?

A.  Yes.

MR. CAPOZZI:  Your Honor, unless there is an objection, the government offers Government Exhibit 2001.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 2001 received in evidence)

Q.  And I'll just note, Ms. Larracuente just published Government Exhibit 2001.

Q.  Mr. Naccarelli, do you recognize this exhibit?

A.  Yes.

Q.  What, if anything, were you asked to do with this exhibit?

A.  I was asked to review and verify the information contained in the chart.

Q.  Turning to slide 10 briefly, what's reflected there?

A.  Those are the Government Exhibits that I reviewed to verify the information in the chart.

Q.  Going back to slide one at a high

PC4Frin2                    Naccarelli - Direct

level, Mr. Naccarelli, what does this exhibit show?

A.   This exhibit shows a flow of funds through various bank accounts.

A.   Through the month of March.

Q.   What is depicted on page 1 of this exhibit?

A.   This is a $11 million deposit from Netflix on March 6, 2020, into the account ending in 6485.

Q.   Who held that account?

A.   Home VFX.

Q.   Did you review signature cards for the account held by Home VFX ending in 6485?

A.   Yes.

Q.   Ms. Larracuente please publish what is in evidence as Government Exhibit 3011.

Q.   Do you recognize that exhibit?

A.   Yes.

Q.   What is it?

A.   This is a business signature card for the bank account ending in 6485.

Q.   And towards the bottom of the page, who are listed as the signatories on this signature card?

A.   Carl Rinsch and Gabriela Roses.

Q.   If we could go back to Government Exhibit 2001, which is in evidence turning to page 2 of the exhibit, what, if anything happened on or about March 9, 2020, with respect to the account

ending in 6483 held in the name of Home VFX?

A.   Ten.$5 million was deposited into the account.

Q.   Did you review any signature cards for that account?

A.   Yes.

Q.   I'd like to publish Government Exhibit 3026, which is in evidence Mr. Naccarelli, do you recognize this?

A.   Yes.

Q.   What is it?

A.   That is a business signature card for the account ending in 8643.

Q.   Who is listed at the bottom of the page as a signatory on this account?

A.   Carl Rinsch.

Q.   On what date was this signature card signed?

A.   March 9, 2020.

Q.   Based on your review of records from this account on what date was this account opened?

A.   March 9, 2020.

Q.   And how does that date relate to the date on which ten.$5 million was transferred into this account?

A.   It's the same date.

Q.   If we could return to Government Exhibit 2001 and turn to page 3.

         What's reflected on page 3 of the exhibit?

A.   This is showing that on March 16, 2020, $8 million was

deposited into the Wells Fargo account ending in 4450.

Q. Have you reviewed records for account ending in 4550 at Wells Fargo?

A. Yes.

Q. Could we please publish what's in evidence as Government Exhibit 3036? Do you recognize this exhibit?

A. Yes.

Q. What is it?

A. This is a Wells Fargo bank statement.

Q. Towards the upper right, what is listed as the account name?

A. Carl Eric Rinsch trust.

Q. And below that, who is listed as the financial advisor?

A. Ronald G See.

Q. If we could return to Government Exhibit 2001.

And page 4 what's reflected on page 4 of the exhibit?

A. On this page is depicted that on March 30, 2020, the Charles Schwab account ending in 3719 received $2 million from the account ending in 8643 and received eight.$5 million from the Wells Fargo account ending in 4450.

Q. Have you reviewed records for that account ending in 3719 at Charles Schwab held by Carl Rinsch?

A. Yes.

Q. Please publish what's in evidence as Government Exhibit 3027 do you recognize this?

A.   Yes.

Q.   And what is it?

A.   This is a Charles Schwab bank statement.

Q.   For for what account. At account ending in 3719.

Q.   And to the left at the upper 207 it says Schwab one account of Carl Rinsch.  Who is listed as the independent investment manager as on check which I capital advisors, LLC.

Q.   If we could return to Government Exhibit 2001 and slide five and then slide six Mr. Naccarelli, how much money was in the Home VFX Benjamin of America account ending 6485 before the transfer of Netflix on or about March 6, 2020?

A.   There was $450,000 in the account.

(Continued on next page)

BY MR. CAPOZZI:

Q   And if we turn to slide seven, how much money was in the Home VFX Bank of America account ending in 8643 before the transfer of 10.5 million on or about March 9, 2020?

A   There was no money in the account.

Q   Turning to slide eight, how much money was in the Wells Fargo account ending in 4450 held by the Rinsch Trust before the transfer of $8 million on or about March 16, 2020?

A   There was approximately 2.18 million.

Q   And finally, on slide nine, how much money was in the Charles Schwab account ending in 3719 held by Carl Rinsch before the transfers of $2 million and $8.5 million on or about March 30, 2020?

A   There was no money in the account.

Q   You can take that down, please.  Mr. Naccarelli, were you asked to trace what happened to the funds transferred to the Charles Schwab account ending in 3719 on March 30, 2020?

A   Yes.

MR. CAPOZZI:  Ms. Larracuente, if you could please publish stipulation S9, which is in evidence.  And if you could go to page three.

Paragraph 7 reads Government Exhibits 6276 through 6281A consist of true and accurate copies of records maintained by Payward Ventures, Inc. d/b/a Kraken, a cryptocurrency exchange, in the regular course of its business.  The records

were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records were kept in the course of regularly conducted activity of Kraken as a regular practice of that activity.

Government Exhibit 6279 consists of a data reports document explaining terms used in the Kraken records.  Unless there is an objection, the government offers Government Exhibits 6276 through 6281A.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6276 through 6281A received in evidence)

MR. CAPOZZI:  Unless there's an objection, the government would offer Government Exhibit 2010.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 2010 received in evidence)

MR. CAPOZZI:  Ms. Larracuente, please publish what's in evidence now as Government Exhibit 2010.

Q   Mr. Naccarelli, do you recognize this?

A   Yes.

Q   What is it?

A   This is a flow of funds through three financial institutions.

Q   What, if anything, were you asked to do with this exhibit?

A   I was asked to review and verify the information on the chart.

Q   And turning to slide two for a moment, what's reflected on slide two?

A   Those are the Government Exhibits that I used to review and verify the information on the chart.

Q   If we could please return to slide one.  So how, if at all, does this exhibit relate to the last flow of funds exhibit we looked at, Government Exhibit 2001?

A   This one begins with the Charles Schwab account ending in 3719, which is where the previous one ended.

Q   So starting at the bottom left of the page, what account is depicted there?

A   That is the Charles Schwab account ending in 3719.

Q   Can you just remind us as of March 30, 2020 how much money was in the Charles Schwab account ending in 3719?

A   It was 10.5 million.

Q   Between March 30, 2020 and February 12, 2021, was any additional money added to this Charles Schwab account from other accounts?

A   No.

Q   On this chart starting at the bottom left and then moving up and to the right, there's a green arrow.  What does that green arrow represent?

A   That green arrow represents the amount of money that moved from the Charles Schwab account to the Kraken account during the time period.

Q   What is Kraken?

A   Kraken is a cryptocurrency exchange.

Q   And for what account did you review records from Kraken?

A   The account ending in SAMA.

Q   And in whose name was that account held?

A   Carl Rinsch.

Q   How much money was in this account at Kraken before the transfers from account 3719 began on February 12, 2021?

A   There was no money in the account.

Q   During the period between February 12, 2021 to July 4, 2023, was money added to this Kraken account from sources other than the Charles Schwab account ending in 3719?

A   Yes.

Q   Of the money that was added to this Kraken account during that period, roughly speaking, what proportion of the money was from the Charles Schwab account ending in 3719?

A   The Charles Schwab account accounted for approximately 63 percent.

Q   And where did the rest of the money that was added to this Kraken account during that time period come from?

A   Approximately ten percent was deposited from the Wells Fargo account ending in 4450.  Approximately 26 percent was

deposited from the Bank of America account ending in 3966. And the remaining one percent was deposited from unknown sources or various crypto.

Q   Now, moving up and to the right from the middle of this slide, there's another green arrow. What does that green arrow represent?

A   That green arrow represents the amount of money that moved from the Kraken account to the Bank of America account ending in 3966 during that time period.

Q   And the time period specifically is June 28, 2021 to July 4, 2023; is that correct?

A   Correct.

Q   And how much money moved from the Kraken account to the Bank of America account ending in 3966 during that period?

A   Approximately 13.76 million.

Q   Based on your review of the records, how, if at all, was the Kraken account used during the period between February 12, 2021 and July 4, 2023?

A   It was used to trade crypto.

Q   And by "crypto," what do you mean by "crypto"?

A   Crypto coins, tokens.

Q   Cryptocurrency?

A   Yes.

Q   Now, if the majority of the money that was added to the Kraken account was the 4.48 million from the Schwab account,

how is it that $13.7 million came out of the Kraken account?

A    The trades performed very well.

Q    What trades are you referring to?

A    The cryptocurrency trades.

Q    Were you asked to review records concerning the Bank of America account ending in 3966 that's depicted on the upper right hand portion of this chart?

A    Yes.

Q    Who was the signatory on that account?

A    Carl Rinsch.

Q    How much money was in this account at Bank of America before the transfers from Kraken began on June 28, 2021?

A    There was no money in the account.

Q    During the period from June 28, 2021 to July 4, 2023, was money added to this Bank of America account from sources other than the Kraken account?

A    Yes.

Q    Of the money added to the Bank of America account during that period, roughly speaking, what proportion of the money was from the Kraken account?

A    Approximately 80 percent.

Q    Mr. Naccarelli, what, if anything, were you asked do with respect to this Bank of America account ending in 3966?

A    I was asked to determine what the net expenditures were for the various vendors.

PC4JRIN3                    Naccarelli - Direct

MR. CAPOZZI:  Unless there is an objection, your Honor, the government offers Government Exhibit 2012.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 2012 received in evidence)

BY MR. CAPOZZI:

Q   Before I publish that exhibit, Mr. Naccarelli, you referenced crypto trades.  What cryptocurrency coins were traded in the Kraken account?

A   Dogecoin, Ethereum, Ethereum Classic, Bitcoin Cash, Cardano, and some various others that I can't recall.

Q   Ms. Larracuente, if you could please publish what is now in evidence as Government Exhibit 2012.

Mr. Naccarelli, do you recognize this exhibit?

A   Yes.

Q   How do you recognize it?

A   I created it.

Q   If we could go briefly to the sources tab.  What's reflected there?

A   These are the Government Exhibits that I used to create the Excel file.

Q   And if we could return to the first tab in the exhibit, at a high level, what is depicted in this Government Exhibit?

A   This is various vendors that transacted with the Bank of America account ending in 3966 and their net expenditures.

Q    So starting with the tab in this exhibit that we're currently on which is labeled "key," what is listed in the entity column?

A    Those are the vendors that transacted with this bank account that I was asked to review.

Q    And what is listed in the category column?

A    The category column is the line of business that the entity would fall under.

Q    So for example, what entity or entities that you were asked to look at did you categorize as lodging?

A    Airbnb, Four Seasons, and Exclusive Rentals Spain.

Q    What, if anything, did you do for each of these categories?

A    I created a separate tab for each category showing the transactions and the amounts.

Q    So let's look at the jewelry tab as an example.  Could you explain what information is reflected in each column of this tab.

A    Yes.  So column A is the account number.  Column B is the date of the transaction.  Column C is the bank description, which is the description that appears on the bank statement. Column D is the description or the vendor or entity that is being transacted with.  Column E is the category.  Column F is the amount spent.  And column G is the addition amount.

Q    So could you just by way of example walk us through row two of this tab.

A    Sure.  So row two is on July 30, 2021 there was a wire out to Richemont in the amount of $106,200.

Q    What is Richemont?

A    Richemont is a jewelry company.

Q    If we could look at the automobile tab, what's reflected in this tab?

A    This tab is all of the transactions that were categorized as automobile.

Q    So if we look at row ten, what's depicted in that row as an example?

A    Row ten is on September 20, 2021 there was a wire out to Manhattan Motorcars Inc. in the amount of 100,000 with a wire memo that says 2021 Rolls-Royce Dawn.

Q    And if we look at row 16 of this tab, what's reflected there?

A    Row 16 is on October 1, 2021 there was a wire out to Ferrari Silicon Valley in the amount of 300,000 with a wire memo stating trade related ACC red 812 GTS Spider.

Q    And one more row in this tab, row 17.

A    Row 17 is on October 7, 2021 there was a wire out to Ferrari Silicon Valley in the amount of 150,000 with the wire memo stating Ferrari Carl Rinsch.

Q    If we could go to the food delivery tab.  What's reflected on this tab?

A    This tab is all of the transactions that related to food

delivery for the entities that I was asked to review.

Q   And looking at row two briefly, what date was the transaction reflected in row two?

A   June 27, 2022.

Q   And if we could go down to row 486, on what date was that transaction?

A   December 19, 2022.

Q   About how many months were there between June 27, 2022 and December 19, 2022?

