UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 25 Cr. 85 (JSR)

CARL ERIK RINSCH,

Defendant. Trial

------------------------------x

New York, N.Y.
December 5, 2025
9:30 a.m.

Before:

HON. JED S. RAKOFF,

District Judge
-and Jury-

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
DAVID MARKEWITZ
TIMOTHY CAPOZZI
ADAM SOWLATI
Assistant United States Attorneys

LAW OFFICES OF DANIEL A. McGUINNESS
Attorneys for Defendant
BY: DANIEL A. McGUINNESS
-and-
ZEMAN & WOMBLE, LLP
BY: BENJAMIN C. ZEMAN

Also Present:
Nicholas DiMarino, FBI
Maria Larracuente, Paralegal
William Coleman, Paralegal
Laurie Tang, Paralegal

(Trial resumed; jury not present)

THE COURT: Good morning.

Juror No. 11, who my courtroom deputy described as an elderly person -- although from my standpoint, she looked like a kid, but anyway -- unfortunately fell and broke her arm.

THE DEPUTY CLERK: Shoulder.

THE COURT: Shoulder. Sorry. No lengths to which people will go to get out of jury service. In any event, in all seriousness, obviously we had to excuse her and replace her with Alternate No. 2. I assume that's acceptable to both sides.

MR. MARKEWITZ: Of course, your Honor.

MR. McGUINNESS: Yes, your Honor.

THE COURT: Very good. All right. Let's get the witness on the stand and let's bring --

THE DEPUTY CLERK: They're not all here yet.

I'll go take attendance.

THE COURT: Okay.

THE DEPUTY CLERK: Usually when I go back there to take attendance, they all miraculously appear. Let's hope that works this time.

THE COURT: Let's talk a little bit about schedule. We could do the charging conference either at 5 o'clock on Monday, I have a 4 o'clock matter -- or we could do it, I suppose, early Tuesday and have the jury come in a little

later.

Now, this is partly dependent on whether the government finishes on Monday or not, although the court and charging conference is absolutely not dependent on the government; it could be before the government finishes. The, I suppose, worst case, we could do it on -- I prefer to do it after the government closes just because of the motions that might conceivably affect the charge.

But I suppose, worst case, we could do it Tuesday after the government finishes and before there's any defense case. But I would rather do it Monday.

Any preferences counsel has?

MR. MARKEWITZ: I think Monday would work for the government. Obviously, either day would work, but I think Monday will be our preference, your Honor.

And we'll endeavor to get you the letter that we spoke about yesterday about the issue about retain so that your Honor is able to review it in advance of the charge conference.

THE COURT: That would be great, but let me ask defense counsel, can you get me your letter?

I'm going to be in chambers on Sunday.

THE DEPUTY CLERK: All jurors present.

THE COURT: Can you get me your letter, maybe, by 5 o'clock Sunday?

(Counsel conferred)

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  Okay.  And then we'll have the charging conference Monday at 5 o'clock.

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  Very good.

Let's get the witness on the stand.

Let's bring in the jury.

(Continued on next page)

(Jury present)

THE COURT: Please be seated.

Good morning, ladies and gentlemen, and thank you once again for your promptness.

JUROR: Good morning.

THE COURT: Juror No. 11, I'm sorry to report, fell and had an injury, and so we had to excuse her. But Alternate No. 2, you're now Juror No. 11. Very good.

Let's continue, please.

MR. MARKEWITZ: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. MARKEWITZ:

Q. Good morning Ms. Skotnikova.

A. Good morning.

Q. Could you just make sure you've got the mic right there so that we're able to hear you back here? Thank you.

I believe that you testified yesterday about Mr. Rinsch purchasing a watch in 2021; is that right?

A. Yes.

Q. What was the brand of that watch?

A. Vacheron Constantin.

MR. MARKEWITZ: Your Honor, I'd like to read paragraph 10 of what's already been admitted as a stipulation between the parties as Government Exhibit S9.

Government Exhibits 6394 through 6395 consist of true

and accurate copies of records maintained by Richemont, the owner of the watch manufacturer Vacheron Constantin, in the regular course of its business. The records were made by or from information transmitted by a person with knowledge of the matters set forth in the records at or near the time of their creation. The records were kept in the ordinary course of a regularly-conducted activity of Richemont as a regular practice of that activity.

Your Honor, at this time, the government would offer Government Exhibit 6394 A.

MR. ZEMAN: No objection.

THE COURT: Received.

(Government's Exhibit 6394-A received in evidence)

MR. MARKEWITZ: Ms. Larracuente, can you please publish that exhibit. And if you could zoom in from the top, including the title, down through the bottom of the means of payment section.

Q. Ms. Skotnikova, do you recognize this document?

A. Yes.

Q. What is it?

A. It's an invoice.

Q. For what?

A. For one of the watches.

Q. Which watches?

A. Vacheron Constantin.

Q. And who purchased this watch?
A. Mr. Rinsch.
Q. What's the total price listed for the watch, including tax?
A. $387,630.
Q. Did you ever see this watch?
A. Yes.
Q. How?
A. First time in the message, an image, and later, in Los Angeles.
Q. You say you saw is in an image. What do you mean?
A. Mr. Rinsch sent me an image via iPhone to confirm the delivery of the watches.

MR. MARKEWITZ: Ms. Larracuente, can we show the parties and the witness what's marked as Government Exhibit 5062, please.

Q. Ms. Skotnikova, do you recognize what's on the screen in front of you?
A. Yes.
Q. What is it?
A. It's a screenshot from my phone.
Q. And what is it a screenshot of?
A. The message I received from Mr. Rinsch.
Q. Reflecting the watch?
A. Reflecting the watch.
Q. Now there's a date at the top of the image.

What does that date signify?
A. The date I received the image.
THE COURT: I'm sorry. Is this in evidence?
MR. MARKEWITZ: It's not, your Honor. I'm just laying a foundation for it.
THE COURT: Well, you're asking about the contents of something that's not in evidence, namely, the date.
Q. Ms. Skotnikova, is this a true and accurate copy of the photograph that Mr. Rinsch sent to you?
A. Yes.
MR. MARKEWITZ: Your Honor, the government would offer Government Exhibit 5062.
MR. ZEMAN: No objection.
THE COURT: Received.
(Government's Exhibit 5062 received in evidence)
MR. MARKEWITZ: Ms. Larracuente, can we please publish this. Zoom in on this to the date at the bottom of the photograph.
BY MR. MARKEWITZ:
Q. Ms. Skotnikova, there's a date at the top of this photograph. What is that?
A. It's the date of the image.
Q. Did you ever speak to Mr. Rinsch about why he was buying this watch?
A. This one was his birthday present.

Q.  Did he ever tell you about specific plans to use this watch in the White Horse production?

A.  No.

MR. MARKEWITZ:  We can pull this down, Ms. Larracuente.  Thank you.

At this time, unless there's objection, the government would offer Government Exhibit 6217.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6217 received in evidence)

Q.  If you could zoom in.  Actually, before we do that, Ms. Skotnikova, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a copy of an email.

Q.  Did you receive this email?

A.  Yes.

Q.  The subject line at the top is quote from Gramercy Fine Linens, and the message at the top is from Mr. Rinsch to a Mattie Holden.  Do you see that?

A.  Yes.

Q.  And you're copied.  Why, to your understanding, were you copied on this message?

A.  I kept the records of all purchases.

MR. MARKEWITZ:  Ms. Larracuente, can we please go to

page 3 and zoom in on Mattie Holden's email near the middle ending at the line: please don't hesitate.

On October 2, 2021, a Mattie holden emails Carl: Thanks so much for inquiring with us about bedding.

Do you see that?

A.   Yes.

Q.   And then near the bottom of what's on your screen, it says: You could also add a blanket and/or coverlet, but I know you want a minimal slick look, and I imagine it stays fairly warm in LA?  Do you see that?

A.   Yes.

Q.   Without actually telling us where, were you aware of where Mr. Rinsch was living in October of 2021?

A.   Yes.

Q.   How were you aware of that?

A.   I paid for the rent and later paid for the hotel.

Q.   And just to clarify, when you say you paid, were you actually the one funding it or were you paying the bills on Mr. Rinsch's behalf?

A.   I was paying the bills on his behalf.

Q.   Where was Mr. Rinsch living, personally, in October of 2021?

A.   Either Metz Place or Four Seasons.

Q.   And what city was that in?

A.   Los Angeles.

Q.  And you say Metz Place.  What is Metz Place?

A.  It's a rented house.

MR. MARKEWITZ:  Ms. Larracuente, can we please zoom in on Mr. Rinsch's response at the top of the page?

Q.  Ms. Skotnikova, do you see where it says:  Please set these aside for me and give me a call on Monday to confirm and walk me through it.  And if there are any more expensive and limited supplies, I would be happy to purchase.  At the risk of sounding awful, whatever the best and most expensive product I am interested in because I need bedding for my family and supplies are limited?

A.  Yes, I can see.

MR. MARKEWITZ:  You can put this down, Ms. Larracuente.  Thank you.

Your Honor, the government would offer, unless there's objection, Government Exhibit 6223.

MR. ZEMAN:  No objection

THE COURT:  Received.

(Government's Exhibit 6223 received in evidence)

MR. MARKEWITZ:  Ms. Larracuente, can we show pages 1 and 2 side by side and then could you zoom in on the header information at the top of page 1.

Q.  Ms. Skotnikova, do you recognize Government Exhibit 6223?

A.  Yes.

Q.  What is it?

A. It's an email from me to myself.
Q. And what were you sending yourself in this email?
A. Dealer's list.
Q. What kinds of dealers?
A. Antique and furniture.
Q. It's dated November 24, 2021. Why were you sending yourself a list of antique and furniture dealers?
A. So I could have it when I have no laptop around on my phone.
Q. And what were you doing with these antique and furniture dealers?
A. I put the list to have all the names of the galleries and shops would be contacted to to acquire furniture.
Q. And why were you inquiring about furniture antiques from these dealers?
A. To buy some furniture.
Q. And why were you buying furniture?
A. Per Carl's request.
Q. Did you ever ask Mr. Rinsch why he was buying furniture?
A. Yes.
Q. What did he say?
A. To collect designers' furniture and have a monopoly on it.
Q. You said monopoly. What do you mean by that?
A. Monopoly means that you own a fair amount of all these designer produced, so you control the price.

Q. You control the what? I'm sorry. I didn't hear that.
A. The market price.
Q. Was there any particular designer that Mr. Rinsch spoke to you about?
A. Jacques Adnet.
Q. Jacques Adnet?
A. Yes.
Q. What, if anything, did he say about Jacques Adnet in particular.
A. That probably it's interesting and under-appreciated designer and -- nothing specific.
Q. Did Mr. Rinsch ever tell you about specific plans to use these antiques or furniture to make the White Horse show?
A. No.

MR. MARKEWITZ: Ms. Larracuente, if you could zoom in, please, on line -- before we do that, just leave this page us.

Q. Can you just explain to us what this chart is, Ms. Skotnikova?
A. There is a name of the dealer of the company, address, contact person, email, phone number, and website.
Q. And what does each row in this chart represent?
A. Gallery or other contact.
Q. And again, could you make sure you just have the microphone right by your month? It's just a little hard to hear you back here.

A. Every row, it's information about certain dealer.

MR. MARKEWITZ: Ms. Larracuente, can we please go to page 3, and if you wouldn't mind zooming in on line 26, please.

Q. The left-hand side of this row, it says Maison Gerard Limited? Do you see that?

A. Yes.

Q. What is Maison Gerard?

A. It's the name of the dealer.

MR. MARKEWITZ: Your Honor, at this time, unless there's objection, the government would offer Government Exhibit 6208, 6210, 6215, 6222, 6303.

MR. ZEMAN: No objection.

THE COURT: Received.

(Government's Exhibits 6208, 6210, 6215, 6222, and 6303 received in evidence)

MR. MARKEWITZ: Ms. Larracuente, could you publish what's been introduced as Government Exhibit 6210.

And if you could zoom in, Ms. Larracuente, from the top, including the header down through the signature block in the bottom email. Can you include the actual signature block at the bottom as well? Thank you.

Q. Ms. Skotnikova, do you recognize this document?

A. It's a copy of email, yes.

Q. At the bottom half of the page is an email sent on August 30, 2021, from an Osvaldo Da Silva from an email address

osvaldo@MaisonGerard.com.

Do you see that?

A.  Yes.

Q.  Do you know who Osvaldo Da Silva is?

A.  One of the dealers from Maison Gerard.

Q.  Okay.  Then looking down at the signature block, can you let me know the address that's listed there?

A.  43-53 East 10th Street, New York.

Q.  Thank you.

MR. MARKEWITZ:  Ms. Larracuente, we can pull this down and replace it with what's been introduced into evidence as Government Exhibit 6222.

Q.  Ms. Skotnikova, do you recognize this document?

A.  Yes.

Q.  At the top, it says the message if from an Osvaldo Da Silva to you.  Is that the same Osvaldo Da Silva we just talked about?

A.  Yes.

MR. MARKEWITZ:  Ms. Larracuente, can you please jump to page 13.

Q.  What is this document, Ms. Skotnikova?

A.  It's an invoice.

Q.  For what entity?

A.  Can you repeat the question?

Q.  For which -- can you read the name at the very top left of

the page?

A.   Maison Gerard.

Q.   And you see where it says "customer"?  Whose name is listed under that?

A.   Carl Rinsch.

Q.   And then in the middle where it says customer deposit, what's the amount?

A.   $150,000.

Q.   Thank you.

         MR. MARKEWITZ:  Ms. Larracuente, we can pull this down.

Q.   Ms. Skotnikova, I believe yesterday you mentioned that you understood that project Amarna, at some point, became a luxury lifestyle corporation.  Do I have that right?

A.   Yes.

Q.   Did Mr. Rinsch say anything about antique purchases being connected to Amarna?

A.   Yes.

Q.   What, specifically?

A.   By collecting this furniture, he's somehow getting the copyright to designs.

Q.   Sorry.  Can you repeat that again.  It's just a little bit hard to hear you.  Can you just make sure you're speaking into the mic.

A.   By collecting this furniture, he is somehow getting to get

the copyrights to the designs of the furniture.

Q.   And so what would that -- did he say what that would allow him to do or what he thought that would allow him to do?

A.   To produce the furniture that looks like it.

Q.   And do what with it?

MR. ZEMAN:  Objection.

THE COURT:  As stated.  Sustained.

Q.   Did he tell you what he wanted those -- to do with the furniture that he was producing?

MR. ZEMAN:  Objection.

THE COURT:  Why?

MR. ZEMAN:  Relevance, 403.

THE COURT:  Well, I think we need a sidebar.

(Continued on next page)

(At sidebar)

THE COURT: So, the government correctly cured the other objection, but now we have the objection of relevance and 403.

What is she going to say?

MR. MARKEWITZ: My expectation is that she's going to say he was intending to buy this furniture to get the title to the copyright so that he could make and then sell his own furniture, and that goes to the government's point, that he's not purchasing this furniture for White Horse, despite the fact that he's representing to Netflix after the fact he's buying for his own business purposes.

THE COURT: So, is the defense going to contend that he did by the furniture for White Horse?

MR. ZEMAN: No.

And the witness has already said that --

THE COURT: All right. So I think the only question that should be put at this point is a leading question -- which I'll allow, given the objection -- and that is: Did he tell you why he was buying me furniture, yes or no. She'll say yes. And did it have anything to do with White Horse? Answer, no.

I think that's sufficient.

(Counsel conferred)

MR. McGUINNESS: Judge, I just want to be clear at sidebar so we're accurately representing to the Court, my

client may take the stand, and it may be his testimony that this was for the show, so I just want to make sure that that's clear at this point.

THE COURT:  Well, if it becomes material, we can recall the witness at that point.

But thank you for alerting me to that.

But I'm still going to leave it as I just suggested for now.

(Continued on next page)

(In open court; jurors present)

Counsel, maybe I'll put the questions to make sure.

Without telling us what he said, did he tell you, in effect, what his purpose was in purchasing the furniture.

That's a "yes" or "no" question.

Did he tell you, in effect, why he was purchasing the furniture?

THE WITNESS: To spend the money.

THE COURT: No, no, no. Just the answer.

Did he tell you?

THE WITNESS: Yes.

THE COURT: Yes. That's better.

And did it have anything to do with the production of White Horse?

THE WITNESS: No.

THE COURT: Thank you very much.

MR. MARKEWITZ: Thank you, your Honor.

Unless there's objection, the government would offer Government Exhibits 5052 through 5059.

MR. ZEMAN: No objection.

THE COURT: Received.

(Government's Exhibit 5052 through 5059 received in evidence)

MR. MARKEWITZ: Ms. Larracuente, can you please publish what's been introduced as Government Exhibit 5052.

BY MR. MARKEWITZ:

Q.  We'll zoom in so we can see some specific messages, but before we do that, Ms. Skotnikova, do you recognize this document?

A.  Yes.

Q.  What is it?

A.  It's a copy of messages?

Q.  Between whom?

A.  Between me and Mr. Rinsch.

Q.  And what color are your messages?

A.  My messages is in blue color.

Q.  What color are Mr. Rinsch's messages?

A.  Gray.

Q.  And so we don't have to do this each time, there are a number of mes- -- we've looked at other messages between you and Mr. Rinsch; is that right?

A.  Yes.

Q.  In -- what color are your messages in all of the messages that you exchanged with Mr. Rinsch?

A.  In blue.

Q.  What color are Mr. Rinsch's messages in all of those?

A.  In gray.

Q.  Now, do you see in the middle of the page, there is a date stamp of August 12, 2021?

A.  Yes.

Q.   Around when were the messages above that date stamp sent?

A.   About the same day or the previous day.

MR. MARKEWITZ:   Ms. Larracuente, can you please zoom in on the second and third messages underneath the date stamp?

Q.   In the first message bubble, Mr. Rinsch refers to buying the entire collection of living designers and then mentions pieces.  Do you see that?

A.   Yes.

Q.   What sorts of pieces did you understand him to be referring to?

A.   The furniture pieces.

MR. MARKEWITZ:   Ms. Larracuente, can you please go to page 2 and zoom in on the four bubbles below the blue message.

Q.   Do you see at the bottom, the last message that reads:  The collection is for 70 items, which I am buying blind?

A.   Yes.

Q.   What did you understand Mr. Rinsch to be saying when he said "buying blind"?

A.   Meaning, he wouldn't take a look on the collection in person.

MR. MARKEWITZ:   Ms. Larracuente, we can pull this down and put in its place what's been introduced as 5054.

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?

A.  Copy of the text messages.

Q.  You said a copy of the messages?

A.  Yes.

Q.  Between whom?

A.  Me and Mr. Rinsch.

Q.  And near the bottom of the page is a date stamp September 3, 2021.  Do you see that?

A.  Yes.

Q.  Around when were the messages above that date stamp sent?

A.  The same day or the previous day.

MR. MARKEWITZ:  Ms. Larracuente.  Can you please zoom in on the two photographs at the top of this page.

Q.  Ms. Skotnikova, looking at these two photographs, do you know where they were taken?

A.  Yes.

Q.  So before you tell us where, how do you know where they were?

A.  I've been there.

Q.  Okay.  Where are they from?

A.  Los Angeles, Metz Place.

Q.  And what is Metz Place?

A.  The house that Mr. Rinsch was renting.

Q.  So we can see various items of what appear to be furniture in the photographs.  Do you see that?

A.  Yes.

Q. Where did those -- do you know where those items of furniture came from?
A. From the dealerships.
Q. That we talked about earlier?
A. Yes.

MR. MARKEWITZ: Ms. Larracuente, we can pull this down and publish in its place 5057. It's what's already been introduced as 5057.

Q. Do you recognize this document, Ms. Skotnikova?
A. Yes.
Q. What is it?
A. It's a copy of a text messages.
Q. Between whom?
A. Me and Mr. Rinsch.
Q. I don't see any date stamps on this page.

Around when were these messages sent?
A. Autumn 2021.

MR. MARKEWITZ: Ms. Larracuente, can you please zoom in from: I would love it if we could build, through: got to spend like it's on fire?

I'll pause just for a moment so everyone can read.

Q. Ms. Skotnikova, do you see in the middle message and then two of the lower messages, there's a reference to "Brewster's Millions"?
A. Yes.

Q.   Do you know what that is?

A.   It's a movie.

Q.   Are you familiar with the plot of that movie?

A.   Yes.

Q.   Generally speaking, what's the plot of "Brewster's Millions" as you understand it?

A.   A guy received inheritance but on condition to spend big amount of money on a limited time without leaving himself an asset.

          MR. MARKEWITZ:  Can we pull this down, please, Ms. Larracuente and publish what's already in evidence at Government Exhibit 5058.

Q.   Do you recognize this document, Ms. Skotnikova?

A.   Yes.

Q.   What is it?

A.   It's a copy of text messages.

Q.   Between whom?

A.   Me and Mr. Rinsch.

Q.   And again, I don't see any date stamps on this page.

          Do you know around when these messages were sent?

A.   Around August 2021.

          MR. MARKEWITZ:  Ms. Larracuente, can you please zoom in from the top through until just above the third blue message.

Q.   Ms. Skotnikova, can you please read the first six messages

from Mr. Rinsch on this page aloud.

A.   Go.  Buy like mad now.  If I fuxking hear anything about it, I'm going to freak out.  Cull all that Hermes stuff now. This money doesn't show up for no reason.  Get it.

Q.   Ms. Skotnikova, there's that word "Hermes" there.  What did you understand Mr. Rinsch to mean by "Hermes"?

A.   It's the name of the luxury brand.

Q.   What types of items do they sell?

A.   Leather accessories.

Q.   The bottom of the page, I'll just read a few messages.

          This is your job, we have to do this or else the money goes bye-bye.  Get it?  The granted gifts get taken back.

          MR. MARKEWITZ:  We can pull this down, Ms. Larracuente.

          And can you see what's been published in its place what's been introduced as Government Exhibit 5055.

Q.   Do you recognize this document, Ms. Skotnikova?

A.   Yes.

Q.   What is it?

A.   It's a copy of text messages.

Q.   Between whom?

A.   Me and Mr. Rinsch.

Q.   Near the top of the page, there's a date stamp of October 10, 2021.  Do you see that?

A.   Yes.

MR. MARKEWITZ: Ms. Larracuente, can you please put down this callout, and can you zoom in from the photograph down through the three messages below the next date stamp?

