PC8JRIN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                              25 Cr. 85 (JSR)

CARL ERIK RINSCH,

                                                 Trial
              Defendant.

------------------------------x

                                           New York, N.Y.
                                         December 9, 2025
                                         9:00 a.m.

Before:

                        HON. JED S. RAKOFF,

                                      District Judge
                                      -and Jury-

                          APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
DAVID MARKEWITZ
TIMOTHY CAPOZZI
ADAM SOWLATI
    Assistant United States Attorneys

LAW OFFICES OF DANIEL A. McGUINNESS
    Attorneys for Defendant
BY:  DANIEL A. McGUINNESS
    -and-
ZEMAN & WOMBLE, LLP
BY:  BENJAMIN C. ZEMAN

Also Present:
Nicholas DiMarino, FBI
Maria Larracuente, Paralegal
William Coleman, Paralegal
Laurie Tang, Paralegal

PC8JRIN1

(Trial resumed; jury not present)

THE COURT:  One of the jurors left us a voice message that she's running late, but she should be here by about 9:40.

So, I received the requested proposals from defense counsel.  With respect to the first two, in the paragraph in instruction No. 8 beginning with: as to the first element, after the description in that paragraph of the government's claim, quote, specifically, the claim here is that Mr. Rinsch induced Netflix to provide him with additional $11 million by representing that he would use it to further certain aspects of the White Horse project when he actually intended to use it, in part or in whole, for his own benefit.

The proposed additional instruction is:  On the other hand, the defense states that Mr. Rinsch honestly believed he was owed the 11 million and agreed in good faith to spend a portion of that money to perform work on specific tasks.

I don't like "on the other hand."  We use that too much.  And I think it should say:  The defense contends rather than states, but the rest of that first suggestion looks okay to me.

But let me hear if the government has any objection to that.  Okay.

MR. CAPOZZI:  Your Honor, the government's concerned that the characterization could lead to some confusion in terms of causing the jurors to wonder about what tasks we're talking

PC8JRIN1

about.  And while we understand the Court's view that if we're going to characterize the government's contention, then it would be fair-handed to, in some respect, represent the defense's contention.  And perhaps the way to even that out is to simply not try to do either in the charge and simply instruct them on the law.

THE COURT:  Well, I seem to have a recollection that the defense has a right, under Second Circuit law, to have its theory of the case briefly described.

Now, it is true that the defense failed to present any request to charge and it's required in my individual rules a days before the start of the trial, but I don't think that means that they have waived what the Second Circuit requires.

And so here's what I think we should do.  We, fortunately, still have a little time, because the defense's case has not yet been presented.  That will be today.

So, why doesn't the government see if they can find -- and I'll take a look, and defense is welcome to take a look, obviously, as well -- at what Second Circuit law requires.

But if, as I seem to remember, the Second Circuit requires that if the defense asks for a brief statement of their theory of the case, it must be included in the Court's instructions, then I can I think we would have to have something in there.

With respect to the second proposal by the defense that, I think is completely unrequired.  This is in the paragraph that begins: in this regard, let me advise you that defendant's good faith is a complete defense to a charge of wire fraud and they -- and then in my original -- I'm still in the paragraph that I had proposed, we continue:  If at the time Mr. Rinsch made statements and promises that you find induced Netflix to transfer the $11 million to his account, Mr. Rinsch genuinely believed he would use all the money to further the White Horse project, that would be a complete defense to the charge of wire fraud, even if later, circumstances led him to use some or all of the money for his personal benefit.

And I'd be willing to add to that sentence that the addition that Mr. Rinsch genuinely believed he was owed the 11 million and/or, *et cetera*, picking up from what's in the earlier sentence.  But then we get the following from the defense.

This is all in addition to what I just mentioned. Quote, a defendant's good faith is a complete defense to the wire fraud charge in this case.  That's a repetition of the first sentence, so that's completely erroneous.  You have no right to have that sentence repeated *in haec verba* twice.

If the defendant believed he was acting properly even if she was mistaken in that belief, even if others were injured by his conduct, there would be no crime.  If you want that kind

of general language, then we're going to strike the earlier language that I suggested.

But then you say:  "Thus, just by way example of a given defendant -- I think there's only one defendant, but -- if a given defendant stated that additional funding was necessary to continue work on a project in a green and good faith with terms associated with the dispersal of the money but misunderstand that that was expected, that would be a complete defense to this charge of wire fraud even if his belief ultimately proved to be inaccurate."

I'm quite mystified that you didn't include your entire summation in that sentence, but, I mean, that will not be given under any set of circumstances.

MR. ZEMAN:  Judge, understood.

I just wanted to share our thinking here.  This was copied from an instruction you gave.  This is from an instruction you gave in U.S. v. Parker, 19 Cr. 850.

THE COURT:  Yes, including given the defendant, because both of the defendants are there, but what the hell.

MR. ZEMAN:  We tried your language, so that's where it came from.

THE COURT:  Well, in any event, what I'm going to do, first, I've invited the parties I'll take a look and see what the Second Circuit requires at a minimum; and second, maybe

PC8JRIN1

I'll try a redraft of the two paragraphs that you've suggested additions to and present that to you.

We could do it -- let me ask your preference.  We could do it at lunch or we could do it at the end of the day.  The benefit of doing it at the end of the day, we would have heard everything from Mr. Rinsch.  The advantage of lunch is that you would know, even before the afternoon began, where we're coming out.  I'm happy to do either one.

What's your preference?

MR. McGUINNESS:  We would prefer to do it at lunch, your Honor.

THE COURT:  Okay.

So, let me give you -- it's going to be at least ten minutes before the jurors are here.  Why don't you use that time to do your research, and we'll reconvene in 10 minutes.

(Recess)

THE COURT:  I'm sorry to say, the juror still has not arrived, but in answer to the question I posed to you, in *United States v. JAF Corporation*, 2d Cir. 928 F.2d 1253, "this Court has repeatedly recognized a criminal defendant's right to a jury charge which reflects the defense's theory," and then they go on to cite like about ten cases, so I think that answers that question.

So, I will take a stab at -- as is, I largely accept the first sentence that the defense proposed this morning.  I'm

not going to accept the much more argumentative and excessive second sentence, but I'll take a stab at some variation on that and see what we can come up with.

MR. McGUINNESS:  Thank you.

THE COURT:  Okay.

MR. CAPOZZI:  And just to highlight, your Honor, one observation that I have about their proposal is just that the way they frame, sort of, a good faith defense in that proposed language seems to be a little bit at odds with the way the good faith description is then described two paragraphs later, and so it creates a potential distance between the two that could cause confusion, and I just want to highlight that.

THE COURT:  That's right.  And I don't think every they say there fits within the legal theory of good faith.

The Second Circuit has held that if a proposed charge from any party is legally erroneous in any respect, the judge can refuse to give the entirety of the proposed charge. However, that strict rule is, I think, a little too strict, so I will give -- as I said, I'll come up with something and we'll discuss it at lunch, and it will reflect something of what the defense proposed.  I've already accepted most of the first proposal.

So, it's very unfortunate this juror is late.  It's the same juror that was late yesterday, and we have a full day ahead.  We'll go to 4:30 if necessary.

PC8JRIN1

THE DEPUTY CLERK:  May I bring in the jury?

THE COURT:  Yes.

(Continued on next page)

PC8JRIN1

(Jury present)

THE COURT:  Please be seated.

Still waiting for --

THE DEPUTY CLERK:  No. 12.

Oh, two people.

THE COURT:  Good morning, ladies and gentlemen.

As I mentioned yesterday, the defense is not required to put on a case, but they have the opportunities, if they wish, and they have decided to call the defendant.

So, please call your witness.

MR. McGUINNESS:  The defense calls Carl Erik Rinsch.

THE DEPUTY CLERK:  Take the witness stand.

(Defendant sworn)

THE COURT:  Counsel.

BY MR. McGUINNESS:

Q.  Good morning, Mr. Rinsch.

A.  Good morning, sir.

Q.  Mr. Rinsch, did you receive money from Netflix in March of 2020?

A.  Yes, I did.

Q.  How much?

A.  $11 million.

Q.  What did you understand that money was for?

A.  That money was to pay back for principal photography that I had shot between late July and early August of 2019, all the

way to September, late September of 2019.

Q.  What, if anything, did you tell Netflix you would do if that repayment was made?

MR. MARKEWITZ:  Objection.  Hearsay.

THE COURT:  No, I think the door has been opened to that.  Go ahead.

THE WITNESS:  Can you repeat the question, sir.

Q.  What, if anything, did you tell Netflix you would do if that money was repaid?

A.  I had told them that if they honored a previous agreement and repaid the funds, that I would personally self-fund what was the development of the sequel for the next one.

Q.  Mr. Rinsch, I'm going to ask you to pull the microphone just a little bit closer.

A.  Sure, of course.

I could never tell here.

Q.  And you just discussed that you were going to self-fund the soft prep.

How much did you anticipate that was going to cost?

A.  We had a five-week period of time that we could prepare materials, whether it's drawings and whatnot.  I figured it would be about $500,000 or $100,000 a week.

Q.  Did you ever tell anyone at Netflix that you would use all of the $11 million they gave you in March towards completion of that soft prep?

PC8JRIN1

A.   No, I did not.

Q.   Okay.  Let's back way up.

        How old were you when you began making films?

A.   I was very young; I was 13.

Q.   And did you attend college?

A.   Yes, I did, sir.

Q.   Where did you go?

A.   Well, I went to school in Rhode Island at Brown University, and then I went to school here at Columbia as well as SVA for painting and then the Rhode Island School of Design for Photography.

Q.   Why so many different schools?

A.   They are all incredible institutions.  They each have a unique offering.  So for SVA, I did painting and they were specific for that.  And at Columbia, it was classics.  And at Brown, they had Neuroscience and English literature.

Q.   And did you graduate?

A.   Yes, sir, I did.

Q.   What year?

A.   2001.

Q.   And were you able to get a job in film after graduating?

A.   Yes, I was.

Q.   What was that job?

A.   I worked for a gentlemen by the name of Ridley Scott who is a filmmaker, and he has a commercial production company called

PC8JRIN1

RSA, so I worked for RSA or Ridley Scott's production company.

Q.  And what did you do working in that company?

A.  I directed commercials.

Q.  What type of commercials did you direct?

A.  As one might expect by seeing the stuff, we did highly-visual, visual-effects kind of -- and they were more like little movies than they were advertisements, *per se*.  So, we made these little small little commercials that were like movies.

Q.  What products did you make commercials for?

A.  We made commercials for a lot of these companies like Mercedes and BMW.  We did things for Sony, Phillips, tech companies as well.

Q.  Approximately how long did you do that for?

A.  I did that for about nine years, something like that, ten years.

Q.  And approximately which years were those?

A.  Everywhere between 2002 to 2012.

Q.  And during your time making commercials, did you win any awards for making those commercials?

A.  Yes, I did.

Q.  And what awards were those?

A.  There is something called a Grand Prix, out of Cannes.  The Cannes Film Festival has a Cannes Advertising festival, and we won that the Grand Prix.

PC8JRIN1

Q.   What year was that?

A.   I think it was 2008, maybe, 2010, somewhere around that.

Q.   Did there ever come a time where you worked on an feature film?

A.   Yes.  Yes.

Q.   And what film was that?

A.   That film was "47 Ronin."

Q.   And what studio did you work for when you mare "47 Ronin"?

A.   That was for Universal.

Q.   What was your position on that project?

A.   I was the director.

Q.   And when was this?

A.   2012, I believe, when we started.

Q.   Approximately what was the budget on "47 Ronin"?

A.   It was very big budget, actually, 150, $175 million.

Q.   Did you complete that film?

A.   Yes, sir, I did.

Q.   Was it released in theaters?

A.   Yes, sir, it was.

Q.   After "47 Ronin," what was your next project?

A.   This was the next project, was White Horse.

Q.   Who wrote White Horse?

A.   I wrote White Horse.

Q.   Where did you get the idea for the concept of White Horse?

A.   I had been working on developing something for "Alien," the

PC8JRIN1

film "Alien."  It turned into "Prometheus," and I'm religious.

And in the development process, I thought, would it be possible for us ever to communicate with God, and if so, could we do it through technology?  So, is AI, in the future, going to allow us to communicate with God?  And that was, that was sort of the big idea, that we would need somebody in between us and the highest of powers.

Q.  And where did you get the idea for the narrative plot of White Horse?

A.  The narrative plot developed -- it started off as something very small, just a scene that I had in my head.  And I would draw it out and I would see is it in my head, and I would film it.  And I didn't know what the rest of the story would be.

And it just started to grow.  And I would cast actors that I liked and just say, oh, you're great.  It's not different than when we're kids and we're just playing make-believe:  Well, you can play this guy over here, and what if you're his brother and things like that, just make up as you go.

Q.  And what year did you start filming White Horse?

A.  I started filming it in 2013.

Q.  Who was financing White Horse at that time?

A.  I was.

Q.  Did there ever come a time where you needed additional financing?

PC8JRIN1

A.  Yes, there was.

Q.  And who, if anyone else, provided additional financing for the project.

A.  Well, I had spent all the money I had made from commercials in film, so I invested that, and it was -- a lot of money, frankly.

And then I wanted to make it bigger.  And there was a wonderful lady named Megan Ellison, who is a benefactor of the arts, really, in Los Angeles, and she provided some money, some extra money.

Q.  Did in anybody else provide financing for White Horse?

A.  My agent.  My agent represented me at the time, and he had been the one who had a connection with Ms. Ellison.

And afterwards he said, could I put money in?  I thought:  Sure, let's do it.  And so Micah Green, my agent at the time, he put money in as well.

Q.  And as there anyone else who provided financing for White Horse?

A.  Prior to Netflix?

Q.  Yes.

A.  No -- well, Keanu.  Keanu Reeves.  Sorry.

Keanu as well.  He's a very good friend, and he'd seen what we were doing, and he was incredibly supportive and work.

Q.  Have you worked with him in the past?

A.  I worked with Keanu on "47 Ronin."

PC8JRIN1

Q.   Did there come a time when you entered into negotiation with a company or companies about purchasing White Horse?

A.   Yes, there was.

Q.   When was that?

A.   I would say that was in late 2017 early 2018.  We had gotten it to a certain point, and my agent said:  Well, let's give it to one of these big streamers and see if they can distribute it.  Because up until that point, it's really just an art project that nobody knows about except for us.  And so and let's see if we can get people to watch it.

         And obviously, that's exciting.  So we approached all the normal people, but hopefully, as you'll see, it's a short format, so it's not like a traditional movie; it's more of an experimental thing.  So YouTube wasn't making short-form content like this.  Nobody really was, and so it was new.  And we went to Amazon, YouTube, and Netflix.

Q.   And did you end up agreeing with any company to purchase White Horse?

A.   Yes, sir; we did.

Q.   Which company?

A.   At first we agreed to do it with Amazon, the Jeff Bezos company.  And then we changed our minds and we ended up going with Netflix.

Q.   And did you enter into a term sheet with Netflix?

A.   Yes, we did.  I did, yeah.

PC8JRIN1

Q. And at the time you entered into a term sheet with Netflix, approximately how much content for White Horse had you completed?

A. Sorry, at the -- can you repeat that question, please.

Q. At the time you entered into the term sheet with Netflix, approximately how much content for White Horse had you created?

A. About 55 minutes of finished material.

Q. Do you see that flash drive up there?

A. This one? I do, yes.

Q. Yes, sir.

A. It's marked 301.

Q. Yes.

A. Yeah, I do.

Q. That has been marked as Defense Exhibit 301. The files inside are marked as Defense Exhibit 301-1 through 301-6.

Mr. Rinsch, have you had the opportunity to review the contents of that thumb drive?

A. Yes, I believe so.

Q. And are those true and accurate copies of episodes on that thumb drive?

A. Yes. I believe so.

Q. At this time, defense moves to admit Defense Exhibit 301, the flash drive. and the episodes 301-1 through 301-6.

MR. MARKEWITZ: No objection.

THE COURT: Received.

