UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,       :      25 CR 85 (JSR)

       - v. -               :

CARL ERIK RINSCH,            :

       Defendant.       :

-----------------------------------------------------------------X

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# CARL RINSCH'S POST TRIAL RULE 29 AND 33 MOTIONS

BENJAMIN ZEMAN, ESQ.
ZEMAN & WOMBLE, LLP
20 Vesey Street, Suite 400
New York, New York 10007
(718) 514-9100
zeman@brooklynattorney.nyc

DANIEL McGUINNESS
Law Offices of Daniel A. McGuinness, PC
353 Lexington Avenue, Suite 900
New York, NY 10016
(646) 360-0436
dan@legalmcg.com

**ARGUMENT**

**The Trial Evidence Was Insufficient to Sustain
The Defendant's Conviction Under 18 U.S.C. §§ 1343 and 2**

In the Defendant's principal memorandum, we argued that the trial evidence was insufficient to prove that Mr. Rinsch had the requisite intent to defraud Netflix. Despite the conceded facts that $11 Million was transferred to Mr. Rinsch in March 2020 and the show was never completed, the trial evidence was deficient to prove that the show was not completed due to Mr. Rinsch's alleged scheme to defraud Netflix. On the contrary. The evidence at trial showed that Mr. Rinsch, despite his clear failings as a producer and as a financially responsible individual, attempted to realize his artistic vision. He failed, not because he was a crook, but rather due to incompetence, the ambiguous and sloppy negotiations where competing parties were speaking past each other, a once-in-a-century global pandemic that further complicated Rinsch's ability to finish the show, and Netflix ultimately pulling the plug and writing down their investment loss on their 2020 tax filings.

In the government's Memorandum, it offers three arguments in opposition. First, that Mr. Rinsch's contention that he didn't need to use the entire $11 million on the show, was "[n]ot so." Gov. Mem at 13.[1] Second, it claims that Mr. Rinsch's repeated representations to Netflix that he was owed this money pursuant to the Term Sheet was "irrelevant." Id. Finally, the Government dismisses Rinsch's argument that Government's theory that Rinsch sought the funds for COVID investments as "patently false," claiming this argument was "a straw man." Id.

As set forth below, none of these arguments can withstand serious scrutiny.

---

1 Gov. Mem. Refers to the memorandum of law that the Government submitted in opposition of Defendant's original motion.

### A. Mr. Rinsch Never Intended to Convey nor Create the Impression that the Entirety of the $11 Million Would Be Used on those Enumerated Tasks for the *White Horse* Project

Contemporaneous emails between Rinsch, his counsel and the Netflix negotiators show the back-and-forth that preceded the Agreement that was ultimately reached between the parties. GX 6358. This correspondence shows the ways in which the parties were speaking past each other and is consistent with the ambiguity at the heart of this misunderstanding. Over the course of these emails, Rinsch and his counsel agreed to perform work on the project if the money he claimed owed to him was paid, but never explicitly promised that all of the money would be used for those specifically enumerated tasks.

The fear of misunderstanding that ultimately led to arbitration and eventual indictment was presciently predicted by both Mr. Rinsch and his attorney. One example, from Rinsch's attorney, Bryan Noon, to Netflix executives in the day before the money was disbursed: "Now you have confused me." DX 6358 at 2. Similarly, from Mr. Rinsch to Cindy Holland on March 4, 2020: "Cindy, I'm a little unclear about this proposal and want to make sure we understand each other and do not set ourselves up for disagreements down the road." GX 6368A at 6.

In an effort to prove Rinsch's state of mind in March 2020, the government relies on a September 2019 email, when Rinsch's lawyer sought additional money for *White Horse*. In this email, Brian Noon assured Netflix "that all additional funding would go into the project," Gov. Mem. at 13. The government cites this guarantee to show that the money that was disbursed in March 2020 also carried the same promise. To conflate the September 2019 pledge, made six months earlier than the negotiations that led to the disbursal of the $11 million and before the production had moved to Europe and incurred additional budgeting crises, is not supported by the

plain language of the contemporaneous negotiations. With respect to the $11 million that was transferred to Mr. Rinsch in early March of 2020, he never communicated that he would use the *entirety of the funds* on the project.