A   About six months.

Q   During that approximately six months, about how many food delivery purchases were made using this account?

A   About 485.

Q   If we could go to the summary tab.  Could you walk us through what is reflected in each column of this tab.

A   Yes.  Column B is the category.  Column C is the amount spent within that category.  Column D is the additions from that category.  Column E is the net expenditure related to that category.  Column F is the start date, which is when the first transaction occurs from a vendor within that category.  And then the end date, column G, is the last date that a transaction occurs within that category.

Q   So for the vendors that you looked at, what was the total amount spent from this account?

A   $9,142,890.30.

Q   And to be clear, were there vendors where money was spent that were not included in the list that you were asked to look at?

A   Yes.

Q   And is it possible that some of those other vendors also were part of the categories or industries that were the categories that you looked at?

MR. ZEMAN:  Objection.

THE COURT:  Hang on.  Sustained.

Q   Mr. Naccarelli, let's take the jewelry row as an example. What's reflected on the table?  Sorry.  You can return to the summary tab.  The jewelry row, row nine.

A   So that is depicting that a total of $387,630 was spent on jewelry between July 30, 2021 and August 12, 2021.

Q   And what's reflected in row ten for lodging?

A   For lodging, the net expenditures was $357,655.25.  And that was between the course of November 12, 2021 to August 24, 2023.

Q   And row eight for furniture?

A   For furniture, the net expenditures was $3,210,653.15 starting on August 23, 2021 through July 29, 2022.

Q   Now, in that row, there is information in the additions column.  What types of things could be listed in additions?

A   Additions would be anything that increases the value of the account, so deposits, refunds, wires in, returns.

Q   You could take that down, please.  Mr. Naccarelli, as part of your work on this case, were you asked to review an income and expense declaration?

A   Yes.

MR. CAPOZZI:  Please publish what is in evidence as stipulation S4.  It reads that it is hereby stipulated and agreed by the parties that Government Exhibit 7001 consists of a true and accurate copy of a proclamation of a state of emergency signed by the governor of California on March 4, 2020, which is from a public office where items of this kind are kept, namely the office of the governor of California.

Government Exhibit 7002 consists of a true and accurate copy signed by the governor of California and attested to by the secretary of state of California on March 19, 2020, which is from a public office where items of this kind are kept, namely the office of the governor of California.

Government Exhibit 7003 consists of a true and accurate copy of an income and expense declaration for Carl Rinsch that was recorded or filed in a public office, namely the Superior Court of California, County of Los Angeles in the case of *Gabriela Rinsch v. Carl Rinsch*, case number 20STFL07216.

Unless there is an objection, the government offers Government Exhibit 7001, 7002, and 7003.

THE COURT:  Received.

PC4JRIN3                    Naccarelli - Direct

(Government's Exhibit 7001, 7002, 7003 received in evidence)

MR. CAPOZZI:  Ms. Larracuente, if you could please publish Government Exhibit 7003.

Q   Mr. Naccarelli, do you recognize this?

A   Yes.

Q   What is it?

A   This is an income and expense declaration.

Q   Were you asked to review this as part of your work?

A   Yes.

Q   Mr. Naccarelli, near the middle of the page it says -- at the bottom of the top portion it says income and expense declaration.  Do you see that?

A   Yes.

Q   Near the bottom of the page there's a line for a name and a signature.  What name appears?

A   Carl Rinsch.

Q   Above that, there's a date.  What date is listed?

A   April 19, 2022.

Q   And if you could please read out loud the sentence above the date.

A   I declare under penalty of perjury under the laws of the state of California that the information contained on all pages of this form and any attachments is true and correct.

Q   Turning to page 2 of this exhibit, near the bottom it says

Naccarelli - Direct

11, assets. Do you see that?

A   Yes.

Q   Could you please read what it says on the right under total.

A   See attached schedule of assets and debts.

Q   If you could turn to page 5, Ms. Larracuente, please.

Near the top of this page it says schedule of assets and debts. Do you see that?

A   Yes.

Q   Please read out loud the first sentence in the instructions that appear below that.

A   List all your known community and separate assets or debts.

Q   At the bottom of this page, page 5, what does it say below number three, jewelry antiques, art, coin collections, etc., identify? And if you could highlight that, thank you.

A   None, respondent contends he is not the owner of any and all jewelry, antiques, art, coin collections, etc. purchased in connection with film projects including, but not limited to, *Conquest* for Netflix, and that Netflix is the holder of any and all ownership interests therein.

Q   At the top of page 6, what does it say below number four, vehicles, boats, trailers, describe and attach copy of title document?

A   None, respondent contends you he is not the owner of any and all vehicles, boats, trailers, etc. purchased in connection

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

with film projects, including, but not limited to, *Conquest* for Netflix and that Netflix is the holder of any and all ownership interests therein.

Q    Lower on this page on the schedule of assets and dates, it says five, savings accounts, and six, checking accounts.  Are you familiar with the accounts listed under number five and number six?

A    Yes.

Q    How are you familiar with those accounts?

A    I reviewed those accounts.

Q    And were those accounts referred to earlier in your testimony in the charts that you created?

A    Yes.

Q    Turning to page 7 of this schedule of assets and debts, it says 11, stocks, bonds, secured notes, mutual funds, give certificate number and attach copy of the certificate or copy of the latest statement.  Are you familiar with the account listed there?

A    Yes.

Q    And in your work on this investigation, did you review records for that Charles Schwab account?

A    Yes.

Q    Lower on that page, at 13, it says profit sharing, annuities, IRAs, deferred compensation.  Are you familiar with the account listed there?

A    Yes.

Q    Is that one of the accounts that you reviewed for your analysis?

A    Yes.

Q    And a bit lower on this page it says number 16, other assets, and then cryptocurrency accounts.  What value is listed?

A    TBD.

Q    At the bottom of page 8 of this exhibit, there appears to be a signature.  What name appears to the left of the signature on this schedule of assets?

A    Carl Rinsch.

Q    And what date?

A    April 18, 2022.

Q    Mr. Naccarelli, you testified earlier about a Kraken account ending in SAMA; is that correct?

A    Yes.

Q    Again, who held that account?

A    Carl Rinsch.

Q    Were you asked to look at the holdings in that account on a particular date?

A    Yes.

Q    What date?

A    April 18, 2022.

         MR. CAPOZZI:  Your Honor, unless there's an objection,

PC4JRIN3                       Naccarelli - Direct

the Government Exhibit offers Government Exhibit 2014A.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 2014A received in evidence)

MR. CAPOZZI:  Ms. Larracuente, if you could please publish what's now in evidence as Government Exhibit 2014A.

Q   Mr. Naccarelli, do you recognize this exhibit?

A   Yes.

Q   How do you recognize it?

A   I created it.

Q   Turning to slide two, what information is reflected there?

A   Those are the Government Exhibits that I used to create the chart.

Q   And returning to slide one, at a high level what is this exhibit?

A   This exhibit is the balance of cryptocurrency in the Kraken account as of April 18, 2022.

Q   And specifically which account?

A   The account ending in SAMA.

Q   And again, who is the holder of that account?

A   Carl Rinsch.

Q   So what's reflected in the currency column in this table?

A   That is the name of the cryptocurrency.

Q   And what's reflected in the currency code?

A   The currency code is the code that's used for that

PC4JRIN3                    Naccarelli - Direct

cryptocurrency.

Q   And what's reflected in the column labeled balance as of April 18, 2022?

A    That is the balance of each cryptocurrency.

Q    As of what date?

A    As of April 18, 2022.

Q    How does that date compare to the date that appears on the schedule of assets and debts that we just reviewed in Government Exhibit 7003?

A    It's the same date.

Q    I'd like to focus on the second row from the bottom, which says Ethereum.  And what do you understand Ethereum to be?

A    A cryptocurrency.

Q    What was the balance of Ethereum held in this account on April 18, 2022?

A    The balance was 296.4693 Ethereum.

Q    Now, next to that, next to where it says 296.4693, in the cell to the right of that, it says 3,474.  What does that number represent?

A    That number represents the USD value of one Ethereum on April 5, 2022.

Q    And how did you determine that value?

A    There was a trade involving USD and Ethereum on April 5, 2022.  And so I used the USD value and divided it by the Ethereum value to determine your price per USD.

Q   And when you say USD, what are you referring to?

A   United States dollars.

Q   And so to be clear, what you're saying is that -- well, in terms of that trade, how much was one Ethereum worth based on that trade on that date?

A   One Ethereum was worth $3,474.

Q   And why did you look at April 5, 2022?

A   That was one of the trades that occurred in proximity to April 18, 2022.

Q   Did you find any trades that fell exactly on April 18, 2022 for this account?

A   No.

Q   Now, if we look to the cell, to the right of the cell that we were just looking at, the cell in which I'm focused on now has 2,858.71, what does that number represent?

A   That number represents the United States dollar value of one Ethereum on April 25, 2022.

Q   And how did you determine that value?

A   There was a trade on April 25, 2022 between United States dollars and Ethereum, and I divided the United States dollar value by the Ethereum.

Q   And why did you look at April 25, 2022?

A   Because it was in proximity to April 18, 2022.

Q   Next to that cell it says 3,166.36.  What does that represent?

A    That represents the average of the value on April 5, 2022 and April 25, 2022.

Q    Why did you calculate an average?

A    Because there were no transactions specifically on April 18, 2022, and it falls in between those two trades.

Q    Next to that average is a cell that says 938,726.93.  What does that represent?

A    That represents the estimated USD value of the Ethereum on April 18, 2022 using the average value between April 5 and April 25, 2022.

Q    Now, below the Ethereum row is a row where in the farthest left column it says Dogecoin.  What is your understanding of what Dogecoin is?

A    That is a cryptocurrency.

Q    For that row did you perform singular calculations as what we just discussed for Ethereum?

A    Yes.

Q    And based on those calculations, what was the estimated United States dollar value of the holdings in Dogecoin as of April 18, 2022?

A    $755,658.33.

Q    Now, the other rows in this table are shaded out for the four columns on the right.  Why did you not list estimated U.S. dollar values as of April 18, 2022 for those other forms of cryptocurrency on this chart?

A    The cryptocurrency value is much more minimal than the two on the bottom, and there were no transactions or trades in proximity to the April 18, 2022 date.

Q    So using the method that you did, what was the total estimated U.S. dollar value of the Ethereum and Dogecoin held in this Kraken account on April 18, 2022?

A    It was approximately 1.7 million.

Q    If we could go back to page 8 of what's in evidence as Government Exhibit 7003.  What date appears on this schedule of assets and debts at the bottom above where it says Carl Rinsch?

A    April 18, 2022.

Q    And if we could go to page 7, what amount was listed for total assets?

A    $250,281.

Q    You can take that down, Ms. Larracuente.

          Mr. Naccarelli, were you asked to create an exhibit reflecting information on a particular website?

A    Yes.

          MR. CAPOZZI:  Unless there is an objection, the government offers Government Exhibit 7008.

          MR. ZEMAN:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 7008 received in evidence)

          MR. CAPOZZI:  Ms. Larracuente, please publish Government Exhibit 7008.

Q    Do you recognize this?

A    Yes.

Q    What is it?

A    This is an article from a website that I converted to PDF.

Q    Near the top it says February 26, 2020.  Do you see that?

A    Yes.

Q    Could you please read the bold headline.

A    Gilead Sciences initiates two phase three studies of investigational antiviral remdesivir for the treatment of COVID-19.

         MR. CAPOZZI:  Your Honor, no further questions for this witness.

         THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. ZEMAN:

Q    Good afternoon, Mr. Naccarelli.  So we saw, Mr. Naccarelli, that you made a number of charts in anticipation of your testimony today, correct?

A    Yes.

Q    And Ms. Tang, if you could just pull up Government Exhibit 2001, please.  That is in evidence.

         So you remember this chart that you made, right?

A    Yes.

Q    And this was following the March 2020 payment from Netflix, correct?

A    Correct.

Q    Mr. Naccarelli, did you make a chart like this that followed the 2018 payment from Netflix?

A    No.

Q    Same question for the 2019 payment from Netflix, did you make a similar chart that tracked where the money went for that payment?

A    No.  To be clear, I didn't create this chart.  I simply reviewed it and verified the information in it.

             MR. ZEMAN:  Okay.  I have no further questions, your Honor?

             THE COURT:  All right.  Anything else?

             MR. CAPOZZI:  No redirect, your Honor.

             THE COURT:  Thank you very much.  You may step down.

             (Witness excused)

             THE COURT:  Please call your next witness.

             MR. CAPOZZI:  Your Honor, the government calls Special Agent Allen Grove.

ALLEN GROVE,

       called as a witness by the Government,

       having been duly sworn, testified as follows:

             MR. CAPOZZI:  May I inquire, your Honor?

             THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. CAPOZZI:

Q   Where do you work?

A   I work with the Federal Bureau of Investigation.

Q   Is that also known as the FBI?