Q. Can you read the first gray message in this bubble on your screen?

A. Thank God for furniture. Otherwise, we would have been screwed.

Q. Two messages below it, Mr. Rinsch writes: It was a nail biter. We had to have substantial expenses of nearly 11 millions on record in 2021 to offset any potential gains carried over in all aspects of business. High-end shit.

Ms. Skotnikova, can you remind us how much Mr. Rinsch was paid by Netflix in 2020?

A. Approximately $11 million.

MR. MARKEWITZ: Ms. Larracuente, can you now zoom in on the last two messages on this page?

Q. Ms. Skotnikova, can you please read those aloud for us?

A. Cool to have this kind of ass covering. Exhausting for sure, but I hate to leave us open for any trouble that might derail us as we advance. Big-time gains ahead.

MR. MARKEWITZ: Ms. Larracuente, we can pull this down, and can you replace it with what's been introduced as Government Exhibit 5056.

Ms. Skotnikova, do you recognize this document?

A. Yes.

Q.  What is it?

A.  It's a copy of text messages.

          MR. MARKEWITZ:  And Ms. Larracuente, can you zoom in
from the top down through the blue message, please.

          Do you know what date these messages were
sent, Ms. Skotnikova?

A.  It says October 12, 2021.

Q.  And I apologize if I already asked this.

          Whose messages are these?

A.  Carl Rinsch and me.

Q.  So if you could just take a look around the middle of the
page, there's a message where Mr. Rinsch writes:  That's the
way it's done in the old country.

          Do you see that?

A.  Yes.

Q.  What did you understand him to mean by that?

A.  There are different ways to approach something, and this
one is the one that used to be used in the old country.

Q.  In the next message he writes:  Only have what is an asset
that increases in value and make sure that you have already
beaten the system before they can claim anything against you.

          MR. MARKEWITZ:  Ms. Larracuente, can you zoom in on
the last three messages on this page?

Q.  You see the last message, Ms. Skotnikova?  Mr. Rinsch
writes:  I think I was flat broke?

A.   Yes.

Q.   What point in time did you understand him to be referring to?

A.   February and beginning of the March 2020.

MR. MARKEWITZ:  We can pull this down, and can we please pull up what's been introduced into evidence as Government Exhibit 5059.

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's copy of the text messages.

Q.   Between whom?

A.   Between me and Mr. Rinsch.

Q.   And on what date -- around what date were these messages sent?

A.   January 2, 2022.

MR. MARKEWITZ:  Ms. Larracuente, can you please zoom in from the fifth through the seventh message on the page and can you also zoom in on all of Mr. Rinsch's messages below the blue one.

I apologize.  For the top one, can we start with: get your energy, and then end with: and finally get it structured and perfect.

Thank you.

I'll pause so that everybody can read this.

A. From the top?

Q. No. I'm pausing so that everyone can read it.

Do you see in the middle there, Mr. Rinsch writes: Movies died, Masha. Sorry have to be the one that told you, but they go the way of vaudeville theater and the Dodo bird, extinct?

A. Yes.

Q. What, if anything, did you take away from that statement that movies died?

A. As a genre, as a business.

Q. Now at the bottom of the screen, can you read the message: I wanted you to know, and the next two below that?

A. I wanted you to know, this was always the plan. I told you before that empire-building will occur. Now is that time.

THE COURT: Cross-examination.

MR. ZEMAN: May I, your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. ZEMAN:

Q. Good morning, Ms. Skotnikova.

A. Good morning.

Q. You met Mr. Rinsch and Gabby in late 2018; is that correct?

A. Yes.

Q. Okay. Because your husband was doing some work on Mr. Rinsch's show; correct?

A.   Yes.

Q.   Your husband does 3-D design work; correct?

A.   Yes.

Q.   And you were both invited to a kickoff party for White Horse; is that correct?

A.   Yes.

Q.   And this was at Mr. Rinsch's house?

A.   No.

Q.   Where was it?

A.   At the office of Home VFX in Hollywood.

Q.   And you saw the design for the show there; correct?

A.   Yes.

Q.   And there were costumes for the show there?

A.   Yes.

Q.   And you began working for Mr. Rinsch in the summer of 2019; is that correct?

A.   Yes.

Q.   You came on as part of the production team for White Horse; isn't that right?

A.   Yes.

Q.   And you worked in a variety of roles on the production of White Horse; isn't that correct?

A.   Yes.

Q.   At the beginning, you were helping Gabby with costumes; right?

A.   Yes.

Q.   And you were also doing budgeting for the show; right?

A.   Yes.

Q.   You testified yesterday about Movie Magic; is that correct?

A.   Yes.

Q.   And you were moving numbers from Movie Magic to Excel; right?

A.   Right.

Q.   Because that was the preferred platform Mr. Rinsch liked to see the numbers; right?

A.   Right.

Q.   So you had access to the accounting for the show; correct?

A.   Correct.

Q.   Had you ever worked on a movie or a production before working for Mr. Rinsch in the summer of 2019?

A.   Animated movies.

Q.   Sorry?

A.   Animated movies.

Q.   Had you ever worked on a budget for a movie or a television show?

A.   No.

Q.   And you were involved in creating the budget for the Brazil portion of the White Horse shoot; correct?

A.   Not correct.

Q.   Well, you were involved in moving the numbers from Movie

Magic to Excel for the Brazil portion of the shoot; right?

A. Yes.

Q. And you did the same thing on the Uruguay portion of the shoot; correct?

A. Only a draft, the first draft.

Q. Sorry. Say that again?

A. Only the first draft.

Q. Okay. Ms. Skotnikova, you testified that you went down to Brazil as part of the production team; isn't that correct?

A. Yes.

Q. But you were only there just a short time; right?

A. Right.

Q. You said you were fired; right?

A. Right.

Q. That was after just one day down in Brazil; isn't that correct?

A. No.

Q. How long were you down in Brazil?

A. More than two weeks.

Q. And after that, you flew back home; correct?

A. Yes.

Q. And that's Las Vegas?

A. Yes.

Q. But at the end of October 2019, Mr. Rinsch reached back out to you; isn't that correct?

A.   Yes.

Q.   And he asked you to do the budget for the Budapest portion of the production for White Horse; isn't that correct?

A.   Partially correct.

Q.   Well, which part wasn't correct?

A.   That I didn't create the project.  I just moved the numbers from Movie Magic to the Excel format.

Q.   Again for the Brazil portion?

A.   Yes.

Q.   But your title was budget supervisor; isn't that correct?

A.   Correct.

Q.   And eventually, you flew to Budapest; right?

A.   Yes.

Q.   And that was while the production was taking place?

A.   Yes.

Q.   Because it was your understanding that the production in Budapest was going to finish out the first season of White Horse; isn't that correct?

A.   Yes.

          MR. MARKEWITZ:  Objection.  Foundation.

          THE COURT:  Lay a foundation.

Q.   Ms. Skotnikova, you had been discussing the production of the first season of White Horse with Mr. Rinsch; correct?

A.   Yes.

Q.   And isn't it true that he told you -- isn't it true that,

based on those conversations, it was your understanding that after Budapest, that would be the end of shooting for the first season of White Horse?

MR. MARKEWITZ: Objection. Hearsay.

THE COURT: Sustained.

Q. You were on the set at the shoot in Budapest; isn't that correct?

A. Yes.

Q. And there was a special set that had been built there; isn't that correct?

A. Yes.

Q. And they were using hundreds of extras every day; correct?

A. Partially correct.

Q. There were days on the production that there were hundreds of extras on set; correct?

A. Yes.

Q. And there were futuristic-looking costumes that the extras were wearing; correct?

A. Correct.

Q. And that shooting for Budapest was completed in December; isn't that correct?

A. Yes.

Q. And after that, the crew flew back to Los Angeles; isn't that correct?

A. Partially correct.

Q. Well, you went back to Los Angeles; right?
A. Yes.
Q. And Mr. Rinsch went back to Los Angeles; right?
A. I went back to Las Vegas and other crew were -- some were based in Europe, some in other countries.
Q. Understood.
But you returned to Las Vegas?
A. Yes.
Q. Okay. And Mr. Rinsch went back to Los Angeles; correct?
A. Correct.
Q. You went back to Los Angeles later in December; isn't that correct?
A. Yes.
Q. And you saw Mr. Rinsch there; right?
A. Right.
Q. And what was your impression of how he looked after the shooting in Hungary?
MR. MARKEWITZ: Objection. 401.
THE COURT: Sustained.
Q. When you got back to Los Angeles and saw Mr. Rinsch, you saw that he was working on the script again; correct?
A. No, not correct.
Q. I'm talking about December of 2019.
A. I didn't see him working. Please rephrase your question.
Q. Sorry. Can you say that again?

A. Please rephrase your question.

THE COURT: She said she didn't see him working.

MR. ZEMAN: Thank you, your Honor.

Q. In January of 2020, you were with Mr. Rinsch in Los Angeles; isn't that correct?

A. End of January 2020, yes.

Q. Okay. And at that point, you were making a schedule for shooting season two of White Horse; isn't that correct?

A. Partially.

Q. Well, there was a schedule to go shoot season two in Vienna in the summer of 2020; isn't that correct?

A. Correct.

Q. And also in Prague; isn't that correct?

A. Correct.

Q. As well as Bucharest?

A. Yes.

Q. And Finland?

A. I can't recall the Finland right now.

MR. ZEMAN: Ms. Tang if you could just show the witness and the parties Government Exhibit 6190. And if we could go down and just slowly go down.

Q. And Ms. Skotnikova, I'm just going to ask you to look at this document and see if it refreshes your recollection.

A. Could you please zoom in?

MR. ZEMAN: Can you say that again?

A. Yes. Could you please zoom in.

MR. ZEMAN: And just give her a moment.

A. That's the correct page, yes.

MR. ZEMAN: Could you do the next page, please.

Could we go to the next page.

THE COURT: Counsel, I'm not quite sure what is going on here, but it doesn't seem to be helpful.

MR. ZEMAN: Well, thank you, your Honor.

I'll --

BY MR. ZEMAN:

Q. Ms. Skotnikova, does this document refresh your recollection?

A. Yes.

Q. Okay. So, there were plans to continue shooting season two for 2020 and 2021?

Do you remember that?

MR. MARKEWITZ: Your Honor, the government would just ask that the document be pulled down.

MR. ZEMAN: Sorry. Thank you.

Q. And in addition to Vienna and Prague and Bucharest, do you remember there was a plan to shoot in Finland?

A. I do not recall.

Q. And do you remember there was also a plan to shoot in Mexico City?

A. I do not recall.

Q.   When you were working with Mr. Rinsch in January of 2020, you testified yesterday that the last script you read was that month, January of 2020.

Do you remember saying that yesterday?

A.   Yes.

Q.   And in early 2020, Mr. Rinsch was also planning further production with Nick Girdaux.

Do you remember that?

A.   Yes.

Q.   And he is a special effects designer; right?

A.   And 3-D concept artist, yes.

Q.   Okay.  And he also did post-production and art direction; correct?

A.   Not correct.

Q.   What was his role on the show?

A.   He was a 3-D concept designer.

Q.   3-D concept designer.

And he was helping Mr. Rinsch with the expanded script; isn't that correct?

MR. MARKEWITZ:  Objection.  Foundation.

THE COURT:  Yes.  Lay a foundation, if you could.

Q.   You testified just now that you had read the script in January; correct?

A.   Yes.

Q.   Do you remember how long that script was?

A.   I do not recall.

Q.   You remember it was a newer version of the script than the one you had previously read; correct?

A.   Correct.

Q.   And Mr. Gindraux was helping Mr. Rinsch with design for that version of the script; correct?

          MR. MARKEWITZ:  Objection.  Foundation.

          THE COURT:  Sustained.

Q.   Mr. Gindraux was working on new costume designs for the script; correct?

A.   Correct.

Q.   And during 2020, the winter of 2020, you were living mostly in Las Vegas; isn't that correct?

A.   Correct.

Q.   But you were still working for Mr. Rinsch at that time; right?

A.   Correct.

Q.   So you were working remotely for him?

A.   Yes.

Q.   And many of the roles that you had to do for him were administrative; correct?

A.   Yes.

Q.   You were paying his bills for him; correct?

A.   Not at the time.  No.

Q.   Well, you were paying bills on the production of White

Horse; right?
A. No.
Q. You were paying things like the insurance; correct?
A. In the beginning of 2020, no.
Q. You were paying for the maintenance of the storage facility; correct?
A. I didn't set up payments. It wasn't my responsibility at the time.
Q. You were making payments to Taylor and Taylor; correct?
A. When.
Q. In the Spring of 2020.
A. No.
Q. Iron Mountain, the storage facility --
MR. MARKEWITZ: Objection. Foundation.
THE COURT: Well, I think, just to move this along: When, if ever, did you become involved in making payments for some of the items that you said you were not making payments for in the Spring of 2020? When did, if ever, did you --
THE WITNESS: In 2021.
THE COURT: 2021. Okay.
BY MR. ZEMAN:
Q. So I want to direct your attention, Ms. Skotnikova, to March of 2020. This is when Carl received the payment from Netflix. And you understood at that time that that money was payment due to him pursuant to the term sheet; isn't that

correct?

            MR. MARKEWITZ:  Objection.  Foundation and hearsay.

            THE COURT:  Sustained.

Q.  Ms. Skotnikova, in March of 2020, you didn't have access to the bank accounts for Mr. Rinsch; correct?

A.  Correct.

Q.  So at that point, payments for the show were made by Mr. Rinsch; isn't that correct?

            MR. MARKEWITZ:  Objection.  Foundation.

            THE COURT:  Sustained.

Q.  When COVID hit in early March 2020, you were in Las Vegas; right?

A.  Yes.

Q.  You were not with Mr. Rinsch, right?

A.  Right.

Q.  You were helping him with cost reporting projects; right?

A.  Yes.

Q.  And you saw payments that he was making; right?

A.  I was helping for the reports for 2019.

Q.  And as part of that work, you were dealing with invoice payments; right?

A.  Please rephrase your question.  Please rephrase your question.

Q.  Well, as part of this audit that you were helping him with, you were managing the invoices; correct?

A. Please define "managing."
Q. You were helping to input numbers from invoices and payments into various spreadsheets; correct?
A. Not correct.
Q. Well, you were getting information from Mr. Rinsch to input into these audits; correct?
A. Not exactly correct.
THE COURT: All right. Well, in this regard, what were you doing?
THE WITNESS: In 2020, I was collecting data for 2019 for the CPAs, and I didn't pay attention to 2020 because it wasn't my responsibility.
BY MR. ZEMAN:
Q. Well, this ten-year audit that he had asked you to help him on, this was part of the divorce proceedings; correct?
A. Correct.
Q. And would you say that --
THE COURT: I'm not sure -- maybe I missed it -- that we've had reference -- he was getting divorced from his wife?
MR. ZEMAN: Correct.
THE COURT: I'm asking the witness.
THE WITNESS: Yes.
THE COURT: Okay. And when you say the divorce proceedings, what are you referring to?
THE WITNESS: That at some point in 2021, I was also

doing not only 2019 audit but ten years to 2020, so it was ten years audit made later in 2021.

THE COURT:  And that was in connection with legal proceedings related to his divorce, or what?

THE WITNESS:  Can you explain legal?

THE COURT:  What was your understanding of why you were doing that?

THE WITNESS:  It was one of the reasons for the preparing all these reports.

THE COURT:  What was one of the reasons?

THE WITNESS:  His divorce.

THE COURT:  Right, but maybe I'm not being very clear. Were there ongoing legal proceedings, to your understanding, regarding the divorce?

THE WITNESS:  I'm just not familiar with the term "legal proceeding," what does it apply.

THE COURT:  Okay, well, was there something going on -- all right.  We'll leave it alone.  We'll get to it with other witnesses.

(Continued on next page)

BY MR. ZEMAN:
Q Ethan Weiner used to work for Mr. Rinsch, right?
A Yes.
Q And he left right around when COVID hit, right?
A Yes.
Q And at that time you took on some of his responsibilities for Mr. Rinsch, correct?
A Yes.
Q You were responsible for taking care of his rent, paying the bills for where he was staying, correct?
A Not at the 2020. Later.
Q Well, you were helping Mr. Rinsch pay his bills, right?
MR. MARKEWITZ: Objection. Form.
THE COURT: Sustained.
Q During 2020.
THE COURT: I think what the objection -- when you say helping him pay his bills, what do you mean by that?
Q You were facilitating his ability to pay for rent with his own money, not your money, with Mr. Rinsch's money?
A Later, in 2021.
Q Okay. And because during 2020, Mr. Rinsch, to your understanding, wasn't spending in the way he was in 2021, correct?
A Correct.
Q He didn't own a house at that point, right?

A    To my knowledge, no.

Q    But things changed when his divorce proceedings --
withdrawn.

Ms. Tang, if you could please bring up what's in
evidence as Government 5055.  And before we publish it,
Ms. Skotnikova, you talked a lot on direct examination about
the purchases you made for Mr. Rinsch in 2021.  Do you remember
that?

A    Yes.

Q    And this was a big change in the way he had spent
previously, right?

A    Yes.

Q    And Ms. Tang, if you could zoom in on -- in the middle
there, the three line -- just that portion, right there.

At this time, Ms. Skotnikova, Mr. Rinsch was talking a
lot about his taxes, right?

A    Not correct.

Q    Well, the purchases he was making, he was trying to
offset -- sorry.  I'd like you to read what's been enhanced on
the screen, Ms. Skotnikova, and tell me what -- the line that
started as a nail biter, Mr. Rinsch texted you that the nearly
11 million on record, what, if anything, did that mean to you?

A    It means that there was spendings, and we have all these
expenses recorded in the bookkeeping as our expenses and it
will go to the negative report.

Q At this time Mr. Rinsch was talking to you a lot about his taxes, right?

A Not correct.

Q So I want to talk about how the relationship with Mr. Rinsch unwound for you. Things didn't end well between the two of you; is that correct?

MR. MARKEWITZ: Your Honor, can we have a sidebar, please?

(Continued on next page)

(At sidebar)

MR. MARKEWITZ:  During yesterday's testimony I sought to elicit this exact line of questioning.  Mr. Zeman objected on 403 grounds.  Your Honor granted that objection.  I don't think it's proper -- during yesterday's line of questioning, I sought to elicit this exact issue.  Mr. Zeman objection on 403 grounds and your Honor granted that objection.  Given there was on objection that was sustained, I don't think it's proper for him to now be getting into this issue that was not opened.

THE COURT:  I don't recall the exact question that --

MR. MARKEWITZ:  I asked her how her relationship with Mr. Rinsch ended.  And Mr. Zeman objected on 403 grounds and your Honor sustained that objection.

THE COURT:  Well, so let's hear what he's going to elicit.  And of course you're going to have redirect, so I don't think that is definitive.  I understand your point.  But whether it comes out on direct or redirect is not the most material matter.  But what is it you're going to seek to elicit?

MR. ZEMAN:  I was going -- you know what?  I'm not -- I'm going to move on and I'm about to wrap up, too.  So --

THE COURT:  All right.

(Continued on next page)

(In open court; jury present)

BY MR. ZEMAN:

Q Ms. Skotnikova, I believe you testified yesterday that your business's name is Black Sky Symmetry; is that correct?
A Yes.
Q And the first time you spoke to the government about this case was in May of this year; isn't that correct?
A Yes.
Q And this was in New York City?
A Yes.
Q You met with them in their office at 26 Federal Plaza; is that correct?
A Yes.
Q And this was 22 months after Mr. Rinsch had been charged with the crimes he's on trial for now, correct?
A I don't know exact date when he was charged.
Q Well, you knew at that point that he had been charged with these crimes, correct?
A Yes.
Q And you had an attorney with you, right?
A Can you repeat the question.
Q You had an attorney with you, correct?
A At the meeting with the government?

THE COURT: Yes.

A Yes.

Q   And you've had several calls with the government since that first meeting, correct?

A   Yes.

Q   And that was in preparation for your testimony here, correct?

A   Yes.

Q   And a little bit more than two weeks ago, they sent you something that you discussed yesterday called a nonprosecution agreement, correct?

A   Yes.

Q   And this was an agreement that promised that you wouldn't be charged for any crimes connected to this situation, correct?

A   Correct.

Q   So long as you testified at this trial, right?

           MR. MARKEWITZ:  Objection.  Form.

           THE COURT:  I'll allow it.

Q   So long as you testified at this trial, correct?

A   Yes.

Q   And so long as you testified, I believe yesterday you said honestly, correct?

A   Truthfully, yes.

Q   And it's the government who decides whether you're truthful, correct?

A   No, not correct.

Q   Well, they get to decide whether or not they would press

charges with you following your testimony, correct?

A    I think the premise of your question is incorrect.

Q    Well, the agreement you signed with them says that so long as you testify truthfully you won't be charged with crimes, correct?

THE COURT:  Sustained.  The agreement speaks for itself.  If you want to offer the agreement, you can direct her --

Q    Ms. Skotnikova, the government gets to decide whether your testimony is truthful, correct?

A    Not correct.

Q    You signed this agreement with them, correct?

A    Yes.

MR. ZEMAN:  One moment.

Q    Ms. Skotnikova, it's the government who decides whether they would bring charges against you or not, correct?

A    Yes.

MR. ZEMAN:  I have nothing further.

THE COURT:  Redirect?

MR. MARKEWITZ:  Nothing further, your Honor.

THE COURT:  Come to sidebar.

(Continued on next page)

(At sidebar)

THE COURT: I'm totally mystified why neither side wants to put the agreement into evidence, thus leaving the jury uncertain as to what the exact terms of the agreement are. I'm not saying that I'm going to do it, although I think I have discretion to do it, but I find it very unusual. But if you both determine not to put the agreement in, thus leaving the jury in doubt as to what it actually says, I guess I will not override that, but I find it strange.

MR. MARKEWITZ: We'll put it in, your Honor.

THE COURT: All right.

(Continued on next page)

(In open court; jurors present)

MR. MARKEWITZ:  Briefly, your Honor.

Ms. Larracuente, can you please pull up for the witness and parties only what's marked for identification as Government Exhibit 5063.

REDIRECT EXAMINATION

BY MR. MARKEWITZ:

Q   Ms. Skotnikova, do you see what's on the screen here?