PC8JRIN1

(Defendant's Exhibits 301 and 301-1 through 301-6 received in evidence)

Q.  The episodes on that flash drive, are those the same ones or different ones that had been completed when you entered into a term sheet with Netflix?

A.  The ones I've seen on this drive are the ones that wee presented to Netflix.

Q.  Are all of the 55 minutes that had been completed contained within those episodes?

A.  You know, there's -- if I understand correctly, there's six episodes on here, but we also made other -- I don't know if they're complete.  I guess you could call them episodes.  They are not necessarily linear, so there's a couple of things extra beyond this.

Q.  At the time you entered into the agreement with Netflix, what, if any, other work on White Horse did you intend to do?

A.  Well, I wanted to make it a franchise.  So, the idea was, how could we make a universe of movies and stories?  So, it wasn't just about one.  You want to make -- truly, in the term sheet -- five of them, so five seasons.

And the idea was, well, what would a season look like?  Would a season be an hour and a half of television?  Would it be a feature, or would it be what I'm hoping you'll all see, which is a series of shorts.  I always thought of it like a

PC8JRIN1

book.  Like, you could get on the subway, watch an episode that would be five or ten minutes long.  And when you leave work and come back home, you could open it up and watch another five or ten minutes.  So, they were these little kind of bite-sized films, you could call it.  But we have a short attention span these days, and so it allowed me to tell more story very quickly.

MR. McGUINNESS:  If you could open up what's in evidence and publish to the jury the term sheet, which has been marked Government Exhibit 6336, please.  And if we could go to the first page, and if you could call out the section on first season.

A.  I can see that.

Q.  Mr. Rinsch, what did you understand the first season to be defined as in the term sheet?

MR. MARKEWITZ:  Objection, form and legal conclusion.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I may answer?  Thank you.

Sorry.  Can you repeat the question, sir.

BY MR. McGUINNESS:

Q.  What did you understand the first season to be defined as, according to the term sheet?

A.  The term sheet that I see here, it's -- the first season is 110 to 120 minutes of content.  So, it's the new era of stories

where we call it content.  So, 100 to 120 minutes of stuff, basically.

Q.  And how long was the script that existed at the time of this term sheet?

A.  I had a script at the time of this term sheet that was 160 pages long.

Q.  Did you intend to shoot the entire script for the first season?

A.  No.  I couldn't shoot the entire script for the first season.  It is more than is required.

Q.  Why do you say that?

A.  There's a -- there's a rule of thumb in Hollywood, which is:  When you get a script, every one page is equivalent to one minute.  That's just kind of the standard, so if you get a 100-page screenplay, it's 100 minutes.  If you get a 200-page screenplay, it's 200 minutes.  And it's very, very basic, but it's worked for quite some time.

And for me, I write it as well as shoot it, so I adhere to that.  And I'll say, if this is a 160-page screenplay, this is going to be 160-minutes long.

Sometimes, you get exceptions to that rule, like if anybody's watched "The Social Network," there's all this dialogue that's really, really fast, so it might be a very long screenplay that fits into a shorter period of time.

MR. MARKEWITZ:  Your Honor, objection to that answer.

PC8JRIN1

Foundation.

THE COURT:  Well, the objection should have been raised, if at all, at the very start of the answer, so I think it's been waived.

Overruled.

The answer will stand.

MR. McGUINNESS:  Thank you, your Honor.

If we could show, only to the witness, Defense Exhibit 111, please.

Do you recognize this document?

A.  Yes, I do.

Q.  At a high level, what is this document?

A.  This is the assignment agreement.

Q.  And is this a true and accurate copy of that document?

A.  Yes, I believe so.

Q.  The defense offers Defense Exhibit 110.

MR. MARKEWITZ:  Your Honor, objection on relevance and hearsay grounds.

May we approach, your Honor?

THE COURT:  All right.

(Continued on next page)

PC8JRIN1

(At sidebar)

MR. McGUINNESS:  Your Honor, the relevance is that this document was executed at the time of the term sheet, and it defines the current 160-page script as 160 minutes.

It informed my client's state of mind and his belief that the script was going to be 160 minutes, and it would not comport with requirement in the term sheet that explicitly states that the first season was to be 110 to 120 minutes.

MR. MARKEWITZ:  Your Honor, this assignment is between Mr. Rinsch and the company.  There are recent decrees.

But this is not a contract with Netflix.  My understanding from defense counsel is, they want to get this introduced as an appearance that this is submitted for the truth.

THE COURT:  Objection is sustained.

(Continued on next page)

PC8JRIN1

(In open court; jurors present)

MR. McGUINNESS:  If we could show, only to the witness, what's been marked as defense exhibit 109.

BY MR. McGUINNESS:

Q.  As that's being brought up, Mr. Rinsch, did you understand there was any legal obligations that would prevent you from producing a first season that was longer than 120 minutes?

A.  Yes.

MR. MARKEWITZ:  Objection.  Form, foundation.

THE COURT:  I think there was a question there that can be asked, but the current question is defective as to form. So, the objection is sustained without prejudice to formulating another question.

BY MR. McGUINNESS:

Q.  Mr. Rinsch, what, if any, legal obligations existed that prevented you from producing a first season that was longer than 120 minutes?

THE COURT:  It's the term "legal obligations" that is, I think, misleading in the sense that no witness has a right to state what the law is.  That's strictly the prerogative of the Court.

Now, that doesn't preclude a witness from testifying as to what he thought, but that's a different subject.  And the way you phrased it, it was as if there was a legal obligation, which there may or may not have been, but that's strictly for

PC8JRIN1

me to determine, not the witness.

BY MR. McGUINNESS:

Q. Mr. Rinsch, to your understanding, was there anything that prevented you from producing a first season that was longer than 120 minutes?

MR. MARKEWITZ:  Objection.

THE COURT:  Overruled.

THE WITNESS:  May I answer?

THE COURT:  Yes.

THE WITNESS:  By my understanding, I had an agreement with my agent who was a passive partner.  He had invested $4.5 million dollars into the project, and he was to get money for every sequel we made.  And so every iteration beyond 110 minutes, he would get compensated for.

So, we would have the first season, he got paid a certain amount of money.  And if we go over 120 minutes, he gets paid passively, even though he's not part of it.  So it's like residual payment almost, if that makes sense.

MR. McGUINNESS:  If we could show, only the witness, exhibit 109, please.

Do you recognize this document?

A. Yes, I do.

Q. And at a high level, what is this document?

A. This is a settlement agreement.

Q. Is this a true and accurate copy of that settlement

PC8JRIN1

agreement?

A.   Yes, it is.

MR. McGUINNESS:   Your Honor, the defense offers the DX 109 into evidence.

MR. MARKEWITZ:   Objection.   Relevance and hearsay, your Honor.

THE COURT:   No.   I think enough foundation has been laid.   Received.

(Defendant's Exhibit 109 received in evidence)

MR. MARKEWITZ:   Your Honor, could we have a sidebar, please?

THE COURT:   Okay.

(Continued on next page)

PC8JRIN1

(At sidebar)

MR. MARKEWITZ:  Your Honor, this is a 72-page document.

THE COURT:  Oh, I'm sorry.  I just --

MR. McGUINNESS:  We could take out whatever pages they would like.  I'm happy to --

THE COURT:  All that was up on the screen was like, one page and I was under a total misimpression.

MR. MARKEWITZ:  If your Honor is inclined to allow in the contract, we would say that it should only be the --

THE COURT:  No.  Now that I know and understand that -- so, I've been troubled throughout this case by the fact that no one seems to have hard copies of anything and the screen, inevitably, is in a font that is virtually illegible.

And now, I've been further troubled by the fact that only one page of this extraordinarily long document was on the screen, and I now see that there were, in later pages, handwritten notes.

Are those it notes in the original?

MR. MARKEWITZ:  We received this document this morning, so I'm not certain.

MR. McGUINNESS:  It's my understanding that this is the entire agreement with attachments.  I wanted to complete it.

THE COURT:  I'm not -- I'm not going to allow this in.

PC8JRIN1

MR. McGUINNESS:  Your Honor, while we're here, can I just revisit the immediately prior ruling and ask it that be admitted as a prior consistent statement.

THE COURT:  That what be?

MR. McGUINNESS:  My client's statement in that assignment of agreements that it's 160 minutes he wrote out in 2018, I believe, is a prior consistent statement.

THE COURT:  I haven't stricken any of that.

MR. McGUINNESS:  That was the prior objection to that document, though, your Honor.  I was seeking to have it admitted, and I'm stating that I believe it was a prior consistent statement.

THE COURT:  Wait.  Let's go back.  Now you have me totally confused.

MR. McGUINNESS:  I apologize, Judge.

THE COURT:  I thought the only pending objection was to the admission of this exhibit, and now that I understand much more completely what it's all about and what it consists of, I am sustaining the objection.

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  Now, I don't think there was any objection to the last answer, if that's what you're --

MR. McGUINNESS:  No, your Honor.  I'm sorry.

This is as to the exhibit we discussed at the last sidebar, and I think I was remiss in not stating, at the time,

PC8JRIN1

that it was a prior consistent statement.

THE COURT:  Oh, that that exhibit.

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  Well, you got the gist of it into his testimony.

MR. McGUINNESS:  But your Honor I believe the --

THE COURT:  And I'm not sure -- I mean, I believe the exhibit is -- the hearsay questions -- and I'm not sure when you say prior consistent, prior consistent only comes up after he's cross-examined.  So if he's challenged on that particular point, then on rebuttal, he may be able to offer it.

But that's -- prior consistent doesn't come in until the statement has been challenged, and the statement hasn't yet been challenged on his direct.

MR. McGUINNESS:  Your Honor, I don't want to belabor this, but this is going to be a recurring issue throughout other exhibits, and I just want to state, I believe, as he is defendant in a fraud trial, many witnesses have challenged his credibility as to these propositions, and I believe that it is proper to enter a prior consistent statement.

THE COURT:  No, no, no.  And you'll have to show me some case law that says that, because that's certainly not my understanding.

My understanding is that the hearsay exception for prior consistent statement, namely, an out-of-court statement

PC8JRIN1

that otherwise would be hearsay -- can be admitted only after he testifies to the contrary and that testimony is then challenged on cross.

If it's not challenged on cross, you can, of course, make the argument that it's not been challenged.

MR. McGUINNESS:  All right.

Your Honor, I feel there will be more discussion on this topic, but I accept, of course.  Thank you.

THE COURT:  I'm happy to -- you can always show me, if you wish, something to the contrary from Weinstein on evidence, Judge Weinstein who died just a few years ago, was one of the greatest judges ever to be a federal district judge, one of my personal heros, and the author of the leading treatise on evidence other than the 19th century, equally famous expert, Professor Wigmore, so I'm happy to have you quote me something of Weinstein or Wigmore or any case law if you can find it.  But right now, I offer all that contention.

(Continued on next page)

(In open court; jury present)

THE COURT:  Based on the sidebar, the objection is now sustained.  Put another question.

MR. MCGUINNESS:  If we could bring up 6336 again, please, and go to page 3 and call out the section of granted rights, please.  And Ms. Tang, if you could highlight that sentence that begins "to the extent any episodes."

BY MR. MCGUINNESS:

Q   Mr. Rinsch, what did you understand this highlighted language beginning "to the extent any episodes," what do you understand this language to mean?

A   To the extent any episodes of the first season have not been written or produced, such episodes shall be written and produced as works made for hire for the company.  Idea being that it wasn't determined yet exactly what the consent would be for the first 110 minutes.  And so I was open to -- I had creative control, thank goodness, and was able to write new things.  So if I did write something new, which I would have to or would want to, they would own it basically.

Q   Do you have an understanding of why that particular language was in this term sheet?

A   It was in the -- because I asked for it actually.

Q   Why?

A   I wanted the freedom to be able to create it as I went.

Q   We can go to page 5 of this same document, Ms. Tang.  Call

out the subsequent productions section.

Mr. Rinsch, this section that begins "promptly following signature of this term sheet," what do you understand this section to require the parties to do?

A   We're required at the *White Horse* group, which is myself, my company, Keanu, and Gabriela, we're required to make a deal for the sequel or what they call the subsequent season.  So right after signing this for the first season, we're obligated to get into the room and say, okay, well, what's the next one going to be and, you know, how much is it going to cost and stuff like that.

Q   If we could go to page 4, please.  If we could call out that section beginning with (ii) 11.218 million on completion of principal photography of the first season.

A   Yeah.  Okay.  Right.

Q   Mr. Rinsch, based on your years of working in film production, did you have an understanding of what the term "principal photography" meant?

A   Yes, I did.

Q   And what is principal photography?

A   Principal photography is effectively the main unit.  So that's when you have the most people together and you shoot as much as you can to get it all done.

Q   Is there any photography that's completed on a project that's not principal photography?

A    Sure.   There's sometimes additional photography or reshoots or visual effects photography or second unit photography.  So if you think about it like on a main unit for principal photography, you're going to have all of these people, but you might need -- for a shot where you have to go on location in Brooklyn on the street, you're not going to bring everybody with you.  You're only going to bring a small little team. That would be additional photography.

And also you have reshoots.  So now the process of making a movie, the editorial process plays into it.  So you have a film like *Pretty Woman*, *Pretty Woman* -- the original version of *Pretty Woman* ends with Richard Gere leaving Julia Roberts, which is not a great ending.  And they went back and they went, well, that's not so good, so let's rewrite and change the ending and we'll reshoot it so they get together. So things are plastic, they move.

Q    We can go to page 11, please.  Call out that bottom section.  Based on your years in film production and working on sets, do you have an understanding of what the term "final cut" means?

A    Yes, I do.

MR. MARKEWITZ:  Objection, your Honor.  Foundation, form.

THE COURT:  Overruled.  You may answer.

A    Yes, I do.

Q    What do you understand "final cut" to mean?

A    Final cut is very unique privilege that allows the filmmaker to determine what is the final cut, what's the last thing that's going to go on the screen.  And that puts you in full creative control because everybody knows the last thing that you put together is the last thing that everybody sees. It's the only thing anybody sees.

Q    Now, you've sat here throughout trial and heard other witnesses describe what final cut is.  Do you recall that testimony?

A    Yes, I do.

Q    Do you agree with that testimony?

A    No, I do not.

Q    Why do you disagree?

A    Final cut is the highest honor, and that is something that going to Steven Spielberg.  It goes to Chris Nolan.  It goes to Martin Scorsese.  Is goes to very few people — so few people that there's not even a rule in a rule book about it.  And so the idea that that's a tie break is not true.  It's to give the artist full control over their work, and that is a non-compromising position.

Q    Ms. Tang, we can take down that exhibit.

I'm going to direct your attention now to September of 2019.  Do you recall where you were at that time?

A    September of '19?

Q   Of 2019.

A   2019, I was either in Brazil or I was in Uruguay.

Q   What were you doing in Brazil?

A   Brazil I was filming.  I was filming *White Horse*, this project.

Q   Did you run into financial difficulties while filming *White Horse* in Brazil?

A   We had -- yes.  To a certain extent, yes.  We had all set out to make this project, and it was incredibly ambitious and it was more than what was needed, but we all wanted to do it. The studio wanted to do it, and we as the filmmakers wanted to do it --

        MR. MARKEWITZ:  Objection.  Foundation, your Honor.

        THE COURT:  I need to advise the witness just answer the question put.  The question was, did you run into financial difficulties while filming *White Horse* in Brazil?  And your answer was, "Yes.  To a certain extent, yes."  That's the end of the answer.  The rest will be stricken.

        THE WITNESS:  Copy that.  Thank you.

Q   Did you have any communications with Netflix about these difficulties?

A   Yes, I did.

Q   What communications?

A   I raised my hand, so to speak, and I texted Peter Friedlander and told him we're not going to be able to shoot

PC9JRIN2                        Rinsch - Direct

all of the 203-page screenplay with the budget that we have.

MR. MARKEWITZ:  Objection.  Hearsay, your Honor.

THE COURT:  No, I think the door has been opened to that.  Overruled.

Q   And what was Netflix's response?