The government attempts to counter this point by citing testimony from Rinsch's arbitration where Rinsch acknowledged that "Yeah. Home VFX shall perform and shall use the 11 million to fund this." Id.; see also GX 1009B (acknowledging that 'Home VFX was agreeing that the $11 million would be used on the bulleted items in . . . the March 4th e-mail')." Gov Mem. at 13-14. But Rinsch never stated or implied that he would use *the entirety of the $11 million* on the project. Tr. 914: 8-20. In fact, he believed and testified at trial that the bulleted items in the email agreement in March 2020 would cost around $500,000 to complete. Tr. 879: 20-22.

### B. Mr. Rinsch's Repeated Representations to Netflix that he was Owed this Money Pursuant to the Term Sheet was Not "Irrelevant" as the Government Asserts

As with any fraud case, with respect to intent, it's the defendant's state of mind that matters. In the beginning of February 2020, Mr. Rinsch informed Netflix that he had "over 300 hours of media ready for post production." (GX 6351). And then that "principal photography is to be considered completed." (GX 6352 at 2). Rinsch had "final cut," which according to Netflix executive Peter Friendlander, meant that Rinsch had "final say at the end of the show's edit." Tr. 167: 5-24. The fact that Mr. Rinsch informed Netflix that he had these 300 hours of footage (from the shoots that occurred in Brazil, Uruguay and Hungary) and that "principal photography is to be considered completed" go directly to his state of mind at the time he demanded payment for the completion of principal photography milestone. That Noon, Holland and Friedlander disagreed with this claim is undercut by the fact that none of them had seen any of the footage that had been shot. Whether Rinsch had met that milestone would undoubtedly be at issue in a contract dispute,

but is insufficient to make out the requisite *mens rea* necessary to establish that Mr. Rinsch had committed fraud.

**C. The Government Theory that Rinsch Sought the Funds for COVID Investments is "Patently False"**

Finally, the government argued at trial that Rinsch's alleged fraud was motivated by an effort to secure funds to invest in the stock market and try to make money based on where he expected the markets would go in the looming shadow of the COVID-19 pandemic. Rinsch sought the $11.218 million, which he believed was owed to him for completing principal photography, on February 4th, 2020, more than a month before the pandemic shut down the United States. The government also cited the fact that on March 9, 2020, Rinsch sold more than $500,000 of Netflix stock that he owned (GX 3036 at 23) to show that he was trying to make money off the pandemic. Selling stock in a streaming entertainment company at the beginning of a global pandemic that would force people to stay at home speaks more to Rinsch's financial irresponsibility and market naivete than it does in establishing criminal intent.

**CONCLUSION**

The government was wrong to bring this case and their expansive reading of 18 U.S.C. §§ 1343 and 2, if accepted, would stretch the statute's meaning far beyond the legislature's intent. Not every contract dispute or subjectively unmet expectation amounts to federal fraud. The fraud which the government described at trial had nothing to do with Mr. Rinsch's intent, but rather on the way he spent money he believed was his. For the reasons set forth herein and in the Defendants' original moving papers, we respectfully submit that this Court should enter a judgment of acquittal with respect to Count One of the Indictment.

Dated: March 11, 2026
New York, New York

Respectfully submitted,

BENJAMIN ZEMAN
ZEMAN & WOMBLE, LLP
20 Vesey Street, Suite 400
New York, NY 10007
(718) 514-9100


DANIEL McGUINNESS
Law Offices of Daniel A. McGuinness, PC
353 Lexington Avenue, Suite 900
New York, NY 10016
(646) 360-0436