A   Yes.

Q   What is your title at the FBI?

A   I'm a special agent.

Q   How long have you been a special agent with the FBI?

A   Approximately ten years.

Q   In what office of the FBI do you work?

A   I work out of the FBI's Los Angeles field office.

Q   Are you assigned to a particular team at the FBI's office in Los Angeles?

A   I am, the FBI's art crime team.

Q   I'm sorry.  What was that?

A   It's the FBI's art crime team.

Q   What types of cases do you investigate as a special agent assigned to the art crime team?

A   We handle all types of complaints regarding fine art, as well as antiquities.  Specifically we deal with thefts of art, frauds, forgeries involving art, as well as trafficking of antiquities.

Q   Special Agent Grove, did there come a time when you became aware of someone named Carl Rinsch?

A   Yes.

Q   About when was that?

A    In April of 2023.

MR. ZEMAN:  Objection.  Your Honor, may we approach briefly?

THE COURT:  Yes.

(Continued on next page)

(At sidebar)

MR. ZEMAN:  Your Honor, I'm just going to object to this witness.  I don't really understand what his relevance is to this case at all.

THE COURT:  So what is this witness going to say?

MR. CAPOZZI:  Your Honor, this witness is going to say that in 2023 Carl Rinsch, the defendant, contacted the FBI to report a complaint that he had been swindled on the purchase of a million dollars' worth of furniture, and that that swindle had happened in 2021.  During that reporting of that crime he did not say anything about the money being Netflix's money.  He represented essentially that he was a collector interested in fine furniture.

The evidence at this trial will show that that furniture was purchased with the proceeds of that fraud.  And the representation that it was his money that he was trying to get back through this complaint against this third party is directly relevant to the government's case showing that he converted Netflix's money to his own and he laundered it on the purchase of things such as furniture.

THE COURT:  Well, I wonder whether this can't be more expeditiously handled through a stipulation saying that in connection with a complaint not otherwise relevant to this case Mr. Rinsch in 2023, whatever the time was, represented to the federal government that he has furniture that he had purchased

which belonged to him or something like that.  But anyway what does defense counsel say?

MR. CAPOZZI:  If I could just add one more point, your Honor.  During that reporting he represented to the special agent that he was quote/unquote the "Dogecoin whale" who had made a lot of money on cryptocurrency, which again is directly relevant and I don't think could be accomplished by a simple stipulation.

MR. ZEMAN:  I don't really know what -- the government has clearly established that he traded a lot of cryptocurrency over that relevant time period.  It also clearly established that he spent a lot of money on luxury items.  This is just cumulative, and I don't think the relevance of him claiming to have been a Dogecoin whale has any value for the jury.  We've just heard an hour of testimony about all the crypto trading that he engaged in as well as all the luxury purchases he made.  This is just cumulative.

THE COURT:  My concern is really not a 401 and 402 problem, but a 403 problem.  And I think this complaint to the FBI might cause the jury to speculate about things that have nothing to do with this case, but I'm happy to have it settled through a stipulation.  Defense counsel has just indicated that he's not challenging what sounds like the relevant respects.  So otherwise I think the substantial value probably the outweighs the prejudicial value, which would be easily cured in

any event.

So why don't we do this. It is now about ten minutes before the lunch break. So why don't we take our lunch break now. If you can work out a stipulation, fine. If you can't, I will allow the government to go forward with this witness. All right?

(Continued on next page)

(In open court; jurors present)

THE COURT: So ladies and gentlemen, counsel have indicated that they're desperately hungry, and therefore we're going to take our lunch break now. So it's about ten off. We'll take an hour lunch break and resume at ten minutes to 2:00. See you then.

(Continued on next page)

(In open court; jury not present)

THE COURT:  In connection with the legal issue that I mentioned earlier on attaining and retaining, let me bring to your attention the case of *United States v. Countrywide Home Loans Incorporated*, a decision of the Second Circuit in 2016, well after the cases that the government was citing, reported at 822 F.3d 650, I'll read you the first paragraph.

"When can a breach of contract also support a claim for fraud?  This question, long an issue in common law courts, comes before us in the context of a judgment in the United States District Court for the Southern District of New York (Rakoff J) imposing civil penalties exceeding $1.2 billion on defendants/appellants Countrywide Home Loans Inc., Countrywide Bank FSB, Bank of America N. A., and Rebecca Mairone under the Financial Institutions Reform Recovery and Enforcement Act of 1989.

"As the necessary predicate for these penalties, the government alleged that the defendants violated the federal mail and wire fraud statutes by selling poor-quality mortgages to government-sponsored entities.  On appeal, defendants argue that the evidence at trial shows at most an intentional breach of contract — i.e., they sold mortgages that they knew were not of the quality promised in their contracts — and is insufficient as a matter of law to find fraud.  We agree, concluding that the trial evidence fails to demonstrate the

contemporaneous fraudulent intent necessary to prove a scheme to defraud through contractual promises. Accordingly, we reverse with instruction to enter judgment in favor of defendants."

So putting aside the pain that I still feel from that reversal, I think it gets closer to addressing, though not exactly, the issues that I was discussing with government counsel. I think it can be perhaps distinguished from the situation, but it seems to me worth addressing. So I'm going to adopt the government's suggestion and give the defense as well an opportunity to put in further papers on that issue. And you can submit them contemporaneously limited to ten double-spaced pages by no later than Friday. Well, maybe that's too soon. Why don't we say Monday. Okay? Very good. Thanks a lot.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

1:50 p.m.

(Trial resumed; jury not present)

THE COURT: The government just asked the law clerk whether we were going to 4 or 4:30. I had told the jury 4:30, but let me ask you this. How are we doing in terms of the speed of the trial? Because I think if we were moving not that rapidly in which case I think we would go to 4:30, but if you think we're moving okay, then, what I'm most concerned about, ideally, I would like to finish the case by next week.

But we told the jury it might go a little longer. You may recall that's possibly a problem for one of the remaining alternates. That's why I'm raising it. And of course, we don't know the defense case, although we should know by now. If the defense is actually calling any witnesses other than the defendant. they need apprise the government of that. The defendant is a different question. He doesn't have to make a decision until the close of the government's case.

Well, anyway, I'm perfectly happy to stop at 4. I'm sure the jury would enjoy that, but not if we're not moving at a rapid pace.

So what's the government's view on that?

MR. CAPOZZI: Your Honor, we think we're doing well. We expect that the government's case will probably rest on Monday.

Pc4Frin4

THE COURT:  Okay.  Then I think we can stop at 4 today.

So, bring in the jury.

And let's get -- now wait -- I'm sorry.  One more quick thing.  What did you decide as to the witness?

MR. McGUINNESS:  I'm going to withdraw my objection, your Honor.

THE COURT:  Very good.  Let's get the witness on the stand.

(Continued on next page)

(Jury present)

THE COURT:  Ladies and gentlemen, I have terrible news.  We were originally going to go to 4:30 today.  Counsel have convinced me that we can safely end today at 4 o'clock.  So I know you have nothing better to do with your afternoon.  You're going to miss being here for another half hour, but so be it.  I'll abide by counsel's wishes.

Go ahead.

MR. CAPOZZI:  May I inquire, your Honor?

THE COURT:  Please.

BY MR. CAPOZZI:

Q.  Special Agent Grove, before the lunch break, I believe you testified that you became aware of someone named Carl Rinsch; is that correct?

A.  That's correct.

Q.  About when was that?

A.  About April of 2023.

Q.  How did you learn of Carl Rinsch?

A.  I was contacted by the FBI's Art Crime Team program manager, which is a person that sits in Washington D.C., regarding an American, Carl Rinsch, who had reached out to the FBI's legal attache in Paris, France and wished to file a criminal complaint.

Q.  After you learned of Carl Rinsch, did there come a time when you spoke with him?

A.   There did.

Q.   About when was that?

A.   April 20, 2023.

Q.   Was the phone conversation -- was the conversation in person or over the phone?

A.   Over the telephone.

Q.   What, if anything, did Carl Rinsch say about where he was residing at the time of the call?

A.   Mr. Rinsch resided in Madrid, Spain.

Q.   And during the call, did Carl Rinsch explain his complaint to you?

A.   He did.

Q.   What did he say?

A.   Mr. Rinsch told me that in 2021, he had engaged in a business transaction to purchase a set of high-end furniture known as Polar Bears from a furniture dealer in Paris named Andre Hayat.

     Mr. Rinsch had paid $1 million for the furniture but did not get anything in return and therefore, that was the source of his complaint.

Q.   What, if anything, did he say about why he bought the furniture?

A.   Mr. Rinsch had explained to me that he wanted to buy the best in fine art.  However, the best in fine art was beyond his grasp, financially, so instead, he turned his eye to purchasing

Pc4Frin4                        Grove - Direct

the best in design and furniture, which would include a

collection or sets such as the Polar Bear set and other

mid-century French furniture.

Q.   What, if anything, did Carl Rinsch say about how he paid

for the furniture?

A.   He told me that he paid via wire transfer via his Bank of

America account.

Q.   And what, if anything, did he say about his personal

financial circumstances?

A.   Mr. Rinsch explained to me that he had become wealthy burg

the pandemic by investing dogecoin.  He described himself to me

as the dogecoin whale.

Q.   What did you understand him to mean what he described

himself as the dogecoin whale?

A.   I understood that to mean he had invested heavily in

dogecoin and made a significant profit by doing so.

Q.   And from your training and experience with the FBI, do you

have an understanding of what dogecoin is?

A.   I do, yes.

Q.   What is dogecoin?

A.   Dogecoin is a cryptocurrency, more commonly associated as a

meme coin, which has different characteristics than your

typical cryptocurrency, but at the end of the day, it is a

cryptocurrency.

Q.   In addition to your call with Carl Rinsch, did he provide

Pc4Frin4                    Grove - Direct

records to the FBI?

A.  He did, yes.

Q.  Did you review those records?

A.  I did.

MR. CAPOZZI:  Unless there is an objection, I offer what's been marked as Government Exhibits 5131, 5132 and 5133?

MR. McGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibits 5131, 5132 and 5133 received in evidence)

MR. CAPOZZI:  Ms. Larracuente, if you could please publish what's in evidence as Government Exhibit 5133.

Q.  Special Agent Grove, do you recognize this?

A.  I do.

Q.  What is this exhibit?

A.  This is an invoice from Gallery Andre Hayat, the furniture dealer in Paris, France.

Q.  How do you recognize this?

A.  This item was provided to me by Mr. Rinsch.

Q.  What, if anything, did Carl Rinsch represent this to be?

A.  This was the invoice specific to the Polar Bear set, which included one couch and two chairs.

Q.  Now, highlighting the top half of the exhibit, in the blue box at the top, it says: Gallery Andre Hayat.  Do you see that?

A.  I do.

Q. Based on your conversation with Carl Rinsch, what did you understand that to be?

A. That was the furniture store where Mr. Rinsch purchased these -- the furniture.

Q. At the bottom of the page next to beneficiary name, it says, SARL Themes. Based on the records provided by Mr. Rinsch, what if anything, did you understand that to be?

A. I understand this name, SARL Themes, to be a d/b/a or doing business as moniker for Gallery Andre Hayat.

Q. And what is a d/b/a or doing business as moniker?

A. It's simply another title that usually a business can go by in order to conduct legal transactions.

Q. Going to the middle of the page, if you could expand the top portion, including the middle, who is listed as the client?

A. Carl Rinsch.

Q. What is listed as the date on this invoice?

A. It says 01/11/2021. This being a French invoice, they write the month and day different, so I understand this to be November 1, 2021.

Q. And what items does this invoice appear to concern?

A. It's for the Jean Royère Ours Polaire, or Polar Bear set, including one couch and two chairs.

Q. How much is the invoice for?

A. $1 million.

MR. CAPOZZI: Publish, in its place, Government

Exhibit 5132, which is in evidence.

Q. Special Agent Grove, do you recognize this exhibit?

A. I do.

Q. What is it?

A. This is another invoice from Gallery Andre Hayat to Mr. Rinsch.

Q. And how do you recognize it?

A. This was provided to me by Mr. Rinsch.

Q. Who is listed as the client?

A. Carl Rinsch.

Q. What is listed as the date?

A. October 11, 2021.

Q. For how many items is this invoice?

A. It's a total of four items.

Q. And are these the same items that were reflected in the last invoice that we just looked at?

A. They are different items.

Q. And what is listed as the total cost of these four items?

A. $155,000.

         MR. CAPOZZI:  We could go to what's been marked as, and what's in evidence as Government Exhibit 5131.

Q. Do you recognize this exhibit, Special Agent Grove?

A. I do.

Q. And what is it?

A. It's another invoice from Gallery Andre Hayat to

Pc4Frin4                    Grove - Direct

Mr. Rinsch.