A   Yes.

Q   Ms. Larracuente, can you please go to the next page.  And then the last page.

Do you recognize this document?

A   Yes.

Q   What is it?

A   It's nonprosecution agreement I signed.

Q   Is this the agreement that you were discussing with defense counsel just a few moments ago?

A   Yes.

Q   Is this a true and accurate copy of the agreement?

A   Yes.

MR. MARKEWITZ:  Your Honor, the government would offer Government Exhibit 5063.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 5063 received in evidence)

MR. MARKEWITZ:  Ms. Larracuente, can we please go to the first page.

Q   Can you please zoom in on the first paragraph, Ms. Larracuente.

Ms. Skotnikova, can you please read that aloud.

A   As you are aware, your client, Maria Skotnikova, has been subpoenaed to testify as a fact witness in a prosecution being conducted in this district.  It is understood that this agreement is not to be construed as a legal or factual determination that Ms. Skotnikova has violated any federal law.  This agreement has been entered into solely on the terms set forth below and to confirm Ms. Skotnikova's status as a fact witness.

MR. MARKEWITZ:  Ms. Larracuente, can we please put down this call out.  And can we call out the next paragraph, please.

Reads, on the understandings specified below, the Office of the United States attorney for the Southern District of New York will not criminally prosecute Ms. Skotnikova for any crimes except for criminal tax violations, if any, as to which this office cannot and does not make any agreement, related to her participation between in or about March 2020 and in or about January 2022, in the following:  Carl Rinsch's spending of approximately 11 million paid to Mr. Rinsch's production company, Home VFX, by Netflix Studios LLC, on or

about March 6, 2020, including the spending of any proceeds
that were generated through the use of that 11 million.

You can put this down, Ms. Larracuente.  Oh, sorry
just that call out.  I apologize.  And if you could do side by
side on the first and second page.  And if you could zoom in on
the third paragraph that spills across the two.

Q   Ms. Skotnikova, do you see in the paragraph on the screen
here there's a section E, as in echo?

A   Yes.

Q   Can you read that aloud, please.

A   Shall truthfully testify at any trial and other court
proceeding with respect to any matters about which this office
may request her testimony.

Q   What is your understanding of what that requires of you?

A   To truthfully testify at any trial.

Q   We can put down this call out, Ms. Larracuente and the
other one as well.  And if we could now do a call out of the
first full paragraph on page 2.  I'll leave that up and allow
people a moment to read it.

Ms. Skotnikova, did the existence of this agreement in
any way influence the testimony you've provided at this trial?

A   No.

MR. MARKEWITZ:  No further questions, your Honor.

THE COURT:  Anything else?

MR. ZEMAN:  Very briefly.

RECROSS EXAMINATION

BY MR. ZEMAN:

Q   Ms. Skotnikova, you discussed this document with your attorney, right?

A   Yes.

Q   And you discussed how important this was for you, right?

            MR. MARKEWITZ:  Objection.

            THE COURT:  Yes, I don't think any discussions with her attorney --

            MR. ZEMAN:  Withdrawn.  Apologies.

Q   Ms. Tang, could you pull up, please, the second page, the first four lines of the second full paragraph.

            Ms. Skotnikova, can you just read the portion — you can read it to yourself — that's called out here.

A   Out loud?  Do you want to read?

Q   You can read it to yourself.

A   Okay.

Q   Ms. Skotnikova, you understand that it's the government alone who decides whether or not you have given accurate testimony today, correct?

A   It should be proven.  It's not just their opinion about the matter.

            MR. ZEMAN:  I have no further questions.

            THE COURT:  Anything else?

            MR. MARKEWITZ:  No, your Honor.  Thank you.

THE COURT:  Thank you very much.  You may step down.

(Witness excused)

THE COURT:  Please call your next witness.

MR. SOWLATI:  The government calls Christopher Eriksson.

JOHAN KRISTOFER ERIKSSON,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOWLATI:

Q   Good morning, Mr. Eriksson.

A   Hi.

Q   Who is your employer?

A   I work for Damon Capital LLC.

Q   If I could ask you to bring the microphone a little closer to you.  Thank you.

      What is Damon Capital?

A   So Damon Capital is the holding company that represents the Hästens brand on the U.S. market.

Q   What is Hästens?

A   Hästens is a Swedish brand company that manufactures mattresses out of Sweden.

Q   And what is your title at Damon Capital?

A   My title is vice president of sales.

Q   And what are your responsibilities as vice president of

sales?

A   My responsibilities are selling mattresses and managing the sales team across the West Coast of the U.S.

Q   And how long have you worked at Damon Capital?

A   So it was my 11-year anniversary yesterday at Hästens.

Q   Can you tell us more about what a Hästens mattress is.

A   Yes.  It's considered, you know, a sleep system.  It's a box spring, it's a mattress, it's a top mattress.  They're all manmade in Sweden with all natural materials, made to last for a lifetime and are considered one of the finest performance instruments for your health and your sleep.  Yeah.

Q   How much do your mattresses cost?

A   So our mattresses typically start in the $15,000 price range for a king size mattress.  But that's a mattress you'll have for the rest of your life.  It's all natural.  But they go all the way up to a million dollars with customizations and depending on size.  It's a very wide range.

Q   Why are your mattresses so expensive?

A   So the price -- I mean, the price is because I would say the customer service, the quality, the attention to details, the way they're built.  They're still manmade in Sweden.  We don't use foam or latex or anything artificial.  They come with a bed doctor team that will come to your house and massage it and flip it.  It's really like an investment in your sleep.  And then the price range depends on how much materials is

inside the mattress.  Pretty much the further up you get in range, the more comfortable the mattress becomes and the better it's going to feel when you lay down and then experience it.

Q   Who is your typical client?

A   I would say -- I mean, I've obviously seen all kinds of clients over 11 years of doing this on the West Coast.  People that invest in Hästens are usually someone that really values their sleep, their health, their well-being, that's seen as, like, one of the pillars of health for themselves, sleep.  So they want the best for themselves.  They want something that lasts.  They don't like that most mattresses have to be tossed out every few years because it's foam and latex and artificial materials, because ours are hypoallergenic and free from chemicals.  So it's really someone that truly cares about their sleep.

Q   Now, with that background, did there come a time that you become involved in the sale of mattresses to Carl Rinsch?

A   Yes.

Q   When did that happen?

A   So it was in 2021, September of 2021.

Q   Did you speak directly with Mr. Rinsch about the mattresses he wanted?

A   Yes.

Q   How did you speak with him?

A   We communicated over -- yeah, several weeks, months in

person, over phone, via text, via email.
Q When you first spoke to him, what did he tell you?
A So the first interactions we had with Carl was that he reached out to our showroom in West Hollywood inquiring about our showroom models in that particular showroom. He wanted to acquire some of the showroom models.
Q How many mattresses was Mr. Rinsch interested in buying?
A So initially, you know, we -- he was asking what was available. And we told him what was available. And I think we ended up on four mattresses in the end that he was interested in making an order for.
Q And what was the approximate cost of these four mattresses?
A So the total order came out to I believe just over $600,000.
Q And what was your reaction to learning he wanted to buy these mattresses?
A I mean, I've been in this business for 11 years, and every time someone comes in, we celebrate every sale. It was great. It was -- I was happy for the team, and it was a good order, so yeah.
Q With such a large order, did you require any sort of deposit?
A Yes. When someone places an order with us, we typically always want a deposit to start working on the deal and do the paperwork and vet the client.

Q    Did you collect that deposit?

A    Yes.

Q    How did you collect it?

A    So I went to Carl Rinsch's home to collect the deposit.

Q    And how did he greet you?

A    I came to his house.  He opened the door, and I showed him the sales order quote that I had made for him.  And I said hey Carl, I'm here to collect the deposit.  I'm Chris, Hästens, congrats on your mattresses, I'm here to collect the deposit. He said okay, I'm going to go and get it.  And he came back with a little pouch with cash.

Q    How much cash?

A    I counted it then and there, and I think it was around $10,000 in cash.

Q    Did he eventually give you the rest of the money for the mattresses?

A    Yes.

Q    And in what form of payment?

A    So I believe he wrote one check, and there were two wire deposits as well for the remaining balance.

            MR. SOWLATI:  Unless there's any objection, the government offers Government Exhibit 6251F.

            MR. MCGUINNESS:  No objection.

            THE COURT:  Received.

            (Government's Exhibit 6251F received in evidence)

MR. SOWLATI:  Ms. Larracuente, if you could please publish that.

Q   Do you recognize this document?

A   Yes.

Q   What is it?

A   So that is the check that Carl made for the $200,000 that we also deposited.

Q   Mr. Larracuente, you can bring that down.

After you got the deposit, did you ever go back to Mr. Rinsch's home?

A   Yes, I did, the following day.

Q   Why is that?

A   He wanted me to measure a few of his bed frames.

Q   Where in his house did you measure the bed frames?

A   So one of the bed frames was in one of the bedrooms, and then I think I believe there were two bed frames in his garage.

Q   Were the bed frames next to anything?

A   I mean, there was a lot of stuff in there.  He had his car there.  There were -- yeah, things scattered, but yeah.

Q   You mentioned a car.  What type of car was it?

A   It was a Rolls-Royce.

MR. SOWLATI:  Unless there's any objection, the government offers Government Exhibit 6251A.

MR. ZEMAN:  No objection.

THE COURT:  Received.

(Government's Exhibit 6251A received in evidence)

BY MR. SOWLATI:

Q    Ms. Larracuente, thank you for publishing that.

Do you recognize this document?

A    Yes, I do.

Q    And what is it?

A    So that is the initial sales order quotations that we made out to Carl when he initially called in and made the inquiry about what we had available for sale in our showroom.

Q    There's a marking in the middle of the page. Ms. Larracuente, can you zoom in on that.  Do you know what this is?

A    Yes.  That's his -- the signature that he made when I came to collect the deposit.

Q    Okay.  If we could zoom out.  And then if we could zoom out to the middle of the page where there are a number of items listed.

Can you walk us through what this quote shows and the cost.

A    Yes.  So the first line there is the Hästens David headboard high European size 210 by 125 centimeters.  It's the width and the height of the headboard.  It's the back end.  And that piece was connected to the Hästens Vividus, we can see a little bit further down.

And then the second line is the Hästens Maranga and

BJX Luxury, so that's the whole sleep system — a base, a mattress, a top mattress, in the queen size. It's the firm, and yeah.

And then we have the Hästens Anniversia headboard in the 210-centimeter width in the leather, which was paired with the grand Vividus, which you can see further down.

And we have the Hästens adjustable in the twin XL, which is one of the models that moves up and down. We then have the Hästens Vividus king in the 210 by 210 size in white.

And then we have the Hästens Grand Vividus, which is also in the 210 by 210 size, which is not here on this document, in the black color.

Q   Ms. Larracuente, if we can zoom out and focus on the bottom right corner.

What was the total cost of this order?

A   The total including the discount, because it was showroom models, $617,610.66.

Q   Why was there a discount?

A   I mean, we do sell our showroom models annually, so it's a way for us to clear out used mattresses and refresh the inventory to get new beds. So we need to give a discount in order to move them pretty much.

Q   Ms. Larracuente, if we could zoom out.

You mentioned one of the items, the Grand Vividus, which is listed here as costing $439,900. Can you tell us more

about what that is.

A    Yeah.  Absolutely.  So it's our top-of-line model in the Hästens collection.  It's just the most comfortable, supportive sleep instrument ever made.  It has beautiful details.  It's super comfortable.  It's super luxurious.  It takes over 700 hours to make.  It's based upon the Vividus, which is also on this document, and has more supportive version.  And it's -- yeah, I mean it's beautiful.  It's heavenly.  And it's just an incredible piece of sleep art.

            MR. SOWLATI:  Unless there are any objections, the government offers Government Exhibit 6252.

            MR. MCGUINNESS:  No objection.

            THE COURT:  Received.

            (Government's Exhibit 6252 received in evidence)

            MR. SOWLATI:  Ms. Larracuente, if you could keep the sales order, Government Exhibit 6251A, on the right of the screen and put Government Exhibit 6252 on the other side of the screen.

Q    Do you recognize Government Exhibit 6252?

A    Yes.

Q    What is it?

A    So that is the Grand Vividus.  It's a rendering of the Grand Vividus in the black.  It looks to me like it is the Viking size, as we call it, the 210 by 210 centimeters, which is a little bit bigger than the eastern king, in the black

shadow colorway.

Q    Does it relate in any way to the quote Mr. Rinsch signed on the left?

A    Yes, it would be -- that's the depiction, the rendering of the model that he bought.

Q    You testified that you received a deposit from Mr. Rinsch for these beds.  Did Mr. Rinsch end up -- and then you said that he later paid for these beds.

A    Yeah.

Q    What happened after that?

A    So we delivered one of the beds to him, but then there came a time when we were discussing changing the order and updating it to only include two of the Grand Vividus instead.  He wanted to change the order to two Grand Vividus and skip the other ones except for the ones we had already delivered.

            MR. SOWLATI:  Unless there are any objections, the government offers Government Exhibit 6251E.

            MR. MCGUINNESS:  No objection.

            THE COURT:  Received.

            (Government's Exhibit 6251E received in evidence)

            MR. SOWLATI:  Ms. Larracuente, if you could please publish that.  And then if we could zoom in to the document itself.

Q    Are you familiar with this document?

A    Yes.

Q    And what is it?

A    Yes, this is the second sales order quotation we made to show Carl how much he would have to add extra in order to get a second Grand Vividus, so two Grand Vividus change order, yeah.

Q    What's the date of this document?

A    It's the 22nd of October 2021.

Q    Do you know why there's a discount listed on the bottom of $131,976.30?

A    Yes.  So when we made this -- the upgrade order, in order to -- because, I mean, it was a higher amount he was going to pay — these are two very special beds — we decided to up the discount to help make the order happen.

Q    Ms. Larracuente, you can bring that down.

          Mr. Eriksson have you ever sold to one person two Grand Vividus mattresses at once?

A    Not me personally.

Q    Where did you get the Grand Vividus mattresses for Mr. Rinsch?

          MR. MCGUINNESS:  Objection.

          THE COURT:  Sustained.

Q    Did Damon Capital end up delivering -- besides the bed that you mentioned that was delivered, did Damon Capital end up delivering any additional beds to Mr. Rinsch?

A    No.

Q Why not?
A Because he still owed the balance on the sales order, first and foremost.
Q Did Mr. Rinsch ever try to cancel his order?
MR. MCGUINNESS: Objection.
THE COURT: Sustained.
Q Did you ever discuss with Mr. Rinsch's experience with the Hästens mattresses?
MR. MCGUINNESS: Objection.
THE COURT: Sustained.
Q Mr. Eriksson, to wrap up our time together, a few final questions. Did you ever have any discussions with Mr. Rinsch about whether the mattresses could be used in a movie or TV show?
A No.
Q In your 11 years, around how many people have you sold Hästens mattresses to?
A Probably anywhere between 500 to 1,000 people, I would say.
Q Are you aware of anyone buying a Hästens mattress for a TV show or movie?
MR. MCGUINNESS: Objection.
THE COURT: Sustained.
Q Are you aware of any Hästens mattresses being resold on a secondary market?
MR. MCGUINNESS: Objection.

THE COURT: Sustained.

MR. SOWLATI: Your Honor, if I could have a sidebar on this.

THE COURT: No.

Q You mentioned earlier that you gave Mr. Rinsch a discount for the floor model of the mattresses. Why were you willing to give a discount for floor mattresses?

A So when people come in to buy their Hästens, you know, it's -- most people want it new. But when it's a showroom model, it's something that we have readily available. It's paid for. They're in good condition. But it's a great value, so it's part of the business model that, you know, of course, you know, someone has laid on it. It's not going to have the same value as a brand new mattress.

MR. SOWLATI: One second.

Unless there are any objections, the government offers Government Exhibit 1006H.

MR. MCGUINNESS: No objection.

(Government's Exhibit 1006H received in evidence)

MR. SOWLATI: I'm now going to summarize a portion. And Ms. Larracuente, if could you please publish that.

I'm now going to summarize a portion of Government Exhibit S3, a stipulation entered into between the government and the defendant and admitted into evidence.

Government Exhibit 1006H is a true and accurate copy

of a record created in an arbitration between Carl Erik Rinsch

and Netflix Entertainment, and this is a videotape deposition

of Carl Rinsch.

Ms. Larracuente, can we please turn to page 3.

Actually, if we could turn to the prior page.  I'm going to

read the question and answer, Mr. Rinsch's answer:

"Q   Why did you purchase a mattress that cost 450,000 for a

bed for this production?

"A   Because it retains value, and a mattress that you spend

30,000 is worth zilch.  But a mattress that you spend 450,000

on, guess what?  It's worth a hundred grand more now.  So hey,

what are you going to do?"

Nothing further.

MR. MCGUINNESS:  Objection.  Move to strike, your

Honor.

THE COURT:  Waived.  Overruled.

CROSS-EXAMINATION

BY MR. MCGUINNESS:

Q   Good morning.

A   Hi.

Q   Are you aware if Mr. Rinsch had any other conversations

with anyone else who worked with you at Hästens?

A   Yes.

Q   And did you have a boss there named Carl?

A   Yes.

Q And were you present with all of the -- withdrawn.

Were you present for all of the conversations between Mr. Rinsch and your boss, Carl?

A No.

Q And do you know if they corresponded by phone?

A I know that they texted.

Q And have you reviewed those texts?

A No.

MR. MCGUINNESS: Nothing further.

THE COURT: Anything else?

MR. SOWLATI: No your Honor.

THE COURT: Thank you very much. You may step down.

(Witness excused)

THE COURT: All right. Ladies and gentlemen, we're going to give you your midmorning break right now for 15 minutes. Don't fall asleep. I'll see you in 15 minutes.

(Continued on next page)

(In open court; jury not present)

THE COURT: Please be seated.

It's not my practice to set time limits on witnesses, though some of my colleagues do, but I can't imagine why the government spent as long as it did so that we had, for example, I was going to call it a sales pitch, but that's unfair to the witness. He obviously deeply believes in the brilliance of these mattresses, and so we had elaborate testimony on things that were totally irrelevant.

And part of my rulings with respect to some of the last questions put by the government were not only based on the technical correct nature of the objections, but also on the Court's determination that the government was wasting time. Don't let it happen again.

Now, there was something defense counsel wanted to say.

MR. MCGUINNESS: Just briefly, your Honor. I truly do not mean to quibble. Just procedurally going forward, this is the second time the government has introduced evidence from an arbitration read at length. And the reason I'm not objecting to it, I'm anticipating a question to follow. And when no question does follow, your Honor, that's when I made the objection. In the future --

THE COURT: And I think I anticipated that's why you were making the objection because it was of course another

example of the government operating contrary to the Court's prior admonitions. If there was no question, they should have excused the witness or offered him up for cross-examination or whatever and then read in whatever they thought was relevant.

But the reason I overruled the objection as waived is by the third sentence of that long quote, you knew what they were doing. There was no possible question they could have put. So that's why I said it was waived. However, assuming on reconsideration that it wasn't waived, given what you said, I still think it's harmless. It could have come into evidence if done properly, so the jury has a right to have that testimony even though it was procedurally not proper the way they introduced it. So I will amend my ruling to say overruled on those other grounds rather than on the grounds of waive.

Anything else?

MR. MARKEWITZ: No, your Honor.

THE COURT: All right. Very good. We'll see you in ten minutes.

(Recess)

(Continued on next page)

CYNTHIA HOLLAND,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: Counsel.

MR. CAPOZZI: Thank you.

Ms. Holland, please keep the microphone close to your mouth just so we make sure the jurors over here can hear you.

DIRECT EXAMINATION

BY MR. CAPOZZI:

Q. Are you familiar with the show called White Horse?

A. I am.

Q. What, if any, connection did you have to that show?

A. I was part of the team that oversaw the commissioning and through production of the project.

Q. Where were you working at the time?

A. Netflix.

Q. Was anyone more senior than you at Netflix involved in the project?

A. No.

Q. In your role at Netflix, did you have any interactions with the creator of White Horse?

A. I did.

Q. Who was the creator?

A. Carl Rinsch.

Q. Do you believe you would recognize Mr. Rinsch if you saw

him today?
A. Yes.
Q. Do you see Mr. Rinsch in the courtroom today?
A. I do.
Q. Could up identify him based on where he is sitting and what he is wearing?
A. Sitting in the last row inside the court area wearing a blue suit.
Q. Your Honor, the government requests that the record reflect the witness has identified the defendant.
THE COURT: Yes.
BY MR. CAPOZZI:
Q. Ms. Holland, did Mr. Rinsch have a company that was involved in the production of White Horse?
A. Yes.
Q. What was the name of that company?
A. Home VFX.
Q. Did there come a time when you were involved in an $11 million payment to Home VFX?
A. Yes.
Q. About when was that payment?
A. Early March of 2020.
Q. Who at Netflix ultimately approved that payment?
A. I did.
Q. Were you involved in discussions with Carl Rinsch around

the time of that payment?

A.  I was.

Q.  During those conversations, did he say what he would use that money for?

A.  Yes.

Q.  In substance and at a high level, what did he say he would use the $11 million for?

A.  Seek the funds to be able to -- what's called pay or play deals, so, to hold windows for actors' availability, to ensure they would be available for production, to work on production designs, costume designs, storyboards, start hiring editors for editing of the existing footage and special effects supervisors for the existing footage, among other things.

Q.  Would you have approved that payment if he said he would have used the money on anything other than White Horse?

MR. McGUINNESS:  Objection.

A.  No.

THE COURT:  When there's an objection, you have to wait until I rule.

Overruled.

BY MR. CAPOZZI:

Q.  Ms. Holland, before I ask you more questions about White Horse, I want to ask a few more questions about you.

How far did you go in school?

THE DEFENDANT:  Bachelors degree in college.

Q. Where did you go to college?
A. Stanford University.
Q. During what period did you work at Netflix?
A. 2002 until towards the end of 2020.
Q. Did you hold one position at Netflix for the entire time you worked there, or did your position change over the approximately 18 years?
A. I held several different positions during that time.
Q. What positions did you hold?
A. Director of content acquisition; and then was promoted to vice president of content acquisition; and then as we moved into the original content production arena, I was vice president of origin series; then vice president of original content.
Q. And you used a few terms there that I just want to make sure we all understand. What does it mean to be involved in content acquisition?
A. So, licensing pre-existing movies and TV series from third parties.
Q. How about original content?
A. It would be the commissioning of projects that would have their debut on the service.
Q. Ms. Holland, are you currently employed?
A. I am.
Q. What type of work do you currently do?