A   They wanted the -- they wanted us to shoot everything in the 203-page screenplay and --

Q   Did you ever provide them with a proposal going forward?

A   Yes, I did.

Q   At a high level, what was your proposal to Netflix?

A   The proposal was, listen, we know we can deliver what's in the contract for 110 minutes, but we also know we want to do more.  So let us come up with an option for you.  We can finish what we have for the first season or we can take the sequel and merge it so that's -- you know, like *Wicked*, for instance. *Wicked* has two films as one story.  We can either do the first one or we can do both at the same time.

Q   If we could show only the witness what's been marked as Government Exhibit 6344 at page 2, please.

This is an email in evidence from yourself to Mr. Noon.  And you write to him, I believe you went either way. What do you mean by that?

A   What I mean is that it's possible that both are great.  We can make the first season that's 120 minutes and it's going to be great, so that's a win.  If they want more, well, then we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

can make more, and that's also a win.  I don't think there was a failing option there.

Q   Did there come a time where you moved the production to Hungary?

A   Yes, there was.

Q   Approximately when was that?

A   That occurred, if I recall correctly, the end of September of 2019, right around September 29.

Q   By the time the production arrived in Hungary, had Netflix agreed to provide additional funding for the production?

A   By the time it had arrived in Hungary?

Q   Yes.

A   At the point that is arrived in Hungary no.

Q   Were you still negotiating with Netflix at that time?

A   Yes.

Q   Who was paying for the production at this point?

A   I was.

Q   For how long did you expect to continue production in Hungary?

A   Well, as long as I didn't know -- as long as the crew wanted to.  However, much more they wanted, we would be able to do it or try to.

Q   Did that financial uncertainty cause any issues with production?

A   Yes.

Q   What issues?

A   Well, at the time, we were renegotiating for what the sequel would be.  And I was paying for it in terms of I had a crew of probably 100 people staying in a hotel, everybody's ordering room service and everybody's exposed.  So the idea being, I will subsidize and pay for us all to be here while we negotiate what is the sequel going to be.  And that was my cost and it was a very big cost.

Q   Did there come a time in October 2019 when Netflix did provide additional funding to the project?

A   Yes, there was.

            MR. MARKEWITZ:  Objection.  Form.

            THE COURT:  I'm not sure I understand the objection. It's to the date or -- no, I don't think we need a sidebar.

            MR. MARKEWITZ:  The term "additional," your Honor. It's leading.

            THE COURT:  Okay.  So --

            MR. MCGUINNESS:  I'll rephrase, your Honor.

Q   Did there come a time in October 2019 that Netflix transferred money to yourself or Home VFX?

A   Yes.

Q   And prior to Netflix transferring that money, who, if anyone, did you speak to at Netflix?

A   I spoke to Bryan Noon, I spoke to Cindy Holland, and I spoke to Peter Friedlander, all of which have been here.

Q   Was there an individual primarily responsible for those negotiations?

A   Bryan Noon was the person responsible.

Q   And did you have a conversation with Mr. Noon about that $5.3 million transfer?

A   Yes, I did.

Q   If we could show the witness and the jury what's in evidence as Government Exhibit 6347, please.  Okay.  If we can just call out just that final message, please, Ms. Tang.

        Did you see this email from Mr. Noon when it was sent?

A   No, I did not.

Q   Have you ever seen this email?

A   I have, yes.

Q   When was the first time you saw this email?

A   I saw this email about four days after I had the phone call.

Q   What was your reaction to seeing this email?

A   I was very upset.

Q   Why were you upset?

A   I had a conversation, and I had spent $1.6 million of my family's money on this negotiation so that they could get more material.  And the agreement was that he would pay $5.3 million of new funding.  And after I saw this, after the phone call, it came back as, well, the $5.3 million is actually going to be deducted from the money we were going to pay you.  And that's

PC9JRIN2                        Rinsch - Direct

effectively paying me with my own money, and so I did not appreciate that and it was a phone call.

Q   So did this email accurately reflect the phone call you had with Mr. Noon?

A   No, absolutely not.

Q   We can take this down and show the witness what's in evidence as 6352, also to the jury, please.  Okay.  And if we could go to page 2, please.

Okay.  Why were you sending this message to Mr. Noon on February 4?

A   I was sending it because at a certain point I have to declare that the principal photography is complete so that they repay the debt.

Q   If we could call out the paragraph beginning "principal photography is to be considered completed."

Was that a true statement when you made it, that principal photography was to be considered completed?

A   Yes, it was.

Q   Had principal photography been completed by that point?

A   Yes, it had.

Q   Did you believe that Netflix owed you money as a result?

A   Yes, I did.

Q   How much money did you believe that Netflix owed you as of writing this email?

A   I had spent $11.3 million of my money at this point, and I

believed they owed me 11.218 million to repay that.

Q   Is that the same or different amount that the term sheet says you were to be paid at the completion of principal photography?

A   It's the same amount.

Q   If we can go to page 3, please.  If we could call out the 3.75 million.

What were you asking for this money to be given to you for?

A   So this was an additional 3.75 million.  If they wanted to make a sequel, we could start putting money to use and making that sequel, everything from building sets to just advancing in preproduction.

Q   How would that money be spent?

A   That would be spent a lot of different ways, everything from what is considered soft preproduction, which is the artistic part of designs and things like that, and then also production service contracts.  When you're making these films you need to contract a company in a foreign country to shoot for you.  You know, you go there, but they have their own on-the-ground teams and so you have to reserve them.  And they ask for sometimes a million or so upfront just to reserve them before you get there.

Q   If we could take that document down, go to what's in evidence as Defendant's Exhibit 50.  Call out that bottom

PC9JRIN2                        Rinsch - Direct

email, please.

          This is a document in evidence.  And when your

attorney writes that "Carl will self-fund the prep necessary,"

do you have an understanding of what he meant by that?

A    Yes, I do.

Q    What did he mean by that?

A    What he means is that what I had relayed to him and what --

          MR. MARKEWITZ:  Objection.  Form of the answer.

          THE WITNESS:  Sorry if I didn't answer that correctly.

          THE COURT:  Overruled.  You may answer.

          THE WITNESS:  Thank you, sir.

A    I had understood this to mean if they paid back the

$11.218 million, then I would out of my pocket pay for,

self-fund a preproduction of the sequel so that they could

determine if they wanted to make it.

Q    And what exactly would you be self-funding?

A    I would be self-funding what's called soft prep.  I had

written the script and so -- I believe I'd written the script.

Yes, I had written the script at this time with Keanu on the

longer version.  And that would be everything from storyboards,

concept illustrations so you can see what the world looks like

to understand where you would shoot it, the locations, securing

locations, and what they call breaking down the screenplay.

You have the screenplay and you break down each scene — well,

how many people are we going to need in this scene, what do

they have to wear, things like that.  And that allows you to get to a budget.  So that's all this very early planning and proposal phase, truly.

Q   And how much did you anticipate that this soft prep was going to cost?

A   As I discussed, I think $500,000 was a liberal amount of money to apply to preparing this proposal.

Q   And is this soft prep you just described the same or different than the preproduction work that we just looked at in your $3.75 million proposal?

A   It's different.

Q   Why?

A   Well, one is a proposal, effectively.  It's called general elements.  You're putting together a proposal.  And another is deciding that we're going to do it.  So you don't have to commit all $3.75 million if you're just putting it together to see if everybody likes it.  So that's kind of the difference is one is we're going to put enough together to see if everybody loves it and wants to make it, and another is we're making it and this is the first steps in making it.

Q   So which of those options would be more expensive?

A   Well, we're making it is a lot more expensive.

Q   And so just so we all understand, what type of expenditures would you make it you knew Netflix was committed, as opposed to if you hadn't yet made a decision that they were going to do

PC9JRIN2                         Rinsch - Direct

the next season?

A    If I knew that they were going to be committed to it, I would start spending a lot of money on securing teams overseas like crews, and I would start actually physically building certain sets.  But truly I'd be securing crews overseas.  It takes -- to get the best people, it takes time and you have to -- they have other options.  So you have to put down the money in advance.

Q    Replace that call out and call out Mr. Noon's response in the middle.

        Okay.  When Mr. Noon writes that 11.218 is not the correct amount of the next installment, did you understand what he meant by that?

A    I understood that from my opinion, I thought that this was a negotiating position.  I thought that he was hardball negotiating.

Q    And what negotiating position did you think he was taking here?

A    I think he was taking the position of you're not done so we don't have to pay you anything.

Q    Okay.  And as to his statement that it was not the correct amount, did you have any understanding of what he meant by that?

A    I think he also was trying — this is my opinion — I also think he was trying to double down on the idea that the

$5.3 million he had paid was somehow my money that he was paying me.

Q   And was that true?

A   No, sir.

Q   We can replace that call out and call out the top message, please.

Okay.   And your lawyer asks for an explanation from Mr. Noon as to why he believes that the next installment was not yet due.   Did Mr. Noon ever respond to that?

A   No, he did not.

Q   Approximately how many hours of footage had you shot at this point?

A   I believe somewhere in the neighborhood of 300 hours of footage.

Q   Okay.   And we can take down the document, please.

Do you recall a February 20 meeting with Ms. Holland?

A   Yes, I do.

Q   Where did that take place?

A   That took place at Netflix Studios.

Q   And did you bring her anything to that meeting?

A   Yes, I did.

Q   What did you bring?

A   I brought her some books from Star Wars that they had put together, these big books that showed how Star Wars was made, the first one, the second one, the third one, and all the

PC9JRIN2                        Rinsch - Direct

designs and the world creation, what they call world building of the film.

Q   Why did you bring those?

A   Because I wanted to impress upon her that this was in my eyes a franchise.  It wasn't just one movie.  And I don't know if Netflix at the time had done a big franchise like that, but I thought this was an opportunity to be their Star Wars.

Q   During the February and March negotiations, who at Netflix did you speak with?

A   February and March negotiations I spoke with Cindy Holland and I -- I spoke -- give me a moment to think about this.  I don't know if I spoke with Bryan Noon.  I might have -- I emailed Bryan Noon, but I spoke mostly with Cindy Holland.

Q   In those negotiations, did you ever tell Ms. Holland or Mr. Noon that you would use the entirety of the $11 Netflix would give you towards *White Horse*?

A   No, I did not.

Q   Why not?

A   It's a -- it's too much money.  I would -- I would never spend $11 million in five weeks.

Q   What type of deal was this -- withdrawn.

        What type of deal did you have with Netflix for the *White Horse* project?

A   It's called a negative pickup deal.

Q   What's a negative pickup deal?

A   So a negative pickup is when a group of artists goes to a studio and says we really want to make this film, will you pay for it?  And they say tell you what, we're not going to give you the money now to make it, but if you pay for it and then you finish it, when you give it to us, we'll pay you back.  So that's what a negative pickup deal is, and that's what this was.  So we got to have creative control.

There's advantages of it.  You get to have creative control.  You don't have a studio on top of you telling you what you can do.  You can edit it and complete it as you want because it's effectively your money that you're spending, but they're on the hook for paying you back when you're done.

Q   So how much money were you asking for in February and March negotiations with Netflix?

A   I was asking for them to pay back the 11.218 I had spent. Did I misunderstand the question?

Q   We saw in this trial some arbitration testimony that said you had spent the $11 million you got from Netflix, correct?

A   Yes.

Q   And could you explain to the jury how that's related to the negative pickup deal please, if it is?

A   Sure.  As I explained or tried to explain, sorry.  I had spent $11.3 million of my money upfront, and the studio was not involved.  They did not pay for that.  I paid for that, and then at the end of it I said you guys need to pay.  We're done.

I have enough material to be able to shoot -- or rather I have enough material to be able to complete my first season, and I need to be paid back.  So that's what it was.

Q   And you've stated that you spent the money.  How did you spend the money?

A   I spent the money shooting the first season of *White Horse*.  So we shot in Brazil and we shot in Uruguay.  As you'll see in the book, we shut down the city.  It was an amazing shoot.

Q   All right.  If we can bring up what's in evidence as Government Exhibit 6358, please, and page 5.  All right.  If we could call out these bullet points.

And if we could actually call out the statement right above it with them.  Sorry.  All right.  Where it says Home VFX shall perform and shall use the 11 million to fund the following over a five-week period, and then there's these bullet points, what did you understand this to mean?

A   I understood this to be from a previous proposal that I had provided.  But the idea behind this was this is the soft preproduction for a five-week period of time.  I will self-fund and pay out of my pocket to make storyboards, shot diagrams, locations, designs in order for them to determine if they wanted to make it or not.

Q   Did you understand this to mean that you were to use the entire $11 million on these bulleted items?

A   No.

PC9JRIN2                       Rinsch - Direct

Q   You saw other arbitration testimony where you commented on these bullet points.  Could you explain to the jury what you understood the question and answer from the arbitration to mean.

A   Could you repeat the question.

Q   Sure.  We saw arbitration testimony where you were asked about these bullet points.  Do you recall that?

A   Yes, I do.

Q   Could you please explain to the jury what you understood the question and answer from the arbitration to communicate.

A   I believe, if I recall correctly, in the arbitration they asked, did you spend any of your money on these items?  And I said I did, I spent my personal -- I self-funded these items.

Q   If we could go to page 4 of this document, please.

In number two here in the email from your attorney, Mr. Kendall to Mr. Noon, when he states that Netflix funding of $11 million is to be considered as an additional "first season production cost," did you have an understanding of why that money should be considered first season production costs?

A   It was my understanding it was first season production costs because it was reimbursement of the first season.

Q   Was there any tax reasons why you wanted that language?

A   Yes, there are tax reasons.

Q   What were the tax reasons?

A   I'm not a tax expert, but my understand --

MR. MARKEWITZ: Objection. Foundation.

THE COURT: Overruled. You may answer.

THE WITNESS: Thank you, sir.

A   I'm not a tax expert, but from what I understood, if I spend money on a first season production cost, then the money I get back has to be for that, to reimburse that. So the assignment, if I claim that the first season production costs is paying this crew, when I get paid back it needs to be clear that that's what the money was for.

Q   And when your attorney writes that you are to continue to retain final cut rights, do you have an understanding of why he wrote that?

A   He wrote that as much --

MR. MARKEWITZ: Objection. Calls for attorney-client --

THE COURT: Sustained.

Q   Did you understand from the term sheet any way in which additional funding could affect your final cut rights?

A   Yes, I did.

Q   Could you explain how that could effect your final cut rights.

A   From my understanding, at the moment that I go over budget or I require more money, then I lose that privilege of final cut rights, so I lose creative control of the project. So I have to keep it within a certain budget. And if I blow the

budget, then I no longer can control the creative.

Q   If we can replace that call out and call out the message from Mr. Rinsch above it.

Okay.  And you mention again some tax significance with the classification of first season production costs.  What was your understanding of any tax significance of first season production costs?

MR. MARKEWITZ:  Objection.  Your Honor, this issue was addressed prior to trial.

THE COURT:  Sustained.

Q   All right.  If we could go to page 3, please.  If we could call out that language.  Thank you.

So this final sentence from Mr. Noon, in addition the parties hereby agree that the $6 million funded in October was an advance against the contractual delivery payment, the final sentence, when you saw this language, what did you understand it to mean?

A   I understood this to mean the same as before, that the $6 million that they had spent for more material, they were attempting to claim as money that they needed to repay me.  If they had owed me $12 million, and then paid six for more stuff, it doesn't reduce the amount of money they had owed me.  And that's what this was.  If they owed me $12 million and they pay me six for extra stuff, that doesn't mean they don't owe me $12 million any more.

Q   So Mr. Noon is writing here about $6 million funded in October.  And we've heard about $5.3 million that was sent.  Do you have any understanding of the discrepancy between the 6 million and the 5.3 million?

A   Yes.  The -- originally I had spent -- I had spent about $1.6 million while we were doing this negotiation.  And when the negotiation came through, he said, well, why don't we split it.  You can still spend $800,000 on the negotiation, and I'll spend $800,000.  These were monstrous numbers.  And so that was my commitment.  I put in $800,000, which got reduced to 700.  It's a technical thing.