Q. And how do I recognize it?

A. This was provided to me by Mr. Rinsch.

Q. Who is listed as the client?

A. Carl Rinsch.

Q. What is listed as the date?

A. September 2, 2021.

Q. For how many items is this invoice?

A. Four items.

Q. What is listed as the total cost?

A. $164,900.

MR. CAPOZZI: You may take that down, please.

Q. In addition to invoices, did Carl Rinsch provide you with copies of any other records?

A. Yes.

MR. CAPOZZI: Unless there's an objection, your Honor, I offer what's been marked as Government Exhibit 5130.

MR. McGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 5130 received in evidence)

MR. CAPOZZI: Ms. Larracuente, if you could, please, publish that exhibit 5130.

Q. Special Agent Grove, do you recognize this exhibit?

A. I do.

Q. What is it?

A.   It's a bank record provided to me by Mr. Rinsch.

Q.   What, if anything, did Carl Rinsch represent the materials included in this exhibit to be?

A.   These are from his Bank of America account.

Q.   Turning to page 7, on the upper right, it says: funds transfer request authorization.

What did you understand this page to be?

A.   This is as described as an authorization to transfer funds from the account of Mr. Rinsch from his Bank of America account.

MR. CAPOZZI:   And if you could highlight the top half of the page, please, Ms. Larracuente.

Q.   In the customer information section at the top of the page, what name appears?

A.   Carl Rinsch.

Q.   And in the account information section, what is listed as the account?

A.   PER_3966.

Q.   In the wire information, what is listed as the source?

A.   In person.

Q.   What is listed as the ID verification?

A.   U.S. driver's license.

Q.   And are you familiar with bank records from your work at the FBI on the Art Crime Team?

A.   I am, yes.

Pc4Frin4                        Grove - Direct

Q.   What, if anything, did you understand the source and ID verification to men?

A.   That this transaction was conducted in person, meaning at a Bank of America location and that Mr. Rinsch provided a U.S. driver's license as a source of identification.

Q.   What is listed as the wire date?

A.   November 2, 2021.

Q.   What is listed as the wire amount?

A.   $500,000.

Q.   Now, in the recipient information section below that, what is listed as the recipient name?

A.   SARL Themes.

Q.   What is listed as the additional bank instructions?

A.   It states, Royère sofa and two chairs, Polar Bear set in fur; one of two payments.

Q.   At a high level, what did you understand that to mean?

A.   I understood this to correlate to the invoice of the Polar Bear set from Andre Hayat.

Q.   And at a high level, what if anything, did you understand the other pages in this exhibit to consist of?

A.   Additional wire transfers from Mr. Rinsch's account.

            MR. CAPOZZI:   You may take that down, Ms. Larracuente.

            Thank you.

Q.   Did the FBI ultimately open an investigation into Carl Rinsch's complaint?

MR. McGUINNESS:  Objection.

THE COURT:  Well, too late.  Waived.

Q.  Special Agent Grove, are you familiar with something called White Horse?

A.  I am not.

Q.  During your communications with Carl Rinsch, did he say anything about something called White Horse?

A.  No.

MR. CAPOZZI:  Your Honor, no further questions.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. ZEMAN:

Q.  Good afternoon, Mr. Grove.

A.  Good afternoon.

Q.  You testified that you first interacted with Mr. Rinsch in April of 2023; correct?

A.  Yes.

Q.  And that was following his reaching out to the French attache?

A.  That's correct.

Q.  And he had this issue with this French furniture dealer; correct?

A.  Yes.

Q.  Did he tell you he had initiated a lawsuit against them?

MR. CAPOZZI:  Objection, your Honor.

Pc4Frin4 Grove - Cross

THE COURT: Sustained.

Q. He told you that he had wired money to them; correct?

A. Yes.

Q. For high-end furniture that he had purchased?

A. Yes.

Q. But that he never took delivery of; correct?

MR. CAPOZZI: Objection, your Honor.

THE COURT: No, I think the door was opened to the entirety of the conversation. The objection to the previous question went beyond that, but this one, I will allow.

Overruled.

A. That's my understanding, yes.

Q. And he was just trying to recover the money that he had wired to this furniture store; correct?

A. That was my understanding, yes.

MR. ZEMAN: I have no further questions.

THE COURT: Any redirect?

MR. CAPOZZI: No redirect, your Honor.

THE COURT: Thank you very much. You may step down.

(Witness excused)

THE COURT: Please call your next witness.

MR. MARKEWITZ: Thank you, your Honor.

The next witness will be Maria Skotnikova, but before we call her to the stand, I'd like to read an exhibit into the record. I'll be sure to read the questions and answers this

time, your Honor.

THE COURT: Okay. The witness should hang on for a minute. Counsel is about to read.

Go ahead, counsel.

MR. MARKEWITZ: Thank you, your Honor.

Reading, again from paragraph 1(f) from what's already in evidence at Government Exhibit S3, Government Exhibits 1007 through 1011 are true and accurate excerpts of transcripts of hearing testimony provided by Carl Erik Rinsch during the arbitration.

Your Honor, the government would offer Government Exhibit 1009E.

THE COURT: Received.

(Government's Exhibit 1009E received in evidence)

MR. MARKEWITZ: Ms. Larracuente, can you please pull up Government Exhibit 1009E, and please go to page 3, please.

If you could zoom in, please, on the bottom right-hand box. I'll proceed with reading the questions and answers.

"Q. Okay. But it looks like there was a Ferrari?

"A. Absolutely.

"Q. And if you go down?

"A. Four Rolls Royces.

"Q. Four Rolls Royces?

"A. That's correct.

"Q. All purchased in the late 2021 time frame?

A.   Yes.

"Q.   And these purchases weren't necessary for any part of conquest, were they?

"A.   Sorry.  Ask that question again, please.

"Q.   These purchases weren't necessary for --

"A.   Were not?  Is that what you said?

"Q.   Were not.

         MR. MARKEWITZ:  Ms. Larracuente, can you please go to the next page and zoom in on just the top left box?

"A.   No.  Of course they were.  That would be fraud.  I would go to prison otherwise.

         MR. MARKEWITZ:  You can take that down, Ms. Larracuente.  Thank you.

         Your Honor the government will call Maria Skotnikova to the stand.

         THE COURT:  All right.

MARIA SKOTNIKOVA,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

         MR. MARKEWITZ:  May I proceed, your Honor?

         THE COURT:  Yes.

         MR. MARKEWITZ:  And Ms. Skotnikova, can you just make sure you keep your voice up?  It's just a little hard to hear you back here.

         THE WITNESS:  Okay.

DIRECT EXAMINATION

BY MR. MARKEWITZ:

Q.   Good afternoon.

A.   Hello.

Q.   Who, if anyone, were you working for in the second half of 2021?

A.   For Carl Rinsch.

Q.   What work were you doing for Mr. Rinsch during that time?

A.   Different task, including keeping records, helping with financial reports, buying some luxury things, managing project Amarna, registering entities.

Q.   We'll talk about all of those, but I want to focus on -- you said buying luxury things.  Did I hear that right?

A.   Yes.

Q.   What sorts of luxury things were you buying for Mr. Rinsch at that time?

A.   Cars, watches, designer furniture, designer accessories, bedding.  That's the big items, yes, this.

          MR. MARKEWITZ:  If there's no objection, the government would offer Government Exhibits 5050 and 5051.

          MR. ZEMAN:  No objection.

          THE COURT:  Received.

          (Government's Exhibits 5050 and 5051 received in evidence)

          MR. MARKEWITZ:  Ms. Larracuente, can we publish

Government Exhibit 5051. If we could zoom in on the bottom portion of the screen, please, Ms. Larracuente, where we can actually see.

Q. Ms. Skotnikova do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It's a copy of messages between me and Carl.

Q. Between you and Carl. And who do you mean by Carl?

A. Carl Rinsch.

Q. See at the top, there's a date stamp that says August 7, 2021?

A. Yes.

Q. Who were the messages sent from below that date stamp?

A. In gray color, it's messages from Carl to me.

Q. Okay. Can you read the top two messages from Carl to you on August 7, 2021?

A. I'm supposed to buy Ferrari and that watch this weekend, my birthday gift to me, to myself.

MR. MARKEWITZ: Ms. Larracuente, can we now you pull up, please, Government Exhibit 5050. And if we could please zoom in from the top -- the first blue message on the page, please. It does have redactions on it, but include that. Thank you.

Ms. Skotnikova, do you recognize this document?

A. Yes.

Q.   What is it?

A.   It's a copy of messages between me and Carl as well.

Q.   What color messages are the ones that you sent?

A.   In blue color.

Q.   And what color are the messages that Mr. Rinsch sent?

A.   In gray.

Q.   Around when were the messages on this page sent?

A.   It's dated July 2021.

Q.   In your first visible message on the page, the blue message, you write: from Vacheron Constantin we have not received the funds yet.  Would you please check with you bank.  Thank you.

A.   It's a brand for Swiss watches.

Q.   For what watches?  Sorry.

A.   Swiss.  Made in Swiss.

Q.   Why were you talking to Mr. Rinsch Vacheron Constantin watches in July 2021?

A.   He requested to know the price for the timepiece he wanted to buy.

Q.   You said the word timepiece.  What's a timepiece?

A.   It's a watch, another name for a watch.

Q.   Did he tell you what watch he wanted to buy?

A.   There was a specific model.

Q.   And what was your role in that transaction?

A.   I contacted the representative of Vacheron Constantin and

request for the price.

Q.  Did you receive the price?

A.  Yes.

Q.  Approximately how much was the price of the watch that he was asking for the price of?

A.  Over $300,000.

Q.  Are you aware of whether he bought that watch?

A.  Yes, he did.

Q.  I want to back up for just a moment.  Where are you from originally?

A.  Was born and raised in Moscow, Russia.

Q.  Where do you lived today?

A.  Vancouver, Washington State, United States.

Q.  You said Vancouver, but it's a Vancouver in Washington State here, not Canada?

A.  Yes.

Q.  When did you move to the United States?

A.  In 2009.

Q.  And have you lived here since then?

A.  Yes.

Q.  From what company, if any, do you work today?

A.  It's Black Sky Symmetry.

Q.  What is Black Sky Symmetry?

A.  It's a company me and my husband co-founded.

Q.  Around when did the two of you co-found that company?

A.   Around 2014.

Q.   So what is Black Sky Symmetry's business?

A.   3-D concept art.

Q.   You used the phrase, 3-D concept art.  What is that?

A.   Three-dimensional concept art, meaning that it's not just two-dimensional sketch; it's a full-on three-dimensional model made in special software for this purpose.

Q.   And again, I'll just ask you to keep your voice up just a little bit.  It's just a bit difficult to hear you back here.

A.   Okay.

Q.   Focusing on the period of 2018 to 2020, what sorts of work was Black Sky Symmetry doing?

A.   Design, concept design for the White Horse, one of the project and other movies like "Transformers", "Alita Battle Angel."

Q.   You said White Horse.  What's White Horse?

A.   It's the TV series for the Netflix.

Q.   Who at Black Sky Symmetry was the one actually creating these concepts?

A.   My husband, Vitaly Bulgarov.

Q.   And what was your role at Black Sky Symmetry?

A.   Back office, supporting the business.

Q.   Other than yourself and your husband, does anyone else work for Black Sky Symmetry?

A.   No.

Q.   Before we go any further, let me ask you:  Do you have any agreements with the United States Attorney's Office for the Southern District of New York?

A.   Yes, I do.

Q.   What do you understand that the government said it would do in that agreement, if anything?

A.   I will not be criminally prosecuted for any crimes related to Carl's spending of approximately $11 million.

          MR. ZEMAN:  Objection.

          THE COURT:  I'll allow it.

          Go ahead.

          THE WITNESS:  -- paid by Netflix.

BY MR. MARKEWITZ:

Q.   As part of that agreement, did you admit to committing any crimes?

A.   No.

Q.   Were you accused of committing any crimes?

A.   No.

Q.   What do you understand that you promised to do in return in that agreement, if anything?

A.   Testify truthfully.

Q.   Switching gears, how did you first come to learn who Mr. Rinsch was?

A.   When Mr. Rinsch contacted my husband, Vitaly, regarding his project, the White Horse project, and Vitaly started working on

the designs.

Q.  And around when was that?

A.  2018.

Q.  Did there come a time when you began to work on White Horse yourself?

A.  June 2019.

Q.  How did that happen?

A.  I contacted the producer on the project, Gabriela, and wrote her an email offering my services, and she hired me.

Q.  When you first started, what was your role on the project?

A.  I started as a production assistant, and my first assignment was to help with travel of the local crew.

Q.  Travel to where?

A.  Brazil.

Q.  Over the next few weeks, how, if at all, did your role on the project change?

A.  I ended up helping with the budgeting.

Q.  What did that mean as a day-to-day matter?

A.  I was working with the Brazilian producer who worked directly with the production company in Brazil, and I was helping to transfer data from Movie Magic to Excel.