A.  I am the chair of direct-to-consumer streaming for Paramount.

Q.  And briefly, what is Paramount?

A.  Paramount is a media conglomerate.

Q.  And what is a media conglomerate.

A.  It's an aggregation of production and distribution outlets Paramount Pictures, CBS.  I oversee Paramount Plus and Pluto.

Q.  Now I'd like to turn back to White Horse.  About when did you first become aware of White Horse?

A.  Towards the end of 2017.

Q.  At that time, what was your title at Netflix?

A.  I believe it was vice president of original series.

Q.  I'm sorry.  Did you say original series?

A.  Yes, I believe so.

Q.  And what is original series at Netflix?

A.  I was responsible for overseeing the commissioning acquisition of series that were intended to have their premiere on the Netflix service.

Q.  Around the time you first became aware of White Horse, how many projects did you oversee?

A.  In various forms, from inception to launch on the service, certainly well over 100.

Q.  Can you give us a couple of examples of Netflix projects you worked on?

A.  Sure.  Stranger Things, The Crown, Queen's

Gambit, Bridgerton.
Q. Who did you report to at Netflix at that time?
A. Ted Sarandos.
Q. And what was that person's title?
A. At the time, chief content officer.
Q. And, who did Ted Sarandos report to?
A. Reed Hastings.
Q. And what was Reed Hasting's title?
A. CEO.
Q. Were there people at Netflix who reported directly to you?
A. Yes.
Q. About how many people?
A. Just reporting to me directly, eight to ten. In the organization, 150 or so.
Q. When did you, or rather, how did you first become aware of White Horse?
A. I was contacted by Peter Micelli who was an agent at Creative Artist Agency, which represented Mr. Rinsch.
Q. After you first heard of the show, did there come a time when you had an opportunity to watch a trailer for the show?
A. Yes.
Q. Where did you first see the trailer?
A. In the theater at Creative Artist Agency.
Q. Was anyone else present?
A. Yes.

Q. Who?
A. Mr. Rinsch was present, producing partner Gabby Roses, several colleagues of mine.
Q. What happened at that screening of the trailer?
A. We watched the trailer and some segments that had already been produced.
Q. What was your impression of the trailer and the segments that had been produced?
A. It was really impressive.
Q. What did you find impressive about it?
A. Stunning visual effects, really interesting characters, and it was unusual and exciting.
Q. After you saw the trailer and that other footage, did there come a time when you had an opportunity to review a script for White Horse?
A. Yes.
Q. Where did you do that?
A. At Keanu Reeves' house.
Q. And what was your impression of White Horse, having read the script?
A. It was an impressive script. It was really well-written. It told a really interesting science fiction story from beginning to end.
Q. What, if any, views did you have about whether Netflix should pursue White Horse?

A. I believed we should pursue the project.
Q. Did Netflix, in fact, pursue a deal for White Horse?
A. Yes.
Q. Who at Netflix decided to pursue the White Horse project?
A. Well, the team and I decided together.
Q. Was an agreement eventually entered into between Netflix and Carl Rinsch's production company?
A. Yes.
Q. Who at Netflix were the primary negotiators of that agreement?
A. Bryan Noon, my business affairs team, and then there was another business affairs executive on his team, and then Peter and another executive would weigh in. We would all discuss in the background, but the primary negotiator was Bryan Noon.
Q. And when you refer to Peter, who is Peter?
A. Peter Friedlander.
Q. What involvement, if any, did you have in the negotiations?
A. I would be involved and Bryan would come and ask me questions or talk about the latest offers and counters that were happening, and we would discuss the general framework work of it.
Q. Did you have an understanding of the basic terms of the agreement that was eventually reached?
A. I did.
Q. At a high level, what was your understanding of the terms

of the agreement?

A.   That we were acquiring the project as it existed, partially completed, and that we would be funding additional photography and post-production to be able to complete the entire script.

Q.   After Netflix reached that agreement, what was your involvement in the project?

A.   I was sort of in the background, would get updates from time to time from the team and would talk with Carl directly from time to time.

Q.   At the time that Netflix acquired the rights to Netflix, was the entire script already filmed or was there filming that still remained to be done.

A.   There was filming that still remained to be done.

Q.   Did there come a time after Netflix acquired the rights to White Horse that additional footage was shot for the show?

A.   Yes.

Q.   About when was that footage shot?

A.   Starting in the Summer of 2019.

Q.   Did you receive updates regarding how many that filming was going?

A.   Yes.

Q.   Based on those updates, what was your understanding regarding how filming was going?

A.   That there was some really great footage that was being captured but that the project was behind schedule and over

budget, which is not all that unusual.

Q. Ms. Holland, did you communicate directly with Mr. Rinsch about White Horse?

A. I did.

Q. Unless there is an objection, the government offers Government Exhibit 6349.

MR. McGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 6349 received in evidence)

MR. CAPOZZI: Ms. Larracuente, if you could publish that's now in evidence at 6349 and if you could make larger the portion that has content on the top.

Q. Ms. Holland, near the top of this exhibit, it says: Cindy Holland 10/31/2019. And then it says: Glad we talked and could unstick things.

Who is your understanding of who sent that message?

A. I did.

Q. Below that, it says, Carl Rinsch, 10/31/19, and then it says: Thank you. We are all engines go.

What's your understanding of who sent that message?

A. Carl.

Q. So these messages were around -- they were on October 31, 2019. What was your understanding of what was happening with respect to White Horse around that time?

A. The production was in Hungary at that time.

Q. Were additional funds provided by Netflix around that time?

A. Yes.

Q. Approximately how much?

A. There was an advance of about a little over $5 million, $5.3 million, as I recall.

Q. And if you could speak just a little bit louder, just from where I'm sitting, it's a little hard to hear sometimes.

A. Okay.

Q. Near the bottom of this page, or, at least the bottom of what you can see right now, it says Carl Rinsch 11/12/2019 at 7:57 a.m. Below that is a reference to an attached URL, and then there is what appears to be a file name ending in .jpg.

If we scroll through pages two of this exhibit, three, and four to the top of five, there were some images there. Who sent those images?

A. They came from Mr. Rinsch.

Q. And what's your understanding of what was depicted on those pages?

A. Some photographs from the shooting location.

Q. Near the bottom of page 5 of this exhibit, it says, Carl Rinsch 11/21/2019, and there's another reference to an attached URL and what appears to be another file name ending in .jpg. And if we scroll to page six, there was another image.

Who sent that image?

A. Mr. Rinsch.

Q. And what is your understanding of what is depicted on that page?

A. It's a production design from the location.

Q. On the top of page 7, there is a message from Mr. Rinsch to you on November 21, 2019 in which he wrote, quote, coming to life.

What was your understanding of that message from Mr. Rinsch?

A. I understand it to mean that production was continuing.

Q. I'm sorry. I didn't quite watch catch the end.

A. I understood it to mean that production was underway, continuing in Hungary.

MR. CAPOZZI: Now, if we go to page 13 of this exhibit, in the middle, Ms. Larracuente, if you could make larger the largest message.

Q. On December 20, 2019, Mr. Rinsch send you a message at 1:54 p.m.

Do you see that?

A. I do.

Q. Could you please read the first two sentences of that message out loud.

A. CH, is there a way you and I could do a one-on-one state of the union in a casual way after you're back from NYC? I have pretty clear optics on it all and can give a candid report.

Q. At the beginning of the message you just read, Mr. Rinsch

wrote CH. Who is CH?
A. Me.
Q. And what was your understanding of the status of White Horse at the time you received this message from Mr. Rinsch in late December of 2019?
A. That production had concluded in Hungary and there were several more locations and a lot more footage to be captured.

MR. McGUINNESS: Objection.

Move to strike.

THE COURT: Overruled.

Q. What did you understand Mr. Rinsch to be asking you when he wrote, quote, is there a way you can do a one on one state of the union in a casual way?
A. I understood it to mean that he wanted to see me in person and have a one-on-one meeting.
Q. A bit later in the message, Mr. Rinsch wrote: please know that this is not cause for existential concern; it's just an honest and common-sense review that I think would make everybody more comfortable. Mr. Rinsch then wrote: More than anything, I am fully aware of the good faith you have shown in me, and I want to honor it. You've stuck your neck far, far out for me.

In the first line of the message, Mr. Rinsch proposed that the state of the union happen after you come back from NYC. Where did you live in December 2019?

A. I have homes in both Los Angeles and New York.
Q. Where did you stay while you were in New York City?
A. At my home in Manhattan.
Q. Where did you typically work from while you were in New York City?
A. My home.
Q. Where were you on the date of this message, December 20, 2019?
A. I had traveled from Los Angeles and arrived in New York.

MR. CAPOZZI: Now, Ms. Larracuente if you could please enlarge the next two messages in this portion of the exhibit.

Q. Please read out loud your response to Mr. Rinsch on December 21, 2019.
A. Hi, Carl. I'd be happy to see you when I'm back in LA on Jan 2 or 3. Work for you?
Q. In December 2019 when you sent that message, were you open to having a state of the union with Mr. Rinsch to discuss White Horse?
A. I was.
Q. Why?
A. Because he was a creator of a project that we were excited about and that I was overseeing.
Q. Where were you when you sent that message on December 21, 2019?
A. I was in New York.

Q. And on December 21, 2019, Mr. Rinsch responded:  Either is great.  I'm around.

Where were you when you received that message?

A. I was in New York.

MR. CAPOZZI:  Ms. Larracuente, you can take that portion of the exhibit down and leave the exhibit up.

Q. Ms. Holland, did you, in fact, meet with Mr. Rinsch for a one-on-one state of the union?

A. I did.

Q. When was that meeting?

A. In early January of 2020.

Q. Where was that meeting?

A. In Los Angeles.

Q. What, if anything, did Mr. Rinsch say about White Horse at that meeting?

A. That he was pleased with the footage that existed, and we were talking about planning for the future.

Q. After that state of the union meeting with Mr. Rinsch in January 2020, did you continue to be involved in discussions about White Horse?

A. Yes.

MR. CAPOZZI:  Unless there's an objection I'd -- strike that.

Ms. Larracuente, can you please publish what's in evidence as Government Exhibit 6351.  And if you could enlarge

the top.

Q.   Ms. Holland, do you recognize this?

A.   I do.

Q.   What is it?

A.   It's an email from Mr. Rinsch to Bryan Noon copying a number of folks, including me.

Q.   When was it sent?

A.   February 3, 2020.

Q.   Could you read, out loud, the first two sentences in Mr. Rinsch's email, beginning with: let me begin.

A.   Let me begin by taking this opportunity to thank you, all, personally for sharing your time, support, passion. and excellence with me.  This project and the scores of people who have been involved with its production.  I am aware that your personal time and company resources are limited, and it means the world to me that you invested so heavily in who we are and what we've set out to create.

Q.   What project did you understand Mr. Rinsch to be referring to?

A.   White Horse.

Q.   Did you agree with Mr. Rinsch that Netflix's resources were limited?

A.   Yes.

Q.   Could you explain?

A.   I had a finite budget with which to oversee commissioning

of projects for Netflix.

Q.   In the third sentence, Mr. Rinsch said he, quote, would like to present the current state of affairs and present a structured business plan.

What did you understand him to be saying when he wrote that?

A.   Well, what it says, that he wanted to review where things stood with respect to the project and propose a plan for going forward.

Q.   A little bit below that, he wrote:  To be clear, our objective is to complete and deliver the product and to bring it to market.

What did you understand Mr. Rinsch to mean when he wrote that?

A.   That his intention was to continue and to complete and deliver the project so that we could launch it on the Netflix service.

Q.   Now in the header of this email, there is a reference to attachments.  Do you see that?

A.   I do.

Q.   Let's look at the attachment to this email with file name:  Netflix proposal Feb. 2, 2020?

MR. CAPOZZI:  And Ms. Larracuente, if you could turn to page 3 the exhibit.  I believe it was the next page.

Thank you.

Q. On the top of this page of the attachment, it says: state of the union. A bit below that, Mr. Rinsch wrote: All media has been prepared for post-production over 300 hours of media.

What did you understand Mr. Rinsch to be saying when he wrote that?

A. That over 300 hours of raw footage existed for the project that was ready for post-production.

Q. And what is post production?

A. Once you're finished shooting a project, it's assembling and editing to create the scenes and then the ultimate episodes.

MR. CAPOZZI: If we could go to page 5.

Q. On the top of page 5 of this exhibit, Mr. Rinsch wrote: Operating on good faith, but time to make decisions and a plan.

At the time that Mr. Rinsch sent this proposal to you in February 2020, did you believe that he was operating in good faith?

A. I did.

Q. What gave you that impression?

A. He told me so.

And I had no reason to believe otherwise.

Q. At the bottom of page 5, Mr. Rinsch wrote: Possible future and then, a simple plan. And then below that, he wrote: A plan specifically geared towards completion, delivery, and distribution.

What do you understand him to be saying when he wrote in this proposal about a plan specifically geared towards completion, delivery, and distribution?

A. That he had the intention of completing and delivering the project so that we could launch it on Netflix.

Q. He then wrote: And can be implemented immediately.

What was your understanding of what Mr. Rinsch meant when he wrote in this proposal about a plan that could be implemented immediately?

A. That the intention was to get working again.

Q. Turning to page 7 of this exhibit, towards the bottom of the page, Mr. Rinsch wrote: Proposed step two deal. He then wrote: Ten-week preproduction commitment 5MM USD, and then to finance, and then there's a list of items.

At a high level, what did you understand Mr. Rinsch to be proposing in this portion of that is proposal?

A. That if the funds were provided, that he would get to work on the list of items detailed here.

MR. CAPOZZI: Ms. Larracuente, if you could please take that down and publish what's in evidence as Government Exhibit 6352. And if you could make that larger.

Q. Ms. Holland do you recognize this?

A. I do.

Q. What is it?

A. An email from Mr. Rinsch to Bryan Noon and me copying

others.

Q.  On what date was it sent?

A.  February 4, 2020.

Q.  In this email, Mr. Rinsch, wrote:  BN, please find a later attached in response to and in consideration of our call yesterday.

Who is BN?

A.  Bryan Noon.

Q.  Do you recall participating in calls with Mr. Rinsch around this time?

A.  I do.

Q.  In sum and substance, what do you recall him saying during those calls?

A.  Largely, that we were discussing how much would it cost to continue and complete the production, discussing the items that needed to be done, funds required to accomplish them.

Q.  In the header of the email, it states: attachments, letter to Bryan Noon, February 4, 2020 .pdf.

MR. CAPOZZI:  If we could turn to the attachment on page 2 of this exhibit.  Mr. Rinsch wrote in the third paragraph -- and if you could make that larger -- efforts will now be directed towards actively completing the contracted work.

Q.  What did you understand Mr. Rinsch to be saying when he wrote that?

A. Exactly what it says, that he was intending to complete and deliver the work.

Q. Below that, Mr. Rinsch wrote: Principal photography is to be considered completed. From your work in the movie and television industry, are you familiar with the term "principal photography" as it's used in television production?

A. I am.

Q. What does principal photography mean?

A. It refers to capturing all the footage required to tell a story, generally, that matches that script that had been written.

Q. And what does it mean for principal photography to be completed?

A. That all required footage has been captured.

Q. What if any understanding did you have at the time of this email in early February 2020 regarding whether principal photography on White Horse was complete?

            MR. McGUINNESS: Objection.

            THE COURT: How it's phrased, sustained.

Q. Did you agree what Carl Rinsch had written there about when he wrote principal photography is considered to be completed?

A. I did not.

Q. Why not?

A. There were multiple filming locations yet to be traveled to, and many, many scenes remained un-photographed.

Q. To your knowledge, was principal photography ever completed on White Horse?

A. To my knowledge, it was not.

Q. On the bottom -- on page 3 of this exhibit in bold, in the middle it says: bottom line 11.218MM is required.

At this point how much money did you understand Mr. Rinsch to be seeking from Netflix?

A. $11.218 million.

Q. Below that, Mr. Rinsch wrote: Payment maintains contracts and protects all parties. Timeline for payment is immediate. Post-production to begin immediately.

Based on this portion of this letter from Mr. Rinsch, what, if anything, did you understand that Mr. Rinsch would do if he received 11.218 from Netflix?

A. He would begin post-production on the project.

Q. Around this time in February 2020, did you communicate with Mr. Rinsch by text messages?

A. I did.

MR. CAPOZZI: Unless there is an objection, the government offers --

THE COURT: Before you get to that, just so I'm clear and, hopefully, it's of aid to the jury, tell us again what is meant by post-production.

THE WITNESS: Sure. Post-production is the process -- once filming has concluded and sometimes in parallel with

filming happening -- where editors are assembling footage, different shots into scenes, and then accumulated into episodes.

THE COURT: So you, I think, told us a minute or two ago, that it was your understanding at this time that filming had not been completed; correct?

THE WITNESS: That's correct.

THE COURT: So, why was post production being considered?

THE WITNESS: Very often, production and post-production can happen simultaneously. I've been involved in numerous productions where scenes being shot one day will be edited the next day for review by the director and the producing teams.

In this instance, the production had traveled to several locations and so that footage would be available for post-production.

THE COURT: Go ahead, counsel.

MR. CAPOZZI: Unless there is an objection, the government offers Government Exhibit 6368A.

MR. McGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 6368A received in evidence)

MR. CAPOZZI: Ms. Larracuente, please publish what's now in evidence at Government Exhibit 6368 A.

Q.  Ms. Holland, do you recognize this exhibit?

A.  I do.

Q.  And what does it contain?

A.  Text messages between Mr. Rinsch and myself.

Q.  At the top of page 1, on February 18, 2020, at 6:52 p.m., you wrote:  Hey, Carl.  I am back in town, and it would be great to have an in-person chat.

Why did you propose an in-person chat with Mr. Rinsch at this time?

A.  I wanted to talk about progressing the project.

Q.  On this same page, about half way down, Mr. Rinsch wrote on February 18, 2020, at 11:24 p.m.:  I think an in-person sit down is a good idea, and thank you for the invitation.  Any time that works for you.  And I will be there.

Then towards the bottom of this page, on February 20, 2020, at 9:31 a.m., Mr. Rinsch wrote:  See you in two hours.

Did you, in fact, have an in-person chat with Mr. Rinsch on February 20, 2020?

A.  I did.

Q.  Where was that chat?

A.  At my office in Los Angeles.

Q.  What did Mr. Rinsch say during that chat about White Horse?

A.  He expressed enthusiasm for the project.  He expressed that we wanted to figure out how to continue it.  That was the general shape of the conversation.

Q.   At the bottom of this page, Mr. Rinsch wrote you a message on the same date, February 20, 2020, at 3:27 p.m., and it begins: Cindy, long text.  Do you see that?

A.   I do.

Q.   Did Mr. Rinsch send you this message before or after the in-person meeting that we just discussed?

A.   After.

Q.   Turning to page 2 of this exhibit, about at the top about two-thirds of the way into this message, Mr. Rinsch wrote: Bottom line -- it's right towards the middle -- bottom line, I am confident that we will make you proud and that we have impressive results.

     What was your understanding of what Mr. Rinsch meant by that?

A.   He was confident in the project and that he felt that the project would make us proud, as he says.

Q.   Taking a step back, what, if any, view did you have about the White Horse project in general at this point, in February 2020?

A.   I still believed that it had incredible potential.

Q.   A little bit lower down on this page at 9:23 a.m., Mr. Rinsch messaged you:  I'm be moving forward in both physical and post-pro.

     What did you understand him to mean by that?

A.   That he was continuing to work on the project.

Q. And that what is physical and post-pro production.
A. Physical is referred to here. My understanding was, you know, doing work to prepare for additional physical production, meaning additional photography. And then post-production, as described earlier, would be editing and visual effects and finishing of footage that already existed.
MR. CAPOZZI: Ms. Larracuente, you can take that down, please.
And unless there is no objection, the government offers Government Exhibit 6354.
MR. McGUINNESS: No objection.
THE COURT: Received.
(Government's Exhibit 6354 received in evidence)
MR. CAPOZZI: Ms. Larracuente, can you please publish Government Exhibit 6354 into evidence, and if you could enlarge the top portion.
Ms. Holland, who is this email from?
A. Mr. Rinsch.
Q. And who is it to?
A. Me.
Q. And when was this email sent?
A. Friday, February 28, 2020.
Q. Ms. Holland, did Mr. Rinsch ever discuss the COVID-19 pandemic with you?
A. Yes.

Q. In the second sentence of this email, Mr. Rinsch wrote, quote, thoughts on pandemic attached. Do you see that?
A. I do.

MR. CAPOZZI: Ms. Larracuente, if you could go to the attachment to this email, which begins at page 2 the exhibit. And. Just -- could you take that down for a moment, Ms. Larracuente.

A just one moment, your Honor, we have to fix the exhibit.

THE COURT: While we're waiting, let me just see if we can move ahead briefly. You ultimately approved the payment of an additional $11-plus million to Mr. Rinsch in connection with the White Horse project; is that right?

THE WITNESS: It was $11 million.

THE COURT: Okay. And why?

THE WITNESS: We -- that was associated with the list of activities that had been outlined in the previous exhibit, so, to establish a plan for going forward with additional shooting, to finish the photography at the various locations that had not been traveled to yet, production design, costume design, storyboards, all of those things would be associated with more filming and at the same time, the hiring of editors and special effects folks to process in post-production to complete scenes that had already been filmed.

Q.   And you had originally paid a sum of money for the overall project; yes?

A.   Yes.

Q.   How much?

A.   I don't recall at this moment.

Q.   Well, it was in the many millions of dollars; yes?

A.   Yes.

Q.   And wasn't that supposed to cover the whole project?

A.   Initially, yes, but it is entirely commonplace for productions to go over budget.

THE COURT:  And the things that were supposed to be done in return for the additional 11 million were outlined in a written document; yes?

THE WITNESS:  Yes.

THE COURT:  And was that something that was approved by you?

THE WITNESS:  Yes.

THE COURT:  And did you approve that upon Mr. Rinsch's representations that that that was what the money would be used for?