Q   If we could call out the response to that email, please.

Did you have a phone call with Cindy Holland on March 5, 2020?

A   Yes, I did.

Q   And is your attorney's proposal that we're looking at right now consistent or inconsistent with the phone call you had with Ms. Holland?

A   This is consistent with what I recall talking to Ms. Holland about.

Q   This second paragraph that starts "if no agreement is reached on phase two in five weeks," what did you understand this to mean?

A   Basically we put a clock on it so that if in five weeks they decide that they don't want to do the sequel, we were okay

PC9JRIN2                        Rinsch - Direct

with that.  We would just do the first season.

Q   Your attorney is asking for $11 million now with $218,000
to be paid later.  How, if at all, does that relate to the
$11.218 million that you had been repeatedly asking for?

A   That's the money.  If you -- it gets back to the primary
idea.  If you guys honor the debt and repay the debt, then I
will provide $500,000 or so.  This is -- it's not written this
way, but in my mind I'll provide $500,000 or so, and if at the
end of five weeks and I've spent that money you decide you
don't want to make the sequel, okay.  No harm, no foul.  I lose
500 grand because I'm not asking them to pay that back if they
decide not to move forward.  But that's a risk that I'm willing
to take to believe in the project.

Q   Your lawyer writes that you will deliver the contractually
required 100-to-120-page deliverable.  We've been talking about
the first season in terms of minutes.  Why is your lawyer
referring to it in terms of pages here?

          MR. MARKEWITZ:  Objection.  Form.

Q   To your understanding.

          MR. MARKEWITZ:  Objection stands, your Honor.

          THE COURT:  Sustained.

Q   Directing your attention to paragraph 3.

          What did you understand this number three to mean?

A   Netflix will have no argument that it has overpaid for that
deliverable and will have no recourse against -- to recover the

6 million.

Q   And did you understand this to be the same or different $6 million that Mr. Noon had just referred to as the money transferred in October?

A   This is the same $6 million.

Q   Okay.  We can take that document down.  After you received the $11 million from Netflix, did you continue to work on *White Horse*?

A   Yes, I did.

Q   What did you do?

A   Well, I did -- I had -- thinking.  I had broken the film down.  I broke it down even further.  I hired my line producer to come on.  I started doing all of the storyboards and the concept illustrations and worked on that.  Then we did a lot of the preparation for visual effects.  We started to do a lot of the visual effects work, which hopefully you'll see.  So yes, effectively we did everything in that list.

Q   Okay.  Let's go through these one by one.  You said you broke down the screenplay.  What does that mean?

A   So when you break down the screenplay -- I spoke about it a little bit.  When you break down the screenplay, you start with a screenplay and it's got numbers for scenes.  And you break down every scene and you say which actors are going to be in it, what clothes are they supposed be wearing in that scene, what props are they holding on to, what location is that scene

going to be in?  What furniture is going to be in that room and what lights are you going to need and what camera gear?

It's basically like a recipe, right.  You have the script, which you can read and it's entertaining, but then you have to break it down to recipes.  I'm going to need tomatoes, pasta, put the water on, whatever -- I don't know.  And that's really what the breakdown is.  And then from there, once you know what the recipe is, then you can figure out how much it's going to cost when you go to the market.  So then every single element you say, well, okay, I'm going to need three makeup people that day.  I know it costs $150 each makeup person, so then I can start doing the budget.  So that's a different -- that's reverse cooking basically.

Q   You mentioned that you hired a line producer.  Who was that?

A   A gentleman by the name of Clayton Townsend.

Q   Were you familiar with any of Mr. Townsend's work when you contacted him?

A   Yes, he's very good.  He did some older films like *Born on the Fourth of July,* worked with Oliver Stone a lot, if anybody is an Oliver Stone fan.  And then he'd also done the big Hollywood-style movies like *Fast and the Furious* and did *Fast and Furious* nine, ten, something like that.  And he also did smaller films like *Bridesmaids*, which I thought was great.  And he was just an incredibly experienced guy, but also still a

young and virile guy.

Q   If we could show to the witness what's been marked as Defense Exhibit 101.  Do you recognize this document?

A   Yes, I do.

Q   At a very high level, what is this document?

A   This is an invoice.

Q   And is this a true and correct copy of that document?

A   Yes, it is.

MR. MCGUINNESS:  Defense offers Exhibit 101.

MR. MARKEWITZ:  Objection.  Hearsay, your Honor.

THE COURT:  Can we have a sidebar on this one.

(Continued on next page)

PC9JRIN2                        Rinsch - Direct

(At sidebar)

THE COURT:  So before we even get to the hearsay issue, as I recall defense counsel succeeded in an authenticity objection to one of the government's exhibits.  Why isn't that the same problem here?

MR. MCGUINNESS:  This is an invoice that he received and acted upon, your Honor.  Whether or not -- this is not being offered for the truth of the matter, and the authenticity issue is related to this, your Honor.  It all goes to my client's state of mind.  It is in fact an invoice he received. My client thought he was paying money towards this *White Horse* project.  Frankly, I believe he was, but it is of no relevance to this trial.  All that matters is that he believes he was paying money towards this project and it purports to be from an individual.

THE COURT:  I'm sorry.  What is this?  Because I couldn't really make it out on the screen.

MR. MCGUINNESS:  It is a very well accomplished line producer, which is a technical word for a budgeter, someone who budgets on films, your Honor.  And it is his invoice for services.  And I note this was one of the -- this goes directly to one of the tasks he had to do.

MR. MARKEWITZ:  Your Honor, the defendant has already testified that he's hired him, a line producer.  But he certainly is fine to do that, but there is rank hearsay in this

PC9JRIN2                      Rinsch - Direct

document.  First there's descriptions of payments being interim

payments.  There's descriptions of future negotiations,

good-faith negotiations.  This is hearsay, your Honor.

MR. MCGUINNESS:  We could certainly redact the

document.  One of the reasons the defense needs this is because

bank records confirm a $30,000 payment to this company, which

this company is Mr. Townsend.  He receives this from

Mr. Townsend saying send the money here, and he does.  Again,

if this is all a fraud on Mr. Rinsch, and this is not true --

THE COURT:  Well, I think it does seem to be -- have

an awful lot of hearsay in it.  Whether it can be redacted,

where -- would you just redact it so it's just the first four

lines?

MR. MCGUINNESS:  We would be -- we're happy to do

that, your Honor.

THE COURT:  All right.  I will receive it as redacted.

MR. MARKEWITZ:  Your Honor, we would ask to redact

"interim payment" as well.

THE COURT:  No, I think that's relevant to his

understanding.

(Continued on next page)

(In open court; jury present)

THE COURT:  All right.  So the exhibit as redacted is received.

(Defendant's Exhibit 101 received in evidence)

MR. MARKEWITZ:  Your Honor, I think there was a juror --

THE COURT:  Oh, I'm sorry.  Well, in that case, let's take our midmorning break for 15 minutes.

(Continued on next page)

(In open court; jury not present)

THE COURT:  All right.  I will send you sometime during this break my revised version of the charge on wire fraud.  That's the only thing I've changed.  And then we can discuss it at lunch.

(Recess)

THE COURT:  Please be seated.  So two things.  One is I just gave both sides or my law clerk gave both sides a copy of my revised instruction number eight, which we'll discuss at lunch.

Second, I want to reaffirm but also add further to my ruling on prior consistent statements.  Prior consistent statement can only be introduced if it meets at least two requirements.  First, that it is offered to rebut a claim of recent fabrication.  So for example, normally it would only come up in a situation like what we're talking about where on cross-examination of the defendant he was accused of having said something that the cross-examiner was impeaching. And second, the prior consistent statement must have been made prior to the time when the speaker had the same motive to fabricate.

I had forgotten about this second requirement.  In that case, that probably means it would have to be a statement going back before March of 2020 at the earliest, and then it might even have to be even prior to 2019.  But in any event, I

PC9JRIN2                      Rinsch - Direct

stand by my determination on that score.  Yes.

MR. MCGUINNESS:  Just because I think this is relevant to a number of exhibits the defense intended to argue, your Honor, I believe the circumstances here — and I do note the second subsection that I think your Honor was going to or alluded to, which is to rehabilitate the witness's credibility as a witness when attacked on other grounds, I believe that has happened throughout the course of this trial through introduction of arbitration testimony and evidence that was contradictory or at least presented as such.  I believe this witness was --

THE COURT:  First of all, I'm not sure that's true. The government introduced his statements, for example, from the arbitration for the truth that he admitted he had done so and so.  The statements that were attacked as false of course are the statements that are the subject of the wire fraud charge. But in any event, how do you get around even assuming -- and I don't agree with what you just said, but even assuming I were to be persuaded, how do you get around the recent fabrication -- how do you get around the prior to the motive to fabricate having arisen?

MR. MCGUINNESS:  The motive to fabricate is defense of the criminal charges, which happened this year, not the -- that arose in --

THE COURT:  Well, it depends on what specifically.

PC9JRIN2                      Rinsch - Direct

But if, for example, I've given you more leeway than I probably should in allowing him to say what he said back when, but I've done that on other grounds that the door was opened. But if he were -- what he says he understood now were to be attacked on cross, a prior consistent statement would have to go to a time before he had the motive to have given the allegedly false testimony he gave. The motive arose, according to the government's view, at the time he had the negotiations with Netflix on the $11 million. But anyway, let's bring in the jury.

Roughly how much more do you have on direct?

MR. MCGUINNESS:  Less than an hour, your Honor.

(Continued on next page)

(In open court; jurors present)

THE COURT:  Please be seated.

MR. MCGUINNESS:  Your Honor, subject to the Court's ruling, I believe Defense Exhibit 101 in its current form is admitted into evidence.  If we could show that to the witness and the Court please, Ms. Tang.

THE COURT:  Yes.

MR. MCGUINNESS:  If we could publish to the jury, Ms. Tang.

BY MR. MCGUINNESS:

Q   Mr. Rinsch.

A   Yes, sir.

Q   So prior to the break, you were discussing Clayton Townsend as a line producer.  Is this a document -- was that received from Mr. Townsend?

A   Yes, it was.

Q   And what was this document related to?

A   This was the -- this was the payment for his services as a line producer.

(Continued on next page)

PC9Frin3                        Rinsch - Direct

BY MR. McGUINNESS:

Q.   (Continued) If you could bring up what's in evidence as Government Exhibit 3008 at page 42, and do them side by side, please.

A.   You'll tell me if I'm too close or too loud, right?

          MR. McGUINNESS:   Perfect.

Q.   And just to remind everyone, Mr. Rinsch, this account ending 6485 --

A.   Yes.

Q.   -- what was this account?

A.   This was the Home VFX cash account.

Q.   If we could replace that call out and call out the transaction on March 12, please.

A.   March 12.  It is -- oh, you're not asking me to call it out.

Q.   Do you recognize this transaction?

A.   Yes, I do.

Q.   What is this transaction?

A.   This is to Itinerant Film, which is Clayton Townsend's company.

Q.   And how much did you transfer to Itinerant Film?

A.   $30,000.

Q.   What was that money for?

A.   That was for his services as a line producer.

Q.   On what project?

PC9Frin3                         Rinsch - Direct

A.  On White Horse, as a line producer.

          MR. McGUINNESS:  If we could take that callout down.

          If we could take both of those documents down.

Q.  Mr. Rinsch, did you do any work related to White Horse in securing locations for shooting?

A.  Yes, I did.

Q.  And did you do that work after you received the 11 million from Netflix?

A.  Yes, I did.

Q.  And what locations did you work on?

A.  We worked on a palace location, and it's called -- I might get this wrong -- it's called the Palais Liechtenstein, which is a Palace, the Liechtenstein Palace, but it's in Vienna.  So, the royal family of Liechtenstein has this tremendous palace in Vienna that was going to be the palace in the film.

          MR. McGUINNESS:  If we could show to the witness only Defense Exhibit 102.  And if we could, briefly, just go through each page of the document.

          At a very high level, what do you understand this document to be?

A.  This is the rental agreement which says how much it's going to cost.

Q.  And is this a document that you received?

A.  Yes.

Q.  Is this a true and accurate copy of this document?

A.   Yes, it is.

Q.   Defense moves to admit Defense Exhibit 102.

          MR. MARKEWITZ:  No objection.

          THE COURT:  Received.

          (Defendant's Exhibit 102 received in evidence)

Q.   You mentioned that this is a palace location.  What, if anything, related to White Horse did you intend to shoot at this location?

A.   Most of the sequel.

          You can see there's a higher -- sorry, I touched something.  The higher period.  The first and second floor of this palace and where we were going to shoot it.

          It's like a -- it's like a science fiction "Game of Thrones," basically.  So, what happens is, it becomes about palace intrigue and this royal family that starts with nothing and it becomes a royal family, so it becomes like sci-fi "Game of Thrones."

          THE COURT:  I think you've answered the question.

          THE WITNESS:  Sorry.

BY MR. McGUINNESS:

Q.   If we go to the last page of the document, please, and if we could just call out the date of this contract.

A.   This was March 11 of 2020.

Q.   And was that the date that you executed this contract?

A.   Yes, it was.

Q.  Was money owed related to this contract to secure this location?

A.  I believe so, yes.

MR. McGUINNESS:  If we could put this side by side 3008 again at page 42, please.  If we could call out that March 13, 2020 payment.

Q.  Is this $33,327.47 payment related to securing the location we've been discussing?

A.  Yes.  This was to secure the location on certain days for shooting.

MR. McGUINNESS:  We can take both documents down.

Q.  Who is Nick Gindraux?

A.  Nick Gindraux is a concept designer, but he's also the production designer and visual effects art director.

He's my right-hand man, so to speak.

Q.  Did he do any work on White Horse?

A.  Absolutely, yes.

Q.  And what periods of time did he work on White Horse.

A.  Mr. Gindraux worked on White Horse starting as early as, I believe, the third or fourth month of 2019, and so he was working on the first season as well as the second season, all the way through.

Q.  And was he working on the project in 2020?

A.  Yes, he was.

Q.  Did he continue working throughout the entire year?

PC9Frin3                        Rinsch - Direct

A.   Absolutely, yes.

Q.   Did he continue working on White Horse in 2021?

A.   Yes, he did.

Q.   Could we show only the witness DX 103, please?

A.   Thank you.

Q.   Are these documents that you received?

A.   Yes, they were.

Q.   And this is -- this document has many pages.

         MR. McGUINNESS:  If we could just scroll through some
of the pages.

A.   Yes, I can see.

Q.   Have you reviewed this document previously?

A.   Partly.  I'm --

         MR. McGUINNESS:  If we could go through every page
just to make sure you are familiar with this document.

A.   Yes, great.  Yes, I am familiar.

Q.   Almost done.

         Did you receive every one of these invoices?

A.   Yes.

Q.   At a very high level, what are these documents?

A.   These are documents that are invoices from Nick Gindraux.

Q.   Are these true and accurate copies of those invoices?

A.   Yes, they are.

Q.   Defense moves Defense Exhibit 103 into evidence, your
Honor.

PC9Frin3                          Rinsch - Direct

MR. MARKEWITZ:  Your Honor, objection to the fifth column as hearsay.

THE COURT:  Well, you want to redact that?

MR. McGUINNESS:  Your Honor it goes to my client's state of mind.

MR. MARKEWITZ:  Your Honor, if we could have a sidebar on this.

THE COURT:  So, does the government want instruction that this is not being received for the truth of that column but only for what effect, if any, it might have had on the defendant's state of mind?

MR. MARKEWITZ:  I don't think it's being introduced for state of mind, your Honor.

THE COURT:  Okay.  I apologize to the jury.

I need a sidebar on this one.

(Continued on next page)

(At sidebar)

THE COURT:  So, I'll note for the record that when the government referred to fifth column, I'm old enough to know to remember when that had a very different meaning from the one that the government intended.

I am troubled.  I think there is no way the jury can view this as anything as being offered for its truth, even despite an instruction, because it has all the earmarks of a legitimate invoice.