Q.  Just a few follow-up questions there.  You said Movie Magic?  What is Movie Magic?

A.  It's a special software usually used to create budgets and plan the movie shoot.

Q.   You said you were moving data from Movie Magic to excel.
Do I have that right?

A.   Yes.

Q.   What type of information were you moving from Movie Magic
to Excel?

A.   Numbers.

Q.   And what were those numbers?

A.   Budgeting for different departments in order to make the
movie.

Q.   Were you the person who was actually preparing the budgets?

A.   No.

Q.   So, beyond moving the budgets from one format to another,
were you doing anything else in your role working on the
budget?

A.   No.

Q.   Did you review the information as you would transfer it?

A.   Yes.

Q.   Did you travel to Brazil for the shoot?

A.   Yes.

Q.   When you were in Brazil, did you have visibility into the
actual spending that was occurring?

A.   Yes.

Q.   How so?

A.   I was given access to accounting department of the
production company in Brazil, and I was getting information on

Pc4Frin4                    Skotnikova - Direct

a daily basis from the accountants.

Q.   And so what type of information did you have access to?

A.   Actual invoices and spendings that were one of the

production expenses.

Q.   And were you reviewing that information?

A.   Yes.

Q.   Once you arrived in Brazil, how did the actual spending

compare to what had been budgeted?

A.   Over two weeks, there was couple departments in the budget

that were over budgeted.

Q.   So you said over two weeks, just, can you explain what that

time frame -- what the relevance of that time frame is?

A.   It's a pre-production time when the actual shoot just

didn't start yet, so you just prepare for the shoot.

Q.   Did you speak with Mr. Rinsch about the show's budget

during that time?

A.   Yes.

Q.   Can you describe those conversations for us?

A.   I was telling him when we meet about current

spending, current speed of spending, or some issues with

expenses.

Q.   And how did he respond?

A.   He was concerned.

Q.   Were you in Brazil for the entire time the production was

there?

Pc4Frin4                    Skotnikova - Direct

A.   No.

Q.   Why not?

A.   I was fired.

Q.   Was that the last time that you worked on White Horse?

A.   No.

Q.   How did you come to work on the project again?

A.   I was contacted by Carl Rinsch, himself.

Q.   Around when?

A.   Around late October, November, 2019.

Q.   And what did Mr. Rinsch say when he contacted you?

A.   That he needed help with the budgeting.

Q.   Did you -- and you returned to the role after that?

A.   Yes.

Q.   What was your title when you returned?

A.   Budget Supervisor.

Q.   What were you doing as a budget supervisor when you returned to White Horse?

A.   I was monitoring budget versus spending of the production company in Hungary.

Q.   Did you, in fact, go to hungry for the production?

A.   Yes.

Q.   When you were in Hungary, how closely, if at all, were you with Mr. Rinsch?

A.   Almost every day.

Q.   Were you in Hungary for the entirety of the shoot there?

A.   Yes.

Q.   Around when did the shoot in Hungary finish up?

A.   December 2019.

Q.   Did the production have any equipment in Hungary at that time?

A.   Yes.

Q.   Are you aware of what happened to that equipment when the shoot finished there?

A.   Yes.

Q.   How were you aware of that?

A.   I was helping with the contract, with the warehouse in Hungary, to re- -- to place their old equipment.

Q.   So, maybe just -- I'll just follow-up, then.  Can you just say for us more specifically, what happened to the equipment after the shoot finished that was in Hungary?

A.   All the equipment were placed in a warehouse in the Hungary and stayed there.

Q.   Why was the equipment left in Hungary, to your knowledge?

A.   Because there were plans to continue shooting next year in some of the European countries.  So, there was -- they were making sense to leave in Europe and return to move it to another country when we schedule the shooting.

Q.   Now, did you continue to work on White Horse in the first few months of 2020?

A.   Yes.

Q.   Focusing on your time working on the project in 2019 and 2020, did you have visibility into the various sorts of work that was going on on the project?

A.   Yes.

Q.   How so?

A.   I have an access to financial information and invoices.

Q.   And again, were you reviewing that information?

A.   Yes.

Q.   Focusing on the period in early 2020, around that time, did Mr. Rinsch or the production receive any money from Netflix?

A.   In March 2020.

Q.   How much money did they receive?

A.   $11 million.

Q.   And how did you learn of that payment?

A.   Later when I saw the statements, bank statements.

Q.   Now, in March 2020, did the COVID-19 pandemic cause shutdowns?

A.   Yes.

Q.   Did you continue to work for Mr. Rinsch after the start of those shutdowns?

A.   Yes, remotely.

Q.   How would you all communicate during the shutdowns?

A.   Through emails, messages, phone calls.

Q.   When you say messages, what do you mean by "messages"?

A.   WhatsApp or iMessage.

Q.   Just for those of us who may not know, what's WhatsApp?

A.   It's an application for messaging.

Q.   And how frequently were the two of you in communication over this period in 2020 during the COVID lockdowns?

A.   Frequently.

Q.   Frequently, what do you mean by that?  Every day?  Every week?

A.   Every week for sure, sometimes everyday.

Q.   Around when did you ultimately stop working for Mr. Rinsch?

A.   The beginning of 2022.

Q.   Why did you stop working for him at that time?

          MR. ZEMAN:  Objection.

          THE COURT:  Sustained.

Q.   What were you doing for him between -- actually, strike that.

          What were you doing for him throughout 2020, after the start of the COVID pandemic?

          MR. ZEMAN:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  So should I answer?

          THE COURT:  Yes.

          THE WITNESS:  At the beginning of 2020, I was working with the accountants to help with the financial reports, doing some planning on the further shooting in 2020 and helping with some managing artist thing.

BY MR. MARKEWITZ:

Q.  After the first few months of 2020, did you personally perform any work on future White Horse productions?

          MR. ZEMAN:  Objection.

          THE COURT:  Overruled.

A.  After March?  No.

Q.  You mentioned having access to financial statements and invoices earlier.  Do you recall that?

A.  Yes.

Q.  Did that access continue throughout 2020?

A.  Yes.

Q.  Did you continue to review those records?

A.  Yes.

Q.  And did those records concern Mr. Rinsch and his company?

A.  Yes.

Q.  Based on the information you had access to, did you have any information about additional White Horse production work occurring after the first few months of 2020?

          MR. ZEMAN:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  Can you repeat the question?

Q.  Based on the information to which you had access, did you have any additional information about any White Horse production work?

A.  Production, no.

Pc4Frin4                    Skotnikova - Direct

Q.   Now, when you were in Brazil and Hungary for White Horse, was footage shot there?

A.   Yes.

Q.   Are you familiar with the concept of post-production work in film production?

A.   Yes.

Q.   How are you familiar with that term?

A.   My husband worked in the movies.  And later, I was also involved with photography, so I did HDR photography, which is used to render 3-D models.

Also, I worked in the video games industry.  I was art director back in the days, so I'm pretty much familiar with how the things are done in special VFX.

Q.   Just at a very high level, what is post-production work on a TV show.

A.   It's editing.  It's special, like, visual special effects. It's sound design.  It's color grading.  So, a lot of things involved in post-production.

Q.   You said the word editing.  What's editing?

A.   It's when you have a lot of material from principal shooting and you have a script, and you have to decide which take will go, which not and also compose the movie.

Q.   You say you have a lot of material?  What is -- material footage?

A.   Material footage, yes.

Q.   In 2020, did you ever speak to Mr. Rinsch about the status of the post-production work on White Horse footage that had been shot in 2019?

A.   Yes.

Q.   Around when did you speak to him about that?

A.   Spring 2020.

Q.   What did he say to you in the Spring of 2020?

A.   That the project is in limbo because of some dispute with Netflix.

Q.   And did he say anything in particular about the post-production work in that conversation?

MR. ZEMAN:  Objection.

THE COURT:  I'll allow it.

Overruled.  You may answer.

THE WITNESS:  Post-production.  I ask why it's -- the material, the footage wasn't edited further, and he said it's because still have minor issue with Netflix and Netflix has to pay more money in order for him to continue.

MR. MARKEWITZ:  Your Honor, the government would offer Government Exhibit 6188, if there's no objection.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6188 received in evidence)

MR. MARKEWITZ:  Ms. Larracuente, can you please publish what's been introduced as government Exhibit 6188, and

can you please zoom in on just the top email on the thread?

Q.   Do you recognize this document, Ms. Skotnikova?

A.   Yes.

Q.   What is it?

A.   It's an email from Neil Spangler to me.

Q.   Who is -- and what's the date of this email?

A.   January 31, 2020.

Q.   The subject line is: Carl Rinsch Production Accounting.
So, who is Neil Spangler?

A.   It's a CPA based in Los Angeles who was hired to produce
the reports.

Q.   Just a few things to unpack there.

        You said CPA.  What's a CPA?

A.   It's an accountant, certified accountant.

Q.   And you said he was hired to prepare reports.

        Did I hear that right?

A.   Yes.

Q.   Who hired Mr. Spangler?

A.   Carl.

Q.   And what sorts of reports was he hired to prepare?

A.   Negative cost reports and preparation for tax returns.

Q.   I want to focus on the first thing you said.  What is a
negative cost report?

A.   It's a report all expenses for the movie production as
stated.

Q.   And what movie in particular?

A.   The White Horse project.

Q.   Were you part of any conversations involving Mr. Rinsch in which that negative cost reporting project was discussed?

A.   Yes.

Q.   What, if anything, did Mr. Rinsch say about the purpose of the negative cost reporting project?

A.   It was to present it to Netflix to report for every dollar spent on production.

          MR. MARKEWITZ:  We could pull down Government Exhibit 6188.  Thank you.

Q.   Were you personally involved in the negative cost reporting project?

A.   Yes.

Q.   What was your role?

A.   I was middleman.

Q.   What do you mean by that?

A.   I was collecting all the information I could reach to present it to the CPAs.

Q.   CPAs, is that -- who is that again?

A.   Neil Spangler and his company.

Q.   And you said you're collecting information.  What sorts of information?

A.   Bank statements, invoices, reports from the production companies from Brazil and Hungary.

Pc4Frin4                    Skotnikova - Direct

Q.   As part of this project, did Mr. Spangler or others from his firm ever ask questions about the White Horse production?

A.   Yes.

Q.   Whose responsibility was it to answer those questions?

A.   If I have information, I was responsible.  If I didn't have information to reply to the question, I would ask Carl.

MR. MARKEWITZ:  Your Honor, the government would offer, if there's no objection, Government Exhibit 6194.

MR. ZEMAN:  Objection.  Hearsay.

THE COURT:  Yeah, I don't know what the exhibit is.

MR. MARKEWITZ:  Ms. Larracuente, can we pull up the exhibit for just the parties and the witness.

Ms. Larracuente, can you zoom in on the top email for Judge Rakoff, please.  Let me see the rest.

THE COURT:  Sustained.

(Counsel conferred)

MR. MARKEWITZ:  Your Honor, could we have a quick sidebar?

THE COURT:  Sure.

(Continued on next page)

Pc4Frin4                    Skotnikova - Direct

(At sidebar)

THE COURT:  So, it looks to me like an out-of-court statement being offered for its truth, which is the definition of hearsay.

MR. MARKEWITZ:  Your Honor, I believe I laid -- and I'm happy to ask one follow-up question, whether this email concerned the negative cost report of the project.  But I believe I laid the foundation of, this would be the statement of Mr. Rinsch's agent.  She was hired for the project by Mr. Rinsch.  She was involved in the project.  She was collecting the information, and one of her responsibilities was to answer questions posed to her by the CPA.

THE COURT:  What about that?

MR. ZEMAN:  I don't think the foundation has been laid that this -- her answer would have been based on hearsay that she would have heard from somebody else, so I think it's a double hearsay problem.

MR. MARKEWITZ:  I think she's laid the foundation sufficiently and at length about her access to all sorts of information and records related to the show and her own personal work on it.  I'm also happy to ask her how does she know the answer, where is that coming from.

THE COURT:  On that, I think you have -- counsel, of course, can cross-examine.  Do you want to voir dire on agency?

MR. ZEMAN:  I'll deal with it at cross.

THE COURT:  Okay.  So I will receive the exhibit.

MR. MARKEWITZ:  Okay.  Thank you, your Honor.

(Continued on next page)

(In open court; jurors present)

Okay, based on the sidebar, the exhibit is received.

(Government's Exhibit 6194 received in evidence)

THE COURT:  Thank you, your Honor.

MR. MARKEWITZ:  Can you please publish for the jury what's been introduced as Government Exhibit 6194 and can you please zoom in on just the top email in the thread.

Ms. Skotnikova, I'm showing you what's been introduced into evidence as Government Exhibit 6194.

Do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's an email from me to Marissa.

Q.   Who is Marissa?

A.   One of the CPAs at Neil Spangler's firm.

Q.   What is the date of this email?

A.   August 25, 2020.

Q.   And I see it in the copy line there, there is an email: CERinsch@runbox.com.  Who is that?

A.   It's Mr. Rinsch email.

Q.   And you see in the body of your email there is some text that is a slightly different font from the rest and it's in quotes?