THE WITNESS:  Yes.

THE COURT:  Okay.  Go ahead.

MR. CAPOZZI:  Ms. Larracuente, if you could publish Government Exhibit 6354 and go to page 2 of the exhibit.

At the top of the page, it says: the playbook, and

two-thirds of the way down this page, there's a heading:
premeditated solution.  Can you enlarge the two lines below
premeditated solution.

BY MR. CAPOZZI:

Q.  Ms. Holland, can you just read the sentence beginning --
the sentence and then read the next sentence, the first
sentence beginning: ensure that virus --

A.  Ensure that virus COVID-19 has patented treatment (but
vaccine) Remdesivir GS 5734 before deploying, ensure it works.
It has worked at least two years prior and is in ample stock
and in parenthesis, it says Gilead.

MR. CAPOZZI:  And Ms. Larracuente, if you could
enlarge near the bottom of the page, the theatrical solution
section.

Q.  Ms. Holland, can you please read out loud the second and
third bullets to me where it says: theatrical solutions save
the world?

A.  At moment of U.S. financial threshold of ten percent and
once Gilead has proven to effectively treat COVID-19 in the
field in China, assign MP as candidate to run global pandemic
solution.

MR. CAPOZZI:  You could take that
down, Ms. Larracuente.

Q.  Did the discussions between Netflix and Mr. Rinsch about
this request for $11 million Continue into March 2020?

A. They did.

MR. CAPOZZI: Ms. Larracuente, can you please publish what's in evidence as Government Exhibit 6358.

Q. Ms. Holland to you recognize this?

A. I do.

Q. And what is it?

A. It's a series of emails between Bryan Noon and Richard Kendall.

THE COURT: Counsel, come to the sidebar.

(Continued on next page)

(At sidebar)

THE COURT: So, I admire the fact that no one in the jury has remotely closed their eyes, but I'm not sure I can say the same about myself, because this sounds, to me, like endlessly repetitious of stuff we've already covered through numerous witnesses.

What is it that is new that you expect to elicit from this witness?

MR. CAPOZZI: Well, your Honor -- and I should say that I believe this is the last of the exhibits that are not solely between this witness and Carl Rinsch and so no one else has testified about it, but this email that we're at right now is the Bryan Noon email that has the list of tasks that is at the heart of the case in terms of the payment of the $11 million, so I'll streamline it, but it corroborates.

THE COURT: You're saying that we are finally getting to something of material relevance and that I really should have gone to sleep earlier when only irrelevant matters were being considered.

MR. CAPOZZI: I understand.

THE COURT: Keep my admonition in mind.

BY MR. CAPOZZI:

Q. Ms. Holland, were you blind-copied on this email chain?

A. Yes.

Q. And when was this email sent?

A. Sorry, it's a little small.

MR. McGUINNESS: Objection.

The document speaks for itself.

THE COURT: Well, she can read it.

Thank you, but we'll let her read it to the jury.

What does it say?

THE WITNESS: Friday, March 6, 2020.

BY MR. CAPOZZI:

Q. And if we could turn to page 5, there's an email dated March 4, 2020 at 10:11 p.m., and it's from Bryan Noon to Richard Kendall and Carl Rinsch.

The second paragraph reads: Netflix shall fund $11 million, 11M. Such funding shall not represent an acknowledgment of any of the contractual milestones. Home VFX shall perform and shall use the 11M to fund the following over a five-week period.

And could you describe what's listed after that?

A. A list of items to be accomplished, including: storyboards; shot diagrams for every shot; location contracts; production design; art design; costume design; hair and makeup designs; fabrication for art and costumes; calendar shooting schedules; pay or play for key crew actor artist; budgets; PSA contracts; editor and support team for editorial on existing material; production insurance; legal overhead; accounting overhead; office space.

THE COURT:  What does it mean when it says:  Such funding shall not represent an acknowledgment of any of the contractual milestones?

THE WITNESS:  That means we are not acknowledging that milestones in the original term sheet have been met.

THE COURT:  By milestones, you mean dates in the original contract when certain things were supposed to have occurred?

THE WITNESS:  Or the completion of certain types of activities.

So, there -- we were not acknowledging that the contractual milestone of principal photography being completed.

THE COURT:  Okay.  Go ahead, counsel.

BY MR. CAPOZZI:

Q.  How, if at all, does the list that you just went through relate to the $11 million that Netflix was potentially going to send to Mr. Rinsch?

A.  They were directly tied.

Q.  I'm sorry.  I couldn't quite hear you.

A.  In my mind, they were directly tied.

Q.  How so?

A.  We were agreeing to fund the money for the completion of those activities.

MR. CAPOZZI:  Ms. Larracuente, you could take that down for a moment.

Q. Based on your experience in the television and movie industry, could the items on the list be worked on during the early period of the COVID-19 pandemic?

MR. McGUINNESS: Objection.

THE COURT: Overruled.

A. Not all of those activities could be completed at that time, but many of them could be worked on and many of them could be completed.

MR. CAPOZZI: And Ms. Larracuente -- actually, could you please bring that up again, Government Exhibit 6351.

Page 5 -- sorry -- rather, 6358.

Page 5. And if you could enlarge that list of items, starting with storyboards.

Q. What are a few examples of items on this list that could be worked on during that period?

A. Storyboards, and shot diagrams, production design, art design, costume design, fabrication for art and costume, you could work on calendars, but you would have to -- you could rough calendars, but you couldn't assign specific dates at that time, editorial, editor and support team for editorial could be done.

(Continued on next page)

BY MR. CAPOZZI:

Q   During the early period of the COVID-19 pandemic, were you involved in Netflix projects other than *White Horse*?

A   Yes.

Q   And in your experience, did other projects work on these types of tasks during the early period of the COVID pandemic?

A   Yes.

Q   Now, we won't spend much more time on this exhibit, but if we could move to page 4.  There's an email response at 1940 from Richard Kendall.  And he wrote, Brian, thank you for the below email.  Your language is acceptable with the following clarification.  What did you understand Richard Kendall to mean when he wrote "your language is acceptable"?

A   That the proposal was largely being agreed to.

Q   And did you understand the clarifications listed in his email to affect in any way the proposal that Mr. Rinsch use the $11 million on the tasks listed in Bryan Noon's March 4 email to Richard Kendall?

MR. MCGUINNESS:  Objection.

THE COURT:  Hold on.  All right.  Do you want to rephrase?

Q   In the email by Richard Kendall, he wrote, your language is acceptable with the following clarification.  Do you see that?

A   I do.

Q   And there are two numbered paragraphs.  Do you see that?

A    Yes.

Q    How, if at all, did you understand those clarifications to affect the proposal that Mr. Rinsch use the $11 million on the tasks listed in the earlier email?

A    I don't know that they would, but based on my recollection, this language was not agreed to.

Q    In the first paragraph Richard Kendall referenced Carl Rinsch's final cut rights.  Do you see that?

A    I do.

Q    From your work in the television and movie industry, are you familiar with the term "final cut"?

A    I am.

Q    And what does that term mean in the industry?

A    That it is a term used by generally directors in the Directors Guild.  So it gives directors with that right the ability to have the last say on the final edit of a series or film.

Q    When does final cut occur in the life of a production?

A    At the very end of post production.

Q    Who had final cut on *White Horse*?

A    Carl Rinsch.

Q    In March 2020, was the *White Horse* project at the final cut stage?

        MR. MCGUINNESS:  Objection.

        THE COURT:  Based on what you understood at that time,

you may answer.

A    Can you repeat the question, please.

Q    Based on your understanding, in March 2020 was the *White Horse* project at the final cut stage?

A    No, it was not.

Q    Can you explain.

A    There was -- well, the existing footage had not yet been edited into scenes or episodes.  And there was a lot of photography still to go before we completed filming that matched the script that we had acquired.

Q    If we move to page 1 of this exhibit there's an email from Richard Kendall on March 5, 2020 at 7:05 p.m.  Do you see that in that email Richard Kendall wrote, Bryan the language you proposed in the below 5:40 p.m. email is acceptable, Dick?

A    Yes, I see that.

Q    Now, Ms. Larracuente, you can take that down and please publish what's been marked as Government Exhibit 6368A, which is in evidence.  And if you could proceed to page 7 and if you could highlight or enlarge the top message.

         In that message Carl Rinsch wrote on March 5, 2020 at 7:18 p.m., I have agreed to terms through Dick.  Who did you understand Dick to be?

A    Richard Kendall.

Q    And what did you understand Mr. Rinsch to mean when he wrote that he had agreed to terms through Dick?

A    That he's agreed to the proposal.

Q    And what proposal are you referring to?

A    The completing of the list of activities for which we would fund $11 million.

Q    You can take that down, Ms. Larracuente.  Thank you.

In addition to the emails and text messages that we've just looked at, did you also participate in phone calls with Mr. Rinsch around this time in early March about this proposed agreement concerning $11 million?

A    I likely did.

Q    And in substance, what did Mr. Rinsch say during those conversations about the $11 million?

A    In that period of time he was quite concerned because there were particular actors who had appeared in the footage that had already been filmed, and they were receiving offers for other projects.  And he was quite worried, as he expressed to me, that they would become unavailable and that we wouldn't be able to continue filming unless we offered them sums of money to not take other work and to remain available for this project.

Q    And based on those conversations that you had, what, if anything, did you understand he would do with the $11 million if he received it from Netflix?

MR. MCGUINNESS:  Objection.  Asked and answered.

THE COURT:  Overruled.

A    Can you repeat the question, please.

Q   Based on those conversations you had with Mr. Rinsch, what,
if anything, did you understand he would do with the
$11 million if he received it from Netflix?

A   That he would work to secure the actors for continuing
photography, that he would hire editors and visual effects
supervisors to work on post production of the existing footage,
and that he would work on the items on the list that has been
previously seen and described.

Q   And what gave you that understanding?

        MR. MCGUINNESS:  Objection.

        THE COURT:  Overruled.

A   He told me so.

Q   Did there come a time when Netflix sent Mr. Rinsch's
company that approximately $11 million he had requested?

A   Yes.

Q   Who at Netflix decided to fund the 11 million?

A   I approved it.

Q   Why did you fund the $11 million?

        MR. MCGUINNESS:  Objection.

        THE COURT:  Well, just to move this along, did you
fund the one $11 million in reliance on the statements he had
made and the proposal he had agreed to?

        THE WITNESS:  Yes.

Q   Based on your participation in those conversations and the
negotiations of that payment, what did you expect Mr. Rinsch

would do with the $11 million?

             MR. MCGUINNESS:  Objection.

             THE COURT:  I think we've been through this several times, counsel.

Q   Did Mr. Rinsch ever tell you that he would use the $11 million on something other than *White Horse*?

A   No, he did not.

Q   Can you please publish what's in evidence as Government Exhibit 6368A and go to the top of page 7.  And if you could highlight the three messages on March 6 at 1:57 p.m.

             Mr. Rinsch wrote at the top message, thank you.  You will not regret it.  Funds have landed.  What's your understanding of what Mr. Rinsch meant when he wrote that the funds have landed?

A   That he'd received the $11 million.

Q   What did you understand him to mean when he wrote, you will not regret it?

A   That he will -- he was going to work on the items and complete the project.

Q   You responded, good.  Breathe.  Looking forward.  What were you looking forward to when you wrote that message?

A   Looking forward to progress of the project.

Q   He then responded, I've got you 100 percent.  What did you understand that to mean?

A   That he was intending to continue work on the project as we

had agreed.

Q   A little bit lower on this page — Ms. Larracuente, can you highlight the message on March 8, 2020 at 2:34 p.m. — Mr. Rinsch references self-quarantines and then writes on the third line of the message, on our end, we are prepared and have planned for what I have described as a tunnel.  So there is no need to worry.  We are moving forward with preproduction at 100 percent effectivity.  We will be on track to shoot end of July and present in five weeks.  What was your understanding of that?

A   As he indicates, that he's moving forward with preproduction, which would encompass a number of the items that were on that list, and planning for future production.

          MR. CAPOZZI:  You can take that exhibit down, Ms. Larracuente, please.

          And unless there's an objection, the government offers Government Exhibit 6361.

          MR. MCGUINNESS:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 6361 received in evidence)

          MR. CAPOZZI:  Ms. Larracuente, please publish Government Exhibit 6361.

          THE COURT:  Counsel, how much more do you have on your direct?

          MR. CAPOZZI:  About 20 minutes or so.

THE COURT: All right. I think we'll give the jury their lunch break at this time, so we'll take an hour for lunch.

(Continued on next page)

(In open court; jury not present)

THE COURT:  Please be seated.  I continue to be mystified by what sounds to me to be endless repetition of matters that are largely not in controversy.  Let me ask defense counsel.  It's not your contention, is it, that Mr. Rinsch didn't agree to the terms of the $11 million proposal.

MR. MCGUINNESS:  I think there was different understandings of the proposal, your Honor.

THE COURT:  In what way?

MR. MCGUINNESS:  Well, your Honor --

THE COURT:  In what way that -- I know you haven't decided yet whether or not your client is taking the stand. And this is not, to state the obvious, a contract dispute, in which case understandings would be irrelevant.  But it's a fraud case, in which case his understanding is relevant.  But the jury will have to evaluate whether that understanding has any reasonable basis or -- had any subjective validity or was really just made up.

But in any event, in what respect -- what I'm trying to do is move things along.  You don't contest that he accepted the proposal that was in writing, do you?

MR. MCGUINNESS:  He certainly did accept the $11 million --

THE COURT:  I think the email said "I accept" or

something like that.

MR. MCGUINNESS: He certainly did --

THE COURT: Are you contending your client was lying when he said that or --

MR. MCGUINNESS: No.

THE COURT: -- not? Okay. So he accepted that. That doesn't preclude your saying he had a different understanding of what he was accepting. That we'll get into when he takes the stand or you have evidence or you think you can argue that from the evidence here. But this is like the third time at least that we've gone through the term sheet, the response that he accepted. What are we doing here?

MR. CAPOZZI: Your Honor, it's been difficult to pin down what exactly the defense case is going to be, and so it's been important for us to have consistent testimony that corroborates the various Netflix executives in terms of what the deal was and --

THE COURT: Well, that's what I'm trying to establish, what is actually in dispute here and is not. So I don't hear counsel denying that these emails were sent. I don't see -- counsel for your adversary. I don't see him denying that there was a term sheet, that after some attempt to change some of the language they walked away from that and they accepted it and Mr. Rinsch personally accepted it. And let me make sure defense counsel is not contesting any of those objective facts.

Are you?

MR. MCGUINNESS: Your Honor, I don't want to take a position that I later regret. When you say walked away from that position --

THE COURT: Well, there was -- and I don't have the email right in front of me, but when he said I accept the terms or whatever, what was meant by that?

MR. MCGUINNESS: Well, that's the question, your Honor. I believe that, you know a good-faith defense, specific intent defense, what was in my client's mind at that time, turns on a reasonable interpretation or an objectively reasonable interpretation, and specific to my client as well, and that will be argument. However, as your Honor stated, the fact that he agreed to what was written is not in controversy.

THE COURT: And what was written was the term sheet, right?

MR. MCGUINNESS: Absolutely. Yes, your Honor. He accepts the term sheet. We are not arguing that that was in any way invalid. I think we have a different understanding of the term sheet than the government's case. I think we have a different understanding of this email agreement than what's in the government's case. But the fact that both of those exist --

THE COURT: So what's your different understanding?

MR. MCGUINNESS: If the Court's pressing me on

presenting the defense argument, I certainly will, your Honor. I would like to reserve rights, if I may. However --

MR. CAPOZZI: Your Honor --

THE COURT: Anyway, defense counsel has convinced me that the government is quite correct to drone on the way it's been droning, given the uncertainty of what it's facing by way of a defense. So I will not press counsel for the surprise of his defense, which hopefully will arise sometime before closing arguments, but we'll see.

All right. We'll see you in an hour.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

1:45 p.m.

(In open court; jury present)

THE COURT: Please be seated. So ladies and gentlemen, to stay on schedule I think we do have to go to 4:30 today, but we'll take a short break around 3:15 or so.

Okay, counsel.

MR. CAPOZZI: Unless there's objection, the government offers Government Exhibit 6361.

MR. MCGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 6361 received in evidence)

MR. CAPOZZI: Ms. Larracuente, please publish what's in evidence as Government Exhibit 6361.

Q This is an email from Carl Rinsch to Cindy Holland on Tuesday, March 10. And could you expand the bottom portion, Ms. Larracuente.

A little more than halfway down on this page, Mr. Rinsch wrote, as it pertains to our business we continue moving forward diligently. What did you understand that to mean?

A That work was continuing on the project.

Q Could you speak or have the microphone a little bit closer to you.

A Sorry. That work was continuing on the project.

Q Which project?
A *White Horse*.
MR. CAPOZZI: You can take that down, Ms. Larracuente.
And unless there's an objection, the government offers Government Exhibit 6368B.
MR. MCGUINNESS: No objection.
THE COURT: Received.
(Government's Exhibit 6368B received in evidence)
BY MR. CAPOZZI:
Q Ms. Larracuente, if you could please publish that exhibit, 6368B and go to page 2.
Ms. Holland, could you please read the message that Carl Rinsch sent you on April 20, 2020 at 12:58.
A By the way, don't worry about the show. It's awesome and moving forward really well.
Q What did you understand Mr. Rinsch to mean when he wrote that message to you?
A That work was continuing on *White Horse*.
Q If we could go to page 10 of this exhibit, and if you could enlarge the top two messages on this page.
Could you read the messages that Carl Rinsch sent to you on April 20, 2020 at 12:58 and then 12:59.
A It's other level. Don't worry. Game changing good and hasn't stopped or even slowed down while I've been handling "other stuff."

Q    What was your understanding of what Mr. Rinsch was referring to when he said it's "other level"?

A    That he was pleased with the work that they were doing or he was doing.

Q    And what did you understand him to mean when he wrote that it hasn't stopped?

A    Just what it says, that he hadn't stopped working on the project, *White Horse*.

MR. CAPOZZI:  Ms. Larracuente, if you could please take that down, and then can you take down that exhibit.

Unless there's an objection, the government offers Government Exhibit 6368C.

MR. MCGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6368C received in evidence)

BY MR. CAPOZZI:

Q    Ms. Larracuente, please publish Government Exhibit 6368C and go to the bottom of page 2, and if you could just enlarge the bottom message.

On June 4 at 6:44 p.m. Mr. Rinsch wrote, we're getting there Cindy.  Thank you for everything.  What did you understand Mr. Rinsch to mean when he said "we're getting there Cindy"?

A    That work was progressing on *White Horse*.

Q    We can go to page 4 of this exhibit.

And the message on June 13, 2020 at 12:35 p.m., Mr. Rinsch wrote, let's do 2:00 p.m. at the Four Seasons. What's that a reference to?
A A meeting that was and did take place at the Four Seasons.
Q And did that meeting in fact happen?
A Yes.
Q Who was at the meeting?
A Mr. Rinsch, Peter Friedlander, and me.
Q And focusing on *White Horse* in particular, what, if anything, about the show did Mr. Rinsch talk about at that meeting?
A We talked about costume design and fabrication. Gaby Roses joined by telephone from I believe -- if I recall correctly, it was Uruguay where that work -- where we were told that work was happening.
Q What, if anything, did Mr. Rinsch show you and Mr. Friedlander at that meeting?
A There was a book related to the production -- production that had already taken place for the project, *White Horse*, as well as some images of production design and costume design, as I recall, for remaining or future production.
Q What was your impression of the book?
A It was impressive.
Q On page 5 of this exhibit, on June 15, 2020, at 1:23 p.m., Mr. Rinsch sent you a message containing what appears to be a

link to a dropbox.com website. Do you see that?

A I do.

Q Do you recall what that refers to?

A I believe it was some of the images that were shown to me and to Peter Friedlander at the meeting.

Q And do you know when those images were created?

A I do not.

MR. CAPOZZI: Ms. Larracuente, you can take that down.

Unless there's an objection, the government offers Government Exhibit 6368D.

MR. MCGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 6368D received in evidence)

BY MR. CAPOZZI:

Q Ms. Larracuente, please publish Government Exhibit 6368D, and if you could go to page 3 of the exhibit and if you could highlight the message on July 1, 2020 at 640 p.m.

In that message, Mr. Rinsch wrote to you, lots to share, good news. All of it. What was your understanding of that?

A That he was looking forward to sharing good news about the project *White Horse*.

MR. CAPOZZI: Ms. Larracuente, you can take that down.

And unless there's an objection, the government offers Government Exhibit 6371B.

MR. MCGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 6371B received in evidence)

BY MR. CAPOZZI:

Q Ms. Larracuente, please publish Government Exhibit 6371B in evidence.

Ms. Holland, do you recognize this?

A I do.

Q What is it?

A A text thread.

Q And who was involved in this?

A Mr. Rinsch, me, and Gaby Roses.

Q Who is Gaby Roses?

A A producer on the project *White Horse*.

Q Whose messages are on the left in gray?

A Gray messages from Mr. Rinsch.

Q On July 27, 2020, Mr. Rinsch wrote, hi ladies. Happy Monday. I wanted to reach out to make sure everybody is connected in a healthy and happy way. If I can be of help, I'm always here. I know Cindy is in NYC and Gaby just got back in LA. Now is probably the time to get the band back together and move forward. Best, C.

What did you understand Mr. Rinsch to mean when he wrote that now is probably the time to get the band back together and move forward?

A    That he felt it was time to continue moving forward with the project.

Q    And where were you when you received this message?

A    I was in New York.

Q    New York City?

A    Yes.

MR. CAPOZZI:  Could you take that message down, that exhibit down.

And I think this should be the last one of these. Unless there's on objection, the government offers Government Exhibit 6368E.

MR. MCGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6368E received in evidence)

BY MR. CAPOZZI:

Q    Ms. Larracuente, please publish Government Exhibit 6368E and go to page 3 of the exhibit, please.

On August 11, 2020, at 8:59 a.m., Mr. Rinsch wrote can we schedule time to catch up today?  And you responded okay, I should be free sometime after 5:00 p.m. PST.  Shall I call when available?

Ms. Holland, do you recall whether you had a call with Mr. Rinsch on August 11, 2020?

A    I do not.

Q    Where were you located on August 11, 2020?