But let me ask the government find out a little bit more about this from defense counsel.  So, this was sent by whom for what and when?

MR. McGUINNESS:  This is after the transfer of the $11 million.

THE COURT:  Right.

MR. McGUINNESS:  And this is throughout -- I believe we're going to go through September of 2020.  Mr. Gindraux was in constant contract with Mr. Rinsch.  Mr. Rinsch was receiving these invoices saying:  I was working on X design, which is directly related to the show.  And we'll show the ultimate product of -- that he did, but we will say that this, you know, shows that Mr. Rinsch believed, at least, that work was being done on the show.

THE COURT:  With respect to this document and others that you're planning to introduce along these lines, were they

PC9Frin3                        Rinsch - Direct

presented -- to the extent the witness who created it was on the stand, were they presented by you in cross examination to that witness.

MR. McGUINNESS:  Mr. Gindraux was not called.

THE COURT:  Right.  I'm just flagging that for others that may come up, because I think that would be --

MR. McGUINNESS:  Yes, your Honor.

THE COURT:  -- a problem.

So, I don't see how even a careful juror could really understand this as being other than for its truth.

You know he's basically going to testify -- in part, he already has: I got this for services rendered by Mr. Gindraux for such, and such, and such and this confirms, in effect, that he performed those services.

And of course whether or not he -- I mean, you know, and even if he were to just say:  And this confirmed my view that he was performing the services. that's such a fine distinction.  I don't think the jury can meaningfully distinguish it.

Now, again, it may be -- I caution the government that a lot of this -- a door to a lot of this may be opened on close. but you take your chances, so to speak.

MR. MARKEWITZ:  If I may also just add for the record, your Honor, there's also been testimony -- and I expect Mr. Rinsch will say this -- he was also receiving the work

product.  So there's no need for this description to go to his state of mind, because he's actually receiving the work project, so there's no need for this description to go to his state of mind, because he's actually receiving work product. If within a week he, getting things that aren't for the show, he could say that.

THE COURT:  So, yeah, I'm surprised -- I mean, let me put it to defense counsel.  I will give you the alternative of either I will sustain the objection, or if you prefer to have fifth column redacted for now, recognize that it may come back in after across, I will receive it with that redaction.

MR. McGUINNESS:  Okay.  We'll use the redacted copy for now.

Thank you, your Honor.

THE COURT:  Okay.

(Continued on next page)

PC9Frin3                      Rinsch - Direct

(In open court; jurors present)

THE COURT:  Okay the exhibit is received as redacted.

MR. McGUINNESS:  Thank you, if we could publish this for the jury.

(Defendant's Exhibit 103 received in evidence)

A.  Yes.

THE COURT:  Okay.  And if we could just go through the pages of this for the jury.

MR. McGUINNESS:  You can take that down for now.

BY MR. McGUINNESS:

Q.  Now, Mr. Rinsch --

A.  Yes.

Q.  -- when you received these invoices, what work did you understand Mr. Gindraux to be doing?

A.  Mr. Gindraux was doing work for me on the second design, so doing design work, I was painting sometimes.  He was painting.  Then we would -- we were creating things in 3-D and creating what, hopefully, everybody will see.  Just, our creative work.

Q.  Is that the second season of White Horse?

A.  Second season of White Horse, yes.

Q.  Did you ever share the work that Mr. Gindraux was doing with Netflix during this period?

A.  Absolutely.  Yes, I did.

Q.  How did you share?

A.  Took two ways.  I was in text communication with Cindy

Holland. I had A personal relationship with her, a friendly one, and so I would periodically send her a picture from my dining room table where I would do some painting or draw.

And I would also put together a Dropbox link that had all the creative work on it so that she and her team could take a look at that.

Q. Let's discuss that first way you said you shared information with her.

MR. McGUINNESS: If you could bring up Government Exhibit 6368 B at pages -- start at page 3, please.

A. Right, that's --

MR. McGUINNESS: You could actually up one page. And actually we can publish this to the jury. It's in evidence. Thank you.

A. That's not a full picture of the --

MR. McGUINNESS: All right. So -- and if we could scroll through the pages.

Q. So, this is a text message between you and Ms. Holland. Is this the same version of the image you sent t Ms, holland?

A. No, absolutely not.

MR. McGUINNESS: If we could bring up defense exhibits 105 and 106 next to each other, just for the witness, please.

A. Yes. Yes.

THE COURT: There's no question pending.

THE WITNESS: I'm sorry about that, sir.

PC9Frin3                     Rinsch - Direct

Q.  Do you recognize these two images being shown to you?

A.  Yes, I do, sir.

Q.  And are they true and accurate copies of the images you recognize?

A.  Yes, they are, sir.

Q.  And who took these?

A.  I did, sir.

Q.  Okay.

        MR. McGUINNESS:  The defense moves to admit Defense Exhibit 105 and 106.

        MR. MARKEWITZ:  No objection.

        THE COURT:  Received.

        (Defendant's Exhibits 105 and 106 received in evidence)

Q.  So how, if at all, did these two images relate to the images in the text exchange that we were just looking at that the government introduced.

A.  The government introduced images are cropped and they are just a small -- they don't provide context or -- they're not clear.

Q.  So, are these the same or different images you sent to Cindy Holland?

A.  These are the images I sent to Cindy Holland.

Q.  What do we see in these images?

A.  Well, we see a few things.

Is the jury able to see these images?

Q.  Let's call out the image on the left as tight as we can to just the image, please?

A.  So, the jury will be able to see that there is some color paintings that -- of a woman, sort of -- there's some color paintings there.  There's some storyboards.  There's some hand-drawn drawings, and these are stacked.  So, you'll see some concept paintings and the storyboards that are clipped to each scene.

And then you'll see things like what you see in the middle there, which is armor, and that's done in 3-D.  That's armor designed in 3-D so we could print it.  It's sci-fi "Game of Thrones."

Q.  And what's the process between the hand sketches and these fancy computer artwork that we're seeing in this image?

A.  Well, sometimes it will start with just me and a doodle, and I'll just draw things out how I see it.  And it's called storyboarding.  It's basically like making a cartoon of the film as far as I see it.

And then at the same time, we'll know that we're going to shoot in a certain palace, and we'll take that palace and recreate the palace in a computer and then, basically, mock up the scene in what is the real palace so it looks very, very close to the final product.

And it's just an amazing process when you're using 3-D

and able to pre-visualize everything.

Q.  Okay.

MR. McGUINNESS:  We can take down those images.

Q.  You mentioned a second way in which you shared your work with Netflix.  What was that?

A.  I put together a Dropbox account so that they could see the progress as it was going and we had a meeting.  Yeah.

Q.  Sorry?

A.  No, we had a meeting in June of 2020, where I showed some printouts of the artwork that we were doing, because it was COVID at the time.  So, it was COVID at the time, and for the first opportunity when the city opened up and we could have a sit-down meeting, we had a sit-down meeting and I showed printouts and sent the Dropbox link so that they could look at it later.

MR. McGUINNESS:  If we could show to the jury what's in evidence as 6368C, please.

Okay.  You could go forward, please.

If we could take that down for just a minute.

We're going to come back to that.

A.  Sure.

Q.  If we could show Defense Exhibit 107, please.

Do you recognize this photo?

A.  Yes, I do.

Q.  Who took this photo?

PC9Frin3                    Rinsch - Direct

A.  I did.

Q.  Is this a true and accurate copy of the photo?

A.  Yes, it is.

Q.  Defense offers Defense Exhibit 107.

        MR. MARKEWITZ:  Objection your Honor, hearsay as to the two screens in the background.

        THE COURT:  Overruled.

        Received.

        (Defendant's Exhibit 107 received in evidence)

        MR. McGUINNESS:  Could you please publish this to the jury.

A.  Sorry.  The question?

Q.  Wait until it's published to the jury.

        MR. McGUINNESS:  Call out the image so they could see it better as well.

Q.  What is this picture?

A.  So, this is in my home office during COVID.

Q.  And what is it a picture of?

A.  This is a picture of the home office next to where the table was, where all at paintings were going on.  This is where I'm doing calendaring and scheduling.

Q.  Okay.  I see a bunch of different colored post-its on what looks like a calendar.  Can you explain what's going on there?

A.  This is what's called a block calendar.  So, you say, we're going to shoot this day to this day in Vienna and it will be

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

one color, and then it will say:  Well, we're going to move and shoot this day and this day in Berlin, and it will be in a different color, or, where going to Kenya again, and it will be in a different color.

So, each section is laid out that way so you could just look at it at and go:  Okay, I get it.

Q.  Thank you.  We can take that down.  Okay.

Going back to Government Exhibit 3008, at page 41, if we could call out the March the first March 9, 2020 expense.

A.  Sure.

Q.  What is Taylor and Taylor?

A.  Taylor and Taylor is an insurance broker here in New York.

Q.  And was that expense related to White Horse?

A.  Yes, it was.

Q.  How?

A.  So, when you're working on a film, you need to have all kind of insurance.  Sometimes insurance for the -- they call it production insurance.  So, if you rent something and break it, then that's insured.  Sometimes if you have bath weather, that's insured.  Unfortunately, if somebody's hurt while you're shooting it.  That's insured.

So there's different types of insurance.  Sometimes there's errors and omissions insurance, sp that if you get sued that somebody else says, hey, that's my idea, they cover you. It's expensive, but there's lots of liability associated with

films.

Q.   Okay.  And if you could replace that callout. and go right below it to the bottom two on the page, please.

Okay.  Do you recognize these two expenditures, one for 20,000 and the one below it for 90,000 and something?

A.   Yes, I do.

Q.   What are they?

A.   Those are payments to actors.

Q.   And can you tell from these entries what actors they went to?

A.   This went to Moritz Bleibtru, who was the lead actor you'll see one of.  And he's a German actor, wonderful guy, and great actor.

And then the other is for Britta Thie.  And she's a German actor, also a wonderful lady and a great actress.

Q.   And were these payments related to White Horse?

A.   Yes, sir, they were.

Q.   Are these actors who appeared in the White Horse episode?

A.   Yes, sir, they are.

Q.   And did you intend for them to appear in subsequent seasons?

A.   Yes, sir, I did.

Q.   If we can take that down, and we're going to go back to Government Exhibit 6368C at page 5.

And if we can call out the message from Carl Rinsch on

June 15, 2020, and this is a text message between yourself and Cindy Holland.

What are you sending in this message that we're looking at now?

A.  So, the previous day, I had a sitdown where I showed printouts of work, and then the following day -- so on the 14th is when I sat down and had a meeting with them, which you probably heard about as the Four Seasons meeting.  And then the next day, I sent her a Dropbox link that shows all the work that we've created up until that point, between February of 2020 and June of 2020.

I believe it's still live today.

Q.  And have you had an opportunity to look at those images that are accessible through the link?

A.  Yes, I have.  I've looked at them before and, I've just recently looked at them, yes.

Q.  And are those images available through the link the same or different than they were on June 15, 2020?

A.  They are the same.

Q.  Unless there's an objection from the government, the defense is going to seek to enter defense exhibit 201-1 through 201-9?

MR. MARKEWITZ:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 201-1 through 201-9 received in

PC9Frin3                      Rinsch - Direct

evidence)

Q.  If you could bring up and publish to the jury what's now in evidence at Defense Exhibit 121-1.  Okay.

        MR. McGUINNESS:  Mr. Rinsch, are we looking at artwork that was available through that Dropbox link?

A.  Yes, we are.

Q.  Who created this artwork?

A.  This is between Nick and myself.  We created this. Anywhere between, I believe, early to mid February all the way to June.

        MR. McGUINNESS:  If we could scroll through some of the pages, please, Ms. Tang

A.  So, some of these are just rough sketches and concepts and some of these are more polished.

        I've lost you.  There you go.

        So that's a scene painting.  That's a scan.  Some of these are detailed works on things, as you can see.  I'm not sure if they could see this as well.

        Is there a way they could go page by page?  It looks cropped.  It looks halfway through page.

        Sorry.

Q.  All right.  What are we looking at in this image?

A.  It seems to be loading.  I don't know exactly.

        MR. McGUINNESS:  I apologize.  We're having a technical issue.  Ms. Tang, take that down.

And if we could bring up 201-2.

A.  So this is -- yeah, we could just step through it.  These are drawings, just rough sketches.

Q.  Okay.  If we can go on to the next page.

A.  Again, rough sketches.  This is actually 3-D.

Q.  Can we go to next page, please.

A.  These are little MCATs, we make.  You can just keep going.

          MR. McGUINNESS:  If we could bring up, 201-5, please.

          Okay.  And if we could just scroll from the first page through the sixth page, please.

A.  I believe there's scene paintings in there that you can take a look at.

          It's loading.

Q.  Okay.  Very good.

          Are those images we just looked at related to White Horse?

A.  Yeah.  Those are some of them.  I feel like there's a lot better work on there, frankly.

Q.  Fair enough.

          But the ones we just looked at, could you just describe, how are these related to White Horse?

A.  Those are some of the concept illustrations for an obelisk that is outside of the palace.  So, you have a big palace and you've got -- sorry, I'm a sensitive artist -- a big obelisk outside in the front.  And we're playing with all of these

organic designs and these fertility designs for, effectively, like a -- like a new version of Egypt; right?  We talk about science fiction "Game of Thrones," science fiction Egypt of the future.

MR. McGUINNESS:  If we could look at this, go through pages 7 to 11, please.

What were we looking at in those illustrations?

A.  These are just some rough illustrations of what is called the God particle, and we should look at some of the concept paintings, I would imagine.

Q.  What do you mean by the God particle?  How does that relate to White Horse?

A.  Well, the God particle, they've talked about it here, where they talk about this God particle.  But ultimately, what happens is, these AI or these OI -- I call hem organic intelligences -- they get the word of God through them and they are struck with it, and they create what is called the White Horse, the word of God.

And so in the process of what is that going to look like visually, we were exploring some of these early ideas.

Q.  Last one.  Let's just go back to Defense Exhibit 201-1 at page 9, please.

A.  Is there a way to see the Dropbox site?

Q.  Okay.  What are we looking at here?

A.  So, this is a concept painting where there's a meeting that

takes place between the humans and these OI.

Q.  How was this created?

A.  This was created with 3-D, so we recreate the room in 3-D, and then we paint the people into the room.

MR. McGUINNESS:  All right.  Let's bring that down. We're going to go back to Government Exhibit 3008.  This is the bank statement, at page 57, please.

Okay.  And if we could call out the April 10, 2020 expense right here.

Q.  What is this, Mr. Rinsch?

A.  That's an expense to a location scout in Kenya, the Maasai tribe, actually.

Q.  Very good.  Now, we've gone through a number of expenses in this document.  Are these all of the expenses in the period of 2020 after you spent is the $11 million on White Horse?

A.  No, they are not.

MR. McGUINNESS:  Okay.  We can take that down.

Q.  During the trial, you heard testimony from Josh Loney.

Do you remember that?

A.  Yes, I do.

Q.  Was he working for you from March 2020 to September 2020?

A.  Yes.  He was --

Q.  What was he doing?

A.  He was helping with small tasks, such as food, you know.  I would work quite a bit and I don't -- you know, I can get lost

sometimes in the work, and so somebody makes sure there's food in front of me and my clothes are clean.

Q.  Was he helping you with the preproduction or the post-production?

A.  No, sir.  He was not.

Q.  Why not?

A.  I didn't -- I didn't know at the time he was doing film; I found that out while I was sitting here with you, all.  He never really mentioned it, so he wasn't invited into that creative process.

And I only saw him periodically, once every couple of days, and usually it was to deliver day-to-day stuff.  He's a very nice guy.

Q.  The March 5, 2020, emails had discussed a five-week period for Netflix and yourself to make a decision on where the process was going to go.  Did that decision get made at the end of the five weeks?

A.  No, it did not.

Q.  Did there ever come a time that you reached out to Netflix to ask what their decision was?

A.  Yes, there was.

Q.  And when was that?

A.  I reached out -- well, periodically, I reached out anywhere from April to June, as we saw, all the way up until May of -- I mean, I was constantly asking, where do we land, what do we

want to do.