A.   Yes.

Q.   Where did that text come from?

A.   It's a copy-paste from the previous email with Neil.

Q.   The first word is: here?

A.   It's meant to be "there."  I just missed one letter.

Q.   So you write:  Everything on pause, even post-production and editing, since the end of December of 2019.

     Do you see that?

A.   Yes.

Q.   What are you referring to there?

A.   The facts.

Q.   What project?

A.   That there was no movement on post-production and everything else on the project.

     THE COURT:  The question was, what project?

     THE WITNESS:  The White Horse project, sorry.

Q.   And what was your basis for saying that?

A.   Financial information and the -- any direction with other members of the crew.

Q.   Did Mr. Rinsch ever reach out to you after you sent this email and tell you he disagreed with what you said?

A.   No.

Q.   At the last line of your email, you refer to a CBIZ. What's CBIZ?

A.   It's another CPA firm that was handling finances previously.

     MR. MARKEWITZ:  You can pull this down.

Pc4Frin4                    Skotnikova - Direct

          Thank you, Ms. Larracuente.

Q.  Setting aside White Horse for a moment, during 2020 or
2021, did Mr. Rinsch speak with you about any other projects?

A.  Yes.

Q.  What project?

A.  Project Amarna.

Q.  When did he first speak with you about project Amarna?

A.  Summer 2020.

Q.  What did he tell you about the project at that time?

A.  It was -- at the beginning it was research, kind of
scientific and exploring some theories.

Q.  You can give us one or two examples of the types of
research?

          MR. ZEMAN:  Objection.

          THE COURT:  I'll allow it.

          THE WITNESS:  I answer, right?

          THE COURT:  Go ahead.

          THE WITNESS:  From black holes to human autonomy,
anatomy, and some bats' behavior in the caves and movement of
the ice.

Q.  Who was in charge of project Amarna, to your knowledge?

A.  Mr. Rinsch.

Q.  Did you have any title on the project?

A.  Not official.

Q.  Understanding you didn't have an official title, did you

have any role on the project?

A.   Yeah, you can call it project manager.

Q.   Can you explain to us what your duties were?

A.   I was managing artists.  I was doing some research.  I was structuring information and store it in the Dropbox so everybody has access.  I helped with collecting invoices and did some 2-D art myself.

Q.   Based on your conversations with Mr. Rinsch and the tasks that you saw being performed on project Armana, to your knowledge, was it connected to a movie or a TV show?

A.   To my knowledge, no.

Q.   Focusing on the period of 2020, what categories of work did you see be performed for project Amarna?

A.   Some 3-D visualization, some research on several topics.  The company was registered, and there was a request to register a trademark as well for Amarna and websites for Amarna.

Q.   You said 3-D visualizations.  What are those?

A.   It's when --

        MR. ZEMAN:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  It's 3-D visualization, when you take a 2-D, two-dimensional sketch or representation of anything and you represent it in three-dimensional software or any other tool you have, or sometimes you add animation -- sometimes not -- sometimes special effects or whatever needed to be done to

Pc4Frin4                    Skotnikova - Direct

use it in three-dimensional space.

MR. MARKEWITZ:  If there's no objection, the government would offer Government Exhibit 6196.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6196 received in evidence)

MR. MARKEWITZ:  Ms. Larracuente, can we please publish Government Exhibit 6196 for the jury.  If we could zoom if in on the portion -- thank you.

Q.  Ms. Skotnikova, I'm showing you what's been admitted into evidence as Government Exhibit 6196.

Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's an email from me to Nick Gindraux.

Q.  First things first, what project did this email have to do with?

A.  Amarna.

Q.  And in the second line of your email, at the end, you refer to Amarna archives, what are the Amarna archives?

A.  It's a Dropbox I created specifically to store all the data we collected for the project.

Q.  And so in the two field, there is -- the first name is a Nick Gindraux.  Do you see that?

A.  Yes.

Pc4Frin4                    Skotnikova - Direct

Q.   What sorts of work was Mr. Gindraux doing on project

Amarna?

A.   He was doing the 3-D visualization.

          MR. MARKEWITZ:  If we could please go to page 2 of

this exhibit.

Q.   What is this?

A.   It's a 2-D representation of Carl's drawing.

Q.   To your knowledge, did this have anything to do with White

Horse?

A.   No.

Q.   We could pull this down, please.

          The government would offer, if there's no

objection, Government Exhibit 6198.

          MR. ZEMAN:  Objection.  May we approach, your Honor?

          THE COURT:  Sure.

          (Continued on next page)

(At sidebar)

MR. ZEMAN: My objection is to relevance and the cumulative nature of this. I know this is another exhibit about Amarna. The jury has now heard about this. They've seen exhibits. I'm just wondering why we need to keep beating the Amarna horse.

MR. MARKEWITZ: It's two-fold, your Honor.

Number one, the defense has included on their exhibit list and also received materials pursuant to a trial subpoena related to work that both Nick Gindraux and his brother, Spencer Gindraux, performed.

And my understanding is that they would like to say that this is work performed by White Horse, so we are putting into evidence our understanding that, in fact, those individuals were performing another unrelated project during this time period.

Similarly, there are other invoices and expenses that could, if the jury is reviewing the bank records in evidence, look as though it's White Horse because it is things like concept designs, 3-D designs, things like that, and they are related to Amarna.

Our position is that is Amarna work, not White Horse. The next email I'm showing --

THE COURT: All right. Hold on.

What about all that?

MR. ZEMAN: She testified that, I think, that she doesn't know whether this was related to White Horse or not. Now, I think we're at least at September --

THE COURT: I think, to my recollection, she it was not related.

MR. MARKEWITZ: I can ask the question again.

MR. ZEMAN: But now we're into September 2020.

MR. MARKEWITZ: Well, the other issue is there's other names on here, and so we --

THE COURT: Let me cut to the chase. Is the defense contending that any expenses relate to these particular transactions and documents we're talking about are related to White Horse as opposed to Amarna or something else?

MR. ZEMAN: Well, it depends when they are. They could be related to White Horse. They could be related to this other entity, which we contend is it related to White Horse, but --

MR. MARKEWITZ: And that seems like it's relevant your Honor.

THE COURT: I think so, too, and so the objection is overruled.

You may have cross, of course.

(Continued on next page)

(In open court; jurors present)

THE COURT:  Why don't we take a ten-minute break at this point.

You can step down.  We'll see you in ten minutes.

(Jury excused)

(Continued on next page)

(Jury not present)

Okay.  We'll see you all in ten minutes.

(Recess)

(Continued on next page)

THE COURT:  Please be seated.

MR. MARKEWITZ:  The government would offer Government Exhibit 6198.

THE COURT:  Received.

(Government's Exhibit 6198 received in evidence)

BY MR. MARKEWITZ:

Q   Ms. Larracuente, can you please publish that document.  If we could zoom it.  Thank you.

Do you recognize this document, Ms. Skotnikova?

A   Yes.

Q   What did this email -- what is it?

A   It's an email from me to a list of people.

Q   And what's the date of this email?

A   September 27, 2020.

Q   What project did this email have to do with?

A   Project Amarna.

Q   So there's a number of people listed in the BCC line.  Do you see their names?

A   Yes.

Q   What, if any, connection did they have to Project Amarna?

A   They were providing artist services.

Q   Directing your attention to the BCC line at the very end of the first one.  There's Nick Gindraux.  Do you see that?

A   Yes.

Q   Is that the Nick Gindraux that we looked at from the prior

email?

A    Yes, the same.

Q    To the left of his name says Spencer Gindraux.  Who is that?

A    It's Nick's brother, also 3D artist.

Q    We can pull this down.  Thank you.

          Now, at some point did the nature of the Amarna work Mr. Rinsch was having you do change?

A    Yes.

Q    Around when did that change occur?

A    Summer 2021.

Q    And how did it change?

A    He asked to buy a lot of things.

Q    And how was that related to Project Amarna?

A    The idea of Amarna changed to some luxury lifestyle corporation.

Q    So going back to Mr. Rinsch's finances, I think you said you had visibility into them in 2020; is that right?

A    Yes.

Q    How, if at all, did your visibility into his finances change over the course of 2020 and into 2021?

A    In 2021 -- in April 2021 I was able to log in myself to his bank accounts and credit cards.

Q    Who gave you that access?

A    Mr. Rinsch.

Q   Were you able to access the accounts without his assistance?

A   Yes.

Q   Were you able to make purchases or send money without his assistance?

A   No.

Q   What do you mean by that?

A   In order to do any purchases or money transfer, I would need to double way identification.

Q   Sorry.  What did you say at the end there?

A   Two-way authentication.

Q   What is that?

A   It's basically some code from bank to Mr. Rinsch, so to confirm that he's the person making the transfer.

Q   And how is that code communicated?

A   While I was online on the bank application, I would be on the phone or texting him so he can send me the code.

Q   And I apologize.  When did you say that you gained that additional access?

A   Around April 2021.

Q   Were you reviewing his financial records after that date?

A   Yes.

Q   Based on what you saw, how, if at all, did Mr. Rinsch's spending habits change between 2020 and the end of 2021?

A   They changed drastically.

PC4JRIN5                    Skotnikova - Direct

Q    How so?

A    He was buying expensive things.

Q    Are those the things you mentioned at the start of your testimony?

A    Yes.

Q    Did you talk to Mr. Rinsch about why he was buying all those things?

A    Yes.

Q    What did he say?

A    Don't ask, just buy.

Q    Did you ask him again?

A    Yes.

Q    What did he say?

A    Some of them were investments.

Q    What do you mean by that?

A    So for example, expensive cars or watches, they wouldn't lose in price over the time.

Q    Did he say anything else to you about why he was buying all these items?

A    Later in 2021, when I was preparing all the financial reports for 2021, he was mentioning tax deadline in 2021.  So he need to spend $11 million in order to not pay taxes on them.

Q    Did he say anything to you about Netflix?

A    And report to Netflix about every dollar spent on the production.

Q    How did that report relate to this spending in 2021?

A    It showed proof that $11 million were spent for the purpose of production of the movie, the *White Horse* movie.

Q    You had done budgeting on *White Horse* prior to this; is that correct?

A    Yes.

MR. ZEMAN:  Objection.

THE COURT:  Overruled.

Q    Mr. Rinsch, ever ask you to budget these items for the production?

A    Can you rephrase the question.

Q    Did he ever ask you to track this spending as part of a budget for the production?

A    Yes.

Q    For the production, for making the show *White Horse*?

A    Just for, like, the company, his production company, his expense.

Q    What I'm asking is not was it being tracked --

THE COURT:  Let me see if I can clarify because I think it's a little confusing and it may be confusing to the jury as well.

You testified there came a point in time when he began making large, expensive purchases of cars, watches, and the like, correct?

THE WITNESS:  Yes.

THE COURT:  And approximately when was that?

THE WITNESS:  Started in August 2021.

THE COURT:  Okay.  And to your knowledge or information, were those actually related to the *White Horse* project or not?

THE WITNESS:  Directly it was not related to the production of *White Horse*.

THE COURT:  And were you asked to nevertheless record them in some way as being related to *White Horse*?

THE WITNESS:  Pass the information to the CPA as expenses.

THE COURT:  And that was to avoid taxes?

THE WITNESS:  Yes.

THE COURT:  All right.  Go ahead, counsel.

BY MR. MARKEWITZ:

Q   The work product that the CPAs were preparing, who, if anyone, was that going to be provided to?

A   The negative cost report to Netflix and the books were prepared to do the tax return.

Q   And the information you provided during the questioning with Judge Rakoff, was that information going into the negative cost report that would be provided to Netflix as well?

A   There was open items that were to discussed, but all the data, all the statements, all the transactions were presented to the CPAs.

Q   What, if anything, did Mr. Rinsch tell you about the status of the *White Horse* production around the time he was making these purchases in 2021?

A   That the project is in limbo and the movies is dead in general.

Q   Ms. Larracuente, can we please publish what's already admitted into evidence as Government Exhibit 3001.  And can we zoom in on the top half of this page, please.  Can you go a little bit further so we have the account number as well.

    Ms. Skotnikova, do you recognize this document?

A   Yes.

Q   What is it?

A   It's one of the bank statements from Bank of America.

Q   Do you recognize this account in particular?

A   Yes, it's personal Carl's account.

Q   Was this one of the accounts to which you had access?

A   Yes.

Q   Like to look at some of the transactions.  Ms. Larracuente, can we please go to page 20.  And if you could zoom in from the top of the page through the headers and then also zoom in on the August 27 transaction for $330,000.

    Ms. Skotnikova, before getting into the actual details, are you familiar with this transaction?

A   Yes.

Q   How are you familiar with it?

A    I helped to set it up.

Q    What is this transaction?

A    It's a partial payment to a car dealer for Rolls-Royce.

Q    What car dealer?

A    Rusnak Pasadena.