A In New York City.
Q You can take that exhibit down. Thank you.
Ms. Holland, do you know someone by the name of Rochelle Gerson?
A I do.
Q Who is she?
A She was -- is -- was an attorney. She's a great person. Was an attorney at Netflix at the time.
Q Ms. Holland, you testified that you no longer work at Netflix, correct?
A That's correct.
Q When did you stop working there?
A October 1, 2020.
Q Aside from what Mr. Rinsch told you, the book he showed you and provided you, and the still images he sent you, were you personally aware of any work actually being done on *White Horse* between March 2020 and the time of your departure from Netflix?
A I was not.
Q To your knowledge, what was the status of the *White Horse* production at the time you left Netflix?
A Well, it had not resumed production, so in terms of actual production, it was at a standstill.
Q To your understanding, was any work on the project happening at that point?
A I do not know.

Q   To your knowledge, did filming ever resume on *White Horse*
after 2019?

A   To my knowledge, it did not.

Q   Other than *White Horse*, did Netflix have any other projects
with Mr. Rinsch while you were at the company?

MR. MCGUINNESS:  Objection.

THE COURT:  Well, you can answer that yes or no.

A   Can you repeat the question, please.

Q   Other than *White Horse*, did Netflix have any other projects
with Mr. Rinsch while you were at the company?

A   No.

Q   To your knowledge, does the term "Amarna" have anything to
do with *White Horse*?

A   No.

Q   To your knowledge, did Netflix ever receive any episodes of
*White Horse* beyond what already existed at the time it acquired
the rights to *White Horse* in 2018?

A   No.

MR. CAPOZZI:  Just one moment, your Honor.

THE COURT:  Yes.

MR. CAPOZZI:  No further questions, your Honor.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. MCGUINNESS:

Q   Good afternoon, Ms. Holland.

The script expanded after it was purchased by Netflix, correct?

A   It got longer, yes.

Q   Mr. Rinsch wrote a script that was approximately 40 pages longer than the script Netflix had bought, right?

A   That is correct.  However, the shape of the story remained the same.

Q   And after that, he expanded the script even longer, right?

A   As I recall, yes.

Q   And the final script was approximately 220 pages, right?

A   I don't recall the final page count.

Q   In the fall of 2019, Mr. Rinsch was in discussions with Netflix whether to produce a longer version of the production. Do you recall that?

A   To produce a version with more page count, yes.

Q   And he submitted a proposal to Netflix that he could stop the project at a shorter version or continue it on with more funding at a longer version, right?

A   That was the proposal he made, yes.

Q   And the expanded script, one of the ways that it changed was that it changed the first episode.  Do you recall that?

A   I don't recall.

Q   Well, do you recall scenes that were supposed to be set in Mexico?

A   I do.

Q    And those scenes were not in the original script, right?

A    As I recall, that's true.

Q    And there was discussions in the fall of 2019 about which things could be cut from the expanded script to film it at a more modest budget, right?

         MR. CAPOZZI:  Objection.  Form.

         MR. MCGUINNESS:  I'll rephrase.

Q    Netflix made suggestions about cuts to the script moving forward in fall 2019, right?

         MR. CAPOZZI:  Objection.  Hearsay.

Q    Were you -- withdrawn.

         Were you part of any discussions about cuts to the script in fall of 2019?

A    I had been aware that members of the team had reviewed one of the versions of the script to see if there were places or scenes that could be lifted for budgetary reasons that wouldn't be material to the overall arc of the story.

Q    Are you familiar with the term to wrap on set?

A    Yes.

Q    What does that mean in industry lingo?

A    When you're finished for the day, the first AD will usually call wrap, saying we're done for the day.

Q    Would you wrap on a location?

A    Yes.

Q    Would you wrap on a project?

A    You could, yes.  Yes.

Q    If we could bring up 6349, which is in evidence, and go to page 7, please.  And if we could call out the message at 10:44 a.m. on December 5, 2019.

And so on December 5, 2019, Mr. Rinsch is saying that he had wrapped to you, right?

A    I see that, yes.

Q    Okay.  If we could take that down.

Now, you mentioned on direct testimony that Mr. Rinsch had emailed you and others at Netflix saying that he had completed principal photography in early February.  Do you recall that?

A    I recall that exhibit.

Q    And the person in charge of negotiations at that point was Mr. Noon, correct?

A    Yes.

Q    And Mr. Noon at that point was being assisted by litigators, right?

A    I don't know all the folks he consulted with on the project.

Q    I'm sorry?

A    I don't recall who he worked with on the project entirely.

Q    Okay.  If we could show to the witness only, please, 3514-004 at the first page and put that up next to --

MR. CAPOZZI:  Objection, your Honor.  The witness

testified that -- well, objection.

THE COURT:  Well, I don't know yet what is going to be on the screen, so I can't really rule till I see the two things on the screen.

MR. MCGUINNESS:  Attempting to refresh, your Honor. And if we could also -- you can put that on the screen, Ms. Tang.  And also, if you could put up a document next to that that's previously been marked as USAO Rinsch_relativity_00700329 and call out the relevant portions, please.

Q   Have you had a chance to review the document?

A   The one on the left?

Q   The period of text that's called out in the image.

A   Oh, yes.

Q   And does that refresh your recollection?

A   Not -- no.

Q   We can take the documents down.

You testified that you met with Mr. Rinsch in your office on February 20 of 2020, correct?

A   Yes.

Q   And he brought a book to you, right?

A   I don't recall.

Q   Well, do you recall that he brought you a Star Wars book?

A   Oh, it's -- yeah, it was -- I think the production designer -- I don't recall his name.  It was related -- I don't

recall -- it was related to Star Wars.

Q   And was there a discussion had about the universe of Star Wars and the franchise of it?

MR. CAPOZZI:  Objection.  Hearsay.

THE COURT:  Sustained.

Q   Did you discuss with Mr. Rinsch during that meeting his buying the project back from Netflix?

MR. CAPOZZI:  Objection.  The hearsay.

MR. MCGUINNESS:  State of mind, your Honor.

THE COURT:  Well, we'll see how it goes.  You can answer that question yes or no.

A   Sorry.  Can you repeat the question.

Q   At that February 20, 2020 meeting, did you have a discussion with Mr. Rinsch where he discussed buying the project *White Horse* back from Netflix?

A   Yes.

Q   If we could bring up GX-6368A at page 2.  If we could just call out that third line, please.  This is in evidence.

This is a message from Carl where he writes, I kindly ask you to relate to Bryan that I have no ill will towards him and I respect him as an aggressive negotiator protecting your best interests.

Did you agree with that statement that Bryan Noon was an aggressive negotiator?

A   He's a good negotiator.

Q   Okay.  We can take that down.  Actually, if we could bring back up GX-6368A at page 2.  And if you could call out the three messages beginning at 2/27/20 at 9:21:17 a.m.

So in these messages you say that you just tried Carl and Carl asks is there something beside what we discussed?  And he goes on.  And your response is not really, just to align on details.  What did you mean by that?

A   I don't recall.

Q   Which details did you still have to align on there?

A   I don't recall.

Q   Okay.  If we can go on to the following page, please.  So if we can call out the first line of Carl's message at February 28, 2020 at 6:58 p.m.

This is a message from Carl.  He says, Dick is calling Bryan now as it appears that this has turned off the road.

What do you understand him to mean by that?

A   That Dick and Bryan were not concluding the agreement.

Q   And did you have any understanding of why the negotiations were going poorly at this time?

MR. CAPOZZI:  Objection.  Misstates testimony.

THE COURT:  You want to put a timeframe on it?

MR. MCGUINNESS:  I'll rephrase, your Honor.

Q   Did you have any understanding of why the negotiations had turned off the road at this point?

A   I don't know that I would characterize it that way.

Q   Do you have any idea why Mr. Rinsch was characterizing it that way at that time?

MR. CAPOZZI:  Objection.  Called for speculation.

THE COURT:  Sustained.

Q   If we could go to page 5 of this document and call out the first message there, please.  All right.

In this message — and this is on March 4, 2020 — you write to Carl, I have a solution that I believe is workable, hopefully you will agree.  What was your solution?

A   As I recall, in other areas of this text thread Carl was expressing that there was potential to lose actors that had appeared in prior photography.  He was in danger of losing them to other projects, and so the -- the solution ended up being part of this proposal and funding of -- of money in order to allow him to secure future services for those actors, among other things.

Q   And was that solution conveyed to Mr. Rinsch?

A   As I recall, yes.

Q   Was that the sum and substance of the solution?  Were there any more specifics?

A   I mean, I believe at the same time or in the days around it prior, you know, the -- it had been pretty clear email threads and proposals.

Q   Okay.  If we can place that call out and call out the message from Carl at May 5, 2020 at 11:18 a.m.  On March 5,

2020, this is the day that the email agreement is reached, correct?

A    I don't recall the date, but --

Q    Well, Carl writes in this message, one basic question on the proposal and one request, I want to be really candid and transparent and clear, I know we want the same thing, so you will be able to understand from my POV, one, what happens if in five weeks, for any reason when you see all the prepro material and budget, you or rather Netflix decides against it, whether you don't like creative budget, schedule, present market conditions, who knows?  We will be nine weeks out from that point.  Does the project die?  Is there a version where I could buy it back and then give you first right of refusal when completed?  My bottom line is that I want to make it and I want to show it with you on Netflix.

        And then he goes on to ask, and I'm going to paraphrase number two, which is he's asking for Netflix to do the script breakdown and budgeting in house.  Is that a fair characterization of number two, Ms. Holland?

A    Yes.

Q    Now, do you recall if you answered these questions?

A    I don't.  It's been a long time.  I'd have to review the documents.  I haven't seen this.

Q    Okay.  Well, if we can go on to the following page, please. And if we could call out the message at March 5, 2020 at

4:24 p.m., please.

Mr. Rinsch writes, Cindy I'm a little unclear about this proposal and want to make sure we understand each other and do not set ourselves up for disagreements down the road. How can I make this incredibly clear to everybody involved without it being contentious?  Carl.

Do you know if you followed this message up with a phone call?

A   I'd need to review the entire document to understand and refresh my recollection on what's -- where we are here because you're --

Q   Is there a particular page of the document that would help refresh your recollection?

A   I mean, the whole thread, frankly.

Q   I'm sorry?

A   The whole thread would be helpful.  You're highlighting certain pieces, and I haven't seen the other pieces since they were written perhaps.  So it's been a long time.

Q   That's fair.  So could we replace the call out, and if you'd like me to call out any other portion of the document, please just let me know, if you'd like me to go forward or back.

A   I mean, I guess you need to go further back in time.

Q   Can we do that, please.

A   Go back further, please.  Back further, please.  Back

further, please.  Can you advance one page, please.

Q    Pardon me?

A    Can you advance one page, please.  Thank you.  You can advance.  Thank you.  You can advance, please.  Advance, please.  Okay.

(Continued on next page)

BY MR. McGUINNESS:

Q. So my question was, after Carl wrote to you: I'm a little unclear about this proposal and want to make sure we understand each other and do not set ourselves up for disagreements down the road, did you talk to him on the phone about his misunderstanding or his confusion or whatever he was articulating?

A. Sorry. Can you show me exactly that?

Q. I believe that's on the next page.

A. Can I review that entire page, please. Thank you.

Can I see the next page, please.

From reviewing this, it appears that I was not available, and Mr. Rinsch called Bryan Noon to have a conversation.

Q. He spoke with Mr. Noon.

A. That's what it appears from this thread.

Q. All right.

MR. McGUINNESS: We can take that down.

A. The next -- the next text from Carl says: I think we worked it through.

Q. Thank you.

MR. McGUINNESS: So if we could look at GX 6368B, please, at page 3.

Q. All right. So, we see an image. Would you agree with me, this version of the image is different, it's cropped from

what was sent to you originally?

A.  I don't -- I don't recall.

MR. McGUINNESS:  If we could see the next page.

Q.  And these are images that Mr. Rinsch sent to you.

Do you recall see receiving these images?

A.  I recall receiving images from Carl.  I don't know that I have specific recollection of specific detail of things.

Q.  He would occasionally send you images of art work; fair to say?

A.  Yes.

MR. McGUINNESS:  We can take that down.

Q.  Gabby Roses was Mr. Rinsch's wife; correct?

A.  I wasn't sure.  I didn't know if they were married or not married, but I understood them to be both business and life partners.

Q.  Did there come a time in April 2020 when you and Peter Friedlander spoke with Gabby without Carl present?

MR. CAPOZZI:  Objection.

THE COURT:  Well, I can't tell yet, so you can answer that question -- either yes, no, or you don't recall.  But don't give any further details, just yes, no or I don't recall.

THE WITNESS:  Can you repeat the question, please.

BY MR. McGUINNESS:

Q.  I'll ask a slightly narrower question.  Did there come a time after the March deal, before you met Carl in the Four

Seasons, where you and Peter Friedlander and Gabby Roses had a phone call?
A. I don't recall.
Q. Did you recall ever having a call with yourself, Peter Friedlander and Gabby Roses?
A. I do.
Q. And that call was after March 2020; right?
A. I believe so.
Q. And as a result of that call, you decided to not reach out to Carl for a period of time; correct?
A. I don't recall.
Q. Well, as a result of that call, you decided to give Carl some time to handle personal matters; correct?
MR. CAPOZZI: Objection.
THE COURT: Come to the sidebar
(Continued on next page)

(At sidebar)

THE COURT: So, assuming the answer is yes, what's the objection?

MR. CAPOZZI: Your Honor, first of all, I think this question is essentially the last question that she just answered. Second of all, it's -- in terms of the relevance, it's not clear what he's getting at. Furthermore --

THE COURT: Tell me where you think this is going.

MR. McGUINNESS: Yes, Judge.

There's the 3500 material that states that during this call, his wife -- who was in the process of a divorce -- told them that he was suffering from a drug and mental health problem. And they decided they would give him some time to himself.

I think this explains why they're not in contact with him and having meetings about the shoot. It shows why the work wasn't delivered is that they, not he, cut off contact.

THE COURT: Well, at an earlier stage of this case, when he was represented by previous counsel, counsel wanted to seek and drew some evidence regarding his mental state. And Mr. Rinsch vehemently objected to his counsel doing that, and that was the reason why new counsel was appointed.

So, have you cleared this with him?

MR. McGUINNESS: I have discussed this with him and, your Honor, I want to be clear that we are not conceding there

was anything going on with him as far as mental health. It was his wife, who was going through a messy divorce, was telling Netflix and how they were acting on that information.

THE COURT: So his wife tells Netflix about his mental health.

What does she say, in substance?

MR. McGUINNESS: She says that she -- and this is from the government's 3500 -- they would be in a better position to state it. I believe she says that he needs detox, that he's gone -- I believe the quote is "off the deep end" and that COVID has made him mentally unwell and there's substance abuse involved.

THE COURT: Okay. And then, what is the evidence that it was because of that that they cut off contact?

MR. McGUINNESS: Well, as a result of the conversation, they said they needed to give him time to detox. And then we see that there is not any communication until the Four Seasons meeting, which Ms. Holland states, was to check on his well-being, his state of mind.

THE COURT: Okay. But now, having done all of that, what's the relevance of their giving him time?

MR. McGUINNESS: Well, we see this gap from April to July where we don't see this weekly check-ins, which they agreed to in that March 5 email exchange. All this work requires communication, and they are backing away, not him.

And he initiated the Four Seasons meeting, so he's pulling them --

THE COURT: I'm still -- and I've had this problem -- as previous sidebars have indicated -- that if he was claiming to be working on the project but he was not. Instead, he was using funds to launder his own pocket, for lack of a better way to put it, whether they knew it or should have known it or anything about their response is irrelevant.

MR. McGUINNESS: It --

THE COURT: It would only be relevant if he was raising some sort of mental disability defense, which he expressly is not.

So, if he says to them: Give me $11 million and I'm going to do X, Y, and Z and they blithely never check in with him again but the evidence -- the government is able to show that he never did any of that and that he intentionally never did any of that, the fact that they, in my hypothetical, that they never did any check-ins again, irrelevant.

MR. McGUINNESS: Completely true, your Honor, if we were raising this in the first instance, but we're responding to the government's evidence, which has already come in through Netflix executives, that he wasn't checking in, that he wasn't producing materials, that there was a lack of communication.

So we have to rebut this, this lack of communication.

THE COURT: I see.

What about that?

MR. CAPOZZI:  Your Honor, this is both going to blaming the victim, contending that Netflix was failing to reach out to him, which is not relevant.  It's also extremely prejudicial for the limited purpose that to the extent it has any relevance to elicit, sort of, through the backdoor that there was a mental health issue and shielding it through the idea that it was the wife and not himself is just --

THE COURT:  Well, it seems to me that that could be addressed by simply bringing out:  Is it correct that, for whatever reason, Netflix did not make contact with Mr. Rinsch between time X and time Y.

That's really the point you want to make.  And you all want to make that because, in response to what the government has already adduced about checking in and finding that he hadn't done anything, in effect --

MR. McGUINNESS:  Exactly, your Honor.

THE COURT:  -- I will allow that phrased in that way.

And we'll have do make sure the witness makes sure that she does not volunteer anything.  I agree that the background of mental health would be not only prejudicial but it would raise all sorts of issues in the jury's mind and create a mini trial and something that the defendant has expressly said he doesn't want to be a part of this case.

But I'll allow that limited.

666
Pc5Frin5 Holland - Cross

MR. McGUINNESS: Thank you.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(In open court; jurors present)

MR. McGUINNESS:  Ms. Holland, following the call with Ms. Roses and Ms. Friedlander, did you give Mr. Rinsch a period of time to handle his personal issues?

A.  I don't recall that.

THE COURT:  Let me try a different phrasing.

Were you or other people at Netflix, to your knowledge, having regular communications with Mr. Rinsch about progress following the March 5 agreement on the 11 million?

THE WITNESS:  Sorry.  Can you repeat?

THE COURT:  Yeah.  There was an agreement reached to give him a $11 million in return for doing X, Y, and Z; right?

THE WITNESS:  Right.

THE COURT:  And that was March 5?

THE WITNESS:  Mm-hmm.

THE COURT:  Okay?  You can't just nod your head.  You have to say yes or no.

THE WITNESS:  I thought I did.  Sorry.

THE COURT:  Is that a yes; right?

THE WITNESS:  Yes.

THE COURT:  And did Netflix, to your knowledge, follow-up on his progress thereafter?

THE WITNESS:  I know that there were attempts to do so, yes.

THE COURT:  Were you involved in that personally?

THE WITNESS: At times.

THE COURT: Okay. Was there ever a period when Netflix put a pause on that because -- if you know -- because of what they believe were some personal problems he was involved in?

THE WITNESS: Not to my knowledge.

THE COURT: Okay. That's the answer to the question.

BY MR. McGUINNESS:

Q. After the March deal, Netflix was still considering whether to do the longer version of the script; correct?

A. Yes.

Q. And it was considering that into August of 2020; right?

A. Yes. We could not make a decision until we received the further information from Mr. Rinsch.

Q. And as of the time you left the company, the decision on the longer or shorter script still hasn't had not been made; correct?

A. That is correct.

MR. McGUINNESS: One second, your Honor.

(Counsel conferred)

MR. McGUINNESS: Nothing further.

Thank you.

THE COURT: Redirect.

MR. CAPOZZI: Your Honor, I believe one of the jurors is trying to get the Court's attention.

THE COURT: Oh, okay.

By the way, you should -- because this has happened before -- don't hesitate to shout out: We need a break, or something like that. Because I'm often focused on the --

JUROR: Somebody might tackle me.

THE COURT: Why don't we take our mid-afternoon break right now for 15 minutes.

JUROR: For how long?

THE COURT: 15.

(Jury excused)

(Continued on next page)

670
670|alphanum"left header}center header

(Jury not present)

THE COURT: All right. We'll see you all in 15 minutes.

(Recess)

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

(Jury present)

THE COURT: All right, counsel.

REDIRECT EXAMINATION

BY MR. CAPOZZI:

Q. Ms. Holland, on cross-examination do you recall you were asked questions about the existence of multiple versions of the script for White Horse?

A. Yes.

Q. While you were at Netflix, did Carl Rinsch ever provide footage that matched the complete story in any version of the various scripts?

A. No.

Q. Do you recall, on cross-examination, that you were asked about a December 2019 email where Mr. Rinsch said that there had been a wrap?

A. It was in a text.

Q. It was a text message, not an email?

A. Yes.

Q. Did you understand that to mean that principal photography had been completed?

A. No.

Q. Why not?

A. There were many locations and scenes from the original script or any version that had not yet been photographed.

Q. Do you recall you were asked questions about a message in

which Mr. Rinsch said he wanted to be incredibly clear?

A.   Yes, but I don't recall the specific message right now.

Q.   During your conversations with Mr. Rinsch around March 2020, did he ever express my confusion about what he could spend the $11 million from Netflix on?

A.   No.

          MR. CAPOZZI:  Ms. Larracuente, if you could pull up Government Exhibit 6368B, which is in evidence, and go to page 4.

Q.   Ms. Holland, do you recall you were asked about the images in this exhibit?

A.   Yes.

Q.   Do you know when those images were taken?

A.   No.

Q.   Do you know when what was depicted in the images was created?

A.   No.

          MR. CAPOZZI:  Your Honor, no further questions?

          THE COURT:  All right.  Anything else?

          MR. McGUINNESS:  Very briefly, your Honor.

          If we could bring up and show to the witness exhibit 6351, at the top of page 3, please.

          We can publish this.  This is in evidence.

Page 3, please.

RECROSS EXAMINATION

BY MR. McGUINNESS:

Q. You stated that you never saw footage showing completion of principal photography on redirect a moment ago.

Did you review all of the 300 hours of media that Mr. Rinsch had on this project?

A. No, but I understood what had -- roughly, what had been filmed and what had not been filmed.

Q. And much of what had been filmed had been filmed on gigantic green screens; right?

A. I don't -- I don't know.

Q. No further questions.

THE COURT: Anything else?

MR. CAPOZZI: No, your Honor.

THE COURT: Thank you very much. You may step down.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Please call your next witness.

MR. SOWLATI: The government calls Tobias Suhm.

TOBIAS SUHM,

      called as a witness by the Government,

   having been duly sworn, testified as follows:

THE COURT: Counsel.

DIRECT EXAMINATION

BY MR. SOWLATI:

Q. Good afternoon, Mr. Suhm.

What's your occupation?