But of course, we were in the middle of COVID, so I think there was some reluctance to respond.

MR. MARKEWITZ:  Objection, move to strike that last sentence.

THE COURT:  Yes, the last sentence will be stricken.

Go ahead.

BY MR. McGUINNESS:

Q.  Did there ever come a time where you Mr. Noon was leaving Netflix?

A.  Yes, I did.  I found that out.

Q.  Did there ever come a time where you learned that Ms. Holland was leaving Netflix?

A.  Yes.

Q.  When was that?

A.  I found that out in September -- yeah, early September of 2020.

So we had been working from March all the way up through September of 2020, and then she was let go.

Q.  And did there ever come a time when Netflix informed you that they did not want to pursue a second season?

A.  Yes.  In November of 2020, they said that they did not want to make the sequel.

Q.  After you got that information, did you continue to work on White Horse?

A.   Yes, I did.

Q.   What is Amarna?

A.   Amarna, Amarna is a fictional company within the film.

So, again, in films like "Alien," there's a company called Weyland-Yutani, or in "Terminator," there's Robodyne. You have these fictional companies inside of the story of the movie.  And so from me, hopefully, what you'll see the film is about organic intelligence going out to help in a world that is going poorly: volcanos, horrible environmental disasters are occurring, and they're sent out into the world to help.

And so Amarna is this corporation that's showing us how the world and the geo-spheric conditions work; right?  They show you how the human body works.  They show you how the Earth works.  It's like a super-tech company in the future about planetary forces and how our bodies work.

Q.   So we just discussed a time when Netflix told you they didn't want to pursue a second season.  Did there ever come a time when Netflix informed you they no longer wanted to pursue the first season?

A.   Yes.  Yes, there is, in March of 2021.

Q.   And did there ever come a time after that where you provided materials related to White Horse to Netflix?

A.   Yes, there was.

Q.   And how did you provide those materials?

A.   So, another Dropbox link was sent in May of 2021, and that

PC9Frin3                          Rinsch - Direct

work had all of the work that we had started in February of 2020 all the way through to the work in May of 2021, so, over years of work.

MR. McGUINNESS:  If we could show to the witness only, please, what's been marked as Defendant Exhibits 113 and 113-1.

Do you recognize this document?

A.   Yes, I do.

Q.   Is this an email that you sent?

A.   Yes, it is.

Q.   And this is true and accurate copy of the email?

A.   Yes, it is.

Q.   The defense offers Defense Exhibit 113 and 113-1 into evidence.

MR. MARKEWITZ:  Objection.  Hearsay, your Honor.

THE COURT:  Unless counsel for the defense wants a sidebar, I will sustain the objection.

MR. McGUINNESS:  Yes, Judge, if you could, briefly.

(Continued on next page)

PC9Frin3                        Rinsch - Direct

(At sidebar)

THE COURT:  So, these are not only out-of-court statements, but they come at a time well after the events that are the focus of this case, so I don't -- putting aside the hearsay problem, which is substantial, I don't even see the relevance.

MR. McGUINNESS:  Your Honor, I -- the part that I want to get across with this is the Dropbox link, that he did provide a Dropbox link containing many materials.

THE COURT:  He's already said that.

MR. McGUINNESS:  This is different material that was conducted in the relevant material -- in the relevant portion. Sorry, Judge.  And this --

THE COURT:  And what's the relevance of that?

MR. McGUINNESS:  Well, your Honor, I believe it shows the work he did from March to September of 2020, he did communicate it to Netflix.

THE COURT:  Now, I don't think that of comes the hearsay problem.  It's still being offered for its truth.

Sustained.

(Continued on next page)

PC9Frin3                          Rinsch - Direct

(In open court; jurors present)

MR. McGUINNESS:  Can we take down those exhibits.

BY MR. McGUINNESS:

Q.   You just testified that you sent a Dropbox link to an individual at Netflix through that link.  Was it connected to materials you had produced related to the show?

A.   Yes, it was.

Q.   All right.  Unless there's an objection, the defense offers Defense Exhibit 202 through Defense Exhibit 206.

MR. MARKEWITZ:  Objection, relevance.

THE COURT:  Since I'm not seeing anything, how can I rule.

Sustained.

MR. McGUINNESS:  I'm sorry, may I be heard briefly?

THE COURT:  Yep.

(Continued on next page)

(At sidebar)

MR. McGUINNESS:  Your Honor, the government has opened the door to the work he was doing in this time period, and specifically, the work he was doing related to Amarna, whether it was related to the show or not and whether it's related to these expenses.

THE COURT:  I didn't realize, these images are related to Amarna.  I thought Amarna was a phony company.

MR. McGUINNESS:  Yes, your Honor, but they are related to Amarna.  That's my client's testimony.

THE COURT:  In what way?

MR. McGUINNESS:  He will explain that they -- Nefertiti, who is the Egyptian --

THE COURT:  I've heard of her.

MR. McGUINNESS:  Yes, your Honor.

I'm failing to -- but she has related to Amarna and related to White Horse.  It's what makes the connection, your Honor.

MR. MARKEWITZ:  Your Honor they're introducing it to show that this was sent to Netflix after the parties' --

THE COURT:  Pardon?

MR. MARKEWITZ:  They have laid the foundation of this as records that were sent to Netflix after the parties' relationship was expired.  That seems to be the reason that they have presented these records as relevant.

PC9Frin3                         Rinsch - Direct

THE COURT:  Well, no.  I take it he's going to claim that he made these earlier, right?  Or not.

MR. McGUINNESS:  Your Honor, no, but this is responding to the government's claim that he's buying Rolls-Royces and fancy beds and they have nothing to do with the show, and this shows that he's scanning all sorts of things through this Amarna corporation, and it ties into White Horse.

THE COURT:  No.  I thank you.

Good try, but, sustained.

MR. McGUINNESS:  Thank you.

(Continued on next page)

(In open court; jurors present)

MR. McGUINNESS:  If we could show, just to the witness, as what's been marked as Defense Exhibit 203.

Q.  Mr. Rinsch, do you recognize this document?

A.  Yes, I do.

Q.  This just the first page of the document, but have you had a chance to view in document recently?

A.  Yes, I have.

Q.  And at a very high level, what is this document?

A.  This is an art bible from Sao Paolo.

Q.  And is this a true and accurate copy?

A.  Yes, it is.

Q.  Defense offers Defense Exhibit 203.

MR. MARKEWITZ:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 203 received in evidence)

BY MR. McGUINNESS:

Q.  Do you remember during this trial hearing testimony about numerous Rolls-Royces?

A.  Yes, I do.

Q.  When was this document created?

A.  This was created in 2019.

MR. McGUINNESS:  If we could go to page 28, please.

Go to the next page, please.

If we could go to the next page, please.

PC9Frin3                          Rinsch - Direct

If we could continue on to page 32, please.

Okay.

A.   The orange one, I think.

Q.   How, if at all, did these pages relate to how you wanted to use Rolls-Royces in the show?

A.   There's something called a cavalcade -- what we call a cavalcade -- which is a fleet of these Rolls-Royces that are like diplomatic cars.  So, the same way that you see in the UN, UN dignitaries get into cars and they drive, this is the crossing from the human world to this organic intelligent AI world.

And so they get in their cars.  They get in these Rolls-Royces, and they travel across this border to get into this royal world, if you can recall from the trailer.

Q.   Now, do you recall your ex-wife testifying at this trial that the script didn't call for any cars like this?

A.   Yes, I did.

Q.   Would she have been provided with this document?

A.   Yes, she would have, yes.

Q.   Do you know if he she's seen in document?

A.   I know she has seen this document, yes.

MR. MARKEWITZ:  Objection, foundation.

THE COURT:  Rephrase it.

Q.   Well, your ex-wife worked as a costume designer; correct?

A.   Yes, she did.

PC9Frin3                        Rinsch - Cross

Q.  As the costume designer, was she provided a copy of this document?

A.  Yes, she was.

Q.  Have you ever had discussions with her related to this document?

A.  Yes.

          MR. McGUINNESS:  If I could just have one moment, your Honor.

          (Counsel conferred)

          MR. McGUINNESS:  Nothing further, your Honor.

          THE COURT:  Cross-examination.

CROSS-EXAMINATION

          MR. MARKEWITZ:  May I proceed, your Honor?

          THE COURT:  Please.

          MR. MARKEWITZ:  Thank you.

BY MR. MARKEWITZ:

Q.  Good morning Mr. Rinsch.

A.  Good morning, sir.

Q.  You've been in the courtroom --

          THE COURT:  Technically, it's this afternoon.

          MR. MARKEWITZ:  I apologize, your Honor.

          My focus was elsewhere.  So, let me rephrase.

          Good afternoon Mr. Rinsch.

A.  Good afternoon, sir.

Q.  You've been in the court for this entire trial; correct?

A.   That is correct, sir.

Q.   You've been sitting right there at the second table here?

A.   Yes, I have.

Q.   And so you've listened to all of the witnesses in this case testify before you; correct?

A.   Yes, I have.

Q.   They testified right where you you're sitting right now?

A.   That's correct.

Q.   And you listened to all the testimony before you got on the stand?

A.   Yes, I did.

Q.   And you've seen every exhibit that was introduced during this trial; correct?

A.   I believe so, yes.

Q.   Those are the documents and the photographs that have been introduced?

A.   Sorry.  Say again, sir?

Q.   Those are the documents and the photographs that have been introduced?

A.   Yes, sir.

Q.   You saw them on the screen right in front of you?

A.   Yes, I did, sir.

Q.   And again, you saw all of that before you got on the stand to testify here today; correct?

A.   That is correct, sir.

Q.  Now, in February of 2020, you thought that you were broke; correct?

A.  Not entirely, sir.

Q.  You were telling the truth on February 15 when you told Ethan Weiner you were under water financially; correct?

A.  Let me think about that for a second.

I had yet to be repaid for the money we had spent, so until that point, we had not been repaid, and I was out $12 million.

Q.  So let me ask my question again.  You were telling the truth on February 15 when you told Ethan Weiner you were under water financially?

A.  That's correct.

Netflix had not repaid the money.

Q.  And you were telling the truth that same day when you told Mr. Weiner that you were getting financially murdered; correct?

A.  Yes.  I was in debt $12 million.

Q.  Sorry, I can't hear you.  Can you please speak up?

A.  Yes.

Netflix had not paid the money back, and so it was a sizable debt.

Q.  By mid-February 2020, you only had enough money to pay for another three weeks of White Horse; correct?

A.  I had more than that, but I felt comfortable with three weeks -- for a full staff and everything.

Q.   Sir, on February 15, you told Mr. Weiner:  I only have enough to get us through the month, really, just three weeks; correct?

A.   That's correct.

Q.   And you were being truthful when you told that to Mr. Weiner; correct?

A.   Yes, I was.

Q.   Now, around February of 2020, you wanted to make investments based on COVID-19; right?

A.   I'm sorry, can you ask that again.

Q.   Around February 2020, you wanted to make investments based on COVID-19; correct?

A.   That happened after February.

Q.   You were focused on Gilead Sciences in February; correct?

A.   I had researched what was going to be the cure for the virus.

Q.   You researched that in February; right?

A.   I believe most of it occurred in March.

Q.   So, that wasn't my question.  You had done research into Gilead in February of 2020; correct?

A.   I might have done a little bit.

Q.   You were aware of what Gilead was; right?

A.   No, I only learned of Gilead after the virus, and it was in the newspapers.

Q.   That wasn't my question, sir.

My question was, in February of 2020, you were aware of what Gilead was; correct?

A.  I'd have to look.  I believe it was in March that I came to understand it.

MR. MARKEWITZ:  And you were also -- could we pull up on the screen, please -- just one moment.

(Pause)

MR. MARKEWITZ:  Can you pull up on the screen, please, what's been introduced into evidence as Government Exhibit 6354.  And can you zoom in on the top there, please.

Q.  Mr. Rinsch that's your email address in the "from" line; correct?

A.  Yes, it is.

Q.  And you're sending this message to Cindy Holland; correct?

A.  Yes, I am.

Q.  And the date there, that's February 28, 2020; right?

A.  Yes.

Q.  And that's before March 2020?

A.  Yes; it's in the last day or two of February.

MR. MARKEWITZ:  Can you go to the second page, Ms. Larracuente?  And can you zoom in where it says: premeditated solution.

BY MR. MARKEWITZ:

Q.  Mr. Rinsch, on February 28, you wrote:  Premeditated solution.  Ensure that virus, COVID-19 has pattened

treatment, not Remdesivir, GS5734, before deploying.  Ensure it works, has worked at least two years prior, and is in ample stock.  Gilead.

Did I read that correctly, sir?

A.  Yes, you did.

(Continued on next page)

PC9JRIN4                          Rinsch - Cross

BY MR. MARKEWITZ:

Q   And Ms. Larracuente, we can put down that bubble and zoom in on the last underneath where it says "step six," please.

In the second bullet, Mr. Rinsch, you write, at moment of U.S. financial threshold of ten percent and once Gilead has proven to effectively treat COVID-19.  Below that, you write promote GS5734 as cure.  Do you see that?

A   Yes, I do.

Q   And that's the same letters and numbers that were next to remdesivir in the paragraph above?

A   Seems that way, yes.

Q   So you were familiar with Gilead in February of 2020, correct?

A   In February 28 it appears I was, yes.

Q   And the drug that they were creating, remdesivir, you were also familiar with that in February, right?

A   Yes.

Q   And you were interested in both those things, correct.

A   Yes, I was.

Q   You were sending them to a senior executive at Netflix, correct?

A   Yes, I was.

Q   And around that time you thought that Gilead Sciences might be a profitable investment, correct?

A   No, I had no idea.

Q   You have no idea -- your testimony is you have no idea if you thought Gilead Sciences might be a profitable investment?

MR. MCGUINNESS:  Objection.

THE COURT:  Well, I think the problem is in the phraseology.  Put another question.

Q   Start that again, Mr. Rinsch.  Around the time of this email --

A   Uh-huh.

Q   -- you believed that investing in Gilead could be profitable, correct?

A   No, I did not know.  This is unknown stuff.  We didn't even know if the -- there was going to be a quarantine.  We didn't even know if COVID hit yet.  Why would I know that it was going to be profitable, if I had known that we were going to quarantine, I don't know.

Q   Mr. Rinsch, your testimony is that you don't know that -- you didn't think that Gilead would be profitable yet because you didn't know what would be happening with the pandemic; is that right?

MR. MCGUINNESS:  Objection.

THE COURT:  Sustained.

Q   Mr. Rinsch, your testimony is that around this time in late February/early March, you didn't know what was going to happen with the pandemic?

A   We had learned -- I had gotten sick in March, March 1, and

I felt the effects of it and I didn't know what it was.  And I hadn't been tested, so I can't confirm that it was COVID and there was no lockdown or anything until mid-March.  So no, I didn't know.  I'm not an oracle.  I did not know that COVID would happen.

Q   On March 2, you thought that there would be a -- that the WHO was going to declare an official pandemic, correct?

A   On March 2.

Q   Yes?

A   It's possible.

Q   Ms. Larracuente, can we pull up Government Exhibit 6119, zoom in on the header first, please.

Mr. Rinsch, that's your email address, correct?

A   That is correct.

Q   This is an email you sent to Gaby Roses?

A   It appears that way, yes.

Q   The date of this email is March 2, 2020, correct?

A   That's correct.

Q   Ms. Larracuente, can we please zoom in on the portion of the email titled "Monday."

On March 2, you told Ms. Roses that the market opens down two to three percent, right?

A   That's correct.

Q   And then in number three, you wrote the WHO will declare an official pandemic, correct?

A    Yes, the World Health Organization.

Q    Correct.  That's what you wrote, right?

A    That's correct.

Q    Ms. Larracuente, if we could go down below Wednesday and if you could zoom in on paragraph 12F.

       Mr. Rinsch, you mentioned Gilead again in this email, correct?

A    Yes, I do.

Q    In an email in which you're discussing the pandemic's likely effect on the economy, right?