Q    Who is the person who decided to make this transaction?

A    Mr. Rinsch.

Q    I apologize.  What did you say the vehicle was?  Did you say the vehicle that was being purchased?  I'm sorry.  I didn't hear you?

A    Yes, Rolls-Royce.

Q    Do you know the model of Rolls-Royce?

A    It shows that it's Ghost.

Q    Ms. Larracuente, can we please go to page 22 and zoom in to the first transaction on the page.

         Similarly, Ms. Skotnikova, before you get into the details, are you familiar with this transaction?

A    Yes.

Q    What is it?

A    It's a transfer payment for a car.

Q    And how are you familiar with it?

A    I helped to set it up.

Q    Who is the transaction to and what type car was it for?

A    Transaction is to one of the car dealers, Kerbeck & Sons, and for black Dawn Rolls-Royce.

Q   Ms. Larracuente, can we please now go on page 22.  Can we zoom in on the second to last transaction on that page.

Similarly, Ms. Skotnikova, are you familiar with this transaction?

A   Yes.

Q   How are you familiar with it?

A   I helped to set it up.

Q   And what is it?

A   It's another payment to a car dealer.

Q   Which car dealer?

A   Kerbeck & Sons.

Q   And what was it for?

A   Two other Rolls-Royces.

Q   Which Rolls-Royces in particular?

A   Black Ghost and Cullinen.

Q   And are those models of cars?

A   Yes, it's models.

Q   And again, who was the person who directed that this transaction happen?

A   Mr. Rinsch.

MR. MARKEWITZ:  Like to read paragraph one from what's already admitted into evidence as Government Stipulation S9.

Government Exhibits 6084 through 6086 consist of true and accurate copies of records maintained by FC Kerbeck & Sons, an automobile dealer, in the regular course of its business.

The records were made by or from information transmitted by a person with knowledge of the matter set forth in the records at or near the time of their creation. The records were kept in the course of regularly conducted activity of FC Kerbeck & Sons as a regular practice of that activity.

Your Honor, the government would offer Government Exhibits 6084, 6085, and 6086.

MR. ZEMAN: No objection.

THE COURT: Received.

(Government's Exhibit 6084, 6085, 6086 received in evidence)

BY MR. MARKEWITZ:

Q   Ms. Skotnikova, did you ever speak to Mr. Rinsch about why he was buying these Rolls-Royces in 2021?

A   Yes.

Q   What did he tell you?

A   That's a good investment.

Q   What do you mean by "investment"?

A   That's when you buy something that will be costing more over the time.

Q   What did you understand him to be saying he was getting out of the investment?

A   Because he has a theory that after COVID people will not be able to do such quality things, and these Rolls-Royces will be the last one that will be the same quality as before.

MR. MARKEWITZ:  And your Honor, the government would now like to read paragraph 11 of what's already been admitted as Government Stipulation S9.

THE COURT:  Okay.

MR. MARKEWITZ:  Government Exhibit 6420 and 6421 consist of true and accurate copies of records maintained by United Services Automobile Association, USAA, in the regular course of its business, the records were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation.  The records were kept in the course of regularly conducted activity of USAA as a regular practice of that activity.

Your Honor, the government would offer Government Exhibits 6420 and 6421.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6420 and 6421 received in evidence)

BY MR. MARKEWITZ:

Q   Ms. Larracuente, can you please publish Government Exhibit 6421, and if you can do two pages, please, and go to pages 10 and 11 side by side.  And if you could zoom in, from the top of the page down through the table that reads "description of vehicles."  If you do that on both pages,

please.  Thank you.

Ms. Skotnikova, focusing on the bubble on the left-hand side of the page, at the top left it says USAA Casualty Insurance Company, and below that it says California auto policy renewal declarations.  Do you see that?

A    Yes.

Q    Are you familiar with what USAA is?

A    It's an insurance company.

Q    And are you aware of any connection between Mr. Rinsch and USAA?

A    Yes.  He used this company for insurance.

Q    So focusing on the two bubbles here, these description of vehicles tables, can you tell us what cars are identified in there.

A    Rolls-Royces, five Rolls-Royces and one Ferrari.

Q    Can you read the name in the box titled named insured and address.

A    Carl E. Rinsch.

Q    The top right of the bubble on the left-hand side of the page says effective March 1, 2022 to September 1, 2022.  Below that it says operators.  Can you read the name for us below operators.

A    Carl Rinsch.

Q    And then lastly, Ms. Larracuente, can you please change the call out on page 11 to just the right-hand side of the table

including the asterisk box, please.  Could you include above
that box as well so we have the column that's titled VEH use.
Thank you so much.

So do you see the column titled VEH use?

A    Yes.

Q    What letter is listed next to each of the cars?

A    Letter P.

Q    Looking just underneath where that column is, do you see
where there's a box that has an asterisk and some additional
text next to it?

A    Yes.

Q    At the end do you see where it says P equals?

A    Yes.

Q    What does it say P equals?

A    Pleasure.

Q    Now, there's also a B equals.  What does it say B equals?

A    Business.

Q    We can pull this down.  Thank you.

Did Mr. Rinsch ever tell you about specific plans to
use these Rolls-Royces to make *White Horse*?

A    No.

Q    In your role working on the *White Horse* production had you
read the script for the show?

A    Yes.

Q    Do you recall the approximate date of the script that you

reviewed?

A    End of January 2020.

Q    Now, in addition to having read the script, were you familiar with the intended visual aesthetics and look of the show?

A    Yes.

Q    How so?

A    I was at the meeting when there was introduction for the *White Horse* for journalists and Netflix.  And there was exhibition of costumes and wardrobe made for the project and printed out images of all art that was made for the project by the time.  Also, my husband was working for the project as well, so I knew every design he did for the project.

Q    I believe you testified earlier that you were working on the budget for the show for the Brazil and Hungary shoots; is that right?

A    Yes.

Q    Based on that work, were you aware of any cars that were purchased for those two shooting locations?

A    Yes.

Q    How many cars were purchased?

A    One.

Q    What was the look of that car?

A    It was 1970s era sedan.

Q    Now, other than that one car that was purchased, were any

other cars used for the production in Brazil or Hungary?

A    Yes.

Q    If they weren't purchased, how were they used?

A    Rented.

Q    So why was one car purchased and the remainder rented?

A    You can buy car for purpose of destruction, to destroy it.

Q    Based on your review of the script and the other information you had about the show, were multiple Rolls-Royces required for the *White Horse* production?

MR. ZEMAN:  Objection.

THE COURT:  Well, as phrased sustained.

MR. MARKEWITZ:  I'll move on, your Honor.

Q    Ms. Skotnikova, did you ever see any of the Rolls-Royces that Mr. Rinsch purchased in 2021?

A    Yes.

Q    Which ones did you see?

A    Rolls-Royce Ghost.

Q    Can we show just with the witness and the parties, please, what's marked for identification purposes Government Exhibit 7007.

Ms. Skotnikova, what's reflected on this document here?

A    Rolls-Royce Ghost.

Q    How does the Rolls-Royce depicted in this document compare to the make and model of the Rolls-Royce that Mr. Rinsch

purchased that you saw?

A    It's the same make and model.

Q    Understanding that it appears to be the same make and model, is there anything about that photograph that looked different from the Rolls-Royce that you saw?

A    Yes, the color of the interior, it was bright orange.

Q    The interior color of this photo or the one you actually saw?

A    The one I actually saw.

Q    So other than that interior color, is this photograph a fair and accurate representation of the make and model of Rolls-Royce Ghost that Mr. Rinsch purchased and that you saw in 2021?

A    Yes.

         MR. MARKEWITZ:  Your Honor, the government would offer Government Exhibit 7007.

         MR. ZEMAN:  Objection.

         THE COURT:  Ground?

         MR. ZEMAN:  403.

         THE COURT:  Sustained.

         MR. MARKEWITZ:  Your Honor, can we have a quick sidebar?

         THE COURT:  Sure.

         (Continued on next page)

(At sidebar)

THE COURT:  Of course the main question that I'm sure the jury has is if you have five Rolls-Royces and one Ferrari, what in the world are you driving on Sundays?  But anyway.

MR. MARKEWITZ:  Perhaps a Fiat, your Honor.

THE COURT:  What did you want to say?

MR. MARKEWITZ:  So it was two things, your Honor.  The first is, as I think you've noted previously, obviously not every juror is familiar with everything, and I think it's helpful to show them.  We only have one photo of this Rolls-Royce that we're introducing, and I think it's helpful to show it to them.

The other issue is that we have admitted into evidence that coffee table book that shows photographs from the production including cars that were being used.  And I think it's quite helpful and probative to show the jury how the look and make and model of this car compares to the types of cars that were being used.

THE COURT:  So that's a point I had not considered, the latter point.  I do think while there are some things that need to be clarified for the jury, the general nature of a Rolls-Royce is something that even in this day and age is familiar to all jurors.  If you want, I can voir dire the jury -- no, I don't think we'll do that.

MR. MARKEWITZ:  I don't think that's necessary, your

Honor.

THE COURT:  But what about the second part?  That I think is a good point, that one way of knowing that these could not have been a purchase for *White Horse* is that the photos that were in the book that the defendant himself had presented that showed the vehicles that were being used are very different kinds of vehicles.

MR. ZEMAN:  Well, so we know based on testimony that those photos in that book were from the shoots that occurred in 2019.  These vehicles were purchased in 2021.  If the point is -- if the issue is whether they were for future shooting --

THE COURT:  Yes, I think that goes to weight but not admissibility.  So given that representation, the objection is overruled.

MR. ZEMAN:  I would just say while we're up here, I do anticipate the government is planning to try to admit further photos of other vehicles, particularly the Ferrari in question, and I would maintain or --

THE COURT:  I thought we already had a photo of the Ferrari maybe not in evidence.

MR. MARKEWITZ:  Not in evidence.

THE COURT:  Or maybe it's just wishful thinking on my part.  I understand the point you're making, and I'll deal with that as we get to it.

MR. ZEMAN:  I just want to say one other thing on the

Rolls before we go.  This witness has already testified that these cars were not for the production as far as she understood.

THE COURT:  Yes, but her credibility may be subject to attack in various respects, and therefore the government in any event has to prove its case beyond a reasonable doubt, so I don't think that corroboration is anything other than relevant. So overruled.

(Continued on next page)

(In open court; jury present)

THE COURT:  Based on the sidebar, the exhibit is admitted.  You may show it to the jury.

(Government's Exhibit 7007 received in evidence)

MR. MARKEWITZ:  Thank you, your Honor. Ms. Larracuente, may we please publish this exhibit.

Q   Ms. Skotnikova, where were you when you saw the Rolls-Royce that Mr. Rinsch purchased?

A   I was at the Four Seasons Hotel in Beverly Hills.

Q   Who were you with when you saw this car?

A   With Mr. Rinsch.

Q   Why was Mr. Rinsch at the Four Seasons that day?

A   He was staying there for some time.

Q   And around when was this?

A   Autumn 2021.

Q   We can pull this down, please, Ms. Larracuente, and can we pull back up what's already in evidence as Government Exhibit 3001.  And if we could go to page 28, please, and zoom in on the last transaction on the page.

Ms. Skotnikova, similar to my prior questions, before we get into the details of this, are you familiar with this transaction?

A   Yes.

Q   How are you familiar with it?

A   I helped set it up.

Q    So what was this transaction?

A    It was a partial payment to car dealer for Ferrari.

Q    And who was it that directed this transaction to occur, if anyone?

A    Mr. Rinsch.

Q    Did you have any conversations with Mr. Rinsch about Ferraris in 2021?

A    Yes.

Q    What did he say?

A    In summer 2021 he was looking into buying Ferrari, and he was customizing online for Ferrari Roma.

Q    Did he say anything about why he wanted to buy a Ferrari?

A    As a birthday gift for him.

          MR. ZEMAN:  Objection.

          THE COURT:  Ground?

          MR. ZEMAN:  Foundation.

          THE COURT:  Overruled.

Q    Can you repeat your answer, please, Ms. Skotnikova.

A    He wanted to buy Ferrari as his birthday present.

          THE COURT:  That's what he said to you?

          THE WITNESS:  Messaged, yes.

Q    Ms. Larracuente, can we please go to page 28 of this document and zoom in on the third to last transaction.  Oh, sorry.  You can put this down.  It may be page 29.  I apologize.  Can you just go to page 29.  Yes.  This is the

page. And can you zoom in on the third to last transaction. Thank you.

Ms. Skotnikova, are you familiar with this transaction?

A    Yes.

Q    How so?

A    I helped to set it up.

Q    And what is it?

A    It's another payment for the same Ferrari.

Q    For the same Ferrari as we just discussed?

A    Yes.

MR. MARKEWITZ: Now I'd like to read paragraph 3 from what's already in evidence as Government Exhibit S9.