A.  I'm a film editor.

Q.  Where are you based?

A.  Los Angeles.

Q.  How long have you been a film editor for?

A.  About 20 years.

Q.  And what is film editor?

A.  A film editor is a person who puts the film footage of a film production into a coherent order and make it fun for the audience to watch.

Q.  And if you don't mind bringing the microphone a little closer to you so everyone can hear you.

Thank you.

Now, can you please walk us through the process of editing a film from the beginning until the end?

A.  So, you receive the footage from the DIT, which is the digital image technician who got the footage from the camera crew, and he breaks it down to smaller file sizes to make it easier for the computers to handle the huge amount of data.

That footage is then handed over to the assistant editor who is then breaking it down into smaller, more digestible chunks and sorted into the scene numbers.

And once that is done, the editor takes over and goes through the sorted footage and is watching the takes and marking favorite takes -- putting selects is what it's

called -- and once that is done, you start putting those selected takes together and make a scene out of it.

Q. And what sort of equipment do you use to edit film?

A. Computer and a designated video editing software.

Q. Where do you do your film editing?

A. Either from in home or in office.

Q. Why are you able to edit film from home?

A. Because I have a computer at home, and that's kind of all you need.

Q. Did there come a time when you started working on a show called White Horse?

A. Yes.

Q. When did you start working on White Horse?

A. I think it was May 2017.

Q. How did you start working on White Horse?

A. Mr. Carl Rinsch called me one day and asked me if I was interested in working on the show.

Q. And what were your responsibilities on White Horse?

A. I was asked to be an editor on the show.

Q. And who did you work with on White Horse?

A. Besides the director, I was working very close with the storyboard artist.

Q. What are storyboard artists?

A. A storyboard artist, it's the person who draws illustrations based on the screenplay to visualize the camera

angles that need to be shot for a scene.
Q. Did you have any assistants working for you?
A. Not at first, but during the shoot in 2019, I did, yes.
Q. And was your assistant's name?
A. Phillip Thomas.
Q. Did you work exclusively on White Horse, or did you have other projects in addition to White Horse?
A. I had other projects.
Q. You mentioned you started working on White Horse in n2017. When did you stop working on it?
A. End of January 2020.
Q. Now, I want to focus on the end of your time at White Horse. In 2019, were you aware of any other editors by sides yourself working on White Horse?
A. In 2019, that's my assistant editor and I. I was not aware of other people working as an editor on White Horse.
Q. How about in 2020?
A. Same.
Q. You said you stopped working for White Horse in January 2020. Prior to stopping work, did you do anything with respect to the show?
A. That's when we wrapped up, breaking down the entirety of the footage that was shot in 2019.
Q. And does it mean to break down footage?
A. To take the huge amount of footage that is filmed and break

it down into smaller, digestible chunks and sort it in an order based on the scene numbers.

Q. And what happens after the breakdown of footage, typically?

A. Once that is done, the creative editing process would then start.

Q. So you said you broke down the footage. Prior to stopping work in January 2020, what did you do with that broken down footage?

A. We then handed it over back to the production.

Q. Approximately how many hours of film had you broken down?

A. I don't recall the exact number, but it was north of 200 hours.

Q. Had the film been edited at the time you handed it over?

A. No -- I mean, not that footage.

Q. After you handed over the unedited film, did you ever hear back from Mr. Rinsch to have you edit the film?

A. I did not.

Q. At the time you dropped off the unedited film, did you expect you would be editing it?

A. I was under the impression --

MR. ZEMAN: Objection?

A. -- that I would be eventually called back.

THE COURT: I'm sorry. For some reason, the full question does not show up on the screen.

You want to put the question again, then I'll deal

with whether there's an objection.

MR. SOWLATI: Absolutely.

Q. At the time you dropped off the unedited film, did you expect you would be editing it?

THE COURT: Hold on.

Was there an objection.

MR. ZEMAN: Relevance, your Honor.

THE COURT: Overruled.

You may answer.

THE WITNESS: I had -- I was assuming that I was -- would be eventually called back for that.

Q. And why is that?

A. Because there was no reason to think differently, and I had a brief conversation before Christmas in 2019 with Mr. Carl Rinsch about the potential prospect of how this could proceed, but nothing was committed to or set in stone.

But yeah, there was no reason given why I would not have been called back.

Q. Did Mr. Rinsch ever express concerns about the quality of your work?

A. No.

Q. Are you able to estimate how long it would have been taken you to edit all that film, the approximately 200 hours?

A. Just as a rough estimate, maybe like six months.

Q. Did you end up editing the film the 200 hours,

approximately 200 hours?
A. No.
Q. Why not?
A. I was never called back.
MR. ZEMAN: Objection.
THE COURT: Overruled.
You may answer.
THE WITNESS: I was never called back.
BY MR. SOWLATI:
Q. Did you ever contact Mr. Rinsch?
A. I did not.
Q. Why not?
A. Because that's how the production rolled. I was always called when needed, and not the other way around.
Q. You testified that you dropped off the approximately 200 hours of broken down film at the end of January 2020 and expected you would edit it but never heard back.
In around March 20, are you aware --
THE COURT: I don't know what that was, but it wasn't a question.
MR. SOWLATI: I'll strike, it your Honor.
THE COURT: Yes.
BY MR. SOWLATI:
Q. Are you aware that around March 2020, the COVID-19 pandemic began?

A. Yes.
Q. Did you have the ability to edit the White Horse film during the pandemic?
A. Technically, it would have been possible.
Q. And why is that?
A. Because you can work from home.
Q. In your experience, were other films being edited during the pandemic?
A. Yes.
Q. Did you edit any other non-White Horse material during the pandemic?
A. Yes.
Q. Can you explain?
A. I worked on a short film in May 2020. So everything came to a screeching halt in March and April obviously, and then May 2020 I started to work on a short film. And then by around June-July, 2020, commercial film production started to ramp up again, and I remained busy working from home ever -- for the remainder of the year.

MR. SOWLATI: No further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. ZEMAN:

Q. Good afternoon, Mr. Suhm.

You first met Mr. Rinsch in 2015?

A. No, 2017.
Q. 2017?
A. Yes.
Q. Sorry. I must have misheard.
And this was -- he reached out to you about his project, White Horse; correct?
A. Yes.
Q. And you started working for him around that time; isn't that correct?
A. Yes.
Q. You would work out of his home?
A. The very first time we met, we worked out -- from an office, like an edit bay inside an office building.
Q. Okay. But after that, you would work out of his living room often?
A. We did, yes. Yeah.
Q. But then in 2018, Netflix became involved with this project; right?
A. As far as I remember, yes.
Q. And at that point, you weren't working out of Mr. Rinsch's home anymore; correct?
A. Correct.
Q. There were offices for the production; right?
A. Yes.
Q. And you would work out of those offices; correct?

A. Yes.
Q. When the production, the actual production, began in 2019, you went down to Uruguay; right?
A. Yes.
Q. And you were on set; right?
A. Yeah, like not literally onset, but at a hotel adjacent to the set, yes.
Q. Well, you were doing some editing during the production in Uruguay; correct?
A. Yeah.
Q. And you were doing that on your own; correct?
A. Yes.
Q. No assistants?
A. At that time, I had no assistant, no.
Q. And this production, they were shooting a lot of hours in a day; is that correct?
A. That's correct.
Q. Do you know approximately how many?
A. I can't remember.
Q. Was it as many as ten?
A. I can't remember.
Q. Do you remember they were using more than one camera; right?
A. Yes.
Q. Was it three or four cameras?

A. I don't remember.
Q. Can you give an estimate as to how many hours of footage they were able to shoot in Uruguay?
A. In -- I only remember the number of shooting days, but not the actual amount.
Q. What was that number of shooting days?
A. Ten.
Q. Ten.

And you also had the footage that they had shot in Brazil as well; correct?
A. No. In the Brazil portion of the shoot, I was not present.
Q. I understand that, but you had access to the footage that they shot in Brazil; right?
A. I don't remember if I had access to the footage of Brazil when I was in Uruguay, but eventually, at some point, I had access to the footage.
Q. Okay. And like Uruguay, the Brazil shoot was using more than one camera a day; right?
A. Yes.
Q. Three to four cameras at that time?
A. I don't remember the number of cameras, but it was more than one camera, yes.
Q. Okay. And you also went to Hungary with the production; isn't that correct?
A. Yes.

Q. And this time, though, you insisted on having some assistants; right?
A. Yes.
Q. Because you hadn't had an assistant in Uruguay?
A. Correct.
Q. And that's not typical of a production of this size; isn't that correct?
A. What is not typical?
Q. One editor working alone without an assistant.
A. Alone, without having an assistant, that's not usual.
Q. In your experience, Mr. Suhm, working on a production of this size, how many editors would normally be on set during the production?
A. Well, at least you have -- besides on editor, at the very least one assistant.
Q. And with respect to just the Hungary portion of the production, there were 15 days of shooting; correct?
A. Yes.
Q. And like the Uruguay production, they were using multiple cameras each day; correct?
A. Correct.
Q. And they were shooting on very large stages; right?
A. Yes.
Q. With big green screens as well; right?
A. Yes.

Q.   And hundreds of extras correct.

A.   I don't know if it was hundred of extras, but there were extras.

Q.   Okay.  And during the Hungarian production, you were editing some of the footage at night; right?

A.   We were breaking it down, mostly.

Q.   And you may have experienced this a little bit on direct examination, but breaking it down, what does that mean, as an editor?

A.   Since there is such a huge amount of footage being shot every day, you first have to sort it.  So, the sorting process is basically what is called breaking it down to, like, smaller chunks and sorted by scene numbers so that it's not like a huge amount of footage that you have to go through, but you can go through it in little pieces.

Q.   And Mr. Rinsch also would help with these edits; isn't that correct?

A.   He did in the past.

Q.   He would do some of his own editing correct?

A.   Yes.

Q.   And I think you testified on direct examination that in January of 2020, you began to break down some of the footage that had been shot in 2019; is that correct?

A.   Yeah, so what happened in January 2020 was that we broke down the Brazilian portion of the shoot, which we did not do

before.

Q. And I think you testified to the number of 200 hours of footage; is that right?

A. North of 200 as far as I remember, but that was the entirety of the shoot, not just the --

Q. That's what I was going to ask you. That wasn't just Brazil. That was all the footage that you had in your possession?

A. Brazil, Uruguay, and Hungary.

Q. And that was given to you in January of 20?0; correct?

A. I can't remember when it was given to me, but in January 2020, that's when we -- that's when we broke the Brazilian portion of the footage down.

Q. That's when you start to break down the Brazilian portion; correct?

A. Yes.

Q. And you worked through the month of January 2020 breaking down footage; correct?

A. Yes.

Q. And at that point, some time at the end of January 2020, Mr. Rinsch asked you for the footage back; is that correct?

A. That was the agreement we had, was to be finished by 2020, because I wasn't -- at that time -- yeah. Yeah, to be finished by January 2020.

Q. But by the end of January 2020, that was the contract you

had on the production?

A. Yes.

Q. Okay. And it's true that you -- so you gave the footage back to the production company; correct?

A. Yes.

Q. Okay. And then you got a different job; right?

A. Yes.

Q. Okay. And then that was the last time you worked for Mr. Rinsch; correct?

A. Yes.

MR. ZEMAN: Thank you. I have nothing further.

THE COURT: Anything else?

MR. SOWLATI: No, your Honor.

THE COURT: Thank you very much. You may step down.

(Witness excused)

(Continued on next page)

MR. SOWLATI:  The government calls Joshua Loney.

JOSHUA SALZMAN LONEY,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOWLATI:

Q   Good afternoon, Mr. Loney.  What's your occupation?

A   I'm a filmmaker.

Q   What's that?

A   I do freelance work creating social media videos, music videos, short films, stuff like that, depending what my client needs.

Q   How long have you been a freelance filmmaker?

A   I've been full time for about a year, and I've been doing it part time before that since around 2018 or '19.

Q   Before you were full-time freelance filmmaker, what was your occupation?

A   I was a waiter when I moved to Nashville at first for a couple years, and then before that I was Carl Rinsch's assistant.

Q   At a high level, what did you assist Mr. Rinsch with?

A   Mostly just his day-to-day operations in terms of, like, the pragmatic elements of his life, so stuff like getting his laundry or getting him juice, running errands.

Q   Were you working on any particular project?

A    Yeah, I was hired for the *White Horse* project.

Q    When did you get this job as Mr. Rinsch's assistant?

A    It would have been fall of 2018.  I think November.

Q    Until when did you have that job?

A    Early 2021.

Q    How did you get the job as Mr. Rinsch's assistant?

A    I got it through my friend Ethan Weiner.

Q    And who is that?

A    He was an associate producer on the film.  And he was also -- he produced some of my short films in film school.

Q    When you say he was an associate producer on the film, which film are you referring to.

A    On *White Horse*.

Q    As Rinsch's assistant, were you in regular contact with him?

A    Yes.

Q    In what way?

A    Mostly through text message.

Q    Would you see him in person?

A    Yeah.

Q    Would you talk to him on the phone?

A    Sometimes.  Not actually that often.  It was mostly text or in person.

Q    So you said you did work on *White Horse* as Mr. Rinsch's assistant.  What were your responsibilities with respect to

*White Horse*?

A    They kind of morphed over time.  Like I said, it started with more just kind of basic errands and life management stuff.  And then as it progressed and, you know, they just discovered I had a higher level of competence, eventually I would procure fabrics for the costume department.  They ended up having an entire team of runners that I would help kind of manage and send off to do various things.

Q    In addition to Mr. Rinsch, did you interact with other people on the *White Horse* production?

A    Yeah.

Q    Who did you interact the most with?

A    Ethan the most.  At first he was kind of the intermediary between Carl and I.  But obviously Carl, his then wife Gaby, and First AD Bob Wagner, the first assistant director.

Q    Now, I want to focus on a specific time period, March 2020.  Did your work on *White Horse* change in any way in March 2020?

A    Yeah.

Q    In what way?

A    I think COVID kind of brought everything to a screeching halt.

Q    From the beginning, so from March 2020 through the spring of 2021 when you left your job, were you in regular contact with Mr. Rinsch?

A    Yes.

Q   During this period, so March 2020 through spring 2021, what, if any, work did you observe or hear Mr. Rinsch doing on *White Horse*?

A   None really.

Q   Did you have any conversations with Mr. Rinsch about work that could be done during this time period?

A   Yes.

Q   Can you tell me about that?

A   I inquired just about the progress, and also his then wife had encouraged me to try and encourage him to edit the footage that they had, and so I did that as well.

Q   How did he respond to your suggestion that editing work be done on the show?

A   It was mostly just kind of deflection, and either the subject would get changed, there would be some sort of hand waving or just, you know, oh, yeah, yeah we'll take care of it, but it was kind of vague.

Q   Why were you encouraging him to finish the show?

A   Selfishly I wanted it done because for my own career the credit doesn't mean anything if the film doesn't come out. And beyond that, I just wanted the project to succeed and I wanted him to succeed.

Q   In your discussions with Mr. Rinsch, did Mr. Rinsch tell you that anyone else was doing work on *White Horse*?

A   Not that I can recall.

Q    Did you do any work on *White Horse* from March 2020 through spring 2021 to move the production forward?

A    Ostensibly my being there was for the production, but no, most of the things I did that were related to the production were lateral moves at best, just like rearranging stuff in a storage space, you know, stuff like that.

            MR. SOWLATI:  No further questions.

            THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. ZEMAN:

Q    Good afternoon, Mr. Loney.

            So you said on direct examination that you met Mr. Rinsch through your friend Ethan, right?

A    Correct.

Q    And before you, Ethan had been in the same role that you took over; is that right?

A    Somewhat.  Ethan had broader responsibilities than I did when he was in that role.

Q    Okay.  Well, your responsibilities with respect to Mr. Rinsch were essentially managing his day-to-day; is that fair to say?

A    Somewhat.  I didn't really do much in terms of management or planning with what he did on a day-to-day basis.  But in terms of taking care of things I wanted to --

Q    His day-to-day needs?  Is that --

A    Yeah.

Q    I think you mentioned you'd get him juices.

A    I'd get him juice, get him his food from his chef stuff like that.

Q    You said also on direct examination that you yourself are a filmmaker; is that right?

A    Yes.

Q    But you said you didn't work on the project with Mr. Rinsch, right, on *White Horse*?

A    Well, again, I think my being there was for the project, so that he could focus on the project.

Q    I guess more specifically you weren't an artistic collaborator with Mr. Rinsch, right?

A    No, not beyond the occasional asking of my opinion on something, but no.

Q    He didn't ask you -- strike that.

You also worked with Mr. Rinsch's wife, Gaby, correct?

A    Correct.

Q    And she was also working on the project, right?

A    Yes.

Q    She was in charge of the wardrobe for the project; is that right?

A    Yes.

Q    And Mr. Rinsch and Gaby, they gave you an American Express card for the production, right?

A    Yes.

MR. SOWLATI: Objection. Relevance.

THE COURT: Can't tell yet, so the answer is yes, that will stand and see what the next question is.

Q    They would both ask you to pay for certain things for the production with that card; is that correct?

A    Yes.

Q    And Mr. Rinsch told you about the show that they were working on, right?

MR. SOWLATI: Objection. Hearsay.

THE COURT: Sustained.

Q    Mr. Loney, I want to direct your attention to spring of 2020, specifically when the COVID pandemic hit. What did you notice about Mr. Rinsch's personality when COVID hit?

MR. SOWLATI: Objection, your Honor. Relevance and 403.

THE COURT: Yes, I also think it's probably also forbidden opinion evidence, so for all three of those reasons, sustained.

Q    Mr. Loney, did you consider Mr. Rinsch to be a creative guy?

MR. SOWLATI: Objection. Outside the scope and relevance.

THE COURT: Sustained.

Q    Remind us, Mr. Loney, when you first started working for

Mr. Rinsch.

A    I believe it was in November of 2018.

Q    In 2018?

A    Yeah.

Q    So when they went to shoot in Brazil in 2019 you were working for them at that time, correct?

          MR. SOWLATI:  Objection.  Foundation.

          THE COURT:  I'll allow that.

A    I was kind of on retainer, but I did not go with the production.

Q    That was going to be my next question.  You didn't go down to the production?

A    No.  I had the opportunity to, but I stayed in LA.

Q    But when they returned in December of 2019, you resumed working for him directly, correct?

A    Yes.

Q    Okay.  And after the holidays, you saw Mr. Rinsch around the house working on the show, correct?

A    Yes.

Q    He had a whiteboards around the house, correct?

A    Yeah, there were whiteboards.

Q    And Nick Gindraux was there, correct?

A    Yes.

          MR. SOWLATI:  Objection to form.

          THE COURT:  Overruled.

Q Nick Gindraux was there at the house working on the show in January 2020, correct?
A Ostensibly.
Q Well, he was there working, right?
A Yeah. I saw him working on a laptop.
Q And he was a special effects guy working on the show, right?
A As I understood it, he was a designer.
Q Okay. Mr. Loney, when was the last time you worked for Mr. Rinsch?
A Sometime in early 2021.
Q Okay. And throughout the rest of 2020 following March, were you seeing him in person or were you working for him remotely?
A I would see him in person at least twice a week. I would let the maids into his house, and I would also see him in person if he needed any other errands taken care of. Beyond that, it was mostly remote.
Q It was mostly communicating by phone or --
A It was text. But, I mean, when I would go over to his house we would talk.

MR. ZEMAN: I've got nothing further.

THE COURT: Any redirect?

MR. SOWLATI: May I have just one moment, your Honor?

THE COURT: Yes.

MR. SOWLATI: No redirect, your Honor. Thank you.

THE COURT: Thank you very much. You may step down.

(Witness excused)

THE COURT: Please call your next witness.

MR. CAPOZZI: Your Honor, the government is going to just offer four exhibits that are subject to stipulation. We're not going to publish them at this time. And then we'll call a witness.

THE COURT: Okay.

MR. CAPOZZI: Your Honor, unless there are any objections, the government offers Government Exhibits 1011A, 1006B, 1007A, and 6362.

MR. MCGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 1011A, 1006B, 1007A, 6362 received in evidence)

MR. SOWLATI: The government calls Gabriela Roses Rinsch.

GABRIELA ROSES RINSCH,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SOWLATI:

Q Good afternoon, Ms. Rinsch.

Do you mind bringing the microphone a little closer to

you?

A    There.

Q    Thank you very much.  Ms. Rinsch, do you go by any other names?

A    Gabriela Roses as well.

Q    Are you familiar with Carl Rinsch?

A    I am.

Q    How do you know him?

A    He's my husband.

Q    When did you marry him?

A    January 2014.

Q    Are you and Mr. Rinsch still together?

A    No.

Q    When did you separate?

A    November 2019.

Q    Have you filed for divorce?

A    I did.

Q    When did that happen?

A    July 2020.

Q    Was your divorce contentious?

A    Yes.

Q    At a high level what were some of the issues at dispute?

A    There was a spousal support order, legal fees, and division of assets.

Q    Did you go to trial on these issues?

A    No.

Q    What is the current status of the divorce?

A    The divorce is --

        MR. MCGUINNESS:  Objection.

A    -- being finalized, but the judgment is going to be signed actually 9 of December this year.

        THE COURT:  Overruled.

Q    Have there been any orders issued in the divorce proceeding?

A    Yes.

Q    Do they address at all the division of assets and spousal support?

A    Yes.

Q    Would anything about the divorce affect your ability to tell the truth here today?

A    No.

Q    In addition to being married to Mr. Rinsch, did you work with him?

A    Yes, I did.

Q    How did you work with him?

A    I was one of the producers and the costume designer on the show.

Q    What show are you referring to?

A    *White Horse*.

Q    At a high level, what was *White Horse*?

A    It was a 13 episodes miniseries.

Q    Was *White Horse* produced for a particular network?

A    Yes.

Q    And which is that?

A    Netflix.

Q    Did you say Netflix?

A    Yes, Netflix.

Q    And what was your role on *White Horse*?

A    I was one of the producers and the costume designer.

Q    What were your responsibilities as a producer?

A    I deal mostly, like, with cast, some of the logistic, and the talks with the PSAs that are the production service companies in the other countries where we're going to shoot.

Q    You mentioned you separated from Mr. Rinsch in November 2019.  Did you stay on as a producer on *White Horse*?

A    I did.