A    It appears that way.  Hold on.  Looks that way.  I'm reporting something that looks like.

Q    You can pull this down, Ms. Larracuente.  Thank you.

       In March you told your investment advisor that Gilead stock price could increase by at least 20 percent, correct?

A    Which advisor would that be, sir?

Q    Adam Checchi, sir.

A    Sure.  He was my advisor after COVID.

Q    That wasn't my question, sir.

       My question was in March you told Adam Checchi that you believed Gilead stock price could increase by at least 20 percent?

A    Yes, I did.

Q    And in fact, you thought that investing in Gilead could lead to a 10X return, right?

A    In the instance of a real catastrophe, yes.

Q    You were so excited about the prospect of investing in Gilead that you were comfortable risking a total loss, correct?

MR. MCGUINNESS:  Objection.

THE COURT:  Ground?

MR. MCGUINNESS:  "So excited," your Honor, I believe editorializing, misstates.

THE COURT:  Overruled.

THE WITNESS:  May I answer?

A    No, I was not excited about a million people dying, if I can answer that question heartfully.

Q    My question was about the investment in Gilead.  You wanted to invest in Gilead sufficiently badly that you were willing to risk a total loss, correct?

A    I was hedging the market that in the instance that we had a total calamity where millions of people died, that we would be able to continue working on the show.

MR. MARKEWITZ:  Your Honor, move to strike that answer as nonresponsive.

THE COURT:  Sustained.  The jury will disregard that.

Maybe there's some misunderstanding.  Just to move this along, weren't there a number of occasions when you emailed your brokers to the effect that you were willing on a particular investment to recognize the total loss in that investment?

PC9JRIN4                          Rinsch - Cross

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Go ahead.

MR. MARKEWITZ:  Thank you, your Honor.

BY MR. MARKEWITZ:

Q   Now Mr. Rinsch by March 4, 2020, you thought that there was about to be systemic failure in the market, right?

A   I was worried that there could be.

Q   You thought that there was going to be systemic failure in the market by March 4, correct?

A   I did not believe there was going to be systemic collapse in the market in March 4.  I said if it's possible, there could be.  I'm reading the headlines like everyone else.

Q   Sir, you were telling the truth when you messaged Ethan Weiner on March 4 and told him the markets are going to get shattered, correct?

A   Yeah, I was very worried about that.

Q   And at that time you just wanted to secure money from Netflix before that happened, correct?

A   That is not the case, sir.

Q   Sir, you were telling the truth when you emailed Ethan Weiner on March 4 that you were trying to get money secured before that happened, correct?

A   I was trying for us to get repaid and for the production to move forward.

Q   Mr. Rinsch, during your testimony you talked about your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

educational background.  Do you remember that?

A   Yes, sir.

Q   It's fair to say you're a well educated man, sir?

A   I would like to think so.

Q   You got a degree from Brown University, correct?

A   That's correct, sir.

Q   And you've received a degree from Columbia University as well?

A   No, sir.  I studied there.

Q   You attended Columbia.  Did I hear that right?

A   Yes, that's correct.

Q   And you also attended two other institutions as well, right?

A   Yes, art schools.

Q   So that's four different institutions of higher learning?

A   Yes, sir.

Q   And you've also worked in the entertainment industry for a number of years, correct?

A   Yes, sir.

Q   Can you remind us how many years have you been working in the entertainment industry.

A   Since today?

Q   Yes.

A   Well, let's see.  About 25 years.

Q   And you talked about a number of exhibits during your

PC9JRIN4                         Rinsch - Cross

direct examination.  Do you remember that?

A    Yes, sir.

Q    You've had access to these documents for a while now, correct?

A    I believe so, sir, yes.

Q    And you've reviewed them extensively before today, correct?

          MR. MCGUINNESS:  Objection.

          THE COURT:  Now, I think it's a little ambiguous.

          Sustained.

Q    You reviewed those documents before today, correct?

A    Yes, sir.  I did.

Q    Now, in addition to your work as a director, you also have experience acting, correct?

A    Not lots, but yes.  One occasion.

Q    You've acted before, right?

A    One occasion, yes, sir.

Q    Can you pull up Government Exhibit 5007 and go to page 365, please, Ms. Larracuente.  The exhibit's in evidence.

          It's you on the left, correct, sir?

A    That's correct, sir.

Q    Acting in *White Horse*, right?

A    That's correct, sir.

Q    We can pull this down, Ms. Larracuente.

          Just want to make sure I understand some things you said during your direct testimony.  Your testimony here today

is that the $11 million Netflix paid you was to pay you back for money that you previously spent; is that right?

A    That is correct, sir.

Q    And your testimony here today is that you had no obligation -- you believed you had no obligation to use that $11 million to fund *White Horse* moving forward, correct?

MR. MCGUINNESS:  Objection.  Misstates.

THE COURT:  If it misstates, the witness will let him know.  Overruled.

A    I had said if they had repaid the debt and if they had made good with their previous deal, then I would have self-funded out of my pocket soft preproduction or presentation to determine if they wanted to make the sequel.

Q    And that was limited you said to $500,000, correct?

A    I had imagined it would cost $500,000.  It would probably cost less over the course of five weeks.

Q    So your testimony is that you believed you had no obligation to use roughly $10.5 million that Netflix gave you making *White Horse*, correct?

A    I'm not sure.  I want to answer your question honestly.  So can you ask that again.

Q    Sure.  I want to make sure I understand your direct testimony.  So let's just start it over.

THE COURT:  Well, wait a minute.  While it's fascinating to hear you two having a conversation, it's not the

rule of evidence.  Ask a question, give an answer.

Q   I'll cut to the chase.  Your testimony is that you did not need to spend the 11 million performing the bullets in Bryan Noon's email from March 4, correct?

A   My testimony is that I had told Cindy Holland that I would self-fund these points.  That's -- that was my testimony, and it remains it.

Q   So your testimony is that you did not need to spend $11 million performing the bullets in Bryan Noon's email?

A   No, I did not accept $11 million for the purposes of financing those points.  I had made the deal that if they had paid it back then I would self-fund myself those points which cannot cost, in my opinion, $11 million over five weeks.

Q   Mr. Rinsch, this is not the first time that you've been asked about how you had to spend that $11 million, correct?

A   No, it is not.

Q   In fact, it's not even the first time you've been asked these questions under oath, correct?

A   That's correct.

Q   Can you pull up what's already in evidence as Government Exhibit 1006C, please.

        Mr. Rinsch, this is a transcript of deposition testimony you gave in September of 2023, right?

A   It appears that way, yes.

Q   And you gave that testimony in an arbitration with Netflix,

right?

A   Yes, I did.

Q   And a deposition, that was a time for Netflix's lawyers to ask you questions, right?

A   That's correct.

Q   And it was also an opportunity for you to answer those questions, right?

A   That's correct.

Q   And when you were answering those questions, you were under oath, right?

A   That's correct.

Q   And there was also a court reporter there preparing a transcript of your answers, right?

A   That is correct.

Q   And this particular deposition was held on September 20, 2023, right?

A   That's correct.

Q   And that was before you were charged with any federal crimes, correct?

A   That's correct.

Q   And when you were under oath during that deposition, you knew it was important to tell the truth, right?

A   Yes, sir.

Q   And the oath that you took before that deposition, it was quite similar to the oath you took before your testimony here

today, right?

A    Yes, sir.

Q    Ms. Larracuente, can we please go to page 5, please.  If you could zoom in on lines 7 through 14, please.

Mr. Rinsch, I'm going to read your deposition testimony and the questions posed:

"Q    Netflix ended up paying the 11 million, correct?

"A    That's correct.

"Q    HVFX -- and was HVFX agreeing to use the 11 million for the purposes listed here?

"A    To answer your question, yes.  Yeah.  Home VFX shall perform and shall use the 11 million to fund this."

Did I read that correctly, sir?

A    Yes, you did.

Q    And that's not the only time that you've testified about how the $11 million should be used, correct?

A    Sorry if I don't understand the question.  There are other times?

Q    There were other times you testified, correct?

A    Yes.  Yeah.

Q    Can we please pull up what's in evidence as Government Exhibit 1009B, please.  Mr. Rinsch, this is a transcript of --

THE COURT:  Is that -- okay.  Go ahead.

MR. MARKEWITZ:  Thank you.

Q    And Mr. Rinsch, this is a transcript of testimony you gave

on November 10, 2023, correct?

A    Yes, it is.

Q    And you gave that testimony during a hearing in the arbitration, correct?

A    It appears that way, yes.

Q    And the hearing in the arbitration, it was sort of like a trial, right?

A    Yes.  Yes, it was.

Q    And there was an arbitrator present; is that right?

A    Yes, there was.

Q    The arbitrator was sort of like the judge, correct?

A    Like a mediator or judge.

          MR. MCGUINNESS:  Objection.

          THE WITNESS:  I don't know --

          THE COURT:  Yes, I would note my objection to the comparison, but --

          MR. MARKEWITZ:  Only in the most colloquial sense, your Honor.

          THE COURT:  Go ahead.

Q    And there was a court reporter there, right, Mr. Rinsch?

A    Yes, sir.

Q    And when you testified during the arbitration, you were testifying under oath, right?

A    Yes, sir, I was.

Q    Much like when you testified under oath in September of

2023, right?

A    Yes, sir.

Q    And when you gave this testimony on November 10, 2023, that was before you had been charged with any federal crimes, right?

A    I believe so, yes, sir.

Q    Ms. Larracuente, if we could go to page 5.  If you could zoom in on the top left, please.

Mr. Rinsch, I'm going to read the question and answer from your arbitration testimony starting at line 11:

"Q    And Home VFX was agreeing that the 11 million would be used on the bulleted items in that email, right, the March 4 email that we looked at?

"A    Yes.  I don't know if there's gotcha, if I forgot a comma or something, but yeah."

Did I read that correctly, sir?

A    Yes, sir.

Q    But to confirm, your testimony here today is that you did not believe you had to use the $11 million to fund the bullets in Bryan Noon's email; is that right?

A    That's incorrect, sir.

Q    Now on March 6, you received $11 million from Netflix, right?

A    That's correct, sir.

Q    And that money was transferred into Home VFX's checking account, correct?

A    That is correct, sir.

Q    And just three days later you transferred $10.5 million of that money into a new bank account, correct?

A    That's correct, sir.

Q    And that was a bank account that you opened on the very same day that you transferred that money into it, correct?

A    That's correct, sir.

Q    And that day you told Gaby Roses that this new bank account was a safeguard account, correct?

A    That's correct, sir.

Q    You told her that it was a place where you could set aside money for the production, right?

A    Set aside money, capital, back to the treasury, sir.

Q    Sir, on March 9, you told Gaby Roses that this was a place where you could set aside money for the production, correct?

A    That's correct, sir.

Q    And Gaby Roses was not a signatory on this new account, correct?

A    I'd have to check.  It's possible.

Q    Can we publish what's already in evidence as Government Exhibit 3026.  If you could zoom in at the top to start.

        The account title says Home VFX.  Do you see that?

A    Yes, I do.

Q    And the savings box, that's checked, right?

A    That's correct.

Q   And the last four digits of the account number are 8643.
Do you see that?

A   That's correct.

Q   This is the account to which you transferred that
$10.5 million, right?

A   That is correct.

Q   Ms. Larracuente, can we please go to the bottom of this
page.  If we can zoom in on the bottom, please.  Thank you.

     Ms. Roses was not a signatory on this account, right?

A   It doesn't look that way, so that's correct.

Q   The only signatory on this new account is you, right?

A   That's correct.

Q   And the very same day that you put money in this account
that you told Ms. Roses was set aside for the production, you
got wire transfer instructions to move the money elsewhere,
right?

A   Back to the trust, sir.

Q   The answer to my question is yes --

A   I believe --

     MR. MCGUINNESS:  Objection.

     THE COURT:  Put a new question.

Q   You received wire transfer instructions that day to move
the money, right?

A   I'm sorry.  You're going to have to clarify.  I received
wire instructions?

Q   To move the money out of the account that same day.

A   Out of which account?

Q   The new account that you put the money into, the one we just looked at.

A   Out of 8643?

Q   Correct.

A   Into what?

Q   Into a different account.

A   Into a trust account.

Q   A different account from 8643?

A   It's possible if we're on the same page.  It went to 6485; is that correct?

Q   Let's pull up Government Exhibit 3046, please.  If we could zoom in on where there's text, please.

    You received this email on March 9, 2020, correct?

A   That is correct.

Q   And that was the same day that you wired $10.5 million into the new 8643 account, right?

A   That is correct.

Q   And these wire instructions were for an account at Wells Fargo, correct?

A   Yes, that was my account.

Q   An account ending in number 4450, correct?

A   Yes, yes.  That's my account.

Q   The money that Netflix paid you, that 11 million, it

initially went into a Home VFX checking account, right?

A   Yes.  Yes, it did.

Q   And you can do wire transfers out of a checking account, correct?

A   Yes, of course.

Q   You don't need to move the money into a savings account first before you execute a wire transfer, right?

A   I suppose not.

Q   You only left the full $10.5 million in the 8643 account for a week, correct?

A   It's possible.

Q   One week after telling Gaby Roses that the money was set aside for the production, you sent $8 million into a Wells Fargo brokerage account, correct?

A   Where the money began, sir.

Q   So that was not my question.

       My question was one week after telling Gaby Roses that the money was set aside for the production you sent $8 million of it into your Wells Fargo brokerage account, yes?

A   That's correct.

Q   Jumping ahead to March 31, you invested over $6 million in the stock market, right?

A   That's correct.

Q   You bought millions of dollars of stock options on Gilead that day, right?

A    It's -- I don't know the exact amount, but yes.

Q    You bought a large number of stock options in Gilead that day, correct?

A    On which day?  The 31st?

Q    The 31st.

A    Yeah.

Q    And that's the same Gilead that you were emailing Cindy Holland about in late February 2020, right?

A    Yes, it was.

Q    And it's the same Gilead you were emailing Gaby Roses about on March 2, 2020, right?

A    Yes, it was.

Q    And when you made that investment you were fully accepting that you might lose all of the money, right?

A    Yes, it was a hedge.

            THE COURT:  Counsel, find an appropriate spot to interrupt so we can give the jury their lunch break.

            MR. MARKEWITZ:  We can stop now, your Honor.  That's fine.

            THE COURT:  Very good.  Ladies and gentlemen, we'll take an hour for lunch and we'll see you at five minutes to 2:00.

            (Continued on next page)

PC9JRIN4                    Rinsch - Cross

(In open court; jury not present)

THE COURT:  Please be seated.  All right.  You have my revised Count One.  Any objections or additions?  I'll ask that first to the government.

MR. CAPOZZI:  Your Honor, if we could just have one or two minutes very quickly.

THE COURT:  I'll tell you what, although both sides got it, you have been perhaps occupied in other matters, so why don't we reconvene at 1:40 and we'll discuss it then.  That will give us 15 minutes to discuss it.

MR. CAPOZZI:  Thank you, Judge.

(Luncheon recess)

(Continued on next page)

PC9JRIN4

AFTERNOON SESSION

1:40 p.m.

(In open court; jury not present)

THE COURT:  Please be seated.

All right.  So what I did is I cut down on the explanation of the elements and moved the statement of the defense position and competing positions into the paragraph dealing with good faith.  So any objections or suggestions with respect to the revised instruction number eight?  Anything from the government?

MR. MARKEWITZ:  No, your Honor.

THE COURT:  From the defense?

MR. ZEMAN:  One suggestion, your Honor.  And I think you might be amenable because it's a suggestion to shorten it.  It is in the second sentence.  Your Honor wrote about the defense case, the one that begins "if at the time Mr. Rinsch made statements."

THE COURT:  Yes.

MR. ZEMAN:  I would suggest that we end that sentence after "wire fraud," do a period there and then strike the "even if later circumstances led him to use some of or all of the money" --

THE COURT:  That's fine.  I have no problem with that.

MR. ZEMAN:  Thank you.