Government Exhibit 6163 consists of true and accurate copies of records maintained by Ferrari of Silicon Valley, an automobile dealer, in the regular course of its business. The records were made by or from information transmitted by a person with knowledge of the matter set forth in the records at or near the time of their creation. The records were kept in the course of regularly conducted activity of Ferrari of Silicon Valley as a regular practice of that activity.

Your Honor, the government would offer Government Exhibit 6163.

THE COURT: Received.

MR. MARKEWITZ: Ms. Larracuente --

PC4JRIN5                    Skotnikova - Direct

MR. ZEMAN:  Objection.

THE COURT:  Oh, I'm sorry.  I thought he was offering the stipulation.

MR. ZEMAN:  No, then he followed up with 6163.

THE COURT:  I'm sorry.  So --

MR. MARKEWITZ:  Ms. Larracuente, please pull this down.

THE COURT:  Let me --

MR. MARKEWITZ:  For the Court and the parties, please.  Thank you.

MR. ZEMAN:  Pardon me, your Honor.  I withdraw the objection to this exhibit.

THE COURT:  Yes.  I think you were anticipating.

MR. ZEMAN:  I was.

THE COURT:  And we'll deal with that when we get to it.  All right.  Received.

(Government's Exhibit 6163 received in evidence)

BY MR. MARKEWITZ:

Q   Ms. Larracuente, you can now publish this for the jury as well, and can we please go to page 10.  Can you please zoom in on the top two tables on this page, the first one beginning buyer name and address on the left, and then the next is new used on the left.

Ms. Skotnikova who is listed under the buyer name near the top left?

A    Carl Rinsch.

Q    On the right it says seller creditor and underneath it, it says Ferrari of Silicon Valley.  Are you familiar with that entity?

A    Yes.

Q    How so?

A    I helped to fill out the forms.

Q    In the middle of the page, what make and model of car is identified here?

A    Ferrari 812 GTS.

Q    How did that compare to the Ferrari Mr. Rinsch purchased?

A    It's the same Ferrari.

Q    Ms. Larracuente, can we go to page 11, please.

        The table on the left-hand side of this document is titled itemization of the amount financed.  Do you see that at the very top of the table on the left?

A    Yes.

Q    Ms. Larracuente, about middle of the way down the page is a paragraph number two.  Can you zoom in on the row just above that one titled total cash price down to the bottom.

        So starting at the top where it says total cash price, can you read the number on the far right of that.

A    $742,298.08.

Q    Now, looking down at the bottom of the page, you see where it says -- near the bottom of the page there's a line that says

PC4JRIN5                    Skotnikova - Direct

total down payment 450,000?

A    Yes.

Q    And then just below that is a line, amount financed.  Do you see that?

A    Yes.

Q    Was Mr. Rinsch purchasing this car with cash or financing it?

A    Partially financing.

Q    Did you have any discussions with him about why he was partially financing the car?

A    Yes.

            MR. ZEMAN:  Objection.

            THE COURT:  I can't really tell.  Answer the question, and then I'll see if we need to strike it or not.

            MR. MARKEWITZ:  We can move on, your Honor.  It's fine.

Q    Ms. Larracuente, can you please go to page 18.

            Do you recognize this document?

A    Yes.

Q    First, what is it?

A    It's an application for financing.

Q    For financing?

A    Uh-huh.

Q    How do you recognize it?

A    I filled it out for Carl.

Q   Where did the information come from that you put into it?

A   From Mr. Rinsch.

Q   You see at the bottom third there's a signature?

A   Yes.

Q   Do you recognize that signature?

A   Yes.

Q   Whose signature do you recognize it to be?

A   Mr. Rinsch.

Q   We can pull this down, Ms. Larracuente.  Thank you.

        Ms. Skotnikova, did you ever see the Ferrari that Mr. Rinsch purchased in person?

A   Yes.

Q   Where did you see it?

A   Parked in front of the Four Seasons Hotel in Beverly Hills.

Q   Was that on the same day that you saw the Rolls-Royce or a different day?

A   Same day.

        MR. MARKEWITZ:  Your Honor, the government will now read -- can we actually pull up on the screen what's in evidence as Government Exhibit S6 titled stipulation electronic records.

        It is hereby stipulated and agreed by the parties that, starting paragraph 1, the exhibits set forth in attachment A-1 are true and accurate copies of images stored on a laptop obtained by law enforcement on March 18, 2025 at a

residence located at 1267 N. Laurel Avenue Unit Five, West Hollywood, California 90046 at which the defendant was residing.

When this stipulation refers to a Government Exhibit by a number, it includes any Government Exhibit identified by that number followed by a letter.  Can we go to the next page.

This stipulation may be received in evidence as a Government Exhibit at trial.  Neither party will raise authenticity objections to the admission of the Government Exhibits identified herein.  And can we go to the next page, please.

Your Honor, at this time the government would offer Government Exhibit 9001A and 9002A, and I think we can put those on the screen just for the parties and the Court.

MR. ZEMAN:  And I object to these exhibits.

THE COURT:  Well, I need to see them first.  Okay.  To sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  So I assume it's a 403 objection.

MR. ZEMAN:  Yes, cumulative and prejudice from 403.

THE COURT:  So what persuaded me with the Rolls-Royce is that the probative value outweighed the prejudicial effect because I think there is some prejudice to portraying someone with having a lavish lifestyle.  Was the point that the government made about how the book would show what was contemplated for the show was very different from the Rolls-Royces, one of which was portrayed in the exhibit already received.

I assume the same argument can be made with respect to the Ferrari.  But I do begin to get a little concerned about cumulativeness.  And the Ferrari many people would infer is not just sporty, but it is reflective of a lifestyle that some jurors might find extravagant in a way that might be prejudicial.

On the other hand, one could imagine that a sci-fi movie or series of episodes that is portraying outlandish things, for lack of a better word, might have contemplated a Ferrari-like vehicle.  And therefore, the independent value of showing that it's not what was pictured in the book and also the value in corroborating the testimony of the witness suggests that it does have some meaningful probative value.

So the question then becomes does the prejudice

substantially outweigh the probative value, which is the term of Rule 403. And I'll hear anything further anyone wants to say on this, but to me that's the key question is whether the prejudice, of which I think there is some arguable prejudice, is in this context sufficiently strong to say that it substantially outweighs what I think is also the now established probative value.

So you're the objector. Anything you want to say?

MR. ZEMAN: So I do think the prejudice does substantially outweigh the probative value of -- given also the cumulative nature of this with all that we've heard about all of the other cars. Plus I would add we've already heard from this witness that this particular Ferrari Mr. Rinsch said he purchased for himself as a birthday present. There's no allegation that this was --

THE COURT: Well, let me ask you are you going to be contending that this was not purchased for his personal use?

MR. ZEMAN: I'm not going to contend that it was purchased for the show.

THE COURT: You are not going to?

MR. ZEMAN: Yes, exactly.

THE COURT: Okay. So given that concession, why do we need this?

MR. MARKEWITZ: Your Honor, because I think ultimately the defense doesn't bear the burden they and they have to

present a case at all if they don't want to.  Mr. Rinsch

previously did pass this off as for the show to Netflix, and so

us being able to disprove those prior statements, even if

they're not repeated here during this trial, does go to the

fraudulent intent.

I would also add that the probative value of the

Ferrari is actually higher than the Rolls-Royce because the

Ferrari is even more obviously not matched to what's in the

book, and as your Honor noted it's not necessarily clear.  I

would also include that they have seen a lot of dollar figures

that's sort of bound up in this case.

THE COURT:  Yes.  Although I did find there was a

certain irony in the Rolls-Royce model being called a Ghost,

but that's a separate issue.

MR. MARKEWITZ:  We'd be happy -- I have two photos up

on the screen.  Perhaps one way to solve this is we get rid of

one and we just go with one photo instead of two.

THE COURT:  All right.  Though I think it's a somewhat

closer call than in the case of the Rolls-Royce, I will allow

you to put in one photo.

(Continued on next page)

(In open court; jury present)

MR. MARKEWITZ:  Ms. Larracuente, can we please pull down what's been marked as Government Exhibit 9001A and leave only what's marked as Government Exhibit 9002A.

Your Honor, the government offers 9002A only.

THE COURT:  Received for the reasons stated at the sidebar.

(Government's Exhibit 9002A received in evidence)

MR. MARKEWITZ:  Publish this for the jury, please. Thank you.

THE COURT:  Counsel, you've got about seven minutes left.

MR. MARKEWITZ:  Okay.

Q   Ms. Skotnikova, do you recognize the car in this photograph?

A   Yes.

Q   How do you recognize it?

A   Same color, model, make, and it's in the front of the Four Seasons Hotel entrance.

Q   So sorry.  You said same --

A   Color.

Q   -- color, make, and model as what?

A   Ferrari.

THE COURT:  As the one that --

THE WITNESS:  I saw personally.

THE COURT:  As the one that you were referring to in your earlier testimony?

THE WITNESS:  Yes.

Q   And do you recognize where this photograph was taken?

A    In front of the Four Seasons Hotel Beverly hills.

Q   Did you ever see inside this car?

A   Yes.

Q   How many seats did it have?

A   Two.

Q   Mr. Rinsch ever tell you of specific plans to use this Ferrari in the making of *White Horse*?

A   No.

Q   We can pull this down, please, Ms. Larracuente.  And can we pull back up what's already been admitted as Government Exhibit 5051.  And if we can zoom in at the bottom.

Now, can you remind us whose messages are in gray.

A    In the gray color, it's Mr. Rinsch messages.

Q   So this message is sent in August 2021, I'm supposed to buy a Ferrari and that watch this weekend.  My birthday gift to myself.

Ms. Skotnikova, other than the red Ferrari we looked at just a moment ago, are you aware of whether Mr. Rinsch purchased any other Ferraris in 2021?

A   Not that I'm aware of, no.

MR. MARKEWITZ:  Your Honor, I'm happy to continue.  I

am about to proceed into a new topic area.

THE COURT:  Well, the jury is already devastated that we are ending at 4:00, and now they'll be truly heartbroken. But nevertheless, I will accommodate your request.

So ladies and gentlemen, we're going to let you go for the day.  We will start promptly at 9:30, and thank you. You've been so prompt, and please be prompt tomorrow.  And theoretically we'll go to 4:30, but I don't know what counsel will convince me of tomorrow.  But anyway we'll see you tomorrow at 9:30.

(In open court; jury not present)

THE COURT: Okay. I cut things short because of the government's prediction that they're going to rest on Monday, but I want to go through that in a little more detail. After this witness who do you have?

MR. SOWLATI: We have Kristofer Eriksson, who works at Hästens Mattresses. He sold approximately $600,000 worth of mattresses to the defendant.

THE COURT: Okay. And who after that?

MR. SOWLATI: I have the list now. Okay. After that will be -- Cindy Holland is a Netflix executive. After that will be Rochelle Gerson, another Netflix executive. Then Josh Loney, who was one of the defendant's assistants on *White Horse*. Tobias Suhm, who was an editor on *White Horse*. Anton Brodsky, who works at the IRS. Gabriela Roses, who is the defendant's ex-wife. Neil Spangler, who was the CPA referenced earlier. Ethan Weiner, who was another assistant for the defendant. And Brianna Zych, who is an FBI special agent. And finally a summary witness. And we expect that a number of these witnesses — it sounds like a lot, but a number of them, the directs are only 15 minutes long.

THE COURT: All right. Well, we'll see how it goes tomorrow. I'm not guaranteeing you that we're going to stop before 4:30 tomorrow. And now I hear the long list, I'm a little regretful that we stopped today at 4:00 or a few minutes

before 4:00. But if you're right that you're closing on Monday, of course I haven't asked defense counsel and I won't ask defense counsel how much cross you have. That is probably something you can't really meaningfully predict until you hear the direct.

Okay. Assuming you rest on Monday, who, if anyone, other than the defendant does the defense intend to call?

MR. McGUINNESS: Yes, your Honor. We're only planning to call one witness whose name we put on our witness list. We are conferring whether we are going to replace him with a summary witness. We expect it would be a very short testimony, your Honor. And Mr. Rinsch is still considering whether he will be testifying.

THE COURT: Yes. He doesn't have to decide that until the close of the government's case. But at that point, I will need to know for certain whether he's taking the stand or not, but not till then. Okay. Well, it sounds like we're still on schedule, so to speak.

Now, in terms of we should start thinking about when we're going to have a charging conference, and I'll look at my calendar. But my guess is -- I do know I have a number of matters at 4:00 on various days next week, but they're all matters that should take an hour or less. So what I'm thinking is that we'll probably have the charging conference at 5:00 some day early next week, but I'll look in my calendar

more tonight and give you more heads up on that tomorrow.

Anything else we need to take up?

MR. SOWLATI: Nothing from the government. Thank you, your Honor.

MR. McGUINNESS: Nothing from the defense. Thank you.

THE COURT: Very good. See you tomorrow. Why don't you come in about 9:20 just in case something arises.

(Adjourned to December 5, 2025, at 9:20 a.m.)