Q    Until approximately when were you a producer on *White Horse*?

A    About end of 2020.

Q    You testified that *White Horse* was produced for Netflix. When did Netflix get involved in the project?

A    In late 2018.

Q    Focusing on this period, the Netflix period, in your role as a producer, did you interact with other members of the in-house *White Horse* team?

A    Yes.

Q    Can you give an overview of who.

A    Well, everyone that was in preproduction like the first AD, the line producers, the artists, the storyboard artist, yeah, everyone that was part of the core team.

        THE COURT:  I think the question should have been can you give an overview of whom, but I will accept the question nevertheless.

        MR. SOWLATI:  Understood.

Q    How often would you communicate with Mr. Rinsch about *White Horse*?

A    Daily.

Q    Did you have any discussions with Mr. Rinsch about his artistic vision for *White Horse*?

A    Yes.

Q    And why is that?

A    Well, whatever is his vision, it implies to all the other departments what we should follow.

Q    Did you read the scripts for *White Horse*?

A    Yes.

Q    And why is that?

A    That also, like, as a costume designer, I need to know what the script is about in order to create the costumes, and also the producer in order to see what we are shooting, where, how.

Q    Did *White Horse* use cars in its production?

A   Say again.

Q   Did *White Horse* use cars in its production?

A   Cars, yes.

Q   Did you have any discussions with Mr. Rinsch about his artistic vision for cars for *White Horse*?

A   Yes, we have reference of the cars in our mood board of the show.

Q   And what did he say was his vision?

A   Everything was like vintage classic.  The cars were classic.  It was like a grounded science fiction future.

Q   What do you mean by "classic"?

A   Like old cars.

        MR. SOWLATI:  Unless there are any objections, the government offers Government Exhibit 5006.

        MR. MCGUINNESS:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 5006 received in evidence)

BY MR. SOWLATI:

Q   If we could please publish that.  Thank you.

        Are you familiar with this document?

A   Yes.

Q   And what is it?

A   It's a backstage photo of one of our shoot days in Sao Paulo.

Q   What type of cars are in this photo?

A    Classics.

Q    Do you know what the cars in this photo were going to be used for?

A    Yes.  This is like the scene were some of the actors were arriving to one of our sets.

Q    Ms. Larracuente, you can bring that down.

Ms. Roses, are you familiar with the term "principal photography"?

A    Yes.

Q    How are you familiar with that term?

A    It's a term that we use very often on film and shows.

Q    If I could ask you to bring the microphone just a little bit closer.  What does principal photography mean?

A    It's like the core phase of production where all the material gets shot.

Q    In your role as a producer, did you have visibility into how much was left to shoot in the first season of *White Horse* in early 2020?

A    Yes, an idea.

Q    By the beginning of 2020, was principal photography on the first season of *White Horse* completed?

A    No.

Q    Sorry.  Can you repeat that?

A    No.  No, it was not.

Q    Can you explain?

A    Well, when we ended, we ended, like, behind schedule, so there is stuff that still needed to be shot, but we didn't complete.

Q    Do you know how many days you were behind schedule?

A    We needed another 30 days to be shot in order to finish.

Q    How many days of total shooting had been planned for the first season of *White Horse*?

A    Around 100 days I think.

Q    Did you have any discussions with Mr. Rinsch about the finances of *White Horse*?

A    Yes.

Q    Why did you discuss with him the finances of *White Horse*?

A    Well, we always talk about budget because I also need to know the budget for costumes and the budget in general to make it happen.

Q    How was *White Horse* financed?

A    Initially by Carl, then we have Annapurna, 30West, and then Netflix and Keanu also support us.

Q    You mentioned a number of names?

A    Yes.

Q    What is 30West?

A    30West is a kind of private financial capitalist.

Q    Who is Keanu?

A    Keanu Reeves.  Sorry.

Q    Were you directly involved with any negotiations with

Netflix about getting money for *White Horse*?

A   No.

Q   Did you have involvement in managing the finances of *White Horse*?

A   I make some payments in -- yeah.

Q   Based on your discussions with Mr. Rinsch and your role as a producer on *White Horse*, what was the state of *White Horse*'s budget at the end of 2019?

MR. MCGUINNESS:  Objection.

THE COURT:  Overruled.

A   Say again.  Sorry.

Q   Based on your discussions with Mr. Rinsch and your work as a producer, what was the state of *White Horse*'s budget at the end of 2019?

A   We were over budget.

Q   And why is that?

A   Because we were behind schedule.  So when you get late and things start to get out of schedule, money gets shorter.

Q   To your knowledge, in September 2019 did you and Mr. Rinsch have your own money fund the production of *White Horse*?

A   2019?

Q   At the end -- in September 2019, did you and Mr. Rinsch have your own money to fund the production of *White Horse*?

A   No.

Q   Can you explain?

A To my knowledge, all our money was the one that was used in the beginning of when we start to shoot, the initial *White Horse*. Then there was no more personal money for the project.
Q In 2020, do you recall any specific conversations with Mr. Rinsch about the state of his and your finances?
A 2020?
Q Yes.
A Yes.
Q Can you tell me about that?
A In February we went on a lunch and he told me that we were bankrupt.
Q Can you tell me more about that instance.
A It was my birthday. We were no longer together, but he invite me to celebrate my birthday. And that was what he told me.
Q Did you learn if Mr. Rinsch eventually received additional money from Netflix for *White Horse*?
A Yes.
Q How did you learn that?
A He told me.
Q Did he tell you around how much he had received?
A Yes.
Q And how much was that?
A About $11 million.
Q Were you involved in the negotiations with Netflix to

receive that money?

A   No.

Q   And around when did Mr. Rinsch receive the 11 million from Netflix?

A   That was beginning of 2020 about March.

Q   Based on your observations as a producer and discussions with Mr. Rinsch, do you know how that money was spent?

A   Yes.

Q   Was any of that money used to further the production of *White Horse*?

A   Not really.

        MR. MCGUINNESS:   Objection.

        THE COURT:   Overruled.   The answer will stand.

A   No, not really.

Q   Can you explain.

A   What I see that was used did not reflect stuff for the project.

Q   Did you see any money going to individuals related to the production?

A   Some payments were done to graphic designers and artists, a few.

Q   Do you remember the name of the graphic designer?

A   I think the one the most was Nick Greendogs -- sorry.

Q   Nick Gindraux?

A   Gindraux, yeah.

Q   Did you review any invoices for the work Mr. Gindraux did?

A   Some of the invoices, yeah.

Q   And how do you know the work that Mr. Gindraux was doing was not for *White Horse*?

MR. MCGUINNESS:  Objection.

THE COURT:  Well, I will sustain the objection on leading given the previous -- it may be implicit, but it's not explicit in the prior testimony.  Rephrase the question.

Q   What was the work that Mr. Gindraux was doing -- strike that.

THE COURT:  So I'll try to move this along.  You were aware that some money was being paid to Mr. Gindraux after the $11 million was received?  Do I have that right?

THE WITNESS:  Yes.

THE COURT:  And you know approximately how much?

THE WITNESS:  Not to the top of my head, no.

THE COURT:  Okay.  Can you give me a rough estimate?

THE WITNESS:  He was getting at that point double of his rate specifically, and it was like in the hundreds, yeah.

THE COURT:  Hundreds of dollars?

THE WITNESS:  Uh-huh, thousand dollars.

THE COURT:  Okay.  Was any of this to your knowledge in furtherance of the *White Horse*?

THE WITNESS:  For what I felt it was too -- a tiny part.  The rest of the work that I see from him, it was not to

the script that I knew.

THE COURT:  Go ahead, counsel.

MR. SOWLATI:  So I'd now like to turn to a document. We'll talk more about the 11 million in a moment. Unless there's any objection the government, offers Government Exhibit 6191.

MR. MCGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 6191 received in evidence)

BY MR. SOWLATI:

Q  If we could please publish that.

Ms. Roses, are you familiar with this document?

A  Yes.

Q  What is it?

A  An email that Carl sent me.

Q  What's the date of this email?

A  March 2, 2020.

Q  And what's the subject line of the email?

A  The playbook.

Q  Now let's focus on the beginning of the email, Monday. Ms. Larracuente, if you could please highlight where Mr. Rinsch says "market opens down two to three percent."  And then if we could go to Wednesday and highlight item ten.  And finally, let's highlight 12F.

Ms. Roses can you please read that, 12F.

A    We have BBC a great team including the folks from Gilead who have donated their time and energy to go to China and save lives of Chinese citizens struck with the illness.  These reports here show the 100 percent evidence of their efforts and also illustrate a hundred percent success rate in treating and not vaccinating against the virus.

Q    Did you discuss with Mr. Rinsch Gilead?

A    Yes.

Q    What did he tell you about Gilead?

A    That it was one of the labs -- at this point he's talking a lot about COVID, so this was one of the labs that was looking for a cure, stuff like that.

Q    Did he express any excitement about Gilead?

A    Carl was very excited about COVID and anything related to COVID in this period of time.

Q    We can take that document down.  Around this time, so February and early March 2020, were you aware of Mr. Rinsch doing any real work on *White Horse* to move the production forward?

          MR. MCGUINNESS:  Objection.

          THE COURT:  Sustained.  "Real work" is too ambiguous.

Q    Around this time, so February and early March 2020, were you aware of Mr. Rinsch doing any work on *White Horse* to move the production forward?

A    That it would move the needle to actually do the

production, I don't think so.

MR. SOWLATI: So unless there's any objection, the government offers Government Exhibit 6193.

MR. MCGUINNESS: Objection.

THE COURT: I'm sorry?

MR. MCGUINNESS: Objection. Hearsay.

THE COURT: Well, unless the government wants to be heard at sidebar, sustained.

MR. SOWLATI: If we could be heard at sidebar, your Honor.

JUROR: Excuse me, your Honor.

THE COURT: I'm sorry?

JUROR: He has to go to the bathroom.

THE COURT: Oh, okay. We'll take a five-minute break.

(Continued on next page)

(In open court; jury and witness not present)

THE COURT:  Please be seated.  Since the witness is outside now, we can take this up without having to go to the sidebar.  So this appears to be an email message from Ms. Roses to Ethan Wiener.  So let me hear from the government why you think it's not barred by the hearsay rule.

MR. SOWLATI:  Your Honor, so Ms. Roses testified that she was a producer at this time for *White Horse*.  Ethan Weiner was the assistant to Mr. Rinsch at this time, and they are clearly talking about the scope of their work for Mr. Rinsch.  They're talking about -- at the bottom email you see Ms. Roses, she asks for an update on various aspects related to *White Horse*, editorial art, cast.  Mr. Weiner then responds again about what his impression is about what work was being done or not being done on the show.

THE COURT:  All right.  So my understanding is since what she is doing is asking questions, which are not hearsay, and the response, if I understand what your suggestion is, is from an agent of the defendant, and it's therefore admissible.

MR. SOWLATI:  That's right, your Honor.

THE COURT:  What about that?

MR. MCGUINNESS:  Your Honor, this is not within the scope of the employment.  In fact, they're making jokes at my client's expense.  This is very much personal statements, not statements --

THE COURT: Let me read it more carefully.

MR. MCGUINNESS: Yes, your Honor.

THE COURT: Well, so Mr. Weiner says in response to one of Ms. Roses' inquiries, I didn't know, Carl not telling me anything any more. No real updates. So that sounds like he's not responding in his capacity as an agent since he's disclaiming any information from Mr. Rinsch. So what about that?

MR. SOWLATI: Your Honor, in the response after, Mr. Weiner says, Carl has all drives, Tobias — who is Tobias Suhm — broke all the footage down, we just heard testimony about, then stop. It's entirely consistent with that testimony, so it does appear he does have knowledge at that point.

THE COURT: I think it's too ambiguous. I will sustain the objection.

MR. ZEMAN: Your Honor, do we have time? My client needs to use the bathroom as well. Three minutes?

THE COURT: Yes.

MR. ZEMAN: Thank you.

(Recess)

THE COURT: While we're waiting, let me ask counsel, it does seem contrary to my earlier fears that the government might well rest on Monday. Is that presently your inclination.

MR. MARKEWITZ: Absolutely, your Honor. I think once

this witness is off the stand — my colleagues can correct me if I'm wrong, but I don't believe any of our remaining witnesses should be more than 20, 30 minutes per witness. We do have a summary witness. That one may be just slightly longer, but --

THE COURT: I'm going to tell the jury that — although it's not binding — that the government anticipates it will rest on Monday and that, I think, will reassure them that we're right on schedule. And I will also tell them that defendant has no obligation to put on any witnesses, but has the opportunity if they want, and they're going to decide over the weekend.

Okay. Bring in the jury. Let's get the witness back on the stand, please.

(Continued on next page)

(In open court; jury present)

THE COURT:  Please be seated.  Go ahead, counsel.

MR. SOWLATI:  Unless there are any objections, the government offers Government Exhibit 5005.

MR. MCGUINNESS:  No objection.

THE COURT:  Received.

(Government's Exhibit 5005 received in evidence)

BY MR. SOWLATI:

Q   Ms. Roses, are you familiar with this document?

A   Yes.

Q   And what is it?

A   Exchange message between Carl and I.

Q   Around when did you exchange these text messages?

A   March 9 -- March 9, 2020.

Q   I see that the date there is 9/3/20, but you said it's March.  Can you explain the discrepancy.

A   Yeah.  I'm from Uruguay.  In Uruguay we use the date opposite here.  We use first the date then the month then the year, and my phone is set that way.

Q   Understood.  Now, if we could bring that down.

And whose texts are in blue?

A   Mine.

Q   And whose texts are in gray?

A   Carl's.

Q   Let's call out the text exchange in the middle of the page

starting with "I will be in Uruguay third" and ending with "consider that."

A   Okay.

Q   If we could call out that portion.

Can we read this text message exchange with you as yourself and I'll be Mr. Rinsch?

A   Okay.  I will be in Uruguay third week of March if you need scout or anything.  Not sure if Uruguay is back in the plans.

Q   I don't know.  I've passed it all.

A   Pass to Clayton you mean?

Q   Gaby this is a global pandemic.  If I need to point that out to you, there is something seriously out of touch here. The price of oil dropped 25 percent today.

A   Okay.

Q   Consider that.

Who is the Clayton you were referring to?

A   He's a line producer.

Q   Now, if we go down lower in the chain, you mention someone named Chandler.  Who is Chandler?

A   Chandler is the storyboard artist.

Q   And what would a storyboard artist do?

A   He illustrates, sketches the scenes of the script.

Q   You wrote he is avail to start on Thursday.  What does "avail" mean?

A   Available.

Q   You wrote he would like to work with you on a memo deal. What did you mean by that?

A   Chandler at this point, he wanted to have some type of contract or something before he started again.

Q   To your knowledge, did Mr. Rinsch end up having a meeting with Chandler?

A   I think it not happen.

Q   Let's go to the next page and let's call out the first two text messages from Mr. Rinsch.  I'll let everyone read that. What did you understand Mr. Rinsch to be referring to by "10.5MM"?

A   10.5 millions.

Q   Did you have any understanding of where that money came from?

A   Yeah.  I'm assuming this was the 11 millions dollars payment from Netflix.

Q   What did you understand Mr. Rinsch to mean when he said a "safeguard account"?

A   I'm assuming it was a safe different account.

Q   Did Mr. Rinsch ever mention to you that there were conditions on Netflix's money?

A   No.

Q   Did you eventually find out what Mr. Rinsch did with the money?

A   Yes.

Q   Did you have any discussions with Mr. Rinsch about what he did with the money?

A   Yes.

Q   And what did you tell him?

A   I was on a phone call, and I told him about invest in stocks and luxury stuff.

Q   And how did he respond to that?

A   To the stock part he was yelling and upset and told me to shut up, and I didn't know anything about it and that he was actually making money for Netflix.

Q   We can take that down.

After March 2020, did you participate in any meetings with Mr. Rinsch and Netflix executives?

A   I was in a FaceTime call.

Q   And when did that happen?

A   I think it was about June 2020.

Q   Do you know where Mr. Rinsch was during the call?

A   They were at the Four Seasons in LA.

Q   And what, if anything, happened on that call?

A   It was very brief.  Peter and Cindy just told me how beautiful the book was and thank you for putting it together, that's --

Q   What book are you referring to?

A   The disputed book.  It's a book that we put together to recompile everything that we have shot before previously.

Q You said someone thanked you. Who thanked you?
A Cindy Holland and Peter Friedlander.
Q And who and why did you put that book together?
A Carl request to put a book together.
Q Now, Ms. Roses, in front of you is what's been admitted into evidence as Government Exhibit 6372.
A Yes.
Q Do you recognize this?
A Yes. This is the book.

MR. SOWLATI: Now, unless there are any objections, the government offers Government Exhibit 5007.

MR. MCGUINNESS: No objection.

THE COURT: Received.

(Government's Exhibit 5007 received in evidence)

Q If we could publish that.

Are you familiar with this document?
A Yes.
Q What is it?

THE COURT: I'm sorry. Counsel, come to sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  This is my fault.  I thought we might be ending at 4:00 today, so I see that a call that I had scheduled down in my chambers on another matter just came in.  So I need to have my -- we can either end now, or if you think you're going to finish your direct in less than 15 minutes, I'll just go down real quickly and tell them to hold on and we'll start the call downstairs in 15 minutes.

MR. SOWLATI:  I have fewer than 15 minutes left.

THE COURT:  That's what I thought.  Okay.  So let me excuse the jury, and I'll disappear shortly thereafter.

(Continued on next page)

(In open court; jury present)

THE COURT: So ladies and gentlemen, because of something that just came up unexpectedly in another matter that I have, we're going to end shortly before 4:30. We're going to end now.

Let me tell you about the schedule. We are right on schedule. If anything, we're slightly ahead. The government expects to conclude its case on Monday. And the defense has the option, they don't have to call anyone because the burden is always on the government, but they have the opportunity to call someone if they want. So they'll make that decision at that point. If they decide not to call any witnesses, we'll have closing arguments on Tuesday. If they decide to call witnesses, we will have closing arguments on Wednesday. So either way, we're right on schedule and I wanted to let you know that.

so you're excused till 9:30 on Monday. I wouldn't even think about this case, but be sure not to discuss it. You remember all my rules. And have a terrific weekend, stay warm. And we'll see you on Monday at 9:30.

(Jury and witness not present)

THE COURT: Really quickly, because I have to go take that other call, I think it's clear that we'll have the charging conference on Monday. We might be even able to start it before 4:00. But in any event, if not, I'll take my

4:00 meeting matter for one hour, and then we'll have the charging conference at 5:00. I will send you no later than sometime Sunday evening a first draft of the charge.

It will not have resolved the maintaining/retaining issue because you're going to get me stuff, so you'll see that's not addressed in the draft charge, but we'll discuss that at the charging conference. And we'll also not resolve whether the defendant is taking the stand or not, and obviously if he does take the stand I'll have one kind of instruction. If he doesn't take the stand, I'll have another, but we'll discuss that at the charging conference as well. And I will need to know by the time of the charging conference what Mr. Rinsch's decision is on whether or not he's taking the stand.

Very good. Have a good weekend, and I'll see you on Monday.

(Adjourned to December 8, 2025, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of: Page

Direct By Mr. Markewitz . . . . . . . . . . . . 525

Cross By Mr. Zeman . . . . . . . . . . . . . . . 550

Redirect By Mr. Markewitz . . . . . . . . . . . 573

Recross By Mr. Zeman . . . . . . . . . . . . . . 576

JOHAN KRISTOFER ERIKSSON

Direct By Mr. Sowlati . . . . . . . . . . . . . 577

Cross By Mr. Mcguinness . . . . . . . . . . . . 590

CYNTHIA HOLLAND

Direct By Mr. Capozzi . . . . . . . . . . . . . 594

Cross By Mr. Mcguinness . . . . . . . . . . . . 648

Redirect By Mr. Capozzi . . . . . . . . . . . . 671

Recross By Mr. McGuinness . . . . . . . . . . . 673

TOBIAS SUHM

Direct By Mr. Sowlati . . . . . . . . . . . . . 673

Cross By Mr. Zeman . . . . . . . . . . . . . . . 680

JOSHUA SALZMAN LONEY

Direct By Mr. Sowlati . . . . . . . . . . . . . 688

Cross By Mr. Zeman . . . . . . . . . . . . . . . 692

GABRIELA ROSES RINSCH

Direct By Mr. Sowlati . . . . . . . . . . . . . 697

GOVERNMENT EXHIBITS

Exhibit No. Received

6394-A . . . . . . . . . . . . . . . . . . . . 526

5062 . . . . . . . . . . . . . . . . . . . . . 528
6217 . . . . . . . . . . . . . . . . . . . . . 529
6223 . . . . . . . . . . . . . . . . . . . . . 531
6208, 6210, 6215, 6222, and 6303 . . . . . . . 534
6208, 6210, 6215, 6222, and 6303 . . . . . . 534
5052 through 5059 . . . . . . . . . . . . . . 540
5063 . . . . . . . . . . . . . . . . . . . . . 573
6251F . . . . . . . . . . . . . . . . . . . . . 581
6251A . . . . . . . . . . . . . . . . . . . . . 583
6252 . . . . . . . . . . . . . . . . . . . . . 585
6251E . . . . . . . . . . . . . . . . . . . . . 586
1006H . . . . . . . . . . . . . . . . . . . . . 589
6349 . . . . . . . . . . . . . . . . . . . . . 603
6368A . . . . . . . . . . . . . . . . . . . . . 616
6354 . . . . . . . . . . . . . . . . . . . . . 619
6361 . . . . . . . . . . . . . . . . . . . . . 634
6361 . . . . . . . . . . . . . . . . . . . . . 640
6368B . . . . . . . . . . . . . . . . . . . . . 641
6368C . . . . . . . . . . . . . . . . . . . . . 642
6368D . . . . . . . . . . . . . . . . . . . . . 644
6371B . . . . . . . . . . . . . . . . . . . . . 645
6368E . . . . . . . . . . . . . . . . . . . . . 646
1011A, 1006B, 1007A, 6362 . . . . . . . . . . 697
5006 . . . . . . . . . . . . . . . . . . . . . 702
6191 . . . . . . . . . . . . . . . . . . . . . 709

5005 . . . . . . . . . . . . . . . . . . . 715

5007 . . . . . . . . . . . . . . . . . . . 719