THE COURT:  All right.  Very good.  So the charge is

PC9JRIN4

now complete.  I will send you tonight the finals, and you're free to refer to it in summation.  I know some judges don't allow that, but I do.

Now, you were going to give me a binding prediction — "prediction" is the wrong word — a binding limit on how long your summations would be.  So we'll start with the government.  This would be for the two combined summations.

MR. CAPOZZI:  Your Honor, I believe the defense is still in the neighborhood of two and a half hours.  I think it would be appropriate for the government to have an equal amount of time.

THE COURT:  Okay.  So let me hear from the defense.  Are you still at two and a half hours?

MR. MCGUINNESS:  Yes, your Honor.

THE COURT:  Okay.  So two and a half hours for both sides.  I do not think it would be appropriate for the government to have more than a half hour, if that, for rebuttal.  So government can take up to two hours for initial summation.  Defense can take up to two and a half hours for their summation.  Government can have a half hour.

So now, if we start at 9:30, so we can take a break at 11:30 if the jury can last that long and don't put up a sign, and then we would have the first half or so of the defense summation before lunch, the other half after lunch, and then the government's rebuttal.

So I think that all works fine.  I think we will probably not get to my instructions of law, but if we have time, I'll give the instructions of law.  If not, we'll give them very beginning the next morning and then go right into the deliberations.

During deliberations, just so that you know, it's necessary for one lawyer from each side to always be present on this floor.  You can be outside in the hallway, but the reason is so we get notes I don't have to go looking for you.  We can respond immediately to the notes.  And the exception — and I'll tell this to the jury — will be between 1:00 and 2:00 when everyone will have their lunch break.  And you're going to give me tomorrow or you have ready for tomorrow, in case we do get to the instructions, the thumb drives for the exhibits.  Okay.

MR. MCGUINNESS:  Your Honor, court hours for deliberation, the same as they have been for trial?

THE COURT:  Yes.  And I will tell whoever is the foreperson not to let deliberations begin until all 12 are there.  Regretfully, we'll have to excuse the remaining alternate, but he'll be instructed to not discuss the case and to remain on call in case, God forbid, something happens to one of the jurors during deliberations.  Then we can call him back, at which time, as you know, deliberations have to start all over again, but hopefully none of that will occur.

Okay.  So I guess we'll take another five-minute

PC9JRIN4

break, and then as soon as the jury is back we'll resume.

(Recess)

THE COURT:  Bring in the jury.  And the witness is already on the stand.

(Continued on next page)

PC9JRIN4                    Rinsch - Cross

(In open court; jury present)

THE COURT:  Please be seated.  Counsel.

MR. MARKEWITZ:  Thank you, your Honor.

BY MR. MARKEWITZ:

Q   Good afternoon again, Mr. Rinsch.

A   Good afternoon, sir.

Q   In 2021 you bought a Ferrari, correct?

A   That is correct, sir.

Q   A red Ferrari?

A   That is correct, sir.

Q   And you paid for part of that Ferrari using credit, right?

A   That's correct, sir.

Q   And in order to get that credit you submitted a credit
application to Ferrari, right?

A   That's most probable, sir, yes.

Q   And in that credit application that you submitted to
Ferrari you lied about your income; isn't that right?

A   I would not know, sir.

Q   In the credit application that you submitted to Ferrari in
2021, you claim that your annual income was $4 million,
correct?

A   That's possible, sir.

Q   Why don't we pull up Government Exhibit 6163 at page 18.
We can zoom in on the purchaser/lessee portion at the top with
the name.

PC9JRIN4                      Rinsch - Cross

That's your name, right, sir?

A    That's correct, sir.

Q    Your date of birth, August 6, 1977?

A    I'm sure it is.  Yes, it is, sir.

Q    Can we zoom out and go down to the signature, please, and the paragraph above the signature.

That's your signature, right?

A    Yes, sir.

Q    And if you look above it, there's a paragraph — and I'd like to read the first full sentence on the second line.  "For the purpose of securing credit from us, you certify that the above information is true and complete and has been provided to induce you to approve this application."  Did I read that accurately?

A    That's correct, sir.

Q    Can we put this down, please.  And Ms. Larracuente, can you please zoom in on the section that includes the annual salary.

Mr. Rinsch, you reported in this credit application that your annual salary was $4 million, right?

A    It appears that way, yes, sir.

Q    And you signed this credit application in your name certifying that was true, right?

A    That's correct, sir.

Q    But in 2021, that's not even close to what you were actually making in salary each year, correct?

A    I would not say that.

Q    Ms. Larracuente, why don't we pull up Government Exhibit 8008.  Go to page 2, please.  If we can zoom in at the top where it says Form 1040, and then down through Mr. Rinsch's name.

          Mr. Rinsch, this says U.S. individual income tax return 2021.  Do you see that?

A    Yes, I do, sir.

Q    That's your name right there, correct?

A    That is correct, sir.

Q    Ms. Larracuente, can we please put this down, this blow-up down, and if you can zoom in.  You see where there's lines one, two, why don't we zoom in on the first few lines of those.

          Mr. Rinsch, that first line reads wages, salaries, tips, etc.  Do you see that?

A    Yes, sir.

Q    You reported no money in wages, salaries, tips in 2021 to the IRS, correct?

A    I believe this was to be redone, sir.

Q    You believe that this tax filing was to be redone.  Is that your testimony?

A    Yes, sir.

Q    It has not been redone since 2021, correct?

A    That's correct, sir.

Q    Ms. Larracuente, why don't we go to Government

PC9JRIN4                          Rinsch - Cross

Exhibit 8005.  Go to page 2, please.  If you can zoom in at the top through Mr. Rinsch's name.

            This is you U.S. individual income tax return for the year 2020.  Do you see that?

A    Yes, I do, sir.

Q    Ms. Larracuente, can we please put this blow-up down and can we zoom in again down where it says wages, salaries, tips.

            Mr. Rinsch, you reported no wages, salaries, or tips to the IRS for 2020, correct?

A    That's correct, sir.

Q    But in 2021, you told Ferrari that you were making $4 million a year in salary, correct?

A    That's correct, sir.

            MR. MARKEWITZ:  Thank you.  We can put this down, Ms. Larracuente.

            Your Honor, I hate to ask this.  If we might have a very brief sidebar before the next line of questioning, I think it might be prudent.

            (Continued on next page)

PC9JRIN4                    Rinsch - Cross

(At sidebar)

MR. MARKEWITZ:  So your Honor, what I would like to ask now -- and the reason I asked to have this in advance is following the arbitration, the arbitrator wrote a decision and in that decision made an adverse credibility finding as to Mr. Rinsch on a number of topics relevant to this case, including whether principal photography was completed in 2019. And I would like to confront him about the fact that an adverse credibility determination was made.

MR. MCGUINNESS:  Your Honor, we would object.  This is enormously prejudicial under 403 alone.

THE COURT:  Yes, I think it's a 403 issue and I'm going to not permit that.  But thank you for asking for the sidebar.  Since the arbitrator has already been identified as something like a judge, this is in effect the equivalent of saying to the jury that a judge hearing the testimony on related topics has reached a decision.  I think, assuming it's otherwise admissible, I'm not even sure about that, the prejudice would be overwhelming.

MR. MARKEWITZ:  Understood, your Honor.  Thank you.

(Continued on next page)

PC9JRIN4                        Rinsch - Cross

(In open court; jury present)

BY MR. MARKEWITZ:

Q   Mr. Rinsch, to be clear, your testimony here today is that you received the $11 million from Netflix in March of 2020 because according to you principal photography was complete on *White Horse*, correct?

A   That is correct, sir.

Q   Ms. Larracuente, can we please pull up what's already in evidence as Government Exhibit 6358, please, and go to page 5. And if we could include the second and third paragraphs in this email and the bulleted list, please.  Thank you.

And Mr. Rinsch, it's your position that the full $11 million did not need to be spent on this list of items right here on the screen, correct?

A   That's correct, sir.

Q   It's your position that only around $500,000 had to be spent on things like this, correct?

A   Whatever could be reasonably spent in five weeks, sir.

Q   And you think that was about $500,000, correct?

A   That was my estimate.  We might have gone under that.

Q   Read the start of this email.  "Netflix shall fund 11 million.  Home VFX shall perform and shall use the 11 million to fund the following over a five-week period."  Did I read that correctly?

A   Yes, you did.

Q    Just above that, "Such funding shall not represent an acknowledgment of any of the contractual milestones."  Did I read that correctly, sir?

A    Yes, you did, sir.

Q    Ms. Larracuente, can we please pull up Government Exhibit 1009E.  If we could go to page 3 and 4 side by side, please.  Thank you.  Perfect.  And if you could zoom in on page 3 at the bottom right and then on the next page at the top left.

Mr. Rinsch, I just want to read this question and answer:

"Q    Okay.  But it looks like there was a Ferrari?

"A    Absolutely."

And then jumping down.

"Q    All purchased in the late 2021 timeframe?

"A    Yes.

"Q    And these purchases weren't necessary for any part of *Conquest*, were they?"

Jumping down again.

"A    No, of course they were.  That would be fraud.  I would go to prison otherwise."

Mr. Rinsch, that's your testimony from November 10, 2023, correct?

A    That's correct, sir.

Q    And you gave that testimony under oath?

A    Yes, I did, sir.

Q    And you gave that testimony before you were charged with a federal crime, correct?

A    That's correct, sir.

MR. MARKEWITZ:  One moment, your Honor.

THE COURT:  Yes.

MR. MARKEWITZ:  No more questions.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. MCGUINNESS:

Q    Briefly, Ms. Tang, if we could bring up Government Exhibit 6358, which is in evidence, for the jury, please.  And let's go back to page 5.  And could we please call out that paragraph that starts "Netflix shall fund 11 million."  Thank you.

Mr. Rinsch, did you have an understanding of what this sentence "such funding shall not represent an acknowledgment of any of the contractual milestones," did you have an understanding of what that meant?

A    Yes, I did.

Q    What was your understanding of what that meant?

A    My understanding of that was there was a tranche payment of $11.218 million, and they had said, well, we've given you 11 million of the 11.218 and after five weeks we'll pay the remaining $218,000.  At the moment, after five weeks when they

pay the remaining $218,000, the milestone is met.  That was my understanding of it.  So if they gave me $6 million of 11.218, it's not met.  If they gave me 11, it's not met.  So only when 11.218 is paid, the milestone is met.  That was my understanding.

MR. MCGUINNESS:  Apologies.

Q   If we could bring up Government Exhibit 8009 just for the witness.

A   Yes, I see it.

MR. MCGUINNESS:  And subject to an earlier stipulation on authenticity -- well, actually if we could first please, Ms. Tang, bring up page 17.

Defense offers this into evidence.

MR. MARKEWITZ:  Objection.  Hearsay, your Honor.

THE COURT:  This is page 17 of the same exhibit that was referred to earlier?  It's a different exhibit?  I see. Let me see the first page.

Sustained.

MR. MCGUINNESS:  Can we have a brief sidebar on this, your Honor?

THE COURT:  Yes.

(Continued on next page)

(At sidebar)

MR. MCGUINNESS:  Your Honor, the last question by the government was about the Ferrari and Mr. Rinsch stating that it was related to the show and that if it wasn't, it was fraud. This is explaining that, your Honor.  It's also rebutting an allegation that I believe is an allegation of late fabrication. I did specifically ask the timing and if it was before he was indicted.  This shows that he was saying in 2022 that the Ferrari was for the show.  It's a prior consistent statement.

MR. MARKEWITZ:  Your Honor, if I might respond.

The arbitration with Netflix begins before this document is filed in 2022, and we've already heard testimony that he was already contemplating creating a negative cost report to show Netflix how he spent the money as early as 2020. And Ms. Skotnikova testified that he then included in that negative cost report expenses from 2021.  Not only does he have motive to fabricate it's not his fault from being charged criminally, but he absolutely has his motive to fabricate as to hiding it from Netflix.  I also note the last document we introduced, he knew it would be fraud if he misused the Ferrari.

MR. MCGUINNESS:  Your Honor, this is exactly what this is rebutting.  This is a prior consistent statement where he is saying this is for the show.  He's not just saying this today for the first time.  And the government has said the relevant

date or prior fabrication repeatedly as the date of charging. They have asked the question, you said this before you were charged. I mean, that is the turning point that the government has said, which occurred in 2025. This is a statement in 2022 where he is saying I'm making these purchases for the show on a tax document. The government is free to argue that they were untrue when he made them, but --

MR. MARKEWITZ: Just because the motive to avoid criminal prosecution is more substantial than the motive to avoid losing a civil suit, there is still a motive to fabricate testimony from his statements.

THE COURT: Yes. I appreciate the sidebar because I think it is a closer call than I recognized, but I do think it still doesn't meet the requirements for admissibility, so sustained.

(Continued on next page)

(In open court; jury present)

MR. MCGUINNESS:  Nothing further, your Honor.

THE COURT:  Anything else?

MR. MARKEWITZ:  No, your Honor.  Thank you.

THE COURT:  Thank you very much.  You may step down.

(Witness excused)

THE COURT:  So once again, ladies and gentlemen, I'm really heartbroken because I have to let you go early.  My entire soul cries out to keep you hard at it, but let me give you a heads up.  I had assured counsel that they wouldn't have to start their closing arguments until tomorrow because they need to prepare overnight.

Tomorrow we will have closing arguments of counsel. That may take the entire day.  It won't take more than the entire day, may take the entire day.  If it doesn't, I'll give you my instructions of law at the very end tomorrow. Otherwise, I'll give them to you bright and early on Thursday. But in any case, the case will be yours to start deliberating sometime Thursday morning.

So we are again right on schedule, but you can go home now.  I understand it's getting a little warmer.  I think it might even be up to, like, 25 or something like that.  Anyway. Have a very good evening.  We'll see you at 9:30 tomorrow, and we will go to 4:30 tomorrow.

MR. CAPOZZI:  Your Honor, before we excuse --

PC9JRIN4

THE COURT:  Hold on, ladies and gentlemen.

THE DEPUTY CLERK:  Back in the box.

THE COURT:  Sorry.

MR. CAPOZZI:  Just a formal matter to inquire whether or not the defense rests.

THE COURT:  Oh, yes.  Do you rest?

MR. MCGUINNESS:  The defense rests.

THE COURT:  Okay.  Very good.  Now you can go.

(In open court; jury not present)

THE COURT:  Please be seated.  All right.  Any motions from the defense?

MR. MCGUINNESS:  Yes, your Honor.  At the close of evidence, the defense moves to dismiss as the elements have not been made out, specifically the intent element, your Honor.

THE COURT:  Yes.  That motion is denied, but you were right to raise it because you otherwise would not preserve it for appeal, so good for you.  But the motion is denied.  We went over this at the close of the government's case.

All right.  I will send you within a few minutes the final charge, and there will be no further argument about the charges.  But you'll have it so you can refer to it in closing argument.

And I think that concludes it for today.  Now, I do have another matter at 4:00, so feel free to leave your stuff there.  But if you have, you know, you never know whether to

PC9JRIN4

trust these attorneys or not.  So if you'd rather move them off to the side, you can do so, but we'll see you tomorrow.

Since there's almost nothing we need to discuss, why don't we convene at 9:25 tomorrow and we'll see you then.

(Adjourned to December 10, 2025, at 9:25 a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

Cross Mr. Markewitz  . . . . . . . . . . . . . 964

Redirect By Mr. Mcguinness . . . . . . . . . .1001

DEFENDANT EXHIBITS

Exhibit No.                                   Received

 301 and 301-1 through 301-6  . . . . . . . . 887

 109  . . . . . . . . . . . . . . . . . . . . 894

 101  . . . . . . . . . . . . . . . . . . . . 927

 102  . . . . . . . . . . . . . . . . . . . . 934

 103  . . . . . . . . . . . . . . . . . . . . 941

 105 and 106  . . . . . . . . . . . . . . . . 943

 107  . . . . . . . . . . . . . . . . . . . . 946

 201-1 through 201-9  . . . . . . . . . . . . 949

 203  . . . . . . . . . . . . . . . . . . . . 962